**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036-7203
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Ian R. Winters
Sean C. Southard
Stephanie R. Sweeney


*Proposed Attorneys for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- X
                                                                    :
In re:                                                              : Chapter 11
                                                                    :
FIRESTAR DIAMOND, INC.                                              : Case No. 18-10509 (SHL)
                                                                    :
                Debtor.                                      : Joint Administration Requested
                                                                    :
------------------------------------------------------------------- X
                                                                    :
In re:                                                              : Chapter 11
                                                                    :
A. JAFFE, INC.                                                      : Case No. 18-10510 (SHL)
                                                                    :
                Debtor.                                      : Joint Administration Requested
                                                                    :
------------------------------------------------------------------- X
                                                                    :
In re:                                                              : Chapter 11
                                                                    :
FANTASY, INC.                                                       : Case No. 18-10511 (SHL)
                                                                    :
                Debtor.                                      : Joint Administration Requested
                                                                    :
------------------------------------------------------------------- X

## DECLARATION OF MIHIR BHANSALI, PRESIDENT OF THE DEBTORS, CONTAINING INFORMATION REQUIRED PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE DEBTORS' FIRST DAY MOTIONS

I, Mihir Bhansali, make this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the President and sole director of Firestar Diamond, Inc., ("FDI"), Fantasy, Inc. ('FI") and A. Jaffe, Inc. ("AJI" and together with FDI and FI, collectively the "Debtors"), the above-captioned debtors and debtors in possession, each of which filed a voluntary Chapter 11 petition on February 26, 2018 (the "Petition Date").

2. I submit this declaration (the "Declaration") in accordance with Rule 1007-2 of the Local Bankruptcy Rules.

3. I confirmed with the Debtors' proposed counsel, Klestadt Winters Jureller Southard & Stevens, LLP ("KWJSS"), that it performed a PACER search which revealed that no other or prior bankruptcy case was filed by or against the Debtors. No committee of unsecured creditors was organized prior to the order for relief in the Debtors' Chapter 11 cases.

4. Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis.

5. I have reviewed the voluntary petitions and all documents filed in connection therewith and I am generally familiar with the facts alleged and relief requested therein. The information contained in this Declaration is based upon my personal familiarity with the businesses and financial condition of the Debtors. In making any and all financial representations in this Declaration, I am relying on financial statements and other financial information as compiled, prepared and/or submitted to me by Ajay Gandhi, the Chief Financial Officer of the Debtors.

**I.     The Debtors' Businesses**

6.      Each of the Debtors is engaged in business as a wholesaler of fine jewelry merchandise, but the nature of the business conducted by each company is separate and distinct.

7.      FDI and FI have approximately $90 million of annual sales to some of the most well-known and well regarded major department stores, major specialty stores chains, wholesale clubs, and United States armed services bases. Their accounts include Zales, Kay's, Jared's, COSTCO, Sam's Club, Macy's, JC Penney, U.S. Navy, etc.

8.      FDI maintains one of the finest and most experienced sales forces in the fine jewelry industry. Its product development team is extremely creative and highly respected.

9.      FDI owns and has registered numerous copyrights, trademarks and product design patents which it regularly uses in the conduct of its business.

10.     FDI and FI also hold a license for certain intellectual property relating to the Endless Diamond brand and the touch-set jewelry design, which property is used in connection with their manufacture of jewelry merchandise to national and regional retailers throughout the United States.

11.     The centerpiece of the AJI business is its 125 year old luxury bridal brand "A.JAFFE". AJI sells fine jewelry merchandise to hundreds of the finest independent jewelry stores in America. AJI sales had been growing in solid double digits for the last three years and were projected to reach $23 million in fiscal 2018.

12.     The A.JAFFE brand is widely recognized by the public, as several generations of brides in families have been engaged and married with A.JAFFE diamond rings. Its products are uniquely branded with "quilt" patented technology, or with a trademarked European shank that includes an "a." with a small diamond on the lower left

hand sides of the ring shank. The look and quality of A.JAFFE products is unique and timeless and qualifies the company as a true legacy brand. The private label division, which began under the A.JAFFE umbrella in 2016, has been accepted as a high quality preferred brand for generic styling product such as diamond earrings, hoops, bracelets and necklaces. AJI also maintains a highly innovative library of patents and trademarks.

