**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
Ian R. Winters
Sean C. Southard
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------------------ X | |
| : | |
| In re: | : Chapter 11 |
| : | |
| FIRESTAR DIAMOND, INC., et al. | : Case No. 18-10509 (SHL) |
| : | |
| Debtors. | : Jointly Administered |
| : | |
| ------------------------------------------------------------------ X | |

**DEBTORS' MOTION FOR ENTRY OF ORDERS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365, AND BANKRUPTCY RULES 2002, 6004 AND 6006: (A) FIXING THE TIME, DATE AND PLACE FOR HEARING TO CONSIDER BIDDING PROCEDURES IN CONNECTION WITH THE DEBTORS' SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS; (B)(i) ESTABLISHING BIDDING PROCEDURES; (ii) APPROVING THE FORM AND MANNER OF NOTICES AND (iii) SETTING HEARING DATE FOR THE HEARING ON APPPROVAL OF THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; AND (C)(i) APPROVING THE SALE AND ASSIGNMENT OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (ii) GRANTING RELATED RELIEF**

Firestar Diamond, Inc. ("Firestar"), Fantasy, Inc. ("Fantasy") and A. Jaffe, Inc. ("A. Jaffe" and collectively, with Firestar and A. Jaffe, the "Debtors"), the above-captioned debtors and debtors-in-possession, through their undersigned counsel, Klestadt Winters Jureller Southard & Stevens, LLP, hereby submit this Motion (the "Sale Motion") seeking the following relief:

      a.      Entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"): (a) establishing bidding procedures, as

set forth herein (the "<u>Bidding Procedures</u>"), with respect to the Debtors' sale of substantially all of their assets free and clear of liens, claims, interests and encumbrances (the "<u>Proposed Sale</u>"), (b) approving the form and manner of notices thereof (the "<u>Bidding Procedures Notice</u>") attached hereto as **<u>Exhibit B</u>**, and (c) setting a hearing (the "<u>Sale Hearing</u>") to consider approval of the Proposed Sale; and

b.   Entry of an order pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, substantially in the form attached hereto as **<u>Exhibit C</u>** (the "<u>Sale Order</u>"), (i) approving the sale (the "<u>Proposed Sale</u>") of substantially all of the Debtors' assets pursuant to an proposed Asset Purchase Agreement (the "<u>Proposed APA</u>") between the Debtors and the Winning Bidder(s), a template[1] for which is annexed hereto as **<u>Exhibit D</u>**, and (ii) granting related relief.

In support of the Sale Motion, the Debtors submit the *Declaration of Mark Samson in Support of Debtors' Motion for Entry of Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Rules 2002, 6004 and 6006: (A) Fixing the Time, Date and Place for Hearing to Consider Bidding Procedures in Connection with the Debtors' Sale of Substantially All of Their Assets; (B)(i) Establishing Bidding Procedures, (ii) Approving the Form and Manner of Notices, and (iii) Setting Hearing Date for the Hearing on Proposed Sale; and (C)(i) Approving the Proposed Sale and (ii) Granting Related Relief* (the "<u>Samson Declaration</u>"), attached hereto as **<u>Exhibit E</u>** and respectfully state as follows:

## <u>PRELIMINARY STATEMENT</u>

As described in the First Day Declaration, the Debtors filed the Chapter 11 Cases as a result of severe supply chain disruption due to events in India that caused factories that supplied the Debtors with jewelry merchandise to shut down. Since the Petition Date, the Debtors and the Debtors' professionals have worked to stabilize the Debtors' financial condition and business operations in preparation for a sale transaction that ideally would provide for the sale of the Debtors as going concerns. By this Sale Motion, the Debtors now seek to commence that

---

[1] The template is not be construed as an offer and is subject to further review, comment and negotiation among the Debtors and their stakeholders.

process, which the Debtors believe are designed to test the market for the highest and best value available under the circumstances.

As described in greater detail below, prior to the filing of the Sale Motion, the Debtors engaged in a short, but intensive process designed to canvas the market for jewelry industry enterprises and private equity concerns that may be interested in purchasing some or all of the Debtors' assets. Although compressed in time, the Debtors believe that the market of potential bidders has been reached and, if interested, provided with sufficient diligence in order to make a bid.

Prior to the filing of the Sale Motion, the Debtors were engaged in advanced discussions with potential stalking horse bidders for substantially all of the Debtors' assets and additional discussions with parties interested in serving as a stalking horse bidder for certain of the Debtors' assets. While those parties remain interested in bidding at the Auctions (as defined below), the Debtors are presently unable to move forward with a fully committed stalking horse bid on terms they find acceptable[2]. After considering the present facts and their options, the Debtors decided, in their business judgment, that commencing the sale process without a stalking horse was the best path toward ultimately identifying the highest and best offers for the Debtors' assets.

To that end, the Debtors have designed the proposed Bidding Procedures with optionality to seek offers for substantially all of the Debtors' assets, or a combination of offers that will yield the highest and best bid(s) for the Debtors' assets in the aggregate, to be followed by the Auctions if such competing offers are received. The Debtors believe that the process envisioned

---

[2] Although the Debtors do not presently have a stalking horse (a "Stalking Horse") offer for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets (each as defined below) they reserve the right to enter into an asset purchase agreement with a Stalking Horse, subject to approval of the Court. The Debtors proposed procedures for the possibility of entering into an APA with a Stalking Horse are part of the Bidding Procedures for which the Debtors seek approval.

by the Bidding Procedures and other relief sought herein will result in a full and fair process that will determine the highest and best offer obtainable.

For these reasons as more fully described herein, the Debtors respectfully request that the Court grant the Motion.

## JURISDICTION, VENUE AND STATUTORY PREDICATES

1.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief sought herein are sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et. seq. (the "Bankruptcy Code"), and Rule 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

4.     On February 26, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases").

5.     The Debtors continue to operate their businesses and properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or statutory committee ("Committee") has been appointed in these Chapter 11 Cases.

6.     The Court and interested parties are respectfully referred to the *Declaration of Mihir Bhansali, President of the Debtors, Containing Information Required Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Debtors' First Day Motions* (the "First Day Declaration") [Docket No. 2] for a detailed description of the Debtors' businesses, property, and financial condition.

## THE DEBTORS' BUSINESSES AND ASSETS

7.      Each of the Debtors is engaged in business as a wholesaler of fine jewelry merchandise, but the nature of the business conducted by each company is separate and distinct.

8.      Firestar and Fantasy have approximately $75 million of annual sales to some of the most well-known and well regarded major department stores, major specialty stores chains, wholesale clubs, and United States armed services bases.

9.      Firestar maintains one of the finest and most experienced sales forces in the fine jewelry industry. Its product development team is extremely creative and highly respected.

10.     Firestar owns and has registered various copyrights, trademarks and product design patents which it regularly uses in the conduct of its business.

11.     Firestar and Fantasy also hold a license for certain intellectual property relating to the Endless Diamond brand and the touch-set jewelry design, which property is used in connection with their manufacture of jewelry merchandise to national and regional retailers throughout the United States.

12.     The centerpiece of the A. Jaffe business is its 125 year old luxury bridal brand "A.JAFFE".   A. Jaffe sells fine jewelry merchandise to hundreds of the finest independent jewelry stores in America. A. Jaffe sales had been growing in solid double digits for the last three years and were projected to reach $23 million in fiscal 2018.

13.     The    A.JAFFE    brand    is    widely    recognized    by    the public, as several generations of brides in families have been engaged and married with A.JAFFE diamond rings.  Its products are uniquely branded with "quilt" patented technology, or with a trademarked European shank that includes an "a." with a small diamond on the lower left hand sides of the ring shank. The look and quality of A.JAFFE products is unique and timeless and qualifies the company as a true legacy brand. The private label division, which began under

the A.JAFFE umbrella in 2016, has been accepted as a high quality preferred brand for generic styling product such as diamond earrings, hoops, bracelets and necklaces. A. Jaffe also maintains a highly innovative library of patents and trademarks.

## THE DEBTORS' CAPITAL STRUCTURE

14.    Firestar and Fantasy are parties to a co-lending facility among Israel Discount Bank of New York ("IDB") and HSBC Bank USA, N.A. ("HSBC Bank") as co-lenders (together, the "Pre-Petition Lenders"), and Firestar and Fantasy as co-borrowers (the "Borrowers"), in the aggregate amount of $28,000,000, comprised of the IDB Revolving Credit Facility (as defined below) in the principal amount of $12,000,000 and the HSBC Bank Loan Agreement (as defined below) in the principal amount of $16,000,000.

15.    The Borrowers are party to Line Letter, dated as of October 8, 2013 and effective as of September 30, 2013, among IDB, as lender, and Firestar and Fantasy, as co-borrowers, in the maximum principal amount of $12,000,000 (as amended from time to time, together with all documents executed in connection therewith or ancillary thereto, the "IDB Revolving Credit Facility"). The Borrowers' obligations under the IDB Revolving Credit Facility are secured by first priority security interest in all assets of the Borrowers.

16.    Firestar is party to Amended and Restated Loan Agreement, dated as of September 4, 2008, between HSBC Bank, as lender, and Firestar, as borrower, in the maximum principal amount of $16,000,000  (as amended from time to time, together with all documents executed in connection therewith or ancillary thereto, the "HSBC Bank Loan Agreement"). Fantasy was added as co-borrower to the HSBC Bank Loan Agreement pursuant to a Fourth Amendment to the HSBC Bank Loan Agreement, dated as of December 6, 2012, among HSBC

Bank and Borrowers. The Borrowers' obligations under the HSBC Bank Loan Agreement are secured by first priority security interest in all assets of the Borrowers.

17.    As of the Petition Date, Firestar and Fantasy owe approximately $8,600,000 under the IDB Revolving Credit Facility and $11,400,000 under the HSBC Bank Loan Agreement in principal, plus interest, fees and costs payable under the IDB Revolving Credit Facility and HSBC Bank Loan Agreement.

18.    For the avoidance of doubt, A. Jaffe is not a borrower or guarantor of the obligations under the IDB Revolving Credit Facility or the HSBC Bank Loan Agreement.

## THE MARKETING OF THE ASSETS

19.    As described above, following the Petition Date, the Debtors and their professional advisors began extensively soliciting offers for the purchase of their businesses.

20.    As of the time of the filing of this Sale Motion, since the first marketing efforts began, forty-three (43) parties (not counting duplicates for those signed with respect to the Firestar/Fantasy Assets and A. Jaffe Assets) requested non-disclosure agreements, and twenty-five (25) parties executed non-disclosure agreements (not counting duplicates) in order to gain access to the diligence information ("Phase I Diligence") maintained by the Debtors in a password-enabled data room.  The Phase I Diligence is comprised of the last two years' audited financial statements and general information concerning the Debtors' current inventory and accounts receivable. Potential bidders were and continue to be invited to inspect merchandise at the Debtors' offices. In addition, potential bidders were invited to ask questions the Debtors' officers and key employees, financial advisors and attorneys. The Debtors believe that the Phase I Diligence provides Potential bidders with sufficient information to formulate the general parameters an offer for some or all of the Debtors' assets if they were interested in doing so.

21.     Following approval of the Bidding Procedures, the Debtors intend to make available to potential bidders additional diligence ("Phase II Diligence") including more detailed information concerning the Debtors' current inventory and accounts receivable, business operations, including sales levels for the current year and historical sales to customers, intellectual property, licensing and consignment relationships and the terms thereof. The Debtors' officers, key employees, financial advisors and attorneys will continue to make themselves available to potential bidders for additional inquiry.

22.     Due to the highly competitive nature of the jewelry industry and the commercially sensitive nature of the information to be made available as Phase II Diligence, Phase II Diligence will only be made available to potential bidders that provide the Debtors with a written expression of interest and support for financial wherewithal to complete the transaction described in such written expression of interest.

## NEED FOR A TIMELY SALE PROCESS

23.     The need for a prompt sale process is evident from the circumstances that caused the filing of the Chapter 11 Cases as described above and more fully in the First Day Declaration.

24.     In addition, the Pre-Petition Lenders have required, as a condition to use of cash collateral, that the Debtors file this motion not later than March 23, 2018 and obtain approval of the Bidding Procedures (defined below) by not later than March 28, 2018.

25.     Absent the Proposed Sale contemplated by this Sale Motion, the Debtors believe they may not be able to realize the maximum value of their assets for the benefit of all stakeholders.  Thus, a prompt sale is necessary to ensure that such assets are sold at their going concern values.

26.     In addition, it is important that the Proposed Sale be consummated by the first

week of May 2018. The most important jewelry industry trade show, known as JCK, is being

held in Las Vegas, Nevada from June 1-4, 2018. The JCK show serves as a platform to launch

product lines for the fourth quarter, which is traditionally the strongest quarter for sales in the

jewelry industry, like many others. If the Proposed Sale is consummated in the first week of

May, a Purchaser will have sufficient time to prepare the product lines currently owned by the

Debtors for the JCK show. The ability to do so may, therefore, result in more spirited bidding at

the Auctions than if the Proposed Sale could not be consummated before the JCK show.

### PROPOSED BIDDING PROCEDURES, BID
### PROTECTIONS, AUCTIONS AND OVERBID PROCEDURES

### A.     Overview

27.     In connection with the Proposed Sale, the Debtors seek approval of the Bidding

Procedures, which the Debtors submit are designed to maximize the value of the Purchased

Assets. Initially, the Debtors intend to seek offers for (a) substantially all of the Debtors' assets

(the "Assets"), and separately, (b) (i) the assets of debtors Firestar and Fantasy (the

"Firestar/Fantasy Assets") or (ii) the assets of A. Jaffe (the "A. Jaffe Assets"). The Debtors also

intend to solicit offers for the Debtors' assets through a sealed bid process. The Debtors believe

that by doing so, potential bidders will be encouraged in the first instance to put forth their

highest and best bid for the Debtors' assets on which they are making an offer in the event one of

the Auctions (as described below) does not occur. As further encouragement to interested parties

to submit a competitive bid early, if one of the Auctions is held for the Assets, Firestar/Fantasy

Assets, or the A. Jaffe Assets, only the top five (5) bidders or those within twenty percent (20%)

of the highest bid for each of the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets, as

applicable, will be permitted to attend and participate at the applicable Auctions, provided that

the Debtors reserve the right to admit bidders not satisfying the top five (5) or twenty percent (20%) threshold in their reasonable business judgment and in consultation with the Consultation Parties[3].

28.     The Debtors propose that potential bidders (each, a "<u>Potential Bidder</u>") for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets submit a sealed bid (each, a "<u>Sealed Bid</u>") be governed by the following bidding procedures (the "<u>Bidding Procedures</u>"):[4]

(a)     <u>Sealed Bid Deadline</u>. Any person or entity interested in participating in the Auctions (defined below) shall submit a Sealed Bid in writing and transmit such bid to: (a) the Debtors, 592 5th Avenue, 3rd Floor, New York, New York 10036, attn.: Mark Samson, Chief Restructuring Officer; (b) the Debtors' counsel, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, attn.: Ian R. Winters and Joseph C. Corneau, and Forchelli Deegan Terrana LLP, 333 Earle Ovington Blvd., Suite 1010, Uniondale, New York 11553, attn.: Gerard R. Luckman; (c) counsel to IDB, Troutman Sanders LLP, 875 Third Avenue, New York, New York 10022 attn.: Brett D. Goodman and Troutman Sanders LLP, 600 Peachtree Street, NE., Suite 3000, Atlanta, Georgia 30308 attn.: Harris B. Winsberg and Matthew R. Brooks; (d) counsel to HSBC Bank,, Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020, attn.: Ken Coleman; (e) counsel to any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "<u>Committee</u>"), if one is appointed; and (f) the Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014, attn.: Richard Morrissey, so that it is received by no later than **April 19, 2018**[5] **at 5:00 p.m.** (prevailing Eastern Time) (the "<u>Sealed Bid Deadline</u>"). The Debtors may, after consulting with the Consultation Parties, extend the Sealed Bid Deadline in their reasonable business judgment.

(b)     <u>Diligence</u>.  To be eligible to participate in the Auctions, each Potential Bidder must execute a nondisclosure agreement in form and on terms satisfactory to the Debtors.  In addition, each Potential Bidder must demonstrate financial wherewithal to complete a transaction for the Assets, the Firestar/Fantasy Assets, or the A. Jaffe Assets, as applicable, by providing to the Debtors (a) financial

---

[3] Throughout the sale process, as necessary or appropriate, the Debtors will consult with counsel to IDB, HSBC Bank and counsel to the Committee, if one is appointed and the Office of the United States Trustee (together, the "<u>Consultation Parties</u>").

[4] To the extent that there are any discrepancies between this summary and the Bidding Procedures Order, the terms of the Bidding Procedures Order shall govern.  Further, unless otherwise defined herein, capitalized terms defined in the Bidding Procedures Order shall have the meaning ascribed to them in the Bidding Procedures Order.

[5] Dates and deadlines set forth in this Sale Motion are the Debtors' proposed dates and deadlines. The Bidding Procedures Order will establish the dates and deadlines approved by the Bankruptcy Court.

statements for the last two calendar years and (b) a letter from a bank or other financial institution that indicates cash liquidity or credit availability of at least the amount of its Sealed Bid plus fifteen percent (15%).

(c)     <u>Potential for Stalking Horse</u>. Although the Bidding Procedures contemplate that the Debtors will solicit Sealed Bids in connection on or before the Sealed Bid Deadline, the Debtors reserve the right to enter into a form of the APA before the Auctions with a Stalking Horse in consultation with the Consultation Parties. The Debtors contemplates that any APA with a Stalking Horse would nonetheless be subject to the receipt of higher or otherwise better bids in accordance with these Bidding Procedures and the Auctions. If one or more of the Debtors enter into a APA with a Stalking Horse Bidder, all Potential Bidders that have provided the required documentation in subparagraph (b), above, shall be notified and provided the terms of such APA, including bidding protections as may be approved by the Court and thereafter offered as part of the APA.

The Bidding Procedures Order permits the Debtors to present to this Court, on not less than seven (7) days' notice, a revised APA and related proposed bidding protections that the Debtors believe are necessary to induce a Stalking Horse to pursue the Proposed Sale (the "<u>Bidding Protections</u>").

<u>Sale to a Stalking Horse Bidder</u>. If the Debtors enter into an APA with a Stalking Horse, the APA with the Stalking Horse shall be deemed a Qualified Bid (as defined below) and the Stalking Horse shall be deemed a Qualified Bidder (as defined below).

(d)     <u>Qualified Bid Requirements</u>. To qualify as a qualified bid (a "<u>Qualified Bid</u>"), a Potential Bidder must submit a Sealed Bid by the Sealed Bid Deadline, and the Debtors, in consultation with the Consultation Parties, must determine that the Offer satisfies the following requirements:

(1)     <u>Modified APA</u>. Each Sealed Bid must include: (i) an executed copy of an asset purchase agreement which is not materially more burdensome to the Debtors than the Proposed APA or inconsistent with these Bidding Procedures (the "<u>Modified APA</u>"); and (ii) a marked-up copy of the Modified APA reflecting the differences between the Modified APA and the Proposed APA. The Debtors, in consultation with the Consultation Parties, shall determine whether any Modified APA that modifies the Proposed APA in any respect beyond the identity of the purchaser and the purchase price under the Modified APA results in such Sealed Bid being materially less favorable to the Debtors, which may be considered in the Debtors' deliberations as to what constitutes the highest and best offer.

(2)     <u>Allocation Schedule</u>. Each Sealed Bid for the Assets must include an allocation schedule of the proposed purchase price for the Assets as between the Firestar/Fantasy Assets and the A. Jaffe Assets. If the Sealed Bid is not for all of the Assets, then the Sealed Bid must state whether it is for the Firestar/Fantasy Assets or the A. Jaffe Assets.

(3)     Modified Sale Order. Each Offer must include a marked-up copy of the Sale Order (a "Modified Sale Order") reflecting differences between the proposed Sale Order annexed to the Sale Motion as Exhibit C requested by the party submitted a Sealed Bid. The Debtors, in consultation with the Consultation Parties, shall determine whether any Modified Sale Order that modifies the proposed Sale Order in any respect beyond the identity of the purchaser, the purchase price and the allocation of the purchase price results in such Sealed Bid being materially less favorable to the Debtors, which may be considered in the Debtors' deliberations as to what constitutes the highest and best offer.

(4)     Identification of Bidder. Each Sealed Bid must fully disclose the legal identity of each entity that will be bidding for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets, as applicable, participating in connection with such Sealed Bid (including but not limited to any equity holder or other financial backer if the Potential Bidder is an entity specifically formed for purposes of effectuating the Proposed Sale, and the complete terms of any such participation) and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder or Qualified Bidder, and/or any officer or director of the foregoing.

(5)     Financial Information.  Any Potential Bidder that wishes to submit a Sealed Bid for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets, as applicable, must provide the Debtors with sufficient and adequate information to demonstrate, to the satisfaction of the Debtors, in consultation with the Consultation Parties, that the Sealed Bid: (i) is being made by an entity that has the financial wherewithal and ability to consummate the Sealed Bid and (ii) provides information to demonstrate that it is able to fulfill all obligations in connection with all Assigned Contracts (as defined below) so as to satisfy the requirement of providing adequate assurance of future performance, as contemplated by section 365 of the Bankruptcy Code (the "Adequate Assurance Information").

(6)     Other Requirements. Each Sealed Bid shall: (i) state that Sealed Bid is formal, binding and unconditional, is not subject to further due diligence, and is irrevocable until the earlier to occur of: (x) the first business day following the closing of the Proposed Sale or (y) sixty (60) days following the last date of the Auctions (as may be adjourned); (ii) not contain any financing or employment-related contingencies of any kind; (iii) not contain any condition to closing the Proposed Sale on the receipt of any third party approvals; (iv) state that the Potential Bidder is ready, willing and able to perform its obligations under the Modified APA submitted with such Sealed Bid; (v) expressly state that the Potential Bidder agrees to serve as a backup bidder (a "Backup Bidder") if such bidder's Qualified Bid is selected as the next highest or next best bid after the Winning Bid for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets, as applicable; (vi) include contact information for the person(s) the Debtors

should contact with questions about the Potential Bidder's Sealed Bid; and (vii) be received by the Debtors and Consultation Parties by the Sealed Bid Deadline.

(7)     Good Faith Deposit. All Qualified Bids must be accompanied by a good faith deposit in the amount of ten percent (10%) of the Offer (a "Good Faith Deposit"), in the form of a certified or cashier's check, payable to "KLESTADT WINTERS JURELLER SOUTHARD & STEVENS LLP ESCROW MANAGEMENT ACCOUNT" or by wire transfer, instructions for which will be provided upon request.   All such deposits shall be retained by the Debtors pending the hearing to consider the Sale Motion and shall be returned within ten (10) days after entry of a Sale Order, except that the Debtors will hold the deposit of the Backup Bidder, until the earlier of (x) the first business day following closing of the Proposed Sale or (y) sixty (60) days following the last date of the Auction (as may be adjourned), provided that any Potential Bidder submitting a credit bid component pursuant to section 363(k) of the Bankruptcy Code shall not be required to submit a Good Faith Deposit on account of such component of the Potential Bidder's Sealed Bid.

(e)     Selecting Qualified Bidders.   The Debtors shall, in consultation with the Consultation Parties, make a determination whether a Sealed Bid is a Qualified Bid and shall notify each Potential Bidders whether its Sealed Bid has qualified as a Qualified Bid by not later than **April 20, 2018 at 5:00 p.m.** (prevailing Eastern Time). Any Potential Bidder whose Offer is determined to be a Qualified Bid shall be designated as a "Qualified Bidder."

A Sealed Bid shall be determined to be a Qualified Bid only if it satisfies all of the requirements of subparagraph (d), above, and is one of the top five (5) bidders or within twenty percent (20%) of the highest bid received for the Assets, the Firestar/Fantasy Assets, or the A. Jaffe Assets, as applicable, provided, however, that the Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, admit a Potential Bidder to the Auctions as a Qualified Bidder even if its Sealed Bid does not meet the top five (5) or twenty percent (20%) threshold, provided that its Sealed Bid otherwise satisfies all of the requirements of subparagraph (d) above.

(f)     Credit Bidding. Any secured creditor holding an allowed secured claim against the Debtors shall have the right, subject to the provisions of the Bankruptcy Code, applicable law, and any agreement of such secured creditor, to credit bid such claims to the extent of such secured party's interest in or lien on the Assets being bid upon. IDB and HSBC Bank have security interests in and liens on substantially all of the Firestar/Fantasy Assets and IDB and HSBC Bank shall have the right at any time prior to or at an Auction to credit bid their prepetition and/or postpetition claims (including any pre- and post-petition interest and fees accrued and otherwise due pursuant to section 363(k) of the Bankruptcy Code. For the purposes of these Bidding Procedures and any Auction in connection

herewith, any offer by IDB or HSBC Bank shall constitute a Qualified Bid and IDB and HSBC Bank shall be deemed Qualified Bidders.

(g)     The Business Line Auction(s). If more than one Qualified Bid is received for (i) the Firestar/Fantasy Assets or (ii) the A. Jaffe Assets, the Debtors may hold one or more auctions (each, a "Business Line Auction" and together, the "Business Line Auctions") in advance of the All-Asset Auction (defined below).

