**Hearing Date and Time:** Tuesday, May 15, 2018 at 2:00 P.M. (ET)

James L. Bromley
Sean A. O'Neal
Rahul Mukhi *(of counsel)*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for Punjab National Bank*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Firestar Diamond, Inc., *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 18-10509 (SHL)<br><br>(Jointly Administered) |

**OBJECTION OF PUNJAB NATIONAL BANK TO
DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
THE SALE AND ASSIGNMENT OF THE DEBTOR'S ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND
<u>ENCUMBRANCES AND GRANTING RELATED RELIEF</u>**

---

[1] The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Firestar Diamond, Inc. (2729), Fantasy, Inc.(1673), and A. Jaffe, Inc. (4756).

Punjab National Back ("PNB"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the Debtors' *Motion for Entry of Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Bankruptcy Rules 2002, 6004 and 6006 Approving the Sale and Assignment of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and Granting Related Relief*, ECF No. 60 (the "Sale Motion"), seeking, among other things, approval of the sale of A. Jaffe assets, subject to higher or better offers.[2] In support of this Objection, PNB respectfully submits as follows:

## PRELIMINARY STATEMENT

1.  The Debtors filed these Chapter 11 cases less than three months ago and held an expedited sales process with a bid deadline of April 27, 2018 and an auction date of May 3, 2018. Unfortunately, the expedited process attempted by the Debtors failed. There were ▇ all-asset bids for the two Debtors, Firestar Diamond Inc. ("FDI") and Fantasy Inc. ("Fantasy"), purported to be the most valuable, necessitating an indefinite postponement of the auction. In addition, the bids for the third Debtor, A. Jaffe Inc. ("A. Jaffe"), were significantly lower than the Debtors' estimated value. There can be no serious dispute over the impact of the massive fraud committed by Nirav Modi, the majority shareholder of their ultimate parent, and his associates on the bidding and sales process. Indeed, since the Court approved the sales and bidding procedures, substantial facts detailed below have emerged directly connecting the Debtors to the fraud committed by Modi and his affiliates against PNB.

2.  For these reasons, the Court should adjourn the sales process to allow time for the Court to determine, with the assistance of the Examiner, the extent of the Debtors' involvement

---

[2]   The Debtors extended the deadline for filing this objection from May 8, 2018 at 4:00 p.m. until May 10, 2018 at 2:00 p.m. Unless otherwise defined in this Objection, all capitalized terms used herein shall have the same meanings ascribed to them as in the Sale Motion.

in the massive fraud.  There is no compelling reason for Debtors to oppose this request.  The failure of the auction is clear evidence that the justifications the Debtors provided for the expedited sales process are no longer applicable and a delay to permit the investigation to proceed may improve efforts to sell the Debtors' assets.  If the investigation reveals that the Debtors have no responsibility for the fraud committed against PNB, it will undoubtedly result in a more robust bidding environment for the Debtors' assets, including for the assets that have received bids to date.  If, on the other hand, the investigation finds that Debtors were involved in the fraud, then the assets are subject to a constructive trust claim and other claims by PNB.  To be sure, certainty over these issues will aid potential bidders in valuing the Debtors and will ensure that none of the rights of the fraud victim are compromised.

3.    Delaying the sale hearing will also allow the Court and parties in interest to evaluate the impact of various orders and laws of India affecting the Debtors' assets in the United States.  For example, the National Company Law Tribunal ("NCLT") has entered an order precluding the sale of any assets of various entities affiliated with Nirav Modi, including the Debtors, from selling assets.  While the Debtors have the ability to seek relief from this Order, they have not done so.

4.    Finally, despite the Court's instruction that the Debtors run a fully transparent process, this was not the case.  To date, the Debtors have still not filed with this Court, or served on PNB, the terms of the proposed sale.  There has been no disclosure of the purchase agreement, a list of contracts to be assumed, the proposed sale order or related documents.  It was only last night that the Debtors finally authorized the release of the proposed purchase price to PNB.  The Debtors' failure to provide sufficient notice of the terms of the sale violates the Bid Procedures Order, which required the Debtors to file a notice of the results of the auction one

business day after the selection of the winning bidder. This alone justifies an adjournment of the sale hearing to permit all interested parties to review the full details of the A. Jaffe successful bid.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

**A.  The Bankruptcy Proceedings**

6. On February 26, 2018 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (the "Debtors") filed their voluntary petitions for protection under Chapter 11 of Title 11 of the United States Code, thus commencing these proceedings (the "Chapter 11 Proceedings"). To date, the Debtors have continued in the possession and operation of their properties and businesses. The Chapter 11 Proceedings cases have been consolidated for procedural purposes only.

