James L. Bromley
Sean A. O'Neal
Rahul Mukhi
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for Punjab National Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Firestar Diamond, Inc., *et al.*,[1] | Case No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |

**PUNJAB NATIONAL BANK'S MOTION FOR THE**
**ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A**
**CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C §1104(a)**

---

[1]    The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Firestar Diamond, Inc. (2729), Fantasy, Inc.(1673), and A. Jaffe, Inc. (4756).

Punjab National Bank ("PNB"), by and through its undersigned counsel, hereby moves this Court (the "Motion") for the entry of an order directing the appointment of a Chapter 11 trustee in the above-captioned Chapter 11 cases, substantially in the form attached hereto as Exhibit A, under sections 105(a) and 1104(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2007.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support hereof, PNB respectfully states as follows:

## PRELIMINARY STATEMENT

1.     By this Motion, PNB seeks the appointment of a Chapter 11 trustee to serve as a responsible fiduciary who can oversee a sales process not tainted by the Modi fraud and the disturbing evidence of ongoing mismanagement and misconduct by the Debtors' management following the commencement of these Chapter 11 cases that was revealed during the Sale Hearing. Among other things, the record at the Sale Hearing demonstrates that the Debtors' existing management has failed to take any serious steps to ensure that those involved in fraud and other wrongful conduct were not involved in the sale process, that employees did not engage in discussions with Potential Bidders that gave rise to obvious conflicts of interests, or that employees ceased their communications with Nirav Modi, the indirect majority shareholder of the Debtors and a fugitive from justice. After the Sale Hearing, even more disturbing facts came to light, as the Debtors' President, Mihir Bhansali, abruptly resigned to avoid providing information required by the Court at the Sale Hearing and, through his counsel, informed the Court that if called to testify he would invoke his Fifth Amendment right against self-incrimination. A Chapter 11 trustee fiduciary is needed not only to safeguard the Debtors' assets and restore confidence in the sales process, but also to provide the transparency and access to information that has been missing in these cases.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### A. Bankruptcy Proceedings

3.      On February 26, 2018 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (the "Debtors") filed their voluntary petitions for protection under Chapter 11 of Title 11 of the United States Code, thus commencing these proceedings (the "Chapter 11 Cases"). To date, the Debtors have continued in the possession and operation of their properties and businesses. The Chapter 11 Cases have been consolidated for procedural purposes only.

### B. Modi Fraud on PNB

4.      PNB, the second largest government-owned bank in India, learned early this year that it is the victim of the largest bank fraud in India's history. Nirav Modi ("Modi") and several of the entities he directly or indirectly controls (collectively, the "Modi Entities") and his uncle, Mehul Choksi, and certain entities related to Choksi, are the alleged perpetrators of this fraud. *See Declaration of Mihir Bhansali, President of the Debtors, Containing Information Required Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Debtors' First Day Motions*, ECF No. 2 (the "First Day Declaration") ¶¶ 33-34. Nirav Modi is the indirect majority shareholder of the Debtors, and he and other Modi Entities have substantial ties and relationships with the Debtors and their management.

5.      The cornerstone of the fraud was that Modi and the Modi Entities fraudulently obtained Letters of Undertaking ("LOUs") from PNB. See Declaration of Rahul Mukhi dated May 23, 2018 (the "Mukhi Decl."), Ex. A (the "NCLT Order"). An LOU is guarantee by the

issuing Indian bank that guarantees repayment of loans made to such bank customer(s) by a foreign lender, specifically, a foreign branch of an Indian bank. A bank issuing an LOU (here, PNB) agrees to pay to the foreign lender the full amount of the loan plus accrued interest if the importer (here, Modi and the Modi Entities) fails to pay back the foreign lender. See Muhki Decl., Ex. B.

