**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
Ian R. Winters
Sean C. Southard
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- X
                                                                 :
In re:                                                           :   Chapter 11
                                                                 :
FIRESTAR DIAMOND, INC., et al.                                   :   Case No. 18-10509 (SHL)
                                                                 :
                    Debtors.                                     :   Jointly Administered
                                                                 :
---------------------------------------------------------------- X

**DEBTORS' OMNIBUS RESPONSE TO (I) PUNJAB NATIONAL BANK'S MOTION FOR THE ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a), (II) THE MINISTRY OF CORPORATE AFFAIRS OF THE UNION OF INDIA'S JOINDER TO PUNJAB NATIONAL BANK'S MOTION FOR ENTRY OF ORDER DIRECTING APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. 1104(a), AND (III) MOTION OF THE UNITED STATE TRUSTEE FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO SECTION 1104 OF THE BANKRUPTCY CODE OR, ALTERNATIVELY, FOR CONVERSION OF THESE <u>CASES TO CHAPTER 7</u>**

Firestar Diamond, Inc. ("Firestar"), A. Jaffe, Inc. ("A. Jaffe") and Fantasy, Inc. ("Fantasy" and collectively, with Firestar and A. Jaffe, the "Debtors"), the above-captioned debtors and debtors-in-possession, through their undersigned counsel, Klestadt Winters Jureller Southard & Stevens, LLP, hereby submit this response (the "Response") to (i) *Punjab National Bank's Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C.*

§ 1104(a) (the "PNB Motion") [Docket No. 181], (ii) *The Ministry of Corporate Affairs of the Union of India's Joinder to Punjab National Bank's Motion for Entry of Order Directing Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)* (the "Ministry Joinder") [Docket No. 194], and (iii) *Motion of the United States Trustee for the Appointment of A chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy Code or, Alternatively, for Conversion of these Cases to Chapter 7* [Docket No. 185] (the "UST Motion," and together with the PNB Motion and the Ministry Joinder, the "Trustee Motions"). In support of the Response, the Debtors respectfully represent as follows:

**Preliminary Statement**

This Response is required in order to set the record straight concerning the good faith efforts of Debtors' management and professionals to maximize value for the benefit of all creditors and stakeholders since the filing of these difficult chapter 11 cases, all in the face of significant internal and external challenges, with limited resources and tight time frames. The Debtors must also respond to certain statements made by PNB, which paint an inaccurate and misleading picture of the Debtors' operations while in Chapter 11 and mischaracterize the Debtors' sales process as tainted and subject to outside influence.

To be clear, the CRO, Independent Director and the Debtors' professionals were in no way influenced by Modi and are not "tainted" in any way by the Alleged Fraud (defined below). To the contrary, in the face of highly challenging circumstances, the CRO, Independent Director and the Debtors' professionals organized and ran a good faith marketing and sale process that was only scuttled shortly before completion by facts and circumstances out of their control.

Finally, the Debtors' current post-petition management remain willing and able to complete the task of liquidating the assets of these Debtors for the benefit of their creditors but

2

will not oppose the appointment of a new fiduciary, if this Court and parties in interest believe that to be in the best interest of these estates and their creditors. The Debtors' actions in these cases have been and will continue to be guided by that primary principle.

### **Background**

1. On February 26, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases").

2. The Debtors continue to operate their businesses and properties as debtors in possession pursuant to section 1107(a) and 1108 of Title 11, United States Code (the "Bankruptcy Code"). No trustee or statutory committee has been appointed in these Chapter 11 Cases.

3. By order dated April 20, 2018, the U.S. Trustee's appointment of John J. Carney as examiner (the "Examiner") was approved by the Bankruptcy Court [Docket No. 118].

4. In early February 2018, news reports surfaced out of India which alleged that Nirav Modi ("Modi"), and certain foreign entities with which he was affiliated or controlled, were involved in obtaining unauthorized loans from PNB in the form of letters of undertaking which were purportedly used to fund payments to suppliers for purchases of goods (the "Alleged Fraud"). In the week or so that followed, the magnitude of the Alleged Fraud grew dramatically in scope[1] and authorities in India began seizing Modi's personal assets and assets of various corporate entities with which Modi was affiliated. This included entities which served as the Debtors' primary source of supply and entities which provided critical customer support services, IT

---

[1] The scope and participants in the Alleged Fraud continues to evolve since it was first reported by press outlets in India and the United States. Most recently, on or about May 15, 2018, the press reported that in addition to lower level rogue employees of PNB previously charged in relation to the Alleged Fraud, an additional twenty-two (22) people had recently been charged, including the former Chief Executive Officer of PNB and two other executive directors of PNB.

services and various other back office functions.

