UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

In re

FIRESTAR DIAMOND, INC., *et al.,*[1]

Debtors.
-------------------------------------------------------------------x

Chapter 11

Case No. 18-10509 (SHL)

(Jointly Administered)

# REPORT OF JOHN J. CARNEY, EXAMINER

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Tel: 212.589.4200
*Counsel to the Examiner*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Firestar Diamond, Inc. (2729), Fantasy, Inc. (1673), and A. Jaffe, Inc. (4756).

TABLE OF CONTENTS CONTINUED

**Page**

I.     EXECUTIVE SUMMARY ................................................................................................1

II.    KEY ENTITIES, INDIVIDUALS AND TERMS......................................................................4

III.   BACKGROUND ...........................................................................................................8

    A.   The Commencement of the Chapter 11 Cases..........................................................8

    B.   The Examiner's Appointment....................................................................................11

    C.   The Examiner's Work Plan........................................................................................13

    D.   The Examiner's Legal and Forensic Team ...............................................................15

    E.   The Examiner's Investigation ...................................................................................15

    F.   Appointment of the Chapter 11 Trustee...................................................................20

IV.    THE ALLEGED FRAUDULENT CIRCUMSTANCES ...........................................................24

    A.   An Explanation of Letters of Undertaking ("LOUs").............................................25

    B.   The Alleged Fraudulent LOU Scheme .....................................................................27

V.     DEBTORS' STRUCTURE AND REPORTED BUSINESS ........................................................33

    A.   Modi and Debtors' Origins ......................................................................................33

    B.   Firestar Diamond, Inc. .............................................................................................35

    C.   Fantasy Inc..............................................................................................................36

    D.   A. Jaffe ....................................................................................................................37

    E.   Debtors' Capital Structure ........................................................................................38

    F.   Non-debtor US parents and affiliates.......................................................................40

VI.    INVESTIGATIVE FINDINGS REGARDING DEBTORS' BUSINESS PRACTICES..44

    A.   Debtors Engaged in High Volume Transactions with Shadow Entities
        Identified in the Alleged Fraud................................................................................46

    B.   Debtors Treated the Shadow Entities as Related Affiliates Internally While
        Accounting for Them as Independent "Customers" or "Vendors" For
        Transaction Purposes ...............................................................................................47

    C.   Anomalies in Debtors' Financial Reporting of Transactions With Shadow
        Entities ......................................................................................................................64

    D.   Debtors' Loose Diamond Transactions with Shadow Entities Appear
        Fraudulent ................................................................................................................70

VII.   FUNDS ALLEGEDLY OBTAINED THROUGH THE FRAUDULENT LOU
      DIAMOND SCHEME FLOWED THROUGH THE DEBTORS...................................82

    A.   Example of Fraudulent LOU Transaction Traced by the Examiner .......................83

    B.   Confirmed Debtor Involvement in Alleged LOU Diamond Scheme ...................86

**Page**

C.    Officer/Director Involvement in Alleged LOU Diamond Scheme ..................... 122

VIII.   USE OF POTENTIALLY FRAUDULENT FUNDS ..................................................... 136

A.    Suspicious Transfers to Bailey, Banks & Biddle ................................................. 136

B.    Real Estate Transactions ..................................................................................... 150

IX.   ADDITIONAL MISSTATEMENTS AND DISCLOSURE ISSUES ........................... 157

A.    Misstatements In Loan Disclosures ..................................................................... 157

B.    Disclosure Issues in Connection with Chapter 11 Cases .................................... 159

X.    CONCLUSION ......................................................................................................... 164

RED HIGHLIGHTS ARE "HIGHLY CONFIDENTIAL" DOCUMENTS

## I.      EXECUTIVE SUMMARY

On January 29, 2018, Punjab National Bank ("PNB") lodged a complaint with Indian authorities against Nirav Modi and several entities controlled by him—alleging what has been described as the largest bank fraud in Indian history.  As charged by both the criminal and civil authorities in India, Modi and his co-conspirators are alleged to have fraudulently borrowed approximately $4 billion over a period of years by manufacturing sham transactions purportedly to "import" diamonds and other gems into India using a web of more than twenty secretly controlled shell entities.   On April 13, 2018, the Bankruptcy Court appointed the Examiner to determine if the three U.S. corporations indirectly owned by Nirav Modi, Firestar Diamond, Inc. ("FDI"), Fantasy, Inc. ("FI") and A. Jaffe, Inc. ("A. Jaffe," collectively with FDI and FI, the "Debtors") and their officers and directors were involved in the criminal conduct alleged in India. After conducting an intensive 120-day investigation, the Examiner finds substantial evidence to support the knowledge and involvement by the Debtors and their senior officers and directors, namely Mihir Bhansali and Ajay Gandhi, in the criminal conduct alleged by the Indian authorities.

### *Background*

On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, on the basis that the interruption of their supply chain and back office support provided by Modi-affiliated entities made it impossible to continue their respective businesses.  The Debtors led the Bankruptcy Court and parties in these chapter 11 cases (the "Chapter 11 Cases") to believe that they were innocent victims of the fraud.  The prepetition CEO of the Debtors, Mihir Bhansali, remained on as the Debtors' President and their prepetition CFO, Ajay Gandhi, retained his role for the first three months of the Chapter 11 Cases.

The Court appointed the Examiner to, among other things, determine the extent, if any, of the Modi conspirators' influence on the Debtors as well as whether any current officer or director

1

had actively and knowingly participated in fraud or dishonesty involving the affairs of the Debtors. While the Examiner was conducting his investigation, the Court held a hearing to approve the sale of certain assets held by A. Jaffe. Based on testimony at the hearing, the Court raised concerns about approving the proposed sale. At a subsequent telephonic conference, Bhansali's counsel represented that his client would assert his Fifth Amendment right against self-incrimination if compelled to testify about the issues raised during the hearing. Following this conference, the motion to sell the assets was withdrawn, Bhansali resigned all positions with the Debtors, and the Court later appointed a Chapter 11 Trustee.

### *Summary of Investigative Findings*

The Debtors are in the business of selling finished jewelry to major retailers, including Costco, J.C. Penny, Army/Navy Stores, Macy's and Zales, among others. The Examiner has uncovered that in addition to conducting their stated wholesale business, the Debtors conducted transactions totaling hundreds of millions of dollars with the foreign shell companies alleged to have been created and secretly controlled by Modi for the purpose of furthering the fraudulent banking scheme (the "Shadow Entities"). These transactions were primarily structured as purchases and sales of loose diamonds, at a volume and in a manner that is not consistent with the stated business of the Debtors.

In the limited time available, the Examiner has identified tens of millions of dollars of purported diamond sales by the Debtors to various Shadow Entities, where payment can be traced to proceeds from the alleged bank fraud. The Examiner's investigation has confirmed that criminally derived proceeds from these sales flowed from India into the U.S. and in numerous instances were returned to Firestar in India or used to fund Debtors' operations, including making payments on loans made by banks in the U.S.

In addition to linking the Debtors' transactions to specific Letters of Undertaking (LOUs),

2

the Examiner has identified numerous indicia of fraud involving the Debtors' financial reporting, inventory valuation, and operational practices surrounding these transactions.  Specifically:

- Diamonds sold to or purchased from Shadow Entities were routinely shipped out the same day or within days after arrival, without ever being opened or inspected by employees to ascertain the contents of the packets, in contrast to shipments that were made to or received from non-Shadow Entities.

- Certain specific high-value diamonds appear to have been "round tripped":  the same diamond seems to have been bought and sold multiple times at varying prices, often wildly inflated above market prices, in order to create the appearance of millions of dollars in purportedly legitimate transactions and to facilitate the movement of funds.

- The Debtors were in possession of internal financial records that appeared to be the property of numerous supposedly independent Shadow Entities.

- The Debtors' records indicate the Debtors paid back office expenses of numerous supposedly independent Shadow Entities.

- Both the Debtors' CEO and CFO were in possession of internal documents that appeared to track and harmonize accounts receivable and payable between the Debtor entities and the Shadow Entities to foster the appearance of legitimate transactions.

- The volume of sales reported in FDI's tax returns from 2011 – 2017, and in A. Jaffe's returns from 2011- 2012, is millions of dollars (and in some cases tens of millions of dollars) lower than the volume of sales reported in the entities' sales journals, and neither the Debtors' CFO nor any other of the Debtors' employees

3

could explain the source of the figures reported on the tax returns.

- Despite maintaining low balances in their bank accounts, and their stated business of selling finished jewelry to retailers, the Debtors purchased and sold loose diamonds supposedly valued at more than $280 million to Shadow Entities, as reported in their sales journals from 2011 to 2017.

- The Examiner also traced millions of dollars from the Shadow Entities that were funneled through the Debtors to fund the operations of a diamond retail company, Bailey, Banks & Biddle, which relationship was not disclosed to its lenders or to the Bankruptcy Court.

- Money from the Shadow Entities was used to purchase an approximately $6 million apartment on Central Park South for the sole use of Modi and his family in the U.S.

- Throughout the investigation, both Mihir Bhansali, the former CEO of the Debtors, and Ajay Gandhi, the CFO of the Debtors, were questioned about many of the suspicious transactions and irregularities described above.  Bhansali asserted his Fifth Amendment right against self-incrimination as to both interviews and the provision of documents.  Other than identifying himself at the deposition, Bhansali asserted his Fifth Amendment right against self-incrimination as to every question asked by the Examiner.  Gandhi provided documents and participated in multiple interviews, and admitted that at some point he was told by Firestar India employees that the purpose of the loose diamond transactions was to obtain financing in India, specifically LOUs.

## II.   KEY ENTITIES, INDIVIDUALS AND TERMS

### A.  Entities

4

*Debtors*

- **Firestar Diamond, Inc. (FDI)**: A debtor in the chapter 11 bankruptcy. proceeding.

- **Fantasy Inc. (FI)**: A debtor in the chapter 11 bankruptcy proceeding.

- **A. Jaffe, Inc.**: A debtor in the chapter 11 bankruptcy proceeding.

*Affiliates From Corporate Organizational Charts*

- **Firestar Diamond International, Inc. ("FD International")**: U.S. entity that traded high value loose diamonds.

- **Firestar India**: All Firestar entities located in India.

- **Firestar Holdings Ltd., Hong Kong**: Holding company that owned Synergies Corporation.

- **Synergies Corporation**: A U.S. holding company in the Firestar corporate structure; owner of A. Jaffe.

- **Firestar Group, Inc.**: Parent company of FDI and FI. Wholly owned by Synergies Corporation.

- **Central Park Real Estate LLC ("CPRE")**: Entity formed to hold real estate; was 100% owned by Firestar Group Inc. and sold in 2018 to The Ithaca Trust.

- **Nirav Modi Inc.**: Entity that sold high-end jewelry designed.

*The Modi Firms*

- **Diamonds 'R' Us**: Entity name under which Nirav Modi started his business.

- **Solar Exports**: Entity in India controlled by Nirav Modi.

- **Stellar Diamonds**: Entity in India controlled by Nirav Modi.

*Other Entities*

- **Twin Fields Investments Ltd. ("Twin Fields")**: A Delaware registered investment company with ties to Mihir Bhansali.

- **Punjab National Bank (PNB)**: Bank in India that gave Letters of Understanding to Modi entities.

- **HSBC Bank, USA N.A. ("HSBC")**: Lender to FDI and FI.

- **Israel Discount Bank of New York ("IDB")**: Lender to FDI and FI.

- **Standard Chartered Bank ("SCB")**: Former lender to FDI and FI.

- **Marks Paneth LLP**: Auditors for U.S. Firestar entities.

- **Sampat & Mehta**: Indian auditors for Firestar entities.

- **Malca-Amit USA, LLC and Malca-Amit CHB, Inc.**: Companies that provided shipping services to the Debtors.

- **Reserve Bank of India ("RBI"):** India's national bank.

- **Central Bureau of Investigation ("CBI"):** India's primary investigative law enforcement agency.

- **National Company Law Tribunal ("NCLT"):** A quasi-judicial body charged with adjudicating civil disputes between Indian companies.

- **Ministry of Corporate Affairs (the "Ministry"):** Indian governmental authority charged with the administration of the Companies Act of 2013, the Companies Act 1956, the Limited Liability Partnership Act, 2008 and other regulations governing the corporate sector in India.

### *Shadow Entities (Most Cited)*

- **Auragem Company Ltd (Hong Kong)**

- **Brilliant Diamonds Ltd (Hong Kong)**

- **World Diamond Distribution FZE (UAE)**

- **Pacific Diamonds FZE (UAE)**

- **Eternal Diamonds Corporation Ltd (Hong Kong)**

- **Universal Fine Jewelry FZE (UAE)**

- **Tri Color Gems FZE (UAE)**

- **Fancy Creations Company Ltd (Hong Kong)**

- **Unique Diamond and Jewelry FZC (UAE)**

- **Vista Jewelry RJE (UAE)**

- **Empire Gems FZE (UAE)**

6

- **Fine Classic FZE**

## B. Individuals

- **Nirav Modi**: Owner of the Firestar Entities.

- **Mihir Bhansali**: CEO of FDI and FI.

- **Ajay Gandhi**: CFO of all Firestar U.S. entities, including FDI, FI and A. Jaffe.

- **Sumay Bhansali**: CEO of A. Jaffe.

- **Joshua Weinman**: CEO and certified diamond trader at FD International.

- **Bankim Mehta**: Diamond division manager at Firestar Diamond International Inc. and Director of Firestar Holdings Ltd. Hong Kong,

- **Samuel Sandberg**: 5% owner of A. Jaffe and Chief Creative Officer of A. Jaffe.

- **Connie Wong**: Shipping Manager for A. Jaffe.

- **Rebecca Chow**: Diamond Sourcing Manager for FDI.

- **Evelyn Kosiec**: Operations manager for A. Jaffe.

- **Kunal Patel**: Senior Manager for FDI.

- **Hemant Bhatt**: Modi's business partner.

- **Kurian Mathews**: Firestar Dubai employee.

- **Shyam Whadhwa**: Vice President of Accounts for Firestar India.

- **Satyendra Shukla**: Head of the Middle East Firestar entities.

- **Purvi Modi (Mehta)**: Nirav Modi's sister. Managed the Hong Kong Firestar business.

- **Ami Modi**: Nirav Modi's wife.

- **Kavita Mankikar**: Nirav Modi's personal assistant located in India.

## C. Terms

- **Core Banking Solution ("CBS")**: Helps automate front-end and back-end processes of banks to achieve centralized and smooth processing.

7

- **Letter of Undertaking ("LOU")**: Financial instruments unique to India that allows Indian companies to borrow funds from an Indian bank to facilitate imports with international customers and vendors.

- **Nostro Account**: An account that a bank holds in a foreign currency in another bank.

- **Importer**: In an LOU transaction, an entity that obtains short-term credit from Indian banks.

- **Exporter:** Beneficiary of LOU funds and entity that ships goods to overseas importer.

- **Packing Credit:** Short-term working capital loans obtained by vendors to fulfill upcoming orders of goods.

- **SWIFT System:** Network that enables financial institutions worldwide to send and receive information about financial transactions.

## III.    BACKGROUND

### A.    The Commencement of the Chapter 11 Cases

On February 26, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing these Chapter 11 Cases. The Debtors operated their businesses and managed their properties as debtors in possession under section 1107 of the Bankruptcy Code from the Petition Date until the Court entered an order directing the appointment of a chapter 11 trustee on June 7, 2018.

Several weeks before the commencement of the Chapter 11 Cases, governmental authorities in India launched an investigation into Modi, the ultimate owner of the Debtors, several entities owned or controlled by Modi, and persons associated with him for allegedly orchestrating a massive fraud upon PNB in India and other banks around the world.[2] Indian news outlets reported that Modi and others had fraudulently obtained letters of undertaking ("LOUs"), guarantees under

---

[2] *See* Declaration of Mihir Bhansali, President of the Debtors, Containing Information Required Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Debtors' First Day Motions ("First Day Declaration") at 4, 7 (ECF No. 2).

which a qualified bank allows its customers to use money from another Indian bank's foreign branch in the form of short-term credit to engage in foreign import transactions into India. They used these fraudulently obtained LOUs to defraud PNB and other banks by borrowing billions of dollars over the course of several years.[3]

On January 29, 2018, PNB lodged a complaint with the Indian Central Bureau of Investigation ("CBI"), India's primary investigative law enforcement agency, against Modi and his co-conspirators alleging a massive fraud against PNB.[4] The CBI subsequently issued a First Information Report ("FIR"), dated January 31, 2018, identifying criminal statutes Modi and his co-conspirators allegedly violated and basic facts supporting PNB's allegations. This FIR specifically alleges that Modi and his co-conspirators "cheat[ed] . . . Punjab National Bank and caused a wrongful loss."[5] PNB subsequently filed another criminal complaint against certain companies and persons associated with Modi, also for defrauding PNB. The CBI issued a FIR in connection with this complaint as well. This FIR not only details the alleged fraud against PNB and the criminal statutes allegedly violated by the additional parties, but also lists fraudulently issued LOUs that were used to perpetrate the fraud.[6] The Indian government subsequently charged Modi and others alleged to have participated in the fraud with various crimes.[7] On May 24, 2018, the Directorate of Enforcement, Ministry of Finance for the Department of Revenue of India

---

[3] Manoj Kumar and Krishna N. Das, *India's PNB Seeks to Soothe Investors After Uncovering Massive Fraud*, REUTERS (February 15, 2018), https://www.reuters.com/article/us-punjab-natl-bank-fraud/indias-pnb-seeks-to-soothe-investors-after-uncovering-massive-fraud-idUSKCN1FZ0OR.

[4] Central Bureau of Investigation, http://cbi.gov.in/ (last visited August 23, 2018).

[5] First Information Report, Book No. 971, Serial No. 10 (January 31, 2018), available at http://cbi.gov.in/firs/2018/2018_pdf/2018_bsnfc_mumbai_firs/RC0772018E0001.pdf.

[6] First Information Report, Book No. 971, Serial No. 13 (March 4, 2018), available at http://cbi.gov.in/firs/2018/2018_pdf/2018_bsnfc_mumbai_firs/RC0772018E0003.pdf.

[7] Charge Sheet in Case Ref: RC.1(E)/2018-CBI/BS&FC/MUMBAI before The Court Of Honorable Special Judge for CBI Cases, Court No.51, Mumbai (May 14, 2018) ("CBI Charge Sheet"); Abhirup Roy and Devidutta Tripathy, *India Police Expand Probe Against Jeweler Modi in PNB Fraud Case*, REUTERS (Mar. 8, 2018) https://www.reuters.com/article/us-punjab-natl-bank-fraud/india-police-expand-probe-against-jeweler-modi-in-pnb-fraud-case-idUSKCN1GK0YM.

commenced proceedings before the City Civil Court of Greater Bombay for violations of the Prevention of Money Laundering Act of 2002 ("ED Complaint").The Ministry of Corporate Affairs simultaneously commenced civil proceedings[8] before India's National Company Law Tribunal ("NCLT"), a quasi-judicial body charged with adjudicating civil disputes between Indian companies.[9] On February 23, 2018, three days before the Petition Date, the NCLT issued an order freezing Modi's and his affiliates' assets in India, and authorizing the seizure of those assets.[10] Modi fled India and, as of the date of this report, he remains a fugitive from the Indian authorities.

Following the revelation of the fraud allegations, businesses and factories owned and operated by Modi and his affiliates ceased operations because their assets were seized and several employees were incarcerated. Several of these businesses produced jewelry sold by the Debtors and provided back office support to the Debtors. According to the Debtors, the sudden loss of their supply chain and back office support had a severe impact on their operations, leaving the Debtors with no choice but to seek relief under chapter 11.[11]

The Debtors also made other representations formally and informally, explicitly and implicitly, as the Debtors entered chapter 11 regarding their involvement in the events in India. The Debtors led this Court and other parties to believe that they were not involved in the fraud alleged in India and they were innocently caught up in an overseas matter.[12]  For example, at the outset of the cases the Debtors stated: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to…reassure their vendors and customers that they had no

---

[8] *Union of India, Ministry of Corporate Affairs v. Gitanjali Gems Ltd., et al.*, C.P. No. 277/2018, Petition dated February 23, 2018, annexed to the Declaration of James L. Bromley as Exhibit F (ECF No. 151).

[9] *See* Section 408 of the Indian Companies Act of 2013.

[10] *Union of India, Ministry of Corporate Affairs v. Gitanjali Gems Ltd., et al.*, C.P. No. 277/2018, Order dated February 23, 2018, annexed to the Declaration of James L. Bromley as Exhibit A (ECF No. 76).

[11] *See* First Day Declaration at 8.

[12] In a meeting that took place on or about the Petition Date, at which the Debtors' management and counsel were present, the Debtors implied to HSBC and IDB that the Debtors were not involved in the alleged fraud in India.

involvement in the alleged wrongful conduct…and …reassure their customers and vendors that they were committed to carrying on their business and that swift action was being taken to mitigate the damage caused by the actions in India."[13]

### B.      The Examiner's Appointment

On March 23, 2018, the Debtors filed a motion requesting that the Court approve certain bidding and sale procedures for the sale of substantially all of the Debtors' assets free and clear of liens, claims, interests and encumbrances under section 363(f) of the Bankruptcy Code (the "Sale Motion").[14] PNB objected on a number of grounds, citing concerns that Modi's potential connections with the Debtors may chill the bidding process and compromise the rights of parties to the sales proceedings.[15]

In light of these concerns, and based on the reported events in India, on March 30, 2018, the United States Trustee filed a motion to appoint an examiner to investigate and report on the conduct of the Debtors pursuant to section 1104(c) of the Bankruptcy Code[16] and the Debtors consented to the appointment of an examiner.

The Court granted the U.S. Trustee's motion and on April 13, 2018, entered an order (the

---

[13] First Day Declaration at 11.

[14] Debtors' Motion for Entry of an Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Bankruptcy Rules 2002, 6004 and 6006: (A) Fixing the Time, Date and Place for Hearing to Consider Bidding Procedures in connection with the Debtors' Sale of Substantially All of Their Assets; (B)(i) Establishing Bidding Procedures; (ii) Approving the Form and Manner of Notices and; (iii) Setting Hearing Date for the Hearing on Approval of the Sale of Substantially All Of the Debtors' Assets and Preliminary Objection of Punjab National Bank to Debtors' Motion for Entry of an Order (A)(i) Approving the Sale and Assignment of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and (ii) Granting Related Relief (ECF No. 60).

[15] Objection of Punjab National Bank to Debtors' Motion for Entry of an Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Bankruptcy Rules 2002, 6004 and 6006: (A) Fixing the Time, Date and Place for Hearing to Consider Bidding Procedures in connection with the Debtors' Sale of Substantially All of Their Assets; (B)(i) Establishing Bidding Procedures; (ii) Approving the Form and Manner of Notices and; (iii) Setting Hearing Date for the Hearing on Approval of the Sale of Substantially All Of the Debtors' Assets and Preliminary Objection of Punjab National Bank to Debtors' Motion for Entry of an Order (A)(i) Approving the Sale and Assignment of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and (ii) Granting Related Relief (ECF No. 75 at 5).

[16] Memorandum of Law in Support of Motion of the United States Trustee for the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code (ECF No. 87).

"First Examiner Order")[17] directing the appointment of an Examiner under section 1104(c) of the

Bankruptcy Code and directing the Examiner to:

> investigate the circumstances surrounding the alleged fraud involving the individual known as Nirav Modi, certain persons or entities affiliated with Nirav Modi (the "Modi Entities") and certain employees of Punjab National Bank (the "Alleged Fraud Circumstances") for the purpose and to the extent necessary to determine: (1) whether and to what extent, if any, the Modi Entities have the ability to direct and/or influence the conduct, decisions or actions taken by the Debtors in these Cases; (2) whether any current officer or director of the Debtors actively and knowingly participated in fraud or dishonesty in the management of the affairs of the Debtors; (3) whether any claims or causes of action in favor of the Debtors may arise from the Alleged Fraud Circumstances; (items (1) through (3) referred to as the "Determinations") and (4) otherwise perform the duties of an examiner as contained within the scope of 11 U.S.C 1106(a)(3)&(4) of the Bankruptcy Code solely to the extent required or necessary to the foregoing Determinations (collectively, the "Investigation").

The First Examiner Order further directed the Examiner to prepare and file a written report

(the "Report") setting forth his conclusions regarding the Determinations within 120 days of his

appointment by the U.S. Trustee.[18] Until the filing of his Report, neither the Examiner nor his

professionals were authorized to make any public disclosures concerning the performance of the

Investigation.[19]

To facilitate the Investigation, the First Examiner Order specifically directed the Debtors

to "provide to the Examiner all non-privileged documents and information within its possession

that the Examiner deems relevant to perform the Investigation."[20] If a dispute arose concerning

whether the Debtors could properly assert a claim of privilege, the Court authorized the Examiner

to bring the matter before the Court for resolution. The First Examiner Order also required the

Examiner to take reasonable efforts to avoid taking steps that would unnecessarily impact or delay

---

[17] Order Pursuant to 11 U.S.C. § 1104(c) Directing the Appointment of an Examiner (ECF No. 103).
[18] Examiner Order at 3.
[19] *Id.*
[20] *Id.*

the Debtors' sale process.[21]

In addition, the First Examiner Order directed the Examiner to cooperate fully with any governmental authorities in the United States or India who may be investigating the Debtors, and to the extent possible, avoid any duplication of efforts associated with any such investigations.[22]

On April 19, 2018, the U.S. Trustee appointed John J. Carney, who previously has served as Securities Fraud chief, assistant United States attorney, U.S. Securities and Exchange Commission (SEC) senior counsel and certified public accountant at a "Big Four" accounting firm, as Examiner and filed notice of his appointment.[23] Also on April 19, 2018, the United States Trustee filed an application to approve the Examiner's appointment,[24] and the Court subsequently entered an order approving the appointment.[25]

### C.  The Examiner's Work Plan

On May 4, 2018, the Examiner filed a preliminary work plan and budget (the "Work Plan") as directed by the Court, outlining his proposal for conducting the Investigation and issuing this Report.[26] To fulfill his charge, the Examiner described his intention to divide the Investigation into the following categories: (a) conduct initial interviews to understand the Debtors' operations and the Debtors' respective roles in the diamond/jewelry industry; (b) interview key witnesses in the United States, and if necessary in India, who are or were employed in functions relevant to the Investigation, i.e. sales, finance and accounting, operations, and contracting; (c) identify and review documents and communications relevant to the subject matter of the Investigation; (d) conduct a forensic financial analysis of the books and records of the Debtors, bank records, vendor

---

[21] *Id.*
[22] *Id.* at 4.
[23] Notice of Appointment of Examiner (ECF No. 114).
[24] Application for Order Approving Appointment of Examiner (ECF No. 115).
[25] Order Approving Appointment of Examiner (ECF No. 118).")
[26] Preliminary Work Plan and Budget of John J. Carney, Examiner (ECF No. 139).

records, and any and all relevant information of other entities consistent with the Investigation, and trace the movement of monies obtained under the Alleged Fraud Circumstances against Punjab National Bank to the Debtors, and related entities and individuals; and (e) engage with the Ministry (and other agencies within the Government of India if needed) for information and documents relevant to this Investigation.

Crucial to the scope of the Examiner's Investigation was the need to balance the breadth of the Alleged Fraudulent Circumstances with the scope of the Chapter 11 Cases, to operate within the timeframe established by the Court to conduct the Investigation and to minimize costs to the estates. The Alleged Fraudulent Circumstances involve a sophisticated multibillion dollar international fraud over a multi-year period across countries including the United States, India, Belgium, China, and the UAE, among others. The Examiner's role in investigating this complex international fraud is limited to the extent relevant to the administration of the Debtors' estates, which is located entirely within the U.S. and lacks apparent substantial assets.

With these considerations in mind, in the Work Plan, the Examiner stated his intention to rely primarily on the voluntary cooperation of the Debtors, their key staff and current and former accounting and auditing professionals who performed services for the Debtors, as well as the cooperation of other interested parties. This cooperation would encompass the voluntary production of relevant documents as well as the participation in informal interviews with the Examiner and his professionals. Although the Examiner contemplated full cooperation, he reserved the right to conduct formal discovery as he deemed necessary to fulfill his duties to the Court.

On May 28, 2018, the Court entered an order approving the Examiner's Work Plan.[27]

---

[27] Order Approving the Preliminary Work Plan and Budget of John J. Carney, Examiner (ECF No. 189).

### D.       The Examiner's Legal and Forensic Team

Because of the financially complex and highly specialized nature of the appointment, the Examiner engaged Baker & Hostetler LLP ("BH"), led by Jorian Rose, to serve as counsel.  He also retained global consulting firm Alvarez & Marsal Disputes and Investigations, LLC ("A&M" led by retired FBI special agent William B. Waldie, CPA, CFE to assist with fraud investigation and analysis.[28]

### E.       The Examiner's Investigation

To fulfill his charge, and within its limitations, the Examiner and his professionals have conducted a forensic investigation into the Debtors' financial and business operations from the period 2011 through the filing date. The Examiner conducted numerous interviews of the Debtors' employees and other parties in interest, sought cooperation from parties in interest to share documents and information voluntarily, and served 41 document and deposition subpoenas.

