> **THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. (f/k/a A. JAFFE, INC.),<br><br>Debtors. | Chapter 11<br><br>No. 18-10509 (SHL)<br><br>(Jointly Administered) |

## DISCLOSURE STATEMENT
### FOR TRUSTEE'S JOINT CHAPTER 11 PLAN

JENNER & BLOCK LLP
Marc Hankin
Carl Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600

Angela Allen (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350

*Counsel for the Chapter 11 Trustee*

RICHARD LEVIN, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE (THE "**CHAPTER 11 TRUSTEE**") OF THE ABOVE-CAPTIONED DEBTORS, BELIEVES THAT THE TRUSTEE'S CHAPTER 11 PLAN OF LIQUIDATION ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT IS IN THE BEST INTERESTS OF CREDITORS AND URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS APPROVED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. THE CHAPTER 11 TRUSTEE HAS NOT AUTHORIZED REPRESENTATIONS CONCERNING THE DEBTORS, THE ESTATES, OR THE VALUE OF THEIR ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN AND IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN. IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.

ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE EXHIBITS TO THE PLAN AND TO READ THIS ENTIRE DISCLOSURE STATEMENT CAREFULLY BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF, AND THE CHAPTER 11 TRUSTEE DOES NOT ASSUME ANY OBLIGATION TO UPDATE THIS DISCLOSURE STATEMENT FOR EVENT OR INFORMATION ARISING AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION AS TO ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER ACTION OR THREATENED ACTION BUT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT, DEFINITIONS, AND CONSTRUCTION ..............................1

II.    INTRODUCTION AND OVERVIEW ........................................................................................1

   A.    Introduction ........................................................................................................................ 1

   B.    Disclaimers ........................................................................................................................ 2

   C.    An Overview of the Chapter 11 Process............................................................................ 3

III.    HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTOR................................5

   A.    Overview of the Debtors and their Operations ................................................................. 5

      1.    Introduction ............................................................................................................. 5

      2.    Prepetition Business Operations.............................................................................. 5

      3.    Circumstances Leading to the Commencement of the Chapter 11 Cases....................6

   B.    The Commencement of the Chapter 11 Cases.................................................................... 8

      1.    Financing and Significant Indebtedness...................................................................9

   C.    First Day Motions and Other Relief.................................................................................. 9

      1.    Joint Administration ................................................................................................9

      2.    Cash Management ....................................................................................................9

      3.    Cash Collateral Use................................................................................................10

      4.    Employee Obligations............................................................................................10

   D.    Appointment of Examiner ............................................................................................... 10

   E.    Appointment of the Chapter 11 Trustee.......................................................................... 11

   F.    Jaffe Business Sale.......................................................................................................... 11

   G.    Public Sales ..................................................................................................................... 12

   H.    Private Sales .................................................................................................................... 12

   I.    Bar Dates for Filing Proofs of Claim.............................................................................. 13

   J.    Litigation.......................................................................................................................... 13

IV.    DESCRIPTION OF THE PLAN...............................................................................................14

V.    ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES, AND PRIORITY TAX CLAIMS ....14

   A.    Administrative Claims...................................................................................................... 15

   B.    Professional Fee Claims .................................................................................................. 15

   C.    Priority Tax Claims.......................................................................................................... 15

VI.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
INTERESTS .................................................................................................................. 15

    A.    Summary ............................................................................................................ 15

    B.    The Convenience Class ..................................................................................... 16

    C.    Classification and Treatment of Claims Against the Debtors ........................... 17

        1.    Class 1—Secured Tax Claims .............................................................. 17

        2.    Class 2—Secured Reimbursement Claims ............................................ 18

        3.    Class 3—Priority Non-Tax Claims ....................................................... 18

        4.    Class 4—Convenience Claims .............................................................. 19

        5.    Class 5—Allowed General Unsecured Claims ...................................... 19

        6.    Class 6—Subordinated Claims ............................................................. 20

        7.    Class 7—Interests ................................................................................. 20

VII.    ACCEPTANCE OR REJECTION OF THE PLAN ................................................ 20

    A.    Who May Vote ................................................................................................... 20

    B.    Acceptance by Impaired Class .......................................................................... 20

    C.    Presumed Acceptance or Rejection of the Plan ................................................ 21

    D.    Nonconsensual Confirmation ............................................................................ 21

    E.    How to Vote ...................................................................................................... 21

VIII.    MEANS FOR IMPLEMENTATION OF THE PLAN .......................................... 22

    A.    Joint Chapter 11 Plan ........................................................................................ 22

    B.    The Liquidating Trust ........................................................................................ 22

    C.    Dissolution of the Debtors ................................................................................ 22

    D.    Vesting and Transfer of Assets to the Liquidating Trust .................................. 22

    E.    Retained Causes of Action ................................................................................ 23

    F.    Payment of Liquidating Trust Operating Expenses .......................................... 23

    G.    Beneficiaries of Trust Proceeds ........................................................................ 23

    H.    Liquidating Trust Agreement ............................................................................ 24

    I.    Power and Authority of Liquidating Trustee in Accordance with the Liquidating Trust
Agreement ......................................................................................................... 24

    J.    Termination of the Liquidating Trust ................................................................ 24

    K.    Full and Final Satisfaction ................................................................................ 24

    L.    Distribution Procedures ..................................................................................... 25

1.  Disbursing Agent ................................................................................................. 25

2.  Source of Distributions ........................................................................................ 25

3.  Distribution Dates ............................................................................................... 25

4.  Manner of Cash Payments ................................................................................... 25

5.  Claims Payable by Third Parties ......................................................................... 25

6.  No Distributions On Account of Disputed Claims .............................................. 26

7.  Transmittal of Distributions and Notices ........................................................... 26

8.  Record Date ......................................................................................................... 26

M.  Resolution of Disputed Claims ...................................................................................... 26

1.  Allowance and Disallowance of Claims .............................................................. 26

2.  Liquidating Trustee's Authority .......................................................................... 27

3.  Adjustment to Claims Without Objection ........................................................... 27

N.  Reserve Provisions for Disputed Claims ....................................................................... 27

1.  Establishment of Disputed Claims Reserves ...................................................... 27

2.  Amounts to be Reserved ...................................................................................... 27

3.  Distribution .......................................................................................................... 27

4.  Termination of Disputed Claims Reserves .......................................................... 28

O.  Allocation of Distributions ............................................................................................ 28

P.  Unclaimed Property ....................................................................................................... 28

Q.  Setoffs ............................................................................................................................ 28

R.  No Distributions on Late-Filed Claims ......................................................................... 29

S.  No Postpetition Interest on Claims ................................................................................ 29

T.  Claims Paid by Third Parties ......................................................................................... 29

U.  Federal Income Tax Compliance; Withholding ............................................................. 29

1.  Tax Treatment of Liquidating Trust .................................................................... 29

2.  Tax Reporting and Compliance ........................................................................... 30

3.  Payment of Taxes ................................................................................................ 30

V.  No *De Minimis* Distributions ...................................................................................... 31

W.  United States Trustee Fees ............................................................................................ 31

X.  Books and Records......................................................................................................... 31

Y.  Remaining Cash.................................................................................**Error! Bookmark not defined.**

IX.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................... 31

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..................... 31

B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ........................ 32

C.    Reservation of Rights .................................................................................................. 32

X.    CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND TO THE
EFFECTIVE DATE ................................................................................................................ 33

A.    Conditions to Confirmation of the Plan ...................................................................... 33

B.    Conditions to Consummation ...................................................................................... 33

C.    Waiver of Conditions ................................................................................................... 33

D.    Effect of Failure of Conditions to Consummation ....................................................... 34

E.    Effective Date .............................................................................................................. 34

XI.    PLAN CONFIRMATION ............................................................................................... 34

A.    Objections to Confirmation ......................................................................................... 34

B.    Hearing on Confirmation ............................................................................................ 34

XII.    EFFECTS OF CONSUMMATION ............................................................................... 34

A.    Binding Effect of Plan ................................................................................................. 35

B.    Exculpation ................................................................................................................. 36

C.    Release ........................................................................................................................ 37

D.    Injunction .................................................................................................................... 37

E.    Post-Consummation Liability of Liquidating Trustee and PNB.................................... 37

F.    PNB as Consulting Creditor ......................................................................................... 38

G.    Insurance ..................................................................................................................... 38

H.    Implementation ........................................................................................................... 38

XIII.    RETENTION OF JURISDICTION ............................................................................... 38

XIV.    MISCELLANEOUS ...................................................................................................... 39

A.    Modification of Plan .................................................................................................... 39

B.    Liquidating Trustee's Plan Interpretation .................................................................... 39

C.    Plan Supplement .......................................................................................................... 39

D.    Conflicts ...................................................................................................................... 39

E.    Notices ........................................................................................................................ 40

F.    Writings ....................................................................................................................... 40

G.    Reservation of Rights ................................................................................................... 40

H.    Additional Documents ................................................................................................. 41

I.    Successors and Assigns ............................................................................................... 41

J.    Certain Actions ........................................................................................................... 41

K.    Severability of Plan Provisions. ................................................................................. 41

L.    Governing Law. ........................................................................................................... 42

M.    Exhibits. ....................................................................................................................... 42

N.    Computation of Time ................................................................................................. 42

XV.    RISK FACTORS ............................................................................................................ 42

XVI.    BEST INTEREST OF CREDITORS TEST ................................................................. 42

A.    Chapter 7 ...................................................................................................................... 42

B.    Liquidation Analysis ................................................................................................... 43

XVII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..................... 44

A.    Consequences to Debtors ............................................................................................ 44

B.    Federal Income Tax Treatment of the Liquidating Trust ......................................... 45

1.    Classification of Liquidating Trust ...................................................................... 45

2.    Tax Reporting ....................................................................................................... 45

C.    Consequence to Holders of Claims ............................................................................ 45

1.    Holders of Claims ................................................................................................. 46

2.    Distributions in Discharge of Accrued but Unpaid Interest .......................... 46

3.    Character of Gain or Loss; Tax Basis; Holding Period .................................... 47

D.    Consequences to Holders of Interests ........................................................................ 47

E.    Withholding ................................................................................................................. 47

XVIII.    CONCLUSION .............................................................................................................. 48

## I.   PRELIMINARY STATEMENT, DEFINITIONS, AND CONSTRUCTION

Richard Levin, the chapter 11 trustee of the Debtors (the "**Chapter 11 Trustee**"), respectfully submits this disclosure statement (the "**Disclosure Statement**") under chapter 11 of the Bankruptcy Code in support of the Chapter 11 Trustee's Joint Plan of Liquidation (the "**Plan**").

The definitions set forth in Section 1.1 of the Plan apply to capitalized terms used herein. The rules of construction set forth in Section 1.2 of the Plan apply to this Disclosure Statement.

## II.   INTRODUCTION AND OVERVIEW

### A.   Introduction

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of Firestar Diamond, Inc. ("**Firestar**"), Fantasy, Inc. ("**Fantasy**"), and Old AJ, Inc. (formerly known as A. Jaffe, Inc.) ("**Old AJ**," and together with Firestar and Fantasy, the "**Debtors**"), the events leading up to the commencement of the Chapter 11 Cases, events that have occurred during the Chapter 11 Cases, and the anticipated liquidation of the Debtors if the Plan is confirmed and becomes effective. This Disclosure Statement also describes terms and provisions of the Plan, including, among other things, certain effects of Confirmation of the Plan, certain risk factors, certain alternatives to the Plan, and the manner in which Distributions will be made under the Plan.

The following table briefly summarizes the classification and treatment of Claims under the Plan. For a summary of the estimates of the Claims against the Debtors, see Section VI below. For a more detailed description of the classification and treatment of Claims under the Plan, see Sections V and VI below.

| Class | Designation | Status | Voting Status | Approx. % Recovery |
|---|---|---|---|---|
| 1. | Secured Tax Claims | Unimpaired | Deemed to accept the Plan and not entitled to vote | 100% |
| 2. | Secured Reimbursement Claims | Unimpaired | Deemed to accept the Plan and not entitled to vote | 100% |
| 3. | Priority Non-Tax Claims | Unimpaired | Deemed to accept the Plan and not entitled to vote | 100% |
| 4. | Convenience Claims | Unimpaired | Deemed to accept the Plan and not entitled to vote | 100%[1] |

---

[1] Claims will be paid 100% of the lower of the Allowed Claim amount or the Convenience Threshold (defined in sections VI.B and VI.C.4 below).

| Class | Designation | Status | Voting Status | Approx. % Recovery |
|---|---|---|---|---|
| 5. | Allowed General Unsecured Claims | Impaired | Entitled to vote | [•]% |
| 6. | Subordinated Claims | Impaired | Deemed to reject the Plan and not entitled to vote | 0% |
| 7. | Interests | Impaired | Deemed to reject the Plan and not entitled to vote | 0% |

The Plan establishes the Liquidating Trust, which will, among other things, complete the liquidation of the Debtors and their Estates, administer Distributions in accordance with the Plan and the Liquidating Trust Agreement, and prosecute or otherwise resolve the Retained Causes of Action. The Chapter 11 Trustee believes that the Plan is in the best interest of the Debtors' creditors and stakeholders.

On [•], 2019, the Bankruptcy Court entered an order approving this Disclosure Statement as containing adequate information to permit a hypothetical reasonable investor to make an informed judgment about the Plan, in accordance with Bankruptcy Code section 1125. *See* Dkt. [•]. The Bankruptcy Court has not considered the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays or a chapter 7 liquidation. These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan. Accordingly, the Chapter 11 Trustee urges you to accept the Plan by completing and returning the enclosed ballot(s) no later than November 8, 2019 at 5:00 p.m. Eastern Time.

