**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., *et al.*<br><br>Debtors. | Chapter 11<br><br>No. 18-10509 (SHL)<br><br>(Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SYNERGIES CORP., FIRESTAR GROUP, INC., FIRESTAR DIAMOND INTERNATIONAL, INC., NIRAV MODI, INC., and AVD TRADING, INC.<br><br>Defendants. | Adv. Proc. No. |

## COMPLAINT

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or "**Plaintiff**") for Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc., f/k/a A. Jaffe, Inc. (collectively, the "**Debtors**"), for his Complaint alleges as follows:

### NATURE OF THE ACTION

1.      This is an action against Defendants Synergies Corporation ("**Synergies**"), Firestar Group, Inc. ("**FGI**"), Firestar Diamond International, Inc. ("**FDII**"), Nirav Modi, Inc., f/k/a Firestar Jewelry, Inc. ("**NMI**"), and AVD Trading, Inc. ("**AVD**" and, collectively, the "**U.S. Affiliates**"), for amounts due and owing by the U.S. Affiliates to the Debtors, and for the

avoidance of transfers by the Debtors to or for the benefit of the U.S. Affiliates under both state law and section 548 of the Bankruptcy Code.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under Title 11 and arises in and is related to the above-captioned chapter 11 cases, which are pending in this Court.

3.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The Trustee consents to entry of final order or judgment by this Court.

5.      Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

## THE PARTIES & OTHER RELEVANT ENTITIES

*A.      The Trustee*

6.      Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court's order that same day. The Trustee brings this action not individually but solely in his capacity as Trustee.

*B.      The Debtors*

7.      Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("**FDI**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, FDI principally operated a wholesale diamond business.

8.      Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy principally operated a wholesale diamond business. FDI owns 100% of the equity interests in Fantasy.

9.      Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.)
("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New
York. While in operation, Jaffe was principally a bridal jewelry business.

C.    *The Debtors' U.S. Affiliates*

10.     FGI, a Delaware corporation, is a holding company that owns 95% of the equity
interests in FDI. Samuel Sandberg owns the remaining approximately 5% of FDI.

11.     Synergies, a Delaware corporation, is a holding company that owns approximately
95% of the equity interests in Jaffe and 100% of the equity interests in FGI. Samuel Sandberg owns
the remaining approximately 5% of Jaffe. Synergies is a wholly-owned subsidiary of Firestar
Holdings Limited, a Hong Kong entity ("**FHL**").

12.     FDII, a Delaware corporation, operated primarily as a loose diamond trading
business. FDII is a wholly-owned subsidiary of Firestar Holdings Limited, a Hong Kong entity.
Joshua Weinman managed FDII's diamond trading operations, at least in part.

13.     NMI, a Delaware corporation, operated *Nirav Modi*-branded retail boutiques in
New York, Los Angeles, Las Vegas, and Honolulu.

14.     AVD, a Delaware corporation, is a wholly-owned subsidiary of Synergies and was
intended to operate as an online diamond retailer.

## BACKGROUND

A.    *The Bank Fraud*

15.     From approximately early 2011 to early 2018 (the "**Relevant Period**"), Nirav
Deepak Modi ("**Modi**") orchestrated and directed a scheme to obtain loans, credits, or other funds
under false pretenses and without the requisite collateral from numerous banks, including Punjab
National Bank ("**PNB**"), an Indian bank majority owned by the central government of India (as
set forth in more detail below, the "**Bank Fraud**").

16.     The Bank Fraud involved the fraudulent procurement of buyer's credit issued under letters of undertaking ("**LOUs**"), a financial instrument unique to India designed to facilitate efficient import transactions.

17.     When used legitimately, LOUs allow an importer to forego the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank in India, secured by invoices for the to-be imported goods. The issuing bank, in turn, enters into the foreign currency transaction: it requests that a foreign branch of another Indian bank transmit funds into the issuing bank's own account (referred to as its nostro—"our"—account) at the foreign branch of a third bank to pay the exporter in its local currency. The issuing bank then repays the intermediary bank and recoups the loan from the importer (or the imported goods serving as its collateral).

18.     Since each LOU requires an import transaction, an importer's LOU borrowing capacity is tied directly to its import volume—the more imports, the more LOU funding available.

19.     Modi and his co-conspirators conspired to take advantage of this feature by artificially inflating the import volume of Modi's India-based companies with sham transactions so as to obtain more and more LOU funding. Of most importance, these India-based companies included Diamonds 'R' Us ("**DRUS**"), Solar Export ("**Solar**"), and Stellar Diamond ("**Stellar**") (collectively, the "**LOU Entities**"). Upon information and belief, DRUS is separate from the identically named Diamonds 'R' Us, an India partnership formed around 2000, which, upon information and belief, ultimately became Firestar International Limited (f/k/a Firestar International Private Limited) ("**FIL**" or "**FIPL**"), the ultimate holding company the Debtors, the U.S. Affiliates, and other Firestar entities (collectively, including but not limited to the Debtors, U.S. Affiliates, and FIL, the "**Firestar Entities**").

20.      PNB and other banks advanced amounts equal to over $1 billion under LOUs for the benefit of entities under Modi's control in connection with imports to India without the collateral that a bank ordinarily requires for the issuance of an LOU.

21.      To carry out this scheme, Modi and his co-conspirators utilized a web of shadow entities to engage in fraudulent and fictitious import transactions, including *inter alia*:  Auragem Company Ltd. ("**Auragem**"), Brilliant Diamonds Ltd. ("**Brilliant**"), Eternal Diamonds Corporation Ltd. ("**Eternal**"), Fancy Creations Company Ltd. ("**Fancy Creations**"), Sino Traders Ltd. ("**Sino**"), Sunshine Gems Ltd. ("**Sunshine**"), Unique Diamond and Jewellery FZC ("**Unique**"), World Diamond Distribution FZE ("**World Diamond**"), Vista Jewelry FZE ("**Vista**"), Empire Gems FZE ("**Empire**"), Universal Fine Jewelry FZE ("**Universal**"), Diagems FZC ("**Diagems**"), Tri Color Gems FZE ("**Tri Color**"), Pacific Diamonds FZE ("**Pacific**"), Himalayan Traders FZE ("**Himalayan**"), and Unity Trading, FZE ("**Unity**") (collectively, the "**Shadow Entities**," together with the Firestar Entities, LOU Entities, and all other entities controlled by Modi and his family members, the "**Modi-Controlled Entities**").

22.      Though designed to look like legitimate independent businesses, the Shadow Entities were no more than shell companies controlled by Modi and his co-conspirators. They conducted virtually no legitimate business, but instead existed only to further the Bank Fraud by conducting bogus transactions with the LOU Entities, Firestar Entities, and other Modi-Controlled Entities and laundering the ill-gotten proceeds.

23.      Upon information and belief, the LOU Entities and Shadow Entities traded exclusively or nearly exclusively with other Modi-Controlled Entities. For example, as alleged below, the laptop computer of Mihir Bhansali ("**Bhansali**")—who served as the Chief Executive Officer of each Debtor, the sole director of each U.S. Affiliate, and the Chief Executive Officer of FGI, Synergies, and NMI—contained a spreadsheet listing, among other things, each LOU

Entity's sales, costs of goods sold, top customers, and top vendors for fiscal years 2009 to 2017. The top customer and top vendor lists contained only Shadow Entities and Firestar Entities. The following table, which is based on figures in that spreadsheet, reflects the extent to which the LOU Entities traded exclusively with Shadow Entities and Firestar Entities during the Relevant Period:

| LOU Entity | Fiscal Year 2012 - 2017 | | | | | |
| | Sales to Modi-Controlled Entities as % of Gross Sales | | | Purchases from Modi-Controlled Entities as % of Total Costs of Goods Sold | | |
| | Shadow Entities | Firestar Entities | Total | Shadow Entities | Firestar Entities | Total |
|---|---|---|---|---|---|---|
| DRUS | 88.4% | 7.5% | 95.9% | 99.7% | 0.4% | 100.1% |
| Stellar | 98.7% | 0.5% | 99.2% | 100.1% | 0.3% | 100.3% |
| Solar | 98.9% | 0.7% | 99.6% | 99.9% | 0.1% | 100.0% |

24.    Upon information and belief, from around 2013 onward, Modi and his co-conspirators used the Shadow Entities as intermediaries between the LOU Entities and Firestar Entities. PNB and other banks were aware of Modi's affiliation with the LOU Entities and the Firestar Entities, but not his affiliation with the Shadow Entities.

