| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | <u>**FOR PUBLICATION**</u> |

-------------------------------------------------------------x

In re:                                                                                         Chapter 11

Firestar Diamond, Inc., *et al.*,                                          Case No. 18-10509 (SHL)

                                                    Debtors.              (Jointly Administered)

-------------------------------------------------------------x

## **MEMORANDUM OF DECISION**

**A P P E A R A N C E S:**

**JENNER & BLOCK LLP**
*Attorneys for the Chapter 11 Trustee, Richard Levin, Esq.*
919 Third Avenue
New York, New York 10022
By:     Marc B. Hankin, Esq.
            Carl N. Wedoff, Esq.

353 North Clark Street
Chicago, Illinois 60654
By:     Angela Allen, Esq.

**CONDON & FORSYTH LLP**
*Attorneys for Bank of India, Bharat Diamond Bourse Branch*
7 Times Square
18th Floor
New York, New York 10036
By:     Joseph E. Czerniawski, Esq.
            Matthew D. Emery, Esq.

**HILL RIVKINS LLP**
*Attorneys for Union Bank of India (UK) Ltd., Receivers of Firestar Diamond BVBA, Bank of India (Antwerp Branch), and Bank of India (London Branch)*
45 Broadway, Suite 1500
New York, New York 10006
By:     John J. Sullivan, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the objections of the Chapter 11 Trustee (the "Trustee") to the proofs of claim filed by four banks in the above-captioned cases: Firestar Claim No. 55, filed by Bank of India (Bharat Diamond Bourse Branch); Firestar Claim No. 16, filed by Union Bank of India (UK) Ltd.; Firestar Claim No. 12 and Firestar Claim No. 11, filed by Firestar Diamond BVBA's liquidators; and Firestar Claim No. 17, filed by Bank of India (London Branch). *See* ECF Nos. 1121, 1157, 1158, and 1161. For reasons that the Court explains below, the Court grants the Trustee's objections.

## BACKGROUND

The above-captioned debtors are three U.S. corporations indirectly owned by Nirav Modi that filed for Chapter 11 protection in the Southern District of New York: Firestar Diamond, Inc. ("FDI"), Fantasy, Inc. ("FI") and A. Jaffe, Inc. ("A. Jaffe," and together with FDI and FI, the "Debtors").[1] *See* ECF No. 1. The Debtors' were wholesalers of finished jewelry to major retailers, including Costco, J.C. Penney, Macy's, Zales, Kay's, and Jared's, among others. Bhansali Decl. ¶¶ 6-7.

These bankruptcy cases were filed in the shadows of an alleged massive fraud. Less than one month before the bankruptcies were filed, Punjab National Bank ("PNB") filed a complaint against Nirav Modi and several of his associated entities, alleging "the largest bank fraud in

---

[1] The Debtors are Delaware and New York Corporations. Decl. of Mihir Bhansali ¶¶ 14–16, February 28, 2018 [ECF No. 2]. FI is a wholly owned subsidiary of FDI. *Id.* ¶ 18. FDI is a wholly owned subsidiary of Firestar Group, Inc., which is, in turn, a wholly owned subsidiary of Synergies Corporation ("Synergies"). *Id.* ¶ 17. Synergies is wholly owned by Firestar Holdings Limited ("FHL"), a Hong Kong corporation. *Id.* FHL is a wholly owned subsidiary of Firestar International Limited ("FIL"), an Indian corporation, of which Mr. Modi is the majority shareholder. *Id.*

2

Indian history" against PNB and other banks. Report of John J. Carney, Examiner at 4, Aug. 24, 2018 [ECF No. 394] (the "Carney Report").

According to these allegations, Mr. Modi and his co-conspirators used fraudulently obtained Letters of Understanding ("LOUs")[2] to perpetrate the alleged bank fraud. *Id.* at 8–9. According to Indian authorities, the perpetrators used a series of entities that "posed as independent third parties in sham transactions to import gemstones and other jewelry related goods valued at billions of dollars in order to obtain bank financing in the form of LOUs." *Id.* at 28–30. The Indian Central Bureau of Investigation ("CBI") claims that Mr. Modi and his co-conspirators obtained approximately $4 billion from PNB through the fraudulently issued LOUs, while approximately $1 billion worth of LOUs remain unpaid. *Id.* at 27, 36.

