JENNER & BLOCK LLP
Richard Levin
Carl Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600

Angela Allen (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350

*Counsel for the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., *et al.*<br><br>Debtors.[1] | Chapter 11<br>No. 18-10509 (SHL)<br>(Jointly Administered)<br><br>**Related Dkts: 1121, 1157, 1158, 1161** |

**TRUSTEE'S MEMORANDUM OF LAW IN SUPPORT OF
HIS MOTION FOR SUMMARY JUDGMENT ON HIS
OBJECTIONS TO CLAIMS OF BANK OF INDIA (BHARAT DIAMOND
BOURSE BRANCH) [NO. 55], BANK OF INDIA (ANTWERP
BRANCH)/FIRESTAR DIAMOND BVBA [NO. 12], UNION BANK
OF INDIA [NO. 16], AND BANK OF INDIA (LONDON BRANCH) [NO. 17]**

---

[1] **The Debtors and the last four digits of their respective taxpayer identification numbers
are as follows: Firestar Diamond, Inc. (2729), Fantasy, Inc. (1673), and Old AJ, Inc. f/k/a A.
Jaffe, Inc. (4756).**

142668.6

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

BACKGROUND.......................................................................................................1

I.      Prior Proceedings; Remand ...........................................................................1

II.     Undisputed Facts ...........................................................................................2

        A.      The Chapter 11 Case. ...........................................................................2

        B.      The Affiliates' Claims Against Firestar. ...............................................3

        C.      The Affiliates' Transactions With The Banks......................................4

                1.      FZE and Bank of India-London. ..............................................5

                2.      BVBA and Bank of India-Antwerp. .........................................6

                3.      BVBA and Union Bank of India. .............................................6

                4.      FDIPL and Bank of India (Bharat Diamond Bourse Branch). ..............7

        D.      The Banks' Claims Against Firestar.....................................................8

SUMMARY JUDGMENT STANDARD ....................................................................9

ARGUMENT...........................................................................................................10

I.      Section 502(d) of the Bankruptcy Code Requires Disallowance of the Banks'
        Claims. ..........................................................................................................10

II.     The Transaction Documents Establish the Characterization of the Claims..............10

        A.      The Transaction Documents Are Not Ambiguous; Their Meaning and
                Effect Must Be Interpreted Without Extrinsic Evidence. ...............................10

        B.      The Affiliates' Transactions With The Banks Were Pledges of the
                Affiliates' Claims. ..............................................................................11

        C.      In the Alternative, If The Claims Were Not Pledged, the Banks Do Not
                Have An Allowable Claim. ..................................................................14

        D.      In the Alternative, If the Claims Were Assigned, Section 502(d) Still
                Requires Disallowance. .......................................................................16

CONCLUSION ......................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Am. Enviro. Servs. Co., Inc. v Blue Cross/Blue Shield (In re Am. Enviro. Servs. Co., Inc.),*
  164 B.R. 462 (Bankr. W.D.N.Y. 1994) ...............................................................................15

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)..............................................................................................................9

*Beyer v. Cty. of Nassau,*
  524 F.3d 160 (2d Cir. 2008) ................................................................................................9

*Deeb v. Morris (In re Morris),*
  14 B.R. 217 (Bankr. D. Colo. 1981)...................................................................................15

*In re Firestar Diamond, Inc.,*
  615 B.R. 161 (Bankr. S.D.N.Y. 2020) ........................................................................ passim

*In re Firestar Diamond, Inc.,*
  627 B.R. 804 (S.D.N.Y. 2021).......................................................................... 1, 10, 14, 16

*In re KB Toys Inc.,*
  736 F.3d at 252 ...................................................................................................................16

*Monsanto Indus. Chems., Inc. v. Harris,*
  161 B.R. 385 (E.D. Mich. 1993) ........................................................................................15

*Overton v. New York State Div. of Military & Naval Affairs,*
  373 F.3d 83 (2d Cir. 2004) ..................................................................................................9

*Schron v. Troutman Sanders LLP,*
  20 N.Y.3d 430 (2013) .........................................................................................................11

*South Road Assocs., LLC v. Int'l Bus. Machines Corp.,*
  4 N.Y.3d 272 (2005) ...........................................................................................................11

*State Bank of India v. Shane of New York, Inc.,*
  1:12-cv-8916 (S.D.N.Y. Nov. 7, 2014), Dkt. 44 .........................................................12, 16

*W.W.W. Assocs., Inc. v. Giancontieri,*
  77 N.Y.2d 157 (1990) .........................................................................................................11

STATUTES

11 U.S.C. § 502(b)(1)................................................................................................................16

11 U.S.C. § 502(d) .................................................................................................. passim