13. As set forth more fully below, the Debtors are primarily under common ownership and management.

    a. <u>Ownership and Management</u>.

14. FDI was formed as a Delaware corporation on February 2, 2004 under the name Jewelry Solutions International, Inc. The name of the corporation was changed in 2005 to Next Diamond, Inc., changed again in 2007 to Firestone, Inc., and changed for a final time in 2011 to Firestar Diamond, Inc.

15. FI was formed as a Delaware corporation on August 12, 2012.

16. AJI was formed as a New York corporation on July 10, 1975 under the name Sandberg & Sikorski Diamond Corporation. The name of the corporation was changed in 1995 to Sandberg & Sikorski Corporation and changed again in 2011 to A. Jaffe, Inc.

17. FDI is a wholly owned subsidiary of Firestar Group, Inc. ("<u>FGI</u>"), a Delaware corporation. FGI is a wholly owned subsidiary of Synergies Corporation ("<u>Synergies</u>"), a Delaware corporation. Synergies is a wholly owned subsidiary of Firestar Holdings Limited ("<u>FHL</u>"), a Hong Kong corporation. FHL is a wholly owned subsidiary of Firestar International Limited. ("<u>FIL</u>"), an India corporation. Nirav Modi ("<u>Modi</u>"), directly or indirectly, is the majority shareholder of FIL.

18. FI is a wholly owned subsidiary FDI.

19. Approximately 95% of the equity of AJI is owned by Synergies, and approximately 5% of the equity of AJI is owned by its founder Sam Sandberg.

20. Mihir Bhansali serves as sole director and President of each of the Debtors, as well as FGI and Synergies. Ajay Gandhi serves as Secretary and Chief Financial Officer for each of the Debtors, as well as FGI and Synergies.

b. Prepetition Secured Debt

21. FDI and FI are co-Borrower Debtors under a co-lending facility with Israel Discount Bank of New York ("IDB") and HSBC Bank USA, N.A. ("HSBC"), which originated in 2008, in the aggregate amount of $28,000,000 the "Loan Facility"). The Loan Facility is comprised of the IDB Revolving Credit Facility (as defined below) in the principal amount of $12,000,000 and the HSBC Loan Agreement (as defined below) in the principal amount of $16,000,000.

*i. IDB Loan Facility*

22. A Line Letter, dated as of October 8, 2013 and effective as of September 30, 2013, was executed by and among IDB, as lender, and FDI and FI, as co-Borrower Debtors, in the maximum principal amount of $12,000,000 (amending and replacing Line Letter dated December 13, 2012 and an earlier line letter dated September 4, 2008) (as amended from time to time, together with all documents executed in connection therewith or ancillary thereto, the "IDB Revolving Credit Facility")

23. The maturity date of the IDB Revolving Credit Facility was extended to October 31, 2018 pursuant to an Amendment dated as of November 16, 2016.

24. Obligations due and owing by FDI and FI (collectively, the "Borrower Debtors") to IDB in connection with the IDB Revolving Credit Facility are secured by senior liens on all of

the assets of the Borrower Debtors.

25. The IDB Revolving Credit Facility is guaranteed by Modi personally, as well as by FIL and FGI.

### ii. HSBC Loan Facility

26. An Amended and Restated Loan Agreement, dated as of September 4, 2008, was executed by and between HSBC, as lender, and FDI (then known as Firestone, Inc.), as borrower, in the maximum principal amount of $16,000,000 (amending and replacing the Loan Agreement dated September 5, 2007) (as amended from time to time, together with all documents executed in connection therewith or ancillary thereto, the "HSBC Loan Agreement").

27. FI was added as a co-borrower in connection with the Fourth Amendment of the HSBC Loan Agreement, dated as of December 6, 2012, among HSBC and Borrower Debtors.