The Business Line Auctions, if required, shall be held at the offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, or at such alternative location as the Debtors may determine, after consultation with the Consultation Parties. The Business Line Auctions shall commence on **April 24, 2018 at 10:00 a.m.** (prevailing Eastern Time). The Business Line Auctions shall be conducted openly and shall be transcribed by a court reporter

Only Qualified Bidders and their representatives, the Debtors and their representatives, the Consultation Parties and their respective representatives will be permitted to attend the Business Line Auctions. The following procedures will be applicable at the Business Line Auctions:

(1)     Each Qualified Bidder shall appear in person at the Business Line Auctions through a duly authorized representative. Only Qualified Bidders shall be entitled to make any subsequent bids at the Business Line Auctions. Each Qualified Bidder shall be required to confirm that (i) it has not engaged in any collusion with respect to the bidding or the Proposed Sale; and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Firestar/Fantasy Assets or A. Jaffe Assets, as applicable, if such bid if selected as the highest bid at the applicable Business Line Auction, subject to paragraph (3), below.

(2)     Procedures for Conducting Business Line Auctions. At the commencement of each of the Business Line Auctions, the Debtors, after consultation with the Consultation Parties, shall announce the highest Sealed Bid received for the Firestar/Fantasy Assets and the A. Jaffe Assets, as applicable. Such highest sealed bid shall constitute the baseline bid ("Business Line Baseline Bid") for that Business Line Auction. The Qualified Bidder submitting the Business Line Baseline Bid shall not be required to bid in the first round of the applicable Business Line Auction. Qualified Bidders other than the Qualified Bidder that submitted the Business Line Baseline Bid shall be invited to top the Business Line Baseline Bid. Any bid to top the Business Line Baseline Bid shall be not less than $200,000, and each successive bid shall be not less than $200,000, provided, however, that the Debtors may, after consultation with the Consultation Parties, increase or decrease the bid increments. Except with respect to the Qualified Bidder that submitted the Business Line Baseline Bid, subsequent bidding shall be made by other Qualified Bidders in the order in which such Qualified Bids were received, which

14

shall be announced at the commencement of each Business Line Auction. Any Qualified Bidder that declines to top the Business Line Baseline Bid shall be excluded from further bidding. Bidding shall proceed in successive rounds until each Qualified Bidder not previously excluded from bidding declines to top the last bid.

(3)     <u>Highest Business Line Offers</u>. At the end of each such Business Line Auction, the Debtors, after consultation with the Consultation Parties, shall announce the highest and best offer for each of the Firestar/Fantasy Assets and the A. Jaffe Assets, as applicable. If in the Debtors' business judgment and after consultation with the Consultation Parties, a combination of highest and best Offers for each Business Line Auction may be competitive with Sealed Bids for the Assets at the All-Asset Auction (as defined below), then the combination of the highest and best offers of the Business Line Auctions may (but shall not be required to) be designated by the Debtors as the starting bid at the All-Asset Auction (defined below), provided that the Debtors may, in their reasonable business judgment, consider factors other than total purchase price in determining whether or not to designate the combined highest Offers following the Business Line Auctions as the starting bid at the All-Asset Auction, including, without limitation, potential increased execution risk.

(h)     <u>The All-Asset Auction</u>:  If the Debtors receive at least two (2) Qualified Bids for the Assets (including, for the avoidance of doubt, a potential combination of the highest offers for the Firestar/Fantasy Assets and the A. Jaffe Assets as described in subparagraph (e), above, the Debtors shall conduct an auction (the "<u>All-Asset Auction</u>," and together with the Business Line Auctions, the "<u>Auctions</u>"). The All-Asset Auction, if required, shall be held at the offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, or at such alternative location as the Debtors may determine, after consultation with the Consultation Parties, and after providing notice to the Notice Parties.  The All-Asset Auction shall commence on **April 24, 2018 at 11:30 a.m.** (prevailing Eastern Time) or as soon after the Business Line Auctions as is practicable. The All-Asset Auction shall be conducted openly and shall be transcribed by a court reporter.

Only Qualified Bidders and their representatives, the Debtors and their representatives, the Consultation Parties and their respective representatives will be permitted to attend the All-Asset Auction. The following procedures will be applicable at the All-Asset Auction:

(1)     Each Qualified Bidder shall appear in person at the Auctions through a duly authorized representative. Only Qualified Bidders shall be entitled to make any subsequent bids at the Auctions. Each Qualified Bidder shall be required to confirm that (i) it has not engaged in any collusion with respect to the bidding or the Proposed Sale; and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the assets identified if such bid if selected as the Winning Bidder.

(2)     <u>Procedures for Conducting All-Asset Auction</u>. At the commencement of each of the All-Asset Auction, the Debtors, after consultation with the Consultation Parties, shall announce the highest Sealed Bid received for the Assets. Such highest sealed bid shall constitute the baseline bid ("<u>All-Asset Baseline Bid</u>") for the All-Asset Auction, which may be a combination of the highest bids announced at the conclusion of the Business Line Auctions. The Qualified Bidder(s) submitting the All-Asset Baseline Bid shall not be required to bid in the first round of the All-Asset Auction. Qualified Bidders other than the Qualified Bidder that submitted the All-Asset Baseline Bid shall be invited to top the All-Asset Baseline Bid. Any bid to top the All-Asset Baseline Bid shall be not less than $200,000, and each successive bid shall be not less than $200,000, provided, however, that the Debtors may, after consultation with the Consultation Parties, increase or decrease the bid increments. Except with respect to the Qualified Bidder that submitted the All-Asset Baseline Bid, subsequent bidding shall be made by other Qualified Bidders in the order in which such Qualified Bids were received, which shall be announced at the commencement of the All-Asset Auction. Any Qualified Bidder that declines to top the All-Asset Baseline Bid shall be excluded from further bidding. Bidding shall proceed in successive rounds until each Qualified Bidder not previously excluded from bidding declines to top the last bid.

(3)     <u>Winning Bid</u>. Immediately prior to the conclusion of the All-Asset Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which bid or combination of bids constitute the winning bid (the "<u>Winning Bid</u>"); and (ii) notify all Qualified Bidders at the All-Asset Auction of the identity or identities of the bidder(s) that submitted the Winning Bid (each such bidder, the "<u>Winning Bidder</u>") and the amount of the purchase price and other material terms of the Winning Bid.

(4)     The All-Asset Auction may include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids at the All-Asset Auction to improve their bids. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders during the All-Asset Auction.

(5)     The Debtors shall have the right, after consulting with the Consultation Parties, to determine, in their reasonable business judgment, which bid or combination of bids constitutes the highest or otherwise best bid and reject at any time, any bid that the Debtors determine to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, Bankruptcy Rules, or the Local Rules, these Bidding Procedures, any order of the Bankruptcy Court, or is not in the best interests of the Debtors and their estates.

(6)     Within one (1) business day after conclusion of the Auction, the Winning Bidder shall be required to supplement its Good Faith Deposit by the

difference between its Qualified Bid and the Winning Bid times ten percent (10%).

(7)     Backup Bid. Immediately prior to the conclusion of the All-Asset Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which bid or combination of bids constitute the backup bid (the "Backup Bid"); and (ii) notify all Qualified Bidders at the All-Asset Auction of the identity or identities of the bidder(s) that submitted the Backup Bid (each such bidder, the "Backup Bidder") and the amount of the purchase price and other material terms of the Backup Bid. Backup Bids shall be open and irrevocable until the earlier of (x) the first business day following closing of the Proposed Sale or (y) sixty (60) days following the last date of the All-Asset Auction (as may be adjourned). If the Winning Bidder fails to consummate a Proposed Sale, the Backup Bidder shall be deemed the new Winning Bidder, and the Debtors will be authorized, but not required, to consummate a Proposed Sale with the Backup Bidder.

(8)     Subject to the terms and conditions set forth in the Modified APA, in the event that a Winning Bidder fails to consummate the proposed transaction by the Closing Date, such bidder's deposit shall be forfeited to the Debtors as liquidated damages, and the Debtors shall be free to consummate the proposed transaction with the Backup Bidder at the final price bid by such bidder at the All-Asset Auction (or, if that bidder is unable to consummate the transaction at that price, the Debtors may consummate the transaction with the next higher bidder, and so forth) without the need for an additional hearing or order of the Court.

(9)     Within one (1) business day after conclusion of the All-Asset Auction, the Backup Bidder shall be required to supplement its Good Faith Deposit by the difference between its Qualified Bid and the Backup Bid multiplied by ten percent (10%).

(i)     Modification of Procedures. The Debtors may, after consulting with the Consultation Parties, announce at the Auctions modified or additional procedures for conducting the Auctions.

(j)     Auction Results: Within one (1) business day following the Auctions, the Debtors will cause the results of the Auction to be filed with the Court, docketed on the Court's electronic case filing ("ECF") system.

(k)     Bankruptcy Court Approval: All bids for the purchase of some or all of the Debtors' assets shall be subject to approval of the Court and conditioned upon entry of a Sale Order.

(l)     Sale Objection: Objections to the Proposed Sale (each, a "Sale Objection"), including any objection to the sale of the assets free and clear of liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and entry of any Sale Order (other than Adequate Assurance Objections and Cure Objections (as hereinafter defined)), must (i) be in writing and specify the nature

of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; and (iii) be filed with the Court and served on: (a) the Debtors, 592 5th Avenue, 3rd Floor, New York, New York 10036, attn.: Mark Samson, Chief Restructuring Officer; (b) the Debtors' counsel, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, attn.: Ian R. Winters and Joseph C. Corneau and Forchelli Deegan Terrana LLP, 333 Earle Ovington Blvd, Suite 1010, Uniondale, New York 11553, attn.: Gerard R. Luckman; (c) counsel to IDB, Troutman Sanders LLP, 875 Third Avenue, New York, New York 10022 attn.: Brett D. Goodman and Troutman Sanders LLP, 600 Peachtree Street, NE., Suite 3000, Atlanta, Georgia 30308 attn.: Harris B. Winsberg and Matthew R. Brooks; (d) counsel to HSBC Bank, Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020, attn.: Ken Coleman; (e) counsel to any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"), if one is appointed; and (f) the Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014, attn.: Richard Morrissey (the foregoing parties, the "Objection Recipients") by **April 30, 2018, at 4:00 p.m.** (prevailing Eastern Time) (the "Sale Objection Deadline").  Any reply by the Objection Recipients shall be filed and served by no later than **May 2, 2018 at 12:00 p.m.** (prevailing Eastern Time)

(m)     All Sale Objections not otherwise resolved by the parties prior thereto shall be heard at the Sale Hearing. The failure of any party to timely file with the Court and serve on the Objection Recipients a Sale Objection by the Sale Objection Deadline forever shall be barred from asserting, at the Sale Hearing or thereafter, any objection to the relief requested in the Sale Motion, or to the consummation and performance of the applicable Proposed Sale(s) contemplated by an applicable Modified APA with a Winning Bidder, including the transfer of the Assets to the applicable Winning Bidder(s), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

29.     The Debtors submit that the Bidding Procedures are fair and reasonable and request that they be approved.

### B.     Key Dates and Deadlines

30.     Consistent with the Guidelines for the Conduct of Asset Sales established by the Bankruptcy Court for the Southern District of New York, the Debtors propose the following key dates and deadlines for the Proposed Sale:

| March 28, 2018 at 10:00 a.m. | Hearing on Bidding Procedures |
|---|---|
| March 30, 2018 | Deadline to mail and publish Bidding Procedures Notice and Sale Motion |
| April 19, 2018 at 5:00 p.m. | Sealed Bid Deadline |
| April 20, 2018 at 5:00 p.m. | Deadline for Debtors to notify Potential Bidders of their status as Qualified Bidders and whether Auctions will occur |
| April 24, 2018 at 10:00 a.m. and 11:30 a.m. | Auctions, if necessary |
| April 30, 2018 at 4:00 p.m. | Sale Objection Deadline, Cure Objection Deadline, and Adequate Assurance Objections Deadline |
| May 2, 2018 at 12:00 p.m. | Deadline for Debtors to file Replies to Sale Objections, Cure Objections, and Adequate Assurance Objections |
| May 3, 2018 at 10:00 a.m. | Sale Hearing |

## C.    Extraordinary Provisions in Connection with Proposed Sale

31.    Use of Proceeds.  On the assumption that the Winning Bid for the Assets allocates sufficient value to the Firestar/Fantasy Assets to satisfy the claims of IDB and HSBC Bank, the Debtors propose to use the proceeds allocated to the Firestar/Fantasy assets to pay IDB and HSBC Bank at closing of the Proposed Sale the approximate sum of $11,400,000 and $8,600,000, respectively[6], which amounts are due by Firestar and Fantasy to IDB and HSBC Bank, respectively, under the IDC Revolving Credit Facility and the HSBC Bank Loan Agreement, respectively, plus interest, fees and costs thereunder. The payment of the sums due IDB and HSBC will result in reduction of administrative costs associated with those claims and it is submitted that such savings are beneficial to the Debtors and their estates.

---

[6] To the extent either IDB or HSBC Bank assert that Firestar and Fantasy owe one of them a different amount than set forth above, they may request in writing that the Debtors pay such different amount. If the Debtors agree with such different amount, the Debtors seek authority to pay such different amount. If the Debtors do not agree to such different amounts, then IDB and/or HSBC Bank may file an appropriate application to the Court.  The Debtors reserve all rights with respect to any such an application.

D.    **Notice**

32.    The Debtors propose that, within three (3) business days of entry of the Bidding

Procedures Order, the Debtors shall serve a copy of this Sale Motion, the Bidding Procedures

Order, the Bidding Procedures Notice and Potential Assigned Contracts Notice (as defined

below) upon the following persons by first-class mail, postage prepaid: (a) counsel to IDB,

Troutman Sanders LLP, 875 Third Avenue, New York, New York 10022 attn.: Brett D.

Goodman and Troutman Sanders LLP, 600 Peachtree Street, NE., Suite 3000, Atlanta, Georgia

30308 attn.: Harris B. Winsberg and Matthew R. Brooks; (b) counsel to HSBC Bank, Allen &

Overy LLP, 1221 Avenue of the Americas, New York, New York 10020, attn.: Ken Coleman;

(c) counsel to any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases

(the "Committee"), if any is appointed; (d) the Office of the United States Trustee, 201 Varick

Street, Suite 1006, New York, New York 10014, attn.: Richard Morrissey; (e) all Counterparties

to the Assigned Contracts; (f) all parties who have made an offer on some or all of the Assets or

expressed an interest in making an offer on some or all of the Assets; (h) all known persons

holding a lien on any of the Assets; (i) all known creditors and (j) all entities who have requested

notice under Bankruptcy Rule 2002 (collectively, the "Notice Parties").

33.    In addition, within three (3) business days of entry of the Bidding Procedures

Order, the Debtors shall cause the Bidding Procedures Notice to be published one (1) time in

either The Wall Street Journal, Eastern Edition or The New York Times.

34.    The Debtors submit that the foregoing notice is sufficient to provide effective

notice of the Bidding Procedures, the Auctions and the Proposed Sale to potentially interested

parties in a manner designed to maximize the chance of obtaining the broadest possible

participation in the Auctions, while minimizing the costs to the estate.

## ASSUMPTION AND ASSIGNMENT
## OF ASSIGNED CONTRACTS

35.    In connection with the Proposed Sale, the Debtors may seek authority under section 365 of the Bankruptcy Code to (a) assume and assign certain contracts of the Debtors (the "Potentially Assigned Contracts"), and (b) execute and deliver to the Winning Bidder, as the case may be such documents or other instruments as may be necessary to assign and transfer the applicable Potentially Assigned Contracts.

36.    The Debtors believe that there will be no material cure amounts associated with the Potentially Assigned Contracts; however, the Debtors seek to implement the following Assumption and Assignment Procedures (the "Assumption and Assignment Procedures") in order to facilitate an orderly assignment process:

(a)    Notice of Potential Assumption and Assignment. Within three (3) business days after the entry of the Bidding Procedures Order, the Debtors will serve each Counterparty to the Potentially Assigned Contracts, the Potential Assigned Contract Notice, substantially in the form attached hereto as Exhibit F, which shall (i) identify all of the Potentially Assigned Contracts; (ii) list the Debtors' good faith calculation of the cure costs with respect to each Potentially Assigned Contract; (iii) expressly state that assumption and assignment of the Potentially Assigned Contract is subject to Court approval; and (iv) prominently display the deadline to file objections to the assumption and assignment of the Assigned Contracts (the "Potential Assigned Contract Notice").

(b)    Cure Objections.

(1)    Cure Objection Deadline. Any Counterparty to a Potentially Assigned Contract that wishes to object to the proposed assumption and assignment of the Potentially Assigned Contract, the subject of which objection is the Debtors' proposed costs to cure any outstanding monetary defaults then existing ("Cure Costs") under such contract (each, a "Cure Objection"), shall file with the Court and serve on the Objection Recipients its Cure Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than **April 30, 2018 at 4:00 p.m.** (prevailing Eastern Time) (the "Cure Objection Deadline"). Replies, if any, to Cure Objection shall be filed by **May 2, 2018 at 12:00 p.m.** (prevailing Eastern Time).

(2)    Resolution of Cure Objections. The Debtors and a Counterparty that has filed a Cure Objection shall first confer in good faith to attempt to resolve

the Cure Objection without Court intervention. If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined by the Court at the Sale Hearing. The Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph.

(3)     Adjourned Cure Objections. If a timely Cure Objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing; provided that, a Cure Objection (and only a Cure Objection) may, at the Debtors' discretion, after consulting with the Consultation Parties and the Winning Bidder, be adjourned with the Court's consent (an "Adjourned Cure Objection") to a subsequent hearing. An Adjourned Cure Objection may be resolved after the closing date of the applicable Proposed Sale (and therefore the contract of the Counterparty in question may be assumed and assigned at Closing); provided that the Debtors maintain a cash reserve equal to the Cure Costs the objecting Counterparty believes is required to cure the asserted monetary default under the affected Potentially Assigned Contract.

(4)     Failure to File Timely Cure Objection. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Cure Objection, the Counterparty shall be deemed to have consented to the assumption and assignment of the Potentially Assigned Contract (unless such Counterparty has timely filed an Adequate Assurance Objection with respect to the Assigned Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption and assignment. Further, in the event no objections are timely filed and served, the Cure Costs set forth in the Potential Assigned Contract Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Potentially Assigned Contract under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in any Potentially Assigned Contract, or any other document, and the Counterparty to the Potentially Assigned Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Potentially Assigned Contract against the Debtors or any Winning Bidder(s), or the property of any of them.

(b)     Adequate Assurance Objections.

(1)     Adequate Assurance Information. The Debtors shall provide the Adequate Assurance Information with respect to each Qualified Bidder within 48 hours of receipt of an Sealed Bid from a Potential Bidder (the "Adequate Assurance Deadline") to those Counterparties (or their counsel) who have (x) submitted a written request (e-mail to Debtors' counsel is acceptable) for Adequate Assurance Information and (y) confirmed in writing to the Debtors' counsel (e-mail to Debtors' counsel is acceptable) their agreement to keep such Adequate Assurance Information strictly

confidential and use it solely for the purpose of evaluating whether a Potential Bidder has provided adequate assurance of future performance under the affected Potentially Assigned Contracts.

(2)    <u>Adequate Assurance Objection Deadline</u>. Any Counterparty to a Potentially Assigned Contract that wishes to object to the proposed assumption and assignment of a Potentially Assigned Contract, the subject of which objection is a Winning Bidder's proposed form of adequate assurance of future performance with respect to such contract (each, an "<u>Adequate Assurance Objection</u>") shall file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof, including submitting any appropriate documentation in support thereof, by **April 30, 2018 at 4:00 p.m.** (prevailing Eastern Time) (the "<u>Adequate Assurance Objection Deadline</u>").  Replies, if any, to Adequate Assurance Objections shall be filed by **May 2, 2018 at 12:00 p.m.** (prevailing Eastern Time).

(3)    <u>Resolution of Adequate Assurance Objections</u>. The Debtors and a Counterparty that has filed an Adequate Assurance Objection shall first confer in a good faith to attempt to resolve the Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, such objection and all issues of adequate assurance of future performance by the applicable Winning Bidder shall be determined by the Court at the Sale Hearing.

(4)    <u>Failure to File Timely Adequate Assurance Objection</u>. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Potentially Assigned Contract (unless the Counterparty has filed a timely Cure Objection with respect to the Potentially Assigned Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale. Further, in the event no objections are filed and served, the applicable Winning Bidder shall be deemed to have provided adequate assurance of future performance with respect to the affected Assigned Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code, notwithstanding anything to the contrary in the Potentially Assigned Contract, or any other document.

(c)    <u>Other Sale Objections by Counterparties.</u>

(1)    <u>Objection Deadline</u>. Any Counterparty to an Potentially Assigned Contract that wishes to file a Sale Objection (other than a Cure Objection or an Adequate Assurance Objection) to the proposed assumption and assignment of a Potentially Assigned Contract shall file with the Court and serve on the Objection Recipients its Sale Objection, which must state, with specificity, the legal and factual bases thereof, including any

appropriate documentation in support thereof, by no later than the Sale Objection Deadline of **April 30, 2018 at 4:00 p.m.** (prevailing Eastern Time). Replies, if any, to Sale Objections shall be filed by **May 2, 2018 at 12:00 p.m.** (prevailing Eastern Time).

(2) <u>Failure of Counterparties to File Timely Sale Objection</u>. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Sale Objection, the Counterparty shall be deemed to have consented to the assumption and assignment of the Potentially Assigned Contract (unless the Counterparty has filed a timely Cure Objection or Adequate Assurance Objection with respect to the Potentially Assigned Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale.

(3) <u>Reservation of Rights</u>. The inclusion of a Potentially Assigned Contract or Cure Costs on the Potential Assigned Contracts Notice shall not constitute or be deemed a determination or admission by the Debtors, the applicable Winning Bidder(s), or any other party in interest that such contract or other document is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Costs are due (all rights with respect thereto being expressly reserved). The Debtors reserve all of their rights, claims, and causes of action with respect to each Potentially Assigned Contract or other document listed on the Potential Assigned Contracts Notice. The Debtors' inclusion of any Potentially Assigned Contract on the Potential Assigned Contracts Notice shall not be a covenant, promise, or guarantee that such contract ultimately will be assumed and assigned. The Potential Assigned Contracts Notice shall be without prejudice to each Winning Bidder's rights, if any, under the applicable asset purchase agreement, to subsequently exclude any Potentially Assigned Contracts from the assumption or assignment prior to the closing of an applicable Proposed Sale.

37. The Debtors submit that the foregoing Assumption and Assignment Procedures and deadlines are fair and reasonable, and will provide sufficient notice to the non-Debtors Counterparties to the Potentially Assigned Contracts.

## **RELIEF REQUESTED AND BASIS THEREOF**

### A.    **The Proposed Sale is Within the Debtors' Sound Business Judgment and Notice is Good and Sufficient**

38. The Debtors submit that sufficient authority exists for approval of the Proposed Sale. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

39.    In applying this provision, courts in this and other districts have required that the sale of a Debtors' assets be based upon the sound business judgment of the Debtors.  See, e.g., Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143-145 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

40.    In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983), one of the seminal and most widely followed cases dealing with asset sales, the Second Circuit held that the factors to be considered in determining whether a sound business reason exists include the following:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, *most importantly perhaps, whether the asset is increasing or decreasing in value*.

Id. at 1071 (emphasis supplied).

41.    The Lionel decision has been widely accepted and applied by various courts considering a debtor's request to sell assets, including requests to approve a sale of certain of the assets of a debtor's estate.  See, e.g., In re the Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991); In re Eng'g Prod. Co., 121 B.R. 246 (Bankr. E.D. Wis. 1990); In re Thomson McKinnon Sec., Inc., 120 B.R. 301 (Bankr. S.D.N.Y. 1990); In re Channel One

Communications, Inc., 117 B.R. 493 (Bankr. E.D. Mo. 1990); In re Brethren Care, 98 B.R. 927

(Bankr. N.D. Ind. 1989).

42.     Once a court is satisfied that there is a sound business justification for the proposed

sale, the court must then determine whether: (i) the Debtors have provided the interested parties

with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the

purchaser is proceeding in good faith.  See Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens

Sch., Inc.), No. 96 Civ. 3576 (PKL), 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997); In re Del.

& Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Decora Indus., Inc., No. 00-4459

(JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002).

43.     Fair and accurate notice should inform all interested parties of the liquidation of

the Debtors' businesses; disclose accurately the terms of the sale; explain the effect of the sale

upon the Debtors' businesses; and explain why the sale is in the best interests of the Debtors'

estates.  In re Delaware & Hudson Ry., 124 B.R. at 180; Naron & Wagner, Chartered, 88 B.R.

85, 88 (Bankr. D.Md. 1988).

44.     The Proposed Sale provides the Debtors with an opportunity to maximize the value

of the Assets.  The Debtors believe that the Auctions will establish the highest and best offers for

the Assets, particularly in light of the limited market for the specialized assets and the marketing

efforts by the Debtors.