**B.  The Modi Fraud**

7. PNB, the second largest government-owned bank in India, only recently learned that it is the victim of the largest alleged bank fraud in India's history. Modi and several of the entities he directly or indirectly controls (collectively, the "Modi Entities") and his uncle, Mehul Choksi, who is also involved in the jewelry business ("Choksi") and certain entities related to Choksi (collectively, the "Choksi Entities") are the alleged perpetrators of this fraud. *See Declaration of Mihir Bhansali, President of the Debtors, Containing Information Required Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Debtors' First Day Motions*, ECF No. 2 (the "First Day Declaration"), ¶¶ 33-34.

3

8. The cornerstone of the fraud was that Modi and the Modi Entities fraudulently obtained Letters of Undertaking ("LOUs") from PNB. See Declaration of Sean A. O'Neal, dated May 10, 2018 (the "O'Neal Decl."), Ex. A (the "NCLT Order"). LOUs are guarantees by the issuing Indian bank guaranteeing repayment of loans made to such bank customer(s) by a foreign lender, specifically, a foreign branch of an Indian bank. The bank issuing the LOU (here, PNB) agrees to pay to the foreign lender the full amount of the loan plus accrued interest if the importer (here, Modi and the Modi Entities) fails to pay back the foreign lender. See O'Neal Decl., Ex. D.

9. An LOU serves the purpose of a bank guarantee for the bank's customer, allowing the customer to make payment to its offshore suppliers (i.e., exporters) in foreign currency. In accordance with Indian governmental trade and banking regulations,[3] PNB has mandated certain procedures for issuance of LOUs. See O'Neal Decl., Ex. E. Among other things, a customer of PNB requesting an LOU is required to provide documentation of the underlying *bona fide* import/export transaction and pledge security to cover the amount of the LOU. See O'Neal Decl., Ex. F (the "NCLT Petition") at 30-32.

10. Beginning in or about 2011, the Modi Entities began obtaining fraudulent LOUs from the Brady House, Mumbai branch of PNB. NCLT Petition at 31. Two PNB employees, Gokulnath Shetty ("Shetty"), the deputy manager at the Brady House branch, and Manoj Hanumant Kharat ("Kharat"), a single window operator, conspired with the Modi Entities to issue the LOUs without the necessary underlying documentation or the pledging of collateral necessary to repay the amount of the LOUs. See NCLT Petition at 24-25, 30. After being issued

---

[3] See Master Circular DBOD.NO.Dir.BC.18/13.03.00/2008-09 dated July 1, 2008 published by the Reserve Bank of India, available at https://www.rbi.org.in/scripts/NotificationUser.aspx?Id=4345&Mode=0#Application at Section 2.3.8.3.

4

by PNB, the funds issued pursuant to the LOUs were transmitted by these same bank employees through the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") system to the foreign branches of Indian banks. The SWIFT messages authorized the release of funds in the amount of the LOUs for payment to the foreign "exporter/beneficiary" listed in the SWIFT messages for the goods listed therein. NCLT Order ¶¶ 2-4.

11.  According to the LOUs, these funds should have been dispersed to the "exporter/beneficiary" to finance the import of goods into India; however, funds were dispersed to other Modi Entities instead of to third-party exporters/suppliers and were not used for *bona fide* import/export purposes. See NCLT Order ¶ 2; NCLT Petition at 54. Of the funds released by foreign banks pursuant to the fraudulent LOUs, some of the proceeds were used to repay credit previously disbursed to the Modi Entities by foreign branches of Indian banks pursuant to prior fraudulent LOUs. See NCLT Order ¶ 2. Other funds were used to pay exporters for purported import transactions of semi-precious and precious stones that according to a preliminary analysis are unsupported by any documentation (e.g., key documents are missing from Indian customs authority records) and often involve shell companies affiliated with Modi and his associates. PNB suspects that in many instances the proceeds of the fraudulent LOUs were routed back to Modi and the Modi Entities without ever being used for the import of semi-precious or precious stones. See NCLT Petition at 30-32.