6. Beginning in or about 2011, the Modi Entities began obtaining fraudulent LOUs from the Brady House, Mumbai branch of PNB. See Mukhi Decl., Ex. C ("NCLT Petition") at 31. Two PNB employees, Gokulnath Shetty ("Shetty"), the deputy manager at the Brady House branch, and Manoj Hanumant Kharat ("Kharat"), a single window operator, conspired with the Modi Entities to issue the LOUs without the necessary underlying documentation or the pledging of collateral necessary to repay the amount of the LOUs. See NCLT Petition at 24-25, 30. After being issued by PNB, the funds issued pursuant to the LOUs were transmitted by these same bank employees through the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") system to the foreign branches of Indian banks. The SWIFT messages authorized the release of funds in the amount of the LOUs for payment to the foreign "exporter/beneficiary" listed in the SWIFT messages for the goods listed therein. NCLT Order ¶¶ 2-4.

7. According to the LOUs, these funds should have been dispersed to the "exporter/beneficiary" to finance the import of goods into India; however, funds were dispersed to other Modi Entities instead of to third-party exporters/suppliers and were not used for *bona fide* import/export purposes. See Id. ¶ 2; NCLT Petition at 54. Of the funds released by foreign banks pursuant to the fraudulent LOUs, some of the proceeds were used to repay credit previously disbursed to the Modi Entities by foreign branches of Indian banks pursuant to prior fraudulent LOUs. See NCLT Order ¶ 2. Other funds were used to pay exporters for purported

import transactions of semi-precious and precious stones that according to a preliminary analysis are unsupported by any documentation (e.g., key documents are missing from Indian customs authority records) and often involve shell companies affiliated with Modi and his associates. PNB suspects that in many instances the proceeds of the fraudulent LOUs were routed back to Modi and the Modi Entities without ever being used for the import of semi-precious or precious stones. See NCLT Petition at 30-32.

8.      On January 31, 2018, India's Central Bureau of Investigation ("CBI"), which is analogous to the United States Federal Bureau of Investigation, launched an investigation into Modi, the Modi Entities, and others involved in the fraud. Concurrent with the CBI investigation, India's Ministry of Corporate Affairs initiated proceedings before India's National Company Law Tribunal ("NCLT"). On February 23, 2018, three days before the Petition Date, the NCLT issued the NCLT Order, naming each of the Debtors as subsidiaries implicated by the fraud and subject to the injunctive provisions of the order. See NCLT Order ¶ 5.

**C. Close Ties Between Debtors' Management and Nirav Modi**

9.      The NCLT Order identifies various connections between the Debtors and the Modi Entities as well as persons implicated in the Modi fraud. The NCLT Order names Mihir Bhansali, who was President and sole Director of the Debtors as of the Petition Date, as Respondent 62. See First Day Decl. ¶ 1; see also NCLT Order at 2. Among other things, the NCLT Order enjoins Respondents, such as Mihir Bhansali, from "removal, transfer or disposal of funds, assets and properties . . . until further orders." NCLT Order ¶ 9. Mr. Bhansali nonetheless transferred his apartment and was actively engaged in the Debtors' attempts to sell all or substantially all of their assets. See ECF No. 148.

10.     The NCLT Order also lists various affiliates of the Debtors that frequently did business with the Debtors, including Firestar International Ltd., Firestar Diamond International P

Ltd., and Firestar Diamond FZE, as *prima facie* beneficiaries of the Modi fraud. See NCLT

Order ¶ 5. These suspect entities allegedly hold more than $7 million in claims against the

Debtors, which suggests that the Debtors engaged in highly suspect transactions with affiliated

entities. See ECF No. 69 (the "FDI Schedules") at 15-37; ECF No. 71 (the "A. Jaffe Schedules")

at 8-34; ECF No. 73 (the "Fantasy Schedules") at 8-12.

11.     The Debtors also have numerous relationships with exporters and importers

associated with Modi and the related fraud. According to the Debtors' schedules, the total

amount owed to certain suspect exporters and importers is approximately $6.5 million. See FDI

Schedules at 15-30; A. Jaffe Schedules at 8-37. In fact, A. Jaffe's two largest creditors, Pacific

Diamonds FZE and Tri Color Gems, are named as the "exporter/beneficiary" on LOUs already

identified as fraudulent. See First Day Declaration, Ex. B; NCLT Petition at 95. These facts,

along with other facts disclosed in PNB's prior filings with this Court, strongly suggest that the

Debtors were involved in the Modi fraud.