5. Within just a few weeks, the Debtors operations and business prospects were dramatically and irreparably damaged by: (i) the loss of their primary supply chain, (ii) the loss of customer service functions and various back office services essential to the Debtors' normal business operations, (ii) significant market uncertainty resulting from the specter of the fraud allegations in India, (iii) predatory practices of competitors seeking to steal the Debtors' customers, (iv) employee confidence and retention related issues, (v) substantial customer concerns related to supply issues and the impact of the Alleged Fraud on the Debtors and (vi) the loss of cash management functions and account visibility.[2]

6. It was clear that absent a prompt Chapter 11 filing and an expeditious sale of the Debtors' business, the Debtors would have been forced to cease operations and liquidate.[3] The Debtors' management and professionals sought to use the protections afforded by Chapter 11 to stabilize operations in order to facilitate a sale, or sales, which they believed would create the greatest possible pool of proceeds under the circumstances, and to provide an appropriate forum for resolution of all creditor claims. It was acknowledged and stated on the record many times, that investigations would need to take place and that there would ultimately be competing claims to the proceeds. The Debtors sought to preserve the rights of all parties while simultaneously maximizing the value of their assets through one or more going concern sales.

**Early Case Dynamics**

7. Prior to the Petition Date, the Debtors and their professionals engaged in

---

[2] Three days prior to the Petition Date, the Debtors were cut off from accessing their bank accounts and lost all bank account visibility. It was not until days after the filing that account access and visibility was restored.

[3] In discussions with certain interested purchaser parties with knowledge of the Debtors' distress during the week prior to the Petition Date, the Debtors and their professionals were informed that such interested parties would only consummate a transaction if completed through a bankruptcy sale pursuant to section 363 of the Bankruptcy Code.

4

discussions with HSBC and IDB (the "Lenders"), secured lenders to two of the three Debtors, about the Alleged Fraud, the impact of the Alleged Fraud on the Debtors' business operations and future business prospects, and the Debtors' intentions in light of the Alleged Fraud.

8. The Lenders, like the Debtors, realized that a prompt sale of the businesses was necessary to preserve value and discussions centered around steps which could be taken to effectuate a prompt sale and the support the Debtors would require of the Lenders to achieve that result.

9. While the Debtors' management denied any knowledge of or involvement in the Alleged Fraud, the Debtors and their professionals recognized that the Alleged Fraud would loom large over the Debtors' sale efforts and their interactions with all parties. As such, the Debtors worked cooperatively with the Lenders and agreed without hesitation to various measures which were designed to implement operational and governance controls and to safeguard collateral.

10. The Debtors agreed to the immediate appointment of a chief restructuring officer from among a group of candidates proposed by the Lenders. The Debtors also agreed to the retention of vault monitors to safeguard the Debtors' diamond and jewelry inventory and to the establishment of agreed upon protocols with respect to the movement of goods.

11. A final determination to commence an emergency filing was made two days before the Petition Date and the Lenders were informed in advance of the intention and general sale strategy and expectation.

12. On the Petition Date, the Debtors appointed Mark Samson of Getzler Henrich & Associates, LLC as Chief Restructuring Officer (the "CRO") of the Debtors.[4] The CRO's appointment was approved on an interim basis by the Bankruptcy Court pursuant to an order dated

---

[4] The CRO was selected from among three candidates proposed by the Lenders. One candidate withdrew from consideration prior to interviews being conducted.

March 14, 2018 [Docket No. 34], and on a final basis by order dated March 29, 2018 [Docket No. 80]. The scope of the CRO's duties are clearly set forth in his retention documents and were expanded to include oversight on all disbursements and various functions based on suggestions received from the Lenders and the United States Trustee.

13. Early in the Chapter 11 Cases, the United States Trustee indicated a desire for the appointment of a chapter 11 trustee given the Alleged Fraud. Recognizing no clear or obvious connection of the Alleged Fraud to the Debtors' operations at that time and the need to proceed promptly with a sale process given the distress which was apparent in the operations, the parties in interest crafted a solution to ensure that the circumstances which underlie the Alleged Fraud would not impact the Debtors' post-petition operations or their sale efforts. The Debtors and their professionals worked cooperatively through this process to ensure that all concerns in connection with the scope and responsibilities of the CRO were adequately addressed.