Upon appointment, the Examiner conducted initial meetings and telephone conferences with the Debtors' counsel, the Chief Restructuring Officer, HSBC Bank USA, National Association ("HSBC"), Israel Discount Bank of New York ("IDB"), PNB, and the Ministry regarding the known facts and evidence supporting the LOU diamond fraud scheme alleged by the Indian authorities. Following these sessions, the Examiner and his professionals made more than a dozen site visits to the Debtors' facilities at 592 5th Avenue in New York City to examine the Debtors' books and records, interview the Debtors' employees and other witnesses, and to otherwise investigate the Debtors' operations.

The Examiner's access to evidence held by the Debtors was limited in four notable respects.  First, the Debtors did not have U.S. computer servers; the vast majority of the Debtors'

---

[28] The Court entered orders approving BH's retention on May 18, 2018 (ECF No. 175) and A&M's retention on June 11, 2018 (ECF No. 219).

files, e-mails, and other electronic information had been stored on computer servers in India, which the Indian authorities seized before the Petition Date. Second, certain data, and information stored on Mihir Bhansali's computer may have been deleted by use of a software program designed to make erased data unrecoverable. Notwithstanding these limitations, the Examiner's team was able to compile significant evidence from, the laptops of fourteen employees in the United States, their cell phones and flash drives, their saved voicemails, and other information created and stored by third parties.[29] Third, as discussed below, Bhansali refused to cooperate and asserted his Fifth Amendment privilege against self-incrimination with respect to both documents and testimony.[30] Fourth, the Debtors' financial and shipping records were incomplete. The Examiner's professionals imaged and forensically reviewed the laptops of the following fourteen employees:

| Ajay Gandhi | Chief Financial Officer (Debtors) |
|---|---|
| Dhaval Mehta | Sourcing (A. Jaffe) |
| Evelyn Kosiec | Operations Manager (A. Jaffe) |
| Isaac Sandberg | Accounting Assistant (A. Jaffe) |
| Janeth Garcia | Accounts Payable Supervisor (Firestar) |
| Kaushal Javeri | Operations Manager (A. Jaffe) |
| Kunal Patel | Controller (Debtors) |
| Mihir Bhansali | President (Debtors) |
| Rebecca Chow | Head of Production & Diamonds (Firestar) |
| Samuel Sandberg | Chief Creative Officer (A. Jaffe) |
| Sameer Ghadge | Operations Manager (A. Jaffe) |
| Shanna Singh | Head of Distribution (Firestar) |
| Sumay Bhansali | Chief Executive Officer (A. Jaffe) |
| Zaheer Khan | Head of Quality Control (Firestar) |

Generally, the parties in interest in the Chapter 11 Cases readily cooperated with the Examiner's informal requests for documents and information. For example, the Debtors provided

---

[29] On July 27, 2018, the Examiner sent letters via Federal Express and by e-mail to the CBI and the Indian Enforcement Directorate ("ED") seeking the data from the seized Indian servers, among other information, and a telephonic meeting. As of the date of this report, the Examiner has not received a response.

[30] Bhansali's counsel contacted the Examiner and requested that Bhansali's position regarding his assertion of his Fifth Amendment right be included in the Examiner's report. His letter is attached as Exhibit 1.

the Examiner with access to a data room established for parties interested in placing a bid for the Debtors' assets and shared documents that the Indian authorities did not seize. Likewise, PNB and the Ministry provided the Examiner documents and information relevant to the Debtors' connections to India. Moreover, PNB sent its forensic auditors, BDO (India) to the U.S. to meet with and assist the Examiner's forensic team with its investigation.

To address the possibility that parties would withhold their cooperation, on May 8, 2018, the Examiner filed a motion for pre-authorization to conduct examinations under Rule 2004 of the Federal Rules of Bankruptcy Procedure,[31] which the Court granted on May 29, 2018.[32]

Since his appointment, the Examiner has conducted approximately forty-five interviews and meetings with Debtor and non-debtor parties, many of which were multiple interviews.   The Examiner interviewed, among others, the following parties:

1. Ajay Gandhi, Chief Financial Officer, Firestar Diamond, Inc., Fantasy Inc., A. Jaffe and each of the non-debtor U.S. companies under the Firestar umbrella of companies[33]
2. Bankim Mehta, Diamond Trader, Firestar Diamond International Inc.
3. BDO (India), Forensic Consultant for PNB[34]
4. Connie Wong, Shipping Manager, A. Jaffe
5. David Herzog, Loan Officer from IDB
6. Deepak Rao, Former CFO
7. Evelyn Kosiec, Operations Manager, A. Jaffe
8. Howard Hoff, CPA, Partner, Marks Paneth, Auditor of Firestar Diamond, Inc., Fantasy Inc., and A. Jaffe
9. Indian Ministry of Corporate Affairs (through U.S. counsel, White & Case LLP)
10. Joshua Weinman, Diamond Trader, Firestar Diamond International Inc. (Non-

---

[31] Notice of Presentment of Order Granting Motion of the Examiner for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Examiner to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities (ECF No. 145).

[32] Order Granting Motion of the Examiner for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Examiner to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities (ECF No. 191).

[33] See infra for a description of the Firestar group of companies and a chart depicting the companies' organizational structure.

[34] PNB, through its U.S. counsel, Cleary Gottlieb, worked cooperatively with BDO (India) LLP to satisfy the Examiner's request for an in-person meeting.  As the Examiner did not have access to financial records of the global entities charged in the fraud, PNB and BDO (India)'s analyses were instrumental in linking transfers in India with transfers in the U.S.

            debtor U.S. entity)

11.    Kunal Patel, Controller, Debtors
12.    Mark Sampson, Chief Restructuring Officer, Firestar Diamond, Inc., Fantasy Inc., and A. Jaffe
13.    Mihir Bhansali, CEO, Firestar Diamond, Inc., Fantasy Inc., and A. Jaffe [35]
14.    Patrick Hanley, Loan Officer from HSBC
15.    Rakhi Bhansali, Wife of Mihir Bhansali
16.    Raul Echeverz, Nirav Modi's U.S. architect and designer
17.    Rebecca Chow, Head of Production & Diamonds, Firestar Diamond, Inc.
18.    Samuel Sandberg, Chief Creative Officer, A. Jaffe
19.    Steven Velasquez, Former CEO of BBB Group, Inc.
20.    Sumay Bhansali, Chief Executive Officer,  A. Jaffe

The Examiner demanded additional documents and information during and after the interviews as he deemed necessary to the Investigation.  All document demands were made through Rule 2004 subpoenas, and all parties complied. Mihir Bhansali and Rakhi Bhansali each asserted the Fifth Amendment right against self-incrimination and spousal privilege, respectively.

In total, in response to the forty-one document and deposition subpoenas he served, the Examiner received more than five million documents consisting of tens of millions of pages. Most of these documents were hosted on a document management system, across which the Examiner's professionals conducted searches of key terms most likely to be relevant to the Investigation.  The documents, including with voicemails and images, exceeded 1.8 terabytes of data.

The Examiner also negotiated stipulated protective orders to govern the use of confidential materials produced to him by PNB and the Ministry;[36] the Debtors' secured lenders, HSBC and IDB;[37] companies that provided shipping services to the Debtors, Malca-Amit USA, LLC and Malca-Amit CHB, Inc. ("Macla-Amit");[38] one of the Debtors' customers, BBB Group Inc.;[39]

---

[35] In response to most of the Examiner's document requests, Rakhi Bhansali invoked her spousal privilege.
[36] Stipulation and Order Governing Examiner Discovery (ECF No. 218).
[37] Stipulation and Order Governing Examiner Discovery (ECF No. 252).
[38] Stipulation and Order Governing Examiner Discovery (ECF No. 253).
[39] Stipulation and Order Governing Examiner Discovery (ECF No. 341).

Debtors' auditors, Marks Paneth LLP;[40] and the non-debtor U.S. Firestar entities,[41] Firestar Group Inc., Synergies Corporation, Nirav Modi Inc., AVD Trading, Inc., Firestar Diamond International, Inc. ("FD International") (collectively, the "Protective Orders"). As required by the Protective Orders, several days before the submission of this Report the Examiner provided a list of documents on which the Examiner intended to rely. The producing parties were given an opportunity to object to the Examiner's reliance on a designated document and the Examiner to contest the designation or to move to seal the Report. The Examiner believes he has resolved all such objections.[42]

The Examiner's forensic investigation was conducted in conjunction with A&M. Among other forensic procedures, A&M analyzed relevant documents including, but not limited to, all available bank statements, the Debtors' sales and purchase records, the Debtors' tax returns, Debtor and key employee loan documents, key employee investment account activity and credit reports. In addition, A&M tested certain suspect diamond imports and exports, evaluated audit workpapers relating to the Debtors, reviewed emails, assisted in interviewing certain key individuals, analyzed certain real estate transactions with links to the Debtor entities or their employees, and conducted global intelligence research of certain entities and individual alleged to have been involved in the fraud. A&M also performed site visits to certain entities in Hong Kong, Dubai, and India that persons connected to Modi managed, owned, and/or operated.

In addition, the Examiner consulted with the chapter 11 trustee's retained experts, Donald and Angelo Palmieri ("Palmieri") of Gem Certification & Assurance Lab, Inc. ("GCAL"). Donald Palmieri is an internationally recognized gems and jewelry forensic expert, appraiser, publisher,

---

[40] Stipulation and Order Governing Examiner Discovery (ECF No. 340).
[41] Stipulation and Order Governing Examiner Discovery (ECF No. 346).
[42] The Examiner has prepared a compendium of relevant documents, certain of which were designated confidential under the Protective Orders.

and consultant.[43]   The chapter 11 trustee retained Palmieri to, among other things, inspect the Debtors' diamonds and to provide expert testimony regarding the value of the Debtors' assets.[44]

### F.   Appointment of the Chapter 11 Trustee

On April 3, 2018, the Court entered an order establishing bidding and sales' procedures for the sale of the Debtors' assets.[45] Parties expressed an interest in bidding only for the assets of A. Jaffe, and as a result, the Debtors held a business line auction for only A. Jaffe's assets on May 3, 2018.[46] PNB filed an objection to the sale,[47] urging that the Court deny or adjourn the sale until the Examiner has had the opportunity to evaluate the Debtors' involvement, if any, in the Alleged Fraudulent Circumstances.

On April 21, 2018, the President of India issued The Fugitive Economic Offenders Ordinance, which provided for, among other things, the confiscation of property in India belonging to fugitives evading the jurisdiction of the Indian courts to avoid criminal prosecution.[48] According to the Debtors, the issuance of the Ordinance chilled interested bidders from bidding on the Debtors' assets at the auction.[49]

The Examiner took steps, to the extent consistent with his ability at the outset of his investigation, to cause disclosure to the Bankruptcy Court of the bidders' connections with Modi.

---

[43] Chapter 11 Trustee's Application For an Order Authorizing The Employment of Gem Certification & Assurance, Inc. as Appraiser *Nunc Pro Tunc* As of June 29, 2018 (ECF 259).

[44] *Id.*

[45] Order Establishing Bidding Procedures and Related Relief Regarding the Sale of Substantially All of the Debtors' Assets (ECF No. 95).

[46] Notice of Results of Business Line Auction for A. Jaffe Assets (ECF No. 141).

[47] Objection of Punjab National Bank to Debtors' Motion for Entry of an Order Approving the Sale and Assignment of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, And Encumbrances and Granting Related Relief (ECF No. 148).

[48] THE FUGITIVE ECONOMIC OFFENDERS ORDINANCE, 2018, NO. 1 OF 2018.

[49] *See* Debtors' Omnibus Reply to (I) Objection of Punjab National Bank to Debtors' Motion for Entry of an Order Approving the Sale and Assignment of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and Granting Related Relief; and (II) Joinder of The Ministry of Corporate Affairs of the Union of India to Objection of Punjab National Bank to Debtors' Motion for Entry of Order Approving Sale and Assignment of Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances (ECF No. 162).

Prior to the auction, which his counsel attended, the Examiner requested that each of the bidders declare at the auction its connections with Modi or any related entity.  The Debtors acquiesced and asked each bidder to disclose any such connections by email,[50] and again at the auction itself. The Examiner's counsel then attended the auction to monitor the bidders' compliance with his request. All bidders complied.[51]

Upon the conclusion of the auction and selection of a winning bidder, the Examiner requested that the winner represent to the Bankruptcy Court that: (i) other than the Debtors, it neither had any connections nor communications with Modi or any entity under his control (specifically including entities that were identified by authorities investigating the Alleged Fraudulent Circumstances as being connected to Modi and his alleged fraud), and (ii) neither Modi nor any of the related entities had any expectation of involvement or compensation from the proposed sale.[52] For the Debtors' part, the Examiner requested that each of the Debtors' officers and directors provide a parallel representation that the Debtors' directors and officers had no reason to know that the potential purchaser had connections, communications, or an on-going relationship with Modi or any entity under his control as described above.  The Examiner, among other things, also asked Debtors' directors and officers to represent the extent of their own recent communications with Modi. The Debtors' counsel worked with each of the Debtors' directors and officers, other than Bhansali who had independent counsel. Bhansali's counsel represented to the Examiner that Bhansali had discussions with Modi that ended March 15, 2018, regarding the sale and bankruptcy process, but Mr. Modi had no influence or control over the process.[53]

On May 15, 2018, the Court conducted a hearing to approve the sale (the "Sale Hearing").

---

[50] *Id*. at 9.
[51] *Id*.; *see* Auction Tr. 16:5-17 (ECF No. 158).
[52] *See* Emails between counsel to the Examiner and counsel to the Debtors, dated May 11, 2018.
[53] *See* Emails between counsel to the Examiner and counsel to Bhansali, dated May 11-14, 2018.

Mark Samson, the Debtors' chief restructuring officer, testified at the Sale Hearing on several matters relevant to the sale process. First, Mr. Samson testified that Mihir Bhansali had spoken with Modi sometime between the Petition Date and March 15, 2018, on at least one occasion.[54] Second, Mr. Samson testified that he had not established any protocols for employee communication with Modi, nor had he expressly prohibited such communication.[55] Third, Mr. Samson further testified that he was aware of conversations between potential bidders and Bhansali regarding Bhansali's prospective employment with the winning bidder, but that he did not know whether any of those conversations concerned Bhansali's future compensation.[56]

At the end of the Sale Hearing, the Court expressed reservations about approving the sale without further information and requested additional evidence before closing the record. Among other things, the Court expressed concern that Modi had contact with anyone involved in the sale process and regarding the communications between Bhansali and potential bidders concerning prospective employment.[57]

Upon the request of the Debtors, the Court subsequently conducted an emergency telephonic conference to determine how these developments would affect the Sale Motion. At that conference, Bhansali's counsel represented to the Court that Bhansali would assert his Fifth Amendment right against self-incrimination if compelled to testify about the issues raised during the Sale Hearing. Following this revelation, the Debtors filed a withdrawal of the Sale Motion.[58] Several days later, Bhansali resigned as CEO of the Debtors.

In light of these events, PNB and the U.S. Trustee each filed a motion seeking the

---

[54] Sale Hearing Tr. at 21:6-8.
[55] *Id.* at 24-26.
[56] *Id.* at 30:11-18.
[57] *See id.* at 141-143.
[58] Notice of Withdrawal, Without Prejudice, of Sale Motion (ECF No. 177).

appointment of a chapter 11 trustee.[59] The Ministry filed a joinder to PNB's motion.[60] The Debtors filed a response disputing PNB's allegations that the sale process was tainted and mismanaged by the Debtors' CRO and independent director, but did not oppose the appointment of a chapter 11 trustee.[61]

After a hearing on the motions, on June 7, 2018, the Court entered an order directing the appointment of a chapter 11 trustee.[62] On June 14, 2018, the U.S. Trustee appointed Richard Levin, Esq. as chapter 11 trustee (the "Trustee") in the Chapter 11 Cases and filed notice of his appointment.[63] That same day, the United States Trustee filed an application to approve the Trustee's appointment,[64] and the Court subsequently entered an order approving the appointment.[65]

Following this development, the Examiner and the Trustee conferred on their respective roles and duties in the Chapter 11 Cases to avoid duplication of effort and jointly act in the best interest of the Debtors' estates and administration of the Chapter 11 Cases. The Examiner and the Trustee determined that, given the progress of the Examiner's Investigation, the Examiner would complete those investigative steps that were at the core of his responsibilities as set forth in the Examiner Order, while the Trustee would take responsibility outside of the Examiner's charge,

---

[59] Punjab National Bank's Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant To 11 U.S.C. § 1104(A) (ECF No. 181); Memorandum of Law in Support of Motion of the United States Trustee for the Appointment of a Chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy Code or, Alternatively, for Conversion of These Cases to Chapter 7 (ECF No. 185).

[60] The Ministry of Corporate Affairs of the Union of India's Joinder to Punjab National Bank's Motion for Entry of Order Directing Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a) (ECF No. 194).

[61] Debtors' Omnibus Response to (I) Punjab National Bank's Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a), (II) The Ministry of Corporate Affairs of the Union Of India's Joinder to Punjab National Bank's Motion for Entry of Order Directing Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. 1104(a), and (III) Motion of the United State Trustee for the Appointment of a Chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy Code or, Alternatively, for Conversion of These Cases to Chapter 7 (ECF No. 195).

[62] Order Pursuant to 11 U.S.C. § 1104(d) Directing the Appointment of a Chapter 11 Trustee (ECF No. 216).

[63] Notice of Appointment of Chapter 11 Trustee (ECF No. 222).

[64] Application for Order Approving Appointment of Chapter 11 Trustee (ECF No. 226).

[65] Order Approving Appointment of Chapter 11 Trustee (ECF No. 227).

such as determining what claims may be brought by the estates. The revised scope of the Examiner's role[66] was approved by the Court on July 26, 2018. Under the revised scope, Examiner was directed to:

> investigate the circumstances surrounding the alleged fraud involving the individual known as Nirav Modi, certain persons or entities affiliated with Nirav Modi (the "Modi Entities") and certain employees of Punjab National Bank (the "Alleged Fraud Circumstances") for the purpose and to the extent necessary to determine: (1) the nature and extent of any involvement (if any) of the Debtors and any current or former officer or director of the Debtors in the Alleged Fraud Circumstances; (2) the involvement of such parties in any fraudulent, avoidable or suspect transactions related to the Alleged Fraud Circumstances; and (3) otherwise perform the duties of an examiner as contained within the scope of 11 U.S.C 1106(a)(3)&(4) of the Bankruptcy Code solely to the extent required or necessary to the foregoing Determinations (collectively, the "Investigation").[67]

## IV.    THE ALLEGED FRAUDULENT CIRCUMSTANCES

The Debtors' ultimate parent company and its principal have been charged by Indian authorities with orchestrating a multi-billion dollar fraud against PNB and other banks. The CBI has charged that commencing on or before 2011, Modi obtained approximately $4 billion from PNB through fraudulently issued LOUs. LOUs are financial instruments unique to India that allow Indian companies to borrow funds from an Indian bank to facilitate imports with international customers and vendors.[68] LOUs operate like a working capital arrangement. The alleged scheme involved obtaining LOUs to fund Modi's entities and lifestyle, using the funds from new LOUs to repay old LOUs as they became due, and moving gemstones and/or money among a network of related shell entities to simulate real import transactions.[69] Although complex and layered, the scheme alleged by the Indian authorities is a typical bank fraud and money laundering operation.

Because the Examiner's charge is focused on investigating the extent of involvement, if

---

[66] Examiner's Motion to Modify Order Appointing Examiner (ECF No. 276).
[67] Order Granting Examiner's Motion to Modify Order Appointing Examiner (ECF No. 326).
[68] ED Complaint ¶ 3.1.2.
[69] ED Complaint ¶¶ 3.1.8; 3.1.13; 11.7.

24

any, by the Debtors and their officers and directors in the Alleged Fraudulent Circumstances, the key allegations charged by Indian authorities are summarized below.  The Examiner did not investigate the truth of the allegations involving solely Firestar India or overseas operations except to the extent necessary and for the purpose of his investigative directive.

### A.   An Explanation of Letters of Undertaking ("LOUs")

The LOUs at issue in this case are functionally similar to many other forms of vendor financing: they are guarantees by an Indian bank to pay the face amount to a vendor.  LOUs allow for an importer to avoid incurring the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers.  Instead, the importer obtains short-term credit from its bank in India.  The issuing bank, in turn, enters into the foreign currency transaction:  it requests a foreign branch or another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro – "our"—account) at the foreign branch of a third bank to pay the supplier in its local foreign currency.  A legitimate LOU transaction is conducted as follows:



## LOU Transaction Cycle

**KEY**
- Funds Transfer
- SWIFT Message
- Diamonds Transfer
- Importer
- Exporter
- Bank
- Customer

Goods are sent from the Exporter to the Importer.

**Flow of Funds and LOU Cycle**

1. After scouting overseas correspondent banks for interest rates offered, the Importer obtains LOU financing from PNB local bank branch. Documents regarding the transaction are presented to the bank, and the Import Bill is entered into the Core Banking Solution System (CBS). Based on the commodity being imported, payment terms are established for the LOU. Collateral is also posted by the Importer.
2. A LOU Application message is sent from the PNB local bank branch to the overseas bank via SWIFT.
3. Upon receipt of the LOU Application message, the overseas bank funds PNB's Nostro Account (3.A), and sends a LOU Acknowledgement message back to the PNB local bank branch confirming the funding (3.B).
4. A Bank Guarantee No. is generated in the CBS for the LOU issued.
5. The Exporter is paid in its local currency using the PNB Nostro Account funds.
6. The Importer sells the diamonds or related jewelry products to a customer on the open market.
7. Importer repays the LOU principal plus interest owed to Nostro Account (7.A) and overseas bank (7.B).

26

The charged fraud in India involves misrepresentations made to PNB in obtaining the LOUs, misuse of the issued LOUs, and misreporting the LOUs in the bank's recording system. Seemingly because of this fraud, the Reserve Bank of India ("RBI"), India's national bank, in March 2018, issued a Directive ordering the immediate discontinuance of LOUs.[70] However, the RBI still permits Letters of Credit, which are separate instruments that are traditionally used in the international banking system.

### B.    The Alleged Fraudulent LOU Scheme

Modi and several co-conspirators are alleged to have fraudulently obtained LOUs by manufacturing false transactions in India and elsewhere involving the sale of diamonds, pearls and gold bars and other goods.[71]  Bhansali, the Debtors' former CEO, is among those charged. The Indian authorities alleged that the co-conspirators created and managed a global network of related shell companies that posed as independent third parties in sham transactions to import gemstones and other jewelry related goods valued at billions of dollars in order to obtain bank financing in the form of LOUs.[72]

Modi and his entities in India are alleged to have shipped stones back and forth among themselves and other Modi controlled entities around the world, generating shipping invoices that were provided to PNB to secure the LOUs.[73]  These related entities included: entities in the global Firestar organizational structure ("Firestar Global Entities"); three Modi-related entities in India, Solar Exports, Stellar Diamonds, Diamonds 'R' Us (the "Modi Firms"); and the more than twenty

---

[70] Reserve Bank of India, Discontinuance of Letters of Undertaking (LoUs) and Letters of Comfort (LoCs) for Trade Credits dated March 13, 2018, RBI/2017-18/139 (available at https://rbidocs.rbi.org.in/rdocs/notification/PDFs/NOTI139F15274F2540046CE9C14E9DFEAA60941.PDF).
[71] ED Complaint ¶¶ 11.1-11.6.
[72] ED Complaint ¶ 11.7.
[73] *See* ED Complaint ¶¶ 11.6-11.7.

Shadow Entities, Firestar-controlled shells that were falsely represented as independent third parties in connection with certain diamond transactions. These shipments often created records in India's national customs database to correspond with the manufactured shipment invoices. [74] Alleged co-conspirators at PNB assisted the scheme by issuing the LOUs without securing collateral and without recording them in the Core Banking Solution ("CBS"). As LOUs came due, they were paid with the funds from more recently obtained LOUs or improperly utilized packing credits.[75]

### 1.    PNB and the Importer Accounts

PNB is a publicly-owned Indian bank, which is majority owned by the central government of India, and PNB employees are legally considered public servants.[76] Of its many branches, the Brady House branch in Mumbai is one of its largest, and the RBI has designated it an Authorized Dealer of Foreign Exchange, meaning it can issue LOUs. Two Brady House employees, Gokulnath Shetty, the Deputy Manager of the Brady House branch, and Manoj Kharat, a Single Window Operator (a clerk), allegedly conspired with Modi and three of his companies to issue LOUs fraudulently for the benefit of other companies that were secretly Modi affiliates.[77] Other PNB employees charged with aiding Modi and Mihir Bhansali in the fraud include Yashwant Joshi, Shetty's successor; Bechu Tiwari, Manager of PNB's foreign exchange department; and Prafful Sawant, a loan officer responsible for reconciling SWIFT messages with CBS entries. [78] These conspirators are charged with facilitating and concealing the issuance of the LOUs.

---

[74] Meetings with BDO (India), July 2018.

[75] CBI Charge Sheet ¶¶ 26, 30.

[76] Punjab National Bank, *Heritage: Saga of Excellence in Banking*, https://www.pnbindia.in/heritage.html?page=heritage.html.

[77] CBI Charge Sheet ¶¶ 27-28.

[78] *Id*. at ¶¶ 29-30. Joshi was Gokulnath Shetty's subordinate who aided him in issuing the false LOUs. Upon Shetty's retirement in 2017, Joshi assumed Shetty's role and reported the LOU scheme.

The Modi Firms as well as Firestar India maintained accounts at PNB.[79]  The Modi Firms were the importers for approximately 93% of the total value of issued LOUs with Firestar India entities serving as the remainder.[80]  The majority of LOUs issued had at least two exporters each.[81]

Diamonds 'R' Us is a partnership that was formed by Modi, his uncle Mehul Choksi, and Modi's business partner Hemant Bhatt.[82]  Diamonds 'R' Us opened account ending in 6123 at PNB's Brady House branch in 1998 and maintains account ending in 7161.[83]

Solar Exports is a partnership formed by the Nirav Modi Family Trust and the Nirav Family Trust.[84]  The partners of Solar Exports, Ami Modi (Nirav Modi's wife), Hemant Bhatt, and Kavita Mankikar (Modi's secretary at Firestar India) opened account ending in 3609 in 2010 at PNB on behalf of Solar Exports.[85]

Stellar Diamonds is a partnership that was also formed by the Modi Family Trust and the Nirav Family Trust.[86]  Ami Modi, Hemant Bhatt and Kavita Mankikar opened PNB Brady House account ending in 3593 in 2010.[87]

Based on information obtained from the Indian authorities, over the years, individuals unconnected to the jewelry industry were brought in as partners of the Modi Firms simply to act as unwitting signatories, seemingly to transfer money and to act as legitimate participants in import transactions.[88]

Indian authorities alleged these accounts did not meet the requirements or have the proper

---

[79] ED Complaint, ¶ 6.43. Ownership and management of these entities is further described below.
[80] Meetings with BDO (India), July 2018.
[81] Id.
[82] Indenture of Partnership for Diamonds 'R' Us, dated May 10, 2000 (ROI-MCA-00000209); see also CBI Charge Sheet ¶ 7.
[83] CBI Charge Sheet ¶ 7.
[84] Indenture of Partnership for Solar Exports, dated January 16, 2010 (ROI-MCA-00000220).
[85] CBI Charge Sheet ¶ 8.
[86] Indenture of Partnership for Stellar Diamond, dated January 16, 2010 (ROI-MCA-00000229).
[87] CBI Charge Sheet ¶ 9.
[88] ED Complaint ¶ 3.1.4.

authorizations for LOU eligibility.[89]  To obtain legitimate LOUs, the Modi Firms were required to furnish 100% cash as collateral so PNB could repay the overseas, receiving banks that extended the credit based on the validity of the LOUs.[90]  Instead, Shetty and Kharat are charged to have conspired with Modi and the Modi Firms to issue LOUs without the required collateral and made false records in the CBS.

**2.**      The Scope of the Fraud Alleged by Indian Authorities

Modi, his co-conspirators and their PNB accomplices are charged with fraudulently obtaining and issuing LOUs on behalf of the Modi Firms from 2011 to 2018.  According to the CBI charge sheet, 1208 LOUs were fraudulently issued to Diamonds 'R' Us, Stellar Diamonds, and Solar Exports.  The chart below identifies the number of allegedly fraudulent LOUs issued per year:[91]

| Year | Number of LOUs Opened Fraudulently |
|------|------------------------------------|
| 2011 | 43 |
| 2012 | 115 |
| 2013 | 236 |
| 2014 | 123 |
| 2015 | 185 |
| 2016 | 356 |
| 2017 | 150 |
| **Total** | **1208** |

The U.S. Debtors were identified as the exporter entities for six LOUs.   Shadow Entities are alleged to have received hundreds of millions of dollars in direct LOU payments under the guise of legitimate exports/imports.[92]

---

[89] CBI Charge Sheet ¶ 26.
[90] *See, e.g.,* CBI Charge Sheet ¶¶ 21, 35.
[91] CBI Charge Sheet ¶ 36.
[92] ED Complaint ¶ 4.7.