## B.    Disclaimers

NO REPRESENTATIONS ABOUT THE DEBTORS, PARTICULARLY ABOUT THE VALUE OF THE DEBTORS' OR ESTATES' PROPERTY, ARE AUTHORIZED BY THE CHAPTER 11 TRUSTEE OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY. ANY ADDITIONAL REPRESENTATION OR INDUCEMENT SHOULD BE REPORTED TO COUNSEL FOR THE CHAPTER 11 TRUSTEE WHO, IN TURN, WILL PROVIDE THE INFORMATION TO THE BANKRUPTCY COURT OR TAKE OTHER APPROPRIATE ACTION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS INTO THE FUTURE WITH CERTAINTY, THE CHAPTER 11 TRUSTEE IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETE AND ACCURATE, ALTHOUGH REASONABLE

AND APPROPRIATE EFFORT HAS BEEN MADE TO PRESENT COMPLETE AND ACCURATE INFORMATION. THE RECORDS THAT WERE KEPT BY THE DEBTORS RELIED ON INTERNAL BOOKKEEPING FOR THEIR ACCURACY. THE RECORDS KEPT BY THE DEBTORS ARE NOT WARRANTED OR REPRESENTED TO BE FREE OF ANY INACCURACY. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO PRESENT ACCURATE INFORMATION IN THIS DISCLOSURE STATEMENT. COUNSEL TO THE CHAPTER 11 TRUSTEE HAS NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION PROVIDED BY THE DEBTORS' BOOKS AND RECORDS AND DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE TRUTH OR ACCURACY OF ANY OF THE INFORMATION PRESENTED.

CERTAIN STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED UPON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY PERSONS FOR ANY PURPOSE OTHER THAN BY HOLDERS OF CLAIMS ENTITLED TO VOTE FOR WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE CHAPTER 11 TRUSTEE, THE DEBTORS, OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR LEGAL EFFECTS OF THE LIQUIDATION ON THE DEBTORS OR THE HOLDERS OF CLAIMS.

ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW IN FULL THE PLAN AND THIS DISCLOSURE STATEMENT TOGETHER WITH ALL EXHIBITS ATTACHED THERETO, BEFORE VOTING ON THE PLAN, AND TO CONSULT LEGAL COUNSEL BEFORE VOTING TO ENSURE COMPLETE UNDERSTANDING OF THEIR TREATMENT UNDER THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF HOLDERS OF CLAIMS TO ENABLE THEM TO MAKE AN INFORMED DECISION ABOUT THE PLAN.

EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO IT UNDER FEDERAL AND APPLICABLE STATE, LOCAL, AND FOREIGN TAX LAWS. THE CHAPTER 11 TRUSTEE MAKES NO WARRANTIES OR REPRESENTATIONS REGARDING THE TAX IMPACT OF THE PLAN ON ANY HOLDER.

THE CHAPTER 11 TRUSTEE BELIEVES THAT THE PLAN IS FEASIBLE, FAIR AND EQUITABLE, AND IN THE BEST INTEREST OF CREDITORS.

### C.    An Overview of the Chapter 11 Process

Chapter 11 of the Bankruptcy Code allows for a debtor to wind down its operations and liquidate its assets in an orderly fashion for the benefit of its creditors and other parties in interest. The commencement of a chapter 11 case creates an estate comprising all of the legal and equitable interests of the debtor as of the date the petition is filed. The filing of a petition under the Bankruptcy Code triggers the Bankruptcy Code's automatic stay provisions, which stay all attempts by creditors and other parties to collect on prepetition claims against the debtor or

otherwise interfere with the debtor's property or operations, subject to the exceptions listed in the Bankruptcy Code.

The principal purpose of a chapter 11 case is to confirm and implement a chapter 11 plan for the debtor. A chapter 11 plan sets forth the means for satisfying claims against and interests in the debtor's estate.

A chapter 11 plan must designate classes of claims and interests for treatment. Holders of impaired claims against or interests in the debtor may vote to accept or reject the plan. Classes of claims or interests that are not impaired under the plan are presumed to have accepted the plan and therefore are not entitled to vote. Conversely, classes that receive no distribution under the plan are presumed to have rejected the plan and are not entitled to vote. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the proponents of the plan to file a disclosure statement containing information adequate to enable a hypothetical reasonable investor to make an informed judgment about the plan. If all impaired classes of claims and interests accept the plan, and if the bankruptcy court determines that the plan meets additional confirmation requirements set forth in section 1129(a) of the Bankruptcy Code, the court may confirm the plan.

The Bankruptcy Code does not require that each holder of a claim or interest in a particular class accept the plan for the bankruptcy court to determine that the class has accepted the plan. Instead, a class will be deemed to accept the plan if the Bankruptcy Court determines that the plan has been accepted by (i) a majority in number of the claims in the class; and (ii) at least two-thirds in amount of the claims in the class.

Further, the bankruptcy court may confirm a chapter 11 plan even if fewer than all of the impaired classes accept the plan. For that to happen, one class of impaired claims must accept the plan, and the proponents of the plan must show that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class that has not accepted the plan. Section 1129(b) of the Bankruptcy Code provides a list of non-exclusive requirements that a plan must meet to be fair and equitable.

When a plan is confirmed, it becomes binding on the debtor and all of its creditors and interest-holders. The debtor's prior obligations to its creditors and interest-holders are compromised and exchanged for the obligations set forth in the confirmed plan.

In a plan of liquidation, a debtor may propose the formation of a liquidating trust. Upon confirmation, a liquidating trust may take title to certain assets of the debtor's estate, liquidate those assets into cash, and make distributions to holders of claims or interests who are designated by the plan as beneficiaries of the liquidating trust. The liquidating trust's assets can include the debtor's causes of action, such as avoidance actions. The point of vesting such assets in a liquidating trust is to accelerate confirmation and distributions to parties in interest. If confirmation had to wait until the trustee himself reduced potentially valuable causes of action to judgment, all distributions to creditors would be delayed until litigation concluded and judgments enforced, which could take years. Conversely, creating a liquidating trust allows confirmation and interim distributions to occur while the liquidating trust works to convert all of

the estate's assets, including causes of action, to cash. Once a liquidating trust finishes liquidating the estate's assets, it makes a final distribution and dissolves.

### III. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTOR

#### A. Overview of the Debtors and their Operations

##### 1. Introduction

The Debtors primarily operated as wholesalers of finished gold and diamond jewelry out of one office at 592 Fifth Avenue in New York City. Previously, until February 2013, the Debtors operated out of 154 West 14th Street in New York City. Each of the Debtors is a subsidiary of entities that were ultimately owned and managed by Nirav Modi.

##### 2. Prepetition Business Operations

###### a) The Debtors' Origins.

Nirav Modi began his business by operating a diamond trading company in India during 1999 or 2000 under the name Diamonds 'R' Us. At that time, the company's main customers included U.S. jewelry manufacturers that created finished pieces of jewelry for U.S. retailers. Diamonds 'R' Us was renamed Firestone International Private Limited in 2004, then Firestar International Private Limited, and was eventually renamed Firestar International Limited ("**Firestar India**"), the ultimate holding company of the Firestar Entities.

Over time, the Firestar Entities expanded their business to include jewelry manufacturing and product design. In 2010, Modi entered the luxury retail business and started to sell his own high-end finished jewelry. He became a well-known designer whose designs were worn by celebrities such as Kate Winslet, Amy Adams, and Priyanka Chopra. Modi sold these specialty pieces at well-known auction houses such as Sotheby's and Christie's and opened retail stores in India, the United States, London, Hong Kong, Paris, Macau, and Beijing.

While Firestar India was steadily growing across the world, Modi expanded into the United States through several acquisitions starting in 2005. Modi controlled a Hong Kong holding company, Firestar Holdings Limited, and used its wholly-owned subsidiaries, Synergies Corporation and Firestar Group Inc., to make the U.S. acquisitions that ultimately resulted in the ownership of the Debtors.

Modi actively oversaw the establishment of the Debtors and controlled their day-to-day operations until at least 2012. He appears to have been responsible for implementing their operational processes and procedures. Subsequently, Modi became focused on his retail brand rather than the Debtors and delegated operational responsibility to Mihir Bhansali, the chief executive officer of Firestar and Fantasy, and Ajay Gandhi, the chief financial officer of Firestar, Fantasy, and Old AJ.

b)    Firestar Diamond, Inc.

In 2005, Firestar India acquired one of its U.S. customers, Frederick Goldman, Inc., which ultimately became Firestar.  Firestar was incorporated in 2004 under the name Jewelry Solutions International, Inc., which name was changed to Next Diamond, Inc., then to Firestone, Inc., and finally to Firestar Diamond, Inc., in 2011.  Mihir Bhansali was the sole director and CEO of Firestar until May 2018.  Firestar averaged approximately $63 million in reported sales per year.

Firestar operated as a distributor and wholesaler of finished gold and diamond jewelry. Its customer base consisted of traditional jewelry retailers including Zales, J.C. Penney, and Macy's.  Although Firestar dealt in loose diamonds, it did so to create finished pieces of jewelry. Transactions for these purposes were limited to specific stones identified as needed for a particular jewelry item.

c)    Fantasy, Inc.

In 2011 or 2012, Chicago-based Fantasy Diamond Corp. selected Firestar to be its exclusive licensee to supply the Endless Diamond brand to U.S. retailers.  In August 2012, Fantasy, Inc. was incorporated under the laws of Delaware as a wholly-owned subsidiary of Firestar to handle the sales of Endless Diamond jewelry.  Until May 2018, Bhansali was the sole director of Fantasy.

Fantasy sold finished jewelry ranging in value from moderately priced items up to $30,000, generally at a higher price point than Firestar.  Like Firestar, the majority of Fantasy's jewelry was manufactured in India or partially manufactured in India and sent to the U.S. where the diamonds were set in the jewelry.  Fantasy's primary customers included Costco Wholesale Corporation, Zales, Sam's Club, and Walmart.  It reported approximately $25 million in annual sales in fiscal years 2015, 2016, and 2017.

d)    A. Jaffe, Inc. (now known as Old AJ, Inc.)

In 2007, Firestar India purchased a 95% stake in New York-based Sandberg & Sikorski Corp. ("**S&S**").  S&S had two divisions, one that sold to major U.S. retailers, and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers. S&S changed its name to A. Jaffe, Inc. in 2011 and was fully integrated into Firestar India in fiscal year 2016.

Operating in a "made-to-order" model, Firestar India's factories in India predominantly supplied Old AJ with finished jewelry on a piece-by-piece basis for the ultimate customer.  A. Jaffe, Inc. had approximately $20 million in sales in each of the two years before the Petition Date. After the Chapter 11 Trustee sold A. Jaffe, Inc.'s operating assets (as described below), its name was changed to Old AJ, Inc.

**3.    Circumstances Leading to the Commencement of the Chapter 11 Cases**

On January 29, 2018, Punjab National Bank ("**PNB**") lodged a complaint with Indian authorities against Nirav Modi and several entities controlled by him, alleging what has been described as the largest bank fraud in Indian history.

6

Beginning no later than 2011 and continuing into 2018, Nirav Modi orchestrated a fraudulent scheme to obtain approximately $4 billion in financing under false pretenses from financial institutions, including PNB, and to launder the proceeds through a global web of corporate entities, family members, and co-conspirators (the "**Bank Fraud**").

The Bank Fraud involved the fraudulent procurement of letters of undertaking ("**LOU**"), a financial instrument unique to India designed to facilitate efficient import transactions. When used legitimately, LOUs allow an importer to forego the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank in India, secured by invoices for the to-be imported goods. The issuing bank, in turn, enters into the foreign currency transaction: it requests a foreign branch of another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro — "our" — account) at the foreign branch of a third bank to pay the exporter in its local foreign currency. The issuing bank then recoups the loan from the importer (or the imported goods serving as its collateral).

Since each LOU requires an import transaction, an importer's LOU borrowing capacity is tied directly to its import volume — the more imports, the more LOU funding available. Realizing this, Modi and his co-conspirators conspired to artificially inflate the import volume of Modi's India-based companies — most notably Diamonds 'R' Us, Solar Export, and Stellar Diamond (collectively, the "**LOU Entities**") — with sham transactions so as to obtain more and more LOU funding.

To carry out this scheme, Modi and other co-conspirators utilized a web of shadow entities to engage in fraudulent and fictitious import transactions (the "**Shadow Entities**"). Though designed to look like legitimate independent businesses, the Shadow Entities were no more than shell companies controlled by Modi and his co-conspirators. They conducted no legitimate business, but instead existed only to further the Bank Fraud by conducting bogus transactions with entities under the global Firestar umbrella (collectively, the "**Firestar Entities**," together with the Shadow Entities, LOU Entities, and all other entities controlled by Nirav Modi and his family members, the "**Modi-Controlled Entities**") and laundering the ill-gotten proceeds.

The Shadow Entity import transactions purported to involve arm's-length sales of highly valuable loose diamonds. In truth, these transactions routinely involved goods that (i) did not exist; (ii) were never transferred; (iii) were transferred at prices having nothing to do with market value but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities' books and records so as to conceal other transfers made for illegitimate purposes; or (iv) were transferred in "circular transactions," meaning the same diamonds were exported from and re-imported back into India multiple times at varying and often inflated prices, in transactions involving various Firestar Entities and Shadow Entities to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

Moreover, the India-based Modi-Controlled Entities obtained additional funding through packing credit loans, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods. In the context of the Bank Fraud, the India-based Modi-Controlled

Entities would obtain packing credit loans based on purported orders from other Modi-Controlled Entities in Hong Kong, Dubai, and the United States.  As set forth in the Examiner's Report [Dkt. 394], however, packing credit loan proceeds were frequently diverted for other purposes, including the payment of outstanding LOUs.

Transactions between and among Firestar Entities and Shadow Entities furthered the Bank Fraud by: (1) inflating the Indian entities' LOU borrowing capacity by artificially inflating their import and export volume (for LOUs and packing credit loans, respectively); (2) facilitating the repayment of outstanding LOUs and packing credit loans; (3) laundering the fraudulent proceeds by making them difficult to trace and siphoning them to Nirav and his co-conspirators; and (4) manipulating auditors, lenders, and regulatory bodies.