25.    The Shadow Entities' import and export transactions purported to involve arm's-length sales of highly valuable loose diamonds, pearls, gold, silver, and jewelry. In truth, these transactions had no legitimate economic purpose and routinely involved goods that: (a) did not exist; (b) were never transferred; (c) were transferred at prices having nothing to do with market value, but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities' books and records so as to conceal other transfers made for illegitimate purposes; or (d) were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

26.     In the context of the Bank Fraud, transactions between and among Firestar Entities, LOU Entities, and Shadow Entities furthered the Bank Fraud by: (a) inflating the Indian entities' LOU borrowing capacity by artificially inflating their import volumes for LOUs and export volume for packing credit loans, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods; (b) facilitating the repayment of some but not all outstanding LOUs and packing credit loans; (c) laundering the fraudulent proceeds by making them difficult to trace and siphoning them to Modi and his co-conspirators; and (d) making it difficult for auditors, lenders, and regulatory bodies to detect the Bank Fraud.

27.     Transfers for these purposes were concealed in various ways, including: (a) round trip transactions of gems, jewelry, or funds in which Modi-Controlled Entities transferred assets among themselves without any legitimate business or economic purpose; (b) buying and selling gems at inflated or deflated prices (or sending paperwork without sending the gems at all); (c) characterizing transfers as loans or loan repayments or advances against future purchases or returns of such advances; and (d) in some instances, fraudulently doctoring books and records outright.

B.      **Detection and Exposure of the Bank Fraud**

28.     On or around January 20, 2018, a representative of one of the Modi-Controlled Entities solicited issuance of a new LOU from PNB. Unbeknownst to Modi and his co-conspirators, the PNB employee who had assisted the Modi-Controlled Entities in prior LOU issuances had retired. On January 22, 2018, PNB refused to issue the LOU without a 100% cash margin deposit, among other requirements. The Modi representative refused to furnish any margin on the grounds that PNB had never before required a margin to issue an LOU. Alarmed by this revelation, PNB immediately began investigating the borrowing practices of the Modi-Controlled Entities.

29.    The Bank Fraud orchestrated by Modi has resulted in several investigations and criminal enforcement actions against Modi, Bhansali, and others by Indian governmental authorities, including the Central Bureau of Investigation ("**CBI**"); the Directorate of Enforcement ("**ED**"); the Income Tax Department; and the Serious Fraud Investigation Office.

30.    On January 29, 2018, PNB lodged a criminal complaint against Modi with India's CBI. On February 13, 2018, PNB lodged a complaint against Modi with India's ED, which subsequently attached various movable and immovable properties belonging to Modi and several Modi-Controlled Entities.

31.    On July 3, 2018, PNB filed Application No. 119/2018 in the Debts Recovery Tribunal No. I at Mumbai (the "**Indian Debt Tribunal**") against, *inter alia*, Modi and certain of his family members, each LOU Entity, FIL, and Firestar Diamond International Private Limited ("**FDIPL**") (an Indian company that manufactured jewelry that the Debtors and other Modi-Controlled entities marketed and sold).

32.    On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment against, *inter alia*, Modi, the LOU Entities, and FIL, based on certain admissions of liability and assurances of repayment Modi previously made to PNB. The judgment was also based on, *inter alia*, the following factual findings (capitalized terms in original):

    a.    Nirav Modi has floated Overseas Companies in Hong Kong and U.A.E. which are dummy/shell Companies. The Directors and share-holders of these Companies are either ex-employees or employees acting under instructions of Nirav Modi.

    b.    The Overseas Companies and Hong Kong and Dubai deals with the Firestar Group directly or indirectly owned by Nirav Modi who as full control over these Companies through the dummy Directors. The Enforcement Directorate in its Complaint has recorded that the list of top 8 borrowers and top 8 suppliers are none else but the ex-employees of Firestar Group and acting and implementing the instructions given by Nirav Modi and Mihir Bhansali.

    c.   The fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. along with their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel.

    d.   The investigation conducted by the Enforcement Directorate further reveals that the dummy Companies were set up in Hong Kong and Dubai along with the regular Firestar Group Companies [and] acted as nodes for circular transactions to layer and launder money generated by the fraudulent LOUs.

    e.   [Nirav Modi and his family members] are the mastermind[s] behind the perpetration of the fraud. Defendants have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purposes of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs.

    f.   All of the aforesaid dates and events reveal the systematic fraud was perpetrated by Nirav Modi and moving the US Court for insolvency to avoid the liability. Nirav Modi and his accomplishes [sic] have taken prompt steps before the US Court to avoid the seizer [sic] and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt.

33.    The Bank Fraud resulted in a total loss to PNB and other banks in excess of $1 billion. As a result of the Bank Fraud, PNB has asserted claims against each of the Debtors in excess of $1 billion on the grounds, among others, that a substantial portion of the proceeds of the Bank Fraud were transferred to the Debtors.

**C.    *The Debtors' Role in the Bank Fraud***

34.    Modi, Bhansali, Ajay Gandhi (the Debtors' Chief Financial Officer) ("**Gandhi**"), and other co-conspirators funneled millions of dollars in funds and diamonds through the Debtors and their offices in furtherance of the Bank Fraud. They did so through circular transactions with Shadow Entities and other Modi-Controlled Entities that directly furthered the Bank Fraud, and in noncircular transactions that laundered the proceeds of the Bank Fraud for the benefit of the families of Modi, Bhansali, and other co-conspirators.

35.    Upon information and belief, during the early stages of the Bank Fraud, from around 2010 to 2012, the LOU Entities traded directly with Firestar Entities, including the

Debtors, which were directly involved in import and export transactions underlying fraudulently procured LOUs. From around 2013 onward, upon information and belief, the Shadow Entities were used as an intermediary between the Firestar Entities and LOU Entities. PNB and other banks were aware of Modi's affiliation with the Firestar Entities and LOU Entities, but not his affiliation with the Shadow Entities. Applying for financing in connection with transactions among firms known to be controlled by Modi was therefore more likely to raise suspicion.

36.    Upon information and belief, consistent with this shift to using intermediaries since around 2013, the Debtors no longer participated directly in import and export transactions underlying LOU issuances. Instead, during this period, the Debtors received LOU proceeds indirectly through Shadow Entities. Similarly, during this period, the Debtors made numerous transfers to Shadow Entities linked to the repayment of outstanding LOUs.

37.    Upon information and belief, the Debtors' Shadow Entity-linked transactions since 2013 were effectuated for secondary purposes related the Bank Fraud, which included: (a) facilitating repayment of LOUs and packing credit loans; (b) providing Shadow Entities with the goods and funds the Shadow Entities needed to sell and purchase goods to and from the LOU Entities; (c) clearing the Shadow Entities', Firestar Entities', and LOU Entities' accounts receivable and accounts payable so as to avert suspicion from auditors, lenders, and other third parties; and (d) diverting the proceeds of the Bank Fraud for the benefit of the families of Modi, Bhansali, and other co-conspirators.

38.    The Debtors' records reflect cash transfers to and from the Debtors and the Shadow Entities totaling approximately $227 million during the Relevant Period.