Amidst concerns that the Debtors might have been involved with the alleged fraud of Mr. Modi, the Court appointed John J. Carney, Esq. (the "Examiner") to examine the issue. *See* Order Approving Appointment of Examiner, Apr. 20, 2018 [ECF No. 118]. In his eventual report, the Examiner found "substantial evidence to support the knowledge and involvement by the Debtors and their senior officers and directors, namely Mihir Bhansali and Ajay Gandhi, in the criminal conduct alleged by the Indian authorities." Carney Report at 4. During a subsequent hearing on the sale process of Debtors' assets, the Court learned of communications between Mr. Modi and Mihir Bhansali. *See* Hr'g Tr. of May 15, 2018, 141:15–143:14 [ECF No.

---

[2] The LOUs here are:

> guarantees by an Indian bank to pay the face amount to a vendor. LOUs allow for an importer to avoid incurring the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank in India. The issuing bank, in turn, enters into the foreign currency transaction: it requests a foreign branch or another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro—"our"—account) at the foreign branch of a third bank to pay the supplier in its local foreign currency.

Carney Report at 28–30.

3

256]. At the time, Mr. Bhansali was the sole director and president of each of the Debtors, Bhansali Decl. ¶ 20, and had submitted a declaration in support of the proposed sale of the Debtors' businesses. *Id.* ¶¶ 42, 44, 46. Concerned about these previously undisclosed communications, the Court held an emergency telephonic conference, during which Mr. Bhansali's counsel represented that Mr. Bhansali would assert his Fifth Amendment right against self-incrimination if compelled to testify about these communications. *See* Carney Report at 7, 19, 21, 25, 125, 131, and Ex. 1. The Debtors subsequently withdrew their sale motion, *see* ECF No. 177, and Mr. Bhansali resigned as CEO of the Debtors, *see* Carney Report at 25. These events prompted the U.S. Trustee and PNB to seek the appointment of a Chapter 11 Trustee. *See* ECF Nos. 185 and 181. The Court subsequently appointed Richard Levin, Esq. as Trustee, and the Trustee has administered the Debtors' estates since June 2018. *See* ECF No. 227.

Amid this backdrop of the fraudulent conduct alleged by PNB and the Examiner, the Trustee has filed objections to each of the proofs of claim filed by four different banks: Bank of India (Bharat Diamond Bourse Branch) ("BOI-B"), Union Bank of India (UK) Ltd. ("UBI"), Firestar Diamond BVBA's ("BVBA"), Receivers on behalf of Bank of India (Antwerp Branch) ("BOI-A"), and Bank of India (London Branch) ("BOI-L," and together with BOI-B, UBI, and BOI-A, the "Banks"). None of the Banks' claims are based on their dealings with the Debtors. Rather, the claims reflect amounts owed by the Debtors to three nondebtor entities: Firestar Diamond International Pvt. Ltd. ("FDIPL"), Firestar Diamond BVBA ("BVBA"), and Firestar Diamond FZE ("FZE"). In each case, the nondebtor entity pledged its receivables or sold invoices to the claimant for amounts owed by the Debtors.[3]

---

[3] First, the Trustee has objected to the revised proof of claim for $723,900.00 (Firestar Claim No. 55) filed by BOI-B. *See* ECF Nos. 1157 and 1234 for Trustee's Objection and Reply. BOI-B acquired the invoices by way of advancing credit to FDIPL at a discounted price. *See* Resp. to Trustee's Obj. ¶ 19 [ECF No. 1209]. Second, the

4

The Trustee contends that all of the Banks' claims are barred under Section 502(d) of the Bankruptcy Code. The Trustee asserts that the initial transferees of the Banks' claims—FDIPL, BVBA, and FZE—have each received millions of dollars in fraudulent transfers and preferences from the Debtors that have not been repaid. *See* Trustee's Obj. to BOI-B ¶¶ 17–18, 24 [ECF No. 1157]; Trustee's Obj. to UBI ¶¶ 18–20, 26 [ECF No. 1161]; Trustee's Corrected Obj. to BVBA's Receivers and BOI-A ¶¶ 17–19, 25 [ECF No. 1121]; Trustee's Obj. to BOI-L ¶¶ 16–17, 23 [ECF No. 1158]. As the Banks' claims here are based on the Debtors' dealings with FDIPL, BVBA, and FZE, the Trustee argues that they are subject to disallowance in the same way as if the claims were filed by FDIPL, BVBA, and FZE. Thus, the Trustee argues that the Banks' claims should be disallowed under Sections 547(b), 544, and 548 of the Bankruptcy Code, as well as New York Debtor and Creditor Law § 276. *See* Trustee's Obj. to BOI-B ¶¶ 21–23; Trustee's Obj. to UBI ¶¶ 23–25; Trustee's Corrected Obj. to BVBA's Receivers and BOI-A ¶¶ 21–24; Trustee's Obj. to BOI-L ¶¶ 20–22.