11 U.S.C. § 523(a)(5) ...................................................................................................15

11 U.S.C. § 547 ..............................................................................................................4

11 U.S.C. § 548(a)(1)(A) ...............................................................................................4

11 U.S.C. § 550 ..............................................................................................................4

11 U.S.C. § 550(a) ..........................................................................................................4

New York Debtor Creditor Law § 273 ..........................................................................4

## OTHER AUTHORITIES

Bankruptcy Rule 7056 ....................................................................................................1

Fed. R. Bankr. P. 7056 ...................................................................................................9

Fed. R. Civ. P. 56 ...........................................................................................................9

Richard Levin, as the liquidating trustee (the "**Trustee**") for the Firestar Diamond Liquidating Trust, respectfully submits this memorandum of law in support of his motion under Bankruptcy Rule 7056 for summary judgment on his objection to the claims (the "**Claims**") of Bank of India (Antwerp Branch) ("**BOI-A**"), Bank of India (Bharat Diamond Bourse Branch) ("**BOI-B**"), Bank of India (London Branch) ("**BOI-L**,"), Union Bank of India ("**UBI**"), and I. Mertens and E. VanCamp as Receivers of Firestar Diamond BVBA ("**BVBA**"), asserted on behalf of BOI-A and UBI (the "**Receivers**" and, together with BOI-A, BOI-B, BOI-L, UBI, and BVBA, the "**Banks**").

## BACKGROUND

### I.    Prior Proceedings; Remand

1.      By Memorandum of Decision entered April 22, 2020, this Court disallowed the Claims. This Court determined that section 502(d) of the Bankruptcy Code, which requires disallowance of "any claim of any entity from which property is recoverable" under the Bankruptcy Code's avoidance and recovery provisions, unless the property is returned to the bankruptcy estate, also applies to any transferee of such a claim. *In re Firestar Diamond, Inc.*, 615 B.R. 161 (Bankr. S.D.N.Y. 2020) ("*Firestar I*"). The Banks appealed. The District Court agreed with this Court's legal conclusion regarding the applicability of section 502(d) to transferred claims. *In re Firestar Diamond, Inc.*, 627 B.R. 804, 808 (S.D.N.Y. 2021) ("*Firestar II*"). But the District Court vacated this Court's order and remanded for specific factual findings on "a characterization of the Banks' claims and how they are allegedly traced—or not traced—to claims by the Affiliates against Firestar." *Id.* at 809. This motion for summary judgment seeks an order, based on the undisputed facts, determining the issue for which the District Court ordered remand.

## II.    Undisputed Facts

### A.    The Chapter 11 Case.

2.      The chapter 11 debtor Firestar Diamond, Inc. ("**Firestar**") operated a wholesale jewelry business in New York. (*Report of John J. Carney, Examiner* at 33, Dkt. 394 ("**Examiner Report**").[1]) With the other two debtors (A. Jaffe, Inc. and Fantasy, Inc.), Firestar was part of the international diamond and jewelry business of Nirav Modi, who owned and controlled the debtors and numerous other affiliated diamond and jewelry businesses in the United States, India, Belgium, Hong Kong, the United Kingdom, and Dubai. (*Declaration of Mihir Bhansali* at 4-5, Dkt. 2.) The three debtors filed chapter 11 petitions in the Bankruptcy Court for this district on February 26, 2018. (Dkt. 1, Case No. 18-10509; Dkt. 1, Case No. 18-10510; Dkt. 1, Case No. 18-10511.)

3.      These bankruptcy cases were filed in the shadows of an alleged massive fraud. Less than one month before the bankruptcies were filed, Punjab National Bank ("**PNB**") filed a complaint against Nirav Modi and several of his associated entities, alleging "the largest bank fraud in Indian history" against PNB and other banks in which Mr. Modi and his co-conspirators used fraudulently obtained Letters of Understanding ("**LOUs**") to perpetrate the alleged bank fraud. According to Indian authorities, the perpetrators used a series of entities that "posed as independent third parties in sham transactions to import gemstones and other jewelry related goods valued at billions of dollars in order to obtain bank financing in the form of LOUs." *Firestar I*, 615 B.R. at 163; Examiner Report at 4, 8–9.

4.      The Indian Central Bureau of Investigation claims that Mr. Modi and his co-conspirators obtained approximately $4 billion from PNB through the fraudulently issued LOUs. *Firestar I*, 615 B.R. at 163.

---

[1] Unless otherwise noted, "Dkt." refers to docket entries in *In re Firestar Diamond, Inc.*, Case No. 18-10509 (SHL) (Bankr. S.D.N.Y.).