28. Obligations due and owing by the Borrower Debtors to HSBC in connection with the HSBC Loan Agreement are secured by senior liens on all of the Borrower Debtors' assets.

29. The Borrower Debtors, IDB and HSBC are parties to an Amended and Restated Intercreditor Agreement, dated as of March 22, 2013, among IDB, HSBC and Standard Chartered Bank ("SCB"), relating to their relative priorities as against the assets of the Borrower Debtor. That agreement was as amended by that certain First Amendment to Amended and Restated Intercreditor Agreement, dated as of October 17, 2013, between HSBC and IDB, which effectively terminated SCB's credit facility.

30. As of the Petition Date, the amount due and owing from the Borrower Debtors to IDB in connection with the IDB Revolving Credit Facility was approximately $8,600,000.

31. As of the Petition Date, the amount due and owing from the Borrower Debtors to HSBC in connection with the HSBC Revolving Credit Facility was approximately $11,400,000.

32. AJI has no secured financing facilities or associated secured debt.

**II.    Events Leading to the Chapter 11 Filing**

33. Approximately three weeks ago, news reports surfaced out of India which alleged that Modi, and certain foreign entities with which he was affiliated, were involved in obtaining unauthorized loans from Punjab National Bank ("PNB") in the form of letters of undertaking ("LOU") which were used to fund payments to suppliers for purchases. The aggregate amount of the allegedly unauthorized LOU was initially reported as approximately $40 million.

34. By the following week, additional news reports surfaced out of India in which PNB alleged that PNB bank officials colluded with Modi, and that the parties had engaged in such conduct over an extended period of time. PNB estimated that the magnitude of the allegedly unauthorized was in excess of $1 billion. Those articles also referenced other individuals and diamond jewelry companies with which Modi is not affiliated. It is unclear how much of the estimated $1 billion number quoted in the articles is purportedly attributable to Modi, and entities with whom he is affiliated, and how much is purportedly attributable to other unaffiliated third parties.

35. It is my understanding that PNB filed a criminal complaint in India in connection with the foregoing allegations and that India's Central Bureau of Investigation is currently conducting an investigation.

36. Recently, authorities in India began attaching, seizing and/or freezing various assets and properties belonging to Modi and properties belonging to various entities in which he had a direct or indirect ownership interest. This resulted in the immediate closure of multiple business entities and, by some reports, the loss of thousands of jobs for its employees.

37. Among the properties seized and businesses closed were factories in India which

produced most of the fine jewelry merchandise sold by the Debtors to their customers. These entities in India also provided certain back office and support functions for the Debtors.

38. The sudden loss of its supply chain and back office support has dramatically impacted the operations of the Debtors in the short term.

39. The Debtors and their dedicated employees have worked tirelessly over the past week or so to: (i) procure alternate sources of supply; (ii) establish alternate back office and support service functions; (iii) reassure their vendors and customers that they had no involvement in the alleged wrongful conduct; and (iv) reassure their customers and vendors that they were committed to carrying on their business and that swift action was being taken to mitigate the damage caused by the actions in India.

40. The supply chain disruption and negative publicity have dramatically impaired the Debtors' business operations in the short term and have created a great deal of uncertainty and confusion in the market about the Debtors' ability to continue to operate their business as a going concern.

41. Without greater certainty and assurances, certain vendors have expressed a reluctance to continue doing business with the Debtors and certain customers have begun to explore moving certain of the Debtors' programs to other suppliers.

42. As such, the Debtors filed these Chapter 11 cases in an effort to preserve the going concern value of their businesses and effectuate a sale or other transaction that will provide the resources necessary to allow the Debtors' successful brands to continue to thrive.

### III. The Balance Sheet – Other Assets and Liabilities

43. The assets, liabilities and equity of the Debtors, as of February 24, 2018, are set forth on the respective balance sheets annexed hereto as **Exhibit A**.

**IV.     Case Strategy**

44.     During the pendency of these cases, it is the Debtors' intention to continue to operate their businesses while seeking an infusion of capital or the sale of the Debtors' businesses, in whole or in parts, as a going concern.