45.     Moreover, the Debtors submit that the notice provisions previously described

herein to the Notice Parties will ensure that full and fair disclosure, as well as the opportunity to

object, will be afforded to all creditors and parties in interest.

46.     For these reasons, the Debtors submit that the Proposed Sale meets the

requirements of Section 363(b) of the Bankruptcy Code.

B.    **Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

47.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell property of the estate:

> free and clear of any interest in such property of an entity other
> than the estate if (1) applicable nonbankruptcy law permits the sale
> of such property free and clear of such interest, (2) such entity
> consents, (3) such interest is a lien and the price at which such
> property is to be sold is greater than the aggregate value of all liens
> on such property, (4) such interest is in bona fide dispute, or (5)
> such entity could be compelled, in a legal or equitable proceeding,
> to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

48.    The Debtors submit that the Proposed Sale, along with the Bidding Procedures

related thereto, meets the test set forth in section 363(f)(2), in that IDB and HSBC Bank, which

hold liens against certain of the Firestar/Fantasy Assets, have or will consent to the Proposed

Sale.  In addition, the liens of IDB and HSBC Bank against certain of the Firestar/Fantasy Assets

will attach to the net proceeds from the Proposed Sale with the same validity, enforceability,

priority, force and effect that they now have as against the Firestar/Fantasy Assets.

49.    Accordingly, the Debtors submit that the Proposed Sale, free and clear of all liens,

claims, encumbrances and interests, meets the requirements of Section 363(f) of the Bankruptcy

Code.

C.    **Protections as a Good Faith Purchaser**

50.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest

in property purchased from a debtor in the event that the sale conducted under section 363(b) of

the Bankruptcy Code is later reversed or modified on appeal. Specifically, section 363(m)

provides:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] ... does not affect the validity of a sale ... to an

> entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

51.     Section 363(m) of the Bankruptcy Code "affords 'finality to judgment by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids.'" Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.), No. 92 Civ. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (quoting Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt. Corp.), 895 F.2d 845, 847 (1st Cir. 1990)); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.").

52.     The Second Circuit has indicated that, generally, a party would have to show fraud or collusion between the buyer and the debtors-in-possession or trustee or other bidders in order to demonstrate a lack of good faith. See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); see also In re Angelika Films 57th, Inc., Nos. 97 Civ 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997) (same; holding that purchaser's status as an insider was not *per se* bad faith).

53.    Here, the Debtors submit that they will engage in the sale process in good faith and in arms' length with Potential Bidders, and the Winning Bid established at the Auctions will be the product of the arm's length, good-faith negotiations.

54.    Moreover, by exposing the assets to the market through the Auctions, the Debtors submit that the consideration to be received for the assets is fair and reasonable.

55.    For these reasons, the Debtors request a finding that the Winning Bidder is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**D.    The Bidding Procedures are Fair and Reasonable
and are in the Best Interests of the Debtors' Estates and Creditors**

56.    In order to maximize the value of the assets for the benefit of the Debtors, their creditors and the chapter 11 estates, the Debtors seek to implement a competitive bidding process for the Assets that is designed to generate a maximum recovery.  The Debtors believe that the Auctions and proposed Bidding Procedures will encourage participation by financially-capable bidders.  Furthermore, the Bidding Procedures are consistent with other procedures previously approved by this and other courts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  See e.g., In re Kmart, Case No. 02-B02474 (SPS) (Bankr. N.D. 111 May 10, 2002); In re Global Crossing, Case No. 02-40188 (S.D.N.Y. March 25, 2002) (REG); In re Randall's Island Family Golf Ctrs., Inc., 261 B.R. 96 (S.D.N.Y. 2001); In re Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992).

57.    For these reasons, the Debtors submit that the Bidding Procedures should be approved.

E.        **Assumption and Assignment of Assigned  Contracts**

58.        Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession,

"subject to the court's approval, may assume or reject any executory contract or unexpired lease

of the debtor." 11 U.S.C. § 365(a).  A debtors' decision to assume an executory contract or

unexpired lease must be an exercise of its sound business judgment for the court to approve the

assumption under section 365(a) of the Bankruptcy Code. See Nostas Assocs. v. Costich (In re

Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime

Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

59.        Further, section 365(k) of the Bankruptcy Code provides that assignment by a

debtor to a third party assignee of a contract or lease "relieves the trustee and the estate from any

liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. §

365(k). Therefore, upon the closing of the Proposed Sale, the Debtors will be relieved of their

obligations under the Potentially Assigned Contracts, thereby further decreasing the obligations

of the estate and creating value for creditors.

60.        Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults

under executory contracts that will be assumed must be cured or that adequate assurance be

provided to the counterparties that such defaults will be promptly cured.

61.        In addition, pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may

assign an executory contract or unexpired lease of nonresidential real property if "adequate

assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C.

§ 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." See

Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr D.N.J.

1988) (internal citations omitted); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr.

S.D.N.Y. 1985) (holding that adequate assurance of future performance does not mean absolute assurance that debtors will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance when prospective assignee of lease had financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; in the leasing context, chief consideration with respect to adequate assurance is whether rent will be paid).

62.     To the extent that defaults exist under the Potentially Assigned  Contracts, the Debtors will ensure that the Winning Bidder will cure or provide adequate assurance of cure of such defaults within the meaning of section 365(b)(1)(A) of the Bankruptcy Code.

63.     Further, the Debtors will be prepared to present evidence to demonstrate the Winning Bidder's financial credibility, experience in the industry and willingness and ability to perform under the Potentially Assigned Contracts.  Therefore, the Sale Hearing will provide the Court and other interested parties with an opportunity to evaluate and if necessary, challenge the ability of the Winning Bidder to provide adequate assurance of future performance under the Potentially Assigned Contracts.

64.     For these reasons, the Debtors submit that they meet all of the requirements of section 365 of the Bankruptcy Code necessary to assume and assign the Potentially Assigned Contracts.

**F.**       **Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)**

65.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

66.      To preserve the value of the assets and limit the costs of administering and preserving the assets, it is very important that the Debtors close on the Proposed Sale as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors request that the Court waive the stay periods under Bankruptcy Rules 6004(g) and 6006(d).

## NO PRIOR REQUEST

67.      No previous request of the relief sought herein has been made by the Debtors to this or any other court.


[remainder of page intentionally blank]

**WHEREFORE**, for all the foregoing reasons, the Debtors respectfully request that this

Court enter orders, substantially in the form annexed hereto, granting the Motion and such other

further relief as the Court deems just and equitable.

Dated: New York, New York
March 23, 2018

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP

By: /s/ Ian R. Winters
Ian R. Winters
Sean C. Southard
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245

*Proposed Counsel to the Debtors and Debtors
in Possession*

-and-

FORCHELLI DEEGAN TERRANA LLP
Gerard R. Luckman
333 Earle Ovington Blvd, Suite 1010,
Uniondale, New York 11553
Tel: (516) 248-1700
Fax: (516) 248-1700

*Proposed Conflicts Counsel to the Debtors and
Debtors-in-Possession*

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X
                                                                     :
In re:                                                               :    Chapter 11
                                                                     :
FIRESTAR DIAMOND, INC., et al.                                       :    Case No. 18-10509 (SHL)
                                                                     :
                        Debtors.                                     :    Jointly Administered
                                                                     :
-------------------------------------------------------------------- X

### ORDER ESTABLISHING BIDDING PROCEDURES AND RELATED RELIEF REGARDING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

Upon the motion (the "Motion")[1] of Firestar Diamond, Inc. ("Firestar"), Fantasy, Inc. ("Fantasy") and A. Jaffe, Inc. ("A. Jaffe" and collectively, with Firestar and A. Jaffe, the "Debtors"), the above-captioned debtors and debtors-in-possession, for entry of an order (the "Bidding Procedures Order") (a) establishing bidding procedures, as set forth herein (the "Bidding Procedures"), with respect to the Debtors' sale of substantially all of their assets free and clear of liens, claims, interests and encumbrances (the "Proposed Sale"), (b) approving the form and manner of notices thereof (the "Bidding Procedures Notice"), and (c) setting a hearing (the "Sale Hearing") to consider approval of the Proposed Sale; and it appearing that the Debtors have provided good and sufficient notice to interested parties of the Motion, as evidenced by the proof of service filed on _____; and it further appearing that this Court has jurisdiction to grant the requested relief pursuant to 28 U.S.C. §§ 157 and 1334; and after considering all objections to the Motion, if any; and the Court having conducted a hearing on March 28, 2018, at which time the Court considered, among other things, the Bidding Procedures, any objections thereto and the oral arguments of counsel; and it further appearing that the relief requested is

---
[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

reasonable and necessary to protect the interests of the Debtors, their estates, and creditors; and after due deliberation, sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:[2]

A.     The statutory and legal predicates for the relief requested in this Order are sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

B.     The Debtors have provided good and sufficient notice of the relief granted by this Bidding Procedures Order to all parties in interest.  The notice provided is appropriate and is calculated to provide interested parties with timely and proper notice of the Bidding Procedures and the Auctions.  No further notice is required.  A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

C.     The Debtors have engaged in a process with respect to the Purchased Assets to solicit and develop the highest and best offers for the Purchased Assets.

D.     The Bidding Procedures attached hereto as **Exhibit 1** are fair, reasonable, appropriate and are designed to maximize recovery to the Debtors' estates.

E.     The Debtors have demonstrated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures, (ii) the Assumption and Assignment Procedures, and (iii) the form and manner of notice of the Auctions and Sale Hearing.

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

F.      The Bidding Procedures comply with the requirements of Local Rule 6004-1 and the Sale Guidelines.  The Bidding Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote participation and active bidding and ensure that the highest or best value is generated for the Debtors' assets.

G.      The Assumption and Assignment Procedures, including notice of proposed Cure Costs, are reasonable and appropriate and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. The Assumption and Assignment Procedures have been tailored to provide adequate opportunity for all Counterparties to the Potentially Assigned Contracts to raise objections, if any.

H.      The Bidding Procedures Notice is reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Assumption and Assignment Procedures, the Auctions, the Sale Hearing and the Proposed Sale, and the objection deadlines related thereto.

IT IS HEREBY ORDERED THAT:

**The Bidding Procedures and Auctions**

1.      The Bidding Procedures, attached hereto as **Exhibit 1**, are hereby approved in all respects, are incorporated herein and shall apply with respect to any bids for some or all of the Assets.  The Debtors are authorized to take all action necessary or appropriate to implement the Bidding Procedures.

2.      The deadline for submitting an Sealed Bid for the Assets shall be **April 19, 2018 at 4:00 p.m.** (prevailing Eastern Time) (the "Sealed Bid Deadline"); *provided that*, the Debtors may, after consulting with the Consultation Parties, extend the Sealed Bid Deadline for any

reason, in their reasonable business judgment. The Debtors shall provide copies of all bids to each of the Consultation Parties, in accordance with the Bidding Procedures.

3.       If more than one Qualified Bid is received for (i) the Firestar/Fantasy Assets and (ii) the A. Jaffe Assets, the Debtors may hold one or more auctions (each, a "Business Line Auction" and together, the "Business Line Auctions") in advance of the All-Asset Auction (defined below). The Business Line Auctions, if required, shall be held at the offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, or at such alternative location as the Debtors may determine, after consultation with the Consultation Parties, and after providing notice to the Notice Parties. The Business Line Auctions shall commence on **April 24, 2018 at 10:00 a.m.** (prevailing Eastern Time). The Business Line Auctions shall be conducted openly and shall be transcribed by a court reporter.

4.       If the Debtors receive at least two (2) Qualified Bids for the Assets (including, for the avoidance of doubt, a potential combination of the highest Offers for the Firestar/Fantasy Assets and the A. Jaffe Assets, the Debtors shall conduct an auction (the "All-Asset Auction," and together with the Business Line Auctions, the "Auctions"). The All-Asset Auction, if required, shall be held at the offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, or at such alternative location as the Debtors may determine, after consultation with the Consultation Parties, and after providing notice to the Notice Parties.  The All-Asset Auction shall commence on **April 24, 2018 at 11:30 a.m.** (prevailing Eastern Time) or as soon thereafter as practicable following the Business Line Auctions. The All-Asset Auction shall be conducted openly and shall be transcribed by a court reporter.

5.      The Auctions shall be conducted openly and shall be transcribed by a court reporter.

6.      Subject to the Bidding Procedures and this Order, the Debtors shall have the right, after consulting with the Consultation Parties, in their reasonable business judgment, to: (i) determine which bidders qualify as Qualified Bidders; (ii) determine which bids qualify as Qualified Bids; (iii) determine which Qualified Bids are the Winning Bid and the Backup Bid; (iv) reject any bid that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, the Bidding Procedures Order, or any other order of this Court; or (c) contrary to the best interests of the Debtors and their estates; (v) adjourn or cancel one or more of the Auctions; or (vi) modify the Bidding Procedures in a manner consistent with applicable law.

7.      All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auctions and the terms and conditions of the sale or transfer of the Assets.

## The Sale Hearing/Objection Deadline

8.      The Court shall conduct the Sale Hearing on **May 3, 2018 at 10:00 a.m.** (prevailing Eastern Time).  The Debtors may, after consultation the Winning Bidder and the Consultation Parties, seek an adjournment of the Sale Hearing as the Debtors deem appropriate in the exercise of their reasonable business judgment.

9.      Responses or objections (collectively, "Sale Objections") if any, to the relief requested in the Sale Motion, including Cure Objections and Adequate Assurance Objections, shall be in writing, shall state the name of the objecting party, shall state with particularity the reasons and basis for the Sale Objection, and shall be (a) filed with the Court and (b) served upon

(i) the Debtors, 592 5th Avenue, 3rd Floor, New York, New York 10036, attn.: Mark Samson, Chief Restructuring Officer; (ii) the Debtors' counsel, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, attn.: Ian R. Winters and Joseph C. Corneau, and Forchelli Deegan Terrana LLP, 333 Earle Ovington Blvd, Suite 1010, Uniondale, New York 11553, attn.: Gerard R. Luckman; (iii) counsel to IDB, including (x) Troutman Sanders LLP, 875 Third Avenue, New York, New York 10022 attn.: Brett D. Goodman and (y) Troutman Sanders LLP, 600 Peachtree Street, NE., Suite 3000, Atlanta, Georgia 30308 attn.: Harris B. Winsberg and Matthew R. Brooks; (iv) counsel to HSBC Bank, Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020, attn.: Ken Coleman; (v) counsel to any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"), if one is appointed; and (vi) the Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014, attn.: Richard Morrissey (collectively, the "Objection Recipients"), so as to be actually received by no later than **April 30, 2018 at 4:00 p.m.** (prevailing Eastern Time) (the "Sale Objection Deadline").  Any reply by the Debtors or other Objection Recipient shall be filed and served by no later than **May 2, 2018 at 12:00 p.m.** (prevailing Eastern Time).

### Notice Procedures

10.     The Bidding Procedures Notice, attached to the Motion as Exhibit B, provides adequate and sufficient notice to all interested parties of the Bidding Procedures, Auction, Motion, Sale Hearing, and the Proposed Sale pursuant to Bankruptcy Rules 2002 and 6004 and Local Rules 4001-1 and 6004-1, and is hereby approved.

11.     As soon as is reasonably practicable, but by no later than three (3) business days after entry of the Bidding Procedures Order, the Debtors shall serve a copy of this Bidding

Procedures Order, the Sale Motion, the Bidding Procedures Notice and the Potential Assigned Contract Notice upon the following persons by first-class mail, postage prepaid: (a) counsel to IDB, Troutman Sanders LLP, 875 Third Avenue, New York, New York 10022 attn.: Brett D. Goodman and Troutman Sanders LLP, 600 Peachtree Street, NE., Suite 3000, Atlanta, Georgia 30308 attn.: Harris B. Winsberg and Matthew R. Brooks; (b) counsel to HSBC Bank, Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020, attn.: Ken Coleman; (c) counsel to any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"), if any is appointed; (d) the Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014, attn.: Richard Morrissey; (e) all Counterparties to the Assigned Contracts; (f) all parties who have made an offer on some or all of the Assets or expressed an interest in making an offer on some or all of the Assets; (h) all known persons holding a lien on any of the Assets; (i) all known creditors and (j) all entities who have requested notice under Bankruptcy Rule 2002 (collectively, the "Notice Parties").

12.     In addition, the Debtors shall cause the Bidding Procedures Notice to be published one (1) time in either The Wall Street Journal, Eastern Edition or The New York Times.

### The Assumption and Assignment Procedures

13.     The Potential Assigned Contracts Notice, attached to the Motion as Exhibit F, provides adequate and sufficient notice to any applicable Counterparty of any proposed assumption and/or assignment of any Assigned Contract, and is hereby approved.

14.     The Assumption and Assignment Procedures (as set forth in the Motion) are reasonable, fair, and appropriate, and contain the type of information required under Bankruptcy

Rule 2002, Local Rule 2002-1, and comply in all respects with all other applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and are hereby approved.

15.    Within three (3) business days after entry of this Order, the Debtors shall file the Potential Assigned Contracts Notice with the Court and serve the Assigned Contracts Notice on the Notice Parties, including each applicable Counterparty.

16.    Any and all objections to the Cure Amounts (any such objection, a "Cure Objection") shall be in writing, shall state with specificity the legal and factual bases thereof and include any appropriate supporting documentation, filed with the Court and shall be simultaneously served on the following Objection Recipients, so as to be actually received by the Objection Recipients by no later than **April 30, 2018 at 4:00 p.m.** (prevailing Eastern Time) (the "Cure Objection Deadline").  Any reply by the Debtors shall be filed and served by no later than **May 2, 2018 at 12:00 p.m.** (prevailing Eastern Time).

17.    The Debtors and any Counterparty that has filed a Cure Objection shall confer in good faith in an effort to resolve the Cure Objection without Court intervention, after consultation with the Consultation Parties. If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall determine the amount to be paid or reserved with respect to such objection at the Sale Hearing; provided that, a Cure Objection (and only a Cure Objection) may, at the Debtors' discretion, after consulting with the Consultation Parties and the applicable Winning Bidder, be adjourned with the Court's consent (an "Adjourned Cure Objection") to a subsequent hearing.   An Adjourned Cure Objection may be resolved after the closing date of the applicable Proposed Sale (and therefore the contract of the Counterparty in question may be assumed and assigned at the closing), provided that the Debtors maintain a cash reserve equal to the Cure Costs the objecting

Counterparty believes is required to cure the asserted monetary default under the affected Potentially Assigned Contract.

18.     All other Sale Objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to, and under a Potentially Assigned Contract, if it is ultimately designated for assumption and assignment by the Winning Bidder(s), will be heard at the Sale Hearing.

19.     If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Cure Objection, the Counterparty shall be deemed to have consented to the assumption and assignment of the affected Potentially Assigned Contract (unless such Counterparty has timely filed an Adequate Assurance Objection with respect to the affected Assigned Contract) to the applicable Winning Bidder and forever shall be barred from asserting any objection with regard to such assumption, assignment, and sale. The Cure Costs set forth in the Potential Assigned Contracts Notice shall be controlling and will be the only amount necessary to cure outstanding monetary defaults under the affected Potentially Assigned Contract under 11 § U.S.C. 365(b), notwithstanding anything to the contrary in any Assigned Contract, or any other document, and the Counterparty to the Potentially Assigned Contract shall be deemed to have consented to the Cure Costs and shall forever be barred from asserting any other claims related to such Assigned Contract against the Debtors or the Winning Bidders, or the property of any of them.

20.     To the extent requested by a Counterparty, the Debtors shall provide, with respect to each Qualified Bidder, information to demonstrate that each Qualified Bidder is able to fulfill all obligations in connection with satisfying adequate assurance of future performance under any Assigned Contract ("Adequate Assurance Information"). In particular, the Debtors shall, within

48 hours of receipt of an Sealed Bid from a Potential Bidder (the "<u>Adequate Assurance Deadline</u>"), provide a copy of the Adequate Assurance Information to those Counterparties (or their counsel) who have: (x) submitted a written request (e-mail to Debtors' counsel is acceptable) for Adequate Assurance Information and (y) confirmed in writing to the Debtors' counsel (e-mail to Debtors' counsel is acceptable) their agreement to keep such Adequate Assurance Information strictly confidential and use it solely for the purpose of evaluating whether a Potential Bidder has provided adequate assurance of future performance under the affected Potentially Assigned Contract.

21.     Any Counterparty to an Potentially Assigned Contract that has an objection to the proposed assumption and assignment of an Potentially Assigned Contract, the subject of which objection is a Winning Bidder's proposed form of adequate assurance of future performance with respect to such contract (each, an "<u>Adequate Assurance Objection</u>"), shall file with the Court and simultaneously serve on the Objection Recipients an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof, including submitting any appropriate supporting documentation, by no later than **April 30, 2018 at 4:00 p.m.** (prevailing Eastern Time) (the "<u>Adequate Assurance Objection Deadline</u>").  Replies, if any, to Adequate Assurance Objections shall be filed by **May 2, 2018 at 12:00 p.m.** (prevailing Eastern Time).

22.     The Debtors, after consultation with the Consultation Parties, and any Counterparty that has filed an Adequate Assurance Objection shall confer in good faith in an effort to resolve the Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Court shall determine any issues of adequate assurance of future performance by the applicable Winning Bidder at the Sale Hearing.

23.     If a Counterparty fails to timely file with the Court and serve on the Objection

Recipients an Adequate Assurance Objection, the Counterparty shall be deemed to have

consented to the assumption and assignment of the affected Potentially Assigned Contract

(unless the Counterparty has filed a timely Cure Objection with respect to the Assigned Contract)

to the applicable Winning Bidder and shall be forever barred from asserting any objection with

regard to such assumption and assignment. Further, in the event no objections are filed and

served, the applicable Winning Bidder shall be deemed to have provided adequate assurance of

future performance with respect to the affected Potentially Assigned Contract in accordance with

11 U.S.C. § 365(f)(2)(B), notwithstanding anything to the contrary in the Potentially Assigned

Contract, or any other document.

24.     Any Counterparty to an Potentially Assigned Contract that wishes to file a Sale

Objection (other than a Cure Objection or an Adequate Assurance Objection) to the proposed

assumption and assignment of a Potentially Assigned Contract shall file with the Court and serve

on the Objection Recipients its Sale Objection, which must state, with specificity, the legal and

factual bases thereof, including any appropriate documentation in support thereof, by no later

than the Sale Objection Deadline of **April 30, 2018, at 4:00 p.m.** (prevailing Eastern Time).

Replies, if any, to Sale Objections shall be filed by **May 2, 2018 at 4:00 p.m.** (prevailing Eastern

Time).

25.     If a Counterparty fails to timely file with the Court and serve on the Objection

Recipients a Sale Objection, the Counterparty shall be deemed to have consented to the

assumption and assignment of the Potentially Assigned Contract (unless the Counterparty has

filed a timely Cure Objection or Adequate Assurance Objection with respect to the Potentially

Assigned Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption and assignment.

26.     The Debtors reserve all of their rights, claims, and causes of action with respect to each Potentially Assigned Contract or other document listed on the Potential Assigned Contracts Notice. The Debtors' inclusion of any Potentially Assigned Contract on the Potential Assigned Contracts Notice shall not be a covenant, promise, or guarantee that such contract ultimately will be assumed and assigned.

## **Other Relief Granted**

27.     In the event there is a conflict between this Order and the Sale Motion, this Order shall control and govern.

28.     This Order shall become effective immediately upon its entry.

29.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

Dated: New York, New York
        March ___, 2018


_____
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

Bidding Procedures

## BIDDING PROCEDURES

Set forth below are the Bidding Procedures that will be employed in connection with a sale or disposition (the "Proposed Sale") of substantially all of the assets of Firestar Diamond, Inc. ("Firestar"), Fantasy, Inc. ("Fantasy") and A. Jaffe, Inc. ("A. Jaffe" and collectively, with Firestar and A. Jaffe, the "Debtors") in the above captioned chapter 11 cases (the "Chapter 11 Cases").

### A.    Key Dates and Deadlines

| March 28, 2018 at 10:00 a.m. | Hearing on Bidding Procedures Motion |
|---|---|
| March 30, 2018 | Deadline to Mail Bidding Procedures Notice and Sale Motion |
| April 19, 2018 at 5:00 p.m. | Sealed Bid Deadline |
| April 20, 2018 at 5:00 p.m. | Deadline for Debtors to notify Potential Bidders of their status as Qualified Bidders |
| April 24, 2018 at 10:00 a.m. and 11:30 a.m. | Auctions, if necessary |
| April 30, 2018 at 4:00 p.m. | Sale Objection Deadline, Cure Objection Deadline, and Adequate Assurance Objections Deadline |
| May 2, 2018 at 12:00 p.m. | Deadline for Debtors to file Replies to Sale Objections, Cure Objections, and Adequate Assurance Objections |
| May 3, 2018 at 10:00 a.m. | Sale Hearing |

### B.    The Description of the Assets

The Debtors are seeking to sell substantially all of their Assets[1] free and clear of all liens, claims, interests, or other encumbrances. The Debtors are also seeking to Sealed Bids for each of the Firestar/Fantasy Assets and the A. Jaffe Assets.