12.  The fraudulently issued LOUs went undetected by PNB for nearly seven years because the rogue bank employees conspiring with Modi did not enter the LOUs into PNB's Core Banking System ("CBS") software. See NCLT Order ¶¶ 2-4. The fraud was finally uncovered after Modi's associates requested issuance of LOUs without proper documentation on January 16, 2018, after Mr. Shetty had retired, and other PNB employees noticed that the Modi

5

Entities requesting issuance of LOUs did not have official credit facilities set up with the bank. See NCLT Petition at 54.

**C.    NCLT Order**

13.    On January 31, 2018, India's Central Bureau of Investigation ("CBI"), which is analogous to the United States Federal Bureau of Investigation, launched an investigation into Modi, the Modi Entities, Choksi, and the Choksi Entities. Concurrent with the CBI investigation, India's Ministry of Corporate Affairs initiated proceedings before India's National Company Law Tribunal ("NCLT"). On February 23, 2018, three days before the Petition Date, the NCLT issued the NCLT Order. See generally NCLT Order. Specifically, the NCLT Order enjoins certain Modi Entities and others named in the order from removing, transferring or disposing of such entity's funds, assets, or properties. See NCLT Order ¶ 9. Each of the Debtors are named in the NCLT Order as Modi Entities within the Firestar Group that are implicated in the fraud and whose assets are thus subject to the injunction. See NCLT Order ¶ 5. The NCLT Order provided for notice of the order within 15 days and a hearing on March 26, 2018. See NCLT Order ¶ 10.

14.    The NCLT Order identifies various connections between the Debtors and the Modi Entities as well as persons implicated in the Modi fraud. The NCLT Order names Mihir Bhansali, the President and former Director of the Debtors, as Respondent 62. See NCLT Order at 2. The NCLT Order lists various affiliates of the Debtors that frequently did business with the Debtors, including Firestar International Ltd., Firestar Diamond International P Ltd., and Firestar Diamond FZE, as *prima facie* beneficiaries of the Modi fraud. See NCLT Order ¶ 5. These suspect entities allegedly hold more than $7 million in claims against the Debtors, relating to

6

highly suspect transactions.  See ECF No. 69 (the "FDI Schedules") at 15-37; ECF No. 71 (the "A. Jaffe Schedules") at 8-34; ECF No. 73 (the "Fantasy Schedules") at 8-12.

15.     The NCLT Order identifies the Debtors as "Step Down Subsidiaries" who are subject to an asset freeze as a result of the fraud.  NCLT Order ¶¶ 5, 9.  Although the NCLT Order permits persons to seek relief from this freeze, to our knowledge, the Debtors have not attempted to do so.[4]

**D.      Investigation to Date**

16.     PNB has engaged BDO India LLP ("BDO"), an accounting firm, to conduct a forensic investigation into the fraud, which has, based on a preliminary analysis, uncovered significant connections between the Debtors and the Modi Entities and the fraud itself.  See Declaration of Mansi Mehta, dated May 10, 2018; Declaration of Kartik Radia, dated May 10, 2018 (collectively, the "BDO Decl.").

17.     BDO's investigation to date has determined that the Debtors have received a total of approximately $46 million remitted from PNB since 2011, when the fraud is believed to have commenced.  See BDO Decl. at ¶ 5.  Of this amount, at least $8.3 million was remitted to the Debtors in the form of funds issued pursuant to LOUs (the "Debtor LOUs").  See id.  Four of the five Debtor LOUs, totaling approximately $6.4 million (approx. $4.5 million to FDI and approx. $1.9 million to A. Jaffe), share the key indicia of LOUs that were fraudulently obtained by Modi and his affiliates.  See id.  For example, these four LOUs were not recorded in the CBS, they

---

[4]     The Debtors may still move to vacate the NCLT Order with respect to themselves.  On April 2, 2018 the NCLT modified the NCLT Order pursuant to applications for such modification by specific respondents.  See O'Neal Decl., Ex. B.  In each of their applications, these respondents asserted they were not involved in the fraud and requested the NCLT Order be vacated solely with respect to them personally.  See id.  The NCLT vacated the NCLT Order with respect to five out of the seven applicants and modified the NCLT Order to allow for monthly withdrawals from personal bank accounts for the other two applicants.  See id. (While this particular decision was stayed pending appeal, the Debtors may still petition for removal).  The NCLT Order was modified again on April 7, 2018 to add respondents, including PNB which was added as a *pro forma* respondent.  See O'Neal Decl., Ex. C.