12.     Historically, the Debtors' management was closely tied to Nirav Modi, the

indirect majority shareholder of the Debtors. For example, until recently, Mihir Bhansali, one of

Nirav Modi's right hand men, was President and sole Director of the Debtors. He is also a past

director of Firestar Diamond International Pvt. Ltd, which is one of the Modi Entities known to

have been involved in the fraud, and a former director of Nirav Modi Limited, another affiliate of

Modi. Mr. Modi was quoted in a 2015 article as stating that 70% of his "company" reports to

Mihir Bhansali.[2] Still, Bhansali has been intimately involved in the sales process, speaking with

the CRO regarding the process almost daily. See Transcript at 28: 10-12, Hearing, In re Firestar

Diamond, Inc., et al., No. 18-10509 (May 15, 2018) (the "Sale Hearing Transcript"). Similarly,

---

[2]     *Can Nirav Modi Win New York?*, Fortune India, Oct. 5, 2015, available at
https://www.fortuneindia.com/people/can-nirav-modi-win-new-york/100365.

the Debtors' Chief Financial Officer, Ajay Ghandi, is closely tied to Nirav Modi and his associates. Like Mihir Bhansali, he was also a director of Nirav Modi Limited until March 9, 2018.[3]

13.    In response to these and other close ties, the Debtors retained Mark Samson as the Chief Restructuring Officer ("CRO") and appointed Neil Bivona as a director of the Debtors. See ECF No. 10 ¶ 4; ECF No. 161 ¶ 15. Mr. Samson was chosen by Debtors' management, including Mihir Bhansali, from a list of candidates suggested by HSBC Bank USA, National Association ("HSBC") and Israel Discount Bank of New York ("IDB"). See Transcript at 67-68, First Day Hearing, In re Firestar Diamond, Inc., et al., No. 18-10509 (March 6, 2018) (the "First Day Hearing Transcript"). The Debtors have not disclosed the process by which they selected Neil Bivona as a director, other than stating that the CRO spoke with an unspecified number of director candidates. See Transcript at 12: 16-19, Hearing, In re Firestar Diamond, Inc., et al., No. 18-10509 (March 28, 2018) (the "March 28 Hearing Transcript"). Neither Mr. Samson nor Mr. Bivona has made any effort to evaluate whether members of the Debtors' management were involved in any fraudulent activities or otherwise established any controls or procedures to ensure that the Debtors' assets were protected from potential fraud by the Debtors' management. See Sale Hearing Transcript at 31-33.

**D. Debtors' Continued Resistance to Provide Information**

14.    Debtors have not been responsive to requests for information. On March 22, 2018, PNB served various document requests pursuant to Bankruptcy Rule 2004 on the Debtors seeking information about the Debtors' potential participation in fraud. Mukhi, Ex. D. The Debtors have continually resisted providing responses to these requests, and to date have only

---

[3]      See Search Results for Nirav Modi Limited, accessed on May 21, 2018, available at https://beta.companieshouse.gov.uk/company/09309560.

provided minimal information to PNB. Despite saying that the Debtors had no interest in investigating the fraud, the Debtors instead served retaliatory discovery requests on PNB seeking information about the Debtors' own participation in the fraud. Muhki Decl. Ex. E. PNB understands that the Debtors have also delayed providing documents to the Examiner.

### E. Debtors' Tainted Auction Process

15.     On March 23, 2018, the Debtors filed the a motion, ECF No. 60 (the "Sale Motion"), requesting that this Court, *inter alia*, approve certain bidding and sale procedures (the "Bidding Procedures") for the sale of substantially all of the Debtor's assets free and clear of liens, claims, interests and encumbrances and set a hearing to consider approval of the Proposed Sale. The auctions for the assets of Firestar and Fantasy were later adjourned "to a date to be determined." ECF No. 136.