14. Recognizing that the CRO ultimately reports to the Debtors' board of directors, the Debtors also sought to reconstitute their boards such that an independent director would serve as the sole director of each of the Debtors, with the CRO answerable solely to the independent director and not anyone affiliated with the Debtors' prepetition operations. On March 22, 2018, the Debtors appointed Neil Bivona as the independent director (the "<u>Independent Director</u>") and the Independent Director has served as the sole member of the Board of Directors of each of the Debtors since March 28, 2018.[5]

**<u>There Has Been No Post-Petition Mismanagement or Misconduct</u>**

15. The Debtors took reasonable and proper steps to ensure a fair sales process under

---

[5] On March 28, 2018, Mihir Bhansali, who had served as sole director and President of each of the Debtors, resigned as a director of the Debtors and on May 18, 2018 Mr. Bhansali resigned as an officer and employee of each of the Debtors.

the circumstances of these Chapter 11 Cases. The testimony of the CRO during a tense Sale Approval Hearing did not accurately reflect the overall facts and circumstances relating to the Debtors' good faith post-petition operations and sale efforts and does not change the overall conduct or efforts by the Debtors, their management and professionals.

16. The Alleged Fraud has existed since the beginning of the Chapter 11 Cases and was never ignored. In fact, the nature of the Alleged Fraud was such that it could not have recurred during the Chapter 11 Cases. This is so because early in the Chapter 11 Cases, authority over all disbursements was given to the CRO and the Debtors simultaneously agreed and the CRO assured parties in interest that no further transactions would take place with any overseas affiliate companies which might be controlled or influenced by Modi. The Debtors also agreed with the Lenders that they would not do business with any other entity identified as potentially suspect. With these safeguards in place, it was not possible for the type of financial fraud to continue in relation to the post-petition business dealings of these Debtors.

17. A point of much criticism, speculation and inuendo is directed in the Trustee Motions to the continuing role of Mr. Bhansali as President of the Debtors until his resignation on May 18, 2018. To be clear, Mr. Bhansali offered to resign as President of the Debtors during the early stages of the Chapter 11 Case if the CRO and Independent Director determined that his further participation detrimental to the Debtors' sale efforts. The CRO determined that the going concern operations and associated value, particularly for Firestar and Fantasy, would be negatively and materially impacted if Mr. Bhansali were to resign. This determination was based on, among other reasons, his historical knowledge and understanding of operations and his long-standing customer relationships and connections. Mr. Bivona reached a similar conclusion after beginning his tenure and assessing the situation.

18. Notably, during the sale efforts, the Debtors were unaware of any evidence that Mr. Bhansali or anyone else connected with the Debtors were involved in the Alleged Fraud. Moreover, Mr. Bhansali had represented to counsel for Debtors and also to Mr. Bivona in separate conversations that he was not involved in the Alleged Fraud. The first day declaration of Mr. Bhansali indicated that the Debtors were not involved in any fraud, and various press releases were issued by management to assure vendors and customers that the Debtors had not participated in and were not connected to the Alleged Fraud.

19. Despite PNB's attempt to create doubt and stoke suspicion, it was reasonable for the CRO and Independent Director to rely on these representations and not to perform any specific investigations during their efforts to promptly sell the businesses, particularly with the knowledge that no continuing fraud risk existed in relation to the Alleged Fraud, and with the knowledge that they, and not Bhansali or Modi, were running the sale process.

20. Perhaps most relevant to the CRO's determination that no independent investigation into the Alleged Fraud was required by these Debtors, is that the Debtors had suggested and agreed to appointment of an Examiner to allay the concerns of the United States Trustee. Knowledge that the Examiner was to be swiftly appointed to investigate any lingering concerns created comfort for the CRO to permit him to focus his attention on the sale efforts and stabilization of operations until they could be sold. Those needs required constant attention given the acute challenges the Debtors faced, including, without limitation, the constant risk of an exodus of customers and employees. It was obvious to all that the Debtors needed to conduct an expedited sale process before there was nothing left to sell.

**There is No Actual Evidence of Fraud Tainting the Sale Process or the Chapter 11 Cases**

21. Until the filing of its sale objection on May 10, 2018, PNB never offered any

specific allegations in relation to the Debtors' connections with the Alleged Fraud.

22. The specific allegations made by PNB regarding certain transactions in 2011 were met with a swift investigation and response by the Debtors to PNB and the Examiner.