The CBI has stated that over the course of seven years, PNB issued approximately $4 billion worth of fraudulently obtained LOUs. According to the charges, Modi used more recently issued LOUs to repay previous LOUs issued up to one year prior: Instead of using the LOU funds to pay overseas suppliers, the money was partially used to repay the receiving banks to which the old LOUs were originally presented.[93] The result was that Modi and his co-conspirators enjoyed the use of the money issued under each LOU and the extended payment terms that were granted.[94]

For example, the CBI has charged that an LOU issued on February 10, 2017 on behalf of Solar Exports was presented to the Hong Kong branch of Allahabad Bank for payment to exporters Auragems Company Ltd., Sunshine Gems Ltd, and Pacific Diamonds FZE. Although each of these entities was represented to be an independent third party exporter, the CBI alleges that each of them was in fact an entity connected to Modi. The funds that were supposed to pay the "exporters" were allegedly diverted to four accounts at Allahabad Bank and applied to four outstanding LOUs.[95] The first payment of approximately $2.7 million repaid an LOU dated April 11, 2016; the second payment of $1.4 million repaid an LOU dated April 7, 2016; the third payment of $1.4 million repaid an LOU dated April 6, 2016; and the final payment of $1.3 million repaid an LOU dated April 2, 2016.

The chart below represents an example of an allegedly fraudulent LOU transaction and the fraudulent repayment of the LOU.

---

[93] ED Complaint ¶ 3.1.8.
[94] *Id.*
[95] CBI Charge Sheet, ¶ 48.



As of the date of this report, approximately 150 LOUs remain outstanding and unpaid.  At an exchange rate of 64 Indian Rupees to one US Dollar, these unpaid LOUs approximate $1 billion.[96]

## V.   DEBTORS' STRUCTURE AND REPORTED BUSINESS

The Debtors all primarily operate as wholesalers of finished gold and diamond jewelry out of one office at 592 5th Avenue in New York.[97]  Until February 2013, the Debtors operated out of 154 West 14th Street.[98]  Each of the Debtors is a subsidiary of entities that are ultimately owned and managed by Modi in India.

### A.   Modi and Debtors' Origins

Modi began his business by operating a diamond trading company in India during 1999 or 2000 under the name Diamonds 'R' Us.[99]  At that time, the company's main customers included U.S. jewelry manufacturers that created finished pieces of jewelry for U.S. retailers.[100]  The company distinguished itself from other diamond businesses by seeking to supply loose diamonds and gems specifically purposed for customers' final, assembled products as opposed to supplying large, loose-stone parcels.[101]  This manner of supply was designed to eliminate customers' residual inventory and return of diamonds.

Diamonds 'R' Us was renamed Firestone International Private Limited in 2004, then Firestar International Private Limited, and was eventually renamed Firestar International Limited ("Firestar India"), the ultimate holding company of all the Firestar entities.[102]

---

[96] ED Complaint ¶ 2.3.
[97] FD International operated out of a separate office in New York.
[98] Email exchange between Ajay Gandhi and customers, dated August 6, 2015 (FIRE-REL0000286102).
[99] Firestar business write up dated November 17, 2017 (FIRE-REL0000393692.0001).
[100] Draft Firestar promotional materials, undated (FIRE-REL0002671869.0002).
[101] Id.
[102] The corporate name changed frequently between 2006 and 2011.  To avoid confusion, the term "Firestar India," includes the antecedent corporate names of Firestar International Limited.as well as all affiliates located in India.

Over time, Firestar India and its subsidiaries expanded their business to include jewelry manufacturing and product design. They developed rough and polished-diamond trading businesses in Dubai, Antwerp, Armenia, and Hong Kong and diamond cutting and polishing businesses in Surat, Johannesburg, and Moscow. Firestar India also maintained manufacturing facilities in Dubai and throughout India. In 2010, Modi entered the luxury retail business and started to sell his own high-end finished jewelry. He became a well-known designer whose designs were worn by celebrities such as Kate Winslet, Amy Adams and Priyanka Chopra. Modi sold these specialty pieces at well-known auction houses such as Sotheby's and Christies, and due to the success of these auctions, opened retail stores in India, the U.S., London, Hong Kong, Paris, Macau, and Beijing, each held in its own corporate entity under the Hong Kong holding company, Nirav Modi Limited.

While Firestar India was steadily growing across the world, Modi made inroads in the U.S. through several acquisitions starting in 2005, using another Hong Kong holding company, Firestar Holdings Limited ("FHL"). Modi used wholly-owned subsidiaries of FHL, Synergies Corporation and Firestar Group Inc., which he controlled, to make the U.S. acquisitions that ultimately resulted in the ownership of the Debtors: FDI, FI, and A. Jaffe.

Modi actively oversaw the establishment of the Debtors and controlled their day-to-day operations until at least 2012. He appears to have been responsible for implementing their procedures and operational processes. Subsequently, Modi became focused on his retail brand rather than the Debtors, and delegated operational responsibility to Bhansali. Modi became focused again on the Debtors in approximately 2015 in connection with the Debtors' restructuring.

The Examiner found numerous emails in which Modi directed the Debtors to make payments to the Shadow Entities and other Firestar affiliates. It appears that Modi was the ultimate

34

authority for the Debtors.

### B.  Firestar Diamond, Inc.

In 2005, Firestar India acquired one of its U.S. customers, Frederick Goldman, Inc., which ultimately became FDI.[103]  FDI was incorporated in 2004 under the name Jewelry Solutions International, Inc.,[104] which name was changed to Next Diamond, Inc., then to Firestone, Inc.[105] and finally to FDI in 2011.[106]  Mihir Bhansali was the sole director and chief executive officer of FDI until 2018.[107]  FDI averaged approximately $63 million in reported sales per year.[108]

FDI operates as a distributor and wholesaler of finished gold and diamond jewelry.[109]  Its customer base consists of traditional jewelry retailers including Zales, JC Penny, and Macy's.[110]  Although FDI deals in loose diamonds, it does so to create finished pieces of jewelry.  Transactions for these purposes are limited to specific stones identified as needed for a particular jewelry item.  As part of its business model, FDI does not purchase or sell fancy colored loose diamonds in bulk.[111]

Most of the manufacturing and sourcing of gems used by FDI occurs in India and Belgium at the parent Firestar entities, which also set the price of the finished jewelry sold to the U.S. Debtors.[112]  A Firestar non-U.S. affiliate supplied approximately 70% to 80% of FDI's finished jewelry.[113]  CEO and President Bhansali worked with the sourcing team in India to manage

---

[103] *Id.*
[104] Certificate of Incorporation, Jewelry Solutions International, Inc., February 3, 2004.
[105] Certificate of Amendment of Application for Authority of Next Diamond, Inc., March 23, 2007.
[106] Certificate of Amendment of Application for Authority of Firestone, Inc., March 29, 2011. Throughout the report, the Examiner references "sales" and "sales journals."  Those references are to the Debtors' gross sales.
[107] Unanimous Written Consent of the Board of Directors of Firestar Group, Inc., July 1, 2013.
[108] *See* FDI sales journal for 2011-2017.
[109] Israel Discount Bank of New York, Credit Memorandum, February 23, 2018 (ExaminerIDB00000620).
[110] *Id.;* Interview of Ajay Gandhi, May 17, 2018.
[111] Interview of Rebecca Chow, June 1, 2018.  Fancy colored diamonds are rare diamonds that present with colors not on the normal colorless to light yellow spectrum.  They range from darker yellow to blue, pink, and purple, and their price can range in the high thousands of dollars per carat.
[112] Israel Discount Bank of New York, Credit Memorandum, February 23, 2018 (ExaminerIDB00000620).
[113] *See* First Day Declaration ¶ 37.

pricing.[114]   Thus, he had full visibility into the Indian operations and their influence on FDI.
Bhansali controlled the prices for both the internal sale of jewelry from Firestar India to FDI and
the final sale to the ultimate customer.[115]

### C.    Fantasy Inc.

In 2011 or 2012, Chicago-based Fantasy Diamond Corp. selected FDI to be its exclusive
licensee to supply the Endless Diamond Brand to U.S. retailers.[116]   In August 2012, FI was
incorporated under the laws of Delaware as a wholly-owned subsidiary of FDI to handle the sales
of Endless Diamond jewelry.[117]   Until 2018, Mihir Bhansali was the sole director of FI and Ajay
Gandhi was its CFO.[118]

FI was created primarily to acquire business from Costco Wholesale Corporation based on
sales attributable to the Endless Diamond Brand.[119]   Other customers include Zales, Sam's Club,
and Walmart.   According to the CFO, FI was formed as a separate entity specifically to create a
separate vendor number, because the name "Fantasy" generates additional business.[120]   The
operations of FI were otherwise substantially the same as FDI.   FI sold finished jewelry ranging in
value from moderately priced items up to $30,000, generally at a higher price point than FDI.[121]
Like FDI, the majority of FI's jewelry was manufactured in India or partially manufactured in
India and sent to the U.S. where the diamonds were set in the jewelry.[122]   FI bought loose diamonds
from various entities to use in its own finished jewelry products,[123] for which it totaled

---

[114] Interview of Ajay Gandhi, May 17, 2018.
[115] Interview of Sumay Bhansali, May 17, 2018.
[116] Israel Discount Bank of New York, Credit Memorandum, November 26, 2014 (ExaminerIDB00000381).
[117] Certificate of Incorporation, Fantasy, Inc., August 13, 2012.
[118] Unanimous Written Consent of the Board of Directors of Firestar Diamond, Inc., July 1, 2013.
[119] Interview of Ajay Gandhi, July 19, 2018.
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.*

approximately $24 – 27 million in reported sales, in fiscal years 2015, 2016 and 2017.[124]

FDI and FI received the vast majority of their inventory from Firestar's Indian factories. These factories sent finished jewelry, semi-finished jewelry and loose diamonds.[125] Whether a piece of jewelry should be finished in India or should be semi-finished and have diamonds set in the U.S. was decided by the sourcing team in India, whose decision was largely driven by the cost of import duties.[126]

### D.   A. Jaffe

In 2007, Firestar India purchased a 95% stake in New York-based Sandberg & Sikorski (S&S).[127] S&S was founded in 1892 and had two divisions, one that sold to major US retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers.[128] A. Jaffe was originally incorporated as Sandberg & Sikorski Diamond, a New York corporation, in 1975[129] and changed its name to Sandberg & Sikorski Corporation in 1995.[130] S&S changed its name to A. Jaffe in 2011[131] and was fully integrated into Firestar India in fiscal year 2016.[132] While Synergies Corporation owned 95% of A. Jaffe, Samuel Sandberg retained an approximate 5% ownership in A. Jaffe when Firestar India acquired it. A. Jaffe has no bank loan, and therefore is the only Debtor entity that is not audited.[133] Mihir Bhansali was A. Jaffe's director, Sumay Bhansali was its CEO, Ajay Gandhi was its CFO and its Creative Director was Samuel

---

[124] Fantasy, Inc. tax returns for fiscal years 2015, 2016 and 2017.
[125] Interview of Ajay Gandhi, July 19, 2018.
[126] *Id.*
[127] Interview of Samuel Sandberg, May 7, 2018.
[128] *Id.*
[129] Certificate of Incorporation, Sandberg & Sikorski Diamond Corporation, July 14, 1975.
[130] Certificate of Amendment of Application for Authority of Sandberg & Sikorski Diamond Corporation, November 3, 1995.
[131] Certificate of Amendment of Application for Authority of Sandberg & Sikorski Corporation, April 20, 2011.
[132] Firestar business write up dated November 17, 2017 (FIRE-REL0000393692.0001).
[133] However, in the years prior to the filing of the petition, A. Jaffe attempted to secure financing for. Email from Sumay Bhansali to Samuel Sandberg, Ajay Gandhi and Mihir Bhansali, dated December 6, 2017 (FIRE-REL0000392461).

Sandberg.

A. Jaffe's only business is to manufacture and sell finished bridal jewelry to independent retailers. While it purchases diamonds for use in particular pieces of jewelry, it generally does not keep diamonds in inventory or sell loose diamonds. It therefore had no business reason to purchase or sell bulk loose diamonds prior to losing its supplier, Firestar India, in early 2018.[134] When Firestar India first acquired A. Jaffe, the business struggled and only had approximately $6 to $7 million in sales per year and was not profitable/losing money. However, the past three years have seen growth and A. Jaffe had approximately $20 million in sales each of the past two years.[135]

Operating in a "made-to-order" model, Firestar India's factories in India predominantly supplied A. Jaffe with finished jewelry on a piece-by-piece basis. Bhansali and the team in India would set the price of the finished jewelry between Firestar India and A. Jaffe and between A. Jaffe and the ultimate customer. When a customer placed an order, it did so through the customer service email address or by telephone. Customer service then processed the order and entered it into the system. Thereafter, the sourcing department in India determined which Firestar factory would manufacture the order. The sourcing department also created a sales order for the purchase of the finished jewelry by A. Jaffe from the factory and another form for the customer's purchase of the final product.[136]

### E.   Debtors' Capital Structure

As of the Petition Date, FDI and FI were co-borrowers under a co-lending facility with IDB and HSBC (together, the "Lenders") in the aggregate amount of $28,000,000 (the "Credit Facility").[137] The Credit Facility consists of two individual revolving credit facilities, one issued

---

[134] Interview of Sumay Bhansali, May 24, 2018; Interview of Bankim Mehta, June 6, 2018.
[135] Interview of Sumay Bhansali, May 24, 2018; *see also* A. Jaffe sales journal 2016 – 2017.
[136] Interview of Evelyn Kosiec, May 29, 2018.
[137] First Day Declaration at 5; *see also* Motion of Debtors Firestar Diamond, Inc. and Fantasy, Inc. for Entry of Interim and Final Orders (I) Authorizing Debtors Firestar Diamond, Inc. and Fantasy, Inc.'s Use of Cash Collateral, (II)

by IDB (the "IDB Credit Facility"), in the maximum principal amount of $12,000,000, and the other by HSBC (the "HSBC Credit Facility") in the maximum principal amount of $16,000,000.[138] Each facility is secured by senior pre-petition liens in substantially all of FDI's and FI's assets, including their respective inventory and accounts receivables, as more specifically defined in the operative loan documents.[139]

The IDB Credit Facility is governed by a Line Letter, dated October 11, 2013, as amended from time to time, which had amended and replaced earlier Line Letters, dated December 13, 2012, and September 4, 2008 (collectively, the "IDB Loan Documents").[140] The IDB Credit Facility is guaranteed by Modi, FGI and FIL.[141]

The HSBC Credit Facility is governed by an Amended and Restated Loan Agreement, dated as of September 4, 2008, as amended from time to time, which had amended and replaced an earlier Loan Agreement, dated September 5, 2007 (collectively, the "HSBC Loan Documents" and together with the IDB Loan Documents, the "Loan Documents").[142] The HSBC Credit Facility is guaranteed by Modi, FGI and FIL.[143]

A. Jaffe is neither a borrower nor guarantor under the credit facilities.[144] As of the Petition

---

Granting Adequate Protection Claims and Liens, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, And (V) Granting Related Relief (ECF No. 13).

[138] First Day Declaration at 5.

[139] *Id*. at 5-6.

[140] First Day Declaration at 5; *see also* IDB Line Letter for $12,000,000 Line of Credit, dated October 11, 2013 (ExaminerIDB00001355).

[141] First Day Declaration at 6; *see also* IDB Line Letter for $12,000,000 Line of Credit, dated October 11, 2013 (ExaminerIDB00001355); Guaranty of Firestar Group, Inc., dated October 11, 2013 (ExaminerIDB00001164); Guaranty of Firestar International Private Ltd., dated March 24, 2016 (ExaminerIDB00001076); Guaranty of Nirav Modi, dated March 24, 2016 (ExaminerIDB00001587).

[142] First Day Declaration at 6; *see also* Amended and Restated Loan Agreement, dated September 4, 2008 (HBUS0005341- HBUS0005396).

[143] *See* Amended and Restated Guaranty Agreement of Nirav Modi, dated September 4, 2008 (HBUS0005425); Guaranty Agreement of Firestone International Private Ltd., dated February 23, 2011 (HBUS0005596); Amended and Restated Guaranty of Firestar Group, Inc., dated March 17, 2016 (HBUS0005845).

[144] First Day Declaration at 7.

39

Date, A. Jaffe had no secured debt.[145] Although A. Jaffe and IDB explored the possibility of

funding A. Jaffe's operations post-petition, that arrangement never materialized.[146]

The Lenders are parties to an Amended and Restated Intercreditor Agreement, dated March

22, 2013, as subsequently amended by the First Amendment to Amended and Restated

Intercreditor Agreement, dated October 17, 2013, relating to their relative priorities against FDI's

and FI's assets.[147]

### F.     Non-debtor US parents and affiliates

### 1.     Firestar Diamond International, Inc.

FD International, incorporated in the state of Delaware in June 2011, is a non-debtor U.S.

affiliate whose business was to trade in high-end loose diamonds.[148]  On an annual basis, it traded

inventory valued between $6 and $10 million.  Bhansali was the sole director of FD International.

The company's financials were consolidated with a Firestar entity in Hong Kong that also traded

diamonds and reported to Firestar India.  FD International operated separately from the Debtors

and had its own offices and bank accounts.  Ajay Gandhi served as the CFO for this company as

well as for the Debtors.

Modi recruited Joshua Weinman in 2010 to operate this business as he was well-versed in

the diamond trading market.[149] Weinman reported directly to Modi, meaning that Modi ultimately

controlled FD International.  Weinman's duties consisted of purchasing and trading large white

---

[145] *Id.*

[146] Interview of Sumay Bhansali, May 24, 2018.

[147] *See* Amended and Restated Intercreditor Agreement, dated March 22, 2013 (HBUS0005743); First Amendment to Amended and Restated Intercreditor Agreement, dated October 17, 2013 (HBUS0006283). Standard Chartered Bank ("SCB") was a party to the Amended and Restated Intercreditor Agreement. In 2011, SCB had extended a line of credit to FDI and FI. In connection with the First Amendment to Amended and Restated Intercreditor Agreement, IDB advanced sufficient funds to FDI and FI to pay off the indebtedness to SCB, which effectively terminated SCB's credit facility. (*See* Israel Discount Bank of New York Credit Memoranda dated, November 13, 2012 and November 26, 2014 (ExaminerIDB00000250, ExaminerIDB00000381)).

[148] Firestar Diamond International, Inc. Delaware Certificate of Incorporation, dated June 8, 2011 (FIRE-REL0000112034.0003).

[149] Interview of Joshua Weinman, July 17, 2018.

diamonds and fancy-colored diamonds[150] ranging in value from approximately $10,000 to well in excess of $200,000 in value. The company would buy these loose diamonds opportunistically if specific customers requested a particular diamond or if FD International identified a particular diamond that might appeal to a customer.[151] It also traded Modi's diamonds from time to time.[152] The company usually tried to turn inventory in 90 days by trading the diamonds and capitalizing on the changes in worldwide value. Weinman indicated that to the extent any of the U.S. Firestar companies purchased or sold loose fancy-colored diamonds for profit, as opposed to for the purpose of selling manufactured jewelry, he would have expected these transactions to have been performed with his involvement or through FD International.[153] Moreover, he stated he is generally familiar with the companies that would trade in diamonds at this level and volume, and that he was unfamiliar with the Shadow Entities.[154]

## 2.    Firestar Group, Inc. and Synergies Corporation

Firestar Group, Inc. ("FGI") is the parent company of FDI and FI. It was incorporated under the laws of Delaware on May 1, 2008[155] and is owned by Firestar International Private Limited. Mihir Bhansali was its director and Ajay Gandhi was its CFO.[156] Its sole purpose is to act as a holding company for FDI and FI. FGI also held real estate assets through a wholly-owned entity called Central Park Real Estate LLC ("CPRE"), which held and made monthly payments on a corporate apartment located at the Essex House, 160 Central Park South, New York, NY 10019, which was reportedly used exclusively by Modi and his family as Modi's primary U.S. residence. As discussed below, in January 2018, FGI sold CPRE.

---

[150] Interview of Bankim Mehta, June 6, 2018.
[151] Interview of Josh Weinman, July 17, 2018.
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] Draft Firestar promotional materials, undated (FIRE-REL0002671869.0002).
[156] Unanimous Written Consent of the Board of Directors of Firestar Gioup, Inc., July 1, 2013.

41

By 2016, Modi had met with investment bankers to assess a potential global initial public offering for all of the Firestar related companies.  In discussions with the investment bankers and his accounting consultants, Modi was advised to reorganize his ownership structure.  Specifically, he was advised that the U.S. entities should be held by a Hong Kong entity rather than an Indian entity.[157]  Accordingly, in 2017, Firestar India sold FGI's stock to Synergies Corporation for $3,694,000, making Synergies Corporation the parent company to A. Jaffe and FGI.[158]

As noted above, Synergies owns the 95% of A. Jaffe that was not retained by its original founder.[159]  Synergies was incorporated under the laws of Delaware on February 9, 2007 and its sole purpose is to act as an investment holding company.[160]  Mihir Bhansali was the sole director of Synergies.[161]

FHL is the parent company of Synergies and is a wholly owned subsidiary of Firestar India.[162]  Modi's sister, Purvi Mehta, manages the Hong Kong operations of FHL.[163]

The organizational structure of the Firestar group of companies as of October 2012 is detailed below:

---

[157] Interview of Howard Hoff, August 2, 2018.

[158] Stock Purchase Agreement Between Firestar International Private Limited and Synergies Corporation, dated July 10, 2017 (FIRE-REL0002684253.0001).

[159] *Id.*

[160] Draft Firestar promotional materials, undated (FIRE-REL0002671869.0002). Initially, Firestar India owned Synergies; however, after Synergies suffered significant losses because of its ownership of A. Jaffe, Modi assumed ownership. Email between Ajay Gandhi and Mihir Bhansali, dated January 11, 2017 (FIRE-REL0000272604). Modi paid $14,575,000 to purchase Synergies, but this payment was classified as a loan. *Id.* Modi assigned the loan to Purvi Modi on April 1, 2012.  While Modi was seen as the owner of Synergies, Purvi Modi was the sole shareholder from 2011 to October 1, 2016 when she sold 10,000 shares to FHL for $100. *Id.*; Agreement for Purchases of Shares of Synergies Corporation, dated October 1, 2016 (FIRE-REL0000222643.0001).

[161] Unanimous Written Consent of the Board of Directors of Synergies Corporation, July 1, 2013.

[162] Interview of Ajay Gandhi, May 17, 2018; Email from Shyam Wadhwa to Ajay Gandhi, dated December 22, 2016 (FIRE-REL0000220570); Share Certificate for Synergies Corporation (FIRE-REL0000203266.0001).

[163] *Id.*



The company restructured in 2017.  The organizational structure of the Firestar group of companies as of January 2018 is below (debtors are in red):



## VI.    INVESTIGATIVE FINDINGS REGARDING DEBTORS' BUSINESS PRACTICES

The diamond industry is viewed as highly susceptible to fraud. Diamonds are internationally traded in high volumes through several hubs around the globe, including India, Belgium, Dubai, and China.[164] Because diamonds have high value, are difficult to trace, are easy to move and conceal, and are subjectively valued, diamonds are increasingly identified as attractive vehicles for money laundering and other fraudulent schemes.[165]

---

[164] *See* FINANCIAL ACTION TASK FORCE, *Money Laundering and Terrorist Financing Through Trade in Diamonds*, 32 (October 2013) https://www.mf.gov.pl/c/document_library/get_file?uuid=11c4814a-300f-4c26-a349-f6734a1ba79d&groupId=764034.
[165] *Id*. at 49-50.

The crux of the Alleged Fraudulent Circumstances involves Modi's alleged creation of sham import transactions to support requests for financing in the form of LOUs from PNB bank. These transactions allegedly involved the transfer of stones and money at Modi's direction and without any economic purpose, in order to create the appearance of import transactions to support the fraud.[166]  Indian authorities have alleged that these transactions took place between Firestone entities and certain Shadow Entities:  shell entities that posed as independent third parties, but were in fact entities created by the conspirators only "in order to facilitate layering and for laundering of funds so obtained fraudulently from PNB and to camouflage the real usage and identity of beneficiaries of the funds siphoned off [from PNB]."[167]   To ascertain the extent of the Debtors' involvement, if any, in this alleged fraud, the Examiner's team analyzed the Debtors' sales records, tax records, bank records and other financial and operating records for evidence of whether Debtors engaged in similar transactions.   Specifically, the Examiner analyzed information including whether and to what extent Debtors' transacted with Shadow Entities; whether these transactions appeared consistent with a legitimate business purpose, particularly the business purpose reported by Debtors; whether the transactions and the relationships among relevant parties were accurately and consistently reported; and whether the Debtors' books and records revealed other indicia of fraud.  As discussed below, the Examiner's investigation disclosed that the Debtors engaged in a large volume of suspect transactions with Shadow Entities that bear hallmarks of fraud.  The circumstances of these transactions are consistent with the allegations made by Indian authorities regarding the Alleged Fraudulent Circumstances.

---

[166] ED Complaint ¶ 3.1.10.
[167] *Id.*

**A.     Debtors Engaged in High Volume Transactions with Shadow Entities Identified in the Alleged Fraud**

Of the Shadow Entities identified by Indian authorities, the Examiner's investigation centered on those that conducted the highest volume transactions with the Debtors, as well as those identified by the CBI as having received the largest transfers of LOU money:

- Auragem Company Ltd,
- Brilliant Diamonds Ltd,
- Empire Gems FZE
- Eternal Diamonds Corporation Ltd,
- Fancy Creations Company Ltd,
- Pacific Diamonds FZE,
- Tri Color Gems FZE,
- Unique Diamond and Jewelry FZC,
- Universal Fine Jewelry FZE and
- Vista Jewelry RJE, World Diamond Distribution FZE

The Debtors engaged in substantial transactions with these entities; indeed, the Examiner flagged certain such transactions at the outset of his investigation because of the large dollar amount relative to the Debtors' sales.

According to their sales journals, during the seven year period between 2011 and 2017, FDI recorded $167,668,835 in total sales to Shadow Entities and A. Jaffe made $46,136,094 in total sales to these entities.[168] Combined, the total sales from FDI and A. Jaffe to Shadow Entities were $213,804,929. A breakdown of the sales recorded by each entity to each Shadow Entity during the relevant period is below:

---

[168] *See* FDI sales journal from 2011 – 2017; A. Jaffe sales journal from 2011-2017.

46

**A. Jaffe Sales Journal**

| Shadow Entity | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total Sales to Shadow Entity |
|---|---|---|---|---|---|---|---|---|
| Auragem Company LTD | | $ 1,018,737 | | | | | | $ 1,018,737 |
| Diamonds "R" Us | | 3,746,646 | | | | | | 3,746,646 |
| Empire Gems FZE | | 11,305,298 | $ 4,431,231 | | | | $ 11,000 | 15,747,529 |
| Eternal Diamonds Corp LTD | | | | | | $ 218,355 | | 218,355 |
| FANCY CREATIONS CO. LTD | | 1,333,777 | | | | | | 1,333,777 |
| Neeshal Merchandising Pvt LTD | 1,097,543 | | | | | | | 1,097,543 |
| Pacific Diamond FZE | | 350,316 | | 3,153,291 | | | | 3,503,607 |
| Radashir Jewelry Co. Pvt. LTD | 3,557 | 113,965 | (351) | | | | | 117,171 |
| Solar Exports | 2,200,743 | 4,227,609 | | | | | | 6,428,351 |
| Stellar Diamonds | 1,133,779 | 933,005 | | | | | | 2,066,784 |
| Tri Color Gems FZE | | | | | 1,914,721 | | | 1,914,721 |
| Unique Diamond & Jewellery FZC | | | 874,868 | | | | | 874,868 |
| Vista Jewelery FZE | | 1,637,834 | | | | $ 66,610 | | 1,704,444 |
| World Diamond Distribution FZE | | 4,908,740 | 1,454,821 | | | | | 6,363,562 |
| **Total** | **$ 4,435,621** | **$ 29,575,927** | **$ 6,760,569** | **$ 5,068,012** | **$ 66,610** | **$ 218,355** | **$ 11,000** | **$ 46,136,094** |

[1] Though the "Bill to" customer name is Stella, the "Invoice name" is Stellar, and this appears to be the Shadow Entity Stellar Diamonds. The two sales shown here are both loose diamond sales.