Transfers for these purposes were concealed in various ways, including: (a) round-trip transactions of gems or funds in which Modi-Controlled Entities transferred assets amongst themselves without any legitimate economic purpose; (b) buying and selling gems at inflated or deflated prices (or not sending the gems at all); (c) characterizing transfers as loans or loan repayments, or advances against future purchases or returns of advances, etc.; and (d) in some instances, fraudulently doctoring books and records outright.

Several weeks before the commencement of the Chapter 11 Cases, governmental authorities in India launched an investigation into Nirav Modi, several entities owned or controlled by Modi, and persons associated with him for allegedly orchestrating the Bank Fraud. On January 29, 2018, PNB lodged a complaint with the Indian Central Bureau of Investigation ("**CBI**"), India's primary investigative law enforcement agency, against Modi and his co-conspirators alleging a massive fraud against PNB.  The CBI subsequently issued reports that identified criminal statutes Modi and his co-conspirators allegedly violated, detailed the alleged fraud against PNB, and listed fraudulently issued LOUs that were used to perpetrate the fraud. The Indian government subsequently charged Modi and others alleged to have participated in the Bank Fraud.

On February 23, 2018, three days before the Petition Date, India's National Company Law Tribunal, a quasi-judicial body charged with adjudicating civil disputes between Indian companies, issued an order freezing Modi's and his affiliates' assets in India, and authorizing the seizure of those assets.  Following the revelation of the fraud allegations, businesses and factories owned and operated by Modi and his affiliates ceased operations because their assets were seized and several employees were incarcerated.  Several of these businesses produced jewelry sold by the Debtors and provided back office support to the Debtors.

B.      **The Commencement of the Chapter 11 Cases**

On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors alleged that the interruption of their supply chain and back office support provided by Modi-affiliated entities made it impossible to continue their respective businesses.

8

1.      **Financing and Significant Indebtedness**

As of the Petition Date, Firestar and Fantasy were co-borrowers under a co-lending facility with IDB and HSBC (together, the "**Lenders**") in the aggregate amount of $28,000,000 (the "**Credit Facilities**"). The Credit Facilities consisted of two individual revolving credit facilities, one issued by IDB (the "**IDB Credit Facility**"), in the maximum principal amount of $12,000,000, and the other by HSBC (the "**HSBC Credit Facility**") in the maximum principal amount of $16,000,000. Each facility was secured by senior pre-petition liens in substantially all of Firestar's and Fantasy's assets, including their respective inventory and accounts receivable, as more specifically defined in the operative loan documents.

The IDB Credit Facility was governed by a Line Letter, dated October 11, 2013, as amended from time to time, which had amended and replaced earlier Line Letters, dated December 13, 2012, and September 4, 2008 (collectively, the "**IDB Loan Documents**"). The IDB Credit Facility was guaranteed by Modi, Firestar India, and Firestar Group, Inc. ("**FGI**," a Hong Kong-based Firestar Entity).

The HSBC Credit Facility was governed by an Amended and Restated Loan Agreement, dated as of September 4, 2008, as amended from time to time, which had amended and replaced an earlier Loan Agreement, dated September 5, 2007 (collectively, the "**HSBC Loan Documents**" and together with the IDB Loan Documents, the "**Loan Documents**"). The HSBC Credit Facility was guaranteed by Modi, Firestar India, and FGI.

Old AJ was neither a borrower nor guarantor under the Credit Facilities. As of the Petition Date, Old AJ had no secured debt. Although Old AJ and IDB explored the possibility of funding Old AJ's operations post-petition, that arrangement never materialized.

The Lenders were parties to an Amended and Restated Intercreditor Agreement, dated March 22, 2013, as subsequently amended by the First Amendment to Amended and Restated Intercreditor Agreement, dated October 17, 2013, setting forth their relative priorities against Firestar's and Fantasy's assets.

C.      **First Day Motions and Other Relief**

1.      **Joint Administration**

On February 28, 2018, the Debtors filed a motion for the joint administration of their bankruptcy cases for procedural purposes only. [Dkt. 3.] On March 9, 2018, the Bankruptcy Court entered an order directing the joint administration of the Chapter 11 Cases. [Dkt. 24.]

2.      **Cash Management**

On February 28, 2018, the Debtors filed a motion seeking authorization to use their existing cash management system, maintain their existing bank accounts, and waive certain requirements of section 345 of the Bankruptcy Code. [Dkt. 4.] On March 29, 2018, the Bankruptcy Court entered an order authorizing the Debtors to (i) designate, maintain, and continue to use any or all of their existing bank accounts in the names and with the account numbers existing

immediately before the commencement of the Chapter 11 Cases; (ii) deposit funds into and withdraw funds from such accounts by all usual means including, without limitation, checks, wire transfers, automated transfers, and other debits; and (iii) treat their prepetition bank accounts for all purposes as debtor in possession accounts.  [Dkt. 79.]

###    3.    Cash Collateral Use

On March 4, 2018, the Debtors filed a motion seeking the continued use of their cash collateral subject to certain budgetary and procedural restrictions.  [Dkt. 13.]  Over the next several months, after further hearings on the matter, the Bankruptcy Court entered a series of interim orders permitting the Debtors to continue using their cash collateral.  [Dkt. 30, 78, 132, 186, 251, 391.]  In accordance with the interim orders, the Chapter 11 Trustee made numerous adequate protection payments to the Prepetition Lenders.  On November 10, 2018, the Court entered the *Stipulation And Order For Payoff Of Claims Of HSBC and IDB* governing the payoff of the Secured Lenders' claims.  [Dkt. 575.]

###    4.    Employee Obligations

On March 4, 2018, the Debtors filed a motion seeking to pay employees on account of pre-petition obligations and to continue paying them post-petition.  [Dkt. 14.]  On March 29, 2018, the Bankruptcy Court granted the Debtors' motion.  [Dkt. 81.]

##    D.    Appointment of Examiner

On March 30, 2018, the United States Trustee filed a motion to appoint an examiner to investigate and report on the conduct of the Debtors pursuant to section 1104(c) of the Bankruptcy Code in connection with various allegations of wrongdoing and fraud in the Debtors' business operations.  [Dkt. 87.]  The Debtors consented to the request, which the Bankruptcy Court subsequently granted on April 13, 2018.  [Dkt. 103.]  Among other things, the examiner was directed to "investigate the circumstances surrounding the alleged fraud involving . . . Nirav Modi, certain persons or entities affiliated with Nirav Modi . . . and certain employees of Punjab National Bank . . . ."

On April 19, 2018, the United States Trustee appointed John J. Carney as examiner (the "**Examiner**") and filed notice of his appointment.  [Dkt. 114.]  That same day, the United States Trustee filed an application to approve the Examiner's appointment [Dkt. 115], and the Court subsequently entered an order approving the appointment.  [Dkt. 118.]

In total, the Examiner received more than five million documents consisting of tens of millions of pages in response to his requests for voluntary cooperation and the document and deposition subpoenas he served.  Most of these documents were hosted on a document management system, across which the Examiner's professionals conducted searches of key terms most likely to be relevant to his investigation.  The documents, including voicemails and images, exceeded 1.8 terabytes of data.

The Examiner filed the report of his investigation on August 25, 2018.  [Dkt. 394.]  As explained in the report, based on the detailed forensic analyses of available financial records,

interviews of knowledgeable witnesses, email reviews, and analysis of materials provided by Indian authorities, the Examiner determined that the Debtors were directly involved in the transactions related to the Bank Fraud. The Examiner also determined that it is highly likely that the Debtors' CEO (Mihir Bhansali) and CFO (Ajay Gandhi) were involved in assisting in transactions necessary to the success of the Bank Fraud. Since the issuance of the Report, the Examiner has assisted the Chapter 11 Trustee by providing information and documents related to the Examiner's investigation and report.

### E.    Appointment of the Chapter 11 Trustee

On May 23 and 24, 2018, PNB and the U.S. Trustee, respectively, filed motions seeking the appointment of a chapter 11 trustee. [Dkt. 181, 185.] The Debtors filed a response disputing certain of PNB's allegations, but did not oppose the appointment of a chapter 11 trustee. [Dkt. 195.]

Following a hearing on the motions, on June 7, 2018, the Court entered an order directing the appointment of a chapter 11 trustee. [Dkt. 216.] On June 14, 2018, the U.S. Trustee appointed Richard Levin as chapter 11 trustee (the "**Chapter 11 Trustee**") in the Chapter 11 Cases and filed notice of his appointment. [Dkt. 222.] The same day, the United States Trustee filed an application to approve the Chapter 11 Trustee's appointment [Dkt. 226], which the Court subsequently approved [Dkt. 227].

Since his appointment, the Chapter 11 Trustee and his professionals have been working diligently to (i) identify, recover, and liquidate the Debtors' assets for as much value as possible and (ii) investigate and pursue potential causes of action for the benefit of the Debtors' Estates.

### F.    Jaffe Business Sale

Prior to the appointment of the Chapter 11 Trustee, the Debtors moved for an order approving the sale of the Old AJ business to the highest and best bidder but later withdrew the motion without prejudice.

After his appointment, the Chapter 11 Trustee determined it was prudent to revive the effort to sell the Old AJ assets as soon as possible, to reduce the risk that further delay would decrease the realizable value of the assets. Accordingly, on June 25, 2018, the Chapter 11 Trustee filed with this Court the *Notice of Chapter 11 Trustee's Revised Bidding Procedures for Sale of Assets of A. Jaffe, Inc.* [Dkt. 244], establishing, among other things, bidding procedures and certain key dates and deadlines, including a date for an auction for the Old AJ assets.

On July 27, 2018, the Court entered an order approving the sale of Old AJ's assets, subject to certain exclusions, to Paramount Jewels [Dkt. 332]. As consideration for the purchase of the Transferred Assets, Paramount Jewels agreed (i) to assume certain liabilities of Old AJ; and (ii) pay to Old AJ an aggregate amount of $5,200,000.00, subject to certain purchase price adjustments specified in the asset purchase agreement.

### G.    Public Sales

On August 8, 2018, the Chapter 11 Trustee filed a *Motion For Order Establishing Procedures For Trustee To Sell Assets Free And Clear Of Liens And Other Interests* (the "**Public Sale Procedures Motion**") [Dkt. 352] seeking authorization to sell the Debtors' assets, allocated into lots, at one or more public sales.[2]

On August 24, 2018, the Court entered an order (the "**Public Sale Procedures Order**") approving the sale procedures described in the Public Sale Procedures Motion. [Dkt. 389.] Under the Public Sale Procedures Order, the Chapter 11 Trustee is required to file a notice of the bidding results ("**Notice of Proposed Public Sale**") within two business days of a public sale. The Sale Procedures Motion, when combined with each Notice of Proposed Public Sale, is deemed a motion under Bankruptcy Rule 6004(c) for authority to sell property free and clear of interests. The time to object or respond to each Notice of Proposed Public Sale is seven calendar days after filing and service. Each Notice of Proposed Public Sale constitutes a presentment under Local Bankruptcy Rule 9074-1(b), and the Court may issue the order approving the public sale immediately after the conclusion of the objection period.

On September 5, 2018, the Chapter 11 Trustee filed a *Notice of Firestar Public Sale 1, Public Sale 2, and Public Sale 3* [Dkt. 411].

On September 26, 2018, the Trustee conducted an auction of IP Lots 1–12 at Public Sale 1. The Chapter 11 Trustee executed intellectual property assignment agreements and bills of sale transferring certain of these lots, and on September 27, 2018, the Trustee filed Notices of Proposed Sale [Dkt. 450, 451, 452, 453, 454], which were subsequently approved by the Court.

On October 3, 2018, the Trustee conducted an auction of Lots 1–37 at Public Sale 2. The Chapter 11 Trustee executed bills of sale transferring certain of these lots to eleven purchasers. The same day, the Trustee filed and effected service of eleven Notices of Proposed Sale [Dkt. 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469], which were subsequently approved by the Court.

On October 4, 2018, the Chapter 11 Trustee conducted an auction of Lots 24 and 38–77 at Public Sale 3. The Chapter 11 Trustee executed bills of sale transferring these lots to eight purchasers. The same day, the Chapter 11 Trustee filed and effected service of eight Notices of Proposed Public Sale [Dkt. 472, 473, 474, 475, 476, 479, 480, 481], which were subsequently approved by the Court.

### H.    Private Sales

On November 5, 2018, the Chapter 11 Trustee filed a *Motion For Order Establishing Procedures For Private Sales of Assets Free And Clear Of Liens And Other Interests* (the "**Private Sale Procedures Motion**") [Dkt. 568] seeking authorization to sell the Debtors' assets in one or more private sales.

---

[2] Capitalized terms in this section not otherwise defined herein or in the Plan have the meaning ascribed to them in the Public Sale Procedures Motion.

On December 6, 2018, the Court entered an order (the "**Private Sale Procedures Order**") approving the sale procedures described in the Private Sale Procedures Motion. [Dkt. 617.] Under the Private Sale Procedures Order, the Chapter 11 Trustee is required to file a notice of any private sale ("**Notice of Proposed Private Sale**"). The Private Sale Procedures Motion, when combined with each Notice of Proposed Private Sale, is deemed a motion under Bankruptcy Rule 6004(c) for authority to sell property free and clear of interests. The time to object or respond to each Notice of Proposed Private Sale is seven calendar days after filing and service. Each Notice of Proposed Private Sale constitutes a presentment under Local Bankruptcy Rule 9074-1(b), and the Court may issue the order approving the private sale immediately after the conclusion of the objection period. The Court has approved over forty private sales under the Private Sale Procedures Order.

The Chapter 11 Trustee still has a relatively small amount of inventory remaining that he intends to sell. The Chapter 11 Trustee has a more substantial amount of inventory that is subject to competing claims, for which he has received bids that he believes are below saleable value. Accordingly, he is evaluating other possible approaches to selling that inventory.

## I.        Bar Dates for Filing Proofs of Claim

On September 13, 2018, the Chapter 11 Trustee filed a motion requesting that the Court set a deadline by which parties, including governmental units, must file proofs of claim. [Dkt. 423.] The motion was granted by the Court on October 5, 2018 [Dkt. 482] and established December 11, 2018 as the deadline for filing Proofs of Claim for any Claims against the Debtors arising before the Petition Date.