### D.    The Debtors' U.S. Affiliates' Role in the Bank Fraud

### <u>Synergies</u>

39.    As a holding company, Synergies did not purchase or sell diamonds in the same manner as the Debtors or FDII (as described below). Still, Synergies transferred and received funds from Shadow Entities on numerous occasions. Most notably, Synergies was capitalized, in part, by an interest-free, unsecured loan from Brilliant, a Shadow Entity. As of September 30, 2016, the balance was $1,287,000. Often, Synergies would immediately pass along interest payments it received from FDI to pay down its own loans to Brilliant and other Shadow Entities, as demonstrated by a wire sequence Gandhi instructed Bhavesh Patel to effectuate on December 13, 2012:

> Bhavesh:
> Please prepare the following wires today:
>
> 1.  Pay $231,000 to Unique for Back Office expenses from Firestar Diamond, Inc.
> 2.  Pay $391,611 to Synergies Corp from Firestar Diamond, Inc. for Interest
> 3.  Pay $300,000 to Unique from Synergies Corp for Loan Repayment.
> 4.  Pay $91,000 to Brilliant from Synergies Corp for Loan Repayment.
> 5.  Balance amount tomorrow to Diagem once funds are here in Firestar Diamond, Inc. (Tomorrow)
>
> Prepare first 4 today hence once funds come then I can approve.

40.    Other examples of Synergies' transactions involving Shadow Entities include:

a.  On April 17, 2007, Synergies received $3,424,984 from Eternal.

b.  On April 26, 2007, Synergies received $499,984 from Brilliant.

c.  On December 13, 2012, FDI transferred $391,611 to Synergies. That same day, Synergies transferred $91,000 and $90,970 to Brilliant. On December 14, 2012, Synergies transferred $300,000 to Unique.

d.  On October 23, 2013, FDI transferred $123,744 to Synergies. On October 24, 2013, Synergies transferred $125,000 to Brilliant.

e.  On March 18, 2014, FDI transferred $123,097 to Synergies. That same day, Synergies transferred $123,000 to Brilliant.

   f.   On February 20, 2015, FDI transferred $186,871 to Synergies. That same day, Synergies transferred $180,000 to Brilliant.

   g.   On February 26, 2015, HSBC Hong Kong transferred $179,958 to Synergies. On March 2, 2015, Synergies transferred $180,000 to Brilliant.

   h.   On March 9, 2016, FDI transferred $247,551 to Synergies. That same day, Synergies transferred $250,000 to Brilliant.

   i.   On March 20, 2017, FDI transferred $246,871 to Synergies. On March 22, 2017, Synergies transferred $240,000 to Brilliant.

   j.   On July 13, 2017, Firestar Holdings Ltd. transferred $20 million to Synergies. That same day, Synergies transferred $1,047,000 to Brilliant, $14,575,000 to Purvi Mehta, $3,694,000 to FDIPL, and $650,000 to Jaffe.

41.    Synergies was also integral to the laundering of funds through Twin Fields Investment Ltd. ("**Twin Fields**") and BBB Group, Inc. ("**BBB Group**").

42.    On November 4, 2009, Synergies successfully bid $555,000 for the intellectual property rights of Bailey Banks & Biddle. In May 2010, Twin Fields Investment Ltd. (in which Bhansali was the *de jure* or *de facto* director) incorporated BBB Group, Inc. to operate the Bailey Banks & Biddle assets.

43.    On April 6, 2011, Unique and Jewellery transferred $999,972 to Synergies. On April 7, 2011, Unique transferred $2,999,972 to Synergies. That same day, Synergies transferred $4 million to Twin Fields. On April 8, 2011, Synergies received a $4 million "deposit" — presumably from Twin Fields. On April 11, 2011, Synergies transferred $4 million to Unique.

44.    In a June 16, 2011 email, John Regan at HSBC, which then was a lender to FDI and Fantasy, asked Gandhi, the FDI CFO, why Synergies would be wiring funds to Unique. Gandhi replied: "Unique loaned to Synergies Corp. Synergies Corp loaned to Twin Fields. Twin Fields paid back loan after 3 days to Synergies Corp. Synergies Corp paid back funds to Unique." Regan replied, "Unique is affiliated correct? Does Nirav own it? Is this why there are loans back and forth?" Gandhi replied, "Unique is not an affiliated company but Nirav has a very good

relationship with them." Regan then asked, "Why is each company lending to the other?" Gandhi replied, "I am sure there were business reasons. What is the concern for the bank?"

45.    Synergies was also involved in the transactions relating to the transfer of Central Park Real Estate, LLC ("**CPRE**"), which held Modi's Manhattan residence, from FGI to The Ithaca Trust, a revocable trust settled by Modi's sister Purvi Mehta for the benefit of Modi's wife and three children. The CPRE transaction, set forth in more detail in the FGI section below, is an example of how Modi leveraged his web of corporate entities to launder the proceeds of the Bank Fraud for the benefit of his family members.

46.    On July 13, 2017, in connection with Firestar Holding Limited's acquisition of Synergies, FHL made a $20 million capital infusion in Synergies.  That same day, Synergies transferred $650,000 to Jaffe, $1,047,000 to Brilliant (as repayment of the loan noted above), $3,694,000 to FDIPL, and $14,575,000 to Purvi Mehta.  The $14,575,000 to Purvi Mehta was transferred under the pretext of paying off a loan to Modi.  Between October 20, 2010 and March 11, 2011, Modi personally transferred a total of $14,575,000 to Synergies, which Synergies used to pay off loans to FIPL.  Modi subsequently assigned his interest in the loan to Purvi Mehta.  So, upon receiving $20 million capital infusion from FHL, Synergies paid the $14,575,000 to Purvi Mehta. This is another example of how Modi funneled the proceeds of the Bank Fraud for the benefit of his family members.

**FDII**

47.    Of the Debtors' U.S. affiliates, FDII was the most active in transacting with Shadow Entities, purportedly as part of its loose diamond trading business. Shortly after FDII's formation, Gandhi explained to a banker who inquired about Shadow Entity transactions that the plan was to "gradually transfer" transactions involving Shadow Entities from FDI to FDII.

48.    As FDII's involvement with Shadow Entities escalated, so too did the need to engineer FDII's finances to avoid detection. For example, on April 3, 2012, Modi, Gandhi, and Bhansali exchanged emails on achieving a "Desired Balance sheet for financing needs" for FDII. Gandhi noted, "Payables cannot exceed $5 million to meet the ratio. (If we bring in inventory then it will go up but funds needs to be rotated to keep AP level of $5m)."

49.    To achieve this, FDII's accounts receivable and accounts payable were closely monitored and "cleared" through circular fund transfers with other Modi-Controlled Entities. For example, on June 8, 2012, Gandhi emailed Bhavesh Patel and Shyam Wadhwa asking for payables owed by "Firestar, Firestar Diamond Int'l and Jaffe" to "HK and Dubai" and noting that he "need[ed] to pay $1 m to HK or Dubai hence need name and amounts only." Gandhi then added, "It [i.e. the entity owed the payables] could be Pacific, World Diamond, etc. too."  On June 8, 2012, FDI transferred $1,000,000 to Fancy Creations and $800,000 to FDII.

50.    As another example, on October 1, 2013, Shyam Wadhwa sent an email instructing Gandhi to "[p]lan to prune AR/AP of NY Books" by wiring $2m from FDI to Jaffe and then from Jaffe to Pacific Diamond. Then, 1 week later, Gandhi was to wire $2m from FDII to Fancy Creations and then, 2 weeks later, wire an additional $2m from FDII to Fancy Creations.

51.    As another example, on January 31, 2018, FDII wired $2,466,015 and $525,000 to Fancy Creations. Gandhi then forwarded the wire confirmations to Shyam Wadhwa, stating "Please let your vendor know of this payment and clear any AR from HK."

52.    As another example, on March 24, 2014, FDII received: $1,826,234.25 from Pacific;

$1,731,061.40 from Unique; $1,265,481.70 from Fancy Creations; $1,239,970 from FIPL; and

$977,125.65 from World Diamond (for a total of $7,039,873).  FDII accounted for the transfers from

Pacific, Unique, Fancy Creations, and World Diamond as "refunds" and recorded negative A/P

entries for each.  There is no corresponding invoice or outgoing transfer for these amounts. That

same day, FDII transferred two wires totaling $5,858,500 to FHL. On March 25, 2014, FHL

transferred $1,800,000 to FGI and $4,058,500 to FDI (i.e. the entire $5,858,500 it received from

FDII). That same day, FGI transferred $1,800,000 to Brilliant Diamonds and FDI transferred

$4,058,500 to Brilliant. According to email correspondence reviewed, the $4,058,500 sent to

Brilliant was used to repay FDI's outstanding loan from Eternal, and Modi associates discussed

drafting a letter for auditors and bankers justifying the loan repayment going through Brilliant.