Each of the four Banks has opposed the Trustee's objections. *See* ECF Nos. 1209, 1215, 1216, and 1217. Their main argument is that, regardless of any defenses that the Trustee might have against FDIPL, BVBA, and FZE, their claims are not subject to disallowance. More specifically, the Banks contend that disallowance under Section 502(d) is a personal disability and does not travel with the "claim," but with the "claimant." The Banks rely on *In re Enron Corp.*, 379 B.R. 425, 443 (S.D.N.Y. 2007) ("*Enron II*"), which held that disallowance under

---

Trustee has objected to the revised proof of claim for $3,168,074.63 (Firestar Claim No. 16) filed by UBI. *See* ECF Nos. 1161 and 1232 for Trustee's Objection and Reply. BVBA pledged over certain receivables to UBI. *See* Opp'n to Trustee's Obj. ¶¶ 1–2 & Ex. 1 [ECF No. 1215]. Third, the Trustee has objected to the revised proofs of claim for $229,024.03 (Firestar Claim No. 11) and for $5,214,751.23 (Firestar Claim No. 12), filed by BVBA's Receivers on behalf of BOI-A. *See* ECF Nos. 1121 and 1231 for Trustee's Corrected Objection and Reply. BVBA pledged its receivables to BOI-A. *See* Resp. in Opp'n to Trustee's Obj. ¶¶ 4–5 & Ex. 3 [ECF No. 1216]. Lastly, the Trustee has objected to the revised proof of claim for $367,124.60 (Firestar Claim No. 17), filed by BOI-L. *See* ECF Nos. 1158 and 1233 for Trustee's Objection and Reply. FZE pledged its receivables to BOI-L. *See* Resp. to Trustee's Obj. ¶¶ 1–2 & Ex. 1C [ECF No. 1217].

5

Section 502(d) is personal to the claimant, not the claim, and that disallowance of a transferee's claim depends on the nature of the transfer. *See Enron II* at 443–45. The Banks argue that the rationale of *Enron II* applies here because they acquired rights to payment from the Debtors through a "sale" rather than an "assignment." *See* ECF Nos. 1209, 1215, 1216, and 1217.

In reply, the Trustee argues that the Court should not follow *Enron II* but instead the conclusion of other courts—including the United States Court of Appeals for the Third Circuit—that have rejected *Enron II* and concluded that disallowance under Section 502(d) follows the claim. In the alternative, the Trustee argues that the nature of the transfers here does not save the Banks' claims from disallowance even under *Enron II*. *See* ECF Nos. 1231, 1232, 1233, and 1234.

## DISCUSSION

### I.    Applicable Legal Standards

After a proof of claim has been filed, it may be disallowed for various reasons under Section 502 of the Bankruptcy Code. Section 502(d) provides, in part:

> [T]he court shall disallow any claim of any entity from which property is recoverable under [S]ection 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under [S]ection 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under [S]ection 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d). Under Sections 547(b)(4)(A)–(B) of the Bankruptcy Code, a trustee has the power to avoid preferential payments made 90 days before the filing of a bankruptcy petition or up to one year prior if the creditor was an insider at the time of the transfer. *See* 11 U.S.C. § 547(b)(4)(A)–(B). Under Section 548(a)(1)(A) of the Bankruptcy Code, a trustee may avoid fraudulent transfers and obligations two years prior to the filing of the petition. *See* 11 U.S.C. § 548(a)(1)(A). A trustee may also employ state law to avoid fraudulent transfers. *See, e.g.*, N.Y.

6

Debt. & Cred. Law § 276 (McKinney) ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.").