5.     Once it became apparent to the Bankruptcy Court and the creditors that the three chapter 11 debtors were not just innocent bystanders to the fraud but were deeply involved, Richard Levin was appointed Chapter 11 Trustee on June 14, 2018. (Dkts. 222, 227.) Under the confirmed chapter 11 plan, Richard Levin, as Liquidating Trustee of the Firestar Diamond Liquidating Trust, succeeded to the Chapter 11 Trustee's rights and defenses regarding disputed claims.

### B.     The Affiliates' Claims Against Firestar.

6.     Among the entities that Firestar traded with were its affiliates Firestar Diamond International Private Limited, an Indian entity ("**FDIPL**"), Firestar Diamond BVBA, a Belgian entity ("**BVBA**"), and Firestar Diamond FZE, a Dubai entity ("**FZE**," collectively, the "**Affiliates**"). (*See, e.g., BVBA Proof of Claim*, Dkt. 1114-1 ("**BVBA POC**"); *BOI-B Proof of Claim*, Dkt. 1157-1 ("**BOI-B POC**"); *BOI-Bharat Diamond Bourse Invoices*, Dkt. 1209-1; *Union Bank of India Commercial Documents*, Dkt. 1215-3; *Bank of India (London Branch) Commercial Documents*, Dkt. 1217-5.) Firestar appears to have regularly purchased goods from and sold goods to FDIPL, BVBA, and FZE, who issued invoices to Firestar, some of which remained unpaid at the bankruptcy petition date. (*See, e.g., id.*)

7.     In the six years before the bankruptcy, Firestar made numerous transfers of millions of dollars of cash and merchandise to FDIPL, BVBA, and FZE in furtherance of the fraud. (*See Objection to BVBA Claim* at 6-9, Dkt. 1114 ("**BVBA Objection**"); *Objection to BOI-B Claim* at 6-9, Dkt. 1157 ("**BOI-B Objection**"); *Objection to BOI-L Claim* at 5-8, Dkt. 1158 ("**BOI-L Objection**").) Many of the cash transfers within one year before the bankruptcy appeared to be in payment of invoices for merchandise FDIPL, BVBA, or FZE shipped to Firestar. (*Id.*)

8.     The Trustee has asserted that the transfers were avoidable under section 548(a)(1)(A) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(A), or section 273 of the New York

Debtor Creditor Law as transfers made with actual intent to hinder, delay, or defraud creditors. (BVBA Objection at 7-9; BOI-B Objection at 7-9; BOI-L Objection at 8-9.) In addition, the Trustee has asserted that any transfers made within one year before the bankruptcy petition are avoidable under section 547, 11 U.S.C. § 547, of the Bankruptcy Code as insider preferences. (*Id.*) The Trustee brought actions against FDIPL and BVBA to avoid those transfers and recover the amounts or their value under section 550(a) of the Bankruptcy Code and has asserted the voidability of the transfers to FZE in the objection to BOI-L's proof of claim. (Adv. Proc. 20-01053 (SHL) (Bankr. S.D.N.Y. Feb. 25, 2020); BOI-L Objection at 6-7.) None of the Affiliates has paid or returned any of the money or property that is recoverable from them under section 550. (BVBA Objection at 9; BOI-B Objection at 8; BOI-L Objection at 9.)

9.      In the initial proceedings on the Objections to the Claims, this Court found "[t]he Banks have not presented any evidence or argument to contradict the Trustee on these points." *Firestar I*, 615 B.R. at 169.

**C.      The Affiliates' Transactions With The Banks.**

10.      Each of the Affiliates financed their accounts receivable, including their receivables from Firestar, with one or more of the Banks. The financing relationships and the amounts claimed by each of the Banks as of the bankruptcy petition date on account of the unpaid financed receivables for each of the Affiliates were:

| Affiliate | Bank | Amount |
|-----------|------|--------|
| FDIPL | BOI-B | $723,900.00 |
| BVBA | UBI | $3,168,074.63 |
| BVBA | BOI-A | $945,984.40 |
| FZE | BOI-L | $367,124.60 |

(*See* BOI-B POC, BVBA POC; *Bank of India (London Branch) Proof of Claim*, Dkt. 1158-1

("**BOI-L POC**"); *Union Bank of India Proof of Claim*, Dkt. 1161-1 ("**UBI POC**").)[2]

### 1.    FZE and Bank of India-London.

11.    FZE financed its accounts receivables, including those from Firestar, with

Bank of India (London Branch) ("**BOI-L**"). (*See BOI-L Credit Facility*, Dkt. 1217-1; *BOI-L*

*Amended Credit Facility*, Dkt. 1217-2; *BOI-L Credit Facility Renewal Terms*, Dkt. 1217-3;

*BOI-L Deed of Hypothecation*, Dkt. 1217-4.)