45.     The Debtors expect that the Chapter 11 process will add a sense of order, alleviate some of the concerns expressed by vendors and customers and create a forum in which potential purchasers for all or some of the businesses are willing to participate.

46.     The Borrower Debtors have informed their secured lenders, IDB and HSBC, of the intention to commence these Chapter 11 cases on an emergency basis and are engaged in discussions with the lenders for debtor in possession financing and use of cash collateral in order to provide the liquidity necessary to sustain operations until a sale or other transactions can be effectuated.

47.     AJI, which has no secured lender, is engaged in discussions with suppliers and potential financing sources which would enable it to likewise sustain operations until such time as that business may be sold.

48.     Early expressions of interest in purchasing some or all of the Debtors' business operations have been strong.

49.     The Debtors intend to act quickly and efficiently to determine which of the available restructuring options is in the best interests of the estates and to preserve the going concern value of the Debtors' substantial business operations.

**V.     Summary of First Day Motions**[1]

50.     Subsequent to the filing of the Petitions, the Debtors filed or will soon file the

---

[1]     All capitalized terms not defined in the following summary shall have the meanings ascribed to them in the motions discussed herein.

9

First Day Motions summarized below, which I believe are necessary to enable the Debtors' businesses to operate with a minimum of disruption or productivity loss. The Debtors intend to seek entry of orders approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules.

### a. Joint Administration Motion

51. The Debtors have filed a motion (the "Joint Administration Motion") seeking joint administration of their Chapter 11 cases for procedural purposes only. The Debtors are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code. Accordingly, they may be jointly administered pursuant to section 101(2) of the Bankruptcy Code. Joint administration would relieve the Court of the burden of entering duplicative orders and maintaining duplicative dockets and files and will simplify the administrative aspects of these Chapter 11 cases.

52. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will save significant time and expense.

### b. Cash Management Motion

53. The guidelines established by the Office of the United States Trustee for the Southern District of New York require debtors in possession to take certain actions regarding prepetition bank accounts, including, among others, closing all existing bank accounts, opening new accounts and immediately printing new checks with a "Debtor in Possession" designation on them.

54. The Debtors have filed a motion (the "Cash Management Motion") seeking entry

of interim and final orders (i) approving the use of their Existing Bank Accounts, which are identified in the Cash Management Motion, and (ii) authorizing the continued use of existing business forms.

55. The Debtors manage their cash receipts, transfers, and disbursements and records of such receipts, transfers and disbursements through the Existing Bank Accounts. The Debtors utilize a number of methods for disbursing and receiving funds, including: (a) debit; (b) wire transfer; and (c) written check. The Debtors have collected receivables and maintained payroll accounts and operating accounts through the Existing Bank Accounts for an extended period of time. The Debtors believe that any confusion or disruption in the continuity of these pre-existing procedures would severely hamper the Debtors' ability to operate their business. This type of disruption would create adverse economic and operational consequences which would negatively affect the Debtors' ability to maximize value for their creditors.

56. The Existing Bank Accounts are maintained at HSBC and IDB, which are insured by the Federal Deposit Insurance Corporation.

57. I have reviewed the Cash Management Motion and believe that the facts stated therein are accurate to the best of my knowledge, information and belief. I further believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

58. The Debtors anticipate that additional motions for customary "first day" relief, including in relation to retention of a CRO, cash collateral and financing of operations will be made in the coming days following negotiations with HSBC and IDB.

## VI. Other Information

59. The Debtors' cases were originally commenced under chapter 11 of the Bankruptcy Code. Accordingly, no prior trustee was appointed in the Debtors' cases.

60. No official or unofficial committee of creditors was formed prior to the Petition Date.

### (a) Twenty Largest Unsecured Creditors

61. A list setting forth the twenty (20) largest unsecured creditors, of each of FDI, FI and AJI, excluding those persons who constitute "insiders" under Bankruptcy Code section 101(31), is attached hereto as **Exhibit B**.

62. As required by Local Rule 1007-2(a)(4), Exhibit B includes the creditors' names, addresses, telephone numbers (for persons familiar with the account, if available), amount of each claim, and an indication of whether the claims are contingent, unliquidated, disputed, or partially secured.