### C.    Consultation Parties

Throughout the sale process, as necessary or appropriate, the Debtors will consult with the following parties: (a) counsel to IDB, Troutman Sanders LLP, 875 Third Avenue, New York, New York 10022 attn.: Brett D. Goodman and Troutman Sanders LLP, 600 Peachtree Street, NE., Suite 3000, Atlanta, Georgia 30308 attn.: Harris B. Winsberg and Matthew R. Brooks; (b) counsel to HSBC Bank, Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020, attn.: Ken Coleman; (c) counsel to any Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases (the "Committee"), if any is appointed; and (d) the Office of

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Motion.

the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014, attn.: Richard Morrissey (together, the "Consultation Parties").

### D.    Potential for Stalking Horse.

Although the Bidding Procedures contemplate that the Debtors will solicit Sealed Bids in connection on or before the Sealed Bid Deadline, the Debtors reserve the right to enter into a form of the APA before the Auctions with a Stalking Horse in consultation with the Consultation Parties.  The Debtors contemplates that any APA with a Stalking Horse would nonetheless be subject to the receipt of higher or otherwise better bids in accordance with these Bidding Procedures and the Auctions.  If one or more of the Debtors enter into an APA with a Stalking Horse Bidder, all Potential Bidders that have provided the required documentation in paragraph F, below, shall be notified and provided the terms of such APA, including bidding protections as may be approved by the Court and thereafter offered as part of the APA.

The Bidding Procedures Order permits the Debtors to present to this Court, on not less than seven (7) days' notice, a revised APA and related proposed bidding protections that the Debtors believe are necessary to induce a Stalking Horse to pursue the Proposed Sale (the "Bidding Protections").

If the Debtors enter into an APA with a Stalking Horse, the APA with the Stalking Horse shall be deemed a Qualified Bid (as defined below) and the Stalking Horse shall be deemed a Qualified Bidder (as defined below).

### E.    Bidder Qualifications

To qualify as a qualified bid (a "Qualified Bid"), a Potential Bidder must submit a Sealed Bid by the Sealed Bid Deadline, and the Debtors, in consultation with the Consultation Parties, must determine that the Offer satisfies the following requirements:

(1)    Modified APA. Each Sealed Bid must include: (i) an executed copy of an asset purchase agreement which is not materially more burdensome to the Debtors than the Proposed APA or inconsistent with these Bidding Procedures (the "Modified APA"); and (ii) a marked-up copy of the Modified APA reflecting the differences between the Modified APA and the Proposed APA. The Debtors, in consultation with the Consultation Parties, shall determine whether any Modified APA that modifies the Proposed APA in any respect beyond the identity of the purchaser and the purchase price under the Modified APA results in such Sealed Bid being materially less favorable to the Debtors, which may be considered in the Debtors' deliberations as to what constitutes the highest and best offer.

(2)    Allocation Schedule.  Each Sealed Bid for the Assets must include an allocation schedule of the proposed purchase price for the Assets as between the Firestar/Fantasy Assets and the A. Jaffe Assets. If the Sealed

Bid is not for all of the Assets, then the Sealed Bid must state whether it is for the Firestar/Fantasy Assets or the A. Jaffe Assets.

(3)    <u>Modified Sale Order</u>. Each Offer must include a marked-up copy of the Sale Order (a "<u>Modified Sale Order</u>") reflecting differences between the proposed Sale Order annexed to the Sale Motion as Exhibit C requested by the party submitted a Sealed Bid. The Debtors, in consultation with the Consultation Parties, shall determine whether any Modified Sale Order that modifies the proposed Sale Order in any respect beyond the identity of the purchaser, the purchase price and the allocation of the purchase price results in such Sealed Bid being materially less favorable to the Debtors, which may be considered in the Debtors' deliberations as to what constitutes the highest and best offer.

(4)    <u>Identification of Bidder</u>. Each Sealed Bid must fully disclose the legal identity of each entity that will be bidding for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets, as applicable, participating in connection with such Sealed Bid (including but not limited to any equity holder or other financial backer if the Potential Bidder is an entity specifically formed for purposes of effectuating the Proposed Sale, and the complete terms of any such participation) and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder or Qualified Bidder, and/or any officer or director of the foregoing.

(5)    <u>Financial Information</u>.  Any Potential Bidder that wishes to submit a Sealed Bid for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets, as applicable, must provide the Debtors with sufficient and adequate information to demonstrate, to the satisfaction of the Debtors, in consultation with the Consultation Parties, that the Sealed Bid: (i) is being made by an entity that has the financial wherewithal and ability to consummate the Sealed Bid and (ii) provides information to demonstrate that it is able to fulfill all obligations in connection with all Assigned Contracts (as defined below) so as to satisfy the requirement of providing adequate assurance of future performance, as contemplated by section 365 of the Bankruptcy Code (the "<u>Adequate Assurance Information</u>").

(6)    <u>Other Requirements</u>.  Each Sealed Bid shall: (i) state that Sealed Bid is formal, binding and unconditional, is not subject to further due diligence, and is irrevocable until the earlier to occur of: (x) the first business day following the closing of the Proposed Sale or (y) sixty (60) days following the last date of the Auctions (as may be adjourned); (ii) not contain any financing and employment-related contingencies of any kind; (iii) not contain any condition to closing the Proposed Sale on the receipt of any third party approvals; (iv) state that the Potential Bidder is ready, willing and able to perform its obligations under the Modified APA submitted with such Sealed Bid; (v) expressly state that the Potential Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") if such bidder's Qualified

Bid is selected as the next highest or next best bid after the Winning Bid for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets, as applicable; (vi) include contact information for the person(s) the Debtors should contact with questions about the Potential Bidder's Sealed Bid; and (vii) be received by the Debtors and Consultation Parties by the Sealed Bid Deadline.

(7)     <u>Good Faith Deposit</u>. All Qualified Bids must be accompanied by a good faith deposit in the amount of ten percent (10%) of the Offer (a "<u>Good Faith Deposit</u>"), in the form of a certified or cashier's check, payable to "KLESTADT WINTERS JURELLER SOUTHARD & STEVENS LLP ESCROW MANAGEMENT ACCOUNT" or by wire transfer, instructions for which will be provided upon request.  All such deposits shall be retained by the Debtors pending the hearing to consider the Sale Motion and shall be returned within ten (10) days after entry of a Sale Order, except that the Debtors will hold the deposit of the Backup Bidder, until the earlier of (x) the first business day following closing of the Proposed Sale or (y) sixty (60) days following the last date of the Auction (as may be adjourned), provided that any Potential Bidder submitting a credit bid component pursuant to section 363(k) of the Bankruptcy Code shall not be required to submit a Good Faith Deposit on account of such component of the Potential Bidder's Sealed Bid.

### F.      Due Diligence

To be eligible to participate in the Auctions, each Potential Bidder must execute a nondisclosure agreement in form and on terms satisfactory to the Debtors.

In addition, each Potential Bidder must demonstrate financial wherewithal to complete a transaction for the Purchased Assets by providing to the Debtors (a) financial statements for the last two calendar years and (b) a letter from a bank or other financial institution that indicates cash liquidity or credit availability of at least the amount of its Sealed Bid plus fifteen percent (15%).

If the Debtors determine, after consultation with the Consultation Parties, that a Potential Bidder does not qualify as a Qualified Bidder, such Potential Bidder shall not be entitled to receive due diligence access or additional non-public information.

### G.      Offer Deadline

Any person or entity interested in participating in the Auctions (defined below) shall submit a Sealed Bid in writing and transmit such bid to: (a) the Debtors, 592 5th Avenue, 3rd Floor, New York, New York 10036, attn.: Mark Samson, Chief Restructuring Officer; (b) the Debtors' counsel, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, attn.: Ian R. Winters and Joseph C. Corneau, and Forchelli Deegan Terrana LLP, 333 Earle Ovington Blvd., Suite 1010, Uniondale, New York 11553, attn.: Gerard R. Luckman; (c) counsel to IDB, Troutman Sanders LLP, 875 Third Avenue, New York,

New York 10022 attn.: Brett D. Goodman and Troutman Sanders LLP, 600 Peachtree Street, NE., Suite 3000, Atlanta, Georgia 30308 attn.: Harris B. Winsberg and Matthew R. Brooks; (d) counsel to HSBC Bank, Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020, attn.: Ken Coleman; (e) counsel to any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"), if one is appointed; and (f) the Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014, attn.: Richard Morrissey, so that it is received by no later than April 23, 2018[2] at 5:00 p.m. (prevailing Eastern Time) (the "Sealed Bid Deadline").   The Debtors may, after consulting with the Consultation Parties, extend the Sealed Bid Deadline in their reasonable business judgment.

### H.    Selecting Qualified Bidders

The Debtors shall, in consultation with the Consultation Parties, make a determination whether a Sealed Bid is a Qualified Bid and shall notify each Potential Bidders whether its Sealed Bid has qualified as a Qualified Bid by not later than **April 20, 2018 at 5:00 p.m.** (prevailing Eastern Time). Any Potential Bidder whose Offer is determined to be a Qualified Bid shall be designated as a "Qualified Bidder."

A Sealed Bid shall be determined to be a Qualified Bid only if it satisfies all of the requirements of paragraph E, above, and is one of the top five (5) bids or within twenty percent (20%) of the highest bid received for the Assets, the Firestar/Fantasy Assets, or the A. Jaffe Assets, as applicable, provided, however, that the Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, admit a Potential Bidder to the Auctions as a Qualified Bidder even if its Sealed Bid does not meet the top five (5) or twenty percent (20%) threshold, provided that its Sealed Bid otherwise satisfies all of the requirements of paragraph E, above.

### I.    Credit Bidding

Any secured creditor holding an allowed secured claim against the Debtors shall have the right, subject to the provisions of the Bankruptcy Code, applicable law, and any agreement of such secured creditor, to credit bid such claims to the extent of such secured party's interest in or lien on the Assets being bid upon. IDB and HSBC Bank have security interests in and liens on substantially all of the Firestar/Fantasy Assets and IDB and HSBC Bank shall have the right at any time prior to or at an Auction to credit bid their prepetition and/or postpetition claims (including any pre- and post-petition interest and fees accrued and otherwise due pursuant to section 363(k) of the Bankruptcy Code. For the purposes of these Bidding Procedures and any Auction in connection herewith, any offer by IDB or HSBC Bank shall constitute a Qualified Bid and IDB and HSBC Bank shall be deemed Qualified Bidders.

---

[2] Dates and deadlines set forth in this Sale Motion are the Debtors' proposed dates and deadlines. The Bidding Procedures Order will establish the dates and deadlines approved by the Bankruptcy Court.

**J.**     **The Business Line Auction(s)**

If more than one Qualified Bid is received for (i) the Firestar/Fantasy Assets or (ii) the A. Jaffe Assets, the Debtors may hold one or more auctions (each, a "Business Line Auction" and together, the "Business Line Auctions") in advance of the All-Asset Auction (defined below).

The Business Line Auctions, if required, shall be held at the offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, or at such alternative location as the Debtors may determine, after consultation with the Consultation Parties. The Business Line Auctions shall commence on **April 24, 2018 at 10:00 a.m.** (prevailing Eastern Time). The Business Line Auctions shall be conducted openly and shall be transcribed by a court reporter.

Only Qualified Bidders and their representatives, the Debtors and their representatives, the Consultation Parties and their respective representatives will be permitted to attend the Business Line Auctions. The following procedures will be applicable at the Business Line Auctions:

    (1)    Each Qualified Bidder shall appear in person at the Business Line Auctions through a duly authorized representative. Only Qualified Bidders shall be entitled to make any subsequent bids at the Business Line Auctions. Each Qualified Bidder shall be required to confirm that (i) it has not engaged in any collusion with respect to the bidding or the Proposed Sale; and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Firestar/Fantasy Assets or A. Jaffe Assets, as applicable, if such bid if selected as the highest bid at the applicable Business Line Auction, subject to paragraph (3), below.

    (2)    <u>Procedures for Conducting Business Line Auctions</u>. At the commencement of each of the Business Line Auctions, the Debtors, after consultation with the Consultation Parties, shall announce the highest Sealed Bid received for the Firestar/Fantasy Assets and the A. Jaffe Assets, as applicable. Such highest sealed bid shall constitute the baseline bid ("Business Line Baseline Bid") for that Business Line Auction. The Qualified Bidder submitting the Business Line Baseline Bid shall not be required to bid in the first round of the applicable Business Line Auction. Qualified Bidders other than Qualified Bidder that submitted the Business Line Baseline Bid shall be invited to top the Business Line Baseline Bid. Any bid to top the Business Line Baseline Bid shall be not less than $200,000, and each successive bid shall be not less than $200,000, provided, however, that the Debtors may, after consultation with the Consultation Parties, increase or decrease the bid increments. Except with respect to the Qualified Bidder that submitted the Business Line Baseline Bid, subsequent bidding shall be made by other Qualified Bidders in the order in which such Qualified Bids were received, which shall be announced at the commencement of each Business Line Auction. Any Qualified Bidder that declines to top the Business Line Baseline Bid shall be excluded from further bidding. Bidding shall proceed in successive

rounds until each Qualified Bidder not previously excluded from bidding declines to top the last bid.

(3)    <u>Highest Business Line Offers</u>. At the end of each such Business Line Auction, the Debtors, after consultation with the Consultation Parties, shall announce the highest and best offer for each of the Firestar/Fantasy Assets and the A. Jaffe Assets, as applicable. If in the Debtors' business judgment and after consultation with the Consultation Parties, a combination of highest and best Offers for each Business Line Auction may be competitive with Sealed Bids for the Assets at the All-Asset Auction (as defined below), then the combination of the highest and best offers of the Business Line Auctions may (but shall not be required to) be designated by the Debtors as the starting bid at the All-Asset Auction (defined below), provided that the Debtors may, in their reasonable business judgment, consider factors other than total purchase price in determining whether or not to designate the combined highest Offers following the Business Line Auctions as the starting bid at the All-Asset Auction, including, without limitation, potential increased execution risk.

**K.    The All-Asset Auction.**

If the Debtors receive at least two (2) Qualified Bids for the Assets (including, for the avoidance of doubt, a potential combination of the highest offers for the Firestar/Fantasy Assets and the A. Jaffe Assets as described in paragraph J.2, above, the Debtors shall conduct an auction (the "<u>All-Asset Auction</u>," and together with the Business Line Auctions, the "<u>Auctions</u>"). The All-Asset Auction, if required, shall be held at the offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, or at such alternative location as the Debtors may determine, after consultation with the Consultation Parties, and after providing notice to the Notice Parties.  The All-Asset Auction shall commence on **April 24, 2018 at 11:30 a.m.** (prevailing Eastern Time) or as soon after the Business Line Auctions as is practicable.  The All-Asset Auction shall be conducted openly and shall be transcribed by a court reporter.

Only Qualified Bidders and their representatives, the Debtors and their representatives, the Consultation Parties and their respective representatives will be permitted to attend the All-Asset Auction. The following procedures will be applicable at the All-Asset Auction:

(1)    Each Qualified Bidder shall appear in person at the Auctions through a duly authorized representative. Only Qualified Bidders shall be entitled to make any subsequent bids at the Auctions. Each Qualified Bidder shall be required to confirm that (i) it has not engaged in any collusion with respect to the bidding or the Proposed Sale; and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the assets identified if such bid if selected as the Winning Bidder.

(2)    <u>Procedures for Conducting All-Asset Auction</u>. At the commencement of each of the All-Asset Auction, the Debtors, after consultation with the Consultation Parties, shall announce the highest Sealed Bid received for the Assets. Such highest sealed bid shall constitute the baseline bid ("<u>All-</u>

Asset Baseline Bid") for the All-Asset Auction, which may be a combination of the highest bids announced at the conclusion of the Business Line Auctions. The Qualified Bidder(s) submitting the All-Asset Baseline Bid shall not be required to bid in the first round of the All-Asset Auction. Qualified Bidders other than the Qualified Bidder that submitted the All-Asset Baseline Bid shall be invited to top the All-Asset Baseline Bid. Any bid to top the All-Asset Baseline Bid shall be not less than $200,000, and each successive bid shall be not less than $200,000, provided, however, that the Debtors may, after consultation with the Consultation Parties, increase or decrease the bid increments. Except with respect to the Qualified Bidder that submitted the All-Asset Baseline Bid, subsequent bidding shall be made by other Qualified Bidders in the order in which such Qualified Bids were received, which shall be announced at the commencement of the All-Asset Auction. Any Qualified Bidder that declines to top the All-Asset Baseline Bid shall be excluded from further bidding. Bidding shall proceed in successive rounds until each Qualified Bidder not previously excluded from bidding declines to top the last bid.

(3)   Winning Bid. Immediately prior to the conclusion of the All-Asset Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which bid or combination of bids constitute the winning bid (the "Winning Bid"); and (ii) notify all Qualified Bidders at the All-Asset Auction of the identity or identities of the bidder(s) that submitted the Winning Bid (each such bidder, the "Winning Bidder") and the amount of the purchase price and other material terms of the Winning Bid.

(4)   The All-Asset Auction may include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids at the All-Asset Auction to improve their bids. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders during the All-Asset Auction.

(5)   The Debtors shall have the right, after consulting with the Consultation Parties, to determine, in their reasonable business judgment, which bid or combination of bids constitutes the highest or otherwise best bid and reject at any time, any bid that the Debtors determine to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, Bankruptcy Rules, or the Local Rules, these Bidding Procedures, any order of the Bankruptcy Court, or is not in the best interests of the Debtors and their estates.

(6)   Within one (1) business day after conclusion of the Auction, the Winning Bidder shall be required to supplement its Good Faith Deposit by the difference between its Qualified Bid and the Winning Bid multiplied by ten percent (10%).

(7)   Backup Bid. Immediately prior to the conclusion of the All-Asset Auction, the Debtors shall, in consultation with the Consultation Parties, (i)

determine, consistent with these Bidding Procedures, which bid or combination of bids constitute the backup bid (the "<u>Backup Bid</u>"); and (ii) notify all Qualified Bidders at the All-Asset Auction of the identity or identities of the bidder(s) that submitted the Backup Bid (each such bidder, the "<u>Backup Bidder</u>") and the amount of the purchase price and other material terms of the Backup Bid. Backup Bids shall be open and irrevocable until the earlier of (x) the first business day following closing of the Proposed Sale or (y) sixty (60) days following the last date of the All-Asset Auction (as may be adjourned). If the Winning Bidder fails to consummate a Proposed Sale, the Backup Bidder shall be deemed the new Winning Bidder, and the Debtors will be authorized, but not required, to consummate a Proposed Sale with the Backup Bidder.

(8)     Subject to the terms and conditions set forth in the Modified APA, in the event that a Winning Bidder fails to consummate the proposed transaction by the Closing Date, such bidder's deposit shall be forfeited to the Debtors as liquidated damages, and the Debtors shall be free to consummate the proposed transaction with the Backup Bidder at the final price bid by such bidder at the All-Asset Auction (or, if that bidder is unable to consummate the transaction at that price, the Debtors may consummate the transaction with the next higher bidder, and so forth) without the need for an additional hearing or order of the Court.

(9)     Within one (1) business day after conclusion of the All-Asset Auction, the Backup Bidder shall be required to supplement its Good Faith Deposit by the difference between its Qualified Bid and the Backup Bid multiplied by ten percent (10%).

(10)    <u>Modification of Procedures</u>. The Debtors may, after consulting with the Consultation Parties, announce at the Auctions modified or additional procedures for conducting the Auctions.

(11)    <u>Auction Results</u>: Within one (1) business day following the Auctions, the Debtors will cause the results of the Auction to be filed with the Court, docketed on the Court's electronic case filing ("<u>ECF</u>") system.

**Exhibit B**

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
Ian R. Winters
Sean C. Southard
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- X
                                                                    :
In re:                                                              :    Chapter 11
                                                                    :
FIRESTAR DIAMOND, INC., et al.                                      :    Case No. 18-10509 (SHL)
                                                                    :
                                    Debtors.                        :    Jointly Administered
                                                                    :
------------------------------------------------------------------- X

**NOTICE OF SALE AND ASSIGNMENT OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, AND
BIDDING PROCEDURES AND AUCTIONS RELATED THERETO**

**PLEASE TAKE NOTICE** that, on March ___, 2018, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an Order (the "Bidding Procedures Order") (a) establishing bidding procedures, as set forth herein (the "Bidding Procedures"), with respect to the Debtors' sale of substantially all of their assets free and clear of liens, claims, interests and encumbrances (the "Proposed Sale"), (b) approving the form and manner of notices thereof (the "Bidding Procedures Notice"), and (c) setting a hearing (the "Sale Hearing") to consider approval of the Proposed Sale.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures Order, Auctions for the Debtors' assets will take place on **April 24, 2018** at the law offices of Klestadt

Winters Jureller Southard & Stevens, LLP, or at such alternative location as the Debtors may

determine, **commencing at 10:00 a.m.** (prevailing Eastern Time);

      **PLEASE TAKE FURTHER NOTICE** that, to qualify as a qualified bid (a "Qualified

Bid"), a Potential Bidder must submit a Sealed Bid by the Sealed Bid Deadline, and the Debtors,

in consultation with the Consultation Parties, must determine that the Offer satisfies the

following requirements:

(1)     Modified APA. Each Sealed Bid must include: (i) an executed copy of an asset purchase agreement which is not materially more burdensome to the Debtors than the Proposed APA or inconsistent with these Bidding Procedures (the "Modified APA"); and (ii) a marked-up copy of the Modified APA reflecting the differences between the Modified APA and the Proposed APA. The Debtors, in consultation with the Consultation Parties, shall determine whether any Modified APA that modifies the Proposed APA in any respect beyond the identity of the purchaser and the purchase price under the Modified APA results in such Sealed Bid being materially less favorable to the Debtors, which may be considered in the Debtors' deliberations as to what constitutes the highest and best offer.

(2)     Allocation Schedule. Each Sealed Bid for the Assets must include an allocation schedule of the proposed purchase price for the Assets as between the Firestar/Fantasy Assets and the A. Jaffe Assets. If the Sealed Bid is not for all of the Assets, then the Sealed Bid must state whether it is for the Firestar/Fantasy Assets or the A. Jaffe Assets.

(3)     Modified Sale Order. Each Offer must include a marked-up copy of the Sale Order (a "Modified Sale Order") reflecting differences between the proposed Sale Order annexed to the Sale Motion as Exhibit C requested by the party submitted a Sealed Bid. The Debtors, in consultation with the Consultation Parties, shall determine whether any Modified Sale Order that modifies the proposed Sale Order in any respect beyond the identity of the purchaser, the purchase price and the allocation of the purchase price results in such Sealed Bid being materially less favorable to the Debtors, which may be considered in the Debtors' deliberations as to what constitutes the highest and best offer.

(4)     Identification of Bidder. Each Sealed Bid must fully disclose the legal identity of each entity that will be bidding for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets, as applicable, participating in connection with such Sealed Bid (including but not limited to any equity holder or other financial backer if the Potential Bidder is an entity

2

specifically formed for purposes of effectuating the Proposed Sale, and the complete terms of any such participation) and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder or Qualified Bidder, and/or any officer or director of the foregoing.

(5)     <u>Financial Information</u>.  Any Potential Bidder that wishes to submit a Sealed Bid for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets, as applicable, must provide the Debtors with sufficient and adequate information to demonstrate, to the satisfaction of the Debtors, in consultation with the Consultation Parties, that the Sealed Bid: (i) is being made by an entity that has the financial wherewithal and ability to consummate the Sealed Bid and (ii) provides information to demonstrate that it is able to fulfill all obligations in connection with all Assigned Contracts (as defined below) so as to satisfy the requirement of providing adequate assurance of future performance, as contemplated by section 365 of the Bankruptcy Code (the "<u>Adequate Assurance Information</u>").

(6)     <u>Other Requirements</u>.  Each Sealed Bid shall: (i) state that Sealed Bid is formal, binding and unconditional, is not subject to further due diligence, and is irrevocable until the earlier to occur of: (x) the first business day following the closing of the Proposed Sale or (y) sixty (60) days following the last date of the Auctions (as may be adjourned); (ii) not contain any financing or employment-related contingencies of any kind; (iii) not contain any condition to closing the Proposed Sale on the receipt of any third party approvals; (iv) state that the Potential Bidder is ready, willing and able to perform its obligations under the Modified APA submitted with such Sealed Bid; (v) expressly state that the Potential Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") if such bidder's Qualified Bid is selected as the next highest or next best bid after the Winning Bid for the Assets, the Firestar/Fantasy Assets or the A. Jaffe Assets, as applicable; (vi) include contact information for the person(s) the Debtors should contact with questions about the Potential Bidder's Sealed Bid; and (vii) be received by the Debtors and Consultation Parties by the Sealed Bid Deadline.

(7)     <u>Good Faith Deposit</u>. All Qualified Bids must be accompanied by a good faith deposit in the amount of ten percent (10%) of the Offer (a "<u>Good Faith Deposit</u>"), in the form of a certified or cashier's check, payable to "KLESTADT WINTERS JURELLER SOUTHARD & STEVENS LLP ESCROW MANAGEMENT ACCOUNT" or by wire transfer, instructions for which will be provided upon request.  All such deposits shall be retained by the Debtors pending the hearing to consider the Sale Motion and shall be returned within ten (10) days after entry of a Sale Order, except that the Debtors will hold the deposit of the Backup Bidder, until the earlier of (x) the first business day following closing of the Proposed Sale or (y) sixty (60) days following the last date of the Auction (as may be adjourned), provided that any Potential Bidder submitting a credit bid

component pursuant to section 363(k) of the Bankruptcy Code shall not be required to submit a Good Faith Deposit on account of such component of the Potential Bidder's Sealed Bid.