7

were not secured by any margin or collateral, they were authorized by Shetty (one of the employees who approved other fraudulent LOUs), and three of the four do not appear to have been supported by registered import/export transactions. See id. While further investigation is required to ascertain whether these funds were routed through the Debtors back to the Modi or the Modi Entities and whether the Debtors received additional funds (directly or indirectly) from other suspect LOUs, PNB believe that these transfers likely give rise to substantial direct claims against the Debtors.

18. There is also significant additional information from the Debtors' own filings and other sources connecting the Debtors to the Modi fraud:

- The Debtors have numerous relationships with exporters and importers associated with Modi and the related fraud. According to the Debtors' schedules, the total amount owed to certain suspect exporters and importers is approximately $6,452,492.[5] These six suspect entities include: Fancy Creations Company, Ltd., World Diamond Distribution FZE, Eternal Diamonds Corp., Ltd., Empire Gems FZE, Pacific Diamonds FZE, and Tri Color Gems.[6] In fact, A. Jaffe's two largest creditors, Pacific Diamonds FZE and Tri Color Gems,[7] are named as the "exporter/beneficiary" on LOUs already identified as fraudulent.[8]

- The Debtors have listed other affiliates of Nirav Modi as the most significant unsecured creditors of the U.S. Estates. The total amount allegedly owed to Modi affiliates is approximately $53 million.[9] The legitimacy of these amounts is subject to challenge, particularly in light of the *modus operandi* of the fraud, and the estate may have significant claims against these entities. Among these affiliates, Firestar International Ltd. (allegedly owed $4,959,035), Firestar Diamond International P Ltd. (allegedly owed

---

[5]    See FDO Schedules at 15-30; A. Jaffe Schedules at 8-37.

[6]    See BDO Decl. ¶ 5.

[7]    See First Day Declaration, Ex. B.

[8]    NCLT Petition at 95.

[9]    See FDI Schedules at 15-30; A. Jaffe Schedules at 8-37; Fantasy Schedules at 8-37. This sum is derived from amounts listed in the schedules as owed to Firestar Diamond International P. Ltd., Firestar Diamond International Inc., Firestar International Ltd., Firestar Diamond FZE, Firestar Diamond BVBA, and Firestar Holdings Ltd.

8

$1.9 million), and Firestar Diamond FZE (allegedly owed $470,564) are listed as *prima facie* beneficiaries of the fraud in the NCLT Order.[10]

- The Debtors and numerous Modi Entities engaged in significant intercompany transactions.[11] The total magnitude of the intercompany transactions suggests not only that the Debtors were involved in the fraud, but also that the Debtors may be the alter egos of Modi and the Modi Entities responsible for the fraud. Moreover, the *bona fides* of these transactions are open to significant question given the apparent sham transactions that Modi and the Modi Entities entered into with their affiliates during the course of the fraud.

- The Debtors made significant preference payments to insiders. For example, FDI extended a $73,570 personal loan to Modi[12] and made $17,689 in total payments to "Nirav Modi (personal)" in the last year.[13] A. Jaffe also made a $530,000 payment to Pacific Diamond FZE, one of the above suspect entities, during the preference period.[14]

- Mihir Bhansali, the President of the Debtors, has a long standing history with Nirav Modi and his affiliated entities. Modi was quoted in a 2015 article as stating that 70% of his "company" reports to Mihir Bhansali.[15] Mihir Bhasali is also a past director of Firestar Diamond International Pvt. Ltd, which is one of the Modi Entities involved in the fraud.

- In a very suspect transaction, Mihir Bhansali and his wife purchased apartment 24A at 50 Riverside Boulevard in New York City for approximately $7,100,000 on March 22, 2017, of which approximately $5.3 million was paid in cash.[16] Given that Mr. Bhansali's annual salary from the Debtors was approximately $185,000,[17] there are significant

---

[10] NCLT Order ¶ 5.

[11] See FDI Schedules at 15-30; A. Jaffe Schedules at 8-37; Fantasy Schedules at 8-37.

[12] See FDI Schedules at 10.

[13] See ECF No. 70 at 13-25.

[14] See ECF No. 72 at 10. As Debtors are only required to disclose payments made in the 90 days leading up to the bankruptcy petition filing, there may be more such payments to this and other suspect entities. Additionally, some or all of these entities may be characterized as affiliates of the Debtors which would require disclosing payments to such entities made in the past year.