16.     Having adjourned all other auctions, the Debtors held only a Business Line Auction for the A. Jaffe assets on May 3, 2018. See ECF No. 141. Following the conclusion of the auction, the Debtors announced only the names of the winning bidder and backup bidder on May 5, 2018. See ECF No. 141. Consistent with their practice of withholding information, the Debtors did not publicly file the details of the winning bid, including the purchase price, or even permit PNB's advisors to provide necessary information to PNB, until well after the objection deadlines had passed. See ECF No. 157.[4]

17.     PNB filed its objection to the Sale Motion on May 10, 2018, requesting that this Court either deny the Sale Motion or adjourn the sale process which had resulted in a proposed sale at a significant discount. ECF No. 148. In connection with its objection, PNB conducted a

---

[4]     The deadline to file an objection to the Debtors' Sale Motion was May 8, 2018. ECF No. 95 at 6. This objection deadline was extended with respect to PNB and the Ministry of Corporate Affairs of the Union of India to May 10, 2018. See ECF No. 144; ECF No. 146.

deposition of Mr. Samson as the Debtors' witness under Rule 30(b)(6) of the Federal Rules of Civil Procedure. See Muhki Decl., Ex. F.

**F. Court Request for Additional Evidence at Sale Hearing**

18.     On May 15, 2018, this Court held a hearing on the Sale Motion (the "Sale Hearing"). A number of significant and disturbing facts about the Debtors' conduct during the Chapter 11 sales process came to light during the Sale Hearing.

19.     Among other things, Samson testified that Mihir Bhansali had spoken to Modi at some time between the Petition Date and March 15, 2018 on at least one occasion. See Sale Hearing Transcript at 21: 6-8. Despite the fact that Samson was aware of the allegations against Modi and that Modi was a known fugitive from justice, he never established any protocols or procedures to prohibit such discussions, never asked any employees whether they had communicated with Modi and never asked any employees about any discussions they had with Mr. Modi, even after learning about Mihir Bhansali's discussion. See id. at 24-26. Moreover, Samson entrusted the Debtors' management to assist with the sales process, including communicating directly with bidders, but never asked Mihir Bhansali or any other employee whether they had participated in the Modi fraud or had any knowledge of the fraud. See id. at 32-33. As this Court stated, in the context of this case, "it's a really bad fact that Mr. Modi had any contact with anyone." See id. at 101: 13-14.

20.     Samson also testified that he was aware of conversations between employees and the potential bidders regarding continued employment. See id. at 28-30. However, Samson did not know the content or extent of employees' discussions with potential bidders specifically regarding compensation. See id. at 30: 11-18. And he did not take any actions to protect the Debtors or their assets from obvious conflicts of interest arising from these discussions. Id.

21.     At the conclusion of the Sale Hearing, this Court expressed serious concerns regarding the proposed sale. See id. at 139-146. First, this Court noted its concerns regarding valuation, requiring that the record be supplemented to explain (i) the liquidation value of A. Jaffe's assets and (ii) the Debtors' business judgment in assessing the proposed purchase price by the winning bidder. See id. at 140-141. Second, this Court expressed concerns regarding the sale process and, more specifically, the communication between the Debtors' management and Modi as well as management's discussions with and potential bidders concerning prospective employment. See id. at 141-143. Third, this Court requested that parties supplement the record regarding the winning bidder's connections to Nirav Modi. See id. at 143-144.

## G. Debtors' Withdrawal of the Sale Motion Following Bhansali's Invocation of Fifth Amendment

22.     On May 16, 2018, shortly after the Sale Hearing, PNB sent a Notice of Deposition to the Debtors seeking testimony from Mihir Bhansali pursuant to Rule 30(b)(1) of the Federal Rules of Civil Procedure. See Muhki Decl., Ex. G. PNB explained that the deposition would be "targeted to the issues identified by Judge Lane at the May 15, 2018 hearing with respect to the proposed sale of A. Jaffe Inc. to Parag Diamonds Inc." See Muhki Decl, Ex. H. Accompanying the Notice of Deposition, PNB also sent limited document requests targeting communications between the Debtors and Modi and the other issues raised at the Sale Hearing. See Mukhi Decl., Ex. I.