23. While it is true that Mr. Bhansali was significantly involved in the diligence process for the Debtors, and particularly for the Firestar/Fantasy Assets[6], as a key employee for those entities, it is also true that the CRO was also involved in the due diligence process from the outset. The CRO was the primary point of contact for Potential Bidders seeking to conduct diligence on the Firestar/Fantasy Assets and the A. Jaffe Assets. Early in the process, the CRO assessed the requests for access to Phase I Diligence and made all decisions regarding whether or not such access would be granted. As Phase II Diligence commenced, the CRO was responsible for assessing whether Potential Bidders satisfied the heightened, but flexible, standards for access that required written expressions of interest and evidence of financial wherewithal to close a transaction.

24. The Independent Director was also actively involved in the Sale Process. He was fully informed and participated directly in the Debtors' assessment of Potential Bidders, the qualification of Qualified Bidders, the review and analysis of the Qualified Bids, the conduct of the Business Line Auction for the A. Jaffe Assets, the determination that Paramount Jewels was the Winning Bidder, and the negotiation of a Modified Asset Purchase Agreement and Secured Promissory Note with Paramount Jewels. Again, Mr. Bivona's testimony on these matters is uncontroverted.

---

[6] Capitalized terms in the section not otherwise defined have the meaning ascribed to them in the Debtors' Motion for Entry of Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Bankruptcy Rules 2002, 6004 and 6006: (A) Fixing the Time, Date and Place for Hearing to Consider Bidding Procedures in Connection with the Debtors' Sale of Substantially all of Their Assets; (B)(i) Establishing Bidding Procedures; (ii) Approving the Form and Manner of Notices and (iii) Setting Hearing Date for the Hearing on Approval of the Sale of Substantially All of the Debtors' Assets; and (C)(i) Approving the Sale and Assignment of The Debtors' Assets Free and Clear of All Liens, Claims, interests, and Encumbrances and (ii) Granting Related Relief (the "Sale Motion") [Docket No. 60].

25. The decision of whether to qualify Potential Bidders as Qualified Bidders was made by the CRO, in consultation with the Independent Director, and with the assistance of the Debtors' professionals. Mr. Bhansali did not participate in any deliberations related to qualification of Qualified Bidders, had no role in deciding whether to qualify a Potential Bidder or not, and did not attend the Business Line Auction for the A. Jaffe Assets. PNB's claims of influence on the process by Mr. Bhansali are therefore not supportable.

26. The CRO and Independent Director are each highly experienced professionals and are well-suited for their respective roles. Their management of the sale process, with the assistance and guidance of the Debtors' professional advisors, was in all ways responsible and prudent.

27. Further, no evidence has been offered by PNB or any other party about actual taint in the Sale Process. Instead, there are only suspicions and inferences drawn now as a result of Mr. Bhansali's resignation and the statements of his counsel concerning his refusal to offer testimony which occurred on May 18, 2018.

28. On cross-examination, PNB framed the CRO's lack of personal investigation into the Alleged Fraud as evidence of taint to the overall process, notwithstanding the CRO's testimony that neither Mr. Bhansali nor Modi influenced his business judgment regarding any decision he made in the context of the sale process[7]. The CRO also testified that he did not understand an investigation to be within the scope of duties. Rather, the investigation was to be performed by the Court-appointed Examiner and he has ensured that the Debtors have fully cooperated with the Examiner.

29. Importantly, the Debtors invited the Examiner into the sale process and he attended the Business Line Auction for the A. Jaffe Assets through his counsel. Debtors' counsel consulted

---

[7] If asked, Mr. Bivona would similarly testify that neither Mr. Bhansali nor Mr. Modi had any undue influence on the sale process.

directly with counsel for the Examiner and worked cooperatively to obtain any representations from Qualified Bidders the Examiner deemed appropriate in connection with the scheduled Auction. Prior to the Business Line Auction for the A. Jaffe Assets, all Qualified Bidders confirmed a lack of connections or influence by Modi in relation to their bids. At the recommendation of the Examiner, a statement was put on the record at the commencement of the auction further confirming a lack of connections between Modi and any of the Qualified Bidders attending the Business Line Auction for the A. Jaffe Assets.

30. PNB's claim that the Debtors refused to share information related to the sale process or the auction is absurd. The Examiner, and counsel to PNB were given confidential access to the diligence materials available in the data room hosted by the Debtors, as well as all bid packages received by the Qualified Bidders prior to the Business Line Auction for the A. Jaffe Assets. Indeed, PNB was able to conclude (like the Examiner did) that the Debtors had confirmed with bidders their lack of connections to Modi. The only connection between the Qualified Bidders and the Debtors' insiders was disclosed prior to and discussed at length during the Sale Hearing. The results of the Business Line Auction for the A. Jaffe Assets were reported immediately to PNB's counsel and counsel was provided with a copy of the auction transcript within minutes of the Debtors' receipt of the same. PNB's suggestion that the Debtors were attempting to hide something by only posting the name of the winning bidder and not all details concerning the winning bid are disingenuous. They had the auction transcript and were provided with access to all relevant sale related materials and information.