**Firestar Diamond, Inc. Sales Journal**

| Shadow Entity | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total Sales to Shadow Entity |
|---|---|---|---|---|---|---|---|---|
| Brilliant Diamonds LTD | $ 1,706,390 | $ 29,598 | | | | $ 1,168,390 | $ 2,602,481 | $ 5,506,858 |
| Diagem Inc. | | 138,676 | | | | | | 138,676 |
| Diamonds "R" Us | 18,612,061 | 2,064,845 | | | | | | 20,676,907 |
| Empire Gems FZE | | 4,184,984 | $ 3,019,406 | | | 1,014,951 | | 8,219,341 |
| Eternal Diamonds Corp LTD | 45,389 | 1,824,085 | | | | | | 1,869,473 |
| Fair Sino Trading LTD | 48,001 | | | | | | | 48,001 |
| Fancy Creations Co. LTD | 1,728,000 | 7,523,771 | | $ 1,545,775 | $ 1,800,880 | 1,180,231 | 1,031,353 | 14,810,010 |
| Neeshal Merchandising Pvt LTD | 14,803,219 | | 238,947 | | | | | 15,042,166 |
| Pacific Diamond FZE | | 9,341,440 | 4,909,795 | 1,768,433 | 2,967,209 | 296,659 | 1,152,857 | 20,436,394 |
| Radashir Jewelry Co. Pvt. LTD | 74,752 | | | | | | | 74,752 |
| Solar Exports | 11,072,809 | 2,931,077 | | | | | | 14,003,886 |
| Stellar Diamonds | 12,216,057 | 5,848,540 | | | | | | 18,064,597 |
| Tri Color Gems FZE | | 1,805,722 | | | | 2,353,401 | | 4,159,123 |
| Unique Diamond & Jewellery FZC | 17,123,002 | 4,149,213 | | 921,026 | 125,246 | 2,122,402 | 331,029 | 24,771,917 |
| Vista Jewelery FZE | | 1,599,574 | | | | 4,892,792 | | 6,492,366 |
| World Diamond Distribution FZE | | | 959,098 | 5,911,502 | | 2,585,648 | 3,898,118 | 13,354,366 |
| **Total** | **$ 77,429,679** | **$ 41,441,526** | **$ 9,127,246** | **$ 10,146,736** | **$ 4,893,335** | **$ 15,614,474** | **$ 9,015,838** | **$ 167,668,835** |

As discussed more fully below, while the Debtors' sales journals matched their shipping records, the Examiner was unable reconcile the volumes of sales reported in the sales reported in the sales journal with any of FDI's tax returns for the relevant period or with certain of A. Jaffe's tax returns.

**B.    Debtors Treated the Shadow Entities as Related Affiliates Internally While Accounting for Them as Independent "Customers" or "Vendors" For Transaction Purposes**

The Shadow Entities are textbook shell entities. They have minimal physical presence.

47

They are mostly registered at either small, unoccupied offices or at single, leased desks within shared offices. They share managers and directors with each other and with Firestar India. Furthermore, they have almost identical websites with similar backgrounds, fonts, contact pages, and language.[169] They are located in Special Economic Zones ("SEZ") and Free Trade Zones ("FTZ"), which are areas within a country that enjoy trade incentives, such as reductions in trade controls and enforcement, and whose reduced oversight makes them havens for fraudulent schemes and money launderers.[170]

The Examiner's investigation confirmed that these Shadow Entities were controlled by or affiliated with the Firestar Global Entities and the Debtors treated them as such. First, current or former Firestar India employees managed many of the Shadow Entities' operations. The following chart lists these entities and the former and current employees of Firestar, some of whom simultaneously managed these entities while working at Firestar India.[171]

| Shadow Entity | Firestar Employee & Manager of Shadow Entity |
|---|---|
| Auragem Company ltd (Hong Kong) | Divyesh Kumar, Naresh Gandhi, Sonu Mehta – Accountants at Firestar India |
| Brilliant Diamonds Ltd (Hong Kong) | Bhavik Jayesh Shah - Firestar India diamond sorter |
| World Diamond Distribution FZE (UAE) | Sandeep Mistry – Firestar India employee (position unknown) |
| Pacific Diamonds FZE (UAE) | Jinesh Shah – Firestar India employee (position unknown) |
| Eternal Diamonds Corporation Ltd (Hong Kong) | Ashish Bagaria – Data entry operator at Firestar India |
| Universal Fine Jewelry FZE (UAE) | Jubin Jose, Sonu Mehta, Satyendra Shukla – Jose worked in admin department at Firestar India |
| Tri Color Gems FZE (UAE) | Jinesh Shah – Firestar India employee (position unknown) |

---

[169] *See e.g.* http://www.empiregemsuae.com/about_us.html;
http://www.worlddiamonddistribution.com/about_us.html,; http://universalfinejewelry.com;
http://www.vistajewellery.com/ourvision.html.
[170] *See* FINANCIAL ACTION TASK FORCE, *Money Laundering Vulnerabilities of Free Trade Zones*, 4 (March 2010) http://www.fatf-gafi.org/media/fatf/documents/reports/ML%20vulnerabilities%20of%20Free%20Trade%20Zones.pdf.
[171] ED Complaint ¶ 3.1.7.; ROI-MCA-00000433

| Fancy Creations Company Ltd (Hong Kong) | Nilesh Valjibha Khetani – Data entry operator at Firestar related party |
|---|---|
| Unique Diamond and Jewelry FZC (UAE) | Jayesh Doshi, Sheedhar Mayekar, Chetan Chauhan – Firestar India employee (position unknown) |
| Vista Jewelry RJE (UAE) | Netaji Mohite, Ashish Lad – Firestar India employee (position unknown) |
| Empire Gems FZE (UAE) | Rushabh Jethwa – Firestar India employee (position unknown) |

Second, the Examiner's review of email correspondence and other documents prepared by various parties within the Modi Firms confirmed that these entities were affiliated with either the Modi Firms or Modi himself, and that Debtors were aware of this affiliation.

In an email dated August 6, 2013, Ajay Gandhi, the CFO of the Debtors sent an email to Bhavesh Patel, a Firestar back-office employee in India, attaching a spreadsheet titled "FS-Inc from Kurian June 2013."[172]  The spreadsheet contained purchase and sales ledgers of Fancy Creations Company Limited, Brilliant Diamonds Limited, Eternal Diamond Limited and Unique Diamond & Jewelry showing these entities accounting for transactions with FDI.[173]  The Examiner's team traced and agreed purchases, sales and cash movement from the ledgers to FDI's purchase and sales journals and bank statements, confirming that these ledgers in fact represent records of the Shadow Entities and reflect the relevant transactions from their perspective.  Gandhi not only had possession of a supposed third party's books, but he had access to four sets of books for supposed third parties all compiled in one spreadsheet.

Tellingly, Mihir Bhansali, the CEO of FDI and director of the Debtors, was in possession of a spreadsheet entitled "AR-AP (Jan'18)" with a document date in early February 2018 identifying payables and receivables as between each of the Modi Firms, the Firestar entities and

---

[172] Email from Ajay Gandhi to Bhavesh Patel, dated August 6, 2013 (FIRE-REL0000102654; FIRE-REL0000102654.0001).

[173] Attachment to email from Ajay Gandhi to Bhavesh Patel titled "FS-Inc from Kurian June 2013," dated August 6, 2013 (FIRE-REL0000102654.00001).

the Shadow Entities in "HK" (Hong Kong) and "DXB" (Dubai).[174]  The Modi Firms and the Firestar entities were listed on the horizontal axis and the Shadow Entities on the vertical axis. Solar [Exports], Stellar [Diamonds], and DRUS [Diamonds 'R' Us], the Modi Firms, were grouped on the same axis as the Firestar entities.[175]  One of the Firestar entities is labeled "FS INC." The Examiner team performed targeted searches of the "Payables" and "Receivables" listed under this Firestar entity, and reconciled six out of the nine amounts listed to underlying accounts receivable and accounts payable amounts of various Firestar U.S. entities with Shadow Entities around the January-February 2018 timeframe.[176]  While it shows one snapshot in time, the spreadsheet appears to show many millions in accounts receivable and accounts payable balances between the Shadow Entities and Firestar entities being tracked.  The Examiner found this spreadsheet significant in that it listed no customers known to be legitimate, foreign or otherwise, but only Shadow Entities. The spreadsheet also contains a column identifying many Shadow Entity employees that were current or former Firestar employees.[177]

In an email dated March 1, 2013, Shyam Wadhwa[178] sent Ajay Gandhi a spreadsheet containing reconciliations between various Shadow Entities' books, referred to as vendors or customers, and FDI and FD International's books.[179]  The spreadsheet was categorized into four categories: 1) matching "vendor" and Firestar books; 2) old balances that did not match up; 3) "correction entries required in NY books as well as Customer Vendor books;" and 4) "Purchase

---

[174] Spreadsheet titled "AR-AP (Jan '18)" (FIRE-REL0001797347).

[175] *Id*.

[176] Spreadsheet titled "AR Ageing Report" dated February 12, 2018 (FIRE-REL0000410560.001); Email from Ajay Gandhi to accounts@fancycreations.hk, dated February 3, 2018 (FIRE-REL0000290860); House Airway Bill and Firestar Jewelry, Inc. Invoice to Fancy Creations Co. Ltd. (FIRE-REL0000258366.001), House Airway Bill and Firestar Jewelry, Inc. dated July 8, 2016 (FIRE-REL0000258366.002).

[177] *See* ED Complaint ¶ 3.1.7.

[178] Shyam Wadwha was charged by the Indian Authorities and was described as a key person who got directives from Bhansali (ROI-MCA-00000434).  Wadwha admitted to the Indian authorities that he placed many Firestar employees in jobs with the Shadow Entities (ROI-MCA-00000439).

[179] Email from Shyam Wadwha to Ajay Gandhi, dated March 1, 2013 (FIRE-REL0000068259).

Invoice values to be Reconciled with Physical Vendor Invoices."[180]  In the "action required" column, there were notes relating to the books of the Shadow Entities such as "Remittance from Aura[gem] on behalf of Pacific [Diamonds] accounted by Aura as paid on its account instead of Pacific."[181]

Correspondence suggests that these entities were under the shared control of the Firestar Global Entities. Like entities within the Firestar organizational structure, the accounts payable for one entity appear to have been available to clear the accounts receivable of another entity, as needed to satisfy inquiries by auditors or banks.  The Debtors' President and CFO appear to have referred to such practices as "pruning the AR" and "the around the horn." [182]  At the same time, the Debtors described the Shadow Entities as independent customers or vendors, treating what was essentially internal circulation of funds as legitimate third party business.

For example, in an email dated June 8, 2012, Ajay Gandhi asked Bhavesh Patel and Shyam Wadwha, two Firestar employees, for "payables to HK and Dubai – all the companies. Firestar, Firestar Diamond Int'l and Jaffe." because he "need[ed] to pay $1 m to HK or Dubai hence need name and amounts only."[183]  Bhavesh Patel replied "There is nothing open with Dubai however HK open payable is attached herewith." Gandhi responded "It could be Pacific, World Diamond etc too."[184]  The email documents that Gandhi's goal was to send $1 million from the Debtors or FD International to Hong Kong or Dubai, and that he considered the Shadow Entities (and transactions with them) as fungible sources to legitimize such a payment.

---

[180] Attachment to email from Shyam Wadwha to Ajay Gandhi titled "NY balance comparison of select vendors / customer as of 15th Feb '13" dated February 13, 2013 (FIRE-REL0000068259.00001).
[181] *Id.*
[182] Email from Kurian Matthews to Ajay Gandhi, dated November 4, 2013 ("Kindly let me know whether there is any payable from Firestar NY to Fantasy in order enable us to do the **around the horn** to clear outstanding in our books." (emphasis added) ((FIRE-REL0000099797)).  *See also* email chain between Ajay Gandhi and Shyam Wadwha, dated October 1, 2013 ("Plan to prune the AR/AP of NY books") (FIRE-REL0000100701).
[183] Email chain between Ajay Gandhi and Bhavesh Patel, dated June 8, 2012 (FIRE-REL0000111796).
[184] *Id.*

Firestar employees also directed payment of certain of the Shadow Entities' back office expenses by the Debtors—a very unlikely practice among unaffiliated entities. For example, on March 18, 2014, Ajay Gandhi requested that $150,000 be wired from FDI's account to Unique for the payment of back office expenses for the period of October 2013 to March 2014.[185] The Examiner identified a $150,000 disbursement from FDI to Unique on the same day. In October 2010, Gandhi wired $220,000 for Unique's back office expenses.[186] On October 24, 2013 a wire was sent from Synergies to Brilliant for $125,000 for "back office expenses."[187] Both Unique and Brilliant were reported on the Debtors' books to be customers of the Debtors.[188]

Critically, although the Debtors' CFO Ajay Gandhi engaged in regular correspondence with these entities over a period of at least seven years, he refused in multiple interviews to acknowledge that he was familiar with them beyond their status as customers of the Debtors.[189] When confronted with his emails Gandhi stated he could not remember these correspondences, a denial that was not credible given his general level of recall, or that he authorized the payment of back office expenses of such entities, or held copies of their internal books. In other conversations with the Examiner, Gandhi recalled that many of the Shadow Entities were "clients of Mihir" Bhansali.[190] After engaging counsel, Gandhi provided statements that he had no knowledge as to the legitimacy or relatedness of these Shadow Entities – including those entities that he has previously represented to auditors and banks as related parties.[191] The Examiner's investigation

---

[185] Email chain from Ajay Gandhi to Bhavesh Patel, copying Hemant Bhatt, dated March 18, 2014 (FIRE-REL0000152658).

[186] Email chain between Ajay Gandhi, Hemant Bhatt and Bhavesh Patel, dated April 15, 2010 (FIRE-REL0000073216).

[187] Email chain between Ajay Gandhi and Bhavesh Patel, dated October 24, 2013 (FIRE-REL0000060554).

[188] Both shadow entities appear in the A. Jaffee Customer-Vendors listing ("AX_AJAFFE_CUSTOMERS-VENDORS.xlsx") and the Firestar Diamond Inc. customer listing ("NAV_NDI_CUSTOMERS.xlsx").

[189] Interview of Ajay Gandhi, May 17, 2018.

[190] *Id*.

[191] Interview of Ajay Gandhi, dated July 19, 2018.

with respect to the most utilized Shadow Entities are summarized below.

### (a) "Shadow Entities" Registered in the United Arab Emirates ("UAE")

The UAE Shadow Entities are EZ companies.  All are single shareholder entities except for Unique Diamond and Jewelry FZC, which has multiple shareholders.  The Examiner reviewed each companies' registrations and conducted site visits to obtain evidence relevant to whether these entities were shell entities controlled or affiliated with Modi and Firestar.

### i.   Universal Fine Jewelry FZE ("Universal Fine")

Universal Fine was incorporated in 2010 and is located at Suite #Q1-05-068/A, Saif Zone, Sharjah, UAE.  The Universal Fine office consists of a single desk space in a two-floor building. The site visit revealed that Apollo Energy FZE occupies the office listed for Universal Fine.  It was locked, and the investigators learned from the EZ licensing department that Universal Fine ceased operations in May 2018.  According to PNB's financial advisor BDO (India) LLP and as listed in the accounts receivable and accounts payable analysis in possession of Bhansali, Jubin Jose Varghese is Universal's sole shareholder[192] and a 2016 document created by a Firestar employee identifies Jubin Jose as Universal's owner. [193]   In a 2012 Firestar document drafted to analyze salary increases, "Jubin Jose" was listed as a Firestar Employee.[194]

Similarly, another manager of Universal, according to a public records search performed by the Examiner's team, was Satyendra Shukla.  Shukla sent an email to Mihir Bhansali on August 19, 2017, enclosing a profile of three Shadow Entities, Universal, Empire and Diagems, and asking Bhansali to "review and advice [sic]."  Shukla's email signature indicated he was the General Manager of Firestar Diamond in Dubai.[195]

---

[192] Spreadsheet titled "AR-AP (Jan '18)" (FIRE-REL0001797347).
[193] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).
[194] Spreadsheet titled "Dubai Increment," dated 2012 (FIRE-REL0002648082.0001).
[195] Email from Satyendra Shukla to Mihir Bhansali, dated August 19, 2017 (FIRE-REL0000399723); Attachment to

Internal documents indicate that Modi's partners exercised control over both Universal and A. Jaffe.  For example, on February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, a New York entity with connections to the Modi family,[196] wrote to Bhansali and Modi Firm partner Hemant Bhatt using personal email addresses.  Krishman told Bhatt and Bhansali "you should expect 1.4 million in Universal fze today.  Please wire the same to A Jaffe."[197] Two days later, Bhatt confirmed that Universal had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."[198]  "Empire" appears to be a reference to Empire Gems, another mann on whose behalf Bhatt corresponded.  A. Jaffe, Universal and Empire Gems appear to be treated as interchangeable sources through which funds for the benefit of Modi and his entities were transacted.

Photographs of the Universal Fine offices are below:





Figure 13: Photo of Universal Fine Jewelry FZE registered office door taken at 1:40 PM on 19th of June 2018.

Figure 14: Photo of Universal Fine Jewelry FZE registered office board label in the ground floor taken at 1:36 PM on 19th of June 2018.

### ii.      Empire Gems FZE ("Empire Gems")

Empire Gems commenced operations in 2010 and is registered at Executive Desk Q1-05-

---

email from Satyendra Shukla to Mihir Bhansali, dated August 19, 2017 (FIRE-REL0000399723.0001).

[196] SDC Designs was not the subject of the Examiner's investigation and the Examiner has drawn no inferences or conclusions about that entity.

[197] Email chain between Mihir Bhansali, Sridhar Krishnan and Hemant Bhatt, dated February 4, 2013 (FIRE-REL0000069235).

[198] *Id.*

010-B, Suite Q1-05-010/B, Saif Zone, Sharjah, UAE.  This address is for a desk in a two-floor building.  Leasing such a desk in this EZ permits the lease-holder two visas.[199]

Signage on site indicated another company named Medrect International FZE occupied the office but referred visitors to Rushabh Jethwa,[200] the listed managing director of Empire Gems and, as of 2011, a Firestar Diamond (Dubai) "Executive."[201]  Jethwa was an authorized signatory of the Firestar Diamond (Dubai) HSBC account.[202]  In 2012, Ajay Gandhi, informed the Debtors' auditors, Marks Paneth LLP, that the email for the authorized contact person for Empire Gems was Rushabh@empiregemsuae.com, presumably Rushabh Jethwa's email address.[203]  At the time, Jethwa was also a Firestar employee in Dubai.[204]

The licensing department of the EZ told the A&M investigators that Empire Gems was closed by request as of May 2018.

On February 11, 2015 Rebecca Chow, an A. Jaffe employee, emailed Sandeep Mistry, a Firestar employee and director of World Diamond that "[r] ecently (end of Jan, 2015) NY made two shipment, one to EMPIRE GEMS FZE and the other to PACIFIC DIAMOND FZE. Please arrange to have goods ship to Belgium for Samir."[205]  This email suggests that Firestar employees had control over, and could determine the fate of, diamonds that had been sent to Empire and Pacific.  On November 6, 2017, Evelyn Kosiec told Mehul Doshii, another Firestar employee, to remove Empire Gems from a list of vendor performance because Empire was not actually a

---

[199]*See* http://www.sreebusinessconsultants.com/saif-free-zone-cost-calculator.html.

[200] Rushabh Jethwa was listed as the contact person for Empire Gems in a chart in the possession of Mihir Bhansali. Spreadsheet titled "AR-AP (Jan '18)" (FIRE-REL0001797347).

[201] Spreadsheet titled "Salary ranges in Dubai (Collated from Internet Sources)," undated (FIRE-REL0002640832.0001).

[202] Email from Kurian Mathews to Mihir Bhansali, dated August 20, 2011 (FIRE-REL0002641288).

[203] Email from Ajay Gandhi to Jessica Belnavis, dated May 1, 2012 (FIRE-REL0000112794).

[204] Attachment to email from Jennifer D'souza to Mihir Bhansali, dated May 30, 2012 (FIRE-REL0002646426); Spreadsheet titled "CVs online" attached to email from Jennifer D'souza to Mihir Bhansali, dated May 30, 2012 (FIRE-REL0002646426.0001).

[205] Email from Rebecca Chow to Sandeep Mistry, dated February 11, 2015 (FIRE-REL0000045835).

vendor.[206]

Below are images taken outside Empire Gems' registered office:

 

Figure 1: Photo of Empire Gems registered office door taken at 1:38 PM on 19th of June 2018.

Figure 2: Photo of Empire Gems registered office board label at the entrance of the building taken at 1:36 PM on 19th June 2018.

### iii.   Unique Diamond Jewelry FZC ("Unique")

Unique was incorporated in 2008 with a registered address of Building # C-1, Office #620, Ajman Free Zone, Ajman, UAE.  Unlike the other UAE entities, Unique is an FZC, which means that it has more than one shareholder.

Another company, Royal Gypsum Products FZC, occupies the address.  The investigators observed that the inside of the office seems to have been abandoned. Upon questioning, occupants of neighboring offices in the same building stated they had not heard of Unique.  The EZ licensing department stated that Unique's owners requested to cancel its license as of April 2018.

The Examiner has identified emails that suggest Unique is a Modi affiliated entity.  On January 19, 2010, Ajay Gandhi asked for an aging report from the back office in India.  Gandhi stated in his request, "You can exclude affiliates such as FIPL, FS, FC, JS, Sandberg, *Unique*."[207]

---

[206] Email from Eveleny Kosiec to Mehul Doshi, dated November 6, 2017 (FIRE-REL0000676153).
[207] Email from Ajay Gandhi to FSI INDIA Accounts & MIS, dated January 19, 2010 (FIRE-REL0000365497) (emphasis added).

On March 18, 2014, Ajay Gandhi request that $150,000 be wired from FDI's account to Unique for the payment of back office expenses for the period of October 2013 to March 2014.[208]  This was only one of several instances in which Firestar related entities, including the debtors, paid Unique money for its back office expenses.  On June 20, 2012, Kurian Matthews, an employee of Firestar Dubai, stated "[a]ccording to the books of Unique Diamond net balance is zero" suggesting he had access to Unique's books.[209] A similar inference may be drawn from an April 2012 email from Miten Pandya, a Firestar India employee, to Firestar Hong Kong employees, including Ashish Bagaria the director of Eternal Diamonds, copying Unique's manager and attaching "the Export Collection Document for Unique for US $463,127.75 thru BOI."[210]

In 2010, Modi and Gandhi exchanged emails about the shipment of a diamond.  Modi stated, "send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK."  Gandhi responded, "Firestone, Dubai confirmed (Not Unique)" to which Modi clarified, "Sorry Unique."  Gandhi concluded the conversation with "Glad I asked!!!"[211]  This internal confusion among entities is consistent with employees treating these supposedly unrelated entities as affiliated with the Debtors.

Below are images of the offices:

---

[208] Email from Ajay Gandhi to Bhavesh Patel and Hemant Bhatt, dated March 18, 2014 (FIRE-REL0000152658).
[209] Email from Kurian Mathews to Judy Ormond dated June 20, 2012 (FIRE-REL0002646890).
[210] Email from Miten Pandya to Ashish Bagaria, dated April 30, 2012 (FIRE-REL0001207752).
[211] Email exchange between Nirav Modi and Ajay Gandhi, dated October 21, 2010 (FIRE-REL0000072963).





Figure 15: Photo of Unique Diamond and Jewelry FZC registered office door taken at 11:12 AM on 19th of June 2018.

Figure 16: Photo of Unique Diamond and Jewelry FZC registered office door taken at 11:12 AM on 19th of June 2018.

### iv.     World Diamond Distribution FZE ("World Diamond")

World Diamond was incorporated in 2010 and is registered at Office D-3, Phase II, Fujairah Free Zone, Fujairah, UAE.  It is a single shareholder entity operated by Sandeep Mistry, who as of 2011 was a Firestar Diamond (Dubai) employee.[212]  In a document created in 2016 by a Firestar employee, Sandeep Mistry is listed as the owner and manager of World after leaving Firestar in 2009-2010.[213]   During a site visit to the Fujairah Free Zone, the security guard at the gate of the EZ denied the Examiner's investigators access and indicated that World Diamond does not exist on the security list of companies.  Interestingly, World Diamond does exist on the EZ's online registry.[214]

### v.      Pacific Diamonds FZE ("Pacific Diamonds")

Pacific Diamonds was incorporated in 2010 and is located at Office 608, Desk A, Building Number B1, Ajman Free Zone, Ajman, UAE.  This address is a specific desk in a building at the Ajman EZ in the UAE.  The site visit revealed that Pacific Diamonds shares a small office with

---

[212] Email from Pradeep Mhatre to Mihir Bhansali, dated February 9, 2011 (FIRE-REL0002668460).
[213] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).
[214] *See* https://www.fujairahfreezone.com/investors-corner/listed-companies--investors.

seven companies. The entirety of each company is one desk in office 608. The drawers of Desk A, which is Pacific Diamonds, were empty. Signs on the office door note Jinesh Shah as the company's contact person. Shah was also a Firestar India "Executive."[215] Additionally, the bank account number for Pacific Diamonds matches that of another LOU beneficiary, Himalayan Traders FZE.[216]

Below are images taken during the Pacific Diamonds site visit:



Figure 3: Photo of Pacific Diamonds FZE registered office door taken at 11:17 AM on 19th of June 2018.



Figure 4: Photo of Pacific Diamonds office from the inside taken at 11:18 AM on 19th of June 2018.



Figure 4: Photo of Pacific Diamonds FZE registered office door taken at 11:17 AM on 19th of June 2018.



Figure 5: Photo of Pacific Diamonds FZE registered office door taken at 11:17 AM on 19th of June 2018.

---

[215] ROI-MCA-00000433-444; Spreadsheet titled "Salary ranges in Dubai (Collated from Internet Sources)", undated (FIRE-REL0002640832.0001).
[216] Meetings with BDO (India), July 2018.

###### vi.      Tri Color Gems FZE ("Tri Color Gems")

Tri Color Gems FZE (was incorporated in 2010 and is located at E-LOB Office No: E-86G-32, Al Ettehad Street, (Near Burj Eiffel), Hamriya Free Zone, Sharjah, UAE, which is a small modular cabin-style building.  Jinesh Shah is the sole shareholder and director as he is for Pacific Diamonds.  In 2011, Jinesh Shah was listed as an executive in the accounts department of Firestar Dubai.[217]  During the site visit, the A&M investigators were unable to enter the locked office.  However, they entered the cabin and spoke to the personnel from the neighboring office, Mena Energy, who were not familiar with the name Tri Color Gems.

###### vii.      Vista Jewelry FZE ("Vista")

Vista was incorporated in June 2010 and is registered at Office No D-16, (Phase-II), Fujairah Free Zone, Fujairah, UAE.  Netaji Mohite is the company's sole shareholder and, as of 2013, was a Firestar India "Executive."[218]  In 2014, he was still receiving business emails at his Firestar email address.[219]  A 2016 document created by a Firestar employee states that Netaji Mohite started Vista in or around 2011.[220]

Like World Diamond, the gate guard outside the EZ never heard of Vista and never saw a company representative.  However, the security gate list includes Vista, suggesting that the company could be virtual. Without a gate pass, the investigators were unable to view the registration building.

###### (b)      "Shadow Entities" Registered in Hong Kong ("HK")

---

[217] Spreadsheet titled "Salary ranges in Dubai (Collated from Internet Sources)", undated (FIRE-REL0002640832.0001).
[218] Spreadsheet titled "AR-AP (Jan '18)" (FIRE-REL0001797347).; Spreadsheet titled "Salary ranges in Dubai (Collated from Internet Sources)", undated (FIRE-REL0002640832.0001).
[219] Email from Arjun Patil to Firestar employees, dated January 25, 2014 (FIRE-REL0001723370).
[220] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).

60

The HK Shadow Entities are structured similarly to the UAE companies in that they seem to operate as shells with Firestar employees as management. The Examiner reviewed each companies' registrations and conducted site visits.

### i.      Eternal Diamonds Corporation Ltd. ("Eternal")

Eternal was formed in 2002 and has an office at its registered address of Unit 2A, 2/F, Focal Industrial Centre, Block A, 21 Man Lok Street, Hung Hom, Kowloon. Ashish Bagaria, a former Firestar India and Hong Kong employee is Eternal's Director. In a document created by a Firestar employee in 2016, Ashish Bagaria is listed as the owner and manager and states that he joined Eternal in 2011.[221] However, in 2014, Ashish Bagaria was still being emailed for business purposes at his Firestar email address.[222] The company's shareholder is a British Virgin Islands company, Everstar Capital Ltd. From the site visit, it seems that Eternal ceased operations although the company signage still exists. Building staff indicated that someone visited monthly to collect mail. Otherwise, they did not observe activity at the office. Investigators visited two alternate addresses without luck.