On March 15, 2019, the Chapter 11 Trustee filed *Amendments to Schedules E/F* for each of the Debtors, which extended the Bar Date for Claims affected by the amendments to April 15, 2019. [Dkt. 740.]

On August 1, 2019, the Chapter 11 Trustee filed a motion requesting that the Court set a deadline by which parties must file Proofs of Claim for Administrative Claims. [Dkt. 992.] The Bankruptcy Court approved the Motion in open court on August 22, 2019, and entered an order granting the Debtors' motion on August 23, 2019. [Dkt. 1032.]

A schedule of the filed Proofs of Claims is being maintained by the Claims Agent.

## J.        Litigation

To determine the competing interests in inventory, the Chapter 11 Trustee has commenced an adversary proceeding against certain of the Debtors' non-U.S. non-debtor affiliates and their alleged assignee to avoid unperfected interests in certain consignment inventory. (*See Levin v. Firestar International Pvt. Ltd.*, Adv. No. 19-1002.) In the meantime, the Court authorized the Chapter 11 Trustee to sell the consignment inventory at issue and escrow the proceeds pending the resolution of the adversary proceeding. [Dkt. 645.] The Chapter 11 Trustee also requested and obtained authority to sell other inventory delivered to the Debtors by their U.S. non-debtor affiliates. [Dkt. 698, 724.]

On March 27, 2019, the Chapter 11 Trustee commenced another adversary proceeding (the "**Breach of Fiduciary Duty Action**") against Nirav Modi, Mihir Bhansali, and Ajay Gandhi seeking damages arising from breach of fiduciary duty, corporate waste, and violations of the Racketeering Influenced Corrupt Organizations Act. [*See Levin v. Modi, Bhansali, & Gandhi*, Adv. No. 19-1102, Dkt. 1.]  With the Court's assistance, the Chapter 11 Trustee has been working diligently to effect service of the complaint and summons on Nirav Modi, who is currently remanded in custody in London.  Bhansali and Gandhi have each moved to dismiss the Breach of Fiduciary Duty Action.  [*See id.* at Dkt. 22, 23.]

On March 27, 2019, the Chapter 11 Trustee also commenced an adversary proceeding (the "**Artwork Action**") against Nirav Modi, Ami Modi (now known as Ami Javeri), Deepak Modi, Mihir Bhansali, Purvi Mehta, and certain of the Debtors' U.S. and foreign affiliates seeking a declaratory judgment regarding the ownership of 23 head-shaped sculptures that were located in the Debtors' offices at the time of the Chapter 11 Trustee's appointment.  [*See Levin v. Modi, et al.*, Adv. No. 19-1103, Dkt. 6.] As with the Breach of Fiduciary Duty Action, the Chapter 11 Trustee is still in the process of serving the Artwork Action complaint and summons on Nirav Modi.

In recent months, the Chapter 11 Trustee and his professionals have also been working diligently to investigate potential bases to disallow claims asserted against the Debtors' Estates by insiders of the Debtors and others suspected of involvement in the Bank Fraud.  The Chapter 11 Trustee is also investigating potential affirmative claims against such parties.  In the coming months, the Chapter 11 Trustee intends to engage in settlement discussions as to these matters and to pursue litigation as warranted.

## IV.   DESCRIPTION OF THE PLAN

The following sections of the Disclosure Statement summarize the Plan, a copy of which is attached hereto as Exhibit A.  This summary is qualified in its entirety by reference to the Plan.  Broadly speaking, the Plan provides for (i) the resolution and satisfaction of all Claims against and Interests in the Debtors; (ii) the creation of a Liquidating Trust to recover and hold assets for the benefit of Holders of Allowed Claims; and (iii) the ultimate dissolution of the Debtors, their Estates, and the Liquidating Trust.  The Chapter 11 Trustee proposes the Plan in good faith and believes the Plan is feasible and in the best interests of the creditors of the Debtors.

## V.   ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES, AND PRIORITY TAX CLAIMS

This section of the Disclosure Statement summarizes the treatment of Administrative Claims, Professional Fees, and Priority Tax Claims under the Plan.   In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified under the Plan.  Section 2 of the Plan sets forth the treatment for each of these types of Claims.  Section 3 of the Plan sets forth the treatment for the remaining Classes of Claims and Interests under the Plan.

The Debtors project that they will have approximately $[•] in cash on hand as of [•], 2019.

### A.   Administrative Claims

The Plan provides that each Allowed Administrative Claim shall be paid in full in Cash under the Plan unless otherwise agreed between the Liquidating Trustee and the Holder of the Allowed Administrative Claim.  Such payment shall be made (a) no later than the Initial Distribution Date, if the Claim is Allowed before the Effective Date; (b) no later than 30 days after the date on which an order allowing such Claim becomes a Final Order, if the Claim is not Allowed before the Effective Date; (c) at a time set as a contractual term of the particular transaction giving rise to the Claim, if the Claim arises from liabilities incurred by the Debtors or the Estates in the ordinary course of their business after the Petition Date; or (d) at such time and upon such terms as may be ordered by this Court or agreed to by the Liquidating Trustee and the Holder of the Claim.

### B.   Professional Fee Claims

The Plan sets forth the manner and timing in which Professionals must submit Professional Fee Claims to be considered for payment.  The Plan further provides for the disallowance of Professional Fee Claims that do not comply with the requirements set forth in the Plan.  In the event there is a dispute over what amount of a Professional Fee Claim shall be Allowed, if any, the dispute shall be resolved by the Bankruptcy Court.

The Plan also sets forth the manner and timing in which the Liquidating Trustee shall pay post-Consummation fees and expenses.  Beginning on the Effective Date, the Plan provides for the Liquidating Trustee to pay in Cash in the ordinary course of business any reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Chapter 11 Trustee or the Liquidating Trustee.  If there are disputes, they may be submitted to the Bankruptcy Court for resolution.

### C.   Priority Tax Claims

Except to the extent that each Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms provided in Bankruptcy Code section 1129(a)(9)(C), in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim.

## VI.   CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### A.   Summary

The Chapter 11 Trustee believes that the Liquidating Trust will not recover enough Available Cash to pay every Allowed Claim and Interest in full.  The exact amount of Available Cash will depend on a number of factors, many of which the Chapter 11 Trustee cannot accurately predict at this time.  Based on information that was available on the date this Disclosure Statement was filed, the Chapter 11 Trustee estimates there will be approximately $[•] in Available Cash to satisfy Allowed General Unsecured Claims against Firestar; $[•] in Available Cash to satisfy Allowed General Unsecured Claims against Old AJ; and $[•] in Available Cash to satisfy Allowed

General Unsecured Claims against Fantasy. The Plan provides that there will be no recovery for Holders of Interests in the Debtors.

The Plan does not treat each Claim identically; rather, Section 3 of the Plan categorizes Claims and Interests into Classes, consistent with the requirements in sections 1122 and 1123(a)(1) of the Bankruptcy Code. That means that, under the Plan, some Holders of Claims will receive full satisfaction of their Claims, some will receive partial satisfaction, and some will receive nothing. In each instance, the Chapter 11 Trustee believes that Holders of Claims or Interests will receive at least as much value as they would receive if the Debtors' assets were to be liquidated under chapter 7 of the Bankruptcy Code and that impaired creditors will receive more than they would receive in a chapter 7 liquidation. Regardless, it is important for Holders of Claims and Interests to read the Plan and this Disclosure Statement carefully to understand how they will be treated under the Plan.

The categories of Claims and Interests set forth in the Plan and summarized below classify Claims and Interests for all purposes, including voting, Confirmation, and Distribution under the Plan and Bankruptcy Code sections 1122 and 1123(a)(1). The Plan shall be separate with respect to each Debtor for voting, Confirmation, and Distribution purposes. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.

A Claim or Interest is classified within a particular Class for the purpose of receiving Distributions only to the extent that such Claim or Interest is Allowed and has not already been satisfied before the Effective Date.

Nothing in the Plan affects the Chapter 11 Trustee's, Debtors', Liquidating Trust's, or Liquidating Trustee's rights with respect to any Claims or Interests, including any such rights relating to legal and equitable defenses to, or setoffs or recoupments against, any such Claims or Interests.

## B.    The Convenience Class

A key feature of the Plan is the creation of a Class of Convenience Claims (Class 4, the "**Convenience Class**"). The Convenience Class serves three functions. *First*, the Convenience Class eliminates *de minimis* distributions on small claims.

*Second*, the Convenience Class allows Holders of Allowed General Unsecured Claims to receive full payment of their Claims up to a threshold. The threshold for each Debtor is different: up to $25,000 for Claims against Firestar; $15,000 for Claims against Old AJ; and $10,000 for Claims against Fantasy (each, the "**Convenience Threshold**"). The Chapter 11 Trustee believes that Holders of Allowed Convenience Claims will receive Distributions in satisfaction of their claims much more quickly and with greater certainty than Holders in Class 5. This is so because Holders in the Convenience Class will not need to wait for the Liquidation Trustee to resolve all Retained Causes of Action before they receive a final Distribution or know how much the total Distributions will be.

16

*Third*, the Convenience Class gives Holders of Allowed Unsecured Claims above the Convenience Threshold the option to accept a Cash payment equal to the Convenience Threshold in lieu of the payment they would otherwise receive if they remained in Class 5 with Holders of other Allowed General Unsecured Claims (described more fully in Section VI.C.5 below). The Chapter 11 Trustee believes that the majority of Holders of General Unsecured Claims will receive a larger payment by opting into the Convenience Class than if they remained in Class 5 with Holders of Allowed General Unsecured Claims. This is so because Holders in Class 5 will receive any Distributions Pro Rata with PNB, and PNB holds very large General Unsecured Claims—approximately $1 billion against each Debtor—which likely will substantially dilute the recovery that other Holders in Class 5 receive. The Chapter 11 Trustee estimates that the recovery on Class 5 Claims will range from [•]–[•]%, but the amount of any recovery depends on the outcome of the claims administration process and related litigation.

Two hypothetical scenarios help illustrate the operation of the Convenience Class. **These hypothetical scenarios are for illustrative purposes only and in no way guarantee any outcome under the Plan**:

**Scenario One:**  Creditor A has an Allowed General Unsecured Claim in the amount of $8,000 against Firestar. Because Creditor A's Claim is below the Convenience Threshold, Creditor A automatically is placed in the Convenience Class and its Claim is paid in full.

**Scenario Two:** Creditor B has an Allowed General Unsecured Claim in the amount of $150,000 against Firestar. Because Creditor B's Claim is above the Convenience Threshold, Creditor B can choose to remain in Class 5 with other Holders of Allowed General Unsecured Claims or choose to take an Allowed Convenience Claim worth $25,000. Given the Pro Rata nature of Distributions for Holders in Class 5, Creditor B's hypothetical Distribution in either Class may approximate the following:

| Creditor B: $150,000 Claim Against Firestar | |
| --- | --- |
| **Class 4: Convenience Claim** (Set at Convenience Threshold) | **Class 5: General Unsecured Claim** (Pro Rata Share of $[•]) |
| $25,000 | $[•] |
| 16.6% of original claim | [•]% of original claim |

Note that Holders of Convenience Claims in Class 4 will not be entitled to vote on the Plan regardless of whether their initial General Unsecured Claim was above or below the Convenience Threshold, because they will have reduced their claims for the purposes of this Plan and will be deemed not to be impaired under the Plan. By contrast, Holders of Allowed General Unsecured Claims in Class 5 will be entitled to vote on the Plan.

### C.    Classification and Treatment of Claims Against the Debtors

####    1.    Class 1—Secured Tax Claims

Classification. Class 1 consists of all Secured Tax Claims.

Treatment.  Except to the extent that a Holder of a Class 1 Claim has agreed to less favorable treatment, each Holder of a Class 1 Claim shall be entitled to receive Cash in an amount equal to the Allowed amount of such Claim, which shall constitute full and final satisfaction of the Claim.  Such payment in full shall be made: (i) no later than the Initial Distribution Date, if the Claim is Allowed before or on the Effective Date; (ii) no later than 30 days after the date on which an order allowing the Claim becomes a Final Order, if the Claim is not Allowed before or on the Effective Date; or, (iii) at such time and upon such terms as may be ordered by this Court or agreed to by the Liquidating Trustee and the Holder of the Class 1 Claim.

Impairment and Voting.  Class 1 is Unimpaired and not entitled to vote.

### 2.      Class 2—Secured Reimbursement Claims

Classification.  Class 2 consists of Reimbursement Claims, as defined in paragraph 4 of the Payoff Letters, up to the amount of the Reimbursement Reserve Funds held by each Prepetition Secured Lender.  All Class 2 Claims are unliquidated, contingent, Secured Claims.

Treatment.  To the extent that any Class 2 Claim becomes fixed before April 1, 2020, such Holder shall be entitled to satisfy the fixed amount of its Class 2 Claim in full from the Reimbursement Reserve Funds held by the Holder of such Class 2 Claim.  If and to the extent any Class 2 Secured Claim does not become Fixed before April 1, 2020, such Claim shall be cancelled and all remaining Reimbursement Reserve Funds held by the Holder shall be delivered to the Liquidating Trust.  To the extent that the amount of a Class 2 Claim exceeds the amount of the Reimbursement Reserve Funds held by the Holder of the Claim, such excess shall be an Administrative Claim under Section 2.2 of the Plan.

Impairment and Voting.  Class 2 is Unimpaired and not entitled to vote.

### 3.      Class 3—Priority Non-Tax Claims

Classification.  Class 3 consists of all Priority Non-Tax Claims.