As a result of these transactions, FGI's loan from Brilliant and FDI's loan from Eternal were paid

off and replaced with identical loans from FHL, which itself became indebted to FDII for

$5,858,500—virtually all of which was sourced from bogus "refunds" paid by Shadow Entities.

53.    As with the other entities, clearing FDII's A/R and A/P balances became

particularly critical around audits. For example, on April 26, 2017, Gandhi forwarded an auditor's

inquiries into FDII's A/R and A/P balances with Shadow Entities to Bhansali. Gandhi

stated: "Point 2 [regarding the Shadow Entities] - lets discuss." Bhansali replied: "Pls speak to

Shyam [Wadhwa] on this, thank you. Let me know when we can clear at least the $4m." At this

time, FDII's A/P included $4,702,350 owed to Auragem and $4,147,816 owed to Fancy Creations.

54.    As another example, on November 10, 2016, Trupti Naag, a senior analyst at

accountancy Manish Modi & Associates, emailed Gandhi requesting additional information

regarding entries on a spreadsheet summarizing "AR/AP of Various Foreign Companies as of

October 31, 2016." The spreadsheet purported to show accounts receivable and accounts payable

balances between Firestar, FDII, NMI, Jaffe, and Synergies (on the horizontal axis) and Shadow

Entities Pacific, Unique, World Diamond, Auragem, Empire, Fancy Creations, Sino Traders,

Eternal, Universal, Vista, Tri Color, and Brilliant (on the vertical axis). The spreadsheet, Naag's

inquiries, and Gandhi's responses—taken as a whole— demonstrate the extent to which the

supposed pretexts for the movement of funds among the various Firestar Entities and Shadow

Entities—frequently accounted for as loans, sales, and advances against future sales—lacked any

basis in reality. For example:

a. The spreadsheet listed Pacific as owing FDII $244,548 in accounts receivable. With respect to this entry, Naag asked, "As per the sale register up to Sep 2016, there has been no transaction with Pacific diamonds, is this receivable against sale or advance given for purchase?" Gandhi responded "AR for Sale in March 2016."

b. The spreadsheet listed FDII as owing a total of $13,484,957 in accounts payable to Pacific, Auragem, Empire, Fancy, and Sino Traders. With respect to these entries, Naag asked, "There were no purchase transactions with these parties up to Sep 2016, what is the nature of these payables?" Gandhi responded "There is a purchase of $1.3m in August 2015." He had no explanation for the remaining more than $12 million in purported accounts payable from FDII to Shadow Entities.

c. The spreadsheet listed Jaffe as being owed a total of $839,278 in accounts receivable from Pacific, Empire, Eternal, and Vista. With respect to these entries, Naag asked, "There are no sale transactions to Pacific, Eternal, and Vista. Are these advances given for purchases?" Gandhi responded, "Yes[.]"

d. The spreadsheet listed Jaffe as owing a total of $6,998,488 in accounts payable to Pacific, Eternal, Universal, and Tri Color. With respect to these entries, Naag asked, "There have been no purchases from these parties up to Sep 2016. Have purchases been made in Oct?" Gandhi responded, "For Future[.]"

e. The spreadsheet listed Synergies as owing Brilliant $1,287,000 in accounts payable. With respect to this entry, Naag asked, "Is this advance received against sale or borrowings?" Gandhi responded, "Borrowing[.]" Upon information and belief, this entry related to the same purported $1,287,000 "loan" from Brilliant to Synergies described above, for which a term sheet was not executed until July 2017 when the issue was "holding up" Synergies' audit.

55.   Additional examples of FDII's transactions with Shadow Entities include:

a.   On August 30, 2012, FDI wired $1,501,000 to FDII. That same day, Gandhi emailed Bhavesh Patel, "Transfer $1,501,000 from [FDI to FDII]. Pay $21,774 from [FDII] to Fancy Creation." That same day, Gandhi emailed Sridhar Krishnan of SDC Designs, another entity related to the Debtors and one that frequently transacted with Shadow Entities, to let him know that FDII would issue a check in the amount of $1,500,395 to SDC Designs. On August 31, 2012, FDII issued a check in the amount of $1,500,395 to SDC Designs.

b.   On December 11, 2012, Gandhi emailed Bhavesh Patel, "Please keep wire ready for $602,862 to SDC Designs LLC from [FDII's] Capital Old account for invoice 63966." On December 12, 2012, Gandhi emailed a banker at Israel Discount Bank of New York a request for a $500,000 loan, with respect to which FDI was the obligor and FDII the beneficiary. That same day, the $500,000 loan proceeds were disbursed to FDII's Capital One Bank account. That same day, FDII wired $602,862 to SDC Designs.

c.   On February 19, 2013, FDI wired $627,000 to FDII. That same day, FDII wired $1,266,430 to Fancy Creations and $332,300 to Diagems.

d.   On April 25, 2013, FDI wired $350,000 to FDII. That same day, Jaffe wired $480,000 to FDII. That same day, FDII wired $812,030 to Diagems.

e.   On May 6, 2013, FDI wired $652,239 to FDII. That same day, FDII wired $463,389 to Tri Color. The next day, FDII wired $280,005 to Empire.

f.   On June 18, 2013, FDI wired $1,525,000 to FDII. That same day, Bhavesh Patel emailed Gandhi the confirmation for this wire, stating "Please find attached wires as per instructions." That same day, FDII wired $1,615,463.93 to Fancy Creations. On June 17, 2018, Bhavesh Patel emailed Gandhi wire documents for this transfer. Gandhi forwarded them to Bhansali to sign and return.

g.   On July 9, 2013, FDI wired $600,000 to FDII. That same day, FDII wired $600,024 to Fancy Creations. That same day, Bhavesh Patel emailed the wire confirmation for this transfer to Gandhi.

h.   On September 29, 2015, Jaffe wired $950,000 to FDII. That same day, FDII wired $943,827 to SDC Designs. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these transfers.

i.   On February 2, 2018, FDII wired $400,000 to Fancy Creations. That same day, Gandhi emailed Avinash Oza and Kunal Patel, copying Shyam Wadhwa, "Please wire $400,000 to Fancy from Capital One – Advance Refund." Oza replied with the wire confirmation.

56.   FDII also tracked sales to Shadow Entities differently in its internal books than in the MIS system for all entities. For example, in a January 20, 2013 email to Modi and Gandhi regarding FDII's December 2012 finances, Shyam Wadhwa noted: "Other than reporting period

related differences, Sales reported in Josh [Weinman]'s financial include internal sales vis-a-vis only external customer sales reported in Polish MIS. Sales reported in Josh [Weinman]'s financial are higher by $398 K, comprising of sale to Pacific $ 222K, Fancy $ 31K, Firestar Diamond Inc. $ 97K, RMD stone sales $ 17K and Others $ 31K." Modi replied: "Sales for NMJ shouldn't be in sales. Why are the sales below included in sales? Shouldn't they be commission?"

57.      In other instances, FDII's books and records were doctored to the point that they no longer reflected the value of transfers and sales. For example, on October 11, 2013, Shyam Wadhwa sent an email to Gandhi flagging as an "anomaly" the fact that Joshua Weinman's spreadsheet analyzing FDII's September 2013 financials attributed values to intercompany sales that did not reflect their actual sale price. Gandhi then sent Bhavesh Patel an email asking "Bhavesh Did you change prices for sale?" Patel responded, "Yes, for 2 styles as per Manish and he told Josh is confirmed too. Because from HK 2 stones sold at another price." Gandhi replied, "Next time ask me before making such changes. Does not make sense to change selling price !!!!"