## II. Claim Disallowance Under Section 502(d) Rests on the Claim and Not the Claim Holder

When interpreting a statute, the Court follows well-established rules of statutory construction that begin with the plain meaning of the language of the statute. *See Peralta–Taveras v. Gonzales*, 488 F.3d 580, 584 (2d Cir. 2007) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)); *United States v. Razmilovic*, 419 F.3d 134, 136 (2d Cir. 2005) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well.") (quoting *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003)); *In re Caldor Corp.*, 303 F.3d 161, 167 (2d Cir. 2002) ("The task of resolving a dispute over the meaning of a provision of the Bankruptcy Code 'begins where all such inquires must begin: with the language of the statute itself.'") (quoting *United States v. Ron Pair Enters.,* 489 U.S. 235, 241 (1989)). The Court must read the Bankruptcy Code as a whole, taking care that it does not construe any provision "in a manner that would place it in conflict with other provisions." *In re Smart World Techs., LLC*, 423 F.3d 166, 183 (2d Cir. 2005) (citing *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002)) ("Statutory construction is a holistic endeavor . . . [T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute.") (internal quotations omitted). The exercise of examining and interpreting provisions of the Bankruptcy Code is "a holistic endeavor." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003).

In the *Enron II* decision relied on by the Banks, the court concluded that disallowance under Section 502(d) is a personal disability of the specific claimant and not an attribute of a

7

claim. *See* 379 B.R. at 439–5. It further concluded that any disallowance under Section 502(d) of a transferee's claim depends on "the nature of the transfer." *Id.* at 445. The court reasoned that a transfer by assignment will not grant the assignee more rights than possessed by the assignor under the "well-established doctrine of *nemo dat qui non habet:* an assignor cannot give more than he has." *Id.* at 436 n.57 (emphasis in the original) (citing *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, 2002 WL 31174470, at *32 n.39 (S.D.N.Y. Sept. 26, 2002)). But the court noted that these principles of assignment law do not apply to a purchase. *Enron II*, 379 B.R. at 436. Thus, "[a] personal disability that has attached to a creditor who transfers its claim will travel to the transferee if the claim is *assigned*, but will not travel if the claim is *sold.*" *Id.* at 436 (emphasis in original) (citations omitted). Said another way, an assignee "stands in the shoes of the assignor" and takes the claim with "whatever limitations it had in the hands of the assignor," *id.* at 435–36 (citations and internal quotations omitted), but a purchaser of the same claim is not subject to any personal disabilities of the transferor. *Id.* at 436.

According to *Enron II*, Section 502(d)'s power to coerce the return of assets obtained by preferential transfer "would not be served if a claim in the hands of a claimant could be disallowed even where that claimant never received the preference to begin with, and as a result, could not be coerced to return it." *Id.* at 443. The *Enron II* court observed:

> [S]ection 502(d) was not intended to punish, but rather 'to give *creditors* an option to keep *their* transfers (and hope for no action by the trustee) or to surrender *their* transfers and *their* advantages and share equally with other creditors. Applying [S]ection 502(d) to purchasers of claims would be punitive because they have no option to surrender something they do not have, which means they have not personally obtained any advantage that they could surrender.

*Id.* at 443–444 (emphasis in original).[4]

---

[4] While the Banks urge this Court to follow *Enron II* based on the principle of *stare decisis*, the Court rejects that argument. A bankruptcy court in a multi-judge district is not bound by *stare decisis* to the decision of a single district judge in that district. *In re Jamesway Corp.*, 235 B.R. 329, 336 n.1 (Bankr. S.D.N.Y. 1999).

Notwithstanding the views of the court in *Enron II*, the Court nonetheless finds more persuasive the analysis of courts that have reached the opposite result. *See, e.g.*, *In re KB Toys Inc.*, 736 F.3d 247 (3d Cir. 2013) ("*KB Toys II*"). In *KB Toys II*, for example, the United States Court of Appeals for the Third Circuit concluded that because Section 502(d) "focuses on claims—and not claimants—claims that are disallowable under [Section] 502(d) must be disallowed no matter who holds them." *Id.* at 252 (noting that Section 502(d) permits the disallowance of "any claim of any entity"). The Third Circuit warned that to "hold otherwise would contravene the aims of [Section] 502(d), the first of which is to ensure equality of distribution of estate assets." *Id.* at 252. As the Third Circuit explained, an alternative reading would permit an original claimant who received a voidable transfer to then "sell" the claim to a transferee, thereby allowing the original claimant to "wash" the claim of disabilities and get a (discounted) value for it. *See id.* In return, the transferee of the original claimant would be able to take the property at issue free and clear of the trustee's powers. *See id.* "To allow the sale to wash the claim entirely of the cloud would deprive the trustee of one of the tools the Bankruptcy Code gives trustees to collect assets—asking the bankruptcy court to disallow problematic claims." *Id.*

Moreover, the Third Circuit Court found *Enron II*'s distinction of "assignment" and "sale" to be "problematic," specifically because the state law on which it relied "does not provide a distinction between assignments and sales . . . [and because] resort to state law in a bankruptcy case must be done with care." *Id.* at 254 n.11 (citation omitted). *KB Toys II* elected instead to follow the analysis set forth in *Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180 (Bankr. S.D.N.Y. 2006) ("*Enron I*") (rev'd by *Enron II*) and *In re Metiom, Inc.*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003).