12.    BOI-L's Claim arises from one transaction between Firestar and FZE. BOI-L

provided a credit facility to FZE under a "Facility Agreement" dated as of July 2, 2012, (Dkt.

1217-1), amended and restated as of July 31, 2013, (Dkt. 1217-2), and continued and extended

as of April 4, 2016, (Dkt. 1217-3). It provides a borrowing limit, (*id.*), interest on borrowings,

(*id.*), cash collateral, (Dkt. 1217-1 at 2), a Deed of Hypothecation to secure the borrowings

under the facility, (Dkt. 1217-4), guarantees of the amounts owing by Nirav Modi and two

affiliates, (Dkt. 1217-1 at 3-4), and repayment terms, (*id.* at 10). The Facility Agreement is

governed by English law. (*Id.* at 31). Nowhere do the agreements provide for the purchase by

BOI-L from FZE of any accounts receivable or Firestar's express agreement to a direct

obligation to BOI-L. (*See* Dkt. 1217-1, 1217-2, 1217-3, 1217-4.) The commercial invoices that

FZE issued to Firestar direct Firestar to pay BOI-L, but for "Ultimate Beneficiary Firestar

Diamond FZE." (*BOI-L Commercial Documents*, Dkt. 1217-5.)

---

[2] The record is unclear whether the amounts are the amounts owing under the Banks' credit facilities or the amounts of outstanding invoices from the Affiliates. (*Compare* BOI-B POC, BVBA POC, BOI-L POC, and UBI POC *with* Dkt. 1209 (the "**BOI-B Response**"); Dkt. 1215 (the "**UBI Response**"); Dkt. 1216 (the "**BOI-A Response**"); Dkt. 1217 (the "**BOI-L Response**," and together with the BOI-B Response, UBI Response, BOI-A Response, and BOI-L Response, the "**Responses**").) This Court's Memorandum of Decision lists a different amount for the claims of the Receivers on behalf of BOI-A and UBI. *See Firestar* I, 615 B.R. at 164. The differences are not material for purposes of this Motion.

### 2.    BVBA and Bank of India-Antwerp.

13.    BVBA financed its accounts receivable, including those from Firestar, with Bank of India (Antwerp Branch) ("**BOI-A**"). (*See BVBA Pledge of Receivables*, Dkt. 1216-1; *BOI-A Credit Agreements*, Dkt. 1216-2.)

14.    BOI-A's Claim arises from three transactions between Firestar and BVBA. BOI-A provided a "Credit Line" to BVBA, (Dkt. 1216-2), which was renewed and extended from time to time, with the last iteration dated January 30, 2017, (*id.* at 27-31). The Credit Line was governed by a cover letter specifying the major terms, (*id.*), and by "General Credit Conditions." (Dkt. 1216-3.) The cover letter provides a borrowing limit, (Dkt. 1216-2 at 27), security for the borrowings, including a margin or by which pledged receivables must exceed the borrowed amounts, (*id.* at 27-30), pledge of receivables, (*id.* at 28), interest on borrowings, (*id.* at 29-30), cash collateral, (*id.* at 29), and guarantees of the amounts owing by Nirav Modi, Neeshal Modi, and two affiliates, (*id.*). The General Credit Conditions provide repayment terms, (Dkt. 1216-3 at 7-9), and enforcement of security interests, (*id.* at 9-10), and is governed by Belgian law, (*id.* at 12). Nowhere do the agreements provide for the purchase by BOI-A from BVBA of any accounts receivable or Firestar's express agreement to a direct obligation to BOI-A. (*See* Dkt. 1216-1, 1216-2, 1216-3.) The commercial invoices that BVBA issued to Firestar direct Firestar to pay BOI-A, but for "Ultimate Credit to [account no. …] of Firestar Diamond BVBA." (*See, e.g.*, Dkt. 1216-4 at 2, Dkt. 1216-5 at 2, Dkt. 1216-6 at 2, Dkt. 1216-8 at 2, Dkt. 1216-9 at 2; Dkt. 1216-10 at 2.)

### 3.    BVBA and Union Bank of India.

15.    BVBA also financed its accounts receivable, including those from Firestar, with Union Bank of India ("**UBI**"). (*See BVBA Pledge of Receivables*, Dkt. 1216-1; *BOI-A Credit Agreements*, Dkt. 1216-2.)