### (b) Five Largest Secured Creditors

63. IDB and HSBC arte the only secured creditors of FDI and FI. AJI has no secured creditors.

### (c) Assets and Liabilities

64. As required by Local Rule 1007-2(a)(6), a summary of the Debtors' assets and liabilities is included above.

### (d) Publicly Held Stock

65. As required by Local Rule 1007-2(a)(7), no classes of shares of stock, debentures, or other securities of the Debtors are publicly held.

**(e) Debtors' Property Held By Others**

66. The Debtors have no property in possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity other than as follows:

- The FDI and Fantasy have accounts with an aggregate approximate value in the amount of $4,399,500, which are currently held by HSBC, and accounts with an aggregate approximate value of $18,000, which are currently held by IDB.

- AJI has accounts with an aggregate approximate value in the amount of $619,000 which are currently held at HSBC.

- UOB Realty (USA) Limited Partnership, FDI's landlord with regard to the 592 Space (defined below), is currently holding a security deposit in the amount of approximately $175,500.

- 22 Rock Plaza, LLC, FDI's landlord with regard to the 22 West Space (defined below), is currently holding a security deposit in the amount of $19,100.

- FDI and Fantasy currently have jewelry merchandise on consignment with their customers having an aggregate consignment price value of approximately $33,250,000 million.

- AJI currently has jewelry merchandise on consignment with its customers having an aggregate consignment price value of approximately $7,300,000.

**(f) Debtors' Office Space**

67. As required by Local Rule 1007-2(a)(9), FDI leases office space located at 592 Fifth Avenue, New York, NY 10036 (the "592 Space") and 22 West 48th Street, New York, NY 10036 (the "22 West Space" and, together with the 592 Space, collectively, the "Office Space"). FI and AJI also operate their respective businesses out of the same Office Space.

**(g)   Location of Debtor's Assets and Books and Records**

68.   Pursuant to Local Rule 1007-2(a)(10), the majority of the Debtors' books and records are maintained within the Office Space.

**(h)   Threatened or Pending Actions Against The Debtors**

69.   In accordance with Local Rule 1007-2(a)(11), the Debtors state that there are presently no pending or threatened actions to be identified.

**(i)   The Debtors' Senior Management**

70.   Pursuant to Local Rule 1007-2(a)(12), the Debtors' senior management consists of Mihir Bhansali, who serves as sole director and President of each of the Debtors, together with Ajay Gandhi who serves as Secretary and Chief Financial Officer for each of the Debtors.

**(j)   Additional Information Required by Local Rule 1007-2(b)**

71.   In accordance with Local Rule 1007-2(b), the Debtors intend to continue the operation of their business and the management of their properties as Debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

72.   In accordance with Local Rule 1007-2(b)(1), the estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the Petition Date is approximately $11,200.  Other than overtime and commissions, salaries for all employees were paid through March, 2018.

73.   In accordance with Local Rule 1007-2(b)(2), the amounts paid and proposed to be paid for the thirty (30) day period following the Petition Date for services rendered by the Debtors' officers and directors is $0.  Salaries through March, 2018 were pre-paid for all employees prior to the filing date.

74. With reference to Local Rule 1007-2(b)(2)(C), the Debtors have engaged Getzler Henrich & Associates LLC to provide a Chief Restructuring Officer and related support services. The Debtors have also engaged Marks Paneth LLP as financial advisor.

75. In accordance with Local Rule 1007-2(b)(3), a schedule, for the thirty (30) day period following the filing of the chapter 11 petitions, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing is annexed hereto as **Exhibit C**.

### VII. Conclusion

76. The Debtors reserve the right to amend or supplement any of the attached schedules in the event additional information is obtained by the Debtors.

77. The Debtors believe that the protection of the Bankruptcy Court will enable them to maximize the value of their assets for the benefit of the estates and their creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on the 28th day of February, 2018.

      /s/Mihir Bhansali

      Mihir Bhansali