**PLEASE TAKE FURTHER NOTICE** If more than one Qualified Bid is received for (i) the Firestar/Fantasy Assets or (ii) the A. Jaffe Assets, the Debtors may hold one or more auctions (each, a "Business Line Auction" and together, the "Business Line Auctions") in advance of the All-Asset Auction (defined below).

The Business Line Auctions, if required, shall be held at the offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, or at such alternative location as the Debtors may determine, after consultation with the Consultation Parties. The Business Line Auctions shall commence on **April 24, 2018 at 10:00 a.m.** (prevailing Eastern Time). The Business Line Auctions shall be conducted openly and shall be transcribed by a court reporter.

Only Qualified Bidders and their representatives, the Debtors and their representatives, the Consultation Parties and their respective representatives will be permitted to attend the Business Line Auctions. The following procedures will be applicable at the Business Line Auctions:

(1)     Each Qualified Bidder shall appear in person at the Business Line Auctions through a duly authorized representative. Only Qualified Bidders shall be entitled to make any subsequent bids at the Business Line Auctions. Each Qualified Bidder shall be required to confirm that (i) it has not engaged in any collusion with respect to the bidding or the Proposed Sale; and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Firestar/Fantasy Assets or A. Jaffe Assets, as applicable, if such bid if selected as the highest bid at the applicable Business Line Auction, subject to subparagraph (3), below.

(2)     Procedures for Conducting Business Line Auctions. At the commencement of each of the Business Line Auctions, the Debtors, after consultation with the Consultation Parties, shall announce the highest Sealed Bid received for the Firestar/Fantasy Assets and the A. Jaffe Assets, as applicable. Such highest sealed bid shall constitute the baseline bid ("Business Line Baseline Bid") for that Business Line Auction. The Qualified Bidder submitting the Business Line Baseline Bid shall not be required to bid in the first round of the applicable Business Line Auction. Qualified Bidders other than Qualified Bidder that submitted the Business Line Baseline Bid shall be invited to top the Business Line Baseline Bid. Any bid to top the Business Line Baseline Bid shall be not less than $200,000, and each successive bid shall be not less than $200,000, provided, however, that the Debtors may, after consultation with the Consultation Parties, increase or decrease the bid increments. Except with respect to the Qualified Bidder that submitted the Business Line Baseline Bid, subsequent bidding shall be made by other Qualified Bidders in the order in which such Qualified Bids were received, which shall be

4

announced at the commencement of each Business Line Auction. Any Qualified Bidder that declines to top the Business Line Baseline Bid shall be excluded from further bidding. Bidding shall proceed in successive rounds until each Qualified Bidder not previously excluded from bidding declines to top the last bid.

(3)    <u>Highest Business Line Offers</u>. At the end of each such Business Line Auction, the Debtors, after consultation with the Consultation Parties, shall announce the highest and best offer for each of the Firestar/Fantasy Assets and the A. Jaffe Assets, as applicable. If in the Debtors' business judgment and after consultation with the Consultation Parties, a combination of highest and best Offers for each Business Line Auction may be competitive with Sealed Bids for the Assets at the All-Asset Auction (as defined below), then the combination of the highest and best offers of the Business Line Auctions may (but shall not be required to) be designated by the Debtors as the starting bid at the All-Asset Auction (defined below), provided that the Debtors may, in their reasonable business judgment, consider factors other than total purchase price in determining whether or not to designate the combined highest Offers following the Business Line Auctions as the starting bid at the All-Asset Auction, including, without limitation, potential increased execution risk.

**PLEASE TAKE FURTHER NOTICE** If the Debtors receive at least two (2) Qualified Bids for the Assets (including, for the avoidance of doubt, a potential combination of the highest offers for the Firestar/Fantasy Assets and the A. Jaffe Assets as described, above, the Debtors shall conduct an auction (the "<u>All-Asset Auction</u>," and together with the Business Line Auctions, the "<u>Auctions</u>"). The All-Asset Auction, if required, shall be held at the offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10018, or at such alternative location as the Debtors may determine, after consultation with the Consultation Parties, and after providing notice to the Notice Parties.  The All-Asset Auction shall commence on **April 24, 2018 at 11:30 a.m.** (prevailing Eastern Time) or as soon after the Business Line Auctions as is practicable.  The All-Asset Auction shall be conducted openly and shall be transcribed by a court reporter.

Only Qualified Bidders and their representatives, the Debtors and their representatives, the Consultation Parties and their respective representatives will be permitted to attend the All-Asset Auction. The following procedures will be applicable at the All-Asset Auction:

(1)    Each Qualified Bidder shall appear in person at the Auctions through a duly authorized representative. Only Qualified Bidders shall be entitled to make any subsequent bids at the Auctions. Each Qualified Bidder shall be required to confirm that (i) it has not engaged in any collusion with respect to the bidding or the Proposed Sale; and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the assets identified if such bid if selected as the Winning Bidder.

(2)    <u>Procedures for Conducting All-Asset Auction</u>. At the commencement of each of the All-Asset Auction, the Debtors, after consultation with the

Consultation Parties, shall announce the highest Sealed Bid received for the Assets. Such highest sealed bid shall constitute the baseline bid ("<u>All-Asset Baseline Bid</u>") for the All-Asset Auction, which may be a combination of the highest bids announced at the conclusion of the Business Line Auctions. The Qualified Bidder(s) submitting the All-Asset Baseline Bid shall not be required to bid in the first round of the All-Asset Auction. Qualified Bidders other than the Qualified Bidder that submitted the All-Asset Baseline Bid shall be invited to top the All-Asset Baseline Bid. Any bid to top the All-Asset Baseline Bid shall be not less than $200,000, and each successive bid shall be not less than $200,000, provided, however, that the Debtors may, after consultation with the Consultation Parties, increase or decrease the bid increments. Except with respect to the Qualified Bidder that submitted the All-Asset Baseline Bid, subsequent bidding shall be made by other Qualified Bidders in the order in which such Qualified Bids were received, which shall be announced at the commencement of the All-Asset Auction. Any Qualified Bidder that declines to top the All-Asset Baseline Bid shall be excluded from further bidding. Bidding shall proceed in successive rounds until each Qualified Bidder not previously excluded from bidding declines to top the last bid.

(3)    <u>Winning Bid</u>. Immediately prior to the conclusion of the All-Asset Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which bid or combination of bids constitute the winning bid (the "<u>Winning Bid</u>"); and (ii) notify all Qualified Bidders at the All-Asset Auction of the identity or identities of the bidder(s) that submitted the Winning Bid (each such bidder, the "<u>Winning Bidder</u>") and the amount of the purchase price and other material terms of the Winning Bid.

(4)    The All-Asset Auction may include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids at the All-Asset Auction to improve their bids. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders during the All-Asset Auction.

(5)    The Debtors shall have the right, after consulting with the Consultation Parties, to determine, in their reasonable business judgment, which bid or combination of bids constitutes the highest or otherwise best bid and reject at any time, any bid that the Debtors determine to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, Bankruptcy Rules, or the Local Rules, these Bidding Procedures, any order of the Bankruptcy Court, or is not in the best interests of the Debtors and their estates.

(6)    Within one (1) business day after conclusion of the Auction, the Winning Bidder shall be required to supplement its Good Faith Deposit by the difference between its Qualified Bid and the Winning Bid multiplied by ten percent (10%).

(7)     <u>Backup Bid</u>. Immediately prior to the conclusion of the All-Asset Auction,
the Debtors shall, in consultation with the Consultation Parties, (i)
determine, consistent with these Bidding Procedures, which bid or
combination of bids constitute the backup bid (the "<u>Backup Bid</u>"); and (ii)
notify all Qualified Bidders at the All-Asset Auction of the identity or
identities of the bidder(s) that submitted the Backup Bid (each such
bidder, the "<u>Backup Bidder</u>") and the amount of the purchase price and
other material terms of the Backup Bid. Backup Bids shall be open and
irrevocable until the earlier of (x) the first business day following closing
of the Proposed Sale or (y) sixty (60) days following the last date of the
All-Asset Auction (as may be adjourned). If the Winning Bidder fails to
consummate a Proposed Sale, the Backup Bidder shall be deemed the new
Winning Bidder, and the Debtors will be authorized, but not required, to
consummate a Proposed Sale with the Backup Bidder.

(8)     Subject to the terms and conditions set forth in the Modified APA, in the
event that a Winning Bidder fails to consummate the proposed transaction
by the Closing Date, such bidder's deposit shall be forfeited to the Debtors
as liquidated damages, and the Debtors shall be free to consummate the
proposed transaction with the Backup Bidder at the final price bid by such
bidder at the All-Asset Auction (or, if that bidder is unable to consummate
the transaction at that price, the Debtors may consummate the transaction
with the next higher bidder, and so forth) without the need for an
additional hearing or order of the Court.

(9)     Within one (1) business day after conclusion of the All-Asset Auction, the
Backup Bidder shall be required to supplement its Good Faith Deposit by
the difference between its Qualified Bid and the Backup Bid multiplied by
ten percent (10%).

(10)    <u>Modification of Procedures</u>. The Debtors may, after consulting with the
Consultation Parties, announce at the Auctions modified or additional
procedures for conducting the Auctions.

(11)    <u>Auction Results</u>: Within one (1) business day following the Auctions, the
Debtors will cause the results of the Auction to be filed with the Court,
docketed on the Court's electronic case filing ("<u>ECF</u>") system.

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion and the Bidding

Procedures Order can be obtained, free of charge, from the website maintained by the Debtors'

designated claims and noticing agent (http://omnimgt.com/firestardiamond) or from the

Bankruptcy Court docket for the Chapter 11 Cases.

Dated:   New York, New York
         March __, 2018

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP

By: _____

        Ian R. Winters
        Sean C. Southard
        Joseph C. Corneau
        200 West 41st Street, 17th Floor
        New York, New York 10036
        Tel: (212) 972-3000
        Fax: (212) 972-2245

        *Proposed Counsel to the Debtors and Debtors*
        *in Possession*

        -and-

        FORCHELLI DEEGAN TERRANA LLP
        Gerard P. Luckman
        333 Earle Ovington Blvd, Suite 1010,
        Uniondale, New York 11553
        Tel: (516) 248-1700
        Fax: (516) 248-1700

        *Proposed Conflicts Counsel to the Debtors and*
        *Debtors-in-Possession*

**<u>Exhibit C</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X
                                                                   :
In re:                                                             :    Chapter 11
                                                                   :
FIRESTAR DIAMOND, INC., et al.                                     :    Case No. 18-10509 (SHL)
                                                                   :
                                       Debtors.                    :    Jointly Administered
                                                                   :
------------------------------------------------------------------ X

## ORDER (A) APPROVING THE SALE AND ASSIGNMENT OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363 (b) AND (f), (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. § 365, AND (C) GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[1] of Firestar Diamond, Inc. ("Firestar"), Fantasy,

Inc. ("Fantasy") and A. Jaffe, Inc. ("A. Jaffe" and collectively, with Firestar and A. Jaffe, the

"Debtors"), the above-captioned debtors and debtors-in-possession, for an order (the "Order"),

*inter alia,* pursuant to Sections 105, 363 and 365 of the United States Bankruptcy Code (the

"Bankruptcy Code") and Bankruptcy Rules 2002, 6004 and 6006 authorizing and approving the

sale of the Purchased Assets free and clear of liens, claims and encumbrances, described in and

pursuant to the terms and conditions of an executed Asset Purchase Agreement, dated as of []

(the "APA"), by and among the Debtors, as sellers, and [_____] ("Purchaser"), as purchaser,

and (b) granting related relief; and the Court having conducted a hearing on the Sale Motion on

[May 3, 2018] (the "Sale Hearing") and the Court having considered the Sale Motion, all

responses filed thereto, if any, as well as any evidence presented at the Sale Hearing; and the

Court having jurisdiction to consider and determine the Sale Motion in accordance with 28

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion or APA as applicable.

U.S.C. §§ 157 and 1334; and due notice of the Sale Motion having been provided, and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor; the Court hereby finds and determines as follows:

## General

A.       The Court has jurisdiction to consider the Sale Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334. The Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

B.       The statutory predicates for the relief sought in the Sale Motion are 11 U.S.C. §§ 105, 363 and 365 and Fed. R. Bankr. P. 2002, 6004 and 6006.

C.       On March __, 2018, the Court entered the Order Establishing Bidding Procedures and Related Relief Regarding the Sale of Substantially all of the Debtors' Assets (the "Bidding Procedures Order") [Docket No. ___], establishing, among other things: (a) Bidding Procedures (as defined in the Sale Motion), including manner and form of notice to be applied during a sale of certain assets of the Debtors and assumption and assignment of related contracts, (b) a date for the Auctions, and (c) a date for the Sale Hearing to consider approval of the Auction results.

D.       As evidenced by the certificates of service filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, and sufficient notice of the Sale Motion, the transactions contemplated therein (including the assumption and assignment of the Assigned Contracts), the Bidding Procedures Order, the Bidding Procedures, the Auctions and the Sale Hearing has been timely provided to all parties in interest in accordance with Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006; (ii) such notice was good and sufficient under the circumstances; and (iii) no other or further notice of the Sale Motion, the transactions contemplated therein (including the assumption and assignment of

2

the Assigned Contracts), the Bidding Procedures Order, the Bidding Procedures, the Auctions, the Sale Hearing or the entry of this Order is required.

E.      A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to: (i) counsel to IDB, Troutman Sanders LLP, 875 Third Avenue, New York, New York 10022 attn.: Brett D. Goodman and Troutman Sanders LLP, 600 Peachtree Street, NE., Suite 3000, Atlanta, Georgia 30308 attn.: Harris B. Winsberg and Matthew R. Brooks; (ii) counsel to HSBC Bank, Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020, attn.: Ken Coleman; (iii) counsel to any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"), if any is appointed; (iv) the Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014, attn.: Richard Morrissey; (v) all Counterparties to the Assigned Contracts; (vi) all parties who have made an offer on some or all of the Assets or expressed an interest in making an offer on some or all of the Assets; (vii) all known persons holding a lien on any of the Assets; (viii) all known creditors and (ix) all entities who have requested notice under Bankruptcy Rule 2002 (collectively, the "Notice Parties"). Counsel for the Debtors has filed with the Court affidavits of service of Notice of the Bidding Procedures Order, detailing the manners of service of, and the persons served with, the Bidding Procedure Order.

### The Chapter 11 Cases

F.      On February 26, 2018 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtors continue to operate their businesses and manage their assets as a debtors-in-possession under 11 U.S.C. §§ 1107(a) and 1108.

**The Marketing Process**

G.      Prior to the filing of the Sale Motion, the Debtors engaged in a short, but intensive process designed to canvas the market for enterprises such as those operated by the Debtors. Although compressed in time, the Debtors believe that the market of potential bidders has been reached and, if interested, provided diligence in order to make a bid.

H.      The Debtors provided notice to all parties as required under the Bidding Procedures Order.

I.      At the All-Asset Auction, the Debtors determined that the Purchaser submitted the highest and best offer for the Assets.

J.      The Bidding Procedures afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the Purchased Assets.

K.      The Debtors and Purchaser have complied with the Bidding Procedures Order in all respects.

**The Sale of the Purchased Assets to Purchaser**

L.      The transactions effectuating, and the terms and conditions governing, the sale of the Assets are embodied in the APA, which was filed with the Court on [_____], 2018 [Docket No. __].

M.      The APA provides that the sale of the Assets shall be free and clear of all liens, claims, interests, and other encumbrances within the meaning of 11 U.S.C. § 363(f).

N.      Purchaser's obligation to consummate the transactions contemplated in the APA is subject to the satisfaction of specific conditions outlined in the APA, including the condition of Court approval.  As of the date of entry of this Order, there has been no failure to satisfy any condition under the APA to Purchaser's obligation to consummate the Proposed Sale that by its nature should have been satisfied prior to the date hereof.

4

O.     The APA was negotiated, proposed, and entered into by and among Purchaser and

the Debtors without collusion, in good faith, and from arm's length bargaining positions.  The

sale process conducted by the Debtors and their agents was non-collusive, fair and reasonable

and was conducted in good faith.  Neither the Debtors nor Purchaser has engaged in any conduct

that would cause or permit the application of 11 U.S.C. § 363(n) to the sale, including having the

APA voided.

P.     Purchaser is a good faith purchaser in accordance with 11 U.S.C. § 363(m) and, as

such, Purchaser and its assignees and designees are entitled to all of the protections afforded

thereby.  Absent a stay of the effectiveness of this Order, if any, Purchaser will be acting in good

faith within the meaning of 11 U.S.C. § 363(m) in closing the transaction under the APA,

including the assumption and assignment of the Assigned Contracts, upon the entry of this Order.

Q.     The Assigned Contracts to be assumed and assigned to Purchaser are valid and

binding, in full force and effect, and enforceable in accordance with their terms and are property

of the Debtors' estates pursuant to Section 541(a) of the Bankruptcy Code, and Purchaser shall

have all of the rights of the Debtors thereunder.

R.     The terms and conditions of the APA to be complied with by Purchaser under the

APA (i) are fair and reasonable; (ii) are valid, binding and enforceable; (iii) constitute the highest

and best offer for the Assets; (iv) will provide a greater recovery for the Debtors' creditors than

would be provided by any other practical available alternative; and (v) constitute reasonably

equivalent value and fair consideration for the Assets.

S.     The transactions contemplated by the APA will, upon consummation thereof (the

"Closing"), (i) be a legal, valid, and effective transfer of the Assets by the Debtors and their

estates to Purchaser with no further action required on the part of the Debtors and (ii) vest

Purchaser with good title to the Assets free and clear of all liens, claims, interests and encumbrances within the meaning of 11 U.S.C. § 363(f).

T.      The relief sought in the Sale Motion, including approval of the APA and consummation of the transactions contemplated therein is in the best interests of the Debtors, their estates, creditors, and all parties in interest.  The Proposed Sale must be approved and consummated promptly in order to maximize the value of the Debtors' estates.

U.      Upon entry of this Order, the Debtors and their estates have good and marketable title to the Assets and all the corporate or organizational power and authority necessary to consummate the transactions contemplated by the APA.

V.      The Debtors have demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of their business judgment, to (i) sell the Assets on the terms and conditions set forth in the APA; (ii) assume and assign the Assigned Contracts to Purchaser; and (iii) consummate all transactions contemplated by the APA, and the sale, assumption and assignment of the Assets is in the best interests of the Debtors, their estates and their creditors.

W.      The provisions of Sections 363 and 365 of the Bankruptcy Code have been complied with and are applicable to the sale of the Assets.

X.      The Debtors may consummate the transactions and transfer the Assets free and clear of all liens, claims, interests, and encumbrances because one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) have been satisfied.  All liens, claims, interests or encumbrances against the Assets shall attach to the proceeds of the transactions with the same validity, enforceability, priority, force and effect that they now have as against the Assets.

Y.      The Debtors have (i) cured, or have provided adequate assurance of cure for all defaults under the Assigned Contracts, if any, existing before the date of this Order, within the meaning of Section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default before the date of this Order under the Assigned Contracts, if any, within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code, and Purchaser has provided adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of Section 365(b)(1)(C) of the Bankruptcy Code.

**ACCORDINGLY, THE COURT HEREBY ORDERS THAT:**

1.      The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014. To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

2.      The Sale Motion, to the extent not previously granted in the Bidding Procedures Order, is granted in its entirety on the terms and conditions set forth herein.

3.      All parties in interest have had the opportunity to object to the relief requested by the Debtors in the Sale Motion, and to the extent that objections to the Sale Motion have not been withdrawn, waived or settled, such objections and all reservations of rights included therein are overruled on the merits.  The parties who did not object, or who withdrew their objections, to the Sale Motion, are deemed to have consented to the relief set forth therein.

4.      The APA and all of the terms and conditions contained therein are approved in their entirety.  The APA is fully enforceable by the parties thereto in accordance with and subject to its terms and conditions.   The Debtors are hereby authorized to perform each of their covenants and undertakings and to take such actions as may be necessary to effectuate the terms of this Order and as provided in the APA.

5.      The sale of the Assets and the terms and conditions contemplated by the APA, including, without limitation, the closing of the transactions contemplated by the APA, are hereby approved pursuant to 11 U.S.C. §§ 105(a), 363 and 365.

6.      The Debtors and Purchaser are authorized and directed, pursuant to 11 U.S.C. §§ 105(a), 363(b) and 365, to perform all of their obligations pursuant to the APA and to execute such other documents and take such other actions as are reasonably necessary to effectuate the transactions contemplated by the APA.

7.      Except as expressly provided in the APA, pursuant to 11 U.S.C. §§ 105(a), 363(f) and 365, upon the Closing, the Assets shall be sold, transferred or otherwise assigned to Purchaser free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the proceeds of sale in the order of their priority, and with the same validity, priority, force and effect that they now have as against the Assets.

8.      Upon Closing, the Firestar and Fantasy are hereby authorized to pay IDB and HSBC Bank undisputed amounts then due and owing under the IDB Revolving Credit Facility and HSBC Bank Loan Agreement, respectively from the proceeds of sale allocated to the Firestar/Fantasy Assets.

9.      The Debtors are authorized pursuant to 11 U.S.C. § 365(a) to assume and assign the Assigned Contracts set forth on Section ___ of the Disclosure Schedules delivered in connection with the APA.

10.      Pursuant to 11 U.S.C. § 365, the Debtors' assumption and assignment of the Assigned Contracts to Purchaser, on the terms contained in the APA, is approved, and the requirements of 11 U.S.C. § 365(b)(1) with respect thereto are deemed satisfied.  The assignment by the Debtors of the Assigned Contracts to Purchaser pursuant to 11 U.S.C. § 365(f) is binding on the Counterparties to those contracts.

11.      Upon Closing pursuant to the APA, the Assigned Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, Purchaser in accordance with their terms, notwithstanding any provision in the Assigned Contracts (including, without limitation, those described in Sections 365(b)(2) and (1) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer. Upon Closing, the Debtors are relieved from any further obligation or liability for any breach of the Assigned Contracts pursuant to 11 U.S.C. § 365(k).

12.      The Cure Costs as set forth in (i) the Potential Assigned Contract Notice or (ii) any stipulation entered into between the Debtors and the Counterparty to an Assigned Contract, as applicable, shall be controlling notwithstanding anything to the contrary in any Assigned Contract or other document, and the Counterparty to each Assigned Contract shall be forever barred from asserting any other claim arising prior to the date of entry of this Order against either the Debtors or Purchaser.

13.     The failure of the Debtors or Purchaser to enforce any term or condition of any Assigned Contract shall not constitute a waiver of such term or condition or of the Debtors' or Purchaser's rights to enforce every term and condition of the Assigned Contracts.

14.     The consideration to be paid by Purchaser for the Assets under the APA is fair and reasonable and may not be avoided under 11 U.S.C. § 363(n).

15.     This Order (a) is and shall be effective as a determination that, upon the Closing, except as expressly provided in the APA, all liens, claims, interests and encumbrances existing as to the Assets prior to the date of entry of this Order have been unconditionally released, discharged and terminated in each case as to the Assets and (b) is and shall be binding upon and shall govern acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that Purchaser is the assignee of the Assets free and clear of all liens, claims, interests and encumbrances.  In addition, upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions to release its liens, claims, interests or encumbrances in or on the Assets as may have been recorded or may otherwise exist.

16.     Except as otherwise provided in the APA or in this Order, consummation of the transactions in the APA will not subject Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, by reason of sale,

transfer or assignment of the Assets (including the Assigned Contracts), including, without limitation, based on any theory of successor or transferee liability.

17.    The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court after consultation with the Consultation Parties; provided, however, that any such modification, amendment or supplement is neither material nor changes the economic substance of the transactions contemplated hereby.

18.    Purchaser, as a purchaser in good faith, and its assignees and designees shall be entitled to the protections of 11 U.S.C. § 363(m).

19.    The provisions of this Order are self-executing and each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

20.    The Court shall retain exclusive jurisdiction (a) to enforce and implement the terms and provisions of the APA and each of the agreements, documents and instruments executed therewith; (b) to resolve any disputes, controversies or claims arising out of or relating to the APA; and (c) to interpret, implement and enforce the provisions of this Order.

21.    The terms of this Order and the APA shall be binding on and inure to the benefit of the Debtors, Purchaser and all other parties in interest, and any successors of the Debtors, Purchaser and the Debtors' creditors, including any trustee or examiner appointed in the Chapter 11 Cases or any subsequent cases.

22.    The failure to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the parties that the APA be approved in its entirety.

23.    Any conflict between the terms and provisions of this Order and the APA shall be resolved in favor of this Order.

24.    Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 6006(d), 7062 and 9014, the terms and conditions of this Order shall be effective immediately and enforceable upon its entry, and no automatic stay of execution shall apply to this Order.  The Debtors and Purchaser are authorized to close immediately upon entry of this Order.