[15] *Can Nirav Modi Win New York?*, Fortune India, Oct. 5, 2015, available at https://www.fortuneindia.com/people/can-nirav-modi-win-new-york/100365.

[16] See O'Neal Decl. Ex. G; O'Neal Decl., Ex. H. See also ACRIS Search Results by Parcel Identifier for Block 1171, Lot 2520, accessed on Apr. 12, 2018, available at https://a836-acris.nyc.gov/DS/DocumentSearch/BBL (enter Block and Lot info).

[17] See ECF No. 70 at 13-25.

9

questions concerning the source of such a large amount of cash. Adding to the suspicious nature of the transaction is that only two days after the Debtors filed for bankruptcy, Mr. Bhansali transferred his interests property to his wife, Rakhi Bhansali.[18]

19. To date, Debtors have refused to meaningfully provide PNB with documents that it requested on March 22, 2018, now over six weeks ago, which would assist PNB in assessing the extent of the Debtors involvement with the Modi fraud. See ECF No. 76, Ex. B. On March 28, this Court held a hearing on the sales process proposed by the Debtors, among other things. At that hearing, this Court stated:

> I particularly think it's important to try to get as much information as possible to the parties. There's no need to wait for an examiner. The debtors will be putting together information to provide to the examiners, and I don't see any reason why, and whether you need a confidentiality agreement or something else. That information, as much as possible, can't be provided. And that folks can work collaboratively on an information sharing protocol to get their questions answered.

Hr'g Tr. 120:9-17, March 28, 2018 [Case No. 18-10509]. Despite the Court's clear instruction, Debtors have dragged their feet in providing relevant and necessary information to PNB. In the spirit of cooperation, PNB offered to suggest a subset of its Document Requests that may be prioritized in order to facilitate the prompt production of responsive documents. On April 3, PNB provided the Debtors with a subset of Document Requests that it considers a priority. See O'Neal Decl., Ex. J. And while Debtors did "commit to begin sharing non-privileged information responsive to the requests contained" in the Debtors' letter dated April 3 "as soon as possible," see O'Neal Decl., Ex. K, despite the execution of a Non-Disclosure Agreement on April 25, no other documents (other than limited accounting data and sale-related documents) responsive to these requests have been forthcoming.

20. On March 22, 2018, the United States Trustee filed a motion seeking the appointment of an examiner to investigate, among other things, the Debtors' connections to the

---

[18] See O'Neal Decl., Ex. I.

10

Modi fraud.  See ECF No. 87.  On April 13, 2018, this Court entered an order directing the United States Trustee to appoint an examiner:

> to investigate the circumstances surrounding the circumstances surrounding the [Modi fraud] for the purpose and to the extent necessary to determine: (1) whether and to what extent, if any, [certain persons or entities affiliated with Modi] have the ability to direct and/or influence the conduct, decisions or actions taken by the Debtors in these Cases; (2) whether any current officer or director of the Debtors actively and knowingly participated in fraud or dishonesty in the management of the affairs of the Debtors; (3) whether any claims or causes of action in favor of the Debtors may arise from the [circumstances surrounding the Modi fraud].

ECF No. 103.  On April 20, 2018, this Court entered an order approving the appointment of John J. Carney, Esq. as examiner (the "Examiner") in these Chapter 11 Proceedings.  See ECF No. 118.  On May 4, 2018, the Examiner filed his preliminary work plan and budget.  See ECF No. 139.

**D.     The Sale Motion and A. Jaffe Auction**

21.     On March 23, 2018, the Debtors filed the Sale Motion, requesting that this Court, *inter alia*, approve certain bidding and sale procedures (the "Bidding Procedures") for the sale of substantially all of the Debtor's assets free and clear of liens, claims, interests and encumbrances and set a hearing to consider approval of the Proposed Sale.  The Bidding Procedures contemplate separate Business Line Auctions as to Firestar/Fantasy Assets and A. Jaffe Assets as well as an All-Asset Auction that would provide for sale of substantially all of the Debtors' combined assets.  See Sale Motion at 14-17.