23.     On May 18, 2018, Debtors' counsel informed PNB that Mihir Bhansali had resigned as President of the Debtors and that the Debtors would not be able to produce Mihir Bhansali at the deposition. Mukhi Decl. ¶ 11. This Court convened an emergency telephonic hearing later that afternoon to discuss how these developments would impact the pending Sale Motion. Mukhi Decl. ¶ 12. During this telephonic hearing, counsel for Mihir Bhansali

represented that, if ordered to testify regarding the issues noted by this Court at the Sale Hearing, Mihir Bhansali would assert his constitutional right against self-incrimination. Mukhi Decl. ¶ 12. Without Mihir Bhansali's cooperation, the Debtors stated they have no other information that they can provide regarding the content of the communications with Modi. Mukhi Decl. ¶ 12. This Court then requested that the Debtors decide whether they would move forward with the Sale Motion without Mihir Bhansali's testimony and to promptly inform the interested parties of their decision. Mukhi Decl. ¶ 12.

24.     On the following day, the Debtors filed a notice of withdrawal, without prejudice, of the Sale Motion. See ECF No. 177.

## ARGUMENT

25.     PNB submits this Motion to ensure that these Chapter 11 Cases continue in an orderly fashion under truly independent and responsible fiduciary. There are significant concerns over the Debtors' connections to the Modi fraud and their ability to oversee an appropriate sales process that maximizes value free of the taint of the fraud. Though they have had ample opportunity to do so, the Debtors have not allayed these concerns. Rather, they have continuously exacerbated them, resulting in the abrupt withdrawal of their Sale Motion after their President and former Director resigned and invoked his Fifth Amendments rights. This Court, PNB, and other parties in interest should not be forced to worry that every single action taken by the Debtors may be tainted by fraud. The integrity of the U.S. bankruptcy process should not be an open question.

26.     These circumstances mandate the appointment of a Chapter 11 trustee pursuant to Sections 1104(a) of the Bankruptcy Code. In relevant part, Section 1104 provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104.

27.     Under section 1104(a), there are two independent bases for appointing a trustee in a chapter 11 case.  Section 1104(a)(1) provides that an independent trustee must be appointed "upon the showing of cause—inclusive of fraud, dishonesty, incompetence or gross management of the debtors' affairs by current management." In re Ashley River Consulting, LLC, No. 14-13406, 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. March 31, 2015); see also In re V. Savino Oil & Heating Co., Inc., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).  If cause does not exist under section 1104(a)(2), a court may still, in its discretion, appoint a trustee under section 1104(a)(2). See In re China Fishery Grp. Ltd. (Cayman), No. 16-11895 (JLG), 2016 WL 6875903, at *14 (Bankr. S.D.N.Y. Oct. 28, 2016).  "The twin goals of the standard for the appointment of a trustee should be protection of the public interest and the interests of creditors . . . and facilitation of a reorganization that will benefit both the creditors and the debtors . . . . " In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 232 (1977), U.S.Code Cong. & Admin.News 1978, p. 6192).

28.     The requirements of both section 1104(a)(1) and section 1104(a)(2) are plainly satisfied here and therefore the appointment of a trustee in these Chapter 11 Cases is warranted under these circumstances.

## A. Abundant Cause Exists For Appointment of a Trustee Under Section 1104(a)(1)

29.     Although "the party moving for appointment of a chapter 11 trustee bears the burden of showing cause by clear and convincing evidence," "[b]ankruptcy courts have wide discretion in considering the relevant facts." In re Ancona, No. 14-10532 (MKV), 2016 WL 7868696, at *9 (Bankr. S.D.N.Y. Nov. 30, 2016).  Moreover, while section 1104(a)(1) of the Bankruptcy Code expressly identifies four bases upon which "cause" may be found – fraud, dishonesty, incompetence, and gross mismanagement—those enumerated grounds are not exclusive. Id.  "Other factors warranting the appointment of a trustee under section 1104(a)(1) include conflicts of interest, inappropriate relations between corporate parents and subsidiaries, misuse of assets and funds, inadequate record keeping and reporting, failure to disclose relevant and material information, lack of credibility and creditor confidence, and various other similar instances of conduct." Id.  The Debtors' conduct in these Chapter 11 Cases evinces several of these factors.