31. The Debtors and their professionals have fully cooperated with the Examiner since his appointment. The Examiner has acknowledged this and previously stated that the Debtors have cooperated with his investigation. The Examiner has interviewed numerous employees of the

Debtors to date and inspected the Debtors' offices on several occasions. The Examiner obtained access to approximately 5.5 million documents, including all relevant email communications, except for those subject to privilege. The Examiner also has full access to the Debtors' ERP system which contains detailed records of all of the Debtors' purchase and sale transactions during the relevant time period. It is impossible to argue in good faith that the Debtors have not fully complied with the Examiner's investigation.

32. Finally, in connection with their interaction with the Examiner and his counsel, during the week before the Sale Hearing, Debtors' counsel was alerted by the Examiner to certain communications between counsel for Mr. Bhansali and the Examiner regarding communications between Modi and Mr. Bhansali that had taken place after the Petition Date. PNB likewise became aware of this communication during the deposition of the CRO on May 14, 2018 and exploited the existence of the communications to suggest that the entire sale process had been tainted.

33. As to the arguments which are focused on negotiations between bidders and key employees of the Debtors and lack of appropriate safeguards, the concern is unreasonable and not material in light of the facts. The reality is that key employee interviews and negotiation over continued employment was required in order to transition the going concern operations of these Debtors. The record is clear that no employee contracts existed to bind key employees or require their peaceful transition to a successful purchaser absent their consent. In middle market companies, this is a fairly common circumstance. There is no evidence that key employee negotiations over continued employment negatively impacted the sale process in any way. This argument is a red herring.

**Request For Fiduciary to Conduct the Remaining Liquidation Efforts**

34. The Debtors' evidence concerning the expected loss of value in the event the A.

Jaffe sale was not consummated is uncontroverted. It is regrettable that PNB's clear tactical approach in seeking to stop the sale of the A. Jaffe assets at all costs will result in a significant impairment to the value ultimately recoverable in the Chapter 11 Cases.

35. The Debtors have been clear in all communications with the Court and parties in interest as to their belief that delay in the sales effort would be materially detrimental to recoverable value. Indeed, the Court expressed an appreciation for this fundamental and rather obvious point. Debtors' management and its professionals were preparing to address questions raised by the Court at the Sale Hearing and would have offered evidence on liquidation value to prove the proposed sale with Paramount was well above worst case scenario liquidation value. However, that effort ended when the Debtors determined that they would be unable to offer admissible evidence in relation to the subject matter of the conversation between Mr. Bhansali and Modi.

36. Moreover, after witnessing the all-out attack on the process and the people who conducted it leveled by PNB, there appeared to be no way to move forward with the sale of the Assets. PNB's attack on Paramount's principal and its clear desire to thwart the sale weighed on Paramount as A. Jaffe sought reassurance from it that it would it would promptly close if A. Jaffe was successful in obtaining entry of an order approving the sale.[8]

37. The Debtors' management continues to believe they can be effective and are best suited to maximize value for creditors in these Chapter 11 Cases, notwithstanding the unwarranted attacks they have faced and the destruction of value that has resulted. Having said that, if case constituents feel a new fiduciary is preferred in the context of this continuing liquidation, the Debtors will not oppose the relief requested.

38. The Debtors do feel that transition to such a new fiduciary should occur as soon as

---

[8] The Debtors would not have been able to deliver a final non-appealable order to Paramount by the APA closing deadline.

practicable if there is any hope of holding together what is now left of the Debtors' business operations.

      **WHEREFORE**, the Debtors respectfully do not oppose the relief requested in the Trustee Motions, to the extent that this Court deems the same to be just and proper.

Dated: New York, New York
         May 31, 2018

                                          KLESTADT WINTERS JURELLER
                                          SOUTHARD & STEVENS, LLP

                              By:  */s/ Ian R. Winters*
                                          Ian R. Winters
                                          Sean C. Southard
                                          Joseph C. Corneau
                                          200 West 41st Street, 17th Floor
                                          New York, New York 10036
                                          Tel: (212) 972-3000
                                          Fax: (212) 972-2245

                                          *Counsel to the Debtors and Debtors in Possession*