Based on emails, it is clear that Eternal was affiliated with Modi. On July 3, 2010, Ajay Gandhi replied to a question from the credit department at Standard Chartered Bank, a former lender to FDI, asking how Eternal Diamonds was related to Firestar and why it was not included in the group structure. Gandhi responded that Eternal Diamonds was owned by Deepak Modi, Modi's father and thus only a related party.[223] Gandhi also explained that Eternal was an investor in FDI and had leant a portion of its $12 million in the form of a subordinated loan.[224]

### ii.     Fancy Creations Company Ltd ("Fancy Creations")

---

[221] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).
[222] Email from Asha Shetty to Bhavesh Patel, dated February 24, 2014 (FIRE-REL0000819123).
[223] Email from Ajay Gandhi to Oakley Champine, dated July 2, 2010 (FIRE-REL0000077897).
[224] *Id.*

Fancy Creations has an office at its registered address of Unit B03, 2/F, Summit Building, 30 Man Yue Street, Hung Hom, Kowloon. Francy Creations was registered in June 2010 with Nilesh Khetani as the sole director. In a document created by a Firestar employee in 2016, Nilesh Khetani is also listed as Fancy's owner and manager, and a former Firestar employee.[225] Khetani was a Firestar employee until at least February 2016.[226] The office seems to be permanently closed. Investigators confirmed by the pile of junk mail on the floor that the office is unused. Building staff indicated that on rare occasion a Pakistani or Indian person visited the office. The investigators experienced similar results at three alternate addresses. At each location, the security guards did not recognize the company name, and Fancy Creations did not appear on the building directories.

On September 7, 2011, Firestar Dubai employee Kurian Mathews forwarded an email to Mihir Bhansali containing fee quotes from accountants for proposed audits of Auragems and Fancy. Mathews stated the fees may have been higher than Firestar Diamond in Hong Kong "due to the complexity of the transactions in these entities."[227] Mathews went on to say "[p]lease advise me how to proceed further on this,"[228] suggesting that a Firestar employee, Bhansali, should be concerned with the audit costs for Auragems and Fancy.

### iii.    Brilliant Diamonds Limited ("Brilliant")

Brilliant's office is registered at Room 8, 7/F, Fu Hang Industrial Building, 1 Hok Yuen Street East, Hung Hom, Kowloon. It was registered in December 2002 and is in the wind-up process. Brilliant's director is Bhavik Shah, a Firestar India employee, and its shareholder is Pacific Regent Trading Limited. In a document created by Firstar employees, Brilliant is described

---

[225] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).
[226] Bombino Express Worldwide Inc. Invoice, dated February 15, 2016 (FIRE-REL0001444993.0001).
[227] Email from Kurian Mathews to Mihir Bhansali, dated September 7, 2011 (FIRE-REL0002640762).
[228] Id.

as being owned and managed by Bhavik Shah, who previously worked for Firestar and joined Brilliant in 2011.[229]  Brilliant, Fancy Creations, and Eternal share the same Corporate Secretary and founding shareholders.

An inspection of the office revealed that although there was a Brilliant sign on the wall, the office appeared unused as the entrance was dusty and the presence of junk mail on the floor indicated lack of use.  There was an electricity bill notice next to the door.

Like Fancy Creations and Eternal, Brilliant has another listed address, but a visit to the location confirmed there was no signage, and the reception staff did not recognize the name "Brilliant."

Brilliant provided a loan of $1.8 million to FDI in order to purchase a $6 million apartment on Central Park South for personal use for Nirav Modi and his family.[230] In an email from Reena Shah to the Indian auditors dated July 13, 2017, Shah asks Kunal Patel to follow up with Ajay Gandhi to get loan confirmations for BBB Group and Brilliant Diamonds.  Patel then forwards the email to Gandi and states "Shyam will give email id tomorrow for follow up (Brilliant Diamond and BBB)."[231]

### iv.    Fine Classic FZE

Fine Classic FZE is a Hong Kong entity owned by Purvi Mehta, Modi's sister. According to Firestar Dubai employee Kurian Mathews, he coordinated with Shyam Wadhwa at the direction of Mihir Bhansali, a Firestar Hong Kong employee to form Fine Classic in 2014.[232] Mathews also appointed a former "office boy / driver" as manager of Fine Classic at Mihir

---

[229] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).
[230] Email chain between Nirav Modi, Ajay Gandhi and Mihir Bhansali, dated December 4, 2008 (FIRE-REL0000174545).
[231] Email from Kunal Patel to Ajay Gandhi, dated July 13, 2017 (FIRE-REL0000201061).
[232] ROI-MCA-00000437.

Bhansali's direction.[233]

In a document containing financial information for FDI, Fine Classic is listed as a related party.[234] In a spreadsheet titled "Annexure A – Related Parties," Fine Classic was listed as an entity owned or significantly controlled by key management personnel or their relatives.[235] It appears this document was created for an audit of Firestar International Private Limited in India.

### C.    Anomalies in Debtors' Financial Reporting of Transactions With Shadow Entities

In addition to corroborating the allegations that the Shadow Entities are Modi-related shell entities, the evidence obtained by the Examiner is consistent with the allegations by Indian authorities that the Shadow Entities were created to facilitate and layer transfers of funds. The Debtors' books and records reflect that a substantial portion of their business for the years 2011 and 2017 was with the Shadow Entities.   Based on the Examiner's forensic investigation, the Debtors received approximately $155.1 in cash transfers from Shadow Entities during the relevant period, and paid approximately $72.4 out to Shadow Entities, for a total stated aggregate transaction value of $227.5 million.[236] The vast majority of these transactions involved the purchase and sale of tens of millions of dollars-worth of loose diamonds per year, which is not consistent with Debtors' stated business purpose.

Notably, the sales volume reported in FDI's tax returns and A. Jaffe's tax returns cannot be reconciled with the sales volume reflected in Debtors' sales journals in all years.  One of the most stark discrepancies is provided by A. Jaffe's books for fiscal year ending March 2012.  In its tax return for that year, A. Jaffe reported $9,090,661 in sales, primarily from its stated business of

---

[233] *Id.*

[234] Spreadsheet titled "FD Inc. Reporting Pack 2012-15 information updated April 21, 2016" (FIRE-REL0000235265.0003).

[235] Spreadsheet titled "Annexure A – Related Parties" (FIRE-REL0000209627.0002).

[236] The Examiner's team analyzed A. Jaffe account ending 2460 and FDI account ending 3004 for activity involving a Shadow Entity and over a $500,000 threshold and recorded those and surrounding transactions.

finished jewelry sales.  Its sales journals, however, reflected $49,628,873 in total sales, of which

$38,845,724 were classified as loose diamonds.  The breakdown of A. Jaffe's reported sales for

FY 2012, as reflected in its sales journals, is:

| Column "SA" | Count | Sum of $ Amount |
|---|---|---|
| Accomodation | 1,046 | 48,495 |
| Anniversary DAR | 55 | 300,835 |
| Beautiful Beginnings | 17 | 56,874 |
| Bridal Shows | 14 | 12,735 |
| Closeout | 5 | 7,626 |
| DAR | 27 | 156,516 |
| DAR modified | 81 | 365,833 |
| Donation | 15 | 31,402 |
| Employee Sale | 8 | 28,981 |
| Heritage Modified | 4 | 25,896 |
| Loose Diamond | 66 | 38,845,724 |
| Melting | 9 | 765,503 |
| Men's DAR | 19 | 115,204 |
| Other | 115 | 735,913 |
| Regular stock | 524 | 2,877,876 |
| Reorder | 128 | 554,822 |
| Repair | 357 | 57,234 |
| Special | 3,123 | 4,637,135 |
| Standard Heritage | 4 | 4,270 |
| Total | 5,617 | 49,628,873 |

Of the 19 categories of sales making up the approximately $49.6 million total, more than

$38.8 million were categorized as "loose diamond" sales.  To date, and limited by the information

and time available to the Examiner's team, more than $29.5 of these loose diamond sales have

been traced to Shadow Entities. Notably, the highest level of total sales reported by A. Jaffe on its

tax return for any year during 2011 – 2017 is $21,904,545, in 2017.

The Examiner's team asked the Debtors' CFO for an explanation of the approximately

$40 million discrepancy between A. Jaffe's sales journals and tax returns for FY 2012.  The

Debtors' CFO was unable to offer a coherent explanation.  Moreover, despite repeated attempts,

Firestar employees have been unable to explain to the Examiner's team how the Debtors arrived

65

at the numbers reported in the tax return. [237]

The sales journals of FDI cannot be reconciled with its tax returns for the entire period 2011 – 2017.  As detailed below, FDI's sales journal reflected a total of $350 million more in sales than were evinced in its tax returns for the same period.  The Examiner has been unable to obtain a credible explanation for this discrepancy.

The Examiner analyzed the Debtors' bank records for, among other things, consistency with reported information in either their sales journals or tax returns.  The Examiner did not have access to A. Jaffe's complete bank account records for FY 2013. However, for each of the other years during this period A. Jaffe's bank records show between about $30,000,000 and $49,000,000 in cash flowing in and out of A. Jaffe's while the beginning and ending account balance for each year remains minimal, between $140,000 and $260.000.

| | A. Jaffe, Inc. Sales and Profitability vs. Bank Statement Activity | | | | | |
|---|---|---|---|---|---|---|
| FYE 3/31: | Gross Sales Per Sales Journals | Gross Sales Per Tax Returns | Gross Profit Per Tax Returns | Taxable Income Before NOL Per Tax Returns | Bank Statement Debits | Bank Statement Credits |
| 2012 | $ 49,628,873 | $ 9,090,661 | $ 1,210,841 | $ (5,387,199) | $ (38,832,026) | $ 38,301,847 |
| 2013 | 18,259,257 | 17,852,268 | 2,311,934 | (764,870) | (3,626,710) | 3,818,933 |
| 2014 | 21,921,391 | 21,904,545 | 3,039,394 | 976,300 | (35,691,359) | 35,465,815 |
| 2015 | 11,219,613 | 11,259,695 | 3,195,215 | (495,204) | (29,658,938) | 29,601,007 |
| 2016 | 21,230,523 | 20,877,218 | 4,370,195 | 221,682 | (49,442,114) | 49,438,796 |
| 2017 | 19,652,106 | 19,217,725 | 4,939,527 | 1,478,379 | (46,101,292) | 46,245,197 |
| 2012 - 2017 | $ 141,911,763 | $ 100,202,112 | $ 19,067,106 | $ (3,970,912) | $ (203,352,439) | $ 202,871,594 |

FDI's bank records similarly reflect cash inflows and outflows each year that are double or sometimes triple the volume of sales reported on their tax returns.   In contrast to A. Jaffe, at no point during the relevant period does the volume of sales reported in FDI's sales journals match

---

[237] As recently as August 17, 2018, the Debtors remaining financial professionals (including one of the professionals that provided the previous numbers) attempted to provide an explanation between the sales journal number provided and the tax return.  They provided yet a new sales journal number that was materially different than the previously supplied sales journal number.  This new number also did not match the tax return.

that reported in its tax returns.  The discrepancy ranges from a shortfall on FDI's 2016 tax returns of $9 million to a difference of more than $79 million – more than the total $64,016,991 in sales reported on the return—for FY 2012.  Firestar employees were unable to explain how the sales volume reported on the tax returns were calculated.

As with A. Jaffe, the Examiner did not have access to a complete set of bank records for FDI for FY 2013.  As a finished jewelry retailer that reported a maximum of $69 million in sales on its tax returns during the relevant period, FDI's pattern of cash transfers of more than double this amount annually is unusual and suggestive of suspicious activity.

| | Firestar Diamond, Inc. Sales and Profitability vs. Bank Statement Activity | | | | | |
|---|---|---|---|---|---|---|
| FYE 3/31: | Gross Sales Per Sales Journals | Gross Sales Per Tax Returns | Gross Profit Per Tax Returns | Taxable Income Before NOL Per Tax Returns | Bank Statement Debits | Bank Statement Credits |
| 2012 | $ 143,760,998 | $ 64,016,991 | $ 7,754,523 | $ 434,714 | $ (200,490,596) | $ 200,576,829 |
| 2013 | 95,923,998 | 60,363,156 | 7,489,410 | 106,924 | (128,039,152) | 128,359,814 |
| 2014 | 110,279,603 | 63,498,768 | 8,039,584 | 205,344 | (173,779,476) | 173,913,854 |
| 2015 | 81,792,312 | 56,978,320 | 6,747,178 | (920,265) | (172,081,424) | 171,836,915 |
| 2016 | 69,631,791 | 60,948,200 | 6,372,066 | (122,427) | (202,301,776) | 202,167,743 |
| 2017 | 86,271,944 | 69,264,575 | 6,317,014 | (1,171,842) | (196,406,121) | 196,753,334 |
| 2012 - 2017 | $ 587,660,647 | $ 375,070,010 | $ 42,719,775 | $ (1,467,552) | $ (1,073,098,545) | $ 1,073,608,490 |

In addition, the Examiner's team reviewed the Debtors' bank accounts for cash transfers made to Shadow Entities, and compared those transfers to the sales transactions reported in the Debtors' sales journals.   Specifically, the Examiner's team analyzed the Debtors' available bank statements for the period 2011 to 2017 and identified the source and recipient of each transfer exceeding $500,000.[238] In total, FDI and A. Jaffe made a combined $71,352,387 in disbursements to the Shadow Entities, and received $155,124,064 in deposits for a total of $227,476,451 in cash transactions between the Debtors and the Shadow Entities. A breakdown of these transactions by Debtor is below:

---

[238] The Debtors' bank statements from the period 2011 to 2017. This data is based on incomplete bank statements for the calendar years 2011 and 2012. The Examiner's team only analyzed transactions over $500,000 and recorded those and surrounding transactions.

| A. Jaffe, Inc. [FY 2011 - 2018] | | |
|---|---|---|
| Shadow Entity | Debits/Disbursements | Credits/Receipts |
| Diamonds R Us | $          - | $      3,746,576 |
| Empire Gems FZE | - | 12,097,627 |
| Eternal Diamonds | 1,900,000 | - |
| Fancy Creations | - | 1,265,752 |
| Neeshal Merchandising | - | 406,853 |
| Pacific Diamonds | 11,700,036 | 9,985,498 |
| Radhashir Jewelry | 1,858,110 | - |
| Solar Exports | - | 6,042,232 |
| Stellar Diamonds | - | 2,066,734 |
| Universal Fine Jewelry | - | 1,399,962 |
| Vista Jewelry | - | 1,637,774 |
| Total | $     15,458,146 | $     38,649,008 |

| Firestar Diamond, Inc. [FY 2011 - 2018] | | |
|---|---|---|
| Shadow Entity | Debits/Disbursements | Credits/Receipts |
| Auragem | $      3,351,496 | $      3,437,706 |
| Brilliant Diamonds | 17,315,979 | 4,938,578 |
| Diagems | 647,432 | |
| Diamonds R Us | 4,798,825 | 11,860,112 |
| Empire Gems FZE | 733,000 | 3,364,151 |
| Eternal Diamonds | | 1,869,448 |
| Fancy Creations | 4,924,528 | 12,315,735 |
| Neeshal Merchandising | 420,479 | 752,894 |
| Pacific Diamonds | 12,311,942 | 14,858,147 |
| Radhashir Jewelry | 168,760 | |
| Solar Exports | 3,714,175 | 7,307,982 |
| Stellar Diamonds | 48,170 | 7,571,383 |
| Tri Color Gems | 6,019,701 | 4,158,979 |
| Unique Diamond | 300,000 | 15,354,666 |
| Universal Fine Jewelry | 1,728,000 | |
| Vista Jewelry | | 4,628,588 |
| World Diamond | | 21,502,243 |
| Total | $     56,482,487 | $    113,920,612 |

| Debtor Entity | Debits/Disbursements | Credits/Receipts |
|---|---|---|
| A. Jaffe, Inc. | $     15,458,146 | $     38,649,008 |
| Firestar Diamond, Inc. | $     56,482,487 | $    113,920,612 |
| A. Jaffe & FDI Total | $     71,940,633 | $    152,569,620 |

Finally, the Examiner analyzed Debtors' shipping records to determine whether they corroborated either the volume of sales reported in Debtors' tax returns or sales journals. Bonded diamond courier Malca-Amit maintained an independent transaction log of diamond shipments involving the Debtors for the majority of the relevant period, specifically fiscal years 2012 - 2017.[239] This log generally corroborates that the Debtors contemporaneously reported $129,000,689 in sales to Shadow Entities during this period for the purposes of obtaining insurance, versus a reported $131,939,628 sold per the sales journal during the corresponding period.

Below is a breakdown of Malca-Amit's shipment records for each year as compared to the sales recorded in the sales journals, both in shipments to Shadow Entities from A. Jaffe and FDI, and shipments from Shadow Entities.

| | A | B | C | D = B + C | E = D - A |
|---|---|---|---|---|---|
| Fiscal Year | Export to Shadow Entity per Malca-Amit | FDI Sale to a Shadow Entity | A. Jaffe Sale to a Shadow Entity | Combined FDI/Jaffe Sales to Shadow Entity per Sales Journals | Difference between Combined Shadow Entity Sales and Export per Malca-Amit |
| 2012 | 66,860,309 | 41,441,526 | 29,575,927 | 71,017,453 | 4,157,144 |
| 2013 | 15,888,166 | 9,127,246 | 6,760,569 | 15,887,815 | (351) |
| 2014 | 16,874,084 | 10,146,736 | 5,068,012 | 15,214,748 | (1,659,336) |
| 2015 | 4,960,516 | 4,893,335 | 66,610 | 4,959,945 | (572) |
| 2016 | 15,264,425 | 15,614,474 | 218,355 | 15,832,829 | 568,404 |
| 2017 | 9,153,189 | 9,015,838 | 11,000 | 9,026,838 | (126,350) |
| Total | $ 129,000,689 | $ 90,239,156 | $ 41,700,473 | $ 131,939,628 | $ 2,938,940 |

**Notes:**

[1] Table excludes exports from Fantasy, Inc. in order to make a direct comparison to the Sales Journal analysis, which includes FDI and A. Jaffe only.

---

[239] The Malca-Amit log began in calendar year 2011, but because these logs did not capture Debtors' FY 2011, which began in April 2010, it is not included in this analysis.

This comparison suggests that the Debtors in fact purported to ship loose diamonds to the Shadow Entities at a volume consistent with that recorded in their sales journals, regardless of what was reported on their tax return. Notably, the shipping records do not perfectly correspond to the sales journals. There is evidence that on at least some occasions, diamonds shipped by the Debtors may have been uninsured, did not exist or were incorrectly valued. For example, the investigation disclosed examples of transactions in which Debtors purported to ship high value stones not via a bonded courier, but via Federal Express. On February 24, 2011, FDI exported a 17.28 carat Emerald Fancy Intense Yellow VVS2 diamond to Fancy Creations Co. Limited, priced at $1,728,000. The invoice is billed to Fancy Creations Company Limited, and identifies the shipper as FedEx.[240] FDI's records confirm a diamond valued at $1,728,000 was indeed shipped via FedEx.

Mr. Palmieri confirms that industry practice is never to ship gems of this value via Federal Express, which insures packages only up to $75,000 to $150,000 at most, and that there is no legitimate business reason to ship diamonds worth millions of dollars without obtaining appropriate insurance. He also stated that the value of the diamond at that time was approximately $28,000 to $30,000 per carat or $518,400 at auction for the stone.

To the extent the Shadow Entities existed to perpetuate the alleged LOU Diamond scheme, as alleged by the Indian authorities, it appears that hundreds of millions of dollars of transactions did run through the Debtors in a pattern and through processes that were consistent with the Alleged Fraudulent Circumstances. This conclusion is supported both by diamond sales to Shadow Entities reported in Debtors' sales journals (totaling $213,804,929) as corroborated by shipping records, and reported cash transfers to and from the Shadow Entities (totaling $227,476,451).

**D.** **Debtors' Loose Diamond Transactions with Shadow Entities Appear**

---

[240] Invoice from Firestone, Inc. to Fancy Creations Co. Ltd., dated February 24, 2011 (FIRE-REL0002673818.0001).

**Fraudulent**

Despite the volume of loose jewelry sales reported by Debtors in their sales and shipping documents, Sumay Bhansali, the CEO of A. Jaffe told the Examiner under questioning that A. Jaffe sold very few loose diamonds pre-petition, advising that he had learned of many such transactions only after the bankruptcy filing on account of the loss of Firestar India as its supplier.[241]   Internal records of the Debtors confirm that bulk transactions of loose diamonds with Shadow Entities were recorded and tracked separately from transactions with retail customers.  For example, in 2012, A. Jaffe appeared to create and maintain two sets of financial sales records: "core" financials, which did not include the loose diamond sales and "regular" financials, which did.  The difference between the reported gross sales of $9,090,661 on A. Jaffe's tax return and the $49,628,873 reflected in A. Jaffe's sales journals for 2012 was described by CFO Ajay Gandhi as the difference between "core" and "regular" financials.[242]   A. Jaffe's sales to Shadow Entities in FY 2012 was reported in its sales journals as totaling $29,575,927.  This number was generally supported by A. Jaffe's bank records and shipment logs from bonded diamond courier Malca-Amit, whose log reflects $28,408,545 worth of loose diamonds being shipped from A. Jaffe to various Shadow Entities—as well as $17,390,358 worth being shipped from Shadow entities to A. Jaffe.[243]

Based on the Examiner's interview of multiple employees and a review of business records, it has been established that the Debtors regularly received international shipments of what were reported to be loose diamonds, often having invoice amounts driven by expensive fancy colored diamonds, and that these diamonds were shipped back out within three days or less, often to the

---

[241] Interview of Sumay Bhansali, May 17, 2018.
[242] Interview of Ajay Gandhi, June 13, 2018.
[243] *See* Malca-Amit Transaction Log for Debtors and Other Modi Entities.

71

country from which they originated.  As discussed below, no employee reported examining a single diamond in connection with these transactions over the entire seven year period.[244]  This process stands in stark contrast to the same employees' description of their ordinary inventory practices for transactions with retail customers like Zales or J.C. Penny.

      **1.**      **Regular sales and inventory practices for transactions with retail customers.**

According to interviews with relevant employees at FDI and A. Jaffe, and as corroborated by documents, the process for a retail sale transaction is as follows.  It starts when a customer places an order with customer service through the phone or email.  The order is processed by customer service and entered into the inventory system, then emailed to the sourcing department in India and to the debtor entity.  The customer service department then creates a sales order.  The sourcing department creates a purchase order for the purchase of the finished product by the Debtor, generally from the Firestar India factory.  When a Debtor receives the finished goods, they are added to the Debtor's inventory by the back office in India, working for the Debtors.[245]  The receiving department in New York receives the finished goods from India.  Importantly, the receiving department removes the contents of the package, checks the packing slip with each item in the package, scans each item from the package for quality control and then scans as completed and "ready to ship."[246]  The receiving department also creates the sales order invoice for the customer.

      **2.**      **Sales and Inventory Practices for Sham Transactions with Shadow Entities**

---

[244] Interview of Rebecca Chow, May 30, 2018.

The Examiner identified that Firestar affiliates in India and Belgium regularly sent the Debtors bulk fancy loose diamonds accompanied by email instructions to export them immediately upon receipt to either the Modi Firms in India or certain Shadow Entities at prices and quantities that Firestar India defined.[247]   Packing slips and invoices for the subsequent exports often accompanied these email instructions.[248]  Sandeep Mistry, a Firestar India employee who doubled as the Owner/Manager of World Diamond, a Shadow Entity, sent most of these emails.[249]  Mistry, who has been charged in India in connection with the fraud, worked under Mihir Bhansali, who ultimately controlled the remittances and imports and exports of goods with many of the Shadow Entities and Firestar entities.[250] The Debtors' employees typically executed the instructions.[251]  As such, the diamonds would only remain with the Debtors for a few days before being exported back to India, Dubai, or Hong Kong.

According to employee interviews, and corroborated by available records, employees processed these shipments as follows:  The diamond department received an email from the back office in India containing instructions, shipping documents and invoices for a shipment of loose diamonds. [252]  The instructions would include the originating entity that sent the diamonds and how the diamonds should be allocated for subsequent shipment outside the U.S.  The diamonds were then sent from the Debtors in New York to either an overseas Firestar entity or a Shadow Entity.

According to Debtors' diamond division and shipping/receiving employees, Rebecca

---

[247] Interview of Rebecca Chow, June 1, 2018.
[248] *Id.*
[249] ROI-MCA-00000430-441; Email chain and attachments between Rebecca Chow, Evelyn Kosiec, Connie Wong, M. Patel, and Sandeep Mistry, dated September 13, 2011 (FIRE-REL0000736349; FIRE-REL0002249979).
[250] ROI-MCA-00000430-441.
[251] Email from Sandeep Mistry to Rebecca Chow and Manish Zalawadia dated October 3, 2011(FIRE-REL0000737527).
[252] Interview of Connie Wong, May 29, 2018.

Chow, Connie Wong, and Evelyn Kosiec, the imports consisted of small metal boxes containing diamonds wrapped in opaque parcel paper.[253] The paper had descriptions of the diamonds (number of diamonds and total carats) apparently made by the exporter.[254] Chow informed the Examiner that she and her team would remove the packets from the metal container but leave the parcel paper wrapping intact.[255] Chow stated that she did not open the parcel paper because doing so would open her team up to liability should anything happen to the inventory.[256] Thus, the employees verified the content of the imports solely by reading the handwriting on the paper and cross-referencing to the invoice/packing list received with the shipment.[257] Unlike imports of jewelry for retail sale, which are entered individually into inventory, Chow and her team would inventory these parcels at a bulk carat and value without opening the individual packets.[258] They would not track these diamonds individually because they were shipped out almost immediately upon receipt.[259] Once inventoried, Chow's team would allocate the diamonds per Firestar India's instructions and ship them to their respective recipients.[260]

### 3. Evidence that the Debtors "Round-Tripped" Loose Diamonds Across India EZs, UAE EZs, and Hong Kong

Circular trading, also known as "round-tripping," occurs when the same goods, in this case diamonds, are traded repeatedly to give the appearance of multiple, distinct transactions.

The Examiner has obtained evidence of a number of transactions that appear to constitute round-tripping of loose diamonds among the Firestar Global Entities, Modi Firms, and the Shadow

---

[253] *Id.*
[254] *Id.*
[255] Interview of Rebecca Chow, May 30, 2018.
[256] Interview of Rebecca Chow, June 1, 2018.
[257] *Id.*; Interview of Evelyn Kosiec, May 29, 2018.
[258] Interview of Rebecca Chow on June 1, 2018.
[259] Interview of Rebecca Chow, June 1, 2018.
[260] *Id.*; email chain and attachments between Rebecca Chow, Evelyn Kosiec, Connie Wong, M. Patel, and Sandeep Mistry, dated September 13, 2011 (FIRE-REL0000736349; FIRE-REL0002249979); Interview of Ajay Gandhi, July 26, 2018.

Entities in the EZ. Specifically, the Examiner reviewed numerous Debtor export invoices and packing lists for diamond transactions that contained expensive fancy-color loose diamonds[261] showing the same fancy color diamonds appear in multiple shipments among the Debtors, international Firestar companies, and the Shadow Entities. These diamonds have a high and subjective value, and the shipments at issue often exceeded $1 million.[262]

Notably, the Examiner did not have access to a substantial portion of the Debtors' inventory packing slips, making a complete analysis impossible. The Debtors produced packing slips for A. Jaffe only, although the Examiner was able to locate a sampling of other packing slips from FDI as indicated below. Many of the Debtors' packing slips described diamonds that were not sufficiently distinct to perform any analysis, while others lacked sufficient descriptions to identify the value of the diamonds.

None of the imports or exports reviewed included references to certifications attesting to characteristics such as regarding quality, size, finish, or grade. The diamond expert explained that such certifications accompany virtually all valuable fancy-colored diamond transactions[263] if for no other reason than a certification confirming a diamond has not been treated and is not synthetic adds value to any transaction.[264] The exclusion of such certifications among the loose diamond transactions that the Examiner analyzed is an independent red flag suggesting a lack of legitimate business purpose. Despite the lack of certifications attached to the fancy-colored diamonds in the loose diamond transactions reviewed, the distinctiveness of the diamond descriptions and carat amounts in the invoices and packing slips provided the Examiner with a high degree of confidence

---

[261] Examples of invoices that were comprised mainly of expensive, fancy loose diamonds can be found at FIRE-REL0002641611;    FIRE-REL0002249979;    FIRE-REL000736349;    FIRE-REL0000684565.002;    FIRE-REL00001837926;    FIRE-REL0000737723.001;    FIRE-REL0002249982;    FIRE-REL0000727922.001;    FIRE-REL0002249993; and FIRE-REL0000224777.0001.
[262] Angelo Palmieri, President, Gemprint Corp.; COO GCal Inc.
[263] *Id*.
[264] *Id.*

75

that certain "high-value" fancy-colored diamonds were in fact being round-tripped.  The diamond

expert corroborated that this sampling of diamonds is likely round-tripped or non-existent given

exaggerated prices and the likelihood that the same diamonds were used in connections with

multiple transactions.  Moreover, based on the market at the time of the transactions, the expert

explained the volume of such diamonds from one entity not well known for their trading in fancy-

colored diamonds could not exist in their market to generate as many sales.[265]  In his opinion, the

values for over ten of the specific diamond descriptions across multiple invoices he reviewed

should have been hundreds of percent lower that listed in the shipments.[266]

The Examiner has identified several specific diamonds that appear to have been round-

tripped in 2011-12.[267]  The Examiner's investigation has determined that these transactions are

consistent with the LOU scheme alleged by the Indian authorities as being used to inflate diamond

inventory and accounts receivables artificially, to justify the need for LOU financing, and to create

purchases and sales to validate the movement of money obtained through fraudulent LOUs.