Treatment.  Except to the extent that a Holder of a Class 3 Claim has agreed to less favorable treatment, each Holder of a Class 3 Claim shall be entitled to receive Cash in an amount equal to the Allowed amount of such Claim, which shall constitute full and final satisfaction of such Claim.  Payment in full shall be made: (i) no later than the Initial Distribution Date, if the Claim is Allowed before or on the Effective Date; (ii) no later than 30 days after the date on which an order allowing the Claim becomes a Final Order, if the Claim is not Allowed before or on the Effective Date; or (iii) at such time and upon such

terms as may be ordered by this Court or agreed to by the Liquidating Trustee and the Holder of the Class 3 Claim.

<u>Impairment and Voting</u>.  Class 3 is Unimpaired and not entitled to vote.

### 4.    Class 4 — Convenience Claims

<u>Classification</u>.  Class 4 consists of all Convenience Claims, which shall be:

- For Debtor Firestar Diamond, Inc., all Allowed General Unsecured Claims of $25,000 or less, or which, by agreement between the Holders thereof and the Liquidating Trustee, have each been reduced to $25,000 or less.

- For Debtor Old AJ, Inc. all Allowed General Unsecured Claims of $15,000 or less, or which, by agreement between the Holders thereof and the Liquidating Trustee, have each been reduced to $15,000 or less.

- For Debtor Fantasy, Inc. all Allowed General Unsecured Claims of $10,000 or less, or which, by agreement between the Holders thereof and the Liquidating Trustee, have each been reduced to $10,000 or less.

<u>Treatment</u>.  Each Holder of an Allowed Convenience Claim shall be entitled to receive 100% of the unpaid amount of such Claim in Cash (i) no later than the Initial Distribution Date, if the Claim is Allowed before or on the Effective Date; (ii) no later than 30 days after the date on which an order allowing such Claim becomes a Final Order, if the Claim is not Allowed before or on the Effective Date; or (iii) at such time and upon such terms as may be ordered by this Court or agreed to by the Liquidating Trustee and the Holder of the Class 4 Claim.

<u>Impairment and Voting</u>.  Class 4 is Unimpaired and not entitled to vote.

### 5.    Class 5 — Allowed General Unsecured Claims

<u>Classification</u>.   Class 5 consists of Allowed General Unsecured Claims that are not Convenience Claims.

<u>Treatment</u>.  Each Holder of an Allowed Class 5 Claim shall be entitled to receive, in full and final satisfaction of such Claim, a Pro Rata share of one or more Distributions of Available Cash from the Liquidating Trust.   Such payments shall not exceed the full amount of such Allowed Class 5 Claim.   Distributions to Holders of Class 5 Claims shall

commence on the Initial Distribution Date and may continue on one or more later Distribution Dates.

Impairment and Voting.  Class 5 is Impaired and is entitled to vote.

### 6.    Class 6—Subordinated Claims

Classification.  Class 6 consists of any Subordinated Claims.

Treatment.  Holders of Class 6 Claims shall not receive or retain any Distribution or Claims under the Plan.

Impairment and Voting.  Class 6 is Impaired, shall not receive any property under the Plan, and is not entitled to vote.

### 7.    Class 7—Interests

Classification.  Class 7 consists of all Interests in the Debtor.

Treatment.  Holders of Interests shall not receive or retain any Distribution or Claims under the Plan.  Upon the Effective Date, such Interests shall be cancelled.

Impairment and Voting.  Class 7 is Impaired, shall not receive any property under the Plan, and is not entitled to vote.

## VII.    ACCEPTANCE OR REJECTION OF THE PLAN

### A.    Who May Vote

Under the Bankruptcy Code, only Classes of Claims or Interests that are (i) Impaired under the Plan; and (ii) entitled to receive a Distribution under the Plan are eligible to vote to accept or reject the Plan.  If a Class is Unimpaired, it is deemed to accept the Plan and is not entitled to vote.  Conversely, if a Class will not receive any Distribution under the Plan, it is deemed to reject the Plan and is not entitled to vote.  Accordingly, because only Holders of Allowed Claims in Class 5 are impaired under the Plan and entitled to receive a Distribution under the Plan, only Holders of Allowed Claims in Class 5 (each, an "**Eligible Holder**") are eligible to vote on the Plan.

### B.    Acceptance by Impaired Class

Section 1126 of the Bankruptcy Code sets forth the voting requirements for the Plan to be confirmed.  Under that section, a voting Class accepts the Plan if Holders representing (i) more than one-half in number of Allowed Claims in the Class who vote on the Plan, and (ii) at least two-thirds in value of Allowed Claims in the Class who vote on the plan, vote to accept the Plan.

If a Class is given the opportunity to vote, but no Holders of Claims or Interests in that Class vote to accept or reject the Plan, then such Class shall be deemed to have accepted the Plan.

**C.    Presumed Acceptance or Rejection of the Plan**

The Plan provides for full satisfaction of Allowed Claims in Classes 1, 2, 3, and 4. Accordingly, Holders of Claims in Classes 1, 2, 3, and 4 are Unimpaired and are not entitled to vote because they are deemed to accept the Plan.

Conversely, the Plan does not provide for any Distribution to Holders of Claims or Interests in Classes 6 or 7. Accordingly, Holders of Claims or Interests in Classes 6 and 7 are Impaired, but are not entitled to vote because they are deemed to reject the Plan.

**D.    Nonconsensual Confirmation**

The Plan may be confirmed even though Holders of Claims or Interests in Classes 6 and 7 are deemed to reject the Plan. Section 1129(b) of the Bankruptcy Code allows for the confirmation of a Plan if (i) at least one Impaired Class of Claims accepts the Plan; and (ii) no holder of a Claim or Interest junior to that Impaired Class retains any property under the Plan. Here, the Plan may be confirmed so long as Class 5 votes to accept the Plan, because Classes 6 and 7 (both of which are junior to Class 5) do not retain any property under the Plan.

**E.    How to Vote**

To solicit votes for the Plan, the Chapter 11 Trustee, through the Claims Agent, sent each Eligible Holder a copy of (i) the Disclosure Statement, (ii) the Plan, and (iii) a ballot substantially in the form of the ballot attached to the Motion to Approve the Disclosure Statement as Exhibit A-1, A-2, or A-3 (a "**Ballot**").

If you are an Eligible Holder, but you did not receive a Ballot, or if your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the Claims Agent:

**By regular mail, overnight courier, or hand delivery to:**

Firestar Diamond, Inc. Ballot Processing
c/o Omni Management Group
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367

**By telephone at:** (818) 906-8300

**By email to:** firestarballoting@omnimgt.com

After reviewing the Plan and Disclosure Statement, you are asked to make two selections on your Ballot. *First*, you are asked to select whether you choose to remain in Class 5 with Holders of Allowed General Unsecured Claims, or whether you instead choose to be placed in Class 4 and accept an Allowed Convenience Claim. *Second*, if you choose to remain in Class 5, you are asked to indicate your acceptance or rejection of the Plan by voting in favor or against the Plan. If you opt into Class 4, you will not be permitted to vote on the Plan because you will be deemed to accept your treatment under the Plan.

You should complete and sign your Ballot and return it to the Claims Agent.  Do not return your Ballot to the Chapter 11 Trustee or to the Debtors.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH HEREIN AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND MUST BE RECEIVED BY THE CLAIMS AGENT NO LATER THAN NOVEMBER 8, 2019 (THE "**VOTING DEADLINE**").  BALLOTS NOT RECEIVED BY THE CLAIMS AGENT BY THE VOTING DEADLINE WILL NOT BE COUNTED.

Copies of the Disclosure Statement and the Plan are available to download for free at: https://cases.omniagentsolutions.com/firestardiamond/.

## VIII.    MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Joint Chapter 11 Plan

The Plan is a joint chapter 11 plan for each of the Debtors.  The Plan for each Debtor is non-severable and is mutually dependent on the Plan for each other Debtor.

### B.    The Liquidating Trust

Distributions under the Plan will be made from the Liquidating Trust.  The Liquidating Trust will be funded with all of the Retained Assets of the Estates on the Effective Date.  That includes Cash, Avoidance Actions, and other Claims, rights of setoff, policies, and interests in those policies.

### C.    Dissolution of the Debtors

The Plan calls for the dissolution of the Debtors.  As soon as practicable after the Effective Date, the Debtors shall be dissolved for all purposes.  The Liquidating Trustee shall file a certificate of dissolution or equivalent document with the appropriate governmental authority in the State where each Debtor was incorporated.  From and after the Effective Date, each Debtor (a) shall be deemed to have withdrawn, for all purposes, its business operations from any state in which it was previously conducting business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal; (b) shall be deemed to have cancelled all Interests under the Plan; and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The dissolution of the Debtors shall not have any effect, in any manner, on the Retained Causes of Action that the Liquidating Trustee may assert in accordance with the Plan and the Liquidating Trust Agreement.

### D.    Vesting and Transfer of Assets to the Liquidating Trust

Title to all Retained Assets shall vest in the Liquidating Trust on the Effective Date, free and clear of all Liens, Claims, and Interests, except that the Liquidating Trust may abandon or otherwise decline to accept any Retained Assets that the Liquidating Trustee believes in good

faith have no value to the Liquidating Trust.  Title to any assets that the Liquidating Trust abandons or declines to accept shall not vest in the Liquidating Trust.

### E.    Retained Causes of Action

All Causes of Action are retained, vested, and preserved by the Liquidating Trust under Bankruptcy Code section 1123(b), including all Retained Causes of Action provided in the applicable schedule to the Plan Supplement.

From and after the Effective Date, all Retained Causes of Action shall be prosecuted or settled solely by the Liquidating Trustee.  To the extent any proceeding on a Cause of Action is already pending on the Effective Date, the Liquidating Trustee, as successor to the Chapter 11 Trustee, shall continue the prosecution of such Cause of Action and shall be substituted as plaintiff or defendant, or in any other capacity, for the Chapter 11 Trustee under the Plan and the Confirmation Order on the Effective Date without need for any further motion practice or notice in any case, action, or matter before the Bankruptcy Court.

Any proceeds from the Retained Causes of Action shall be deposited in the Liquidating Trust Account.

### F.    Payment of Liquidating Trust Operating Expenses

The Plan provides that, in addition to paying Disbursements for Holders of Allowed Claims, the Liquidating Trust Assets will also be used to pay Liquidating Trust Operating Expenses and certain other expenses associated with the administration of the Chapter 11 Cases. To do that, the Liquidating Trustee may establish a reserve account for the payment of Liquidating Trust Operating Expenses and fund it with Available Cash.  The Available Cash may also be used to pay fees and expenses incurred by the Chapter 11 Trustee pre-Consummation. The Chapter 11 Trustee will submit a final fee application, which is subject to the approval of the Bankruptcy Court.

Post-Consummation, the Liquidating Trust Assets will be used to pay the Liquidating Trustee and the Professionals representing the Liquidating Trustee or PNB.  Those Entities shall be paid on a monthly basis at regular hourly rates, although certain of those Professionals may negotiate a contingency fee arrangement, which would be subject to the approval of PNB and the Bankruptcy Court.  Any portion of monthly invoices not subject to an objection by PNB within ten Business Days shall be paid promptly.

### G.    Beneficiaries of Trust Proceeds

In accordance with Treasury Regulation Section 301.7701-4(d), the Beneficiaries of the Liquidating Trust shall be the Holders of all Allowed Class 5 Claims against the Debtors.  The Holders of Allowed Class 5 Claims shall receive an allocation of the respective Liquidating Trust Interests as provided for in the Plan and the Liquidating Trust Agreement.  The Holders of Liquidating Trust Interests shall receive Distributions from the Liquidating Trust as provided for in the Plan and the Liquidating Trust Agreement.

### H.     Liquidating Trust Agreement

On the Effective Date, the Chapter 11 Trustee, on behalf of the Estates, and the Liquidating Trustee shall execute the Liquidating Trust Agreement, which shall be in form and substance reasonably acceptable to PNB and substantially in the form attached as **Exhibit 1** to the Plan Supplement, and take all actions that are required to transfer the Retained Assets to the Liquidating Trust.  From and after the Effective Date, the Liquidating Trustee shall be authorized to, and shall, implement the Liquidating Trust Agreement and the provisions of the Plan that are contemplated to be implemented by the Liquidating Trustee.

### I.     Power and Authority of Liquidating Trustee in Accordance with the Liquidating Trust Agreement

The Plan provides that the Liquidating Trustee will be in charge of the Debtors' Estates post-Consummation.  The Liquidating Trustee shall be appointed as the representative of each of the Estates under Bankruptcy Code sections 1123(a)(5), (a)(7), and (b)(3)(B) and vested with the authority and power (subject to the Liquidating Trust Agreement) to, among other things, (a) object to Claims against, and Interests in, the Debtors; (b) administer, investigate, prosecute, settle, or abandon all Retained Causes of Action assigned to the Liquidating Trust; (c) make Distributions provided for in the Plan, including on account of Allowed Claims; and (d) take such action as is required to administer, wind-down, and close the Chapter 11 Cases. As the representative of the Estates, the Liquidating Trustee shall succeed to all of the rights and powers of the Chapter 11 Trustee with respect to all Retained Causes of Action assigned and transferred to the Liquidating Trust, and the Liquidating Trustee shall be substituted for the Chapter 11 Trustee and the Estates, as applicable, as the party in interest in all litigation pending on the Effective Date concerning the Retained Causes of Action.

### J.     Termination of the Liquidating Trust

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated at such time as (i) all Disputed Claims have been resolved; (ii) all of the Assets of the Liquidating Trust have been liquidated; (iii) all duties and obligations of the Liquidating Trustee have been fulfilled; and, (iv) all Distributions required to be made by the Liquidating Trust under the Plan and the Liquidating Trust Agreement have been made; however, in no event shall the Liquidating Trust be dissolved later than five years after the Effective Date, unless the Bankruptcy Court, upon motion within the six-month period before the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the Liquidating Trust.

### K.     Full and Final Satisfaction

Upon the Effective Date, all Debts of the Liquidating Trust shall be deemed fixed and adjusted under the Plan, except as provided therein, and the Liquidating Trust shall have no

liability on account of any Claims or Interests except as provided in the Plan and the Liquidating Trust Agreement. All payments and all distributions made by the Liquidating Trustee under the Plan shall be in full and final satisfaction, settlement, and release of all Claims against the Liquidating Trust; however, nothing contained in the Plan, shall be deemed to constitute or result in a discharge of the Debtors under Bankruptcy Code section 1141(d).