58.      FDII also engaged in circular diamond trades with various Shadow Entities and other Modi-Controlled Entities. For example:

a.   On October 18, 2010, FDI purchased a 70.19 carat vivid yellow diamond from Heritage Gems for $3,614,785. On October 21, 2010, Modi emailed Joshua Weinman, Bhansali, and Gandhi stating "Josh, please ship the 70 ct vivid yellow to Firestone HK. Pls inform Aditya and Purvi about it. Please ship it today at $51,500 [per carat]." Modi then followed up, "sorry, send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK." Gandhi responded "Firestone, Dubai confirmed (not Unique)." Modi replied, "Sorry, Unique" and then explained that "it was an oversight on my part and I am glad you picked it up." Later that day, Peter Ha sent an email to Gandhi, Amit Shah, and Manish Zalawadia stating: "Be advice [sic] that one shipment was send to Unique via Malca-Amit HAWB# 1473451. The total is $ 3,614,785. See attachment for commercial invoice."

b.   Around January 11, 2011, FIPL sold the same 70.19 carat "Natural Fancy Vivid Yellow Rectangular VS2" diamond to Eternal for $9,525,835.85.

   c.   On April 19, 2011, FDI purchased the same 70.19 carat fancy vivid yellow diamond from Brilliant for $6,317,100. On January 3, 2012, FDI sold the same 70.19 carat fancy yellow vivid diamond to Pacific for $6,562,765.

   d.   In February 2014, FDII purchased the same 70.19 carat diamond from Excellent Facets (an entity owned by Modi's relative Deepak Sheth) for $2,839,536.45. Excellent Facets previously consigned the stone to FDII in December 2013 with a memo price of $3.1 million. So, in response to the $2.8 million sale price, Joshua Weinman asked Gandhi, "We got a price break of $260k?"

   e.   On July 20, 2011, FDI sold 31.50 carat and 30.88 carat fancy yellow cushion diamonds to Empire for $878,789.52 and $864,125.54, respectively. In January 2013, FIPL sold the same two diamonds to FDII for $771,750 and $756,560, respectively. In June 2013, FDII sold the same two diamonds to Firestar Diamond Ltd. for $776,270 and $761,080, respectively.

59.    Finally, as discussed above, FDII routinely bought and sold diamonds at prices that did not reflect their fair market value. Several of these patterns are evident in the "Inter-Co. Sale NDM" tab of the March 2014 iteration of a spreadsheet analyzing FDII's sales, purchases, inventory on-hand, and accrued commissions, among other items. This spreadsheet was prepared by Joshua Weinman and shared with Modi, Bhansali, Gandhi, and others on a monthly basis and indicates for example:

   a.   FDII sold a 1.05 carat "Fancy Intense Green "Yell[ow] Pear" stone to Fancy Creations for $137,813 after having purchased the stone for only $11,340. Similarly, the spreadsheet reflects that FDII sold 1.34 carats of mixed diamonds to Fancy Creations for $251,250 after having purchased the stones for only $28,944.

   b.   There were multiple transactions in which FDII sold stones to one Shadow Entity that FDII purchased from another Shadow Entity, as well as two instances in which FDII sold "Firestar Diamond LTD-HK" the same stones FDII purchased from that same entity in the first place.

   c.   The "Commission Income" tab of the same spreadsheet indicates that FDII tracked accrued commissions on account of sales to Shadow Entities and other Firestar Entities separately from those on account of sales to legitimate third parties, with commissions on intercompany and Shadow Entity transactions being significantly lower.

   d.   There was a discrepancy in profit margin between sales to Shadow Entities and those to third parties. It indicates that FDII did not sell a single item to a legitimate third party at a loss, yet it lost $23,231 and $79,540 on two sales to Pacific.

**FGI**

60.    FGI was incorporated in 2008 as the primary holding company for Modi's U.S. entities. It is the majority owner of FDI and was formerly the 100% owner of Central Park Real Estate LLC, which held Modi's New York residence. FGI was acquired by Synergies in 2017.

61.    At some point prior to March 25, 2014, FGI borrowed $1,800,000 from Brilliant and FDI borrowed $4,058,500 from Eternal. On March 24, 2014, FDII received: $1,826,234.25 from Pacific; $1,731,061.40 from Unique; $1,265,481.70 from Fancy Creations; $1,239,970 from FIPL; and $977,125.65 from World Diamond (for a total of $7,039,873).  FDII accounted for the transfers from Pacific, Unique, Fancy Creations, and World Diamond as "refunds" and recorded negative A/P entries for each.  There is no corresponding invoice or outgoing transfer for these amounts.

62.    That same day, FDII transferred two wires totaling $5,858,500 to FHL. On March 25, 2014, FHL transferred $1,800,000 to FGI and $4,058,500 to FDI (i.e. the entire $5,858,500 it received from FDII). That same day, FGI transferred $1,800,000 to Brilliant Diamonds and FDI transferred $4,058,500 to Brilliant.

63.    According to email correspondence reviewed, the $4,058,500 sent to Brilliant was used to repay FDI's outstanding loan from Eternal, and Modi associates discussed drafting a letter for auditors and bankers justifying the loan repayment going through Brilliant. As a result of these transactions, FGI's $1,800,000 loan from Brilliant and FDI's loan from Eternal were paid off and replaced with identical loans from FHL, which itself became indebted to FDII for $5,858,500 — virtually all of which was sourced from bogus "refunds" paid by Shadow Entities.

64.    In addition, FGI was formerly the 100% owner of CPRE, which owned Modi's New York residence, an apartment at the Essex House located at 160 Central Park South (the "**Essex House Apartment**"). The Essex House Apartment was purchased through CPRE, which was

formed on February 15, 2007 as a Delaware LLC to acquire the Essex House Apartment. CPRE was initially owned by FDI, and ownership was later transferred to FGI.

65.    On February 22, 2007, CPRE agreed to purchase the Essex House Apartment for approximately $5 million. CPRE took out a $3 million mortgage on March 26, 2007 from HSBC to finance the purchase. According to an email from Gandhi to Modi, the remaining $2 million was financed by Brilliant and FDI. The deed appears to be signed by Bhansali.

66.    FDI paid at least $856,335 in mortgage payments on the Essex House Apartment.

67.    In a December 4, 2017 email, Modi instructed Gandhi to pay off the Essex House Apartment mortgage and asked Gandhi if he should "[u]se funds from the bank line."

68.    On December 5, 2017, FDI paid off the mortgage on the Essex House Apartment by transferring $3,000,642 from its account to HSBC. In a December 6, 2017 email to Shyam Wadhwa, Gandhi stated: "FSI – I just paid $ 3 m yesterday from FSI for Niravbhai to settle for his HSBC mortgage of Central Park hence December will be tight…"

69.    With the HSBC mortgage paid off, FGI sold CPRE to The Ithaca Trust. The Ithaca Trust was established on August 23, 2017 as a revocable trust. The settlor was Purvi Mehta and the beneficiaries of the Trust are Modi's wife and three children.

70.    On December 29, 2017, The Ithaca Trust agreed to purchase CPRE for $6 million pursuant to a Membership Interest Purchase Agreement. Gandhi, as the CFO of CPRE, signed the agreement. Purvi Mehta transferred $6 million on January 2, 2018, and on the same day, The Ithaca Trust wired $6 million to FGI's HSBC account for the purchase of CPRE.

**NMI**

71.     Records indicate that NMI dealt with Shadow Entities. In 2016, for example, NMI appears to have participated in the following purchase and sale transactions with Fancy Creations:

   a.   On April 27, 2016, NMI purchased a 6.29 carat fancy yellow pear diamond from Fancy Creations for $81,456.

   b.   On May 20, 2016, NMI sold a 6.29 carat fancy yellow pear diamond to Fancy Creations for $81,456.

   c.   On June 17, 2016, NMI purchased a 77.8 carat diamond from Fancy Creations for $1,813,261.

   d.   On July 8, 2016, NMI sold two approximately 20-carat fancy yellow diamonds to Fancy Creations for a total of $1,211,400.

72.     Additionally, on March 25, 2016, Gandhi sent an email to Avinash Oza and Arpan Doshi instructing them to wire $1.4 million from Jaffe to NMI (then known as Firestar Jewelry, Inc.), and then $613,069.28 from NMI to Auragem and $787,000 from NMI to Nirav Modi Ltd. (NMI's parent company). With respect to the wire from NMI to Auragem, Gandhi also asked them to "Please voucher this invoice too as it was already received[.]" NMI's bank statements reflect each of these transactions.