9

Other courts have reached the same conclusion as the Third Circuit. *See In re Motors Liquidation Co.*, 529 B.R. 510, 572 n.208 (Bankr. S.D.N.Y. 2015) (finding that the assignment-sale distinction in *Enron II* was "problematic"); *see also In re Wash. Mut., Inc.*, 461 B.R. 200, 256 n.44 (Bankr. D. Del. 2011) (holding that to the extent the court disallows the claims at issue, the claims are disallowed regardless of who holds them), *vacated in part on other grounds*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012). In the original decision that was on appeal in *KB Toys II*, for example, the bankruptcy court observed that the distinction in *Enron II* between "assignment" and "sale" has no support under the Bankruptcy Code, which does not distinguish between the two. *In re KB Toys, Inc.*, 470 B.R. 331, 340 (Bankr. D. Del. 2012) ("*KB Toys I*"). Rather, as the court noted, the "Code definition of 'transfer' arguably includes both." *Id.*; *see* 11 U.S.C. § 101(54)(D) (defining the term "transfer" broadly to mean "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property").[5] In the same vein, the bankruptcy court in *In re Metiom, Inc.* concluded that a "claim and the defense to the claim under [S]ection 502(d) cannot be altered by the claimant's subsequent assignment of the claim to another entity . . . that has not received an avoidable transfer." 301 B.R. at 643. The *Metiom* court opined that to permit a "claim assignment to destroy a claim defense under [S]ection 502(d) in such fashion would be a pernicious result. The assignment should not, and does not, affect the debtor's rights vis a vis the claim[.]" *Id.* The court further noted that this reading conformed with the established rule that "the assignee of a non-negotiable instrument is subject to all of the equities and burdens that

---

[5]     *Cf.*, N.Y. U.C.C. Law § 2-106 (McKinney) ("A 'sale' consists in the passing of title from the seller to the buyer for a price (Section 2-401)."); ASSIGNMENT, Black's Law Dictionary (11th ed. 2019) (an "assignment" is "a transfer of rights or property.").

10

attach to the property assigned, because the assignee receives no more than the assignor possessed." *Id.* As the court observed:

> The case most directly on point stated the rule over a century ago. *See Swarts v. Siegel,* 117 F. 13 (8th Cir. 1902), in which the Eighth Circuit applied the predecessor of [S]ection 502(d) of the Bankruptcy Code to disallow a claim in a proceeding under the Bankruptcy Act of 1898 because the original holder had received a preference. 'The disqualification of a claim for allowance created by a preference inheres in and follows every part of the claim, whether retained by the original creditor or transferred to another, until the preference is surrendered.'

*In re Metiom*, 301 B.R. at 643 (quoting *Swarts*, 117 F. at 15); *see also KB Toys I*, 470 B.R. at 335–36 (discussing how Section 502(d) is derived from Section 57(g) of the Bankruptcy Act of 1898 and that this history supports the interpretation that disabilities travel with claims).[6]

Numerous bankruptcy scholars have also concluded that Section 502 follows the claim, not the claimant. S*ee, e.g.*, Adam J. Levitin, *Bankruptcy Markets: Making Sense of Claims Trading*, 4 Brook. J. Corp. Fin. & Com. L. 67, 92 (2009) ("The district court held that the answer depended on whether the claim was 'sold' or 'assigned,' a novel distinction that flew against the long-standing interchangeability of these terms in legal practice."); Jennifer W. Crastz, *Can a Claims Purchaser Receive Better Rights (Or Worse Rights) Than Its Transferor in a Bankruptcy?*, 29 Cal. Bankr. J. 365, 373 (2007) ("While the [*Enron II* ] court went a long way to support the claims trading industry in terms of shielding buyers from liability for creditor misconduct, the district court created a new conundrum for the claims trading industry by turning its decision on the sale versus assignment analysis—terms that the financial world has always used interchangeably."); Tally M. Weiner & Nicholas B. Malito, *On the Nature of the Transferred Bankruptcy Claim*, 12 U. Pa. J. Bus. L. 35, 49 (2009) ("The District Court's [*Enron*

---

[6] Indeed, courts are "reluctant to accept arguments that would interpret the [Bankruptcy] Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history." *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992).