16.    UBI's Claim arises from three transactions between Firestar and BVBA. BVBA

6

and UBI entered into a "Pledge of Receivables Agreement," dated as of October 16, 2014. (Dkt. 1215-1 ("**UBI Pledge**").) The UBI Pledge refers to "a facility agreement dated 16 October 2014 pursuant to which [UBI] has granted to [BVBA] an on demand invoice discounting facility in the maximum principal amount of USD 9,000,000." (*Id.* at 4.) The Agreement provides that BVBA "hereby grants to the [UBI] a right of pledge" over all its receivables to secure payment of liabilities under the facility agreement. (*Id.* at 5.) Although the Agreement permits UBI to notify BVBA's account debtors whose accounts are overdue to pay UBI directly, the Agreement otherwise permits BVBA to collect its own receivables. (*Id.* ¶ 4 at 6.) The Agreement, which is governed by Belgian law, (*id.* ¶ 17 at 11), permits UBI to exercise all remedies it is authorized to exercise under Belgian law if any of the secured liabilities became due and payable but remain unpaid. (*Id.* ¶ 8 at 9.) Nowhere does the Pledge of Receivables Agreement provide for the purchase by UBI from BVBA of any accounts receivable or Firestar's express agreement to a direct obligation to UBI. (*See generally* Dkt. 1216-1.) The commercial invoices that BVBA issued to Firestar direct Firestar to pay "to the credit of" UBI, but for "further credit to [account no. …] of Firestar Diamond BVBA." (Dkt. 1215-2 at 2-4; Dkt. 1215-3 at 2; Dkt. 1215-4 at 2; Dkt. 1215-5 at 2.)

### 4. FDIPL and Bank of India (Bharat Diamond Bourse Branch).

17.     FDIPL financed its accounts receivable, including those from Firestar with Bank of India (Bharat Diamond Bourse Branch) ("**BOI-B**," together with BOI-L, BOI-A, and UBI, the "**Banks**"). (*See* BOI-B POC at 5, 13, 22, 28, 33, 47, 52.)

18.     BOI-B's Claim arises from seven transactions between Firestar and FDIPL. The record does not contain a credit or pledge agreement governing the relationship between BOI-B and FDIPL, only eight "bills," drawn by FDIPL on BOI-B. *See id.* Each bill provides that FDIPL "enclose[s] the following bill for Collection / Purchase / Negotiation with recourse to us [FDIPL]. Please purchase/negotiate / Discount under PSCFC/NON-

7

PSCFC/FCFDB/Rupee Advance Scheme," specifying the bill amount and the tenor (maturity). (*Id.*) Each bill is "subject to the conditions printed on the back hereof," but the back is not included in the record. (*Id.*) Nowhere do the bills provide for the purchase by BOI-B from FDIPL of any accounts receivable or Firestar's express agreement to a direct obligation to BOI-B. (*See id.*) Each bill attaches an invoice from FDIPL to Firestar, which requests that Firestar pay BOI-B through a correspondent bank in New York for "further credit to our [FDIPL's] A/C [number] with Bharat Diamond Bourse Branch." (*Id.* at 6-8, 14-17, 23 [partially obscured], 29, 34, 39-43, 48, 53.)

**D.    The Banks' Claims Against Firestar.**

19.    The Banks' Proofs of Claim and the supporting materials the Banks provided in response to the Trustee's Objections to their Claims are described above and contain all of the documents governing the transactions between the Affiliates and Firestar and between the Affiliates and the Banks. (*See generally* BVBA POC, BOI-B POC, UBI POC, BOI-L POC.)

20.    The Proofs of Claim and the supporting materials do not contain any documents evidencing transactions directly between Firestar and any of the Banks. (*See id.*) Nor are there any such documents that would form the basis for a direct claim by the Banks against Firestar.

## SUMMARY JUDGMENT STANDARD

21.     Federal Rule of Civil Procedure 56 applies in contested matters pending in bankruptcy court. *See* Fed. R. Bankr. P. 7056. A court should grant summary judgment under Rule 56 where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citing Fed. R. Civ. P. 56(c)). Non-material fact issues will not prevent a court from awarding summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). Facts are material only if they "might affect the outcome of the suit under the governing law." *Overton v. New York State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004) (citing *Anderson*, 477 U.S. at 248).

22.     The Trustee seeks summary judgment disallowing the Claims. As this Court has already determined, there is no dispute that the Affiliates received fraudulent transfers and preferences from Firestar and did not return them. *Firestar I*, 615 B.R. at 169. Section 502(d) of the Bankruptcy Code requires disallowance of "any claim of any entity from which property is recoverable" under the Bankruptcy Code's avoidance and recovery provisions, unless the property is returned to the bankruptcy estate. The Claims are either those of Firestar's Affiliates—they were never actually sold to the Banks, and the Banks are merely trying to collect the Claims from Firestar to pay off their own claims against the Affiliates— or the Claims were transferred to the Banks by the Affiliates. In either case, the Claims are not original claims of the Banks. As such, the Claims are subject to section 502(d) and must be disallowed.