Dated:    New York, New York
          May __, 2018

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit D**

**ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is entered into on this _____ day of _____, 2018 by and between A. JAFFE, INC., a New York corporation ("Jaffe"), FIRESTAR DIAMOND, INC., a Delaware corporation ("FDI"), and FANTASY, INC., a Delaware corporation ("FI"; Jaffe, FDI and FI are sometimes individually referred to herein as a "Seller" and are collectively referred to herein as "Sellers" or "Debtors"), and [XYZ, INC.], a Delaware corporation ("Buyer").  Sellers and Buyer are referred to collectively as the "Parties."

W I T N E S S E T H:

WHEREAS, on February 26, 2018 (the "Petition Date") Sellers filed voluntary petitions (the "Bankruptcy Cases") pursuant to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.,* as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Debtors have determined that it is in the best interest of the Debtors' estates to effectuate a prompt sale of substantially all of the Debtors' assets used in connection with the operation of the Debtors' businesses;

WHEREAS, on March 23, 2018, the Debtors filed a motion for entry of orders pursuant to 11 U.S.C. §§ 105, 363 and 365, and Bankruptcy Rules 2002, 6004 and 6006: (a) fixing the time, date and place for hearing to consider bidding procedures in connection with the debtors' sale of substantially all of their assets; (b)(i) establishing bidding procedures; (ii) approving the form and manner of notices and (iii) setting hearing date for the hearing on approval of the sale of substantially all of the debtors' assets; and (c)(i) approving the sale and assignment of the Debtors' assets free and clear of all liens, claims, interests, and encumbrances and (ii) granting related relief (the "Sale Motion");

WHEREAS, on [March 28, 2018], the Bankruptcy Court entered an order establishing bidding procedures and related relief regarding the sale of substantially all of the Debtors' assets (the "Bidding Procedures Order");

WHEREAS, in connection with the Bankruptcy Cases and the Bidding Procedures Order, and subject to the terms and conditions herein, Sellers wish to sell and assign to Buyer, and Buyer desires to purchase and acquire from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of all Liens, Claims and Encumbrances, all of the Transferred Assets which are used in connection with Sellers' respective diamond and jewelry businesses (the "Business") and assume from the Sellers the Assumed Liabilities;

WHEREAS, Buyer and Sellers desire to consummate the asset purchase transaction contemplated herein as promptly as practicable after the entry of an order by the Bankruptcy Court approving the sale contemplated hereunder; and

WHEREAS, the terms of this Agreement are subject to approval by the Bankruptcy Court, and the Parties are not bound to consummate the transactions contemplated hereby until such approval is obtained;

NOW, THEREFORE, in consideration of the premises, the mutual obligations of the Parties contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

**1.01    Definitions**.  Capitalized terms used in this Agreement shall have the meanings ascribed to them in <u>Annex A</u> hereto or as may be set forth throughout the provisions of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF THE ASSETS

**2.01    Purchase and Sale of the Assets**.  Subject to the terms, provisions and conditions of this Agreement, at the Closing referred to in Section 3.01 hereof, pursuant to Sections 363 and 365 of the Bankruptcy Code, Sellers shall sell, assign, transfer (without recourse, representation or warranty whatsoever except as expressly set forth herein) and deliver to Buyer, and Buyer shall purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in and to the following assets and properties of Sellers that are in existence as of May 1, 2018 at 12:01 a.m. (the "<u>Effective Closing Date</u>") (collectively, the "<u>Transferred Assets</u>"):

(a)    <u>Transferred Accounts Receivable</u>.  All of Sellers' accounts receivable that are in existence as of the Effective Closing Date other than the Excluded Receivables, including, without limitation, all accounts receivable created as a result of Sellers' sale of Inventory subsequent to the date of this Agreement (the "<u>Transferred Accounts Receivable</u>");

(b)    <u>Transferred Inventory</u>.  All of Sellers' Inventory in existence as of the Effective Closing Date other than the Excluded Inventory, including, without limitation, all Inventory returned to and received by the Sellers prior to the Effective Closing Date and all Inventory purchased by Sellers after the Petition Date which remains unsold as of the Closing Date (collectively the "<u>Transferred Inventory</u>")

(c)    <u>Real Property Lease</u>.  All of Seller's right, title and interest in and to the Premises under the Real Property Lease;

(d)    <u>Transferred FF&E</u>.  All of Sellers' furniture, fixtures and equipment located at the Premises other than the Excluded FF&E, including, without limitation, the vault and security systems located at the Premises ("<u>Transferred FF&E</u>");

(e)   Customer Information.  All of Sellers' customer accounts, lists and records, including related sales order files, prefix codes, DUNS, vendor, style and stock keeping unit numbers ("Customer Information");

(f)   Intellectual Property.  All of Sellers' Intellectual Property as of Effective Closing Date, other than Excluded Intellectual Property, including but not limited to all patents, patent applications, registered or common law trademarks and service marks, trademark and service mark applications, registered copyrights and copyright applications, trade names, domain names and URLs owned by Sellers, routings and bills of materials ("Transferred Intellectual Property"); and

(g)   Other Transferred Assets.  The following other assets related to the Business: (i) all sales and promotional literature related to the Business, (ii) all labels, packaging  materials and displays associated with the Business; (iii) all goodwill and intangibles associated with the Business; (iv) all credit insurance or other Claims, if any, related to the Transferred Assets uncollected by Sellers as of the Effective Closing Date; (v) the contracts and agreements referenced on Schedule 2.01(g) (the "Assigned Contracts"); (vi) any and all prepaid expenses and deposits related to the Transferred Assets and Assigned Contracts; and (vii) copies of any Books and Records related to the Transferred Assets (collectively the "Other Transferred Assets").

Except as expressly set forth in this Section 2.01 or the Schedules relating thereto, no other assets or properties of Sellers shall be transferred, assigned or delivered to Buyer pursuant to this Agreement, and no other assets or properties of Sellers shall be included as Transferred Assets for the purposes of this Agreement.  For the avoidance of doubt, notwithstanding any other provision to the contrary in this Agreement, the Transferred Assets do not include the Excluded Assets.

   **2.02   Excluded Assets**.  Notwithstanding the foregoing, Sellers are not selling and Buyer is not purchasing pursuant to this Agreement, and the Transferred Assets shall not include, any assets not specifically listed in Section 2.01 or the Schedules relating thereto (such assets not specifically so listed, the "Excluded Assets").  Property, assets or contracts not specifically listed as a Transferred Asset or an Excluded Asset shall be deemed an Excluded Asset.  The Excluded Assets shall include, but not be limited to:

   (a)   the Excluded Receivables identified on Schedule 2.02(a) hereto and any and all accounts receivable generated from the sale of Excluded Inventory;

   (b)   the Excluded Inventory identified on Schedule 2.02(b) hereto;

   (c)   the Excluded FF&E identified on Schedule 2.02(c) hereto

   (d)   the Excluded Intellectual Property identified on Schedule 2.02(d) hereto;

   (e)   all computer hardware, servers and software systems, and related licenses and agreements related thereto;

3

(f)    the Estate Claims, other than Claims and causes of action specifically related to the Transferred Assets;

(g)    corporate minute books, stock transfer books and Tax Returns of Sellers;

(h)    all original Books and Records and files (in whatever media) relating to the Business;

(i)    the Sellers' jewelers block insurance policy and all rights and Claims associated therewith; and

(j)    cash, cash equivalents, insurance claims (except credit insurance claims related to the Transferred Assets that were uncollected by Sellers as of the Closing), indemnification claims, notes receivable, and tax refunds for all periods ending prior to the Closing Date including, but not limited to, all carry back claims whether or not filed as of the date of this Agreement.

**2.03    Method of Conveyance.**    The sale, transfer, conveyance, assignment and delivery by Sellers of the Transferred Assets to Buyer in accordance with Section 2.01 hereof shall be effected on the Closing Date, but effective as of the Effective Closing Date, by Sellers' execution and delivery to Buyer of (i) a Bill of Sale and assignment to transfer the right, title and interest in and to the Transferred Assets to Buyer, without representation, recourse, or warranty, express or implied, and (ii) such other duly executed assignments and other conveyance instruments with respect to Sellers' transfer of intangible and intellectual property rights, Real Property interests, including, without limitation, assignment of leases, and Other Transferred Assets as shall be reasonably necessary to be delivered by Sellers to effectuate the purchase and sale of the Transferred Assets as contemplated by the terms, provisions and conditions hereof, in each case in form reasonably acceptable to Buyer and Sellers.

**2.04    Assumption of Liabilities**.    Except as otherwise expressly provided in this Section 2.04, Buyer shall not assume or be responsible for, and shall in no event be liable for any debts, liabilities or obligations of (or Claims against) Sellers, whether fixed or contingent, known or unknown, liquidated or unliquidated, suspected or unsuspected, material or immaterial, absolute or contingent, matured or unmatured, determinable or undeterminable, direct or indirect, secured or unsecured, or otherwise.    As the sole exception to the first sentence of this Section 2.04, effective as of the Closing Date, Buyer hereby assumes and agrees to pay, discharge or perform, as appropriate, when due or otherwise on a timely basis, only the following liabilities (collectively, the "<u>Assumed Liabilities</u>"):

(a)    all liabilities and obligations of Sellers accruing, arising out of, or to be performed from and after the Closing Date under the Assigned Contracts; and

(b)    except as otherwise provided herein, all liabilities and obligations relating to or arising out of the ownership or use of the Transferred Assets from and after the Effective Closing Date.

**2.05    Purchase Price.**    In addition to assuming the Assumed Liabilities, as consideration for the purchase of the Transferred Assets, Buyer shall, subject to the terms and

conditions hereof, pay to Sellers an aggregate amount of approximately [        ], subject to the purchase price adjustment set forth in Section 2.08 (the "Purchase Price") itemized as follows:

        (a)    The sum of $_____ for the Transferred Accounts Receivable, based on [    ] % of the gross value of Transferred Accounts Receivable in existence as of the Petition Date ($_____);

        (b)    The sum of $_____ for the Transferred Inventory, based on [     ] % of the Book Value of Transferred Inventory in existence as of the Petition Date ($_____);

        (c)    [                    ] ($_____) for the Transferred FF&E, Customer Information, Intellectual Property, Assigned Contracts and Assigned Contracts Rights, and Other Transferred Assets.

**2.06    Deposit.**  Simultaneously with the delivery of this Agreement by Buyer, Buyer shall deliver to Sellers a cashier's check or wire transfer payable to Sellers in an amount equal to ten percent (10%) of the Purchase Price (the "Deposit").  The Deposit shall be non-refundable unless (i) there is a Winning Bidder and Buyer is not the Winning Bidder or (ii) this Agreement is Terminated in accordance with Sections 3.02(a), (b), (d) or (e).  The Deposit shall be held in an non-interest bearing escrow account by Sellers' counsel.  Notwithstanding the foregoing provisions of this Section 2.06, if Buyer is the Winning Bidder, the entire Deposit shall be credited against the Purchase Price.  If Buyer is not the Winning Bidder or Backup Bidder, the Deposit shall be returned to Buyer in accordance with provisions of Section 3.04 hereof.

**2.07    Pre-Closing Inventory & Accounts Receivable and Purchase Price Escrow.**  Prior to the Closing, Sellers and Buyer will jointly conduct a review of Debtors' Inventory records and consignment records to determine the amount of Transferred Inventory to be purchased as of the Effective Closing Date and to determine the applicable Purchase Price to be paid therefore in accordance with Section 2.05(b).  In addition, prior to the Closing, Sellers and Buyer will jointly conduct a review of Debtors' accounts receivable records to determine the amount of Transferred Accounts Receivable to be purchased as of the Effective Closing Date and to determine the applicable purchase price to be paid therefore in accordance with Section 2.05(a).  At Closing, an amount equal to fifteen percent (15%) of the Purchase Price attributable to the Transferred Accounts Receivable and Transferred Inventory (the "Purchase Price Escrow") will be held in escrow by Debtors' counsel, to allow the Parties to conduct post-closing reviews of the foregoing to determine the final Purchase Price for the Transferred Assets.  Debtors' counsel shall release the Purchase Price Escrow only upon the joint written direction of both Buyer and Sellers or an order of the Bankruptcy Court.

**2.08    Review; Post-Closing Reconciliation.**  Buyer and Sellers shall, and shall cause their respective representatives to, cooperate and assist in the calculation of the final Purchase Price based on the Transferred Assets in existence as of the Effective Closing Date.  Sellers shall provide Buyer and its representatives with reasonable access to the Books and Records and employees of Sellers upon reasonable notice and during regular business hours to facilitate same.  The post-closing reviews of the Transferred Assets shall be completed by the Buyer and Sellers

no later than forty-five (45) days after the Closing Date, and the Parties shall prepare and execute a final schedule of Transferred Inventory and Transferred Accounts Receivable.

**2.09    Closing Payment.**    At the Closing, a payment of the Purchase Price less the Deposit shall be made by Buyer to the Sellers by cashier's check or wire transfer of immediately available funds in accordance with written instructions provided by Sellers not less than one (1) Business Day prior to Closing.

**2.10    Purchase Price Allocation**.    The Purchase Price and the Assumed Liabilities shall be allocated, apportioned and adjusted among the Transferred Assets as provided for herein. Sellers and Buyer agree to report an allocation of the Purchase Price in a manner entirely consistent therewith and agree to act in accordance with such allocation in the preparation of financial statements and the filing of all tax returns (including, without limitation, filing Internal Revenue Service Form 8594 with its federal income tax return for the taxable year that includes the Closing Date) and in the course of any tax audit, tax review or tax litigation matter relating hereto.

**2.11    Cure**.    If, as a condition to the assumption and assignment of any of the Assigned Contracts to be assigned to Buyer, it shall be necessary to cure any defaults thereunder, then as a condition to such assignment, Buyer shall perform such acts and/or pay such sums (if any) as shall be required to cure any such default and shall pay any and all Cure Costs on or prior to the Closing Date.

## ARTICLE III

## CLOSING AND TERMINATION

**3.01    Closing Date**.    Subject to the satisfaction of each of the conditions set forth in Article VII hereof (or the written waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Transferred Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at 10:00 a.m. at the offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Fl., New York, New York 10036 (or at such other place as the Parties may mutually agree in writing) on the later of (i) the earlier of the date on which all of the conditions set forth in Article VII hereof have been satisfied (or waived by the party entitled to waive that condition) or May __, 2018, or (ii) such later date that may be mutually acceptable to Buyer, Sellers and Lenders. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."

**3.02    Termination**.    This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date as follows:

(a)    by mutual written agreement of Sellers and Buyer;

(b)    by Buyer upon (i) the failure or lack of satisfaction of any of the conditions set forth in Section 7.02 hereof by the Closing Date or (ii) a material breach of any representation, warranty, covenant or agreement of any Seller set forth in this Agreement such that the conditions set forth in Section 7.02 hereof would be incapable of being satisfied;

provided, however, that the right to terminate this Agreement pursuant to this Section 3.02(b) for breaches shall only be available to Buyer if Buyer delivers written notice of such breach to Sellers no later than the later of (i) 5pm on May __, 2018 or (ii) two (2) days after Buyer discovers the material breach, but in any event not later than May __, 2018;

(c)    by Sellers upon (i) the failure or lack of satisfaction of any of the conditions set forth in Section 7.01 hereof by the Closing Date or (ii) a material breach of any representation, warranty, covenant or agreement of Buyer set forth in this Agreement such that the conditions set forth in Section 7.01 hereof would be incapable of being satisfied; provided, however, that the right to terminate this Agreement pursuant to this Section 3.02(c) for breaches shall only be available to Sellers if Sellers deliver to Buyer written notice of such breach no later than the later of (i) 5pm on May __, 2018, or (ii) two (2) days after Sellers discover the material breach, but in any event not later than May __, 2018;

(d)    by Buyer or Sellers, if there shall be any order, writ, injunction or decree of any court or governmental authority binding on Buyer or Sellers which prevents or permanently prohibits or restrains Buyer and/or Sellers from consummating the transactions contemplated hereby and such order, writ, injunction or decree is or shall become final and non-appealable, except if such order, writ, injunction or decree resulted from any action instituted by the party seeking to terminate this Agreement pursuant to this Section 3.02(d);

(e)    by Buyer or Sellers, if the Closing has not occurred by May __, 2018, or such later date as Buyer, Sellers and Lenders may agree, for any reason; provided, however, that the right to terminate this Agreement pursuant to this Section 3.02(e) shall not be available to Buyer, in the case of a material breach of this Agreement by Buyer or a failure to perform or satisfy the conditions set forth in Article VII hereof under its control, or to Sellers, in the case of a material breach of this Agreement by any Seller or a failure to perform or satisfy the conditions set forth in Article VII hereof under their control, where such breach or failure to perform or satisfy has been the cause of, or resulted in, the failure of the Closing to occur by May __, 2018; provided further however, that if the Closing has not occurred on or before May __, 2018 the Sellers shall be deemed to have elected to terminate pursuant to the first sentence of this subsection (e) unless the Lenders shall have agreed in writing to extend the Closing Date beyond May __, 2018;

**3.03    Procedure upon Termination**.    In the event of the termination of this Agreement, written notice thereof shall forthwith be given by the Party or Parties so terminating to the other Party or Parties, and this Agreement shall terminate, and the transactions contemplated hereby shall be abandoned, without further action by Sellers or Buyer, except that the provisions of this Article III and Sections 6.03, 9.01, 9.05, 9.11, 9.13 and 9.14 hereof shall survive any termination of this Agreement and nothing contained in this Agreement shall relieve any party hereto from liability for any breach or inaccuracy of its representations, warranties, covenants or agreements contained in this Agreement prior to such termination.

**3.04    Refund of Buyer's Deposit**.    Buyer shall forfeit the Deposit if Buyer terminates this Agreement for any reason other than as set forth in Section 3.02 (a), (b), (d) or (e) hereof, if Sellers terminate this Agreement due to Buyer's breach of this Agreement as set forth in Section 3.02 hereof, or if Buyer is unwilling or unable to close this transaction (including the payment in

full in cash of the Purchase Price) on or before May __, 2018 or such later date as may be mutually agreed to by the Parties.  Such forfeiture shall be the sole and exclusive remedy available to Sellers in the event of any breach of this Agreement by Buyer.  If this Agreement is terminated by Sellers in the absence of any breach by Buyer, or if Buyer is not the Winning Bidder or the Backup bidder, the entire Deposit shall be returned to Buyer within seven (7) days after the entry of an order approving the sale of the Assets to the Winning Bidder(s) or Backup Bidder; provided, however, that if Buyer is the Backup Bidder, the entire Deposit shall be returned to Buyer within two (2) Business Days after the consummation of the transactions contemplated hereunder by Sellers and the Winning Bidder but in any event not later than thirty (30) days after entry of the Sale Order.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby individually represents and warrants to Buyer as follows:

**4.01    Organization, Good Standing and Due Authorization**.

(a)    FDI is a corporation duly organized, validly existing and in good standing under the laws of Delaware with full corporate power and authority to conduct the business as it is now being conducted and to own its properties and to lease those properties leased by it.  FI is a corporation duly organized, validly existing and in good standing under the laws of Delaware with full corporate power and authority to conduct the business as it is now being conducted and to own its properties and to lease those properties leased by it.  Jaffe is a corporation duly organized, validly existing and in good standing under the laws of New York with full corporate power and authority to conduct the business as it is now being conducted and to own its properties and to lease those properties leased by it.

(b)    Sellers have full corporate power and authority to execute and deliver this Agreement and the Other Agreements to which they are a party, and, subject to Bankruptcy Court approval, to perform their obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Other Agreements to which Sellers are a party and the performance and consummation of the transactions contemplated hereby and thereby by Sellers have been duly authorized by all necessary corporate action on the part of Sellers.

(c)    This Agreement has been duly executed and delivered by Sellers, and the Other Agreements to which Sellers are a party have been or will be duly executed and delivered by Sellers, and subject to Bankruptcy Court approval and the due authorization, execution and delivery of such agreements by the other parties thereto, this Agreement and the Other Agreements constitute, or will constitute, valid and binding obligations of Sellers, enforceable against Sellers in accordance with their terms.

**4.02    Brokers.**  All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Sellers directly with Buyer without the

intervention of any Person on behalf of Sellers in such manner as to give rise to any valid Claim by any Person against Buyer for a finder's fee, brokerage commission or similar payment.

**4.03    Intellectual Property.**

(a)    All Transferred Intellectual Property owned by Sellers is listed in Schedule 4.03(a) and, with the exception of common law trademarks and service marks, has been registered and maintained with the United States Patent and Trademark Office, the United States Register of Copyrights or other jurisdictions to the extent set forth on Schedule 4.03(a).

(b)    Sellers own and, to Sellers' knowledge, except as set forth in Section 4.03(d) below, Sellers have the exclusive right to use, and at the Closing Buyer will acquire, free and clear of all Liens, Claims, Encumbrances and rights of other Persons, all Transferred Intellectual Property listed on Schedule 4.03(a) as well as all trade secrets, customer lists, secret processes, technology, know-how and other confidential information required for or used in the manufacture, sale, distribution or marketing of all products being manufactured, sold, distributed or marketed by any Seller.

(c)    To Sellers' knowledge, the continuing conduct of Sellers' businesses as presently conducted will not result in (i) the infringement of any patents, trade names, trademarks, service marks, or copyrights owned by any Person or (ii) the improper use of any trade secret owned by any Person.  There are no Claims or suits pending or, to the Sellers' knowledge, threatened, and no Seller has received any notice of any Claim or suit alleging that the conduct of their respective businesses infringe upon or constitute the unauthorized use of the proprietary rights of any Person or challenging the ownership, use, validity or enforceability of any of the Transferred Intellectual Property.  There are no settlements, consents, judgments, orders or other agreements which restrict Sellers' rights to use any Intellectual Property owned or licensed by them.

(d)    Schedule 4.03(d) sets forth a list of all license agreements under which any Seller has granted or received the right to use any Intellectual Property, and no Seller nor, to Sellers' knowledge, any of the other Persons party thereto is in default under any such license. Except as set forth in Schedule 4.03(d), no Person has a right to receive a royalty or similar payment in respect of any item of Intellectual Property of any Seller pursuant to any contractual arrangements entered into by any Seller or otherwise. No former or present employees, officers or directors of any Seller holds any right, title or interest, directly or indirectly, in whole or in part, in or to any of Sellers' Intellectual Property.

**4.04    Financial Statements**.  Schedule 4.04 contains a true, correct and complete copy of the balance sheet of each Seller as of _____, the consolidated Audited Financial Statements of FDI and FI for the fiscal year ended March 31, 2017 and the unaudited balance sheet and income statement of Jaffe as at March 31, 2017 (collectively, the "Financial Statements"). The Financial Statements: (i) present fairly in all material respects the financial position of Sellers as of the dates thereof and the results of operations, cash flow and shareholders' equity for the periods covered thereby; (ii) have been prepared from, and are consistent with, the Books and Records of Sellers; and (iii) have been prepared in accordance

with generally accepted accounting principles, applied on a consistent basis in accordance with past practices.

**4.05    Material Contracts**.   Schedule 4.05 sets forth a list of all written contracts, licenses, leases, Real Property leases and other agreements to which any Seller is a party which either (i) are material to Sellers' respective businesses, (ii) have a term of one year or more, or (iii) contracts for the employment of, or payments of any retention, severance, change of control or similar payments to, any officer or employee (collectively, the "Material Contracts").  True, correct and complete copies of each of the Material Contracts have been provided to Buyer.  All of the Material Contracts are valid and binding obligations of Sellers and, to Sellers' knowledge, the other parties thereto.

**4.06    Transferred Accounts Receivable.** Schedule 4.06 contains a true, correct and complete list of all of the Debtors' outstanding Transferred Accounts Receivable as of the Petition Date.  All of the Transferred Accounts Receivable arose from bona fide transactions in the ordinary course of business and represent accounts validly due for goods sold or services rendered.  There has not been asserted any counterclaim or Claim for offset against any of the Transferred Accounts Receivable.

**4.07    Transferred In-house Inventory.**  Schedule 4.07 contains a true, correct and complete list of all In-house Inventory as of the Petition Date.

**4.08    Transferred Memo/Consigned Inventory.**  Schedule 4.08 contains a true, correct and complete list of all Memo Inventory in the possession of Sellers' customers, in transit to or from Sellers' customers, or for which no sales had been reported by such customers as of the Petition Date.

**4.09    Real Property.**

(a)    Schedule 4.09 lists all of the real property owned or leased by Sellers or otherwise used by Sellers to conduct their respective businesses (the "Real Property"). The Real Property constitutes all of the real property used to conduct Sellers' businesses.

(b)    Each lease pursuant to which Sellers lease any Real Property is in full force and effect and is valid and enforceable in accordance with its terms, all rents and other sums owing thereunder have been paid and Sellers operate therein in peaceable possession thereof.  To Sellers' knowledge, there is not under any such lease any default by any Seller, or any event that with notice or lapse of time or both would constitute such a default by any Seller and with respect to which such Seller has not taken adequate steps to prevent such default from occurring.