22.     The Debtors claimed that an expedited sale process is necessary to (i) realize the maximum values of the assets and (ii) to give the ultimate purchasers sufficient time to prepare for an industry trade show set to be held in early June.  See Sale Motion ¶¶ 25-26.  The Debtors also stated that the market of potential bidders had been reached, noting forty-three (43) parties

11

had requested non-disclosure agreements and twenty-five (25) parties had executed non-disclosure agreements at the time the Sale Motion was filed.  See Sale Motion at 3, 7.

23. On May 1, 2018, the Debtors adjourned the Business Line Auction for Firestar/Fantasy Assets and the All-Asset Auction "to a date to be determined." ECF No. 136. Having adjourned all other Auctions, the Debtors held only a Business Line Auction for A. Jaffe Assets on May 3, 2018. See ECF No. 141. A. Jaffe's Statement of Financial Affairs lists over $22 million in assets, over $14 million of which consist of non-perishable inventory. See ECF No. 71. In the Sale Motion, the Debtors claim "A. Jaffe sales had been growing in solid double digits for the last three years and were projected to reach $23 million in fiscal 2018." Sale Motion ¶ 12.

24. Unfortunately, the winning bid falls far short of the estimated value of the assets, giving the bidder a windfall to the disadvantage of the estate. The purchase price for the winning bidder, Parag Diamonds, Inc. (the "Winning Bidder"), was only ███████████████████████████████████████████████████████████████. Transcript, Business Line Auction of A. Jaffe, In re Firestar Diamond, Inc., et al., No. 18-10509 (May 3, 2018) (the "Auction Transcript") (available to the Court upon request). Flourish City Holdings, Ltd. was determined to be the Backup Bidder. Id.

**ARGUMENT**

25. PNB objects to the proposed sale of A. Jaffe's assets to the Winning Bidder on an expedited basis at a significant discount. The auction process, significantly chilled by the uncertainty surrounding over the Debtors' involvement in Modi's massive fraud, has plainly not achieved a sufficient value to go forward with the sale. In these circumstances, adjourning the sale and allowing more time to clarify the Debtors' connections to the Modi fraud is appropriate.

The estate has already adjourned the Business Line Auction for the Firestar/Fantasy Assets in light of the failed auction process, and should do the same with respect to the A. Jaffe Assets.

26. Section 363(b) of the Bankruptcy Code provides that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363. Second Circuit courts require a debtor seeking to sell substantially all of its assets under Section 363 to show that a good business reason exists for such a sale. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1988). To determine whether a good business reason exists, courts must consider factors including but not limited to:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, *most importantly perhaps, whether the asset is increasing or decreasing in value*.

Id. (emphasis added). When conducting the sale of a debtor's assets, a bankruptcy court has "broad discretion and flexibility . . . to enhance the value of the estate before it" in light of its "principal responsibility, which is to secure for the benefit of creditors the best possible bid." In re Financial News Network Inc., 980 F.2d 165, 169 (2d Cir. 1992).

27. To meet its burden, the debtor must show that the purchase price is fair and reasonable, and "not merely the highest dollar amount—but the highest and *best* offer." In re Flour City Bagels LLC, 557 B.R. 53, 78 (Bankr. W.D.N.Y. 2016) (emphasis added). A court may reject a sale where the purchase price is "woefully inadequate in light of changed circumstances." In re Fairfield Sentry Ltd., 539 B.R 658, 669-670 (Bankr. S.D.N.Y 2015), aff'd, 690 Fed. App'x 761 (2d Cir. 2017). Similarly, a court may find no good business reason exists for completing a sale on an expedited basis where there is "no indication on the record that the business would not be worth as much, if not more . . . in a [Section] 363 transaction at a later

date." In re Wings Dig. Corp., No. 05-12117 (ALG), 2005 WL 3789334, at *3 (Bankr. S.D.N.Y. May 16, 2005).  As no good business reason exists for selling A. Jaffe to the Winning Bidder for ███████████████████, the Debtors cannot meet their burden.

28.     First, there is significant reason to believe that A. Jaffe's assets can be sold for much more at a later date.  That the Winning Bidder prevailed with a mere ███████ bid—after A. Jaffe claimed assets worth approximately $22 million—is simply one indication, among many, that the uncertainty surrounding the Debtors' involvement in the Modi fraud has had a significant negative impact on the bidding process.  Although the Debtors claim 43 parties were interested in the Debtors' assets and 25 parties executed non-disclosure agreements in order to gain access to due diligence information, only █ bidders even participated in the auction for A. Jaffe assets.  See ECF No. 141.  And despite the purported significant initial interest, the Debtors have adjourned the Firestar/Fantasy Business Line Auction until "a date to be determined," ECF No. 136, because they received █ all-asset bids despite claiming assets worth approximately $63 million.