30.     First, incompetence and gross mismanagement by the Debtors' current management have stymied attempts to maximize value to the Debtors' estates.  "Debtors-in-possession have a fiduciary duty to maximize the value of the estate." Id. at *10 (Bankr. S.D.N.Y. Nov. 30, 2016).  After asserting time and time again that a truncated sales process is necessary to dispose of the Debtor's property, ostensibly so that any purchaser could prepare for a June trade show, see ECF No. 60, ¶¶ 25-26; ECF No. 162, ¶ 42, the Debtors were still unprepared for the Sale Hearing.  Among other things, the Debtors were unable to speak to the discounts applied to inventory, which comprised the vast majority of the value ascribed to A. Jaffe's assets. See Sale Hearing Transcript at 140: 11-21.  The evidence on the record was plainly insufficient to assess the Debtors' business judgment in accepting the highly discounted

purchase price proposed by the Winning Bidder. See id. at 141. The Debtors were even incapable of providing this Court with a figure for liquidation value. See id. at 118.

31.     Moreover, as discussed below, the Debtors have woefully failed to safeguard the integrity of the sales process and ensure that it has not been tainted by fraud or other wrongdoing. There can be no doubt that the Debtors had a fiduciary duty to ensure that employees involved in improper conduct were not involved in the sales process and that the Debtors breached this duty. Appointment of a Chapter 11 trustee is proper where, as here, the debtor defaults in its responsibilities. See In re Ancona, 2016 WL 7868696, at *10.

32.     Second, the Debtors' conduct in these Chapter 11 Cases suggests dishonesty and raises deep concerns as to fraud. The Debtors' and their management's conduct "has fallen short of forthcoming." In re Ashley River Consulting, LLC, No. 14-13406 (MG), 2015 WL 1540941, at *10 (Bankr. S.D.N.Y. Mar. 31, 2015). The Debtors consistently show a blithe disregard, perhaps even willful ignorance, with respect to possible misconduct that may contaminate the sale process, among other things. The CRO testified that he was retained "[t]o stabilize the business, protect the assets, run a sale process, and maximize the value of the estate and make sure that all controls are put in place." See Sale Hearing Transcript at 42-43. But he made no efforts to protect the Debtors' assets from fraud or other wrongful conduct by ensuring that employees involved in the sales process, including communications with bidders, had not been involved in the fraud. He did nothing to inquire into the Debtors' (or their officers') potential involvement in the fraud that actually resulted in the Debtors' bankruptcy filing. See id. at 31-33. He did not instruct anyone at the Debtors not to communicate with Modi during the sales process, nor did he instruct anyone to notify him or law enforcement if contacted by Modi. See id. at 23-26.

33. Likewise, the CRO did very little to protect the integrity of the auction process. He did not ask Potential Bidders if they had been in communication with Modi in connection with the proposed sale. See id. at 41: 7-10. He did nothing to prevent employees from speaking with potential bidders about employment opportunities or compensation that created obvious conflicts of interest detrimental to the estates. See id. at 28. Meanwhile, he had fully involved Mihir Bhansali in the sales process, discussing those matters with him on an almost daily basis. Sale Hearing Transcript at 28: 10-12.

34. Indeed, the CRO only learned that Mihir Bhansali had been in communication with Modi after the A. Jaffe auction was completed. See id. at 23: 4-11. Rather than learning of the conversation through his own inquiries, the CRO was informed of the communication by Debtors' counsel. See id. at 24: 9-10. All the while, Mr. Bhansali acted as "a key employee throughout the sales process." Id. at 28: 7-9. Instead of restricting Mr. Bhansali's involvement in the sales process, the Debtors welcomed it. ECF No. 162 ¶ 40 ("The CRO and the Independent Director have . . . concluded that the estates have and would continue to benefit from Mr. Bhansali's involvement in these Chapter 11 Cases."). There can be no clearer indication of Debtors' mismanagement than Mihir's abrupt resignation to avoid having to provide information to this Court about his discussions with Modi, which was immediately followed by Mihir Bhansali's counsel informing the Court that, if he were ordered to testify before this Court as to his communication with Modi, he would invoke his Fifth Amendment rights.