### i.      Fancy Vivid Yellow Orange Cushion Cut SI1 - 3.27 carats

The Debtors reportedly exported a 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1

diamond three times and imported it once between August 8 and September 13, 2011, a period of

five weeks.  According to the diamond expert, between January 1, 2011 and June 30, 2018, only

one diamond matching these characteristics was sold internationally at public auction.[268]  The

value at the relevant time approximated $188,000, [269]

---

[265] *Id.*
[266] *Id.*
[267] The Examiner's forensic accountants could not trace diamonds to round-tripping in later years because the packing lists did not contain diamonds unique enough to say with certainty that the diamonds were round-tripped. In later years the diamonds were mostly white diamonds with no unique characteristics.  The Examiner also did not receive FDI's invoices and packing lists.
[268] Angelo Palmieri, President, Gemprint Corp.; COO GCal Inc.
[269] *Id.*

Records reviewed indicate that the instructions on how to move the diamond came from Firestar India employee Sandeep Mistry[270] to FDI stating "Please Ship Attached as per below Instructions."[271]  The email from India came with a spreadsheet identifying each diamond in the shipment and the destination to which it was to be shipped from FDI.[272]  Invoices for these exports accompanied the spreadsheet.  The documents indicate that on August 8, 2011, FDI (then Firestone, Inc.) sold the stone to Fancy Creations Company, Ltd.[273] from Firestone, Inc. (now, FDI) for $1,098,802.[274]  Approximately three weeks later, Solar Exports, a Modi Firm, exported the diamond to FDI for $183,087—approximately $900,000 less, although much closer to its actual value.[275]  Six days later, FDI exported the diamond back to Fancy Creations Company, Ltd for $1,156,043, now in excess of the original inflated price.[276]  Finally, two weeks later, A. Jaffe sold it to Sandeep Mistry's company, World Diamond for $1,218,991.[277]

| # | Total Invoice Amount | Date | Consignee/ Buyer | Consignor/ Seller | Description | Carats | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| 1 | $ 1,653,015 | 8/8/2011 | Fancy Creations Company Ltd. | Firestar Diamond, Inc. | FANCY VIVID YELLOW ORANGE  CUSHION CUT SI1 | 3.27 | $ 336,025 | $ 1,098,802 |
| 2 | $ 1,824,172 | 8/24/2011 | Firestar Diamond Inc. | Solar Export | NATURAL FANCY VIVID YELLOW ORANGE CUSHION SI1 | 3.27 | $ 55,990 | $ 183,087 |
| 3 | $ 1,475,353 | 8/30/2011 | Fancy Creations Company Ltd. | Firestar Diamond, Inc. | FANCY VIVID YELLOW ORANGE  CUSHION CUT SI1 | 3.27 | $ 353,530 | $ 1,156,043 |
| 4 | $ 1,384,179 | 9/13/2011 | World Diamond Distribution FZE | A. Jaffe, Inc. | FANCY VIVID YELLOW ORANGE  CUSHION CUT SI1 | 3.27 | $ 372,780 | $ 1,218,991 |

The Examiner matched these transactions to the internal FDI and A. Jaffe sales journals, which

---

[270] Mistry doubled as an officer/manager of World Diamond Distribution FZE, a Shadow Entity. Sandeep Mistry was an employee at an overseas Firestar entity and supervised remittances and exports and imports of goods to and from many of the Shadow Entities. Mistry also provided input to Bhansali regarding who to appoint as managers, and directors for Shadow Entities. ROI-MCA-00000430-441; *see* ED Complaint.

[271] *Id.*

[272] Invoice of consignment to Fancy Creations Company, Ltd. from Firestone, Inc. (FIRE-REL0002641611.001).

[273] A Shadow Entity.

[274] Invoice of consignment to Fancy Creations Company, Ltd. from Firestone, Inc. (FIRE-REL0002641611.001).

[275] Spreadsheet containing export documents for Firestar Diamond, Inc. to SDC Designs LLC, Fancy Creations Company Ltd. and Eternal Diamonds Corporation Ltd., dated August 23, 2011 (FIRE-REL0002249979).

[276] *Id.*

[277] Email from Manish Patel to Rebecca Chow, dated September 13, 2011 (FIRE-REL000736349);  Export from A. Jaffe to World Diamond Distribution, dated September 13, 2011 (FIRE-REL000736349.001).

indicated that the diamond transfers occurred, and that the Debtors booked them improperly as legitimate sales.[278]

### ii.     Fancy Intense Pink Emerald Cut SI2 - 1.04 carats

The Debtors reportedly exported a 1.04 carat Fancy Intense Pink Emerald Cut SI2 twice and imported it once within six-weeks.  The diamond's first trip occurred on August 19, 2011, Firestar India sent it to FDI for $608,400.[279]  As with the 3.27 carat Yellow Orange Cushion Cut, Sandeep Mistry sent shipping instructions and a spreadsheet accompanied by invoices created in India.[280]  Consistent with Mistry's instructions, FDI sold it to SDC Designs LLC for $642,200.[281]  Without any sign of a return shipment to the Debtors, A. Jaffe shipped the same diamond one month later to Diamonds 'R' Us for $682,760.[282]

| # | Total Invoice Amount | Date | Consignee/ Buyer | Consignor/ Seller | Description | Carats | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| 1 | $ 738,711 | 8/19/2011 | Firestar Diamond, Inc. | Firestar Diamond International Private Limited (FDIPL) | Fancy Intense Pink Emerald Cut SI2 | 1.04 | $ 585,000 | $ 608,400 |
| 2 | $ 1,824,985 | 9/1/2011 | SDC Designs LLC | Firestar Diamond, Inc. | Fancy Intense Pink Emerald Cut SI2 | 1.04 | $ 617,500 | $ 642,200 |
| 3 | $ 1,921,079 | 10/4/2011 | Diamonds "R" Us | A. Jaffe, Inc. | Fancy Intense Pink Emerald Cut SI2 | 1.04 | $ 656,500 | $ 682,760 |

These shipments were recorded in the Debtors' sales and purchase journals.[283]  According to the diamond expert, between January 1, 1981 and June 30, 2018, at international auction, there haven't been any emerald cut, fancy intense pink SI2 diamonds greater than 1 carat.  The only comparable stone was less than 1 carat.  In 2011, the expert estimates that the maximum value of

---

[278] *See* Firestar Diamond Sales Journal for 2011; A. Jaffe, Inc. Sales Journal for FYE 3/31/2012.

[279] Spreadsheet containing export documents for Firestar Diamond, Inc. to SDC Designs LLC, Fancy Creations Company Ltd. and Eternal Diamonds Corporation Ltd., dated August 23, 2011 (FIRE-REL0002249979).

[280] *Id.*

[281] *Id.*

[282] Email from Manish Patel to Rebecca Chow, dated October 4, 2011 (FIRE-REL0000737723); Spreadsheet containing consignment document for A. Jaffe to Diamonds 'R' Us (FIRE-REL0000737729.0001).

[283] Firestar Diamond Inc. Purchases Journal for 2011 and Firestar Diamond Sales Journal for 2011.

this stone would have been $300,000 per carat.

As detailed below, the Examiner uncovered, with BDO (India), six LOU's in which the Debtors were direct beneficiaries of the loaned funds. Notably, the Examiner identified the final sale to Diamonds 'R' Us as part of a shipment made in connection with one of six LOUs issued in favor of the Debtors and alleged as part of the fraudulent LOU scheme. [284]

### iii.     Fancy Vivid Yellow Cushion VS1 - 15.55 carats

On two occasions, the Debtors exported a 15.55 carat Fancy Vivid Yellow Cushion VS1 diamond and imported it once over the course of approximately 27 days. Records reveal that the diamond was shipped through FDI, Firestar India, a Modi Firm, and Shadow Entity Eternal Diamonds.

| # | Type | Total Invoice Amount | Identifiable Date | Consignee/ Buyer | Consignor/ Seller | Description | Carats | Rate | Amount | Change in Value from Previous Identification |
|---|------|------|------|------|------|------|------|------|------|------|
| 1 [A] | Export | $ 1,499,736 | 8/3/2011 | Firestone Diamond Pvt. Ltd. | Firestar Diamond, Inc. | Fancy Vivid Yellow Cushion VS1 | 15.55 | $ 90,900 | $1,413,495 | $ - |
| 2 [B] | Import | $ 1,849,410 | 8/24/2011 | Firestar Diamond, Inc. | Solar Export | Fancy Vivid Yellow VS1 | 15.55 | $ 44,311 | $ 689,028 | $ (724,467) |
| 3 [A] | Export | $ 1,824,085 | 9/1/2011 | Eternal Diamonds Corporation Ltd. | Firestar Diamond, Inc. | Fancy Vivid Yellow Cushion VS1 | 15.55 | $ 80,390 | $1,250,065 | 561,036 |

A – The date was obtained from the Invoice, the shipment instructions received by the Debtors, the file name recorded in the Relativity Document repository, and/or by agreeing the Total Invoice Amount to the Malca-Amit Transaction Log for Debtors and Other Modi Entities, if available.
B – The file name for FIRE-REL0002249979 is "Export from FSINC Date-23-AUG-11 (1) Rebccas.xlsx". The "Master" tab of this file shows the breakout of the diamond imports received by Firestar Diamond, Inc. and the entities they are to be subsequently exported and shipped to. Though the description of the diamond differs slightly in name, it is the only other diamond at 15.55 carats, and is further indicated to be sold to Eternal Diamonds Corporation, Ltd., which one week later. Thus, it can be concluded to be the same diamond. This file shows

---

[284] Malca-Amit Transaction Log for Debtors and Other Modi Entities; Malca-Amit Shipping documents for Diamonds-R-Us & A. Jaffe - $1,921,078.65 (Reference # 156-1296); BDO-00000480; Additional discussion on this LOU *infra*.

79

the diamond being invoiced by Solar Exports to Firestar Diamond, Inc. at a value considerably lower than other sales transactions.

On August 3, 2011, FDI sold the diamond to Firestar India for $1,413,495. Importantly, the Examiner identified this transaction as being tied to a fraudulently obtained LOU in which FDI was the listed beneficiary.[285] Somehow, the diamond lost over 50% value and made its way to Solar Exports. On August 24, 2011, Solar Exports shipped it to FDI for $689,028.[286] And one week later, FDI exported the diamond to Eternal Diamonds, a Shadow Entity for an 82% markup, at, $1,250,065.[287]

The spreadsheet, which identified the source entity of each diamond, instructions as to the diamond's allocation, and invoices for subsequent exports, included this diamond.[288] Furthermore, each of these purchases and sales was booked and tracked in the respective Debtors' journals.[289]

Although the Examiner does not have visibility into all the transfers, this diamond appeared in many Firestar-related documents from February 13, 2012 through August 21, 2012. On February 13, 2012, Jigar Shah sent an email at the direction of Sandeep Mistry with directions "for Diamond Price and Export," including instructions to "Send [this diamond] to Eternal Diamond (HK) From Firestone" at a rate of $46,880 per carat and a total price of $728,984.[290] Two days later, the diamond appeared to have been set on a gold pendent necklace priced at $933,000.[291] Six months later, non-debtor US entity, Firestar International Inc.[292] reported the diamond in its

---

[285] Meetings with BDO (India), July 2018.

[286] Spreadsheet containing export documents for Firestar Diamond, Inc. to SDC Designs LLC, Fancy Creations Company Ltd. and Eternal Diamonds Corporation Ltd., dated August 23, 2011 (FIRE-REL0002249979).

[287] *Id.*

[288] *Id*.

[289] *See* Firestar Diamond Inc. Purchases Journal for 2011; Firestar Diamond Sales Journal for 2011.

[290] Email from Sandeep Mistry to Jigar Shah, dated February 13, 2012 (FIRE-REL0001241930); Attachment to email from Sandeep Mistry to Jigar Shah, dated February 13, 2012 (FIRE-REL0001241930.0001).

[291] Spreadsheet titled "Export" (FIRE-REL0001237056.0001).

[292] As mentioned above, Firestar International Inc. is the U.S. Firestar Entities' trading arm that sells one-off loose diamonds.

inventory valued at $728,984.[293] Finally, on August 21, 2012, an email concerning the Firestar International Inc. sales commissions noted the diamond was sold to the Shadow Entity Fancy Creations Co., Ltd. for $838,332.[294]

### iv.    Princess Blue Diamond Intense SI1 – 0.72 carats

Originally, in October 2010, FDI sold a 0.72 carat Princess Blue Diamond Intense SI1 diamond to a Firestar Affiliate. Over the course of seven days, FDI imported this stone from Solar Exports for $52,113.96 and exported the same to SDC Designs LLC for $331,740. From August 24, 2011 to August 30, 2011 this diamond experienced an almost 700% markup. Finally, in January 2012, A. Jaffe somehow came into possession of the stone and sold it to Shadow Entity World Diamond.

| # | Total Invoice Amount | Date | Consignee/ Buyer | Consignor/ Seller | Description | Carats | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| 1 | $ 252,000 | 10/1/2010 | Firestone Diamond Ltd. | Firestar Diamond, Inc. | PRINCESS BLUE DIAMOND INTENSE SI1 | 0.72 | $ 350,000 | $ 252,000 |
| 2 | $ 1,824,172 | 8/24/2011 | Firestar Diamond, Inc. | Solar Export | PRINCESS BLUE DIAMOND INTENSE SI1 | 0.72 | $ 72,381 | $ 52,114 |
| 3 | $ 1,824,985 | 8/30/2011 | SDC DESIGNS LLC | Firestar Diamond, Inc. | PRINCESS BLUE DIAMOND INTENSE SI1 | 0.72 | $ 460,750 | $ 331,740 |
| 4 | $ 1,676,135 | 1/12/2012 | World Diamond Distribution FZE | A. Jaffe, Inc. | FANCY INTENSE GREEN BLUE PRINCESS SI1 | 0.72 | $ 523,895 | $ 377,204 |

A    The *Transaction Date* was obtained from the Invoice, the shipment instructions received by the Debtors and/or by agreeing the Total Invoice Amount to the Malca-Amit Transaction Log for Debtors and Other Modi Entities, if available.

B    The file name for FIRE-REL0002249982 is "FANCY INV 08-30-2011.xlsx". The "Master" tab of this file shows the breakout of the diamond imports received by Firestar Diamond, Inc. and the entities they are to be subsequently exported and shipped to. The Princess Blue Diamond Intense SI1 diamond is noted to be received from "Solar". This listing shows the diamond being invoiced to Firestar Diamond, Inc. at a value considerably lower than other sales transactions.

---

[293] Email from Bhavesh Patel to Ajay Gandhi, dated August 4, 2012 (FIRE-REL0000173831); Attachment to email from Bhavesh Patel to Ajay Gandhi, dated August 4, 2012 titled "Inventory Valuation," dated August 4, 2012 (FIRE-REL0000173831.002).

[294] Email from Shyam Wadhwa to Ajay Gandhi, dated July 7, 2013 (FIRE-REL0000066693); Attachment to email from Shyam Wadhwa to Ajay Gandhi, dated July 7, 2013, titled "Josh's commission income backup required for select months" (FIRE-REL0000066693.001).

**C**    The transaction date and total invoice amount were agreed to the Malca-Amit Transaction Log for Debtors and Other Modi Entities.

**D**    The file name for FIRE-REL0000727922.001 is "Export from A Jaffe Date 11-Jan-2012 Final.xls". The "Master" tab of this file shows the breakout of the diamond imports received by Firestar Diamond, Inc. and the entities they are to be subsequently exported and shipped to. The Master tab lists a 0.72 carat Princess Blue Diamond Intense SI1 being sold from A. Jaffe, Inc. to World Diamond Distribution FZE. The subsequent invoice of diamonds to be sold to World Diamond Distribution FZE by A. Jaffe, Inc. lists a 0.72 carat diamond with the description Fancy Intense Green Blue Princess SI1. Though the description of the diamond differs slightly in name, it is the only other diamond at 0.72 carats, and can be concluded to be the same diamond.

Similar to the other round-tripped diamonds described above, a spreadsheet detailed instructions to ship the diamond.[295] Separate shipping logs support the fact that said shipments occurred.[296]

## VII. FUNDS ALLEGEDLY OBTAINED THROUGH THE FRAUDULENT LOU DIAMOND SCHEME FLOWED THROUGH THE DEBTORS

Six of the LOUs that were issued as part of the Alleged Fraudulent Circumstances were issued for the benefit of the Debtors: a Debtor was the exporting entity and direct beneficiary of the LOU funds. The Examiner has confirmed that the funds issued in connection with each of these LOUs were received and deposited by the Debtors, and in each case were either returned to Firestar India or used by the Debtors or Shadow Entities. In addition, the Examiner's team has traced funds generated by numerous of the relevant LOUs through the Debtors, who received the funds as transfers from one or more of the Shadow Entities.

Based on the results of the tracing analyses performed to date, it is likely that access to additional records, such as bank or other financial records for the Shadow Entities or bank and other Debtor records in India, would result in the identification of numerous additional funds that

---

[295] Spreadsheet containing export documents for Firestar Diamond, Inc. to SDC Designs LLC, Fancy Creations Company Ltd. and Eternal Diamonds Corporation Ltd., dated August 23, 2011 (FIRE-REL0002249979).
[296] Malca-Amit Transaction Log for Debtors and Other Modi Entities.

82

could be traced back to the alleged fraudulent LOU scheme.  Regardless, the evidence obtained

to date is sufficient to demonstrate that tens of millions of dollars obtained through allegedly

fraudulent LOUs flowed through the Debtors' accounts.  Moreover, the indicia of fraud evident

in Debtors' operations with Shadow Entities are present, and appear designed to enable, certain

relevant transactions.

### A.   Example of Fraudulent LOU Transaction Traced by the Examiner

The following transaction appears to be an example of the Debtors' involvement in the

alleged fraudulent LOU scheme. In this instance, an overvalued diamond appears to have been

round-tripped between two Modi entities for no purpose other than to obtain LOU financing.  This

fraudulent purpose is evinced by several indicators.  First, the diamond—a 1.04 carat Fancy Intense

Pink Emerald Cut SI2 diamond—appeared in three international transactions with the Debtors

within six weeks of each other, when no such diamond is known to have existed in the most

probable public auctions from June 1, 1982 and June 30, 2018.[297]  Second, this diamond was valued

at three different prices averaging $619,666 over the three purported transactions.  If such a

diamond existed, in 2011 the stone's maximum market value would have been $300,000 per carat,

approximately 50% its reported value.[298]   Third, the transaction consisted of a bulk export by A.

Jaffe of fancy colored loose diamonds,[299] which is not consistent with A. Jaffe's reported business.

Fourth, a related party requested the LOU naming A. Jaffe as the beneficiary for an amount greater

than 20% of A. Jaffe's reported fiscal year in 2012 sales,[300] which A. Jaffe immediately transferred

back to its Firestar affiliate. Finally, while the LOU was used to make a false shipment and to fund

---

[297] Angelo Palmieri, President, Gemprint Corp.; COO GCal Inc.

[298] *Id.*

[299] Malca-Amit Shipping Document Packet Including Invoice and Packing List for Export from A. Jaffe, Inc. to Diamonds 'R' Us.

[300] *See* Internal Revenue Service Form 1120: U.S. Corporation Income Tax Return: Synergies Corporation Synergies Corporation, tax year 2012. A. Jaffe's reported gross sales for fiscal year 2012 was $9.1 million.

Firestar and Modi, Diamonds 'R' Us repaid the LOU using a loan from another Indian bank.  The specifics of this example are as follows.

A 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond was among a package of twenty-six fancy-colored loose diamonds that shipped on October 4, 2011[301] from A. Jaffe to Diamonds 'R' Us in India.  Although A. Jaffe does not transact in bulk fancy colored loose diamonds for its business, it purported to do so in this case to transact with Diamonds 'R' Us, a related party.[302] Diamonds 'R' Us sought an LOU from PNB for $1,921,079 to purchase the stones.[303]  Gokulnath Shetty, the PNB insider charged with aiding Modi in the Alleged Fraudulent Circumstances[304] authorized the issuance of this LOU at the PNB Brady House branch.  He did not record the LOU in the CBS,[305] and Diamonds 'R' Us did not provide the required collateral.[306]  PNB coordinated with its Hong Kong branch via SWIFT message, which deposited money into PNB's Deutsche Bank nostro account in New York, New York.  PNB paid A. Jaffe from the nostro account on October 13, 2011 for exporting the diamonds.[307]

On the same day A. Jaffe received the $1,921,079 from the bank, it transferred $1,832,700 to L/C Collections, which, as noted above, is an HSBC payment mechanism that acts as an intermediary between transacting parties.  The Firestar U.S. Entities would use this payment mechanism to pay overseas affiliates.[308]  Per supporting documents received for these specific disbursements to L/C Collections, the LOU funds were sent to India for the benefit of Firestar

---

[301] Malca-Amit Transaction Log for Debtors and Other Modi Entities.
[302] Indenture of Partnership for Diamonds 'R' Us, dated May 10, 2000 (ROI-MCA-00000209).
[303] ED Complaint ¶ 11.4.
[304] CBI Charge Sheet ¶ 27.
[305] Meetings with BDO (India), July 2018; *see also* ED Complaint ¶ 6.25.
[306] Meetings with BDO (India), July 2018.
[307] A. Jaffe October 2011 bank statement for HSBC account ending in 2460.
[308] Interview of Ajay Gandhi, August 10, 2018 (Money from L/C Collections went to Firestar India 95% of the time, while it went to Firestar Belgium or Firestar Dubai for the remainder of the time.).

India entities.[309]   Thus, a Modi entity received the LOU money under the pretext of legitimate transactions with HSBC and A. Jaffe.  The same diamond was purportedly transacted among Modi entities in two other transactions within six weeks.

The Examiner determined with the help of BDO (India) that Diamonds 'R' Us did not repay the LOU with money earned from the disposition of the diamonds.  Instead, it repaid the nostro account, and ultimately, PNB with other misappropriated funds.  Firestar India obtained packing credit loans, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods. These packing credit funds were improperly utilized, and were diverted to Diamonds 'R' Us from Neeshal Merchandising, an Indian company controlled by Nirav Modi's brother, to Diamonds 'R' Us on the due date of the outstanding LOU.[310]   The diagram below identifies the movement of the money and the process by which the LOU was issued:

---

[309] HSBC Bill Retirement Advice for account ending in 2460, dated October 13, 2011 (IBCCOR383544MTN.pdf); HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383543MTN.pdf); HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383499MTN.pdf).
[310] Meetings with BDO (India), July 2018.

85



**B.      Debtor Involvement in Alleged LOU Diamond Scheme**

In addition to six LOUs that have been identified as directly funding the Debtors, funds generated by an additional 11 LOUs have been traced indirectly to the Debtors. These seventeen LOUs are:

| # | Date of Receipt / Disbursement | US Debtor Who Received / Disbursed Funds | Amount Deposited | Amount Disbursed | Link to LOU / Packing Credit Funds |
|---|---|---|---|---|---|
| 1 | 3/8/2011 | Firestone, Inc. (Firestar Diamond, Inc.) | $ 1,863,256 | $ - | Direct - US Debtors Exporters on LOU |
| 2 | 5/6/2011 | Firestar Diamond, Inc. | 1,858,219 | - | Direct - US Debtors Exporters on LOU |
| 3 | 8/22/2011 | Firestar Diamond, Inc. | 1,499,736 | - | Direct - US Debtors Exporters on LOU |
| 4 | 10/4/2011 | Firestar Diamond, Inc. | 1,803,249 | - | Direct - US Debtors Exporters on LOU |
| 5 | 10/4/2011 | Firestar Diamond, Inc. | 1,246,766 | - | Direct - US Debtors Exporters on LOU |
| 6 | 10/13/2011 | A. Jaffe, Inc. | 1,921,079 | - | Direct - US Debtors Exporters on LOU |
| 7 | 2/7/2013 | Firestar Diamond, Inc. | 931,965 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 8 | 2/11/2013 | Firestar Diamond, Inc. | 980,805 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 9 | 3/19/2013 | Firestar Diamond, Inc. | 191,501 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 10 | 3/19/2013 | Firestar Diamond, Inc. | 236,078 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 11 | 5/6/2013 | Firestar Diamond, Inc. | 21,394 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 12 | 3/27/2015 | Fantasy, Inc. | 1,552,451 | - | Indirect - Remittances to US Debtors Linked to Packing Credit Loan Funds |
| 13 | 9/24/2015 | Firestar Diamond, Inc. | - | 1,840,969 | Indirect - Disbursements from US Debtors Linked to LOU Repayment |
| 14 | 2/26/2016 | Firestar Diamond, Inc. | - | 1,192,106 | Indirect - Disbursements from US Debtors Linked to LOU Repayment |
| 15 | 3/3/2016 | Firestar Diamond, Inc. | - | 873,997 | Indirect - Disbursements from US Debtors Linked to LOU Repayment |
| 16 | 5/3/2016 | Firestar Diamond, Inc. | 399,962 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 17 | 12/19/2016 | Firestar Diamond, Inc. | 599,972 | - | Indirect - Remittances to US Debtors Linked to LOU |
|  |  |  | $ 15,106,432 | $ 3,907,071 |  |

In addition, days before submitting his report, the Examiner was notified of evidence that funds from an additional LOUs alleged to have been issued in connection with the fraud scheme can be traced to the Debtors. While this is consistent with the Examiner's expectation, the Examiner's team has not independently verified this tracing analysis and the Examiner does not rely upon it for his conclusions.[311] The Examiner's analysis is limited to the seventeen LOUs identified above.

### 1.    LOUs of Which Debtors Were Beneficiaries

---

[311] On August 9, 2018, BDO (India) provided the Examiner with additional remittances to the U.S. Debtors that they linked to LOUs. The remittances consisted of $5,946,656 being sent to A. Jaffe and $3,752,480 being sent to FDI for a total of $9,699,136 in additional indirect LOU funds that passed through the U.S. Debtors. Due to the date these linked remittances were received by the Examiner, no analysis has been performed to verify the flow of funds into the U.S. Debtors.

In connection with the Chapter 11 Cases, BDO (India), on behalf of PNB, filed a Declaration[312] identifying five LOUs issued in favor of the Debtors that are alleged to be part of the LOU scheme.  Subsequently, BDO (India) identified a sixth LOU issued to FDI.[313]  The total value of these LOUs, which were remitted to the Debtors between March and October of 2011, is approximately $10 million.  Firestar India and the Modi Firms are identified as importers while the Debtors were identified as the exporters.  The chart below details these six LOUs.

| # | LOU Remittance Date | Importer | Exporter (US Debtor) | LOU Value Amount | Remitting Entity | Sender Institution | Overseas Corresponding Bank | Receiver Institution (PNB Nostro Account) | US Debtor Bank Account in Which Funds are Deposited |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 3/8/2011 | Firestone International Pvt. Ltd. | Firestone, Inc. (Firestar Diamond, Inc.) | $ 1,863,256 | Firestone International Pvt. Ltd. | Punjab National Bank, Brady House Branch, India | PNB - Hong Kong Branch | Deutsche Bank Trust Company, New York | Firestar Diamond, Inc. HSBC (006-06300-4) |
| 2 | 5/6/2011 | Solar Exports | Firestar Diamond, Inc. | $ 1,858,219 | Solar Exports | Punjab National Bank, Brady House Branch, India | Bank of India - Hong Kong Branch | Deutsche Bank Trust Company, New York | Firestar Diamond, Inc. HSBC (006-06300-4) |
| 3 | 8/22/2011 | Firestone Diamond Pvt. Ltd. | Firestar Diamond, Inc. | $ 1,499,736 | Firestone Diamond Pvt. Ltd. | Punjab National Bank, Brady House Branch, India | PNB - Dubai Branch | Deutsche Bank Trust Company, New York | Firestar Diamond, Inc. HSBC (006-06300-4) |
| 4 | 10/4/2011 | Firestone International Pvt. Ltd. | Firestar Diamond, Inc. | $ 1,803,249 | Firestone International Pvt. Ltd. | Punjab National Bank, Brady House Branch, India | Bank of India - Hong Kong Branch | Deutsche Bank Trust Company, New York | Firestar Diamond, Inc. HSBC (006-06300-4) |
| 5 | 10/4/2011 | Firestone Diamond Pvt. Ltd. | Firestar Diamond, Inc. | $ 1,246,766 | Firestone Diamond Pvt. Ltd. | Punjab National Bank, Brady House Branch, India | Bank of India - Hong Kong Branch | Deutsche Bank Trust Company, New York | Firestar Diamond, Inc. HSBC (006-06300-4) |
| 6 | 10/13/2011 | Diamonds-R-Us | A. Jaffe, Inc. | $ 1,921,079 | Diamonds-R-Us | Punjab National Bank, Brady House Branch, India | PNB - Hong Kong Branch | Deutsche Bank Trust Company, New York | A. Jaffe, Inc. HSBC (054-00246-0) |
| | | | | $ 10,192,303 | | | | | |

Of the six LOUs, four (highlighted in red) allegedly were not properly recorded in the CBS.[314]  As

---

[312] Declaration of Mansi Mehta (ECF No. 150).
[313] Meetings with BDO (India), July 2018.
[314] Meetings with BDO (India), July 2018.

a result, no record of the LOUs issued were recognized by PNB, no margin or collateral was posted by the importer, and no Bank Guarantee Number was generated. Another fraudulent characteristic of these transactions identified was the entering of LOU transaction information, the LOU Value Date, and the payment to the exporter occurred on the same day.[315]   In the normal course of business, such transactions would generally require two days to be completed.[316]  As discussed above, two of the diamonds reflected on the export packing lists related to certain of these LOUs appear to have been the subject of "round tripping," or circular trading.