## L.   Distribution Procedures

Section 5.12 of the Plan provides the manner in which the Liquidating Trustee will make Distributions to Holders of Allowed Claims.

### 1.   Disbursing Agent

The Disbursing Agent shall make all Distributions required under the Plan and shall implement such procedures as it deems necessary to make Distributions under the Plan so as to efficiently and economically assure prompt and proportionate Distributions. If ordered by the Bankruptcy Court, the Disbursing Agent shall provide a bond in connection with the making of any Distributions under the Plan.

### 2.   Source of Distributions

The source of all Distributions and payments under the Plan and the Liquidating Trust Agreement shall be Available Cash.

### 3.   Distribution Dates

Commencing upon the Effective Date, the Liquidating Trustee shall be authorized and directed to distribute the amounts required under the Plan to the Holders of Allowed Claims according to the provisions of the Plan. The Initial Distribution Date shall be within 30 days after the Effective Date.

Distribution Dates after the Initial Distribution Date shall be selected by the Liquidating Trustee.

### 4.   Manner of Cash Payments

Cash Distributions made under the Plan shall be in United States dollars by check drawn on or wire transfer from a domestic bank.

### 5.   Claims Payable by Third Parties

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable under one of the Debtors' insurance policies or by a guarantor other than one of the Debtors until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy or guarantor. To the extent that one or more of the Debtors' insurers or guarantors agrees or is ordered by a court to satisfy in full or in part a Claim, then immediately upon such insurer's agreement or court's order, the Liquidating Trustee may expunge the

applicable portion of such Claim without an objection to such Claim having to be Filed, without any further notice, and without any further action, order, or approval of the Bankruptcy Court.

**6.      No Distributions On Account of Disputed Claims**

Distributions shall be made to a Holder of a Disputed Claim on account of such Claim only after, and only to the extent that, the Disputed Claim either becomes or is deemed to be an Allowed Claim.  Any such Distributions shall be made in accordance with the procedures provided in Sections 5.12, 5.13, and 5.14 of the Plan.

**7.      Transmittal of Distributions and Notices**

It is important for Holders of Claims to keep their Distribution Address current to receive notices and Distributions.  Any property or notice that an Entity is or becomes entitled to receive under the Plan may be delivered by regular mail, postage prepaid, in an envelope addressed to that Entity's Distribution Address as described below.  Property or notices distributed in accordance with this Section shall be deemed delivered to such Entity regardless of whether such property or notice is actually received by that Entity.

An Entity's Distribution Address shall be the address listed in the Schedules, its Proof of Claim, or its Proof of Interest, but a Holder of a Claim or Interest may designate a different Distribution Address by notifying the Liquidating Trustee and the Claims Agent of that address in writing after the Effective Date.  Any change of Distribution Address must be provided to the Liquidating Trustee and the Claims Agent in order to be effective.  Such notification shall be effective only upon receipt.

**8.      Record Date**

The Record Date shall be the first day of the Confirmation Hearing, or such other date as is designated in a Final Order of the Bankruptcy Court.

Unless a notice of transfer of Claim or Interest has been filed with the Bankruptcy Court before the Record Date in accordance with Bankruptcy Rule 3001, the Disbursing Agent shall rely on the Claims Register when determining Holders on the Record Date.

**M.      Resolution of Disputed Claims**

**1.      Allowance and Disallowance of Claims**

Each PNB Claim shall be Allowed for all purposes under the Plan as of the Effective Date.

After the Effective Date, the Liquidating Trustee shall have and retain any and all rights and defenses that the Chapter 11 Trustee or Debtors had with respect to any Claim or Interest immediately before the Effective Date.

All Proofs of Claim Filed after the Initial Distribution Date shall be deemed disallowed and expunged as of the Effective Date without any further notice and without any action, order, or approval of the Bankruptcy Court, and Holders of such Claims shall not receive any Distributions on account of such Claims, except (1) if such late Filing is authorized by an order of

the Bankruptcy Court or by the Liquidating Trustee, or is deemed timely Filed by a Final Order on or before the Confirmation Hearing; or (2) as provided herein or otherwise agreed.

### 2.    Liquidating Trustee's Authority

Except as otherwise specifically provided in the Plan, after the Effective Date, the Liquidating Trustee shall have the sole authority to: (a) File, withdraw, or litigate to judgment objections to Claims; (b) settle or compromise any Disputed Claim without any further notice or any action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice or any action, order, or approval by the Bankruptcy Court.

Any objections to Claims shall be filed on or before 180 days after the Effective Date, subject to the extension of the deadline for objecting to such Claims by order of the Bankruptcy Court.

### 3.    Adjustment to Claims Without Objection

Any Claim that has been satisfied, or that has been amended, superseded, canceled, or otherwise expunged (including under the Plan), may be adjusted or expunged (including on the Claims Register to the extent applicable) by the Liquidating Trustee without the need to object to such Claim, without any further notice, and without any further action, order, or approval of the Bankruptcy Court.

### N.    Reserve Provisions for Disputed Claims

### 1.    Establishment of Disputed Claims Reserves

On any date on which Distributions for any particular Class of Claims are made by the Liquidating Trustee, and in connection with making all Distributions required to be made on any such date under the Plan, the Liquidating Trustee shall establish a separate Disputed Claims Reserve on account of Disputed Claims within the Class receiving Distributions.  All Cash distributed into a Disputed Claims Reserve shall be deposited in a separate account at a qualified institution.

### 2.    Amounts to be Reserved

The Liquidating Trustee shall reserve the Pro Rata proportion of all Cash allocated for Distribution on account of each Disputed Claim based upon the Face Amount of each such Disputed Claim, or such lesser amount as may be agreed to by the Holder of the Claim on one hand and the Liquidating Trust on the other hand, as applicable, or in such amount as may otherwise be determined by order of the Bankruptcy Court.

### 3.    Distribution

Unless otherwise required by the applicable treatment provisions of the Plan, payments on any Disputed Claim that becomes an Allowed Claim shall be distributed after the Claim is Allowed.  Distributions shall be made periodically in the discretion of the Liquidating Trustee.

In the event that a Disputed Claim is ultimately disallowed in whole or in part, the funds allocated to the Disputed Claims Reserve on account of that Disputed Claim shall be removed from the Disputed Claims Reserve and shall be Available Cash.

### 4.    Termination of Disputed Claims Reserves

Each Disputed Claims Reserve shall be closed by the Liquidating Trustee when all Distributions and other dispositions of Cash or other property required to be made therefrom under the Plan and the Liquidating Trust Agreement have been made.  Upon closure of a Disputed Claims Reserve, all Cash and other property held in that Disputed Claim Reserve shall be distributed to Holders of Allowed Claims in the order of priority established by the Plan.

### O.    Allocation of Distributions

To the extent that any Allowed Claim entitled to a Distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

### P.    Unclaimed Property

Any Cash or other distributable property unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto in respect of such Holder's Allowed Claim shall be Unclaimed Property. Such Unclaimed Property shall include: (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address; (b) funds for uncashed checks; (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, notwithstanding efforts by the Liquidating Trustee to locate such address that were commercially reasonable under the circumstances; and (d) checks (and the funds represented thereby) not mailed or delivered because a Holder of a Claim or Interest failed to provide a taxpayer identification number or to otherwise satisfy any tax withholding requirements with respect to a distribution within ninety (90) days of the date of on which the Liquidating Trustee requested such information.

Unclaimed Property shall be considered Available Cash.

### Q.    Setoffs

The Liquidating Trustee may setoff against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any Claim of any nature whatsoever that the Estate or the Liquidating Trust may have against the Claim Holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trust of any such Claim or right of setoff it may have against the Claim Holder.  If the Liquidating Trustee chooses to setoff against an Allowed Claim, then, for purposes of determining the amount of the Allowed Claim, the Liquidating Trustee shall deduct therefrom an amount equal to the amount of any Claim that the Liquidating Trust holds against the Holder thereof, to the extent that applicable law permits such setoff, recoupment, or reduction.

28

Holders of Allowed Claims retain whatever rights to setoff they are otherwise entitled to assert under Bankruptcy Code section 553.

### R.      No Distributions on Late-Filed Claims

Any Claim Filed after the Initial Distribution Date shall not be Allowed and shall not receive any Distribution under this Plan unless the Bankruptcy Court orders otherwise.

### S.      No Postpetition Interest on Claims

Unless otherwise specifically provided for in a Final Order, the Plan, or the Confirmation Order, or required by applicable law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

### T.      Claims Paid by Third Parties

To the extent that the Holder of a Claim receives payment on account of the Claim from a party other than the Liquidating Trustee, if the Claim is paid in Full, such Claim shall be disallowed without any further notice and without the need for any action, order, or approval of the Bankruptcy Court.  To the extent that a Holder of a Claim receives a Distribution on account of its Claim and also receives payment from a party other than the Liquidating Trust on account of such Claim, such Holder shall, within two weeks of receipt of the second payment, repay, or return the Distribution to the Liquidating Trustee to the extent that the Holder's total recovery on account of such Claim exceeds the Allowed amount of such Claim.  Failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Liquidating Trust annualized interest at the federal judgment interest rate in effect as of the Petition Date (calculated as provided in section 1961 of the Judicial Code) on such amount owed for each day after the two-week grace period specified above until the amount is repaid.

### U.      Federal Income Tax Compliance; Withholding

#### 1.      Tax Treatment of Liquidating Trust

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations and that such trust be owned by its Beneficiaries.

A transfer to the Liquidating Trust shall be treated for all purposes of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), as a transfer to the Beneficiaries of the Liquidating Trust.  For example, such treatment shall apply for purposes of Internal Revenue Code sections 61(a)(12), 483, 1001, 1012, and 1274.  Any such transfer shall be treated for federal income tax purposes as (1) a deemed transfer to the beneficiary-creditors followed by (2) a deemed transfer by the beneficiary-creditors to the Liquidating Trust, and the Beneficiaries of the Liquidating Trust shall be treated for federal income tax purposes as the grantors and deemed owners of the Liquidating Trust.

2.        **Tax Reporting and Compliance**

The Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust under Treasury Regulation Section 1.671-4(a).  The Liquidating Trustee shall also annually send to each Beneficiary a separate statement setting forth the Beneficiary's share of income, gain, loss, deduction, or credit and shall instruct all Beneficiaries to report such items on their federal income tax returns; however, no such statement need be sent to any Class that will not receive any Distribution from the Liquidating Trust.  The Liquidating Trust's taxable income, gain, loss, deduction, or credit shall be allocated to Holders of Allowed Claims or Interests in accordance with their relative beneficial interests in the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trustee shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes.  The Liquidating Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes.

The Liquidating Trustee may segregate the Disputed Claims Reserve and the Liquidating Trust Account.  The Liquidating Trustee may file all income tax returns with respect to any taxable income or loss attributable to the Disputed Claims Reserve or the Liquidating Trust Account, determining that either or both of the Disputed Claims Reserve and the Liquidating Trust Account are tax reporting entities, separate and distinct from the Liquidating Trust itself, in which case, the Liquidating Trustee shall pay the federal, state, and local income taxes attributable to such tax reporting entities.

The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust, including the Disputed Claims Reserve and the Liquidating Trust Account, under Bankruptcy Code section 505(b) for all returns filed for, or on behalf of, the Debtors and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

The Liquidating Trustee shall be responsible for filing all federal, state, local, and foreign tax returns for the Debtors and the Liquidating Trust.  The Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

3.        **Payment of Taxes**

The Liquidating Trust shall be responsible for payment of all tax obligations of the Debtors, including Priority Tax Claims and Administrative Claims, and any taxes imposed on the Liquidating Trust or its Assets, including the Disputed Claims Reserve and the Liquidating Trust Account.  If and to the extent that any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (a) reimbursed from any Cash amounts later retained on account of Disputed Claims, or (b) to the extent such Disputed Claims have been resolved, deducted from any

amounts distributable by the Liquidating Trust as a result of the resolutions of such Disputed Claims.

### V.    No *De Minimis* Distributions

Notwithstanding anything to the contrary in the Plan, no partial Distribution of less than $50.00 shall be made to any Holder of an Allowed Claim on account thereof.  The amount of *de minimis* Distributions that are not made under this Section shall accrue and be made available for later Distributions.

### W.    United States Trustee Fees

All outstanding amounts due under 28 U.S.C. § 1930(a)(6) that have not been paid shall be paid by the Chapter 11 Trustee on or before the Effective Date.

Any transfer from the Estates to the Liquidating Trustee shall not constitute a "disbursement" under 28 U.S.C. § 1930(a)(6).  The Liquidating Trustee shall pay any statutory fees due under 28 U.S.C. § 1930(a)(6) based on disbursements made by the Liquidating Trustee and such fees shall be paid until entry of a final decree or an order converting or dismissing the case.

### X.    Books and Records

On the Effective Date, the Liquidating Trustee shall: (i) take possession of all books, records, and files of the Debtors and their Estates; and (ii) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee determines, in accordance with the Liquidating Trust Agreement, that their retention is no longer necessary or required.

### Y.    Remaining Cash

If the Liquidating Trustee holds Cash after all Liquidating Trust Operating Expenses are paid and all Distributions are made, the Liquidating Trustee shall transfer such remaining Cash to PNB no later than ten days after all such Distributions are made.

## IX.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 6 of the Plan sets forth the treatment of Executory Contracts and Unexpired Leases, including the treatment of Claims based on the Rejection of an Executory Contract or Unexpired Lease.

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Any Executory Contract or Unexpired Lease not previously assumed or rejected shall be deemed automatically rejected on the Effective Date under Bankruptcy Code sections 365 and 1123, except (a) if such Executory Contract or Unexpired Lease is an agreement or document assumed or entered into in connection with the Plan; (b) if such Executory Contract or Unexpired Lease is a directors' and officers' insurance policy (which policy shall be deemed assumed and

transferred to the Liquidating Trust under the Plan and shall continue to provide coverage for all individuals within the definition of "Insured" in any such policy); or (c) as otherwise provided by a separate post-petition agreement.