73.     NMI also appears to have received funds laundered through BBB Group. As discussed above, Modi and his co-conspirators formed BBB Group—which purchased and operated the intellectual property of the legitimate, but defunct Bailey Banks & Biddle—as an outlet through which to launder the proceeds of the Bank Fraud under the guise of what was ostensibly a longstanding, reputable brand. From July 2017 to February 2018, BBB Group

transferred a total of $4,995,125 to NMI. Of this amount, $4,410,725 appears to have been directly

sourced from funds BBB Group received from Auragem, as follows:

| Date | BBB Group Receipt from Auragem | BBB Group Transfer to NMI |
|---|---|---|
| 7/25/17 | $1,260,725 | $600,000 |
| 10/16/17 | $1,501,475 | $1,410,000 |
| 1/26/18 | $1,250,725 | -- |
| 1/30/18 | -- | $1,175,725 |
| 2/21/18 | $1,299,975 | -- |
| 2/22/18 | -- | $1,225,000 |

### AVD

74.    AVD was incorporated in May 2017 as a wholly-owned subsidiary of Synergies.

The intention was to operate this entity as an online retail diamond business under the name

DiamondHub.com, but the business never got off the ground.

75.    Firestar's general ledger reflects a loan receivable of $55,813.10 owed by AVD to

FDI. The entries that make up the balance includes two debit entries in February 2018.  One entry

for $711 dated February 20, 2018 bearing the description "Invoice 213989" and a second entry for

$55,102.10 dated February 26, 2018 bearing the description "Loan – AVD Trading". Similarly,

AVD's aged accounts payable summary as of March 31, 2018 reflects $49,349.70 in outstanding

A/P owed to FDI.  Thus, both FDI and AVD's books are records reflect approximately $50,000

owed by AVD to FDI. In addition, the Trustee previously possessed inventory contained in a

pouch labeled "AVD." The Trustee now holds the proceeds of that inventory, which has an

approximate book value of $13,000.

### E.    The Trustee's Claims Against the Debtors' U.S. Affiliates

76.    The Trustee has identified at least a total of $1,585,775 in transfers from the Debtors

to or for the benefit of Synergies dating back to February 26, 2012, which can be avoided under

New York law, made applicable by section 544(b) of the Bankruptcy Code, and $700,422 in

transfers dating back to February 26, 2016, which can be avoided under the Bankruptcy Code. Of the $1,585,775 in transfers, the Trustee identified a total of $1,319,775 in transfers from FDI to Synergies that funded subsequent transfers from Synergies to entities involved in the Bank Fraud, including Shadow Entities.

77.    The Trustee has identified a total of $69,113,508 in transfers from the Debtors to or for the benefit of FDII dating back to February 26, 2012, which can be avoided under New York law, made applicable by section 544(b) of the Bankruptcy Code, and $18,039,853 in transfers dating back to February 26, 2016, which can be avoided under the Bankruptcy Code. Of the $69,113,508 in transfers, the Trustee identified a total of $8,324,979 in transfers from the Debtors to FDII ($6,755,239 from FDI and $1,569,740 from Jaffe) that funded subsequent transfers from FDII to entities involved in the Bank Fraud, including Shadow Entities.

78.    The Trustee identified a total of $4,638,806 in transfers from the Debtors to or for the benefit of FGI dating back to February 26, 2012, which can be avoided under New York law, made applicable by section 544(b) of the Bankruptcy Code, and $3,736,446 in transfers dating back to February 26, 2016, which can be avoided under the Bankruptcy Code. Of the $4,638,806 in transfers, FDI transferred $3,000,642 to PHH Mortgage Services to pay off CPRE's mortgage on Modi's New York residence. Also in connection with that property, FDI transferred at least $743,552.60 in earlier monthly mortgage payments to HSBC Mortgage Corporation and at least $346,774.83 in maintenance and other fees to JW Marriott Essex House N.Y.

79.    The Trustee has identified a total of $25,595,025 in transfers made by the Debtors to or for the benefit of NMI dating back to February 26, 2012, which can be avoided under New York law, made applicable by section 544(b) of the Bankruptcy Code, and $14,657,059 in transfers dating back to February 26, 2016, which can be avoided under the Bankruptcy Code.

80.    In addition, FDI and Jaffe were significantly involved in funding NMI's operations, both through direct cash transfers and payments to third parties in satisfaction of NMI's payroll and other expenses. There was no formal loan agreement between NMI and FDI or Jaffe: On October 5, 2016, the Debtors' auditors at KPMG sent Kunal Patel, the Debtors' controller, an email requesting additional information regarding, inter alia, "Long term interest free borrowings from A jaffe and group companies – please provide terms and condition[.]" Kunal Patel responded to this request by stating "No agreement."

81.    FDI's, Jaffe's, and NMI's books and records each reflect significant loan balances owed by NMI to the Debtors. Firestar's general ledger account #14200, entitled "LOAN – Firestar Jewelry", indicates that NMI owes FDI $2,205,284.44 on account of intercompany loans. Jaffe's general ledger account #120250, entitled "Loan Receivable - Firestar Jewelry, Inc.", reflects a loan balance owed by NMI of $11,216,467. Similarly, NMI's balance sheet as of March 31, 2018 reflected a $2,198,614 loan payable to FDI and a $11,216,467 loan payable to Jaffe.

82.    Finally, as to AVD, FDI's general ledger reflects a loan receivable of $55,813.10 owed by AVD to FDI. The entries that make up the balance include two debit entries in February 2018. One entry for $711 dated February 20, 2018 bears the description "Invoice 213989" and a second entry for $55,102.10 dated February 26, 2018 bears the description "Loan – AVD Trading". Similarly, AVD's aged accounts payable summary as of March 31, 2018 reflects $49,349.70 in outstanding accounts payable owed to FDI.  Thus, both FDI and AVD's books and records reflect approximately $50,000 owed by AVD to FDI.

## CLAIMS FOR RELIEF

### COUNT 1

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279, and
§§ 544(b)(1) and 550(a) of the Bankruptcy Code (Synergies)**

83.     Plaintiff restates and re-alleges paragraphs 1 through 82 of this Complaint as though fully set forth herein.

84.     The Debtors made numerous transfers to Synergies, as identified on <u>Schedule A</u>, attached hereto (collectively, the "**Synergies Transfers**").

85.     The Synergies Transfers constituted transfers of interests of the Debtors in property.

86.     The Synergies Transfers were made to or for the benefit of Synergies.

87.     The Synergies Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Modi, Bhansali, Gandhi, and their co-conspirators approved the Synergies Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Synergies Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

88.     Actual creditors, including but not limited to the Debtors' vendors and suppliers and certain taxing authorities, exist who could have the Synergies Transfers set aside, or who could disregard the Synergies Transfers and attach or levy execution upon the property conveyed, under section 278 and/or 279 of the New York Debtor & Creditor Law (the "**DCL**").

89.     Under section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the Synergies Transfers made within six years of the commencement of the Debtors' chapter 11 cases.

90.     Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the Synergies Transfers for the benefit of the Debtors' estates from Synergies, the entity to or for whose benefit the Synergies Transfers were made, and from any subsequent transferees.

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) avoiding each of the Synergies Transfers under section 544(b)(1) of the Bankruptcy Code; (b) entering judgment against the U.S. Affiliates, jointly and severally, under section 550(a) of the Bankruptcy Code, allowing recovery of the Synergies Transfers; and (c) granting such other equitable relief as may be just and proper.

## COUNT 2

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under §§ 548 and 550(a) of the Bankruptcy Code (Synergies)

91.     Plaintiff restates and re-alleges paragraphs 1 through 90 of this Complaint as though fully set forth herein.

92.     The Debtors made numerous Synergies Transfers, as identified on Schedule A.

93.     The Synergies Transfers constituted transfers of interests of the Debtors in property.

94.     The Synergies Transfers were made to or for the benefit of Synergies.

95.     The Synergies Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Modi, Bhansali, Gandhi, and their co-conspirators approved the Synergies Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Synergies Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

96.    Under section 548(a)(1)(A) of the Bankruptcy Code, the Trustee may avoid the Synergies Transfers made within two years of the commencement of the Debtors' chapter 11 cases.