*II* ] ruling is unusual . . . [because] it draws a distinction between the consequences of transferring a claim through a sale, as opposed to an assignment, that neither the parties that appealed to the District Court nor the amici curiae thought carried any significance."); Roger G. Jones & William L. Norton, III, *Norton Creditors' Rights Handbook* § 8:8 (2008) ("The [*Enron II* court] recently held that equitable subordination will be effective against a transferee when received by pure assignment . . . but will generally be ineffective against a purchaser who takes by way of a sale. The court never explains the difference . . . and the case law does not bear out the distinction."); Kevin M. Lippman & Jay H. Ong, *Claims Trading: New York District Gets Bullish on Bankruptcy Claims Market*, Munsch Hardt Kopf & Harr PC (Jan. 18, 2008), https://www.munsch.com/Newsroom/Blogs/93465/Claims-Trading-New-York-District-Court-Gets-Bullish-on-Bankruptcy-Claims-Market ("The District Court's holding is fraught with uncertainty. . . . First, prior to this ruling by the District Court, participants in the claims trading market did not clearly differentiate in claims transfer documents whether the transaction was a sale or an assignment. Practically speaking, the participants considered those terms synonymous. Thus, reviewing the transfer documents to determine the intent of the parties may not end the inquiry. Second, the District Court failed to provide any clear guidance as to what constitutes a sale or an assignment.").[7]

### III. Other Considerations Do Not Favor the Banks

The Banks argue that the Court should weigh the equities in their favor and grant allowance of their claims because they are victims of the Debtors' web of fraudulent transactions. Specifically, the Banks argue that because they were innocent victims of the bank fraud perpetrated by Nirav Modi, the Debtors, and the related entities, the Banks' claims should

---

[7]   These scholarly articles are collected by the court in *KB Toys I*, 470 B.R. at 341 n.12.

not be disallowed. The Banks maintain that they engaged in no inequitable conduct. *See* Resp. of BVBA's Receivers and BOI-A ¶ 12 [ECF No. 1216]; Resp. of BOI-L ¶ 5 [ECF No. 1217]; Resp. of BOI-B ¶¶ 20–2 [ECF No. 1209]; Resp. of UBI ¶ 8 [ECF No. 1215]. The Trustee likewise invokes equity, noting that FDIPL, BVBA, and FZE received millions of dollars collectively in fraudulent transfers in the bank fraud scheme. *See* ECF Nos. 1231, 1232, 1233, and 1234.

The Court rejects the Banks' position. Given the Court's determination that Section 502(d) applies to the Banks' claims, the question becomes whether the claims are disallowed under the applicable law. As the Trustee has demonstrated, the claims are based on amounts owed to the entities that received fraudulent transfers from the Debtors in amounts exceeding the claims, and the claims would be subject to disallowance if those entities filed the claims. *See* Trustee's Obj. to BOI-B ¶¶ 17–18, 24; Trustee's Obj. to UBI ¶¶ 18–20, 26; Trustee's Corrected Obj. to BVBA's Receivers and BOI-A ¶¶ 17–19, 25; Trustee's Obj. to BOI-L ¶¶ 16–17, 23. The Banks have not presented any evidence or argument to contradict the Trustee on these points. Accordingly, the Court finds no equitable basis to bypass Section 502(d).

Moreover, the Court agrees with the Trustee that it would be inequitable to favor the Banks over the Debtors' other creditors. The Court rejects the Banks' notion that their claims should be allowed because a decision against them will wreak havoc in the claims trading market or unfairly punish good faith transferees. *See, e.g.*, Hr'g Tr. of Nov. 18, 2019, 67:24–68:1 [ECF No. 1362] ("[T]o hold an innocent third-party purchaser bank, which is advancing financing, taken to its logical extreme would have a chilling effect on financial markets."); *Enron II*, 379 B.R. at 448 (stating "[t]he unnecessary breadth of the Bankruptcy Court's decisions threatened to wreak havoc on the markets for distressed debt."). The question really is who should bear the