**ARGUMENT**

### I. Section 502(d) of the Bankruptcy Code Requires Disallowance of the Banks' Claims.

23.    The District Court ruled that section 502(d) applies to the Claims and requires disallowance "if the Banks' claims are a result of a transfer from the Affiliates." *Firestar II*, 627 B.R. at 808. The District Court also indicated, and Banks do not dispute, that if the Claims were not transferred and remain the Affiliates' claims, they would also be subject to disallowance under section 502(d). *Id.* ("the claims must be disallowed under Section 502(d) in the same way they would be disallowed if the Affiliates were asserting them."). Therefore, the only question before this Court is "a characterization of the Banks' claims and how they are allegedly traced—or not traced—to claims by the Affiliates against Firestar." *Id.* at 809.

24.    The transaction documents, which govern the relationship between the Banks and the Affiliates and between the Affiliates and Firestar, are not ambiguous and fully address that question: the Claims originated as the claims of the Affiliates, and the Banks' Claims are completely derivative of the claims of the Affiliates. The facts are undisputed and fully set forth in the transaction documents.

25.    The only issue is the legal characterization of the transactions. The Claims remain the Affiliates' claims, pledged to the Banks. But even if the Affiliates assigned or sold—rather than merely pledged—the Claims, any collection rights the Banks have against Firestar derive from the Affiliates' claims and are not based on original claims of the Banks against Firestar.

### II. The Transaction Documents Establish the Characterization of the Claims.

#### A. The Transaction Documents Are Not Ambiguous; Their Meaning and Effect Must Be Interpreted Without Extrinsic Evidence.

26.    In interpreting a contract, extrinsic evidence is not admissible unless the court first determines the contract to be ambiguous. As the New York Court of Appeals explained:

> Under New York law, written agreements are construed in
> accordance with the parties' intent and the best evidence of what
> parties to a written agreement intend is what they say in their
> writing. As such, a written agreement that is complete, clear and
> unambiguous on its face must be enforced according to the plain
> meaning of its terms. Parol evidence—evidence outside the four
> corners of the document—is admissible only if a court finds an
> ambiguity in the contract.

*Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) (internal citation and quotation marks omitted). Whether a contract is ambiguous is a legal issue based on the language of the contract. *South Road Assocs., LLC v. Int'l Bus. Machines Corp.*, 4 N.Y.3d 272, 278 (2005) ("Whether a contract is ambiguous is a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous."). Under the parol evidence rule, the parties may not introduce extrinsic evidence to show the meaning of a contract or even to show that a contract provision is ambiguous. *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) ("It is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" (quoting *Intercont'l Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 379 (1969))).

27.    Here, each of the relevant agreements is unambiguous, and the court can interpret their meaning and effect—the characterization of the transactions—from the terms of the documents themselves. Consequently, no extrinsic evidence may be used to inform their meaning. *See Schron*, 20 N.Y.3d at 436.

**B.    The Affiliates' Transactions With The Banks Were Pledges of the Affiliates' Claims.**

28.    The Banks argue that, contrary to the express terms of the transaction documents, their claims arise from direct rights of payment against Firestar, though for slightly different reasons for each Bank. In their Responses to the Objections, each Bank

11

stated the basis for its direct claim. Perhaps the clearest statement is in the Responses of BOI-L and BOI-A:

> A seller's pledge of a commercial invoice and the funds due in payment thereunder to a commercial lender vests in the lender a right of recovery of the full invoice amount from the purchaser of the goods. *State Bank of India v. Shane of New York, Inc.,* 1:12-cv-8916, ECF Doc. No. 44, at 2 (November 7, 2019) (Ex. 7).
>
> …
>
> Because the acceptance of the pledged invoices by Debtor FDI created a direct right of recovery by BOI-A against FDI, the Trustee is mistaken in claiming that the claim of the Receivers and BOI-A is based solely on amounts owed by Firestar to BVBA. The claim instead is based upon an agreement whereby FDI agreed to make payment on the BVBA invoices directly to BOI-A in consideration of BOI-A's extending credit to BVBA.

(BOI-L Response ¶¶ 6, 9 at 3, 4; *accord* BOI-A Response ¶¶ 13, 17 at 5, 7.)

29.    UBI's response takes a similar position, arguing that BVBA, which issued the underlying invoices, "directed Debtor FDI to make payment 'to the credit of Union Bank of India (UK) Ltd … in accordance with the existing Pledge of Receivables Agreement whereby BVBA granted to UBI a right of pledge over all Receivables of BVBA." (UBI Response ¶ 7 at 3–4.) So does BOI-B, claiming "the Bank was granted the direct right to payment from these invoices as security for a consortium loan made to FDIPL," (BOI-B Response ¶ 9 at 2), and "The Bank acquired the Invoices from FDIPL by way of advancing credit to FDIPL at a discounted price." (*Id.* ¶ 19 at 5.)

30.    However, as each of the Responses makes clear, the Banks' claims to direct payment all arose from the Affiliates' pledge of their receivables. The transactions documents fully support this characterization, as all of the Banks' transactions with the Affiliates were financing transactions, not transfers of the Affiliates' claims against Firestar. (*See* BOI-B POC at 5, 13, 22, 28, 33, 47, 52; Dkt. 1216-2 at 3-31; Dkt. 1216-3; Dkt. 1217-1; Dkt. 1217-2;

Dkt. 1217-3; Dkt. 1217-4.) The financing documents use the language of a pledge, not an assignment or sale. *See*, *e.g.*:

- Dkt. 1215-1 at 5 (BVBA "hereby grants to the [UBI] a right of pledge");

- Dkt. 1216-2 at 28 ("all such bills/invoices … shall be specifically pledged/assigned in our favour");

- Dkt. 1216-3 at 9 ("As security for its obligations, the Borrower shall pledge to the Bank all of its present and future receivables");

- Dkt. 1216-4 at 2 ("As security . . . Firestar Diamond FZE … hereby hypothecates … all of [its] tangible and intangible assets[.]").

In other words, the Banks took the Affiliates' claims as collateral to secure their loans to the Affiliates. By the very terms of their documents, they did not take an assignment of or purchase the claims. For those transactions that are subject to Belgian law, as the Appellants' own Belgian law expert testified, "the classification of the pledged invoices as an assignment is erroneous according to Belgian law … any assignment of receivables made for the purpose of securing a liability is a (mere) pledge." (Decl. of Bernard Insel ¶ 5 at 3, Dkt. 1221.)

31.    Thus, the Affiliates continued to be the owners of the claims, unless and until the Banks took some action to foreclose their pledges and become the owners. There is no evidence in the record—not even a mention—of such foreclosures. Nor does the record contain anything about Belgian, English, Emirati, or Indian law that would show how such a formal transfer of the claim would occur. Rather, the record shows only that the Affiliates directed Firestar to pay the invoices directly to the Banks for further credit to the Affiliates' accounts. (*See, e.g.*, BOI-B POC at 6-8; Dkt. 1215-1 at 2-4; Dkt. 1215-4 at 2; Dkt. 1215-5 at 2; Dkt. 1217-5 at 2.) Thus, the Banks are asserting the Affiliates' own claims.

32.    The assertion of the BOI-A and UBI claims by the Receivers of BVBA underscores the point. The Receivers, not the Banks, succeeded to the assets of BVBA, including the claims against Firestar. (*See* BOIA-A POC at 2-4.) Indeed, the Receivers, not

BOI-A or UBI, filed the Claims. (*Id.*) Therefore, because the claims are still owned by the Affiliates, who received the avoidable preferences and fraudulent conveyances, the claims are subject to disallowance under section 502(d), without regard to the Banks' or the Receivers' assertion of the claims. As such, section 502(d) applies directly and requires disallowance of the claims and affirmation of the judgment below.

> **C.    In the Alternative, If The Claims Were Not Pledged, the Banks Do Not Have An Allowable Claim.**

33.    The District Court opinion posits the possibility that the Banks did not obtain claims from the Affiliates:

> The Banks assert, for example, that they hold invoices that are directly payable by Firestar, and they deny that they actually obtained a "claim" within the meaning of Section 502(d) from the Affiliates. Accordingly, the bankruptcy court's suggestion that the claims may not have resulted from a transfer by either a sale or an assignment—a position that the trustee embraced on appeal—therefore raises the possibility that Section 502(d) does not apply at all ….

*Firestar II*, 627 B.R. at 809. The opinion's characterization of the Banks' assertion is likely based on the  assertion in the Banks' Responses to the Trustee's Objections to their Claims:

> The claim instead is based upon an agreement whereby FDI agreed to make payment on the BVBA invoices directly to BOI-A in consideration of BOI-A's extending credit to BVBA.

(BOI-A Response ¶ 17 at 7; *accord* BOI-L Response ¶ 9 at 4.)

34.    However, the transaction documents do not support the Banks' assertion or the District Court's characterization of it. The only invoices in the record are invoices from the Affiliates to Firestar, not from the Banks to Firestar. In fact, the Banks' argument confirms that fact, claiming Firestar "agreed to make payment on the *BVBA invoices*." (BOI-A Response ¶ 17 at 7 (emphasis added).) There are also no documents in the record under which Firestar agreed to make payment on the Affiliates' invoices directly to the Banks "in

consideration of [the Banks'] extending creditor to [the Affiliates]" or otherwise. Therefore, the only basis on which the Banks can assert direct claims against Firestar is if the Affiliates' invoices were pledged, transferred, or assigned to the Banks, in which case section 502(d) requires disallowance, *or* if the Affiliates merely designated the Banks as the payees of Firestar's obligations to the Affiliates, without any transfer of an interest in their claims.

35.     The holder of a receivable such as the Affiliates—an obligee—may direct the account debtor to pay a third party such as the Banks—the payee—for whatever reason. The payment direction does not change who owns the receivable but separates the obligee from the payee. *See Am. Enviro. Servs. Co., Inc. v Blue Cross/Blue Shield (In re Am. Enviro. Servs. Co.,, Inc.)*, 164 B.R. 462, 465 (Bankr. W.D.N.Y. 1994) (where the debtor, on its employees' instructions, agreed to pay the employees' obligations to an insurer, the insurer was the debtor's payee but not the debtor's creditor and did not hold a claim against the debtor); *Monsanto Indus. Chems., Inc. v. Harris*, 161 B.R. 385, 387 (E.D. Mich. 1993) (where employer subrogated to the child support claim of the debtor's child, the claim remained the child's claim and was nondischargeable under section 523(a)(5)); *Deeb v. Morris (In re Morris)*, 14 B.R. 217, 219–20 (Bankr. D. Colo. 1981) (distinguishing between child's right to payment and professional's right to receive the payment, claim asserted by professional engaged to represent the debtor's child in a divorce proceeding remained the child's claim and was nondischargeable under section 523(a)(5)).

36.     Moreover, in this case, in each of the transactions, the payment direction was *to* the Bank, but not *for* the Bank's account. Rather, the direction was specifically for credit to the account *at* the Bank of the Affiliate. (BOI-B POC at 6-8; Dkt. 1215-1 at 2-4; Dkt. 1215-4 at 2; Dkt. 1215-5 at 2; Dkt. 1217-5 at 2.)

37.    Alternatively, citing *State Bank of India v. Shane of New York, Inc.,* 1:12-cv-8916 (S.D.N.Y. Nov. 7, 2014), Dkt. 44 at 2, the Banks argue a "seller's pledge of a commercial invoice and the funds due in payment thereunder to a commercial lender vests in the lender a right of recovery of the full invoice amount from the purchaser of the goods." (BOI-A Response ¶ 13 at 5; *accord* BOI-L Response ¶ 6 at 3.) But the argument defeats itself. It relies on the premise that the invoices were pledged—a position the Banks deny in this case. If the invoices were pledged, then even if the Banks have "a right of recovery of the full invoice amount from the purchaser of the goods," they are asserting the right derived from the Affiliates' claims, not an independent, newly created claim in favor of the Banks. If the invoices were not pledged and the Banks are not designated payees of the Affiliates' claims, then the Banks have no allowable claim at all, as they have no *independent* rights to payment against Firestar. Firestar never expressly agreed to pay the Banks "in consideration of [the Banks'] extending financing to [the Affiliates]"or otherwise. The Claims would be disallowed under section 502(b)(1) (claim that is unenforceable against the debtor under applicable nonbankruptcy law).

38.    Finally, if a pledge transaction rendered section 502(d) inapplicable to a claim, it would create as much opportunity for evasion if a transfer of a claim neutered section 502(d). *See Firestar I*, 615 B.R. at 169; *In re KB Toys Inc.*, 736 F.3d at 252.

**D.    In the Alternative, If the Claims Were Assigned, Section 502(d) Still Requires Disallowance.**

39.    In the alternative, if this Court were to determine that the Claims did not remain the direct claims of the Affiliates subject to a pledge in favor of the Banks, the Claims are still subject to disallowance under section 502(d). An assignment of a receivable or a direction to pay a third party does not change the origination of the receivable. For purposes of section 502(d), the claim's origination is what matters. *Firestar II*, 627 B.R. at 808 ("[I]f

16

the Banks' claims are a result of a transfer from the Affiliates, the claims must be disallowed under section 502(d)."). If the Banks acquired the Affiliates' claims as a result of a transfer, whether by assignment, sale, or other form of transfer, the Claims must be disallowed under section 502(d), as the District Court ruled.

## CONCLUSION

40.     For the foregoing reasons, this Court should grant the Trustee summary judgment disallowing the Claims.

Dated: June 30, 2021
     New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By: */s/ Richard Levin*
Richard Levin
Carl Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
rlevin@jenner.com
cwedoff@jenner.com

Angela Allen (admitted *pro hac vice*)
353 N. Clark St.
Chicago, Illinois 60654
(312) 222-9350
aallen@jenner.com

*Counsel for the Firestar Diamond Liquidating Trustee*