**4.10    Knowledge**.   Where any representation or warranty of Sellers contained in this Agreement is expressly qualified by reference to the knowledge of such party, it shall mean the actual and collective knowledge of Mihir Bhansali and Ajay Gandhi, in each instance after each such individual has made such due and diligent inquiry as a reasonable person would deem necessary and appropriate as to the matters that are the subject of such representations and warranties.

10

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to each Seller as follows:

**5.01    Organization, Good Standing and Due Authorization**.

(a)    Buyer is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.

(b)    Buyer has full power and authority to execute and deliver this Agreement and the Other Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Other Agreements to which Buyer is a party and the performance and consummation of the transactions contemplated hereby and thereby by Buyer have been duly authorized by all necessary action on the part of Buyer.

(c)    This Agreement has been duly executed and delivered by Buyer, and the Other Agreements to which it is a party have been or will be duly executed by Buyer, and subject to the due authorization, execution and delivery of such agreements by the other parties thereto, this Agreement and the Other Agreements constitute, or will constitute, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms.

**5.02    No Violation; Consents and Approvals**.  Neither the execution and delivery by Buyer of this Agreement or the Other Agreements to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation binding upon Buyer in any material respect or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Entity.

**5.03    Financing**.  Buyer shall have on the Closing Date sufficient unrestricted immediately available funds on hand to pay the Purchase Price.

**5.04    Brokers.**  All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Buyer directly with Sellers without the intervention of any Person on behalf of Buyer in such manner as to give rise to any valid Claim by any Person against Sellers for a finder's fee, brokerage commission or similar payment.

**5.05** **"AS IS" Transaction.** Buyer hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Business or to the Transferred Assets, including, without limitation, income to be derived or expenses to be incurred in connection with the Business or the Transferred Assets, the physical condition of any personal or Real Property comprising a part of the Transferred Assets or which is the subject of any contract to be assumed by Buyer at the Closing, the environmental condition or other matter relating to the physical condition of any Real Property or improvements which are the subject of any assigned lease to be assumed by Buyer at the Closing, the zoning of any such Real Property or improvements, the value or transferability of the Transferred Assets (or any portion thereof), the terms, amount, validity or enforceability of any Assigned Contracts, or the merchantability or fitness of the Transferred Assets).  Without in any way limiting the foregoing, other than as expressly set forth in Article IV of this Agreement, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Transferred Assets.  Buyer further acknowledges that Buyer has had an opportunity to conduct an independent inspection and investigation of the physical condition of the Transferred Assets, made available by Sellers.  Accordingly, if the Closing occurs, Buyer will accept the Transferred Assets at the Closing Date "AS IS," "WHERE IS," and "WITH ALL FAULTS," subject to the provisions of this Agreement and the Sale Order providing that the sale of the Transferred Assets is free and clear of all Liens, Claims and Encumbrances. Without in any way limiting the foregoing, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SPECIFICALLY SET FORTH IN THIS AGREEMENT OR THE OTHER AGREEMENTS, SELLERS HAVE PROVIDED NO REPRESENTATIONS OR WARRANTIES AND SPECIFICALLY DISCLAIM ALL SUCH REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED, TO ANY IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE VI

## COVENANTS OF THE PARTIES

**6.01** **Employees**.

(a)     Buyer shall not be responsible for any wages, salary, severance, termination or any other employee related obligation of Sellers.  Any current employee hired by Buyer shall be considered a new at-will employee of Buyer and have no rights, benefits, seniority or privileges that carry over from its prior employment with Sellers.

(b)     Following the date of this Agreement Sellers shall allow Buyer reasonable access to meet with and interview those of its employees who Buyer elects to meet with.

(c)     At the Closing Buyer may offer employment to those employees of Sellers as Buyer determines in its sole and absolute discretion.  Effective immediately prior to the Closing Date, Sellers shall take all action necessary or appropriate to terminate its 401(k) plan and enable each of its active employees who is a participant in such Plan to make a direct rollover to Buyer's 401(k) plan.

12

**6.02    Cooperation**.  From the date hereof until the Closing, Sellers and Buyer agree (a) to cooperate with each other in determining whether any filings are required to be made or consents are required to be obtained in any jurisdiction in connection with the consummation of the transactions contemplated hereby and in making or causing to be made any such filings promptly and in seeking to obtain in a timely manner any such consent; and (b) to use all commercially reasonable efforts to obtain promptly the satisfaction of the conditions to the consummation of the transactions contemplated herein and to fulfill their respective obligations hereunder.  Sellers and Buyer shall furnish to each other all such information as may be reasonably required in order to effectuate the foregoing.

**6.03    Confidentiality**.  The Parties acknowledge that Sellers and Buyer have previously executed a confidentiality agreement (the "Confidentiality Agreement"), which Confidentiality Agreement will continue in full force and effect in accordance with its terms until the Closing Date.  From and after the Closing Date, the Confidentiality Agreement shall be terminated and of no further force or effect.  Notwithstanding the foregoing, upon the entry of the Sale Order approving this Agreement, Buyer may disclose the transactions contemplated by this Agreement and other information that may be deemed confidential under the terms of the Confidentiality Agreement to employees of Sellers in communications regarding Buyer's potential hiring of such employees, solely to the extent that such disclosure is reasonably required for such purpose.

**6.04    [Certain Tax Matters]**.

(a)    Sellers shall be responsible for and shall pay all Taxes relating to the Transferred Assets or the Business for any period ending prior to the Closing Date, and Buyer shall be responsible for and shall pay all Taxes relating to the Transferred Assets or the Business for the period from and after the Closing Date.  The amount of all such prorations shall be settled and paid on the Closing Date; provided, however, that final payments with respect to prorations that are not able to be calculated on the Closing Date shall be calculated and paid as soon as practicable thereafter.

(b)    Sellers shall use reasonable efforts to obtain Bankruptcy Court approval that, in accordance with Section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer under the transactions contemplated by this Agreement shall not be taxed under any law imposing any transfer Tax, sales Tax, real estate Tax, stamp Tax or similar Tax (collectively, "Transfer Taxes").  If the Bankruptcy Court grants such approval, the instruments transferring the Transferred Assets to Buyer shall contain the following endorsement:

"Because this [instrument] has been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of New York, relating to a plan of reorganization of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. § 1146(a), and any officer receiving this [instrument] is hereby authorized and directed to permit the transfer contemplated by this [instrument] without the payment of any stamp tax, transfer tax or similar tax."

Buyer and Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.  In the event that any Transfer Taxes shall be payable in connection with the transactions contemplated hereby, the payment of such Transfer

Taxes shall be the responsibility of Sellers and not Buyer.  Sellers shall prepare and file all Tax Returns in connection with all such Transfer Taxes and shall provide Buyer with copies thereof at least five (5) Business Days before they are due to be filed.

(c)     Sellers and Buyer shall cooperate with each other and provide each other with such assistance as reasonably may be requested by either of them in connection with the preparation of any Tax Return or any audit or other examination by any taxing authority, or any judicial or administrative proceedings relating to any liability for Taxes under this Agreement. The party requesting assistance hereunder shall reimburse the party providing assistance for all reasonable third-party out-of-pocket expenses incurred in providing such assistance.  Nothing in this Section 6.04 shall require Buyer to be liable for any income tax liability of Sellers.

**6.05     Communications; Access.**  From the date hereof until the Closing, Sellers shall permit Buyer and its representatives to have reasonable access upon reasonable notice, during normal business hours, to the employees of the Business and Transferred Assets, and to such records, contracts and documents relating to the Business and the Transferred Assets as Buyer or its representatives shall reasonably request in connection with the transactions contemplated hereby.  In connection therewith, Buyer shall have reasonable access to inspect the Transferred Assets for the purpose of verification of the amount relative to the computation of the corresponding Purchase Price for the Transferred Assets as of the Effective Closing Date.

**6.06     Notifications.**  Buyer and Sellers shall give prompt notice to the other of any representation or warranty made by Buyer or Sellers contained in this Agreement becoming materially untrue or inaccurate or any failure of Buyer or Sellers to comply with or satisfy in any material respect any covenant, condition, or agreement to be complied with or satisfied by it under this Agreement.

**6.07     Filings and Authorizations.**  Each Seller and Buyer, as promptly as practicable, (i) shall make, or cause to be made, all such filings and submissions under Laws, rules and regulations applicable to it or its Affiliates, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable best efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all governmental and non-governmental Persons necessary to be obtained by it or its Affiliates, in order to consummate the transactions contemplated herein; provided, however, that neither Buyer nor any Seller shall be obligated to consummate the transactions contemplated by this Agreement absent the prior approval of the Bankruptcy Court, and neither Buyer nor any Seller shall be obligated to modify the Agreement in any material respect to satisfy the Bankruptcy Court, and (iii) shall use all commercially reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for it to fulfill its obligations hereunder.  Sellers and Buyer shall coordinate and cooperate with one another in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

**6.08     Amendment to List of Assigned Contracts**.  Notwithstanding anything herein to the contrary, at any time prior to the Sale Hearing, (a) Buyer shall be entitled in its sole discretion to remove any executory contracts or unexpired leases from the list of Assigned Contracts by providing written notice thereof to Sellers, and any contracts or unexpired leases so

removed shall not constitute Transferred Assets at Closing and (b) Buyer shall be entitled in its sole discretion to request, up to fourteen (14) days prior to the Sale Hearing, Sellers to add to the list of Assigned Contracts any executory contracts or unexpired leases of Sellers to the extent solely related to the Business by providing written notice thereof to Sellers, and any contracts or unexpired leases so added shall constitute Transferred Assets to the extent that Sellers are able to schedule a hearing on the assumption and assignment of these added contracts for the Sale Hearing; provided that Buyer shall not be entitled to add to the list of Assigned Contracts any executory contracts or unexpired leases of Sellers that Sellers have rejected by order of the Bankruptcy Court.

**6.09    Waiver of Compliance**.  Buyer waives compliance by Sellers with all applicable bulk sales or bulk transfer laws.

**6.10    Conduct of Business by Seller Pending the Closing Date**.  Between the date of execution of this Agreement and the Closing Date, Sellers shall not take any action inconsistent with the timely consummation of the transaction contemplated hereby, and Sellers covenant and agree that:

(a)    the Business shall be conducted in substantially the same manner conducted subsequent to the Petition Date and prior to the execution of this Agreement, and Sellers shall preserve the organization of the Business and maintain the existing relations with customers, suppliers, business partners and others having business dealing with the Business;

(b)    Seller shall (i) maintain, preserve and protect all of the Transferred Assets in substantially the same  condition in which they exist on the date hereof, and (ii) preserve, protect and prosecute all intellectual property rights related to the Business; and

(c)    Seller shall not take any action which will have or reasonably be expected to have, individually or in the aggregate, a material adverse effect on the transaction contemplated by this Agreement, the Business, or the Transferred Assets.

## ARTICLE VII

## CONDITIONS TO OBLIGATIONS OF PARTIES

**7.01    Conditions to Obligations of Sellers**.  The obligation of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment at or prior to the Closing of each of the following conditions (any or all of which may be waived in whole or in part by Sellers):

(a)    Representations and Warranties.  The representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing Date (except for such representations and warranties which are made expressly as of a specified date or period, which shall be true and correct or true and correct in all material respects, as herein above required, as of such specified date or period).

15

(b)    Performance.  Buyer shall have performed and complied, in all material respects, with all agreements, obligations and covenants required by this Agreement to be so performed or complied with by Buyer at or prior to the Closing Date.

(c)    Corporate Action.    All corporate action necessary to authorize the execution, delivery and performance by Buyer of this Agreement and any Other Agreements or instruments contemplated hereby to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby shall have been duly and validly taken by Buyer.

(d)    Delivery of Certificates and Documents to Sellers.  Buyer shall have delivered, or cause to be delivered, to Sellers a certificate as to the legal existence and corporate good standing of Buyer, issued or certified by the appropriate governmental official of the jurisdiction of its incorporation.

(e)    Closing Documents.  Subject to the terms, conditions and provisions hereof, and contemporaneously with the performance by Sellers of their obligations set forth in Section 7.02 hereof, Buyer shall have executed and delivered to Sellers each of the following, in a form mutually acceptable to Sellers and Buyer,  at the Closing:

(i)    the Intellectual Property Assignment, executed by Buyer, assigning to Buyer the Intellectual Property in the form attached hereto as Exhibit 7.01(e)(i);

(ii)    the Assignment and Assumption Agreement executed by Buyer in the form attached hereto as Exhibit 7.01(e)(ii); and

(iii)    such other documents as may be requested by Sellers' counsel as necessary to consummate the transactions contemplated by this Agreement.

(f)    Judgments, Decrees and Litigation.  There shall not be in effect or exist any judgment, order, injunction or decree issued by a Governmental Entity restraining, prohibiting the consummation of or imposing material modifications on the transactions contemplated by this Agreement or any pending litigation by a Governmental Entity or other third party seeking to restrain, prohibit or impose material modifications on the consummation of the transactions contemplated hereby.

(g)    Cure Costs.  Simultaneously with Closing, Buyer shall pay all Cure Costs in connection with the assumption and assignment of the Assigned Contracts to Buyer.

(h)    Sale Order. The Bankruptcy Court shall have entered an order approving the transactions contemplated hereby, in substantially the form annexed to the Sale Motion as Exhibit C and reasonably acceptable to Buyer and Sellers (the "Sale Order"), which shall be a Final Order. Notwithstanding the foregoing, nothing in this Agreement shall preclude Sellers from consummating the transactions contemplated herein if Buyer, in its sole and absolute discretion, waives the requirement that the Sale Order shall have become a Final Order.

7.02    **Conditions to Obligations of Buyer**.  The obligation of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment at or prior to the

16

Closing Date of each of the following conditions (any or all of which may be waived in whole or in part by Buyer).

(a)     <u>Representations and Warranties</u>.  The representations and warranties made by Sellers in this Agreement shall be true and correct, in each case, as of the date of this Agreement and as of the Closing Date (except for such representations and warranties which are made expressly as of a specified date or period, which shall be true and correct or true and correct in all material respects, as herein above required, as of such specified date or period), except where the failure of such representations and warranties to be true and correct would not result in a material adverse effect on the Business, taken as a whole.

(b)     <u>Performance</u>.  Sellers shall have performed and complied, in all material respects, with all agreements, obligations and covenants required by this Agreement to be so performed and complied with by Sellers at or prior to the Closing.

(c)     <u>Corporate Action</u>.  All corporate action necessary to authorize the execution, delivery and performance by Sellers of this Agreement and any Other Agreements or instruments contemplated hereby to which any Seller is a party and the consummation of the transactions contemplated hereby and thereby, shall have been duly and validly taken by Sellers, and Buyer shall have been furnished with a certified copy of all applicable resolutions adopted by Sellers.

(d)     <u>Delivery of Certificates and Documents to Buyer</u>.  Sellers shall have delivered, or caused to be delivered, to Buyer certificates as to the legal existence and corporate good standing of each Seller issued or certified by the appropriate governmental official of the jurisdiction of its incorporation.

(e)     <u>Closing Documents</u>.  Subject to the terms, conditions and provisions hereof and contemporaneously with the performance by Buyer of its obligations set forth in Section 7.01 hereto, Sellers shall have executed and delivered to Buyer the following, in a form mutually acceptable to Sellers and Buyer, at the Closing:

(f)     The Bill of Sale executed by Sellers, assigning to Buyer the Transferred Assets not otherwise transferred in substantially the form attached hereto as <u>Exhibit 7.02(e)(i)</u>;

(g)     The Intellectual Property assignment agreements duly executed by the applicable Seller, assigning to Buyer the Transferred Intellectual Property in substantially the form attached hereto as <u>Exhibit 7.02(e)(ii)</u>; and

(h)     The Assignment and Assumption Agreement executed by Sellers in substantially the form attached hereto as <u>Exhibit 7.02(e)(iii)</u>.

(i)     <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order. Notwithstanding the foregoing, nothing in this Agreement shall preclude Buyer from consummating the transactions contemplated herein if Buyer, in its sole and absolute discretion, waives the requirement that the Sale Order shall have become a Final Order. No notice of such waiver of this or any other condition to the Closing need be given except to Sellers, it being the intention of the Parties that Buyer shall be entitled to, and is not

waiving, the protections of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the Sale Order being a Final Order.

(j)    <u>Judgments, Decrees and Litigation</u>.  There shall not be in effect or exist any judgment, order, injunction or decree issued by a Governmental Entity restraining, prohibiting the consummation of or imposing material modifications on the transactions contemplated by this Agreement or any pending litigation by a Governmental Entity or other third party seeking to restrain, prohibit or impose material modifications on the consummation of the transactions contemplated hereby.

## ARTICLE VII

## WINDDOWN MATTERS

**8.01    Intellectual Property License**.  Buyer shall, to the extent reasonably necessary, provide Sellers with a limited royalty-free license to use the Transferred Intellectual Property for the sole and limited purpose of selling or otherwise disposing of the Excluded Inventory and collecting the Excluded Accounts Receivable. [IF NEEDED]

## ARTICLE IX

## MISCELLANEOUS

**9.01    Fees and Expenses**.  Except as expressly otherwise provided in this Agreement, Sellers and Buyer shall each respectively pay all fees and expenses incurred by them, or on behalf of them, in connection with, or in anticipation of, this Agreement and the Other Agreements and the transactions contemplated hereby and thereby.  Notwithstanding the foregoing, the prevailing party in any suit or action brought against any other party to enforce the terms of this Agreement or any rights or obligations hereunder shall be entitled to receive reimbursement of its reasonable costs, expenses and attorneys' fees (internal and external) and disbursements, including the reasonable costs and expenses of experts and internal resources expended, actually incurred in connection with such suit or action.

**9.02    Further Assurances.**  From time to time after the Closing, at the request of one of the Parties hereto and at the expense of the party so requesting, each Seller and Buyer agrees to execute and deliver to such requesting party such other documents and take such other action as such requesting party may reasonably request in order to consummate more effectively the transactions contemplated hereby.  Sellers and Buyer shall cooperate with each other and provide each other with such assistance as reasonably may be requested by either of them, including with respect to the prosecution and defense of Claims.  The party requesting assistance hereunder shall reimburse the party providing assistance for all reasonable third-party out-of-pocket expenses incurred in providing such assistance including, but not limited to, reasonable attorneys fees.

**9.03    Change of Name**.  Within thirty (30) days of the Closing Date, Sellers shall file with the Secretaries of State of Delaware and New York Amendments to their Certificates of

Incorporation changing their corporate names to a name dissimilar to Firestar, Fantasy and A. Jaffe and provide copies of such Amendments to Buyer, and shall take any other actions which may be reasonably necessary to transfer all the domain names, URLs, trade names, trademarks or service names included in the Transferred Intellectual Property to Buyer.

**9.04    Remittance of Funds and Return of Inventory Received In Error.** From time to time after the Closing, Sellers may receive payments in error from customers on account of Transferred Assets and Buyer may receive payments in error from customers on account of Excluded Assets.  Sellers and Buyer shall promptly notify each other in the event of receipt of any misdirected payments and shall promptly deliver to the appropriate party any and all such payments received.  Similarly, Sellers and Buyer shall promptly notify each other of the receipt of any returned Inventory which should have been properly returned to the other party and make immediate arrangements for the delivery of all such Inventory to the appropriate party.

**9.05    Notices**.  Any notice or other communication required or permitted to be given to any party hereunder shall be in writing and shall be given to such party at such party's address set forth below or such other address as such party may hereafter specify by notice in writing to the other party.  Any such notice or other communication shall be addressed as aforesaid and given by (1) certified mail, return receipt requested, with first class postage prepaid, (2) hand delivery, (3) reputable overnight courier or (4) electronic mail provided receipt of such transmission is confirmed by the receiving party.  Any notice or other communication will be deemed to have been duly given (1) on the third Business Day after mailing, provided receipt of delivery is confirmed, if mailed by certified mail, return receipt requested, with first class postage prepaid, (2) on the date of service if served personally, (3) on the Business Day after delivery to an overnight courier service, provided receipt of delivery has been confirmed or (4) on the date of confirmation of receipt if sent via electronic mail.

To Sellers:                    _____
                              _____
                              _____

With a copy to:                Ian Winters, Esq.
                              Klestadt Winters Jureller Southard & Stevens, LLP
                              200 West 41st Street, 17th Floor
                              New York, NY  10036

To Buyer:

With a copy to:

**9.06    Entire Agreement**.  This Agreement, the Other Agreements, the Schedules, the Exhibits and Annexes hereto and thereto, and the Confidentiality Agreement, contain the entire understanding of the Parties hereto with respect to the subject matter hereof and thereof and

supersede any and all prior agreements and understandings, oral and written, among the Parties with respect to the subject matter hereof and thereof.

**9.07    Survival**.  All representations and warranties contained in Articles 3 and 4 herein, and all agreements and covenants contained anywhere else in this Agreement shall be deemed to have been relied upon by the other party and shall terminate [sixty days after] the Closing Date, except to the limited extent identified in a formal written Claim submitted by the non-breaching party and asserting specific breaches by the breaching party.

**9.08    Benefit; Risk of Loss.**  Upon consummation of the Closing, Buyer will receive the benefits of the Transferred Assets and accrue the obligations of the Assumed Liabilities from and after 12:01 a.m. EST on the Effective Closing Date, and as of such time, the risk of loss of the Transferred Assets shall be deemed transferred from Sellers to Buyer. Sellers shall receive the benefits of Transferred Assets and bear all risk of loss or damage with regard to the Transferred Assets up to and through the Effective Closing Date

**9.09    Severability**.  Should any provision of this Agreement for any reason be declared invalid or unenforceable by a court of competent jurisdiction, such decision shall not affect the validity or enforceability of any of the other provisions of this Agreement, which other provisions shall remain in full force and effect and be enforced to the fullest extent permitted by law.

**9.10    Binding Effect; Assignment**.  This Agreement and all of the provisions hereof shall be binding upon, inure to the benefit and be enforceable by, the Parties hereto and their respective legal representatives, successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, directly or indirectly, whether voluntarily, involuntarily, by operation of Law or otherwise, by any party hereto without the prior written consent of the other Parties hereto, which consent shall not be unreasonably withheld or delayed.

**9.11    No Third-Party Beneficiaries**.  This Agreement is not intended, and shall not be deemed, to confer upon or give any Person (including, without limitation, any past or current employee of Sellers) except the Parties hereto and their respective legal representatives, successors and permitted assigns any remedy, Claim, liability, reimbursement, cause of action or other right under or by reason of this Agreement.

**9.12    Counterparts; Delivery**.  This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

**9.13    Construction of Agreement; Interpretation**.  This Agreement has been negotiated by the respective Parties hereto and their legal counsel and the language hereof will not be construed for or against any party.  The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

**9.14    Governing Law; Venue**.  This Agreement is and shall be deemed to be a contract entered into and made pursuant to the laws of the State of New York and shall in all respects be governed, construed, applied and enforced in accordance with the laws of said State, without reference to its conflict of laws principles.  Any action, Claim, suit or proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby shall be brought solely in the Bankruptcy Court.  Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court in respect of any action, Claim, suit or legal proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder, and agrees that it will not bring any action arising out of, based upon or related thereto in any other court; *provided, however,* that, if any of the Bankruptcy Cases is dismissed, any action, Claim, suit or legal proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby shall be heard and determined solely in the appropriate courts located in the County of New York.  Each Party hereby irrevocably waives any Claim that it is not subject to the jurisdiction of the above named courts for any reason or that the suit, action or legal proceeding in such court is brought in an inconvenient forum.  Each Party agrees that the service of process in any action, Claim, suit or legal proceeding arising out of, based upon or relating to this Agreement shall be properly served or delivered if delivered in the manner contemplated by Section 9.05.    EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT SUCH PARTY MAY HAVE TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT.

**9.15    Amendments and Waivers**.  This Agreement may not be amended, modified or supplemented except pursuant to an instrument in writing signed by each of the Parties hereto. Any failure of Sellers to comply with any term or provision of this Agreement may be waived by Buyer at any time by an instrument in writing signed on behalf of Buyer and any failure of Buyer to comply with any term or provision of this Agreement may be waived by Sellers at any time by an instrument in writing signed on behalf of Sellers, but any such waiver or failure to insist upon strict compliance with such term or provision shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to comply.

**9.16    Schedules, Exhibits and Annexes**.  The Schedules, Exhibits and Annexes referred to herein are attached hereto and incorporated herein by this reference.

**9.17    Litigation Support**.  In the event and for so long as any party hereto is actively contesting or defending any action, suit, grievance, arbitration, proceeding, hearing, investigation, charge, complaint, Claim or demand with respect to any third party in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act or transaction on or prior to Closing relating to or involving the Business, the Transferred Assets, the Hired Employees or the Assumed Liabilities, the other Parties will reasonably cooperate with such contest or defense and make reasonably available its personnel, records and information applicable to such matter as may be necessary in connection with prudent handling of such contest or defense, at the contesting or defending party's expense.

**9.18    Terms Generally**.  As used in this Agreement (a) words in the singular shall be held to include the plural and vice versa, (b) words of one gender shall be held to include the other genders as the context requires, (c) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (d) references to Article, Section, paragraph, Annex, Exhibit and Schedule are references to the Articles, Sections, paragraphs, Annexes, Exhibits and Schedules to this Agreement, unless otherwise specified, (e) the word "including" and words of similar import when used in this Agreement, shall mean "including, without limitation", unless otherwise specified, and (f) the word "or" shall not be exclusive.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

[BUYER]

By:_____

A. JAFFE, INC.

By:_____
Name:
Title:

FIRESTAR DIAMOND, INC.

By:_____
Name:
Title:

FANTASY, INC.

By:_____
Name:
Title:

**ANNEX A**

<u>Definitions</u>

"Affiliate" shall mean, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person.

"Assigned Contracts" shall have the meaning ascribed to it in Section 2.01(g) hereof.

"Assigned Contracts Rights" shall mean the rights and benefits of any Seller under the Assumed Contracts which such Seller will assign to Buyer pursuant to this Agreement and the Sale Order.

 "Assignment and Assumption Agreement" shall mean the Assignment and Assumption Agreements, dated as of the Closing Date, between any Seller and Buyer, in the form attached hereto as <u>Exhibit 7.01(e)(ii)</u> and <u>Exhibit 7.02(e)(iii)</u>.

"Assumed Liabilities" shall have the meaning ascribed to in in Section 2.04 hereof.

"Backup Bidder" shall have the meaning ascribed to it in the Bidding Procedures Order.

"Bankruptcy Cases" shall have the meaning ascribed to it in the recitals.

"Bankruptcy Code" shall have the meaning ascribed to it in the recitals.

"Bankruptcy Court" shall have the meaning ascribed to it in the recitals.

"Bidding Procedures Order" shall have the meaning ascribed to it in the recitals.

"Bill of Sale" shall mean the Bill of Sale, dated as of the Closing Date, from Sellers to Buyer, in the form attached hereto as <u>Exhibit 7.02(e)(i)</u>.

"Books and Records" shall mean all books, records and files (including, without limitation, all computerized records and other storage media and the software used in connection therewith, plans, drawings, diagrams, manuals and operating records) held or maintained by, or in the control of, Sellers pertaining to the Transferred Assets.

"Book Value" shall mean the Sellers' cost of goods, as reflected in Sellers' Books and Records, which cost shall include invoice price for goods purchased, duty, freight, insurance, and broker's charges.

"Business Day" shall mean any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"Buyer" shall have the meaning ascribed to it in the preamble.

"Claims" shall mean any claim, liability, obligation or right to payment whatsoever, whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, disputed, legal, equitable, secured or unsecured.

"Closing" shall have the meaning ascribed to it in Section 3.01 hereof.

"Closing Date" shall have the meaning ascribed to it in Section 3.01 hereof.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Cure Costs" shall mean all monetary liabilities, including pre-Petition Date monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court.

"Customer Information" shall have the meaning ascribed to it in Section 2.01(e) hereof.

"Deposit" shall have the meaning ascribed to it in Section 2.06 hereof.

"Effective Closing Date" shall have the meaning ascribed to in in Section 2.01 hereof.

"Encumbrance" shall mean (except for any Lien for Taxes not yet due) any Claim, charge, lease, covenant, encumbrance, security interest, Lien, interest, option, pledge, covenants, license, right of others, mortgage, hypothecation, conditional sale, or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition, or otherwise) against or with respect to tangible or intangible property or rights, whether imposed by agreement, understanding, law, equity, or otherwise, including, without limitation, any outstanding unfair labor practice charges or complaints, Liens under ERISA or Section 412 of the Code and successor liability with respect to any multiemployer plan to which Sellers or any ERISA Affiliate has contributed or been required to contribute, except for any restrictions on transfer generally arising under any applicable federal or state securities law, only to the extent such encumbrances may be released, discharged or otherwise eliminated under Section 363(f) of the Bankruptcy Code.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Seller and any trade or business (whether or not incorporated) which are or have ever been under common control, or which are or have ever been treated as a single employer, with such Seller under Section 414(b), (c), (m) or (o) of the Code.

"Estate Claims" shall mean all Claims and causes of action held by Sellers against any party other than Sellers, including without limitation Claims or causes of action arising under, or of a type described in, Sections 547 through 550 of the Bankruptcy Code, or arising under any other statutory or common law principles of law or equity.

"Excluded Assets" shall have the meaning ascribed to it in Section 2.02 hereof.

2

"Excluded Inventory" shall mean the Inventory not purchased by the Buyer and identified on Schedule 2.02(b) hereto.

"FDI" hall have the meaning ascribed to it in the preamble.

"FI" hall have the meaning ascribed to it in the preamble.

"Final Order" shall mean an order, writ, injunction judgment or decree of a court of competent jurisdiction, the operation or effect of which has not been reversed, stayed, modified or amended and any and all appeal periods with respect to such order, judgment or other decree have expired, or as to which all appeals have been determined, withdrawn or dismissed with prejudice.

"Financial Statements" shall have the meaning ascribed to it in Section 4.04 hereof.

"Governmental Entity" shall mean any court, administrative or regulatory agency or commission or other foreign, federal, state or local governmental authority or instrumentality.

"Intellectual Property" shall mean (a) any and all patents and patent applications, (b) trademarks, service marks, certification marks, trade names, brand names, trade dress, logos, business and product names, slogans, and registrations and applications for registration thereof, (c) copyrights (including software) and registrations thereof, (d) inventions, processes, designs, formulae, trade secrets, know-how, industrial models, confidential and technical information, manufacturing, engineering and technical drawings, product specifications and confidential business information, (e) intellectual property rights similar to any of the foregoing, (f) computer software, (g) copies and tangible embodiments thereof (in whatever form or medium, including electronic media), (h) stock keeping units, and (i) all goodwill associated with any of the foregoing.

"Intellectual Property Assignment" shall mean the Intellectual Property Assignment Agreements, dated as of the Closing Date, between any Seller and Buyer, in the form attached hereto as Exhibit 7.01(e)(i) and Exhibit 7.02(e)(ii).

"Inventory" shall mean all of Sellers' inventory of finished goods, work-in-process, samples, precious metals, nonprecious metals, diamonds, gemstones, components, in existence on the Closing Date, wherever located, including but not limited to all inventory owned by Sellers which is on consignment to customers.  For purposes of this Agreement, "Inventory" shall also be deemed to include product and goods returned by a customer for credit against an outstanding account receivable to the extent that such product or goods have been received by Sellers prior to the Closing.

"Jaffe" hall have the meaning ascribed to it in the preamble.

"Lenders" shall mean, collectively, Israel Discount Bank of New York and HSBC Bank USA, National Association.

3

"Lien" shall mean any lien, mortgage, deed of trust, Claim, charge, pledge, security interest, hypothecation, levy, lease, easement, other real estate declaration or encumbrance of any kind.

"Material Contracts" shall have the meaning ascribed to it in Section 4.05 hereof.

"Memo Inventory" shall mean the Inventory identified in Schedule 4.08 hereto and any and all additional Inventory delivered by any Seller to its customers on a memo or consignment basis subsequent to the date of this Agreement in the ordinary course of its business.

"Other Agreements" shall mean the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment and any other agreement to be executed, delivered or provided under this Agreement.

"Other Transferred Assets" shall have the meaning ascribed to it in Section 2.01(g) hereof.

"Person" shall mean an individual, corporation, partnership, association, limited liability company, trust, joint venture, unincorporated organization, other entity or group (as defined in Section 13(d)(3) of the Securities and Exchange Act of 1934, as amended).

"Petition Date" shall have the meaning ascribed to it in the recitals.

"Premises" shall mean that 592 Fifth Avenue, 3rd Floor, New York, NY leased by Sellers from _____ pursuant to the terms and conditions of the Real Property Lease.

"Purchase Price" shall have the meaning ascribed to it in Section 2.05 hereof.

"Purchase Price Escrow" shall have the meaning ascribed to it in Section 2.07 hereof.

"Real Property" shall have the meaning ascribed to it in Section 4.09(a) hereof.

"Real Property Lease" shall mean _____, together with all amendments, riders and modifications thereto.

"Receivables" shall mean the payment obligations of a customer for products or goods delivered or for services rendered by Sellers in the Business.  For purposes of this Agreement, a "Receivable" shall also be deemed to include product or goods returned by a customer for credit against its Receivable which product or goods have not been received by Sellers prior to the Closing.

"Sale Hearing" shall have the meaning ascribed to it in the Bidding Procedures Order.

"Sale Motion" shall have the meaning ascribed to it in the recitals.

"Sale Order" shall have the meaning ascribed to it in Section 7.01(h) hereof.

"Seller" shall have the meaning ascribed to it in the preamble.

"Taxes" shall mean all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state, local or foreign taxing authority, including, but not limited to, income, gross receipts, license, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Sec. 59A), custom duty, capital stock, excise, real property, personal property, water and sewer charges, municipal utility district, ad valorem, sales, use, transfer, franchise, payroll, employment, withholding, severance, social security or other tax of any kind whatsoever, including any interest, penalties or additions attributable thereto, whether disputed or not.

"Tax Return" shall mean any return, declaration, report, claim for refund, information return or other document (including any related or supporting information) required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transferred Accounts Receivable" shall have the meaning ascribed to it in Section 2.01(a) hereof.

"Transferred Assets" shall have the meaning ascribed to it in Section 2.01 hereof.

"Transferred FF&E" shall have the meaning ascribed to it in Section 2.01(d) hereof.

"Transferred Intellectual Property" shall have the meaning ascribed to it in Section 2.01(f) hereof.

"Transferred Inventory" shall have the meaning ascribed to it in Section 2.01(b) hereof.

"Transfer Taxes" shall have the meaning ascribed to it in Section 6.04(b) hereof.

"Winning Bidder" shall have the meaning ascribed to it in the Bidding Procedures Order.

**<u>Exhibit E</u>**

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
Ian R. Winters
Sean C. Southard
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

*Proposed Counsel to the Debtors and Debtors in Possession*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- X
                                                                 :
In re:                                                           :    Chapter 11
                                                                 :
FIRESTAR DIAMOND, INC., et al.                                   :    Case No. 18-10509 (SHL)
                                                                 :
                                       Debtors.                  :    Jointly Administered
                                                                 :
---------------------------------------------------------------- X

**DECLARATION OF MARK SAMSON IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF ORDERS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365, AND BANKRUPTCY RULES 2002, 6004 AND 6006: (A) FIXING THE TIME, DATE AND PLACE FOR HEARING TO CONSIDER BIDDING PROCEDURES IN CONNECTION WITH THE DEBTORS' SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS; (B)(i) ESTABLISHING BIDDING PROCEDURES; (ii) APPROVING THE FORM AND MANNER OF NOTICES AND (iii) SETTING HEARING DATE FOR THE HEARING ON APPPROVAL OF THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; AND (C)(i) APPROVING THE SALE AND ASSIGNMENT OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (ii) GRANTING RELATED RELIEF**

   I, Mark Samson, declare, pursuant to section 1746 of title 28 of the United States Code,

that:

   1.  I am the Chief Restructuring Officer ("CRO") of Firestar Diamond, Inc.

("Firestar"), Fantasy, Inc. ("Fantasy") and A. Jaffe, Inc. ("A. Jaffe," and collectively with

Firestar and Fantasy, the "Debtors"), debtors and debtors-in-possession in the above-captioned cases.

2.    I make this declaration in support of the *Debtors' Motion for Entry of Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Rules 2002, 6004 and 6006: (A) Fixing the Time, Date and Place for Hearing to Consider Bidding Procedures in Connection with the Debtors' Sale of Substantially All of Their Assets; (B)(i) Establishing Bidding Procedures, (ii) Approving the Form and Manner of Notices, and (iii) Setting Hearing Date for the Hearing on Proposed Sale; and (C)(i) Approving the Proposed Sale and (ii) Granting Related Relief* (the "Sale Motion").

3.    Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents and/or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents and/or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

## Qualifications

4.    Since my appointment as CRO of the Debtors on February 25, 2018, I have worked with the Debtors' management and employees to, among other things, familiarize myself with the Debtors' operations and relationships with their customers.

5.    In addition to my work with the Debtors, I have over 25 years of crisis management and operations experience and have worked with a broad range of companies covering all aspects of turnaround crisis management and financial advisory situations.  In the past 16 years, I have served as interim CEO, CRO, board member, president or financial advisor

for more than 100 companies in the United States. I hold a B.B.A. in Economics and Marketing

form the University South Africa.

### The Need for a Prompt Sale Process

6.      The need for a prompt sale process is evident from the circumstances that caused

the filing of the Chapter 11 Cases as described above and more fully in the First Day

Declaration.

7.      In addition, the Pre-Petition Lenders have required, as a condition to use of cash

collateral, that the Debtors file the Sale Motion not later than March 23, 2018 and obtain

approval of the Bidding Procedures (as defined therein) by not later than March 28, 2018.

8.      Absent the Proposed Sale contemplated by this Sale Motion, the Debtors believe

they may not be able to realize the maximum value of their assets for the benefit of all

stakeholders.  Thus, a prompt sale is necessary to ensure that such assets are sold at their going

concern values.

9.      In addition, I am informed by the Debtors' employees that it is important that the

Proposed Sale be consummated by the first week of May 2018. The most important jewelry

industry trade show, known as JCK, is being held in Las Vegas, Nevada from June 1-4, 2018.

The JCK show serves as a platform to launch product lines for the fourth quarter, which is

traditionally the strongest quarter for sales in the jewelry industry, like many others. If the

Proposed Sale is consummated in the first week of May, a Purchaser will have sufficient time to

prepare the product lines currently owned by the Debtors for the JCK show. The ability to do so

may, therefore, result in more spirited bidding at the Auctions than if the Proposed Sale could not

be consummated before the JCK show.

### The Marketing of the Assets

10.     Prior to the filing of the Sale Motion, the Debtors engaged in a short, but intensive process designed to canvas the market for jewelry industry enterprises and private equity concerns that may have an interest in acquiring some or all of the Debtors' assets. Although compressed in time, I believe that the market of potential bidders has been reached and, if interested, they were provided with sufficient diligence in order to make a bid.

11.     As of the time of the filing of this Sale Motion, since the first marketing efforts began, forty-three (43) parties (not counting duplicates for those signed with respect to the Firestar/Fantasy Assets and A. Jaffe Assets) requested non-disclosure agreements, and twenty-five (25) parties executed non-disclosure agreements (not counting duplicates) in order to gain access to the diligence information ("Phase I Diligence") maintained by the Debtors in a password-enabled data room.  The Phase I Diligence is comprised of the last two years' audited financial statements and general information concerning the Debtors' current inventory and accounts receivable. Potential Bidders were and continue to be invited to inspect merchandise at the Debtors' offices. In addition, Potential Bidders were invited to ask questions of me, the Debtors' other officers and employees, financial advisors and attorneys.

12.     Following approval of the Bidding Procedures, the Debtors intend to make available to Potential Bidders additional diligence ("Phase II Diligence") including more detailed information concerning the Debtors' current inventory and accounts receivable, including sales levels for the current year and historical sales to customers, intellectual property, licensing and consignment relationships and the terms thereof. I, along with the Debtors' other officers, their employees, financial advisors and attorneys will continue to make themselves available to Potential Bidders for additional inquiry.

13.     Due to the highly competitive nature of the jewelry industry and the commercially sensitive nature of the information to be made available as Phase II Diligence, Phase II Diligence will only be made available to Potential Bidders who provide the Debtors with a written expression of interest and support for financial wherewithal to complete the transaction described in such written expression of interest.

14.     In light of the number of parties that sought Phase I Diligence and/or Phase II Diligence, it is clear that there was strong interest in the acquisition of some or all of the Debtors' assets. Those parties are all established participants in the jewelry industry. It is my belief based upon my knowledge of the Debtors' business and the jewelry industry that the Debtors' assets have been adequately exposed to the market.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed on March 23, 2018

By:  _/s/ Mark Samson_____
      Mark Samson, Chief Restructuring Officer

**<u>Exhibit F</u>**

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
Ian R. Winters
Sean C. Southard
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X
                                                                      :
In re:                                                                :    Chapter 11
                                                                      :
FIRESTAR DIAMOND, INC., et al.                                        :    Case No. 18-10509 (SHL)
                                                                      :
                                        Debtors.                      :    Jointly Administered
                                                                      :
-------------------------------------------------------------------- X

**NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY**
**CONTRACTS IN CONNECTION WITH THE SALE AND ASSIGNMENT OF**
**SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

       1.       On March 23, 2018, Firestar Diamond, Inc. ("Firestar"), Fantasy, Inc. ("Fantasy") and A. Jaffe, Inc. ("A. Jaffe," and collectively with Firestar and Fantasy, the "Debtors"), debtors and debtors-in-possession in the above-captioned cases, filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a motion (the "Sale Motion")[1] for the entry of orders (a) establishing bidding procedures, as set forth herein (the "Bidding Procedures"), with respect to the Debtors' sale of substantially all of their assets free and clear of liens, claims, interests and encumbrances (the "Proposed Sale"), (b) approving the form and manner of notices thereof (the "Bidding Procedures Notice"), and (c) setting a hearing (the "Sale Hearing") to consider approval of the Proposed Sale.

---

[1] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Sale Motion. Any summary of the Bidding Procedures or the Bidding Procedures Order contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

2.      On March ___, 2018, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. _____] approving the relief requested in the Sale Motion.

3.      The Sale Hearing will take place on May 3, 2018 at __:00 _.m. (prevailing Eastern Time) before the Honorable Sean H. Lane, United States Bankruptcy Judge, in the Bankruptcy Court, located at One Bowling Green, Courtroom 701 New York, New York 10004. The Debtors will have accepted the terms of the Winning Bidder only when such bid has been approved by the Bankruptcy Court pursuant to a Sale Order.

4.      In connection with the Proposed Sale, and in accordance with the Assumption and Assignment Procedures set forth in the Sale Motion and the Bidding Procedures Order, the Debtors may seek to assume and assign the Potentially Assigned Contracts (as defined in the Sale Motion) and execute and deliver to any Winning Bidder such documents or other instruments as may be necessary to assign and transfer the Potentially Assigned Contracts. Each of the Potentially Assigned Contracts are identified on the schedule attached hereto as **Schedule 1** (the "Potentially Assigned Contracts Notice"). The cure costs under the Potentially Assigned Contracts, if any, that the Debtors believe is required to be paid to the applicable counterparty (the "Counterparty") to each of the Contracts to cure any monetary defaults under such Contracts pursuant to 11 U.S.C. §§ 365(b)(1)(a) and (b) is set forth on the Proposed Assigned Contracts Notice.

5.      Cure Objections.

(1)     Cure Objection Deadline. Any Counterparty to a Potentially Assigned Contract that wishes to object to the proposed assumption and assignment of the Potentially Assigned Contract, the subject of which objection is the Debtors' proposed costs to cure any outstanding monetary defaults then existing ("Cure Costs") under such contract (each, a "Cure Objection"), shall file with the Court and serve on the Objection Recipients its Cure Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than **April 30, 2018 at 4:00 p.m.** (prevailing Eastern Time) (the "Cure Objection Deadline"). Replies, if any, to Cure Objection shall be filed by **May 2, 2018 at 12:00 p.m.** (prevailing Eastern Time).

(2)     Resolution of Cure Objections. The Debtors and a Counterparty that has filed a Cure Objection shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention. If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined by the Court at the Sale Hearing. The Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph.

(3)     <u>Adjourned Cure Objections</u>. If a timely Cure Objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing; provided that, a Cure Objection (and only a Cure Objection) may, at the Debtors' discretion, after consulting with the Consultation Parties and the Winning Bidder, be adjourned with the Court's consent (an "<u>Adjourned Cure Objection</u>") to a subsequent hearing. An Adjourned Cure Objection may be resolved after the closing date of the applicable Proposed Sale (and therefore the contract of the Counterparty in question may be assumed and assigned at Closing); provided that the Debtors maintain a cash reserve equal to the Cure Costs the objecting Counterparty believes is required to cure the asserted monetary default under the affected Potentially Assigned Contract.

(4)     <u>Failure to File Timely Cure Objection</u>. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Cure Objection, the Counterparty shall be deemed to have consented to the assumption and assignment of the Potentially Assigned Contract (unless such Counterparty has timely filed an Adequate Assurance Objection with respect to the Assigned Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption and assignment. Further, in the event no objections are timely filed and served, the Cure Costs set forth in the Potential Assigned Contract Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Potentially Assigned Contract under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in any Potentially Assigned Contract, or any other document, and the Counterparty to the Potentially Assigned Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Potentially Assigned Contract against the Debtors or any Winning Bidder(s), or the property of any of them.

6.     <u>Adequate Assurance Objections.</u>

(1)     <u>Adequate Assurance Information</u>. The Debtors shall provide the Adequate Assurance Information with respect to each Qualified Bidder within 48 hours of receipt of an Sealed Bid from a Potential Bidder (the "<u>Adequate Assurance Deadline</u>") to those Counterparties (or their counsel) who have (x) submitted a written request (e-mail to Debtors' counsel is acceptable) for Adequate Assurance Information and (y) confirmed in writing to the Debtors' counsel (e-mail to Debtors' counsel is acceptable) their agreement to keep such Adequate Assurance Information strictly confidential and use it solely for the purpose of evaluating whether a Potential Bidder has provided adequate assurance of future performance under the affected Potentially Assigned Contracts.

(2)     <u>Adequate Assurance Objection Deadline</u>. Any Counterparty to a Potentially Assigned Contract that wishes to object to the proposed assumption and assignment of a Potentially Assigned Contract, the subject of which objection is a Winning Bidder's proposed form of adequate

assurance of future performance with respect to such contract (each, an "Adequate Assurance Objection") shall file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof, including submitting any appropriate documentation in support thereof, by **April 30, 2018 at 4:00 p.m.** (prevailing Eastern Time) (the "Adequate Assurance Objection Deadline"). Replies, if any, to Adequate Assurance Objections shall be filed by **May 2, 2018 at 12:00 p.m.** (prevailing Eastern Time).

(3)    Resolution of Adequate Assurance Objections. The Debtors and a Counterparty that has filed an Adequate Assurance Objection shall first confer in a good faith to attempt to resolve the Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, such objection and all issues of adequate assurance of future performance by the applicable Winning Bidder shall be determined by the Court at the Sale Hearing.

(4)    Failure to File Timely Adequate Assurance Objection. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Potentially Assigned Contract (unless the Counterparty has filed a timely Cure Objection with respect to the Potentially Assigned Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale. Further, in the event no objections are filed and served, the applicable Winning Bidder shall be deemed to have provided adequate assurance of future performance with respect to the affected Assigned Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code, notwithstanding anything to the contrary in the Potentially Assigned Contract, or any other document.

7.    Other Sale Objections by Counterparties.

(1)    Objection Deadline. Any Counterparty to an Potentially Assigned Contract that wishes to file a Sale Objection (other than a Cure Objection or an Adequate Assurance Objection) to the proposed assumption and assignment of a Potentially Assigned Contract shall file with the Court and serve on the Objection Recipients its Sale Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than the Sale Objection Deadline of **April 30, 2018 at 4:00 p.m.** (prevailing Eastern Time). Replies, if any, to Sale Objections shall be filed by **May 2, 2018 at 12:00 p.m.** (prevailing Eastern Time).

(2)    Failure of Counterparties to File Timely Sale Objection. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Sale Objection, the Counterparty shall be deemed to have consented to the

assumption and assignment of the Potentially Assigned Contract (unless the Counterparty has filed a timely Cure Objection or Adequate Assurance Objection with respect to the Potentially Assigned Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale.

(3)     <u>Reservation of Rights</u>. The inclusion of a Potentially Assigned Contract or Cure Costs on the Potential Assigned Contracts Notice shall not constitute or be deemed a determination or admission by the Debtors, the applicable Winning Bidder(s), or any other party in interest that such contract or other document is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Costs are due (all rights with respect thereto being expressly reserved). The Debtors reserve all of their rights, claims, and causes of action with respect to each Potentially Assigned Contract or other document listed on the Potential Assigned Contracts Notice.  The Debtors' inclusion of any Potentially Assigned Contract on the Potential Assigned Contracts Notice shall not be a covenant, promise, or guarantee that such contract ultimately will be assumed and assigned.  The Potential Assigned Contracts Notice shall be without prejudice to each Winning Bidder's rights, if any, under the applicable asset purchase agreement, to subsequently exclude any Potentially Assigned Contracts from the assumption or assignment prior to the closing of an applicable Proposed Sale.

[remainder of page intentionally blank]

Dated:    New York, New York
        March __, 2018

                KLESTADT WINTERS JURELLER
                SOUTHARD & STEVENS, LLP

    By: _____
          Ian R. Winters
          Sean C. Southard
          Joseph C. Corneau
          200 West 41st Street, 17th Floor
          New York, New York 10036
          Tel: (212) 972-3000
          Fax: (212) 972-2245

          *Proposed Counsel to the Debtors and Debtors*
          *in Possession*

          -and-

          FORCHELLI DEEGAN TERRANA LLP
          Gerard P. Luckman
          333 Earle Ovington Blvd, Suite 1010,
          Uniondale, New York 11553
          Tel: (516) 248-1700
          Fax: (516) 248-1700

          *Proposed Conflicts Counsel to the Debtors and*
          *Debtors-in-Possession*