29.     Compounding the Debtors' refusal to share information that will clarify the Debtors' involvement in the Modi fraud, the lack of transparency surrounding the sale process has made it impossible to assess whether the terms of the sale to the Winning Bidder are fair and reasonable.  The Debtors failed to publicly file the sales results, other than the names of the Winning and Backup Bidders, and have withheld material information concerning the sales process from PNB, such as the expected terms of any asset purchase agreement.  This has deprived PNB of a full and fair opportunity, as the undisputed victim of the fraud committed by the Debtors' ultimate majority shareholder, to be fully informed of its rights and whether they

14

have been compromised by the conduct of the sale of Debtors' assets. In these circumstances, going through with the sale of A. Jaffe assets is not prudent.

30. Second, these are not wasting assets, requiring immediate sale in the face of all adversity. Here, the Debtors seek to sell non-perishable inventory, intellectual property, and other assets that will not decline in value based on the passage of time. See ECF No. 71 at 6. The Debtors' principal assets consist of jewelry merchandise on consignment with their customers. See First Day Declaration ¶ 66. These are plainly not wasting assets requiring an immediate sale in order for the Debtors to maximize value. Compare In re Sire Plan, Inc. 332 F.2d 497, 498-99 (2d Cir. 1964) (A "partially constructed building is a 'wasting asset' and can only deteriorate in value the longer it remains uncompleted"), with In re Flour City Bagels, LLC, 557 B.R. at 80 ("The [court] is not concerned about any looming market or business conditions that would qualify" the sale of office furniture, restaurant and bakery equipment, tables, chairs, and fixtures, among other things, "as an emergency or that would cause a marked decrease in the value of [the debtor] in the future"), and In re Gulf Coast Oil Corp., 404 B.R. 407, 427-28 (Bankr. S.D. Tex. 2009) (finding "no evidence" that the debtors' cash, oil and gas properties, fixtures, equipment, inventory, and office equipment, among other things, "are perishable or that any value will be lost through delay").

31. And while the Debtors sought to conduct a sale of their assets on an expedited basis in order to provide any ultimate purchaser with time to prepare for a trade show, see Sale Motion ¶¶ 25-26, the Business Line Auction for Firestar/Fantasy Assets has already been delayed beyond this period. The Debtors have not demonstrated a good business reason for the proposed sale of A. Jaffe Assets to the Winning Bidder and this "unusual situation[] . . .

15

justif[ies] the exercise of [this Court's] discretion to refuse confirmation of the highest auction bid." In re Financial News Network Inc., 980 F.2d at 170 (internal quotations omitted).

32.   Third, PNB is not asking for an indefinite adjournment of the sales process. The Examiner has just been appointed. He should be afforded an opportunity to investigate any connections between the Debtors and the fraud. PNB has already established in its preliminary investigation, without the benefit of any substantial discovery, that funds of at least approximately $6.5 million obtained through apparently fraudulent LOUs were transferred to the Debtors. And, as set forth above, there are several other red flags connecting the Debtors to Modi, as well as other suspect entities and conduct. See supra ¶¶ 17-18.

33.   The Court should allow discovery, including through the Examiner process, to clarify whether the Debtors were sufficiently intertwined with Modi and the fraud that the Court should allow constructive trust[19] or similar claims by PNB against the Debtors' assets. If the Court concludes that there is no such involvement, this will no doubt result in better and higher bids for the Debtors' assets. If, on the other hand, the signs of fraud that have already been identified are corroborated by additional investigation, including by the Examiner, PNB and others will have allowable claims over some or all of the assets and thus adjournment of the sale would be justified on that basis. In either case, there is no reason to rush to move forward with the sale of any of the Debtors' assets given the results of the current sales process and because any clarity on PNB's claims to the assets will significantly benefit the sales market and process.

---

[19] Under New York law, which determines whether a constructive trust may be imposed, the following elements are relevant: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject res made in reliance on that promise; and (4) unjust enrichment." *In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004). Constructive trust is a yielding formula and therefore not all of these elements must be satisfied. *See Golden Budha Corp. v. Canadian Land Cor. Of Am., N.V.*, 931 F.2d 196, 202 (2d Cir. 1991) (concluding district court erred in finding that complaint failed to allege constructive trust where three elements were not satisfied, as the plaintiff had adequately pleaded that "the defendants [held] property they should not retain, in good conscience and equity, under the circumstances revealed"). PNB believes that it has *prima facie* evidence of a constructive trust over at least some assets of the Debtors that further discovery from the Debtors will confirm.

16

34. In a similar vein, bidders were almost certainly chilled by Bhansali's ongoing participation in the Debtors' affairs, including his deep involvement in the sale of their assets, as evidenced by recent filings of the Debtors' professional advisors. See ECF No. 110 at 29-30 (noting Marks Paneth LLP's communication with Bhansali related to the sale of A. Jaffe, including discussions regarding potential bidders (on February 26, February 22, March 7, and March), prospective stalking horse bidders (on March 6), and the data room information (on March 5, March 29 and March 31)). Given his publicly known and longstanding connections to Modi and other Modi Entities involved in the fraud, as well as the fact that he is subject to the asset freeze in the NCLT Order (although he apparently transferred his interest in his apartment after that order was issued), any reasonably prudent arms-length party would naturally have serious reservations about his ongoing involvement with the Debtors and the potential implications of purchasing their assets, particularly one where Bhansali is heavily involved in the sale process.

35. The only other plausible explanation for the unsuccessful results of the sales process—besides the lack of transparency on the Debtors' connections to the fraud and Modi, as well as the ongoing involvement of Bhansali in the Debtors' business—is that the Debtors' books and records vastly overstated the value of their assets. This itself would also be an issue that should be examined by the Court, including with the assistance of the Examiner, prior to any sale.

36. Finally, this Court may choose to adjourn the sales process as an extension of comity to the proceedings in India that implicate these assets. Here, a valid tribunal under Indian law has issued the NCLT Order providing for the freezing of all of the Debtors' assets. Although they have had the opportunity to do so, they have not sought relief from this order. The Second

17

Circuit has consistently extended comity "whenever the foreign court ha[s] proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic policy." Alesayi Beverage Corp. v. Canada Dry Corp., 947 F. Supp. 658, 663 (S.D.N.Y. 1996), aff'd, 122 F.3d 1055 (2d Cir. 1997) (internal citations omitted); see also Hilton v. Guyot, 159 U.S. 113, 163-164 (1895) ("'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other.").

37. Although the NCLT Order is provisional nature, that does not preclude a U.S. court from granting comity to the NCLT Order. Cf. In re Colorado Corp., 531 F.2d 463, 469 (10th Cir. 1976) (bankruptcy court abused its discretion by not recognizing a Luxembourg order appointing a liquidator); see also Pilkington Bros. P.L.C. v. AFG Indus. Inc., 581 F. Supp. 1039, 1045 (D. Del. 1984) ("The question of 'finality' is likewise not dispositive [to enforcing a foreign order].") (internal citations omitted).

38. Accordingly, PNB respectfully requests that this Court deny the Sale Motion, or in the alternative adjourn any auction of A. Jaffe Assets to the same date as any auction of Firestar/Fantasy Assets, together with any other and further relief that this Court may deem just and necessary.

39. In the event that the Court determines to go forward with the Sale Hearing, PNB respectfully requests that the order approving the sale: (i) prohibit the distribution of any proceeds from the sale absent further Court order, (ii) require that the Debtors continue to maintain all original company books and records and which shall not be included in the sale, and (iii) include a specific reservation of rights in favor of PNB that notwithstanding anything to the contrary in the sale order the proceeds of the sale may constitute assets to be held by the Debtors

18

in constructive trust for the benefit of PNB, without prejudice to any rights or causes of action PNB may have with respect to such proceeds.

## RESERVATION OF RIGHTS

40.     PNB intends to take deposition of the Debtors prior to the hearing, in connection with the sales process and the Business Line Auction of A. Jaffe's assets.  PNB expressly reserves its rights to assert, amend, modify or supplement this Objection and to seek additional discovery and/or present evidence at any hearing in connection with the Sale Motion.

Dated: May 10, 2018

/s/ Sean A. O'Neal
CLEARY GOTTLIEB STEEN & HAMILTON LLP
James L. Bromley
Sean A. O'Neal
Rahul Mukhi *(of counsel)*
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for Punjab National Bank*