35. Lastly, throughout these Chapter 11 Cases, the Debtors have been non-responsive to PNB's legitimate requests for documents and information concerning the fraud. The Debtors have withheld information, including the details of the proposed sale to the winning bidder, until

after the sale objection deadline.  It was only through cross-examination of the CRO by counsel

for PNB that this Court learned of the communications between Mihir Bhansali and Modi, the

communications between management and potential bidders relating to their future employment

and the possible connection between family members of Modi and Mr. Jain's family.  See Sales

Hearing Transcript at 141-43.  None of this highly relevant information to the Court was

volunteered by the Debtors as it should have been.  See March 28 Hearing Transcript at 121: 10-

19 ("I'll assume since I haven't heard anything from the [D]ebtors, . . . that that is essentially a

representation that . . . these [D]ebtors have [not] been involved in an ongoing or past fraud that

would be implicated in India. . . . [I]f anything is learned, obviously, people have a duty as

officers of the Court to come to the Court and present that evidence, and notify parties.").

      36.     In sum, there is a serious and compelling need to appoint a fiduciary who will

safeguard the Debtors' assets through the establishment of controls and protocols that will

protect them from potential ongoing fraudulent or other wrongful conduct.  In these

circumstances, abundant cause exists for appointment of a Chapter 11 trustee under Section

1104(a)(1).  See, e.g., In re Ashley River Consulting, LLC, 2015 WL 1540941, at *10 (finding

sufficient cause for appointment of trustee where, among other things, debtor failed to disclose

assets in filings, and failed to disclose relationships with other entities controlled by debtor's

principal, who was accused of fraud); In re Ancona, 2016 WL 7868696, at *10, 12 (finding

sufficient cause for appointment of trustee where, among other things, debtors failed to

investigate possible claims, failed to file timely reports, and there was indicia of self-dealing).

**B. Additionally, Appointing a Trustee is Authorized Under Section 1104(a)(2) as it is in the Interests of the Estates and All Other Parties**

37.     Even if this Court does not find that cause exists to appoint a trustee under section 1104(a)(1), it may appoint a Chapter 11 trustee under section 1104(a)(2) where doing so is in the interests of the parties and the estate. See In re Ashley River Consulting, LLC, 2015 WL 1540941, at *11. Section 1104(a)(2) envisions a flexible standard. See In re Soundview Elite, Ltd., 503 B.R. 571, 583 (Bankr. S.D.N.Y. 2014). In essence, section 1104(a)(2) "reflects 'the practical reality that a trustee is needed.'" See In re V. Savino Oil & Heating Co., Inc., 99 B.R. at 527 n.11 (quoting In re Sharon Steel Corp., 86 B.R. 455, 458 (Bankr. W.D. Pa. 1988)). Factors to consider include: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence— or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." In re Soundview Elite, Ltd., 503 B.R. at 583. Here, those factors weigh against the Debtors remaining in possession.

38.     First, the Debtors plainly are not trustworthy. The lingering questions relating to the Debtors' connections to fraud, including post-petition communications with an international fugitive, as well as the abrupt resignation of Mihir Bhansali that was prompted by the mere prospect of discovery into those ties, evince a broad basis for distrust. See In re Ashley River Consulting, LLC, 2015 WL 1540941, at *11; see also In re Ridgemour Meyer Properties, LLC, 413 B.R. 101, 110, 113 (2008) (finding president and principal displayed a lack of candor and were, among other things, untrustworthy). Clearly, this Court cannot assume that Mihir Bhansali is the only employee of the Debtors that has engaged in untrustworthy conduct. It strains credulity to suggest that in an international fraud as massive as the Modi fraud only one of

16

Modi's employees in the Debtors' operations was involved in the fraudulent conduct. There is no doubt that other employees, including the Debtors' current CFO, have significant and historic ties to Modi and his associates.

39.     Second, the Debtors have little prospect for rehabilitation under current management, having mismanaged the sale process and failed to take even simple steps to protect the Debtors assets from potential fraudulent and other wrongful conduct such as conflicts of interest.

40.     Third, the Debtors, having been forced to withdraw their Sale Motion following their President's decision to invoke his Fifth Amendment rights, cannot possibly have the confidence of potential bidders, creditors and other stakeholders. Current management, including the CRO, is tainted by a misplaced show of confidence in Mihir Bhansali and other employees who may have been involved in the fraud throughout the sales process. As Samson and Bivona have worked side-by-side with Mihir Bhansali, and apparently owe their jobs to existing management, they cannot maintain the credibility needed to remain in place for the duration of the bankruptcy. And while Bhansali is no longer part of management, at least one other current officer (the Debtors' CFO, no less) is known to have been involved in other Modi entities.

41.     Finally, the benefits of appointing a trustee far outweigh the cost of appointment. A trustee will significantly protect the integrity of the sales process and maximize recovery to the estate. Moreover, to the extent a trustee is appointed, there will be no need for the continued services of the CRO or the Independent Director. Such "savings will offset the additional cost resulting from the trustee's appointment." In re Euro-Am. Lodging Corp., 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007).

42.    Because of the dramatic recent developments regarding Mihir Bhansali, not to mention the series of missteps by current management and management's connections to Modi and the Modi Entities described above, the Court should exercise its discretion to appoint a trustee that can command the confidence and trust of potential bidders, creditors and interested parties going forward.

## CONCLUSION

43.    Accordingly, PNB respectfully requests that the Court enter its order (a) granting the Motion; (b) ordering the U.S. Trustee to appoint one disinterested person as Chapter 11 trustee in these Chapter 11 Cases under section 1104(a) of the Bankruptcy Code; (c) ordering the U.S. Trustee to seek approval of such appointment from this Court in accordance with section 1104(d) of the Bankruptcy Code and Bankruptcy Rule 2007; (d) ordering the Debtors and any other individual or entity in possession of the Debtors' records and property to cooperate with the Chapter 11 trustee and immediately turn over to the Chapter 11 trustee all records and property of the estate in their possession or control as directed by the Chapter 11 trustee; and (e) granting PNB such other and further relief as the Court may deem appropriate.

## RESERVATION OF RIGHTS

44.    PNB expressly reserves its rights to assert, amend, modify or supplement this Motion and to seek additional discovery and/or present evidence at any hearing in connection with this Motion.

Dated: May 23, 2018

*Sean O'Neal*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
James L. Bromley
Sean A. O'Neal
Rahul Mukhi
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for Punjab National Bank*

# Exhibit A

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Firestar Diamond, Inc., *et al.*,[5] | Case No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |

## ORDER GRANTING PUNJAB NATIONAL BANK'S MOTION FOR THE ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. §1104(a)

Upon the *Punjab National Bank's Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. §1104(a)*[ECF No. ___ ][6]; the Court having reviewed the Motion; and a hearing having been held on the Motion on _____, 2018 (the "Hearing"); and the Court having found at the Hearing that good and sufficient cause appearing; and the Court having found at the Hearing that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b) and (iv) notice of the Motion was sufficient under the circumstances, and after due deliberation the Court having determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

---

[5]     The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Firestar Diamond, Inc. (2729), Fantasy, Inc.(1673), and A. Jaffe, Inc. (4756).

[6]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to the in the Motion.

**ORDERED**, that the Motion is granted as provided herein; and it is further

**ORDERED**, that the United States Trustee is hereby directed to appoint one disinterested person as Chapter 11 trustee in these Chapter 11 Cases under 11 U.S.C. § 1104(a) no later than five (5) days after entry of this Order; and it is further

**ORDERED**, that the United States Trustee shall seek approval of such appointment from this Court in accordance with 11 U.S.C. § 1104(d) and Bankruptcy Rule 2007.1; and it is further

**ORDERED**, that the Debtors and any other individual or entity in possession of the Debtors' records and property shall cooperate with the Chapter 11 trustee and immediately turn over to the Chapter 11 trustee all records and property of the estate in their possession or control as directed by the Chapter 11 trustee; and it is further

**ORDERED**, that this Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Order.


Dated: _____, 2018
New York, New York


_____
The Honorable Sean H. Lane
United States Bankruptcy Judge