### a.    Suspect transactions underlying LOUs

The Examiner reviewed available records relating to the transactions to determine the representation made to the banks about the underlying import/export transactions presented to obtain the LOU financing; to trace the flow of funds into the US debtor; and, to the extent possible, place these transactions within the context of the overall Modi fraud. The Examiner obtained invoices and packing lists for five of the six LOUs.[317]  Email instructions from India detailing shipping information were identified for three of the LOUs.[318]   Malca-Amit, a courier that specializes in the shipment of valuable items, was used by the US Debtors to export the diamonds to overseas entities in all six of the LOUs, and the Examiner independently confirmed these shipments to a Transaction Log provided by Malca-Amit.[319]

The applications for all six LOUs described the goods to be imported into India as "cut and polished diamonds."[320]  On the five invoices and packing slips available to the Examiner, the

---

[315] *Id.*
[316] *Id.*
[317] One invoice and packing list was obtained from the US Debtors and four were obtained via Relativity email searches.
[318] *See, e.g.,* email from Sandeep Mistry to Rebecca Chow and Manish Zalawadia dated October 3, 2011(FIRE-REL0000737527); *see also* packing list for export between Firestar Diamond, Inc. and Firestone Diamond Pvt. Ltd. (FIRE-REL0002249993); Packing list for export between Firestone, Inc. and Solar Export (FIRE-REL0002247437).
[319] Malca-Amit Transaction Log for Debtors and Other Modi Entities provided by Malca-Amit.
[320] LOU Application SWIFT Messages.

89

quantity of diamonds underlying the application ranged from four[321] to twenty-six loose diamonds, most of which were fancy colored.

The diamond expert noted that such shipments of diamonds were unusual due to the diamonds' high price and lower turnover in the market.[322] The fancy colored loose diamonds that appeared on the invoices were overvalued and so large in quantity that the packing slips alone should have raised suspicion. Taking, for example, the October 4, 2011 $1,246,765.60 LOU transaction between Firestar India and FDI, shipping records and related packing lists show that FDI shipped nineteen fancy colored diamonds to Firestar India with a total carat count of 73.70.[323] The export from FDI to Firestar India occurred on September 19, 2011 for $1,246,765.60,[324] and FDI received the payment on October 4, 2011 with the LOU funds. Two days before this export, FDI imported the same diamonds from Fancy Creations, a Hong Kong Shadow Entity, for $1,233,965.[325] In other words, the records reflect a shipment of more than $1.2 million worth of the same loose diamonds from Hong Kong to the U.S., then to India over a period of two weeks among Modi-related entities for a $12,800 profit less shipping and other transactional costs that would further reduce the profit.

These transactions identified by the Examiner bear indicia of fraud. The diamond expert reviewed three of the five invoices/packing slips as well as other documents accompanying the shipments. He identified multiple items related to the transactions that are inconsistent with

---

[321] Malca-Amit Shipping Document Packet including Invoice and Packing List, $1,803,248.75 Transaction between Firestar International Pvt. Ltd. and Firestar Diamond, Inc., dated September 20, 2011 (FIRE-REL0002249985).

[322] Malca-Amit Shipping Document Packet including Invoice and Packing List, $1,921,078.65 Transaction between Diamonds-R-Us and A. Jaffe, Inc., dated October 4, 2011 provided by Debtors; As per Angelo Palmieri, President, Gemprint Corp.; COO GCAL Inc.

[323] Malca-Amit Shipping Document Packet including Invoice and Packing List, $1,246,765.60 Transaction between Firestone International Pvt. Ltd. and Firestar Diamond, Inc. dated September 20, 2011 (FIRE-REL0002249983).

[324] Malca-Amit Transaction Log for Debtors and Other Modi Entities provided by Malca-Amit.

[325] Invoice and Packing List from Fancy Creations Company Limited to Firestar Diamond, Inc., dated September 17, 2011 (FIRE-REL0002250136); Malca-Amit Transaction Log for Debtors and Other Modi Entities. The total stated value of the import of diamonds into Firestar Diamond, Inc, from Fancy Creations Company Ltd. was $1,972,744, but the specific diamonds used in the subsequent LOU transaction had a stated value of $1,233,965.

standard industry practices.    First, none of the LOU export invoices had references to certifications.[326]  Second, he confirmed it is unusual for large quantities of fancy colored diamonds to be sold at one time due to their high price tag and lower turnover rate in the market.[327]

Finally, the diamond expert stated that the prices of diamonds he reviewed appeared to be highly exaggerated, and based on the values of certain fancy colored loose diamonds at the time of these transactions, the rates and values here would be much lower.[328]  As shown below, the stated rates and values of three fancy colored diamonds identified on the packing list used in the LOU transactions appear to be artificially inflated by at least $705,562:

**Variance between Diamond Rates/Values on Debtor LOU Export Invoice and Independent Diamond Expert**

| | | | | A | | B | A - B |
|---|---|---|---|---|---|---|---|
| **Per LOU Export Invoice** | | | | | **Per Independent Diamond Expert** | | |
| **LOU Invoice** | **Diamond Description** | **Carats** | **Rate Per Invoice** | **Amount Per Invoice** | **Max Rate Per Expert** | **Amount Using Expert's Rate** | **Variance** |
| FSI - FDPL | Fancy Deep Pink Heart Cut I1 | 1.12 | $ 277,145.00 | $ 310,402.40 | $ 150,000.00 $ | 168,000.00 | $ 142,402.40 |
| A. Jaffe - DRUS | Fancy Intense Pink Emerald Cut S12 | 1.04 | $ 656,500.00 | $ 682,760.00 | $ 300,000.00 $ | 312,000.00 | $ 370,760.00 |
| A. Jaffe - DRUS | Fancy Intense Purplish Pink Radiant S12 | 0.52 | $ 505,000.00 | $ 262,600.00 | $ 135,000.00 $ | 70,200.00 | $ 192,400.00 |
| | | | | | | | $ 705,562.40 |

These anomalies identified by the diamond expert are consist with other evidence that the loose diamonds lack legitimacy.

### b.    Tracing the LOU Funds

The Examiner traced the destination of LOU funds after the Debtors received the money. Funds related to five LOUs in which FDI was named as the exporter and beneficiary were

---

[326] None of the LOU export invoices were accompanies by Gemological Institute of America ("GIA") Reports.  GIA Reports are Diamond Grading Reports verifying key characteristics of the diamonds such as shape and cutting style, measurements, carat weight, color, clarity, and cut grade, finish, polish, symmetry and fluorescence. According to the diamond expert, GIA Reports are attached to virtually any valuable fancy colored diamond transaction worldwide because of the possibility of synthetics and treatments in the diamond that could drive the value of the diamond down. A GIA Report stating a fancy diamond was natural and untreated would add value to the transaction. The diamond expert also confirmed that you do not routinely see large quantities of fancy diamonds being sold at one time due to their high price tag and lower turnover rate in the market.

[327] Angelo Palmieri, President, Gemprint Corp.; COO GCAL Inc.

[328] Id.

deposited into FDI's HSBC account ending 3004. Money related to the one LOU in which A. Jaffe was the exporter was deposited into A. Jaffe's HSBC accounting ending 2460.  Based on the related accounts' opening balances as well as the bank statement activity on or around the dates of the deposits, the tracing of some LOU funds is more direct, while others are less so.  Importantly, most of the money obtained through LOU financing was used to pay L/C Collections, which was a payment mechanism to pay vendors, and which the Debtors used to pay Firestar affiliates overseas (Firestar India, Firestar Belgium, or Firestar Dubai).

### i.  LOU 1:  March 8, 2011- $1,863,256 LOU Transaction between Firestone, Inc. (FDI) and Firestar India

Funds from this LOU were deposited into FDI's account on March 8, 2011.  As the account's opening balance on March 8, 2011 was $788,125 and there were $1,680,510 in other deposits, the funds used for disbursements on the same day included LOU funds. However, LOU funds were utilized for at least a portion of the disbursements to Auragem Company Limited (a Shadow Entity) and L/C Collections.  Documents reviewed by the Examiner corroborate that the funds disbursed to L/C Collections in this case were for the benefit of Firestar India.[329]

Excerpts of the relevant FDI bank statements are below:



---

[329] HSBC Bill Retirement Advice for account ending in 2460, dated October 13, 2011 (IBCCOR383544MTN.pdf); HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383543MTN.pdf); HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383499MTN.pdf).

FIRESTONE INC
A-R ACCOUNT
FKA NEXT DIAMOND INC

ANALYZED BUSINESS CHKG
Statement of Account
Account Number ███████300-4

March 1, 2011 - March 31, 2011
Page 4 of 23

TRANSACTION DETAIL

**Total Deposits on 3/8/2011: $3,543,731**

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 03/08/11 | 33RECD CHIP BANK OF AMERICA N.A.*ORG:SOLAR EXPORTS,,MUMBAI 400 004, INDIA.*OGB:PUNJAB NATIONAL BANK,FORT MUMBAI 400 001, INDIA*BNF:FIRESTONE INC.,NEW YORK, NY 10011, USA*OBI:PART PAYMENT INV.NO.15167454 DATED14.09.2010 FOR USD 1,378,512.00.25.00 FEE DEDUCTED*STCHIPSEQ:0165785*TIME:0717*YR REF:3731FIBC36119/11*MMB REF:067384816 | | 378,487.00 | |
| 03/08/11 | 45BOOK DEBIT FIRESTONE INC*BNF:AURAGEM COMPANY LIMITED,HUNGHOM, KOWLOON, HONG KONG*BBI:/REC/REF:854835P00L&U*STBOOK*TIME:0903*YR REF:INVOICE - 028*MMB REF:067395417 | 1,010,527.00 | | |
| 03/08/11 | TRANID:HIE *YR REF: 2630D50746810    MMB REF:IBC COR681482MTN   TYPE:L/C COLLECTIONS  BTA 00057 | 762,607.87 | | |
| 03/08/11 | TRANID:HIE *YR REF: 2630D50760210.   MMB REF:IBC COR382690MTN   TYPE:L/C COLLECTIONS  BTA 00026 | 697,470.00 | | |
| 03/08/11 | TRANID:HIE *YR REF: 2630C50761510   MMB REF:IBC COR059415MTN   TYPE:L/C COLLECTIONS  BTA 00060 | 276,110.00 | | |
| 03/08/11 | TRANID:HIE *YR REF: 2630C50746910   MMB REF:IBC COR057105MTN   TYPE:L/C COLLECTIONS  BTA 00062 | 219,520.00 | | |
| 03/08/11 | TRANID:HIE *YR REF: 2630D50746810   MMB REF:IBC COR056854MTN   TYPE:L/C COLLECTIONS  BTA 00061 | 150,575.59 | | |
| 03/08/11 | TRANID:HIE *YR REF: 2010D830696    MMB REF:IBC COR057874MTN   TYPE:L/C COLLECTIONS  BTA 00072 | 88,515.00 | | |
| 3/11 | 38SEND CHIP BANK OF NEW YORK*BBK:UNION BANK OF INDIA,MUMBAI*BNF:FIRESTONE DIAMOND PVT. LTD.,GUJARAT INDIA*BBI:/REC/REF:397235P0118B*STCHIPSEQ:0236085*TIME:1023*YRREF:30100293 / 294*MMB REF:067408810 | 34,440.00 | | |
| 03/08/11 | CHECK #19335 | 26,909.75 | | |
| 03/08/11 | CHECK #19321 | 16,313.67 | | |
| 03/08/11 | CHECK #19337 | 3,325.00 | | |
| 03/08/11 | CHECK #19306 | 1,062.24 | | |
| 03/08/11 | CHECK #19283 | 722.94 | | 1,043,756.87 |
| 03/09/11 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006301430 | | 3,349.27 | |
| 03/09/11 | DEPOSIT | | 2,558.00 | |
| 03/09/11 | 45BOOK DEBIT FIRESTONE INC*BNF:SANDBERG AND SIKORSKI CORPORATION*BBI:/REC/REF:156035Q00LKW*STBOOK*TIME:1027*YRREF:LOAN*MMB REF:068413339 | 200,000.00 | | |
| 03/09/11 | CHECK #19340 | 29,503.09 | | |
| 03/09/11 | CHECK #19329 | 14,298.20 | | |
| 03/09/11 | CHECK #19339 | 6,250.00 | | |
| 03/09/11 | CHECK #19328 | 3,465.00 | | |
| 03/09/11 | CHECK #19332 | 1,480.00 | | |
| 03/09/11 | CHECK #19334 | 376.93 | | |
| 03/09/11 | CHECK #19331 | 315.74 | | |
| 03/09/11 | CHECK #19343 | 287.19 | | 793,687.99 |
| 03/10/11 | DEPOSIT | 78,497.08 | | |
| 03/10/11 | CORP TRADE PA NEXCOM WO A | | 455.68 | |

**Total Disbursements on 3/8/2011**

| | |
|---|---|
| Auragem Company Limited: | $1,010,527 |
| L/C Collections: | $2,194,798 |
| Firestone Int'l Pvt. Ltd.: | $   34,440 |
| Checks: | $   48,334 |
| | $3,288,099 |

**ii.    LOU 2:  May 6, 2011 - $1,858,219 LOU Transaction between FDI and Solar Exports**

Funds from this LOU were deposited into the FDI account on May 6, 2011.  As the account's opening balance on May 6, 2011 was $366,813 and there were $1,251,072 in other deposits, the funds used for disbursements on or around the same day included LOU funds. The LOU funds were used for at least a portion of the $1,809,131 in disbursements to L/C Collections and $47,566 to Firestar India and possibly to subsequent disbursements in the account on following days.

Excerpts of the relevant FDI bank statements are below:

93



| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 05/09/11 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006326405 | | 79,362.15 | |
| 05/09/11 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006326691 | | 459.00 | |
| 05/09/11 | 33RECD CHIP CITIBANK N.A.*ORG:SOLAR EXPORTS,B J.S.S. ROAD, OPERA HOUSE, MUMBAI*OGB:ORIENTAL BANK OF COMMERCE,MUMBAI*BNF:FIRESTAR DIAMOND INC,NEW YORK*OBI:FINAL PYMNT OF INV. NO.15172338AND 15172336*STCHIPSEQ:0309475*TIME:110 7*YR REF:NONREF*MMB REF:129441798 | | 1,460,830.57 | |
| 05/09/11 | 33RECD CHIP CITIBANK N.A.*ORG:STELLAR DIAMOND,MUMBAI 400 004*OGB:ORIENTAL BANK OF COMMERCE,MUMBAI*BNF:FIRESTAR DIAMOND INC,NEW YORK*OBI:PART PYMNT OF INV. NO.15172335 DT .3.12.2010*STCHIPSEQ:0311735*TIME:1153*YR REF:NONREF*MMB REF:129442694 | | 530,676.90 | |
| 05/09/11 | 33RECD CHIP KBC BANK NV*ORG:DIANET BVBA,2018 ANTWERPEN*OGB:ANTWERPSE DIAMANTBANK N.V.,ANTWERPEN*BNF:FIRESTAR DIAMOND INC,NEW YORK*OBI:INVOICE 15182630*BBI:LESS CHARGES: USD 28.00*STCHIPSEQ:0313865*TIME:1149*YR REF:000EOIN111 260047*MMB REF:129443522 | | 123,347.00 | |
| 05/09/11 | 57SEND FED BANK LEUMI USA*BNF:PACIFIC M INTERNATIONAL CORPORATION,TEL: 213-488-1455*BBI:/REC/REF:32493*F00G9G*ST FEDSEQ:B1Q8982C002273*TIME:1042*YR REF:INV 32630*MMB REF:129424400 | 723,600.00 | | |
| 05/09/11 | TRANID:HIE *YR REF: 3731C750931/10   MMB REF:IBC COR6817781MTN   TYPE:L/C COLLECTIONS  BTA 00029 | 549,850.95 | | |
| 05/09/11 | TRANID:HIE *YR REF: 3731C/50930/10   MMB REF:IBC COR6817783MTN   TYPE:L/C COLLECTIONS  BTA 00030 | 549,732.30 | | |
| 05/09/11 | TRANID:HIE *YR REF: 3731C750998/10   MMB REF:IBC COR382855MTN   TYPE:L/C COLLECTIONS  BTA 00031 | 340,800.00 | | |
| 05/09/11 | TRANID:HIE *YR REF: 3731C750995/10   MMB REF:IBC COR382854MTN   TYPE:L/C COLLECTIONS  BTA 00022 | 269,110.00 | | |
| 05/09/11 | TRANID:HIE *YR REF: 0010410C341569   MMB REF:IBC COR382841MTN   TYPE:L/C COLLECTIONS  BTA 00019 | 143,360.78 | | |
| 05/09/11 | TRANID:HIE *YR REF: 0010410C341569   MMB REF:IBC COR382841MTN   TYPE:L/C COLLECTIONS  BTA 00019 | 25.00 | | |
| 05/09/11 | 37SEND CHIP ISRAEL DISCOUNT BANK OF NEW YORK*BNF:FIRESTONE, INC.,NEW YORK NY 10011*BBI:/REC/REF:84343*F018YJ*ST CHIPSEQ:0300281*TIME:1045*YR REF:TRANSFER*MMB REF:129437 909 | 500,000.00 | | |
| 05/09/11 | 38SEND CHIP BANK OF AMERICA N.A.*BBK:PUNJAB NATIONAL BANK,MUMBAI*BNF:FIRESTONE INTERNATIONAL PVT LTD,MUMBAI 400023*BBI:/REC/REF:18193*F00JQ6*STCHIPSEQ:0258680*TIME:0923 *YR REF:INV 50614*MMB REF:129424408 | 46,085.06 | | 1,042,714.71 |
| 05/10/11 | CASH CONCENTRATION AAFES-VEN PAY | | 24,598.11 | |

### iii.   LOU 3:  August 22, 2011 - $1,499,736 LOU between FDI and Firestar India

Funds from this fraudulently obtained LOU were deposited into FDI's account on August 22, 2011.  As the accounts' opening balance on August 22, 2011 was $272,083 and there was $142,200 in other deposits, the $1,480,091 in disbursements to L/C Collections and $5,692 in checks written can largely be attributed to the LOU funds received.  Excerpts of the relevant FDI bank statements are below:



**TRANSACTION DETAIL**

**Total Deposits on 8/22/2011: $1,641,901**

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 08/22/11 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006370444 | | 85,348.91 | |
| 08/22/11 | DEPOSIT | | 32,294.48 | |
| 08/22/11 | DEPOSIT | | 18,410.00 | |
| 08/22/11 | CASH CONCENTRATION AAFES-VEN PAY AAFES   VEN PAY  1502545689 | | 3,318.27 | |
| 08/22/11 | 41BOOK CREDIT FIRESTAR DIAMOND INC*ORG:UNITED PRECIOUS M ETAL REFINING INC,ALDEN*OGB:HSBC BANK USA - HEXAGON PAYM ENTS*BNF:FIRESTAR DIAMOND INC,NEW YORK*BBI:/REC/REF:0757 3AC00TT0*STBOOK*TIME:1501*YR REF:07573AC00TT0*MMB REF:23 4461684 | | 2,828.31 | |
| 08/22/11 | 33RECD CHIP DEUTSCHE BANK TRUST CO AMERICAS*ORG:FIRESTON E DIAMOND PVT LTD,,INDIA.*OGB:PUNJAB NATIONAL BANK,MUMBA I, INDIA*BNF:FIRESTAR DIAMOND INC,NEW YORK*OBI:FULL PMT. OF INV.NO.15187190DTD.03.08.11 FOR USD 1,499,735.75.*STC HIPSEQ:0243402*TIME:0852*YR REF:NONREF*MMB REF:234414653 | | 1,499,700.75 | ← LOU Deposit |
| 08/22/11 | TRANID:HIE *YR REF: 2630D50856511     MMB REF:IBC COR383189MTN   TYPE:L/C COLLECTIONS  BTA 00089 | 714,089.00 | | |
| 08/22/11 | TRANID:HIE *YR REF: 529133225849-A     MMB REF:IBC COR383265MTN   TYPE:L/C COLLECTIONS  BTA 00092 | 221,140.00 | | |
| 08/22/11 | TRANID:HIE *YR REF: 104207505850111    MMB REF:IBC COR383271MTN   TYPE:L/C COLLECTIONS  BTA 00094 | 194,990.00 | | |
| 08/22/11 | TRANID:HIE *YR REF: 2630C50861811    MMB REF:IBC COR383216MTN   TYPE:L/C COLLECTIONS  BTA 00107 | 148,514.48 | | |
| 08/22/11 | TRANID:HIE *YR REF: 104207507450111    MMB REF:IBC COR383336MTN   TYPE:L/C COLLECTIONS  BTA 00095 | 87,015.00 | | |
| 08/22/11 | TRANID:HIE *YR REF: 104207505900111    MMB REF:IBC COR383270MTN   TYPE:L/C COLLECTIONS  BTA 00093 | 70,520.00 | | |
| 08/22/11 | TRANID:HIE *YR REF: 2630D50856611    MMB REF:IBC COR383194MTN   TYPE:L/C COLLECTIONS  BTA 00090 | 43,822.31 | | |
| 08/22/11 | CHECK #1034 | 3,367.12 | | |
| 08/22/11 | CHECK #20210 | 2,074.16 | | |
| 08/22/11 | CHECK #20147 | 193.50 | | |
| 08/22/11 | CHECK #20120 | 58.00 | | 428,199.72 |
| 08/23/11 | CHECK #1035 | 70,000.00 | | |
| 08/23/11 | AUTOMATIC TRANSFER TO CREDIT ACCOUNT #6711007740 BANKCARD PAYMENT  540580671100774 | 27,352.84 | | |
| 08/23/11 | CHECK #20235 | 2,042.20 | | |
| 08/24/11 | CASH CONCENTR | | | |
| 08/24/11 | 45BOOK DEBIT F AAFES  VEN PA NC,NEW YORK R REF:INTERNA | 10,000.00 | | |
| 08/24/11 | CHECK #20233 | 50,717.55 | | |
| 08/24/11 | CHECK #20226 | 6,983.71 | | |

**Total Disbursements on 8/22/2011**
L/C Collections: $1,480,091
Checks:           $      5,692
                  $1,485,784

8/22/2011 Closing Balance

96

iv.    **LOUs 4 and 5:  October 4, 2011 - $1,803,249 LOU between FDI and Firestar India and $1,246,731 LOU between FDI and Firestar India**

Funds related to both of these fraudulently obtained LOUs were remitted to FDI on October 4, 2011, resulting in $3,049,944 of total LOU funds deposited into the same FDI account on the same day.  The account's opening balance on October 4, 2011 was $103,084 and there were only $1,636 in other deposits.  Therefore, the $3,134,892 in disbursements to L/C Collections on the same day can be directly linked to the LOU funds received.

The Examiner, in cooperation with BDO (India), determined that Firestar India repaid these LOUs. It did so through a financing mechanism called packing credits, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods.  The Reserve Bank of India defines packing credit loans as a:

> loan or advance granted or any other credit provided by a bank to an
> exporter for financing the purchase, processing, manufacturing or

97

packing of goods prior to shipment/working capital expenses towards rendering of services on the basis of letter of credit opened in his favor or in favor of some other person, by an overseas buyer or a confirmed and irrevocable order for the export of goods / services from India or any other evidence of an order for export from India having been placed on the exporter or some other person, unless lodgement of export orders or letter of credit with the bank has been waived.[330]

Rather than use Packing Credit Loans for their intended purpose, and to finance the purchase, processing, manufacturing, and shipment of an upcoming export, funds from the packing credit loans obtained by Firestar India were improperly utilized and diverted to the current accounts of the importers to repay the LOUs.[331]

<strong>v.     LOU 6:  October 13, 2011 - $1,921,079 LOU between A. Jaffe, Inc. and Diamonds 'R' Us</strong>

Funds from this fraudulently obtained LOU were deposited into A. Jaffe's account on October 13, 2011.  The account's opening balance was $136,696 with only $1,585 in other deposits.  Therefore, the $1,832,700 in disbursements to L/C Collections and the $57,994 transfer to Firestar India can be attributed to the LOU funds.  The money deposited with L/C Collections was then transferred to Firestar India.[332]

---

[330] RESERVE BANK OF INDIA, Master Circular on Rupee / Foreign Currency Export Credit & Customer Service to Exporters, July 2, 2012 (https://rbi.org.in/scripts/BS_ViewMasCirculardetails.aspx?id=7377)./

[331] Meetings with BDO (India), July 2018.

[332] HSBC Bill Retirement Advice for account ending in 2460, dated October 13, 2011 (IBCCOR383544MTN.pdf); HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383543MTN.pdf); HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383499MTN.pdf).

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 10/11/11 | TRANID:HIE *YR REF: 04021211C069027    MMB REF:IBC COR383584MTN    TYPE:L/C COLLECTIONS  BTA 00070 | 950,870.00 | | |
| 10/11/11 | TRANSFER BALANCE TO RELATED ACCOUNT | | | 10/13/2011 Opening Balance |
| 10/12/11 | DEPOSIT | | | |
| 10/12/11 | 45BOOK DEBIT A JAFFE INC*BNF:A JAFFE INC,NEW YORK*BBI:R EC/REF:1S323BR01CAL*STBOOK*TIME:1155*YR REF:INTERNAL WIR E*MMB REF:285438335 | 100,000.00 | | |
| | | | *Total Deposits on 10/13/2011: $1,922,629* | |
| 10/12/11 | TRANSFER BALANCE TO RELATED ACCOUNT  797036873 | 36,176.15 | | 136,695.94 |
| 10/13/11 | DEPOSIT | | 1,585.25 | |
| 10/13/11 | 33RECD CHIP DEUTSCHE BANK TRUST CO AMERICAS*ORG:DIAMONDS R US.,OPERA HOUSE,MUMBAI 400 004, INDIA.*OGB:PUNJAB NAT IONAL BANK,MUMBAI, INDIA*BNF:A JAFFE INC,NEW YORK*OBI:FU LL PAYMENT OF INV.NO.S0020580 DTD04.10.2011 FOR USD1,921 ,078.65.*STCHIPSEQ:0174457*TIME:0633*YR REF:NONREF*MMB R EF:286385744 | | 1,921,043.65 | LOU Deposit |
| 10/13/11 | TRANID:HIE *YR REF: 3731C750344/11    MMB REF:IBC COR383544MTN    TYPE:L/C COLLECTIONS  BTA 00071 | 1,101,120.00 | | |
| 10/13/11 | TRANID:HIE *YR REF: 3731C750343/11    MMB REF:IBC COR383543MTN    TYPE:L/C COLLECTIONS  BTA 00070 | 388,200.00 | | |
| 10/13/11 | TRANID:HIE *YR REF: 0076FBC11003680    MMB REF:IBC COR383499MTN    TYPE:L/C COLLECTIONS  BTA 00069 | 343,380.10 | | |
| 10/13/11 | TRANSFER BALANCE TO RELATED ACCOUNT  797036873 | 16,184.20 | | |
| 10/13/11 | 38SEND CHIP JPMORGAN CHASE BANK*BBK:UNION BANK OF INDIA, MUMBAI*BNF:FIRESTONE INTERNATIONAL PVT. LTD.,MUMBAI 400 021*BBI:/REC/REF:05433BS024SJ*STCHIPSEQ:0320399*TIME:12 58*YR REF:60017/28/36/81*MMB REF:286439216 | 57,993.83 | | 152,446.71 |
| 10/14/11 | DEPOSIT | | 36,930.07 | |
| 10/14/11 | TRANSFER BALANCE TO RELATED ACCOUNT  797036873 | 983.94 | | |
| 10/14/11 | 38SEND CHIP JPMORGAN CHASE BANK*BBK:UNION BANK OF INDIA, MUMBAI*BNF:FIRESTONE… 021*BBI:/REC/REF:79853BT… 24*YR REF:INV - 015/11-12*… | 37,050.00 | | 151,342.84 |
| 10/17/11 | DEPOSIT | | 145,642.90 | |
| 10/17/11 | CASH CONCENTRATION AN… AMERICAN SETTLEMENT | | 4,855.00 | |
| 10/17/11 | CASH CONCENTRATION AN… AMERICAN SETTLEMENT | | 924.32 | |
| 10/17/11 | RETURN OF DEPOSITED ITEM | 1,379.00 | | |

*Total Disbursements on 10/13/2011*
*L/C Collections:           $1,832,700*
*Firestone Int'l Pvt. Ltd.:   $   57,994*
*Related Bank Transfer   $   16,184*
                                      *$1,906,878*

Similar to LOUs 4 and 5 described above, Firestar obtained packing credit from Vijaya Bank in India and misapplied the funds to repay this LOU.[333]

### 2.      LOU Funds Sent To Shadow Entities and Then Through the Debtors

In addition to being named as the exporters and direct beneficiaries in connection with the six LOU transactions described above, funds from numerous other LOUs can be traced from the Shadow Entities and through the Debtors' bank accounts during the period from 2013 - 2016.[334] Approximately 1,425 LOUs issued by PNB were primarily for the benefit of Shadow Entities posing as exporters.[335]  The fraudulent nature of these LOUs stems from the fact that they were issued without collateral, were not recorded in the CBS, were largely repaid through improper means, and were usually transacted with the following Shadow Entities:[336]

---

[333] Meetings with BDO (India), July 2018.
[334] Meetings with BDO (India), July 2018.
[335] *Id*. at 17.
[336] Meetings with BDO (India), July 2018.

**LOUs Issued by PNB to Nirav Modi Controlled Entities**

| Exporter Entity | Country | Count of LOUs |
|---|---|---|
| Auragems Company Limited | Hong Kong | 517 |
| Pacific Diamonds FZE | UAE | 370 |
| Sino Traders Limited | Hong Kong | 333 |
| Tri Color Gems FZE | UAE | 320 |
| Sunshine Gems Limited | Hong Kong | 273 |
| Diagems FZC | UAE | 243 |
| Fancy Creations Company Limited | Hong Kong | 168 |
| Unity Trading FZE | UAE | 167 |
| Brilliant Diamonds Ltd | Hong Kong | 85 |
| Universal Fine Jewelry FZE | UAE | 20 |
| Diagems FZE | UAE | 16 |
| Hamilton Precious Traders Ltd Fzco | UAE | 11 |
| Himalayan Traders FZE | UAE | 11 |
| Eternal Diamond Corporation Limited | Hong Kong | 7 |
| DG Brothers FZE | UAE | 6 |
| Unique Diamond And Jewellery FZC | UAE | 5 |
| Firestar Diamond, Inc. | USA | 4 |
| Vista Jewelry FZE | UAE | 2 |
| A. Jaffe, Inc. | USA | 1 |
| Firestone, Inc. | USA | 1 |
| Nipur BVBA | Belgium | 1 |
| Pacific Gems FZE | UAE | 1 |
| Solar Exports Limited | Hong Kong | 1 |
| **Total:** | | **2,563** |

**Source:**

Meeting with BDO (India)

**Notes:**

[1] According to the BDO India team engaged by PNB, there were 1,561 total LOUs issued by PNB to the Nirav Modi Group. Of these 1,561 LOUs issued, there were multiple exporters for the majority of the LOUs. This is the why the count of exporters above is greater than 1,561.

[2] Blue highlight was added by the Examiner team to show 6 LOUs issued in which the US debtors were the exporters. Note that Firestone, Inc. was the previous name of Firestar Diamond, Inc.

100

Many of these exporters appeared in the Debtors' records as customers. Upon inspection of the FDI customer list provided to the Examiner by the Debtors, high, multi-million-dollar credit limits for accounts receivable were listed for many of the alleged Shadow Entities.[337] Also, the salesperson for these customers was stated as "MIHIR" or "001". "MIHIR" was the code used for customers whose salesperson was Mihir Bhansali and "001" was the code used for the House account.[338] According to the Gandhi, the accounts with the "001" House account code were also Mihir's customers based on how they appear in the Debtors' books.[339] According to the ED Complaint, these companies "were only created in order to facilitate layering and laundering of funds obtained fraudulently from PNB and to camouflage the real intention and identity of beneficiaries of the funds siphoned off from PNB."[340]

The Examiner analyzed the bank statements for each of the Debtors, to the extent available. The review documented receipts and disbursements into/out of the Debtors accounts in excess of $500,000 that were linked to a Shadow Entity. BDO (India), with its access to the accounts of certain Shadow Entities, assisted the Examiner in linking money from LOUs to the Debtors and vice versa. Either the Debtors received money from fraudulent LOUs through the Shadow Entities, or the Debtors paid money to a Shadow Entity to aid in repaying an LOU. This analysis resulted in tracing approximately $5 million from specific LOUs to the Debtors[341] between 2013 and 2016 (Table 1 below) and $4 million from the Debtors to Shadow Entities[342] that ultimately repaid

---

[337] Debtor document titled "Firestar Diamond Inc. Customer Listing with address.pdf"; Debtor document titled "Firestar Vendor – Listing.pdf"; Debtor document titled "Fantasy Customer Listing with address.pdf, Fantasy Vendor – Listing.pdf"; Debtor document titled "AJAFFE CUSTOMER LIST.pdf"; Debtor document titled "Jaffe – Vendor Master List.xlsx.".

[338] Interview of Ajay Gandhi, July 19, 2018.

[339] Id.

[340] ED Complaint ¶3.1.4.

[341] See Table 1, below.

[342] See Table 2, below.

specific LOUs (Table 2 below).[343]

It should be noted that the Examiner did not have access to the Shadow Entities' bank statements, which are located in foreign jurisdictions and from which acquiring such information would be challenging and take many months. Thus, while the Examiner was able to trace certain payments, a more extensive tracing analysis would require significant additional time and cost.

### Table 1[344]

**Receipts of Funds into US Debtors Linked to LOUs Obtained by Modi Affiliates**

| Date Posted | Transacting Entity | Deposit Amount |
|---|---|---|
| 2/7/2013 | Pacific Diamonds FZE | $ 931,965 |
| 2/11/2013 | Pacific Diamonds FZE | 980,805 |
| 3/19/2013 | Auragems Company Limited | 191,501 |
| 3/19/2013 | Fancy Creations Company Limited | 236,078 |
| 5/6/2013 | Fancy Creations Company Limited | 21,394 |
| 3/27/2015 | Pacific Diamonds FZE | 1,552,451 |
| 5/3/2016 | Tri Color Gems FZE | 399,962 |
| 12/19/2016 | Pacific Diamonds FZE | 599,972 |
| | | $ 4,914,129 |

### Table 2[345]

**Disbursements of Funds from US Debtors Linked to Repayment of LOUs**

| Date Posted | Transacting Entity | Disbursement Amount |
|---|---|---|
| 9/24/2015 | Auragems Company Limited | $ 1,840,969 |
| 2/26/2016 | Tri Color Gems FZE | 1,192,106 |
| 3/3/2016 | Pacific Diamonds FZE | 873,997 |
| | | $ 3,907,071 |

a)      **Tracing Receipts of Funds Linked to LOUs into Debtors' Accounts**[346]

---

[343] Meetings with BDO (India), July 2018.

[344] Meetings with BDO (India), July 2018; Bank statements for Firestar Diamond, Inc. HSBC account ending 3004 and Fantasy, Inc. account ending 9441

[345] *Id.*

[346] Meetings with BDO (India), July 2018 *See* Bank statement for Firestar Diamond, Inc. HSBC account ending 3004 and Fantasy, Inc. account ending 9441 bank statements and A. Jaffe HSBC account ending 2460.

### 1)      Pacific Diamonds to FDI

Pacific Diamonds transferred $931,965 to FDI on February 7, 2013.  The Examiner, in conjunction with BDO (India) and PNB, through its counsel, Cleary, Gottlieb, Steen & Hamilton LLP ("Cleary"), discovered this deposit was linked to a fraudulent LOU that Diamonds 'R' Us obtained in which Pacific Diamonds was the exporter. The total transaction amount was $3.097 million, and the LOU date was February 8, 2013. The disbursement of $931,965 from Pacific Diamonds to FDI occurred on February 7, 2013, one day before the LOU funds were sent to Pacific Diamonds.  The total movement of funds is depicted below:



The FDI bank statement shows the transfer of money upon receipt from Pacific Diamonds:[347]

---

[347] Firestar Diamond, Inc. February 2013 HSBC account statement for account ending 3004.

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE | |
|---|---|---|---|---|---|
| 02/06/13 | TRANID:IIIE *YR REF: 0076FBC13000551   MMB REF:IBC COR685448MTN   TYPE:L/C COLLE | 120.00 | | | *2/7/2013 Opening Balance* |
| 02/06/13 | TRANID:IIIE *YR REF:   M MTN327467   TYPE:AIR RELEASE CHGS SRA 00083 | | | | |
| 02/06/13 | TRANID:IIIE *YR REF:   MMB REF:AWR MTN327468   TYPE:AIR RELEASE CHGS SRA 00084 | 165.00 | | | |
| 02/06/13 | CHECK #1139 | 10,260.00 | | 83,638.25 | |
| 02/07/13 | DEPOSIT | | 5,302.50 | | |
| 02/07/13 | 53RECD FED HIBERNIA NATIONAL BANK*ORG:FIRESTAR DIAMOND I NTERNATIONAL,NEW YORK, NY 10011-0000*BNF:FIRESTAR DIAMON D INC,NEW YORK*OBI:FOR FIRESTAR*STFEDSEQ:F5QCZ80C001407* TIME:1410*YR REF:NONREF*MMB REF:038452127 | | 643,356.89 | | |
| 02/07/13 | 33RECD CHIP MASHREQ BANK*ORG:PACIFIC DIAMONDS FZE,DUBAI AIRPORT FZE,DUBAI*OGB:MASHREQBANK PSC,DUBAI, UNITED ARAB EMIRATES*BNF:FIRESTAR DIAMOND INC,NEW YORK*OBI:INV NO.: 15209752 DT. 28.09.2012 PART PAYMENT PURCHASE OF DIAMON D*STCHIPSEQ:0303882*TIME:1101*YR REF:NONREF*MMB REF:0384 31039 | | 931,965.00 | | *Funds traced to LOU* |
| 02/07/13 | 45BOOK DEBIT FIRESTAR DIAMOND INC*BNF:FIRESTAR DIAMOND I NC,NEW YORK*BBI:/DAS/REF:61093P899AF1*STBOOK*TIME:1428*Y R REF:INTERNAL TRANSFE*MMB REF:038453856 | 100,000.00 | | | |
| 02/07/13 | TRANID:IIIE *YR REF: 104207523970112   MMB REF:IBC COR684426MTN   TYPE:L/C COLLECTIONS BTA 00043 | 142,290.00 | | | |
| 02/07/13 | TRANID:IIIE *YR REF: 104207524700112   MMB REF:IBC COR684543MTN   TYPE:L/C COLLECTIONS BTA 00045 | 186,320.00 | | | |
| 02/07/13 | TRANID:IIIE *YR REF: 104207524740112   MMB REF:IBC COR684545MTN   TYPE:L/C COLLECTIONS BTA 00046 | 190,345.00 | | | |
| 02/07/13 | TRANID:IIIE *YR REF: 104207524250112   MMB REF:IBC COR684462MTN   TYPE:L/C COLLECTIONS BTA 00049 | 191,510.00 | | | |
| 02/07/13 | CHECK #22110 | 352.00 | | | |
| 02/07/13 | CHECK #21979 | 460.00 | | | |
| 02/07/13 | CHECK #22114 | 721.00 | | | |
| 02/07/13 | CHECK #22085 | 2,825.00 | | | |
| 02/07/13 | CHECK #22087 | 3,177.00 | | | |
| 02/07/13 | CHECK #22108 | 5,675.20 | | | |
| 02/07/13 | CHECK #1140 | 92,805.69 | | | |
| 02/07/13 | 38SEND CHIP JPMORGAN CHASE BANK*BBK:BANK OF INDIA, NEW Y ORK,NEW YORK*BNF:FIRESTAR DIAMOND BVBA,ANTWERPEN*BBI:/DA S/REF:33935P800U70   /ACC/FURTHER CREDIT TO A /C NO.   /ACC/0003325500 OF BANK OF INDIA  /ACC/ANTWE RP FOR ULTIMATE CREDIT  /ACC/TO FIRESTONE DIAMOND BVBA /ACC/A/C NO. 541-1100743-72*STCHIPSEQ:0386892*TIME:1 169*YR REF:111210231P / 89P*MMB REF:038453865 | 643,356.89 | | 104,424.86 | |
| 02/08/13 | 57SEND FED NAVY FCU*BNF:CHARITO DELA CRUZ*BBI:/DAS/REF:3 1883P900MD0*STFEDSEQ:B1O8881C001270*TIME:0011*YR REF:01/ 20 - 02/02/13*MMB REF:03940 | 868.00 | | | *2/7/2013 Closing Balance* |
| 02/08/13 | CHECK #22109 | 600.00 | | 102,956.86 | |
| 02/11/13 | CASH CONCENTRATION AM/ AMAZON.CO Retail dls ECHM | | 221.61 | | |
| 02/11/13 | CORP TRADE PAYMENT FRO NEXCOM WO AP PAYMENT | | 1,673.00 | | |
| 02/11/13 | DEPOSIT | | 7,868.92 | | |
| 02/11/13 | CORP TRADE PAYMENT FRO NEXCOM WO AP PAYMENT | | 72,820.02 | | |
| 02/11/13 | DEPOSIT | | 136,719.06 | | |

Total Deposits on 2/7/2013: $1,580,624

Total Disbursements on 2/7/2013
L/C Collections:           $710,465
Firestar Diamond, Inc.:    $100,000
Firestar Diamond BVBA:     $643,357
Checks:                    $106,016
                         $1,559,838

It appears that, like the LOUs in which the Debtors were beneficiaries, much of the funds went to pay the majority of the money here went to pay L/C Collections, and thus an overseas Firestar affiliate. Four days after this deposit, FDI received another transfer from the same LOU. On February 11, 2013, Pacific Diamonds deposited $980,805 into the FDI account.[348] The relevant portion of the FDI bank statement is below:

---

[348] *Id.*

104

| | | | | |
|---|---|---|---|---|
| | /ACC/A/C NO. 541-1100743-72*STCHIPSEQ:0386892*TIME:1 | | | **2/11/2013 Opening Balance** |
| 02/08/13 | 659*YR REF:111210231P / 89P*MMB REF 57SEND FED NAVY FCU*BNF:CHARITO 1883P9003MD0*STFEDSEQ:B1Q8983C001870*TIME:0921*YR REF:01/ | **Total Deposits on 2/11/2013: $1,421,536** | | |
| | 20 - 02/02/13*MMB REF:039400722 | | | |
| 02/08/13 | CHECK #22109 | 600.00 | | **102,956.86** |
| 02/11/13 | CASH CONCENTRATION AMAZON.COM-RETAIL DIS AMAZON.CO Retail dls ECHM1OS4D5QTXB | | 221.61 | |
| 02/11/13 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006595674 | | 1,673.00 | |
| 02/11/13 | DEPOSIT | | 7,868.92 | |
| 02/11/13 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006595320 | | 72,820.02 | |
| 02/11/13 | DEPOSIT | | 136,719.06 | |
| 02/11/13 | CASH CONCENTRATION AAFES-VEN PAY AAFES   VEN PAY   1592831943 | | 221,428.46 | |
| 02/11/13 | 33RECD CHIP MASHREQ BANK*ORG:PACIFIC DIAMONDS FZE,DUBAI AIRPORT FZE,DUBAI*OGB:MASHREQBANK PSC,DUBAI, UNITED ARAB EMIRATES*BNF:FIRESTAR DIAMOND INC,NEW YORK*OBI:INV NO.: 15209752 DT. 28.09.2012 PURCHASE OF DIAMOND*STCHIPSEQ:0 240752*TIME:1111*YR REF:NONREF*MMB REF:042394267 | | **980,805.00** | **Funds traced to LOU** |
| 02/11/13 | TRANID:HIF. *YR REF: 104207524300112    MMB REF:IBC COR684461MTN    TYPE:L/C COLLECTIONS  BTA 00067 | 857,130.21 | | |
| 02/11/13 | CHECK #22104 | 82.50 | | |

**FKA NEXT DIAMOND INC**

Page 4 of 10

TRANSACTION DETAIL

**Total Disbursements on 2/11/2013**
L/C Collections: $857,130
Checks:          $ 48,276
                 $905,406

| DATE POSTED | DESCRIPTION | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 02/11/13 | CHECK #22111 | 326.63 | | |
| 02/11/13 | CHECK #22107 | 520.80 | | |
| 02/11/13 | CHECK #22106 | 2,966.54 | | |
| 02/11/13 | CHECK #22113 | 3,000.00 | | |
| 02/11/13 | CHECK #22112 | 7,580.00 | | |
| 02/11/13 | CHECK #22116 | 33,800.00 | | 619,086.25 |
| 02/12/13 | DEPOSIT FROM AFS-HSBC BANK LOAN VALUE DATE - 20130212 INCR PRINCIPAL 9941698335 AFS   HSBC BANK 0773630838 | | 400,000.00 | |
| 02/12/13 | 33RECD CHIP MASHREQ BANK*ORG:EMPIRE GEMS FZE,PO BOX NO 9 079,SAIF ZONE, *OGB:MASHREQBANK PSC,DUBAI, UNITED ARAB EM IRATES*BNF:FIRESTAR DIAMOND INC,NEW YORK*OBI:INV NO.: 15 211793 DT. 06.11.2012 -PART PAYMENT PURCHASE OF DIAMOND* STCHIPSEQ:0193895*TIME:1094*YR REF:NONREF*MMB REF:043368 369 | | 917,280.83 | |
| 02/12/13 | 45BOOK DEBIT FIRESTAR DIAMOND INC*BNF:FIRESTAR DIAMOND I NC,NEW YORK*BBI:/DAS/REF:84493PD01AEW*STBOOK*TIME:0950*Y R REF:INTERNAL*MMB REF:043566129 | 25,000.00 | | |
| 02/12/13 | 45BOOK DEBIT FIRESTAR DIAMOND INC*BNF:FIRESTAR DIAMOND I NC,NEW YORK*BBI:/DAS/REF:72633PD01APU*STBOOK*TIME:0950*Y R REF:INTERNAL TRANSFE*MMB REF:043566128 | 25,000.00 | | |
| 02/12/13 | TRANID:HIE *YR REF: 5045FODBC128241   MMB REF:IBC COR684699MTN   TYPE:L/C COLLECTIONS   BTA 00012 | 542,100.00 | | |
| 02/12/13 | 45BOOK DEBIT FIRESTAR DIAMOND INC*BNF:A JAFFE INC,NEW YO RK*BBI:/DAS/REF:84593PD01BAH*STBOOK*TIME:1419*YR REF:INT ERNAL*MMB REF:043391698 | 900,000.00 | | |
| 02/12/13 | CHECK #22105 | 384.00 | | |
| 02/12/13 | CHECK #22103 | 9,982.20 | | 433,900.88 |
| 02/13/13 | TRANID:HIE *YR REF:           MMB REF:AWR MTN327475   TYPE:AIR RELEASE CHGS SRA 00025 | 165.00 | | |
| 02/13/13 | CHECK #22115 | 1,075.68 | | 432,660.20 |
| 02/14/13 | DEPOSIT | | 724.00 | |
| 02/14/13 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006597192 | | 17,918.00 | |
| 02/14/13 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006597193 | | 43,078.42 | |
| 02/14/13 | CHECK #1141 | 4,000.00 | | |
| 02/14/13 | CHECK #22117 | 10,000.00 | | |
| 02/14/13 | CHECK #1142 | 277,500.00 | | 202,880.62 |
| 02/15/13 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006598123 | | 502.02 | |
| 02/15/13 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006598122 | | 3,550.00 | |
| 02/15/13 | CASH CONCENTRATION AAFES-VEN PAY AAFES   VEN PAY 1502834411 | | 6,262.22 | 213,194.86 |
| 02/19/13 | CASH CONCENTRATION JCPENNEY CO,INC-PAYMENT JCPENNEY PAYMENT 543001 | | 490.18 | |
| 02/19/13 | CORP ... | | | |
| 02/19/13 | CASH ... | | | |
| 02/19/13 | CASH ZAL ... | | | |
| 02/19/13 | CASH ZAL ... | | | |
| 02/19/13 | CASH ZAL ... | | | |
| 02/19/13 | DEPO ... | | | |
| 02/19/13 | CASH ZAL ... | | | |
| 02/19/13 | CASH CONCENTRATION ZALE CANADA CO-PAYABLES | | 229,951.36 | |

**Total Disbursements from 2/12/2013-2/15/2013**
L/C Collections:        $542,100
Firestar Diamond, Inc.: $ 50,000
A. Jaffe, Inc.:         $900,000
Customer Payment:       $    165
Checks:                 $302,942
                        $1,795,207

**Total Deposits from 2/12/2013-2/15/2013**
HSBC Bank Loan:     $400,000
Empire Gems FZE:    $917,281
Customer Payments:  $ 71,311
Other Deposits:     $    724
                    $1,389,315

Again, it appears that the LOU money was used to pay L/C Collections and to operate the business of FDI and A. Jaffe.

### 2)   Auragem Company to FDI

On March 19, 2013, Auragem Company Ltd. transferred $191,501 to FDI, and BDO (India) linked the money to an LOU fraudulently-obtained by Diamonds 'R' Us in which Auragem

106

Company was the exporter.[349]  The total LOU transaction was $3.949 million and the LOU date

was March 19, 2013. The disbursement of $191,501 from Auragem Company to FDI occurred on

March 19, 2013, the same day as the LOU funds transfer to Auragem Company.[350]  The relevant

portion of the FDI bank statement is below:



The account's opening balance on March 19, 2013 was $259,212, and there were $260,715 in other

deposits including a $236,078 deposit from another LOU (discussed below).  The funds used for

the disbursements appear to include LOU funds.  Money from the account was paid to Tri Color

Gems, a Shadow Entity; a non-debtor U.S. Firestar entity; and other jewelry businesses.

### 3)   Fancy Creations Company to FDI

From the same LOU dated March 19, 2013, FDI received an additional $236,078 from

---

[349] Meetings with BDO (India), July 2018.
[350] Firestar Diamond, Inc. March 2013 HSBC account statement for account ending 3004.

Fancy Creations Company Limited at the same time as the transfer mentioned above.[351]   The

following bank account excerpt[352] depicts this flow of money into the FDI account, and reflects

the same disbursements as the section immediately above:



#### 4)   Fancy Creations Company to FDI

On May 6, 2013, FDI received $21,393.98 from Fancy Creations linked to an allegedly

fraudulent LOU obtained by Stellar Diamonds.[353]   Three days after the money went to Fancy

Creations, FDI received the transfer.  Upon receipt, the money was added to the account which

already contained over $350,000.  Total disbursements from the account that day totaled over $2.4

million.  Recipients included Tri Color Gems, another FDI account, and FD International.  As the

---

[351] *Id.*
[352] *Id.*
[353] Firestar Diamond, Inc. May 2013 HSBC account statement for account ending 3004.

ending balance on May 6, 2013 was $160,825, the indirect LOU funds can be attributed to these

disbursements.  The FDI bank statement is below:[354]



### 5) Pacific Diamonds to FI, FI to FDI, FDI to FDI's IDB Account, FDI-IDB to Trade Services

This chain of transfers starts with an LOU payments to Pacific Diamonds from which it

transferred $1,522,451 to FI on March 27, 2015.[355]  The account statements below depict the

March 2015 balances for FI (9441), Firestar Diamond, Inc. (3004), and Firestar Diamond, Inc.

(1657). The money ultimately made its way to IDB to pay for the Trade Services Account, which

---

[354] Firestar Diamond, Inc. May 2013 HSBC account statement for account ending 3004.
[355] Meetings with BDO (India), July, 2018.

was a payment program similar to L/C Collections used to pay Firestar overseas affiliates.[356]

### Fantasy, Inc.[357]

### Firestar Diamond, Inc. – HSBC Account[358]

### Firestar Diamond, Inc – IDB Account[359]

---

[356] Trade Services is the IDB version of HSBC's L/C Collections. The use was confirmed through conversations with counsel for Gandhi on August 10, 2018.

[357] Fantasy, Inc. March 2015 HSBC account statement for account ending 9441

[358] Firestar Diamond, Inc. March 2015 HSBC account statement for account ending 3004.

[359] Firestar Diamond, Inc. March 2015 IDB account statement for account ending 1657.

| DATE | DESCRIPTION | | DEBITS | CREDITS | BALANCE |
|------|-------------|---|--------|---------|---------|
| | BALANCE FORWARD | | | | 22,950.36 |
| 3-25 | F003350000ISSC  AIR | | | | 22,790.36 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | REF DATE 032715 | | | 3,009,980.00 | 3,032,770.36 |
| | /DAS/REF:58294AW00XHI | NTRF | | | |
| | FIRESTAR DIAMOND NEW YORK | | | | |
| 3-27 | I083483001PAY | | 314,921.28 | | 2,717,849.08 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083483001PAYC | | 160.00 | | 2,717,689.08 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083349001PAY | | 564,996.10 | | 2,152,692.98 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083349001PAYC | | 160.00 | | 2,152,532.98 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083539001PAY | | 748,720.86 | | 1,403,812.12 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083539001PAYC | | 160.00 | | 1,403,652.12 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083350001PAY | | 433,534.69 | | 970,117.43 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083350001PAYC | | 160.00 | | 969,957.43 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083180001PAY | | 738,172.91 | | 231,784.52 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083180001PAYC | | 160.00 | | 231,624.52 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083148001PAY | | 212,326.78 | | 19,297.74 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | |
| 3-27 | I083148001PAYC | | 160.00 | | 19,137.74 |
| | | FDCR | | | |
| | TRADE SERVICES | | | | CONTINUED |

*$3,009,980 deposit from Firestar Diamond, Inc.*

*$3,013,033 in disbursements to Trade Services on same day as deposit from Firestar Diamond, Inc.*

As the FI account's opening balance on March 27, 2015, was $89,810, there appears to be a direct link between the $1,552,451 funds received from Pacific Diamonds on the one hand and the $2,550,000 disbursement to FDI on the other. The $2,550,000 transfer into FDI from FI appears to constitute the majority of the total $2,561,696 deposits into FDI's account that day. This amount was included in the subsequent $3,010,000 disbursement to FDI's account. On the same day the $3,010,000 was deposited into FDI's account, $3,013,033 was disbursed to "Trade Services," which was transferred to a Firestar overseas affiliates.

111

### 6)   Tri Color Gems to FDI

On May 3, 2016, FDI received $399,962 from Tri Color Gems.  An LOU was issued to

Solar Exports in which Tri Color Gems was the exporter.  The total LOU amount was $1.612

million, and the LOU date was May 2, 2016.  FDI received the $399,962 the day Tri Color Gems

received the LOU funds. The account statement is below:



As the account's opening balance on May 3, 2016, was $772,616, and there were $304,598

in other deposits, the funds used for disbursements appear to include LOU funds. It appears the

funds linked to the LOU were used for a portion of a $650,000 disbursement to FDI's account

112

(which was used for "Trade Services" payments), a $65,681 disbursement to Firestar Diamond BVBA, a $51,680 disbursement to Firestar Diamond International Pvt. Ltd., and a $10,622 Essex House apartment mortgage payment all on the same day.

### 7)      Pacific Diamonds to FDI

A $599,972 deposit from Pacific Diamonds to FDI was linked to an alleged fraudulently-obtained LOU by Stellar Diamonds in which Tri Color Gems was the exporter. The total LOU amount was $2.707 million and the LOU date was December 8, 2016. BDO (India) identified a $1.384M payment made to Tri Color Gems on December 9, 2016.  That same day, Auragem Company transferred $1.459 million to Stellar Diamond.  On December 13, 2016, four days after the receipt of LOU funds, Tri Color Gems transferred $1.119 million to Stellar Diamonds.  On December 15, 2016, Stellar Diamonds transferred $1.42 million to Pacific Diamonds.  On December 19, 2016, Pacific Diamonds transferred $599,972 to FDI.  Based on the bank account snapshots below,[360] it is possible that LOU funds were utilized for at least a portion of the $300,000 payment to FDI's IDB account,[361] which was then paid out to the IDB Trade Services account or for payment to other Firestar international entities.

---

[360] Firestar Diamond, Inc. December 2016 HSBC account statement for account ending 3004.
[361] Firestar Diamond, Inc. December 2016 IDB account statement for account ending 1657.