Rejection of an Executory Contract or Unexpired Lease, whether under the Plan or otherwise, shall not terminate any preexisting obligations owed to the Liquidating Trust under such Executory Contract or Unexpired Lease.

To the extent that a Debtor might have executed any modification, amendment, or supplement to, or restatement of, any prepetition Executory Contract or Unexpired Lease during the Chapter 11 Cases, such action shall not be deemed to alter the prepetition nature of such Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

Confirmation shall, subject to and upon Consummation, constitute a Bankruptcy Court order approving the assumption, assumption and assignment, or rejection of the Executory Contracts and Unexpired Leases assumed, assumed and assigned, or rejected under the Plan. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Each Executory Contract and Unexpired Lease assumed under this Section (or by any order of the Bankruptcy Court) which has not been assigned to a third party before the Effective Date shall vest in the Liquidating Trust and be fully enforceable by the Liquidating Trustee in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for the assumption of such Executory Contract or Unexpired Lease under applicable federal law.

## B.       Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan or the Confirmation Order must be filed with the Bankruptcy Court within 30 days after the Effective Date, unless a Bankruptcy Court order provides otherwise.  Any Claim arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time shall be automatically disallowed and forever barred from assertion, and shall not be enforceable against the Liquidating Trust or its property, without the need for any objection by the Liquidating Trustee, any further notice or any action, order, or approval of the Bankruptcy Court or any other Entity.  Any Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Unsecured Claims and treated accordingly under the Plan, after which such Allowed Claims shall be deemed fully satisfied and released.

## C.       Reservation of Rights

Nothing contained in this Disclosure Statement or in the Plan shall constitute an admission by the Chapter 11 Trustee, the Liquidating Trustee, or the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Chapter 11 Trustee, the Liquidating Trustee, the Liquidating Trust, the Debtors, or the Estates have any liability

thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Liquidating Trustee shall have 30 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

## X.    CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND TO THE EFFECTIVE DATE

### A.    Conditions to Confirmation of the Plan

The following are conditions precedent to the occurrence of the Confirmation Date, which must be satisfied or waived in accordance with Section 7.3 of the Plan:

1.   the Confirmation Order is in form and substance reasonably acceptable to the Chapter 11 Trustee; and

2.   the Confirmation Order is in form and substance reasonably acceptable to PNB.

### B.    Conditions to Consummation

Consummation shall not occur until each of the conditions provided below is satisfied under Section 7.2 of the Plan or waived with Section 7.3 of the Plan:

3.   the Confirmation Order has been entered;

4.   the Confirmation Order is not then stayed, vacated, or reversed, and has not been amended without the agreement of the Chapter 11 Trustee;

5.   the Liquidating Trust has been established;

6.   the Liquidating Trustee has been appointed and has assumed his or her rights and responsibilities under the Plan and under the documents substantially in the form provided in the Liquidating Trust Agreement; and,

7.   all actions, documents, and agreements necessary to implement the provisions of the Plan to be effectuated on or before the Effective Date are in form and substance reasonably satisfactory to the Chapter 11 Trustee, and such actions, documents, and agreements have been effected or executed and delivered.

### C.    Waiver of Conditions

Each of the conditions provided in Sections 7.1 and 7.2 of the Plan may be waived in whole or in part by the Chapter 11 Trustee without any notice to parties in interest or the Bankruptcy Court and without a hearing, but any such waiver shall not be effective without the consent of PNB, which shall not be unreasonably withheld.

### D.    Effect of Failure of Conditions to Consummation

If the conditions to Consummation have not been satisfied or duly waived in accordance with the Plan on or before the first Business Day that is more than ninety days after the Confirmation Date, or such later date as might be agreed to by the Chapter 11 Trustee and PNB, the Chapter 11 Trustee may schedule a status hearing with the Bankruptcy Court. At this status hearing, the Bankruptcy Court may vacate the Confirmation Order if the Court determines that it would be in the best interests of all parties in interest. If the Confirmation Order is ultimately vacated, the Plan shall be null and void in all respects, and nothing contained in the Plan shall constitute an admission, waiver, or release of any Claim against or Interest in the Estates.

### E.    Effective Date

The Effective Date shall be the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date provided in Section 7.2 of the Plan have been satisfied or waived under Section 7.3 of the Plan, and (b) the Chapter 11 Trustee declares the Plan effective.

## XI.    PLAN CONFIRMATION

### A.    Objections to Confirmation

Any objections to Confirmation of the Plan must be in writing and must be Filed with the Clerk of the Bankruptcy Court and served on counsel for the Chapter 11 Trustee, the Debtors, and the United States Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan. Bankruptcy Rule 3020 governs the form of any such objection.

### B.    Hearing on Confirmation

The Court has set November 18, 2019 at 11:00 a.m. for a Confirmation Hearing to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied. The Confirmation Hearing will be held in Courtroom 701, One Bowling Green, New York, NY 10004, before the Honorable Sean H. Lane, United States Bankruptcy Judge. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Court confirms the Plan, it will enter the Confirmation Order.

## XII.    EFFECTS OF CONSUMMATION

Section 8 of the Plan sets forth the effects of Consummation. Upon Consummation, the provisions of the Plan will bind any Holder of a Claim or Interest. The Plan's provisions include the discharge of all prepetition Claims and Interests in exchange for the rights afforded to Holders under the Plan, and the injunction of any attempts to enforce such Claims or Interests. Accordingly, it is important that all Holders of Claims read this section of the Disclosure Statement and Section 8 of the Plan carefully.

A.      **Binding Effect of Plan**

Except as otherwise provided in Bankruptcy Code section 1141(d)(3), upon Consummation, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, a Debtor, whether or not the Claim or Interest of such Holder is impaired under the Plan and whether or not such Holder has accepted the Plan.

### B.      Exculpation

Exculpated Party means (a) Chapter 11 Trustee,  (b) the Liquidating Trustee, (c) PNB, or (d) with respect to any Entity described in the foregoing clauses (a) through (c), such Entity's respective postpetition officers, directors, shareholders, members, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents, related professionals, or affiliates.

As of the Effective Date, except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability to any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents, related professionals, or affiliates for any act or omission occurring or failing to occur after the Petition Date relating to or arising out of the Chapter 11 Cases, including the negotiation and execution of this Plan, the Disclosure Statement, the Liquidating Trust Agreement, any Sale Order or related sale process, the solicitation of votes for and the pursuit of confirmation of this Plan, the Consummation of this Plan, the management of the Liquidating Trust, the liquidation of the Liquidating Trust Assets, the administration of this Plan, or the property to be distributed under this Plan, including all documents ancillary thereto, all decisions, actions, inactions, and alleged negligence or misconduct relating thereto, to the extent permitted by law.  The Plan shall not release the Exculpated Parties from any cause of action related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud (to the extent imposed by applicable non-bankruptcy law).

As of the Effective Date, notwithstanding any other provision of this Plan, neither any Holder of a Claim or Interest, nor any other party in interest, nor any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents, related professionals, or affiliates, shall have any right of action against any of the Exculpated Parties for any act or omission occurring or failing to occur after the Petition Date relating to, or arising out of, the Chapter 11 Cases, the negotiation and execution of this Plan, the Disclosure Statement, the Liquidating Trust Agreement, any asset purchase agreement or related sale process, the solicitation of votes for and the pursuit of confirmation of this Plan, the management of the Liquidating Trust, the liquidation of Liquidating Trust Assets, the Consummation of this Plan, the administration of this Plan, or the property to be distributed under this Plan, including all documents ancillary thereto, and all decisions, actions, inactions, and alleged negligence or misconduct relating thereto, to the extent permitted by law.

C.       **Release**

As of the Effective Date, each Holder of a Claim who has accepted the Plan is deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Exculpated Party from any and all Claims that were not the result of gross negligence, fraud, willful misconduct, or criminal conduct by the Exculpated Party.

D.       **Injunction**

FROM AND AFTER THE EFFECTIVE DATE, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD A CLAIM OR INTEREST BASED UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY RELATED TO THE DEBTORS, THE CHAPTER 11 TRUSTEE, OR THE CHAPTER 11 CASES THAT OCCURRED BEFORE THE EFFECTIVE DATE, SHALL BE PRECLUDED AND PERMANENTLY ENJOINED ON AND AFTER THE EFFECTIVE DATE FROM THE ENFORCEMENT, ATTACHMENT, COLLECTION, ENCUMBRANCE, OR RECOVERY WITH RESPECT TO ANY SUCH CLAIM OR INTEREST AGAINST THE RETAINED ASSETS OR THE PURCHASED ASSETS.

FROM AND AFTER THE EFFECTIVE DATE, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD AN EXCULPATED LIABILITY AGAINST ANY EXCULPATED PARTY ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF SUCH EXCULPATED LIABILITY: (I) COMMENCING OR CONTINUING, IN ANY MANNER AND IN ANY PLACE, ANY SUIT OR OTHER PROCEEDING; (II) ENFORCING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; OR (IV) ASSERTING A SETOFF, RIGHT OF SUBROGATION, OR RECOUPMENT AGAINST ANY DEBT, LIABILITY, OR OBLIGATION DUE TO ANY EXCULPATED PARTY.

NOTHING IN THE PLAN SHALL BE CONSTRUED AS AN INJUNCTION WITH RESPECT TO THE LIQUIDATING TRUSTEE'S PURSUIT OF THE RETAINED CAUSES OF ACTION.

E.       **Post-Consummation Liability of Liquidating Trustee and PNB**

The Liquidating Trustee, its employees, agents, representatives, and professionals employed or retained by the Liquidating Trustee (collectively, the "**Liquidating Trustee's Agents**") and PNB, its employees, officers, directors, agents, members or representatives, or professionals employed or retained by PNB (collectively, "**PNB's Agents**") shall not have or incur liability to any Entity for an act taken, or omission made, in good faith in connection with or related to Distributions made under the Plan or the Liquidating Trust Agreement, the administration of the Liquidating Trust, or the implementation of the Plan.  The Liquidating

Trustee, the Liquidating Trustee's Agents, PNB, and PNB's Agents shall be entitled to rely reasonably on the advice of counsel with respect to their duties and responsibilities under the Plan and the Liquidating Trust Agreement. Entry of the Confirmation Order constitutes a judicial determination that the exculpation provisions contained in Section 8 are necessary to, among other things, facilitate Confirmation and minimize potential Claims arising after the Effective Date for indemnity, reimbursement, or contribution from the Estates, the Liquidating Trust, or each Entity's respective property. Confirmation shall also constitute a final judicial determination of, among other things, the matters included in the exculpation provisions of the Plan. In addition, under Bankruptcy Code section 1125(e), the Chapter 11 Trustee and each of his agents, representatives, employees, advisors, and attorneys shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and to have participated in good faith and in compliance with the Bankruptcy Code. No such parties shall have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

Notwithstanding the foregoing, nothing herein or in Section 8 shall alter any provision in the Liquidating Trust Agreement that explicitly provides for the potential liability of the Liquidating Trustee to any Entity.

### F.    PNB as Consulting Creditor

As provided in greater detail in the Liquidating Trust Agreement, PNB shall have consultation and information rights with respect to the Liquidating Trust. PNB shall not receive compensation for any action it takes in connection with this Plan. PNB shall be entitled to reimbursement of reasonable costs and expenses in connection with its duties as a consulting creditor, including costs of counsel or other professionals, which may be paid by the Liquidating Trust, as appropriate, without the need for Bankruptcy Court approval.

### G.    Insurance

Except as necessary to be consistent with the Plan, the Plan shall not diminish or impair the enforceability of an insurance policy that might cover Claims against the Debtors, the Estates, or any other Entity. In no event shall the Liquidating Trustee have the right to cancel or limit the coverage available under any insurance policy under which the Debtors' directors, officers, or employees are insured parties.

### H.    Implementation

Upon Confirmation, the Chapter 11 Trustee and Liquidating Trustee shall be authorized to take all steps and execute all documents necessary to implement the provisions contained in the Plan.

## XIII.    RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising under, arising in, or related to the Chapter 11 Cases or the Plan to the fullest extent permitted by law.

## XIV.   MISCELLANEOUS

### A.   Modification of Plan

The Chapter 11 Trustee expressly reserves the right to modify the Plan before or after Confirmation, to the extent permitted by law (including Bankruptcy Code section 1127 and Bankruptcy Rule 3019).  The Chapter 11 Trustee may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or to remedy any defect or omission in the Plan, the Disclosure Statement, or the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan.

To the extent that the Plan has been modified before the entry of the Confirmation Order, entry of such Confirmation Order shall constitute approval of such modification without the need for additional disclosure or re-solicitation under Bankruptcy Rule 3019.

If the Chapter 11 Trustee revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then the Plan and the Confirmation Order shall be null and void in all respects; however, neither the revocation or withdrawal of the plan nor the nonoccurrence of Confirmation or Consummation shall have any impact on any Sale Order or on any Purchaser's purchase of any Purchased Assets.

### B.   Liquidating Trustee's Plan Interpretation

The Liquidating Trustee may interpret any effectuating provisions in a manner that is consistent with the overall purpose and intent of the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

### C.   Plan Supplement

The Plan Supplement shall be filed by the Chapter 11 Trustee no later than ten Business Days before the Confirmation Hearing or on such later date as might be approved by the Bankruptcy Court on notice to parties in interest.  The Plan Supplement shall include any other necessary documentation related to the Plan.

### D.   Conflicts

To the extent there are inconsistencies among the Confirmation Order, the Plan, the Disclosure Statement, and any other agreement entered into by the Debtors, the Chapter 11 Trustee, or the Liquidating Trustee, (1) the Plan controls the Disclosure Statement and any such agreements, and (2) the Confirmation Order controls the Plan, the Disclosure Statement, and any such agreements.

To the extent any exhibit or document included in the Plan Supplement is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

### E.    Notices

To be effective, all notices, requests, and demands to or upon the Chapter 11 Trustee or the Liquidating Trustee must be in writing and sent to:

Counsel to the Chapter 11 Trustee and Liquidating Trustee:

> Jenner & Block LLP
> Attention: Carl Wedoff
> 919 Third Avenue
> New York, New York 10022
> cwedoff@jenner.com
>
> *and*
>
> Jenner & Block LLP
> Attention: Angela Allen
> 353 North Clark Street
> Chicago, Illinois 60654
> aallen@jenner.com

Counsel to PNB:

> Cleary Gottlieb Steen & Hamilton LLP
> Attention: Sean O'Neal, Rahul Mukhi
> One Liberty Plaza
> New York, New York 10006
> soneal@cgsh.com
> rmukhi@cgsh.com

Unless otherwise expressly provided herein, notice shall be deemed to have been duly given or made when actually delivered or, in the case of notice sent by electronic mail, when received.

### F.    Writings

Wherever the Plan requires that consent, acceptance, or approval be evidenced by a writing, such a writing may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

### G.    Reservation of Rights

Neither the filing of the Plan, nor any statement or provision contained in the Plan, nor the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement, shall be an admission or waiver of any rights of any Debtor or the Chapter 11

Trustee with respect to the Holders of Claims or Interests, including but not limited to Claims of the Modi-Controlled Entities, unless and until the Effective Date has occurred.

### H.     Additional Documents

The Chapter 11 Trustee shall file with the Bankruptcy Court such agreements, instruments, pleadings, orders, papers, or other documents as may be necessary or appropriate to effect and further evidence the terms and conditions of the Plan.

### I.     Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

### J.     Certain Actions

On or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the directors or stockholders of the Debtors shall be deemed to have occurred and shall be in effect before, on, or after the Effective Date (as appropriate), under the applicable general corporation, limited liability, or partnership law of the states in which the Debtors are incorporated, without any requirement of further action by the directors and stockholders of the Debtors.

On the Effective Date, each of the Debtors' formation documents shall be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under Bankruptcy Code section 1123(a)(6).

On or as soon as practicable following the Effective Date, the Liquidating Trustee shall cancel, annul, and extinguish all Interests.

### K.     Severability of Plan Provisions.

If, before the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

L.     **Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specified, the laws of the State of New York shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise provided in those agreements, in which case the governing law of such agreement shall control), without giving effect to the principles of conflict of laws.

M.     **Exhibits.**

Unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement.  All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if provided in full in the Plan.

N.     **Computation of Time**

Unless otherwise specified, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction would ordinarily occur under the Plan falls on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

## XV.     RISK FACTORS

Distributions to Holders of Allowed General Unsecured Claims are subject to the success of the Liquidating Trust in administering the Retained Causes of Action and implementing the Plan efficiently.  Notwithstanding the Chapter 11 Trustee's best efforts to provide reasonable estimates of the expected return to the Holders of Claims, there is always a possibility that the efforts of the Liquidating Trust will be more expensive or less successful than predicted.  Additionally, there may be significant delay before any Distribution is made on account of Allowed General Unsecured Claims.

For the reasons set forth in this Disclosure Statement, the Chapter 11 Trustee believes that the very same risks described herein are present in and significantly greater to creditors in a chapter 7 case.

## XVI.     BEST INTEREST OF CREDITORS TEST

Confirmation of the Plan requires, among other things, that each Holder of an Allowed Claim in an Impaired Class and each Holder of an Interest either: (a) accepts the Plan; or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is commonly referred to as the "Best Interest Test."

A.     **Chapter 7**

To determine the value that the Holders of Impaired Claims and Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that

would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. Bankruptcy Code section 704 requires a chapter 7 trustee to collect and reduce to money the property of the Estates as expeditiously as is compatible with the best interests of parties in interest.

The Cash available for satisfaction of Allowed Claims would consist of the proceeds resulting from the disposition of the Debtors' remaining assets, augmented by the Cash, if any, held by the Debtors at the time of the commencement of the chapter 7 case. Any such Cash amount would then be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and additional Administrative Claims and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to a chapter 7 case trustee, as well as those that might be payable to his or her attorneys and to other Professionals that such trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be allowed in the chapter 7 case, such as compensation for attorneys, appraisers, accountants, or other Professionals, as well as other costs and expenses of the Debtors. Such Administrative Claims would have to be paid in Cash and in full from the liquidation proceeds before the balance of those proceeds would be available to pay other Claims.

B.     **Liquidation Analysis**

The Plan satisfies the Best Interest Test. The Plan provides equal or greater recovery to the Holders of Allowed General Unsecured Claims than such Holders would receive under a liquidation under chapter 7 primarily because the Plan gives such Holders the option to accept an Allowed Convenience Claim which will provide a significantly larger recovery for most Holders of Allowed General Unsecured Claims than if they instead recovered Pro Rata with all other General Unsecured Claim Holders. Even for the small number of Holders of Allowed General Unsecured Claims who may not recover more by opting to accept an Allowed Convenience Claim, those Holders will receive a greater Distribution as a Holder in Class 5 than they would in a chapter 7 liquidation because the Convenience Class will greatly reduce the overall number of Holders who will recover Pro Rata in Class 5. Further, conversion to chapter 7 would add an additional layer of administrative expense with the appointment of a chapter 7 trustee who would have to reevaluate much of the analysis the Chapter 11 Trustee has already undertaken in the Chapter 11 Cases.

Moreover, in chapter 7 cases, the chapter 7 trustee is also entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Chapter 11 Trustee has already accumulated much of the funds and has already incurred many of the expenses associated with generating those funds. Accordingly, the Chapter 11 Trustee believes that there is a reasonable likelihood that Claim Holders would "pay again" for the funds accumulated by the Chapter 11 Trustee, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed, including possibly substantial funds handed over to the Liquidating Trust by the Chapter 11 Trustee. It is also anticipated that a chapter 7 liquidation would result in delay in the Distributions to Holders of Allowed Claims. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would

43

be more than 70 days following conversion of the case to chapter 7. Hence, a chapter 7 liquidation would not only delay Distributions, but raise the prospect of Entities filing additional Claims that were not asserted in the Chapter 11 Cases, and which would further dilute the recoveries of Holders of Allowed Claims. Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Claim Holders.

## XVII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Claims and Interests. This discussion is based on the IRC, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the IRS as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Interests, the Holder's status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Furthermore, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims or Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies and foreign taxpayers). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local, or estate and gift taxation is addressed.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### A.    Consequences to Debtors

Under the Plan, the Chapter 11 Trustee is transferring assets of the Debtors to the Liquidating Trust. This transfer may result in the recognition of taxable gain or loss by the Debtors. To the extent that any federal income tax liability to the Debtors results from the transfer,

the Liquidating Trust will pay the resulting tax to the IRS. The Plan also provides that the Debtors will eventually be liquidated and dissolved. As a result, there will be no net operating loss or capital loss carry-forwards or other tax attributes available to the Debtors following the Effective Date after giving effect to the transactions contemplated by the Plan.

### B.      Federal Income Tax Treatment of the Liquidating Trust

#### 1.      Classification of Liquidating Trust

Under the Plan, the Chapter 11 Trustee will transfer the Retained Assets to the Liquidating Trust, and the Liquidating Trust will become obligated to make Distributions in accordance with the Plan. The Plan provides, and this discussion assumes, that the Liquidating Trust will be treated for federal income tax purposes as a "creditor trust," as defined in Treasury Regulation Section 301.7701-4(d), and will therefore be taxed as a grantor trust, of which the Beneficiaries will be treated as the owners and grantors thereof. Accordingly, because a grantor trust is treated as a pass-through entity for federal income tax purposes, no tax should be imposed on the Liquidating Trust itself or on the income earned or gain recognized by the Liquidating Trust. Instead, the Beneficiaries will be taxed on their allocable shares of such net income or gain in each taxable year, whether or not they received any Distributions from the Liquidating Trust in such taxable year.

Although the Liquidating Trust has been structured with the intention of complying with guidelines established by the IRS in Rev. Proc. 94-45, 1994-2 C.B. 684, for the formation of creditor trusts, it is possible that the IRS could require a different characterization of the Liquidating Trust, which could result in different and possibly greater tax liability to the Liquidating Trust or the Holders of Allowed Claims. No ruling has been or will be requested from the IRS concerning the tax status of the Liquidating Trust, and there can be no assurance the IRS will not require an alternative characterization of the Liquidating Trust. If the Liquidating Trust were determined by the IRS to be taxable not as a creditor trust, as described in Treasury Regulation Section 301.7701-4(d), the taxation of the Liquidating Trust and the transfer of assets by the Chapter 11 Trustee to the Liquidating Trust could be materially different than is described herein and could have a material adverse effect on the Holders of Allowed Claims.

#### 2.      Tax Reporting

The Liquidating Trust will file tax returns with the IRS as a grantor trust in accordance with Treasury Regulation Section 1.671-4(a). The Liquidating Trust will also send to each Beneficiary a separate statement setting forth the Beneficiary's allocable share of items of income, gain, loss, deduction, or credit and will instruct the Beneficiary to report such items on such Beneficiary's federal income tax return.

### C.      Consequence to Holders of Claims

The federal income tax consequences of the Plan to a Holder of a Claim will depend upon several factors, including but not limited to: (i) the origin of the Holder's Claim, (ii) whether the Holder is a resident of the United States for tax purposes (or falls into any of the special classes

of taxpayers excluded from this discussion as noted above), (iii) whether the Holder reports income on the accrual or cash basis method, (iv) whether the Holder has taken a bad debt deduction or worthless security deduction with respect to this Claim and (v) whether the Holder receives distributions under the Plan in more than one taxable year. HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

### 1.    Holders of Claims

Generally, a Holder of an Allowed Claim will recognize gain or loss equal to the difference between the "amount realized" by such Holder and such Holder's adjusted tax basis in the Allowed Claim. The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim, including, to the extent such Holder is a Beneficiary, the fair market value of each such Holder's proportionate share of the assets transferred to the Liquidating Trust on behalf of and for the benefit of such Holder (to the extent that such Cash or other property is not allocable to any portion of the Allowed Claim representing accrued but unpaid interest (see discussion below)).

The transfer of Assets to the Liquidating Trust by the Chapter 11 Trustee should be treated for federal income tax purposes as a transfer of such Assets to the Holders of Allowed Claims to the extent they are Beneficiaries of the Liquidating Trust, followed by a deemed transfer of such Assets by such Beneficiaries to the Liquidating Trust. As a result of such treatment, such Holders of Allowed Claims will have to take into account the fair market value of their Pro Rata share, if any, of the Assets transferred on their behalf to the Liquidating Trust in determining the amount of gain realized and required to be recognized upon Consummation of the Plan on the Effective Date. In addition, since a Holder's share of the assets held in the Liquidating Trust may change depending upon the resolution of Disputed Claims, the Holder may be prevented from recognizing any loss in connection with Consummation of the Plan until the time that all such Disputed Claims have been resolved. The Liquidating Trust will provide the Holders of Allowed Claims with valuations of the assets transferred to the Liquidating Trust on the behalf of and for the benefit of such Holders and such valuations should be used consistently by the Liquidating Trust and such Holders for all federal income tax purposes. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

### 2.    Distributions in Discharge of Accrued but Unpaid Interest

Under the Plan, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes. Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be treated as receiving taxable interest, to the extent any consideration they receive under the Plan is allocable to such accrued but unpaid interest. Holders previously required to include in their taxable income any

accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

### 3.   Character of Gain or Loss; Tax Basis; Holding Period

The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a Holder of Allowed Claims under the Plan will be determined by a number of factors, including, but not limited to, the status of the Holder, the nature of the Allowed Claim in such Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Allowed Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim. The Holder's aggregate tax basis for any consideration received under the Plan will generally equal the amount realized in the exchange. The holding period for any consideration received under the Plan will generally begin on the day following the receipt of such consideration.

### D.   Consequences to Holders of Interests

Under the Plan, all Interests in the Debtors are being extinguished. A Holder of any Interest extinguished under the Plan should generally be allowed a worthless stock deduction in an amount equal to the Holder's adjusted basis in the Holder's Interest. A worthless stock deduction is a deduction allowed to a Holder of a corporation's stock for the taxable year in which such stock becomes worthless. If the Holder held the Interest as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Interest was held by the Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of other income.

### E.   Withholding

All Distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding. The Liquidating Trustee will withhold appropriate employment taxes with respect to payments made to a Holder of an Allowed Claim that constitutes a payment for compensation. Payors of interest, dividends, and certain other reportable payments are generally required to withhold thirty percent (30%) of such payments if the payee fails to furnish such payee's correct taxpayer identification number (social security number or employer identification number) ("**TIN**"), to the payor. The Liquidating Trust may be required to withhold a portion of any payments made to a Holder of an Allowed Claim if the Holder (a) fails to furnish the correct social security number or other TIN of such Holder, (b) furnishes an incorrect TIN, (c) has failed to properly to report interest or dividends to the IRS in the past, or (d) under certain circumstances, fails to provide a certified statement signed under penalty of perjury, that the TIN provided is the correct number and that such Holder is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance

payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## XVIII. <u>CONCLUSION</u>

The Chapter 11 Trustee believes that the Plan is in the best interest of creditors and urges Holders to vote to accept the Plan.

*[Signature page follows.]*

Dated:  August 29, 2019
      New York, New York

                                RICHARD LEVIN, CHAPTER 11 TRUSTEE
OF FIRESTAR DIAMOND, INC.,
FANTASY, INC., and OLD AJ, INC. (f/k/a
A. JAFFE, INC.)

_____
Richard Levin, Chapter 11 Trustee

JENNER & BLOCK LLP

/s/ Marc Hankin

Marc Hankin
Carl Wedoff
919 Third Avenue, 37th Floor
New York, New York 10022-3908
Telephone: (212) 891-1600
mhankin@jenner.com
cwedoff@jenner.com

Angela Allen (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350

*Counsel for the Chapter 11 Trustee*

49