97.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the Synergies Transfers for the benefit of the Debtors' estates from Synergies, the entity to or for whose benefit the Synergies Transfers were made, and from any subsequent transferees.

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) avoiding each of the Synergies Transfers under section 548(a)(1)(A) of the Bankruptcy Code; (b) entering judgment against the U.S. Affiliates, jointly and severally, under section 550(a) of the Bankruptcy Code, allowing recovery of the Synergies Transfers; and (c) granting such other equitable relief as may be just and proper.

## COUNT 3

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273–75, 278, and 279, and
### §§ 544(b)(1) and 550(a) of the Bankruptcy Code (Synergies)

98.    Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

99.    The Debtors made numerous Synergies Transfers, as identified on Schedule A.

100.    The Synergies Transfers constituted transfers of interests of the Debtors in property.

101.    The Synergies Transfers were made to or for the benefit of Synergies.

102.    The Synergies Transfers were made by the Debtors without fair consideration. The Synergies Transfers were made in service of the Bank Fraud, rather than in the ordinary course of the Debtors' businesses, and were without benefit to the Debtors.

103.    The Debtors were insolvent on the dates that the Synergies Transfers were made or were rendered insolvent as a result of the Synergies Transfers. The Debtors' insolvency was reflected on their balance sheets and the substantial contingent liabilities they incurred in the course of their involvement in the Bank Fraud.

104.    On the dates that the Synergies Transfers were made, the Debtors were engaged in business or transactions, or were about to engage in business or transactions, for which the Debtors' remaining property was unreasonably small capital.

105.    On the dates that the Synergies Transfers were made, the Debtors intended to incur, or believed that they would incur, debts beyond their ability to pay as such debts matured.

106.    Actual creditors, including but not limited to the Debtors' vendors and suppliers and certain taxing authorities, exist who could have the Synergies Transfers set aside, or who could disregard the Synergies Transfers and attach or levy execution upon the property conveyed, under section 278 and/or 279 of the New York DCL.

107.    Under section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the Synergies Transfers made within six years of the commencement of the Debtors' chapter 11 cases.

108.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the Synergies Transfers for the benefit of the Debtors' estates from Synergies, the entity to or for whose benefit the Synergies Transfers were made, and from any subsequent transferees.

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) avoiding each of the Synergies Transfers under section 544(b)(1) of the Bankruptcy Code; (b) entering judgment against the U.S. Affiliates, jointly and severally, under section 550(a) of the Bankruptcy Code, allowing recovery of the Synergies Transfers; and (c) granting such other equitable relief as may be just and proper.

## COUNT 4

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under §§ 548 and 550(a) of the Bankruptcy Code (Synergies)**

109.    Plaintiff restates and re-alleges paragraphs 1 through 108 of this Complaint as though fully set forth herein.

110.    The Debtors made numerous Synergies Transfers, as identified on <u>Schedule A</u>.

111.    The Synergies Transfers constituted transfers of interests of the Debtors in property.

112.    The Synergies Transfers were made to or for the benefit of Synergies.

113.    The Debtors received less than reasonably equivalent value in exchange for the Synergies Transfers. The Synergies Transfers were made in service of the Bank Fraud, rather than in the ordinary course of the Debtors' businesses, and were without benefit to the Debtors.

114.    The Debtors were insolvent on the dates that the Synergies Transfers were made or were rendered insolvent as a result of the Synergies Transfers. The Debtors' insolvency was reflected on their balance sheets and the substantial contingent liabilities they incurred in the course of their involvement in the Bank Fraud.

115.    On the dates that the Synergies Transfers were made, the Debtors were engaged in business or transactions, or were about to engage in business or transactions, for which the Debtors' remaining property was unreasonably small capital.

116.    On the dates that the Synergies Transfers were made, the Debtors intended to incur, or believed that they would incur, debts beyond their ability to pay as such debts matured.

117.    Under section 548(a)(1)(B) of the Bankruptcy Code, the Trustee may avoid the Synergies Transfers made within two years of the commencement of the Debtors' chapter 11 cases.

118.     Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the Synergies Transfers for the benefit of the Debtors' estates from Synergies, the entity to or for whose benefit the Synergies Transfers were made, and from any subsequent transferees.

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) avoiding each of the Synergies Transfers under section 548(a)(1)(B) of the Bankruptcy Code; (b) entering judgment against the U.S. Affiliates, jointly and severally, under section 550(a) of the Bankruptcy Code, allowing recovery of the Synergies Transfers; and (c) granting such other equitable relief as may be just and proper.

### COUNT 5

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279, and
§§ 544(b)(1) and 550(a) of the Bankruptcy Code (FDII)**

119.     Plaintiff restates and re-alleges paragraphs 1 through 118 of this Complaint as though fully set forth herein.

120.     The Debtors made numerous transfers to FDII, as identified on <u>Schedule A</u> (collectively, the "**FDII Transfers**").

121.     The FDII Transfers constituted transfers of interests of the Debtors in property.

122.     The FDII Transfers were made to or for the benefit of FDII.

123.     The FDII Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Modi, Bhansali, Gandhi, and their co-conspirators approved the FDII Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the FDII Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

124.    Actual creditors, including but not limited to the Debtors' vendors and suppliers and certain taxing authorities, exist who could have the FDII Transfers set aside, or who could disregard the FDII Transfers and attach or levy execution upon the property conveyed, under section 278 and/or 279 of the New York DCL.

125.    Under section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the FDII Transfers made within six years of the commencement of the Debtors' chapter 11 cases.

126.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the FDII Transfers for the benefit of the Debtors' estates from FDII, the entity to or for whose benefit the FDII Transfers were made, and from any subsequent transferees.

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) avoiding each of the FDII Transfers under section 544(b)(1) of the Bankruptcy Code; (b) entering judgment against the U.S. Affiliates, jointly and severally, under section 550(a) of the Bankruptcy Code, allowing recovery of the FDII Transfers; and (c) granting such other equitable relief as may be just and proper.

## COUNT 6

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under §§ 548 and 550(a) of the Bankruptcy Code (FDII)

127.    Plaintiff restates and re-alleges paragraphs 1 through 126 of this Complaint as though fully set forth herein.

128.    The Debtors made numerous FDII Transfers, as identified on Schedule A.

129.    The FDII Transfers constituted transfers of interests of the Debtors in property.

130.    The FDII Transfers were made to or for the benefit of FDII.

131.    The FDII Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Modi, Bhansali, Gandhi, and their co-conspirators approved the FDII

Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the FDII Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

132.    Under section 548(a)(1)(A) of the Bankruptcy Code, the Trustee may avoid the FDII Transfers made within two years of the commencement of the Debtors' chapter 11 cases.

133.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the FDII Transfers for the benefit of the Debtors' estates from FDII, the entity to or for whose benefit the Synergies Transfers were made, and from any subsequent transferees.

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) avoiding each of the FDII Transfers under section 548(a)(1)(A) of the Bankruptcy Code; (b) entering judgment against the U.S. Affiliates, jointly and severally, under section 550(a) of the Bankruptcy Code, allowing recovery of the FDII Transfers; and (c) granting such other equitable relief as may be just and proper.

### COUNT 7

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273–75, 278, and 279, and
§§ 544(b)(1) and 550(a) of the Bankruptcy Code (FDII)**

134.    Plaintiff restates and re-alleges paragraphs 1 through 133 of this Complaint as though fully set forth herein.

135.    The Debtors made numerous FDII Transfers, as identified on <u>Schedule A</u>.

136.    The FDII Transfers constituted transfers of interests of the Debtors in property.

137.    The FDII Transfers were made to or for the benefit of FDII.

138.    The FDII Transfers were made by the Debtors without fair consideration. The FDII Transfers were made in service of the Bank Fraud, rather than in the ordinary course of the Debtors' businesses, and were without benefit to the Debtors.

139.    The Debtors were insolvent on the dates that the FDII Transfers were made or were rendered insolvent as a result of the FDII Transfers. The Debtors' insolvency was reflected on their balance sheets and the substantial contingent liabilities they incurred in the course of their involvement in the Bank Fraud.

140.    On the dates that the FDII Transfers were made, the Debtors were engaged in business or transactions, or were about to engage in business or transactions, for which the Debtors' remaining property was unreasonably small capital.

141.    On the dates that the FDII Transfers were made, the Debtors intended to incur, or believed that they would incur, debts beyond their ability to pay as such debts matured.

142.    Actual creditors, including but not limited to the Debtors' vendors and suppliers and certain taxing authorities, exist who could have the FDII Transfers set aside, or who could disregard the FDII Transfers and attach or levy execution upon the property conveyed, under section 278 and/or 279 of the New York DCL.

143.    Under section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the FDII Transfers made within six years of the commencement of the Debtors' chapter 11 cases.

144.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the FDII Transfers for the benefit of the Debtors' estates from FDII, the entity to or for whose benefit the FDII Transfers were made, and from any subsequent transferees.

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) avoiding each of the FDII Transfers under section 544(b)(1) of the Bankruptcy Code; (b) entering judgment against the U.S. Affiliates, jointly and severally, under

section 550(a) of the Bankruptcy Code, allowing recovery of the FDII Transfers; and (c) granting

such other equitable relief as may be just and proper.

## COUNT 8

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under §§ 548 and 550(a) of the Bankruptcy Code (FDII)

145.    Plaintiff restates and re-alleges paragraphs 1 through 144 of this Complaint as

though fully set forth herein.

146.    The Debtors made numerous FDII Transfers, as identified on Schedule A.

147.    The FDII Transfers constituted transfers of interests of the Debtors in property.

148.    The FDII Transfers were made to or for the benefit of FDII.

149.    The Debtors received less than reasonably equivalent value in exchange for the

FDII Transfers. The FDII Transfers were made in service of the Bank Fraud, rather than in the

ordinary course of the Debtors' businesses, and were without benefit to the Debtors.

150.    The Debtors were insolvent on the dates that the FDII Transfers were made or

were rendered insolvent as a result of the FDII Transfers. The Debtors' insolvency was reflected

on their balance sheets and the substantial contingent liabilities they incurred in the course of

their involvement in the Bank Fraud.

151.    On the dates that the FDII Transfers were made, the Debtors were engaged in

business or transactions, or were about to engage in business or transactions, for which the

Debtors' remaining property was unreasonably small capital.

152.    On the dates that the FDII Transfers were made, the Debtors intended to incur, or

believed that they would incur, debts beyond their ability to pay as such debts matured.

153.    Under section 548(a)(1)(B) of the Bankruptcy Code, the Trustee may avoid the FDII

Transfers made within two years of the commencement of the Debtors' chapter 11 cases.

154.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the FDII Transfers for the benefit of the Debtors estates' from FDII, the entity to or for whose benefit the FDII Transfers were made, and from any subsequent transferees.

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) avoiding each of the FDII Transfers under section 548(a)(1)(B) of the Bankruptcy Code; (b) entering judgment against the U.S. Affiliates, jointly and severally, under section 550(a) of the Bankruptcy Code, allowing recovery of the FDII Transfers; and (c) granting such other equitable relief as may be just and proper.

### COUNT 9

**Turnover of Undisputed Account Receivable
Under § 542 of the Bankruptcy Code (NMI-FDI)**

155.    Plaintiff restates and re-alleges paragraphs 1 through 154 of this Complaint as though fully set forth herein.

156.    The books and records of both FDI and NMI reflect that NMI owes FDI $2,205,284.44 on account of an intercompany loan (the "**FDI Account Receivable**"). NMI has not yet paid the FDI Account Receivable, even though the amount of the obligation is undisputed.

157.    The FDI Account Receivable is property of FDI's bankruptcy estate under section 541(a) of the Bankruptcy Code.

158.    The FDI Account Receivable constitutes a matured, payable on demand, valid, and existing debt that is due and owing by NMI to FDI.

159.    Section 542(b) of the Bankruptcy Code provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee."

160.    The Trustee is entitled to payment on the FDI Account Receivable under section 542(b). *See In re Pali Holdings, Inc.*, 488 B.R. 841, 851 (Bankr. S.D.N.Y. 2013) ("A turnover action's essence is in bringing the estate's property into its custody—or in the . . . accounts receivable collection actions for which turnover also may be invoked as a statutory matter, in converting [an] account receivable that already is property of the estate into cash.").

WHEREFORE Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) directing turnover to the Trustee of $2,205,284.44 arising from the FDI Account Receivable; (b) entering judgment against the U.S. Affiliates, jointly and severally, under section 542 of the Bankruptcy Code for the value of the FDI Account Receivable; and (c) granting such other equitable relief as may be just and proper.

### COUNT 10

### Turnover of Undisputed Account Receivable
### Under § 542 of the Bankruptcy Code (NMI-Jaffe)

161.    Plaintiff restates and re-alleges paragraphs 1 through 160 of this Complaint as though fully set forth herein.

162.    The books and records of both Jaffe and NMI reflect that NMI owes Jaffe $11,216,467 on account of an intercompany loan (the "**Jaffe Account Receivable**"). NMI has not yet paid the Jaffe Account Receivable, even though the amount of the obligation is undisputed.

163.    The Jaffe Account Receivable is property of Jaffe's bankruptcy estate under section 541(a) of the Bankruptcy Code.

164.    The Jaffe Account Receivable constitutes a matured, payable on demand, valid, and existing debt that is due and owing by NMI to Jaffe.

165.    Section 542(b) of the Bankruptcy Code provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee."

166.    The Trustee is entitled to payment on the Jaffe Account Receivable under section 542(b). *See In re Pali Holdings, Inc.*, 488 B.R. 841, 851 (Bankr. S.D.N.Y. 2013) ("A turnover action's essence is in bringing the estate's property into its custody—or in the . . .  accounts receivable collection actions for which turnover also may be invoked as a statutory matter, in converting [an] account receivable that already is property of the estate into cash.").

WHEREFORE Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) directing turnover to the Trustee of $11,216,467 arising from the Jaffe Account Receivable; (b) entering judgment against the U.S. Affiliates, jointly and severally, under section 542 of the Bankruptcy Code for the value of the Jaffe Account Receivable; and (c) granting such other equitable relief as may be just and proper.

## COUNT 11

### Turnover of Undisputed Accounts Receivable
### Under § 542 of the Bankruptcy Code (AVD-FDI)

167.    Plaintiff restates and re-alleges paragraphs 1 through 166 of this Complaint as though fully set forth herein.

168.    The books and records of both FDI and AVD reflect that AVD owes FDI $50,000 on account of an intercompany loan (the "**AVD Account Receivable**"). AVD has not yet paid the AVD Account Receivable, even though the amount of the obligation is undisputed.

169.    The AVD Account Receivable is property of FDI's bankruptcy estate under section 541(a) of the Bankruptcy Code.

170.    The AVD Account Receivable constitutes a matured, payable on demand, valid, and existing debt that is due and owing by AVD to FDI.

171.    Section 542(b) of the Bankruptcy Code provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee."

172.    The Trustee is entitled to payment on the AVD Account Receivable under section 542(b). *See In re Pali Holdings, Inc.*, 488 B.R. 841, 851 (Bankr. S.D.N.Y. 2013) ("A turnover action's essence is in bringing the estate's property into its custody—or in the . . . accounts receivable collection actions for which turnover also may be invoked as a statutory matter, in converting [an] account receivable that already is property of the estate into cash.").

WHEREFORE Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter an Order (a) directing turnover to the Trustee of $50,000 arising from the AVD Account Receivable; (b) entering judgment against the U.S. Affiliates, jointly and severally, under section 542 of the Bankruptcy Code for the value of the AVD Account Receivable; and (c) granting such other equitable relief as may be just and proper.

Dated: February 12, 2020
   New York, New York

Respectfully submitted,

JENNER & BLOCK LLP

By: /s/ Marc Hankin    
Marc Hankin
Carl Wedoff
919 Third Avenue, 37th Floor
New York, New York 10022-3908
Telephone: (212) 891-1600
mhankin@jenner.com
cwedoff@jenner.com

Angela Allen (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
aallen@jenner.com

*Counsel for the Chapter 11 Trustee*