13

risk under these circumstances. Once again, this Court is persuaded by the reasoning of *KB Toys II*. After considering the history of claims trading in the United States, the Third Circuit ultimately concluded that the claim purchasers should be the ones to bear the risk for two reasons. First, claim purchasers "voluntarily choose to take part in the bankruptcy process" and are aware of the risks associated therein. *KB Toys II*, 736 F.3d at 253, n.8; *see Enron I*, 340 B.R. at 202. Indeed, it is incumbent "on prospective assignees to take into account possible claim defenses when they negotiate the terms of their assignments." *In re Metiom*, 301 B.R. at 643; *see also KB Toys II*, 736 F.3d at 252 n.8. Second, claim purchasers can mitigate their risk through due diligence and indemnity clauses in the transfer agreement. *KB Toys II*, 736 F.3d at 252 n.8. But while informed claims traders have the ability to reduce and mitigate risk, creditors in a bankruptcy have no way to protect themselves against the risk that claims with otherwise avoidable transfers will be washed clean by a sale or assignment. *See id.*; *Enron I*, 340 B.R. at 202.

      Given its rulings above, the Court does not need to decide whether the transactions underlying these claims are "sales" or "assignments." But there are reasons to think that some or all these transactions might not even be "sales" protected from disallowance under *Enron II*. While providing limited guidance on how to distinguish a sale from an assignment, the *Enron II* court explained that the distinction "depends, not on the name by which it calls itself, but on the legal effect of its provisions." 379 B.R. at 435; *see In re PCH Associates*, 804 F.2d 193, 199 (2d Cir. 1986) ("[T]he bankruptcy court is to look to the circumstances of the case and consider the economic substance of the transaction rather than . . . the form of the transaction.") (quotation omitted). Applying that principle here, the transactions at issue appear to resemble secured loans as the invoices were used as part of a larger financing transaction. *See* Trustee's Reply at 3 [ECF

14

No. 1234]; Trustee's Reply at 3 [ECF No. 1232]; Trustee's Reply at 3 [ECF No. 1231]; Trustee's Reply at 3 [ECF No. 1233]. The Trustee's characterization appears to be consistent with the Banks' own description of the transactions. *See, e.g.*, Resp. of BOI-B ¶ 19 [ECF No. 1209] ("[BOI-B] acquired the Invoices from FDIPL by way of advancing credit to FDIPL at a discounted price."); Resp. of UBI ¶ 1 [ECF No. 1215] ("BVBA granted to UBI a right of pledge over all Receivables of BVBA.").[8]

In the same vein, the Court notes that four of the transactions appear to be subject to Belgian law, which provides that "once a claim stemming from a contract is assigned or pledged, the debtor may raise all defences [sic] acquired prior to the notice of assignment or pledge." *See* Decl. of Bernard Insel ¶ 6, Nov. 8, 2019 [ECF No. 1221]. Considering these four transactions under the analysis set forth in *Enron II*, it is unclear whether these claims should be disallowed based on Belgian law.

## **CONCLUSION**

For the foregoing reasons, the Court grants the Trustee's objections to Firestar Claim No. 55, Firestar Claim No. 16, Firestar Claim No. 12, Firestar Claim No. 11, and Firestar Claim No. 17.

The Trustee should settle an order on five days' notice consistent with this Decision. The proposed order must be submitted by filing a notice of the proposed order on the Case

---

[8] While not challenging this characterization, the Banks nonetheless contend that the transactions underlying their claims are covered by *Enron II* given the way the transactions were structured. For example, BOI-A argues that because Firestar received notice of the pledge of receivables and previously paid BOI-A directly, its claim is not based on amounts owed by Firestar to BVBA but on amounts owed to BOI-A directly. BOI-A's Resp. ¶¶ 16-17 [ECF No. 1216]. But as the Trustee points out, BOI-A did not file the claim here, which was instead filed by BVBA's receivers on behalf of BVBA. Trustee's Reply to BOI-A at 3 [ECF No. 1231]. Moreover, BOI-A admits that any right to payment from Firestar is based on extension of credit under the credit facility and the General Credit Conditions for the transaction, which granted it a security interest in BVBA's invoices. *See* BOI-A's Resp. ¶¶ 15-17; *see also* Trustee's Reply to BOI-B [ECF No. 1234] (arguing that the presence of a "tenor" in the transaction document between FDIPL and BOI-B means the transaction was not a sale, but a secured loan).

15

Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon counsel to all of the Banks.

Dated: New York, New York
April 22, 2020

*/s/ Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE