**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<u>FOR PUBLICATION</u>

-------------------------------------------------------------x

In re:                                                                   Chapter 11

Firestar Diamond, Inc., *et al.*,                          Case No. 18-10509 (SHL)

                                    Debtors.              (Jointly Administered)

-------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**JENNER & BLOCK LLP**
*Attorneys for the Firestar Diamond Liquidating Trustee*
919 Third Avenue
New York, New York 10022
By:     Richard Levin, Esq.
            Carl Wedoff, Esq.

            -and-

353 North Clark Street
Chicago, Illinois 60654
By:     Angela Allen, Esq.

**HILL RIVKINS LLP**
*Attorneys for Claimants*
*Union Bank of India (UK) Ltd.*
*Bank of India (London Branch)*
*Bank of India (Antwerp Branch)*
45 Broadway, Suite 1500
New York, New York 10006
By:     John J. Sullivan, Esq.

**CONDON & FORSYTH LLP**
*Attorneys for Claimants*
*Bank of India, Bharat Diamond Bourse Branch*
7 Times Square, 18th Floor
New York, NY 10036
By:     Joseph E. Czerniawski, Esq.
            Matthew D. Emery, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion filed by the liquidating trustee for the Firestar Diamond

Liquidating Trust (the "Trustee") seeking summary judgment on his objection to the claims filed

in this bankruptcy case by Bank of India (London Branch) ("BOI-L"), Bank of India (Antwerp

Branch) ("BOI-A"), Union Bank of India (UK) Ltd. ("UBI"), and Bank of India, Bharat

Diamond Bourse Branch ("BOI-B," and together with BOI-L, BOI-A, and UBI, the "Banks").

*See* ECF No. 1653.[1]  The Trustee makes two arguments.[2]  He argues that these claims do not

belong to the Banks but rather to the non-debtor affiliates of the Debtor Firestar Diamond, Inc.

("FDI").  In the alternative, the Trustee contends that the claims were transferred to the Banks by

these affiliates and thus are subject to disallowance under 11 U.S.C. Section 502(d) given that

these affiliates received fraudulent transfers and preferences from the Debtors.  The Banks have

filed cross-motions for summary judgment.  *See* ECF Nos. 1658, 1663.  The Banks assert that

their claims should not be disallowed because, among other things, they acquired rights of

payment in the ordinary course of business before the bankruptcy, and the Banks' claims are

"obligations" owed by the Debtors rather than "transfers" of claims from affiliates of the

Debtors.[3]  For the reasons set forth below, the Trustee's motion is granted and the Banks'

motions are denied.

---

[1]      Unless otherwise indicated, references to the Case Management/Electronic Case Filing ("ECF") docket are
to Case No. 18-10509.

[2]      *See generally* Trustee's Memorandum of Law in Support of His Motion for Summary Judgment on his
Objections to Claims of [the Banks] (the "Trustee's Memo") [ECF No. 1654].

[3]      *See* Memorandum of Law of Claimants [the Banks] in Opposition to Trustee's Motion for Summary
Judgment and in Support of their Cross Motion for Summary Judgment (the "Banks' Memo") [ECF No. 1666].

## BACKGROUND

The current dispute involves transactions between the Debtor FDI, the Banks, and three non-debtor subsidiaries of the Debtor FDI: Firestar Diamond International Private Limited, an Indian entity ("FDIPL"), Firestar Diamond BVBA, a Belgian entity ("BVBA"), and Firestar Diamond FZE, an Emirati entity ("FZE," and together with FDIPL and BVBA, the "Affiliates").[4]

The Debtor FDI operated a wholesale jewelry business in New York.[5] FDI and two other U.S. corporations—A. Jaffe, Inc. ("A. Jaffe") and Fantasy, Inc. ("FI," and together with FDI and A. Jaffe, the "Debtors")—were part of the international diamond and jewelry business of Nirav Modi.[6] Nirav Modi owned and controlled the Debtors and numerous other affiliated diamond and jewelry businesses in the United States, India, Belgium, Hong Kong, the United Kingdom, and the United Arab Emirates.[7]

---

[4]    *See* Response of Claimants [BOI-L], [UBI], and [BOI-A] to the Trustee's Local Rule 7056-1 Statement and Cross Motion Statement of Material Facts ¶¶ 8–9, 15–23 ("BOI-L, UBI, and BOI-A Response and Statement of Facts") [ECF No. 1659]; Response of Claimants [BOI-B] to the Trustee's Local Rule 7056-1 Statement and Counter-Statement of Material Facts Pursuant to Local Rule [7056-1] ¶¶ 8–9, 15–23 ("BOI-B Response and Statement of Facts") [ECF No. 1664].

[5]    BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 1; BOI-B Response and Statement of Facts ¶ 1.

[6]    BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 2; BOI-B Response and Statement of Facts ¶ 2.

[7]    BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 2; BOI-B Response and Statement of Facts ¶ 2.

FDI regularly purchased polished diamonds from the Affiliates.[8]  The Banks provided commercial banking services to the Affiliates to finance these sales.[9]  Specifically, each of the Banks extended credit to the Affiliates and/or purchased the rights to payment on the Affiliates' invoices issued to FDI.[10]  The affiliate FZE entered into its credit facility agreement with BOI-L on July 2, 2012, which was later amended and restated and further continued and extended as of April 4, 2016.[11]  The affiliate BVBA's "Credit Line" agreement with BOI-A was last renewed and extended on January 30, 2017.[12]  BVBA's Pledge of Receivables Agreement with UBI is dated October 16, 2014.[13]  The affiliate FDIPL's credit facility agreement with BOI-B is dated February 3, 2015.[14]

---

[8]    *See* BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 8–9; BOI-B Response and Statement of Facts ¶¶ 8–9; Trustee's Response to Local Rule 7056-1 Statement of [BOI-A, BOI-L, and UBI] ¶¶ 56, 64–66, 73–75 ("Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts") [ECF No. 1672]; Banks' Memo at 3; Trustee's Reply Memorandum of Law in Support of his Motion for Summary Judgment on his Objections to Claims of [BOI-B, BOI-A, UBI, and BOI-L] and in Opposition to the Banks' Cross-Motion for Summary Judgment at 6 of 18 & n.7 (the "Trustee's Reply") [ECF No. 1668].

[9]    *See* Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 26–34; Trustee's Response to Local Rule 7056-1 Statement of [BOI-B] ¶ 1 ("Trustee's Response to BOI-B Statement of Facts") [ECF No. 1670].

[10]    *See* BOI-L, UBI, and BOI-A Response and Statement of Facts ¶¶ 15–23; BOI-B Response and Statement of Facts ¶¶ 15–23; Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 26–34; Trustee's Response to BOI-B Statement of Facts ¶ 1; Trustee's Reply at 6 of 18 & n.6; Banks' Memo at 3.

[11]    *See* BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 17.

[12]    *See* BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 19.

[13]    *See* BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 21.

[14]    *See* Affidavit of Chander Mohan Kumra Filed in Support of [BOI-B]'s Motion for Summary Judgment and in Opposition to Trustee's Motion for Summary Judgment (the "Kumra Decl."), Ex. B at 2–3, 5–26, 27–70 of 266 [ECF No. 1665-1].  The Trustee asserts that there is no credit facility agreement in the record between FDIPL and BOI-B.  *See* BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 23; BOI-B Response and Statement of Facts ¶ 23.  But Exhibit B of Mr. Kumra's Declaration appears to contain the credit facility agreement in question. The agreement is between FDIPL and the "UBI Consortium," of which BOI-B is a member bank.  *See* Kumra Decl., Ex. B at 2, 6 of 266.  While the Banks did not specifically deny the assertion that the record does not contain a credit or pledge agreement between BOI-B and FDIPL, the Banks "[a]dmitted only that the Banks' claim is based on its right to payment for seven invoices and that the language on those documents and related transaction documents speak for itself.  Otherwise, this allegation is denied."  BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 23; BOI-B Response and Statement of Facts ¶ 23.

Under these arrangements, the Affiliates were authorized to draw funds from their credit

facilities with the Banks to provide liquidity for the time between the shipment of the goods to

FDI and the date of payment on the invoices issued to FDI.[15] After each purchase of diamonds

by FDI, the Affiliates issued invoices to FDI directing that FDI make payments directly to the

Banks.[16] The Affiliates subsequently requested and obtained draws under the credit facilities

---

[15]    *See* BOI-L, UBI, and BOI-A Response and Statement of Facts ¶¶ 15–23; BOI-B Response and Statement of Facts ¶¶ 15–23; Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 29–31; Trustee's Reply at 6 of 18 & n.6; Banks' Memo at 6 of 28.

[16]    *See* Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 56, 67, 77–78; Trustee's Response to BOI-B Statement of Facts ¶¶ 1, 7–8, 10–12; Trustee's Reply at 6 of 18 & n.8. The relevant dates surrounding the transactions underlying the Banks' claims here are as follows:

On or about November 8, 2017, FZE sold diamonds to FDI, and an invoice was generated on the same date. Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶ 56. On November 9, 2017, FZE initiated the "pledge" of the invoice to BOI-L and sent a letter of exchange to FDI directing payment to BOI-L. *Id.* ¶ 57. On November 11, 2017, FZE sent notice to BOI-L of the sale, the shipment of the diamonds, and FZE's drawing of funds under its credit facility. *Id.* ¶ 58; Declaration of Sasanka S. Panda (the "Panda Decl."), Exs. D-3, E-2 [ECF No. 1661-4]. On November 21, 2017, BOI-L issued notice to FDI's bank of the transaction, instructing how the payment was to be processed, and requesting acceptance of the due date. Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶ 59. FDI's bank then sent acknowledgment that the "draft was accepted by [FDI]" on Nov. 30, 2017. *Id.* ¶ 60 (emphasis omitted).

The relevant sales between BVBA and FDI, with funding from BOI-A, took place on or about August 16, 2017, September 6, 2017, and November 10, 2017. Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 64–66. BOI-A then sent each invoice—issued on the same dates—and proof of shipment—on or around the same dates—to FDI and "FDI accepted each invoice without objection." *See id.* ¶ 69; Declaration of Arvind Singh (the "Singh Decl."), Exs. D-1, D-3, E-1, E-3, F-1, F-3 [ECF Nos. 1660-8, 1660-9, 1660-10]. At a later date, BVBA would submit this documentation with its request to draw funds under its credit facility with BOI-A. *See* Singh Decl., Ex. A at 11–12 of 42 (requiring BVBA to submit invoices and proofs of shipment before making draws under their credit facility).

The relevant sales between BVBA and FDI, with funding from UBI, took place on or about October 6, 2017, November 10, 2017, and November 29, 2017. Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 73–75. The invoices were issued, and the shipments of diamonds were made on or around the same dates. *See* Declaration of Royston Araujo (the "Araujo Decl."), Exs. D-1, D-3, E-1, E-2, E-4, F-1, F-2 [ECF Nos. 1662-6, 1662-7, 1662-8]. At a later date, BVBA would submit this documentation with its request to draw funds under its credit facility with UBI. *See* Banks' Memo at 6 of 28 ("Under the seller financing arrangements, the [Affiliates] were authorized to draw funds from their credit facilities with the Banks in order to provide liquidity during the lead time between shipment of goods being sold and the payment due dates on the commercial invoices issued to the buyers.").

As to the sales between FDIPL and FDI, FDIPL drew funds under its agreement with BOI-B between September 15, 2017 and December 15, 2017. *See* Trustee's Response to BOI-B Statement of Facts ¶ 1. BOI-B received two invoices dated September 15, 2017 from FDIPL, stamped their approval, and submitted them to FDI's bank for confirmation. *Id.* ¶ 9. FDI "accepted[ ] a draft exchange demand for the sum of these first two invoices to be paid to [BOI-B] via [FDI's bank]." *Id.*; *see, e.g.*, Kumra Decl., Ex. C at 3 (the September 15, 2017 invoice stamped "accepted" by FDI on October 6, 2017). FDI's bank and/or FDI were presented with all the invoices for

based on the invoices issued to FDI.[17]  After the invoices were issued, the Affiliates would

inform the Banks—by letter, by submission of an invoice, and/or by submission of proof of

shipment—of each sale and of the Affiliates' draws on their credit funds.[18]  As security for each

draw from their credit facilities, the Affiliates pledged the underlying invoices and their accounts

receivable to the Banks.[19]  Two of the Banks—UBI and BOI-B—were explicitly granted the

right to collect on the invoices as agents for the Affiliates.[20]  In addition to directing FDI to pay

the Banks directly, the invoices further instructed that the payments made to the Banks were for

the ultimate benefit of the Affiliates and that payments on the invoices were due between 120 to

152 days after the invoice date.[21]  In at least one instance, FDI stamped an invoice directing it to

---

the sales that took place between September 15, 2017 and December 15, 2017 with directions to make payments directly to BOI-B.  *Id.* ¶¶ 8, 10, 11; *see also* Kumra Decl., Ex. A.  The shipments of the diamonds sold in these transactions all occurred on or around the dates of the invoices.  *See* Kumra Decl., Ex. A at 27–47 of 51.  On November 20, 2017, December 4, 2017, and December 21, 2017, FDIPL requested post-shipment financing from BOI-B based on several of these transactions.  *See id.*, Ex. A at 10, 23, 30 of 51.

[17]      *See* Trustee's Response to BOI-B Statement of Facts ¶ 1; Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 29–31; Trustee's Reply at 7 of 18 & n.10.

[18]      *See* Trustee's Response to BOI-B Statement of Facts ¶ 9; Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 33–34; Panda Decl. ¶ 13; *id.*, Exs. E-1, E-2; Kumra Decl., Ex. A at 10–12, 23, 30 of 51; Singh Decl., Ex. A at 11–12 of 42; Trustee's Reply at 7 of 18 & n.11.

[19]      *See* Trustee's Reply at 7 of 18 & n.12; Banks' Memo at 7–10 of 28; Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶ 32; Trustee's Response to BOI-B Statement of Facts ¶ 12.

[20]      *See* Araujo Decl., Ex. B at 9 of 15 (UBI Pledge of Receivables with BVBA: BVBA "hereby irrevocably and unconditionally appoints [UBI], with full power of substitution, as its attorney for performing, for as long as the Secured Liabilities are outstanding, in its name, all rights and acts which [BVBA] must perform pursuant to this Agreement"); Kumra Decl., Ex. B at 56 of 266 (BOI-B Working Capital Consortium with FDIPL: "[FDIPL] irrevocably constitutes and appoints Security Trustee and each of the said Banks to be [FDIPL]'s true and lawful attorney(s) to do and execute jointly or severally for and in the name and on behalf of [FDIPL]," among other things, "(d) [t]o demand and receive all debts, sums of money, principal money, dividends, interest and dues of whatever nature."); Trustee's Reply at 8 of 18 & n.13.

[21]      *See* Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 32–35; Trustee's Response to BOI-B Statement of Facts ¶¶ 1, 7–8, 10–12; Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 56, 67, 77–78; Panda Decl., Ex. D-1 (Affiliate FZE commercial invoice directing payment to BOI-L, "Ultimate Beneficiary: Firestar Diamond FZE"); Singh Decl., Exs. D-1, E-1, F-1 (Affiliate BVBA commercial invoices directing payment to BOI-A, "in whose favor [BVBA] endorse[s] this invoice, by way of pledge," and "for ultimate credit to [account] of Firestar Diamond BVBA" (emphasis omitted)); Araujo Decl., Exs. D-1, E-1, F-1 (Affiliate BVBA commercial invoices directing payment to UBI, "[f]or further credit to Account . . . of M/s . . . BVBA with

6

pay BOI-B 150 days after the shipment date as "accepted on 10-6-17."[22]  On at least one other

occasion, a SWIFT document[23]—referencing another invoice also due 150 days after the invoice

date—was sent from FDI's bank to BOI-L indicating that the "draft was accepted by" FDI.[24]  At

oral argument, the Trustee conceded that FDI agreed to pay the Banks on the invoices issued by

the Affiliates.  *See* Hearing Transcript ("Hr. Tr.") 39:12–13, 42:6–7, Dec. 9, 2021 [ECF No.

1684].  If the payments from FDI to the Banks exceeded the amounts outstanding on the

Affiliates' credit lines as to the Banks' claims, the Banks would remit the excess to the

Affiliates.[25]

Pre-dating the transactions at issue here, the Affiliates sold FDI diamonds, and these sales

were also financed by the Banks under the same credit facilities.[26]  For instance, between March

and July 2017, FDIPL issued at least three invoices to FDI directing payment to BOI-B, all of

which were paid in full by FDI.[27]  Similarly, between November 2014 and August 2016, FZE

drew funds under its credit agreement with BOI-L for at least six sales of goods to FDI.[28]  After

---

[UBI]"); Kumra Decl., Ex. A at 4–5, 15–18, 33–36, 41, 46 of 51 (Affiliate FDIPL commercial invoices directing payment to BOI-B, "further credit to [account of FDIPL] with [BOI-B]").

[22]     *See* Kumra Decl., Ex. C at 3.

[23]     A Society for Worldwide Interbank Financial Telecommunications ("SWIFT") document is an interbank messaging system used by members to securely exchange information about transactions.

[24]     *See* Panda Decl., Exs. E–F.

[25]     *See* Banks' Memo at 8–9 of 28 (citing Panda Decl. ¶ 10 (noting that after the balance owed on FZE's credit facility had been credited, BOI-L would remit any amount left over to FZE), and Singh Decl. ¶ 9 (noting that after the balance owed on BVBA's credit facility had been credited, BOI-A would remit any amount left over to BVBA)); Trustee's Reply at 9 of 18 & n.18; *cf.* Araujo Decl. ¶ 9 ("UBI did not transfer any of the funds to BVBA.  Rather UBI simply made a credit entry in the balance owed by BVBA under the credit facility, and BVBA would make any payment for interest to UBI."); *see also supra* note 21 (listing invoices issued to FDI directing payment to the Banks for ultimate credit to the Affiliates).

[26]     *See* Trustee's Reply at 9 of 18 & nn.16–17.

[27]     *See* Trustee's Response to BOI-B Statement of Facts ¶¶ 13–14.

[28]     *See* Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 37–38.

FDI received the invoices directing payment to BOI-L, FDI paid each invoice in full to BOI-L's account at Citibank in New York.[29]  Additionally, in the eighteen months leading up to the Petition Date, BVBA drew funds under its agreement with BOI-A on at least four occasions based on sales to FDI.[30]  BVBA issued invoices to FDI directing payment to BOI-A, and FDI paid the invoices in full to BOI-A's account.[31]  Finally, between April and October 2016, BVBA also drew funds under its credit facility with UBI based on at least three sales to FDI.[32]  After FDI received the invoices directing payment to UBI, FDI paid each invoice in full to UBI's account with Bank of America.[33]  Similar to the transactions at issue here, the Banks would also credit the Affiliates' accounts—based on these previous transactions—and remit any funds they received in excess of the amounts drawn by the Affiliates.[34]

The Debtors filed for Chapter 11 protection on February 26, 2018.  *See* ECF No. 1.  A few months before the Debtors' bankruptcy filing, Punjab National Bank ("PNB") filed a complaint against Nirav Modi and several associated entities in India, alleging "the largest bank fraud in Indian history" against PNB and other banks.  *See In re Firestar Diamond, Inc.*, 615 B.R. 161, 162–64 (Bankr. S.D.N.Y. 2020) ("*Firestar I*"), *vacated in part and remanded*, 627

---

[29]     *Id.* ¶¶ 39–41.

[30]     *Id.* ¶ 43.

[31]     *Id.* ¶¶ 44–48.

[32]     *Id.* ¶¶ 50–51; Araujo Decl., Exs. C-1, C-2, C-3.

[33]     *See* Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 51–54.

[34]     *See id.* ¶¶ 48, 54, 62; *see also* Panda Decl., Ex. C-2 (invoice directing payment to BOI-L with the "Ultimate Beneficiary: Firestar Diamond FZE"); Singh Decl., Exs. C-1, C-2, C-3, C-4 (invoices directing payment to BOI-A "for ultimate credit to . . . BVBA" (emphasis omitted)); Araujo Decl., Exs. C-1, C-2, C-3 (invoices directing payment to UBI "[f]or further credit to  . . . BVBA"); Kumra Decl., Ex. D at 1, 21, 39 of 56 (invoices directing payment to BOI-B "for further credit to [FDIPL's] account with [BOI-B]" (emphasis omitted)); Banks' Memo at 13 of 28 ("All payments made by FDI were for the account of the Banks, and not for the Affiliates, and the Affiliates had no control or access to any funds paid by FDI *until* the Banks were paid in full." (emphasis added)); *id.* at 14 of 28 ("The Affiliates had no access to or control over any of the funds *unless and until* the particular Bank was paid in full for the amount of funds that the Affiliates had drawn." (emphasis added)).

B.R. 804 (S.D.N.Y. 2021); Report of John J. Carney, Examiner at 4 (the "Carney Report") [ECF No. 394].  The Court appointed an examiner who investigated whether the Debtors and their senior officers and directors were involved in the alleged fraud and found substantial evidence to support their knowledge and involvement.[35]  Against this backdrop, the Court appointed Richard Levin as Chapter 11 Trustee in June 2018, and he has administered the Debtors' estates since that time.[36]  After confirmation of a Chapter 11 liquidation plan in 2020, he was appointed as the Liquidating Trustee with all the Chapter 11 Trustee's rights and defenses as to disputed claims.[37]

The current dispute follows a remand from the District Court after a prior decision of this Court on the Banks' claims.  In the prior dispute, the Trustee had argued that the Banks' claims were barred under Section 502(d) of the Bankruptcy Code because the Banks' claims were transferred to the Banks by subsidiaries of the Debtors who had received millions of dollars in fraudulent transfers in a bank fraud scheme.  *See Firestar I*, 615 B.R. at 164.  The main point of contention addressed in this Court's prior decision was whether disallowance under Section 502(d) is a personal disability of the specific claimant or an attribute of the claim itself.  *See id.* at 165–69 (addressing whether a claim disallowed under Section 502(d) should still be disallowed if the claim was transferred from its original owner).  This Court decided that claims that are disallowable under Section 502(d) must be disallowed no matter who holds them.  *Id.* at 167 (citing *In re KB Toys Inc.*, 736 F.3d 247, 252 (3d Cir. 2013)).  In other words, "Section 502 follows the claim, not the claimant."  *Id.* at 168.  Having found that Section 502(d) applied to the

---

[35]    *See* Carney Report at 4; *see also* BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 4; BOI-B Response and Statement of Facts ¶ 4; *Firestar I*, 615 B.R. at 163.

[36]    *See* BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 6; BOI-B Response and Statement of Facts ¶ 6; *see also* ECF No. 227.

[37]    *See* BOI-L, UBI, and BOI-A Response and Statement of Facts ¶ 7 (citing Trustee's Modified First Amended Plan §§ I.1.60 at 5, 5.13.2 at 27 (the "Plan") [ECF No. 1539]); BOI-B Response and Statement of Facts ¶ 7 (same).

Banks' claims, the Court went on to determine that the Banks' claims were disallowed because "the claims are based on amounts owed to the entities that received fraudulent transfers from the Debtors in amounts exceeding the claims, and the claims would be subject to disallowance if those entities filed the claims." *Id.* at 169.

On appeal, the District Court agreed with this Court's conclusion that "a transferee of a claim is subject to the same burdens under Section 502(d) as the transferor." *In re Firestar Diamond, Inc.*, 627 B.R. 804, 808 (S.D.N.Y. 2021) ("*Firestar II*"). But the District Court remanded the case for this Court to make specific factual findings regarding the "characterization of the Banks' claims and how they are allegedly traced—or not traced—to claims by the Affiliates against Firestar," so as to determine whether Section 502(d) applies here. *Id.* at 809. In the discussion below, the Court assumes familiarity with both prior opinions.

The Court held oral argument on the Motions now before the Court on December 9, 2021. *See* Hr. Tr., Dec. 9, 2021.

## DISCUSSION

### I.    Applicable Legal Standards

#### A.  Summary Judgment

Federal Rule of Civil Procedure 56, made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure, governs the granting of summary judgment. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [movant] is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56). If the "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

"A fact is material when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007). But "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "The Court may also grant some but not all of the relief requested in a summary judgment motion if it finds disputed issues of fact as to some of the issues presented." *In re Residential Capital, LLC*, 533 B.R. 379, 395 (Bankr. S.D.N.Y. 2015) (citing Fed. R. Civ. P. 56(g)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [the movant's] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). The showing necessary to satisfy this initial burden depends on which side bears the burden of proof on a particular issue at trial. *See Read Prop. Grp. LLC v. Hamilton Ins. Co.*, 2018 WL 1582291, at *5 (E.D.N.Y. Mar. 30, 2018). When the movant has the burden of proof at trial, its own submissions in support of the motion must entitle it to judgment as a matter of law. *See Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). When the burden of proof falls on the nonmoving party, it is generally sufficient for the movant to point to a lack of evidence on an essential element of the nonmovant's claim. *See Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). To avoid summary judgment, the nonmoving party must then come forward with evidence sufficient to raise a genuine issue of fact for trial. *See id*.

"In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *In re Ampal-Am. Israel Corp.*, 2015 WL 5176395, at *10 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Matsushita*, 475 U.S. at 587). But "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation[,]" *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001), and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"When cross motions for summary judgment are made, the standard is the same as that for individual motions." *United Indus. Corp. v. IFTE plc*, 293 F. Supp. 2d 296, 299 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Id.* "Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

### B. Applicable Sections of the Bankruptcy Code

After a proof of claim has been filed, it may be disallowed for various reasons under Section 502 of the Bankruptcy Code. Section 502(d) provides, in relevant part:

> [T]he court shall disallow any claim of any entity from which property is recoverable under [S]ection 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under [S]ection 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under [S]ection 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d). Thus, "[t]he Bankruptcy Code 'requires a court to disallow an entity's claim against the bankruptcy estate if the estate is entitled to recover property from that entity, such as because of a voidable preference, but that entity has failed to first transfer this property back to the bankruptcy estate.'" *Firestar II*, 627 B.R. at 807 (quoting *In re McLean Indus.*, 30 F.3d 385, 388 (2d Cir. 1994)). "[A] transferee of a claim is subject to disallowance under Section 502(d) on par with the transferor." *Id.* at 808.

Under Sections 547(b)(4)(A)–(B) of the Bankruptcy Code, a trustee has the power to avoid preferential payments made 90 days before the filing of a bankruptcy petition or up to one year prior if the creditor was an insider at the time of the transfer. *See* 11 U.S.C. § 547(b)(4)(A)–(B). Under Section 548(a)(1)(A) of the Bankruptcy Code, a trustee may avoid fraudulent transfers and obligations two years prior to the filing of the petition. *See* 11 U.S.C. § 548(a)(1)(A). A trustee may also employ state law to avoid fraudulent transfers. *See, e.g.*, N.Y. Debt. & Cred. Law § 276 (McKinney) ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.").

## II.    <u>Whether the Banks' Claims are Transfers or Obligations</u>

It is undisputed that any claims by the Affiliates against FDI "would be disallowed under Section 502(d) because the Affiliates have not transferred to [FDI] any preferences they received under Section[s] 544, 547, and 548" of the Bankruptcy Code. *Firestar II*, 627 B.R. at 807. Accordingly, "if the Banks' claims [here] are a result of a transfer from the Affiliates, the claims must be disallowed under Section 502(d) in the same way they would be disallowed if the Affiliates were asserting them." *Id.* at 808. As noted above, the Court must now determine

"what exactly the Banks received from the Affiliates," and "how [the Banks' claims] are allegedly traced—or not traced—to claims by the Affiliates against [FDI]." *Id.* at 809.

The Trustee argues that the Banks' claims are based on the Affiliates' pledges of—or the Banks' security interests in—the Affiliates' accounts receivable, that the claims remain with the Affiliates, and that the claims are disallowable under Section 502(d). Trustee's Memo at 14–18 of 21; Trustee's Reply at 13 of 18; Hr. Tr. 38:22; 47:5–11; 48:1–13, Dec. 9, 2021. In the alternative, the Trustee argues that the Banks' claims are the results of assignments of the Affiliates' claims against FDI and, thus, disallowable under Section 502(d) because they are transfers of the Affiliates' claims. Trustee's Memo at 14, 20–21 of 21; Hr. Tr. 40: 18–22; 47:11–15; 60:8–61:2, Dec. 9, 2021. The Banks, on the other hand, argue that Section 502(d) does not apply because FDI owes direct obligations to the Banks, and that the Banks thus have direct claims—or choses in action—acquired pre-petition against FDI. Banks' Memo at 11–17 of 28; Banks' Reply at 10–14 of 21; Hr. Tr. 33:6–9, Dec. 9, 2021.

As directed by the District Court—and now as narrowed by the parties' Motions and oral argument on the Motions—this Court must now decide whether the Banks' claims are "transfers" under Section 502(d) or contractual "obligations" owed by FDI to the Banks.

"Section 101(54) of the Bankruptcy Code defines a 'transfer' broadly as every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." *In re Asia Glob. Crossing, Ltd.*, 333 B.R. 199, 203 (Bankr. S.D.N.Y. 2005). Although the Bankruptcy Code does not define an "obligation," "it presumably means '[a] formal binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty

arising by contract.'" *Id.* (quoting BLACK'S LAW DICTIONARY 1104 (8th ed. 2004)). "In

most situations, therefore, the 'obligation' will impose a 'debt' on the obligor, and give a 'claim'

to the obligee." *Id.*; *see also In re Zetta Jet USA, Inc.*, 2021 WL 3721477, at *14 (Bankr. C.D.

Cal. Aug. 17, 2021) ("Considering the ordinary common meaning of obligation, it is essentially a

contract or promise to perform some act or do something in the future.").

### A.  The Language in the Agreements Between the Parties

The parties use a variety of terms to label the transactions at issue in this case, including

such terms as discounting, factoring, seller financing, pledges of receivables, accounts receivable

financing, lockbox transactions, assignments, and obligations.  The Trustee has consistently

argued that the arrangements between the Affiliates, the Banks, and FDI are ultimately pledges

of the Affiliates' receivables to the Banks or, in the alternative, assignments of the Affiliates'

claims to the Banks—either of which, the Trustee argues, would be avoidable under Section

502(d).  Trustee's Memo at 15–21 of 21.  The Banks, on the other hand, have been less clear,

contending these are tripartite contractual arrangements that result in choses-in-action, or

obligations, benefiting the Banks with some apparent disagreement among the Banks as to

whether these transactions can fairly be labeled as discounting, or factoring.  *See* Banks Memo at

26 of 38; Banks Reply at 12–17 of 21; Hr. Tr. 18:7–21, 19:21–22, Dec. 9, 2021.[38]  At oral

argument, the Banks appeared to settle on the term "seller financing."  Hr. Tr. 18:18–19, 19:22–

24, Dec. 9, 2021.  Of course, none of the parties' labels are controlling, and the Court must

examine the relevant documents to determine the nature of the parties' relationship.  The relevant

documents here are the Deed of Hypothecation and the Amendment and Restatement Facility

---

[38]     At least some of the Banks argued that the agreements here are best described as "factoring."  *See* Hr. Tr.
18:9–18, Dec. 9, 2021.  A traditional factoring arrangement "involves the *sale* of accounts receivable at a discounted
price."  *Nickey Gregory Co., LLC v. AgriCap, LLC,* 597 F.3d 591, 601 (4th Cir. 2010) (citing *Black's Law
Dictionary* 671 (9th ed. 2009)).

Agreement between the Bank BOI-L and the Affiliate FZE, *see* Panda Decl., Exs. A, B; the

Sanction of Credit Line agreement between the Bank BOI-A and the Affiliate BVBA, *see* Singh

Decl., Exs. A, B; the Pledge of Receivables Agreement between the Bank UBI and the Affiliate

BVBA, *see* Araujo Decl., Ex. B**;** the Consortium Arrangement of Working Capital Facilities

between the Bank BOI-B and the Affiliate FDIPL, *see* Kumra Decl., Ex. B; and the relevant

invoices between the Affiliates and the Debtor FDI, *see* Panda Decl., Ex. D-1; Singh Decl., Exs.

D-1, E-1, F-1; Araujo Decl., Exs. D-1, E-1, F-1; Kumra Decl., Ex. A.  Upon a review of these

documents, the Court finds that the language of the parties' agreements, as well as the

admissions of the Banks' representatives, establish that they created pledges of accounts

receivable between the various Affiliates and Banks and, therefore, the claims here belong to the

Affiliates, not the Banks.

As to the Bank BOI-L, FZE and BOI-L executed a Deed of Hypothecation "[a]s security

for the payment of the principal, interest and other obligations . . . of [FZE]" related to FZE's

credit facility with BOI-L—the "Amendment and Restatement Facility Agreement."  Panda

Decl., Exs. A, B.  BOI-L itself asserts that under the Deed of Hypothecation, "FZE granted BOI-

L a right of *pledge* over all Receivables of FZE."  *Id.* ¶ 5 (emphasis added).  BOI-L defines

"pledge" as "a process where the exporter/seller [FZE] prepares a commercial invoice addressed

to its customer [FDI] . . . directing that payment on the invoice be made by a certain date in the

future at a specified bank account maintained by BOI-L."  *Id.* ¶ 7.  The invoice that FZE issued

to FDI that is at issue here directed FDI to pay BOI-L, with the "Ultimate Beneficiary: Firestar

Diamond FZE."  *Id.* at Ex. D-1; *see also supra* note 21.

As to the second Bank BOI-A, the Sanction of Credit Line between BVBA and BOI-A

similarly provided for security by way of pledge for BOI-A's extension of credit to BVBA.  *See*

Singh Decl., Ex. B at 7–8 of 12 ("Article 16 – Pledge") (emphasis omitted); *see also id.*, Ex. A at 27 of 42 ("All such bills/invoices submitted to us for the purpose of drawing limit/cover shall be specifically pledged/assigned in our favor as mentioned in Article 16 . . . and shall contain a clause mentioning that payment must be made to your account in our books only."); *id.* ¶ 5. All of the invoices issued by BVBA directed FDI to pay BOI-A, "in whose favor [BVBA] endorse[s] this invoice, by way of pledge," and "for ultimate credit to [account] of Firestar Diamond BVBA." *Id.* at Exs. D-1, E-1, F-1 (emphasis omitted); *see also supra* note 21.

As to the third Bank UBI, the "Pledge of Receivables Agreement" between BVBA and UBI "granted to UBI a right of pledge over all Receivables of BVBA." Araujo Decl. ¶ 5; *id.* at Ex. B. The invoices at issue here directed FDI to pay UBI "[f]or further credit to Account . . . of M/s . . . BVBA with [UBI]." *Id.* at Exs. D-1, E-1, F-1; *see also supra* note 21. Additionally, as noted above, UBI was granted the right to collect on the invoices as agent for BVBA. *See supra* note 20.

As to the fourth Bank BOI-B, FDIPL entered an agreement with a consortium of Indian Banks, of which BOI-B is a member, titled "Consortium Arrangement of Working Capital Facilities." Kumra Decl., Ex. B. As security for repayment under the facilities agreement, FDIPL "created/extended or agreed to create/extend . . . for the benefit of the said Banks securities . . . by way of hypothecation of the entire assets of [FDIPL], including, but not limited to, [FDIPL]'s . . . bills, receivables and book debts, both present and future." *Id.*, Ex. B at 8–9 of 266. All of the invoices at issue here directed FDI to pay BOI-B with "further credit to [the account of FDIPL] with [BOI-B]." Kumra Decl., Ex. A at 4–5, 15–18, 33–36, 41, 46 of 51; *see also supra* note 21. And, as noted above, the Banks were granted the right to collect on the invoices as agents for FDIPL. *See supra* note 20.

In construing the meaning of these agreements, the Court finds *Nickey Gregory Co., LLC v. AgriCap, LLC,* 597 F.3d 591 (4th Cir. 2010) and *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063 (2d Cir. 1995) instructive.

*AgriCap* was a case brought under the Perishable Agricultural Commodities Act ("PACA"). *See AgriCap*, 597 F.3d at 594. PACA protects the sellers of perishable agricultural commodities by requiring the purchasers of the commodities to maintain a trust retaining the commodities or the proceeds of the commodities until the sellers are paid, giving the sellers rights of recovery superior to all other creditors and keeping the assets outside of the bankruptcy estate. *AgriCap*, 597 F.3d at 595. While these protections under PACA are not applicable to this case, the court's discussion as to whether the accounts receivable in that case were sold (and thus removed from the trust and its protections) or functioned as collateral for secured loans (and thus remained protected in the trust) is analogous to the arguments raised here. *See id.* at 600–01. Indeed, the question of whether the agreement in that case was a sale of accounts receivable or a loan secured by accounts receivable did not turn on the statutory scheme underlying PACA. The court reviewed the documents constituting the arrangement between the parties and concluded, based on the language of the documents themselves, that "[the lender] was thus only a lender and collection agent, not a purchaser of the accounts receivable that assumed the risks of collecting on the receivables." *Id.* at 603. Specifically, the court reviewed the Preliminary Term Sheet which, among other things, listed the respective parties as "borrower" and "lender," described the credit available under the credit facility as "up to the lesser of $500,000 or 80% of [the borrower's] accounts receivable," and "specified that the purpose of the credit facility was 'to fund Borrower's working capital needs.'" *Id.* at 601. The court further explained that when the borrower transferred a receivable to the lender, the lender advanced 80% of the receivable's face

value as a loan, and when it collected on the receivable the lender, among other things, retained 80% as repayment, and remitted the balance to the borrower. *Id.* at 603.

The language of the agreements here is strikingly similar to the *AgriCap* case. The Affiliates here are listed as "Borrower[s]" in their respective agreements with the Banks, the agreements were entered into for the purpose of funding the Affiliates' working capital requirements, and the Affiliates were permitted to draw up to a sum certain or a percentage—ranging from between 60% and 100%—of the total sale price of the Affiliates' invoices with FDI. *See* Panda Decl. ¶ 6; *id.*, Ex. A at 1, 2, 4 of 50; Kumra Decl., Ex. B at 8 of 266; Singh Decl. ¶ 6; *id.*, Ex. A at 26 of 42; *id.*, Ex. B at 1 of 12; Araujo Decl. ¶¶ 5–7; *id.*, Ex. A at 4 of 6 (labeling BVBA as "Borrower"); *id.*, Ex. B at 3 of 15 (labeling BVBA as "Pledgor" and UBI as "Pledgee" and "Financer"). Other than the agreement between FDIPL and BOI-B, the agreements between the Affiliates and the Banks are either specifically named "Pledges of Receivables" or are referred to as pledges of receivables agreements by the Banks' representatives here. *See* Panda Decl. ¶ 6; Singh Decl., Ex. B at Article 16; Araujo Decl., Ex. B. And although the agreement between FDIPL and BOI-B does not specifically use the word "pledge"—and BOI-B denies that FDIPL's invoices were pledged to BOI-B, *see* Kumra Decl. ¶ 4—the Consortium Arrangement of Working Capital Facilities agreement between them sets up precisely the same arrangement as those between the other Affiliates and Banks. *See* Kumra Decl., Ex. B at 8 of 266. Indeed, as discussed above, the agreement between FDIPL and BOI-B secured the repayment of the credit extended by BOI-B "by way of hypothecation of the entire current assets of the Borrower, including, but not limited to, the Borrower's . . . bills, receivables and book debts, both present and future." *Id.* at 8–9 of 266; *see also* HYPOTHECATION, Black's Law Dictionary (11th ed. 2019) (defining general hypothecation as "[a] debtor's pledge

to allow all the property named in the security instrument to serve as collateral and to be used to satisfy the outstanding debt").

In *AgriCap*, the court also reviewed the Security Agreement which "gave [the lender] a *security interest* in virtually all of [the borrower's] assets—including crops, inventory, and accounts receivable—to secure repayment of [the borrower's] obligations under the Factoring Agreement." *AgriCap*, 597 F.3d at 602. The Banks here deny that there is a security agreement, arguing that if "the Banks simply held the commercial invoices as collection agents for the Affiliates and . . . the Affiliates always owned the accounts[,] . . . then a security agreement should be present in these transactions." Banks' Reply at 15 of 21. But as in *AgriCap*, the agreements here specifically grant the Banks a security interest in virtually all of the Affiliates' assets. *See* Panda Decl., Ex. B (FZE "hypothecat[ing] to [BOI-L] . . . all the tangible and intangible assets of [FZE]"); Singh Decl., Ex. B (BVBA pledging "[a]ll documents, securities, goods, valuables and commercial paper that [BOI-A] keeps on the Borrower's behalf, . . . all [BVBA's] present and future receivables from third parties, including, but not limited to, bills, claims, contracts, engagements, securities, investments, deposits with financial institutions, fees and commissions"); Araujo Decl., Ex. A (listing as security for the credit facility with UBI, the "[p]ledge on asset of [BVBA] upto [sic] the loan amount under . . . agreement" as well as property of BVBA); Araujo Decl., Ex. B (Pledge of Receivables Agreement between BVBA and UBI); Kumra Decl., Ex. B (FDIPL hypothecating "the entire current assets of the Borrower" to BOI-B). Moreover, at least two of the Affiliates—BVBA and FDIPL—specifically appointed the Banks as their attorneys-in-fact to act on the Affiliates' behalf—as agents—in the collection of their secured receivables. *See supra* note 20. And as noted above, the invoices underlying all

of the transactions at issue here direct payment to the Banks with the balance to be remitted to the Affiliates, similar to the agreement in *AgriCap*. *See AgriCap*, 597 F.3d at 603.[39]

For similar reasons, the *Endico Potatoes* case is also instructive. In that case, the court decided whether an assignment of accounts receivable from a borrower to a lender—and that lender's loan advances to the borrower—constituted a purchase for value or whether the lender obtained "no more than a security interest." *Endico Potatoes*, 67 F.3d at 1068. The court in *Endico Potatoes* looked at the documents underlying the transactions in dispute in determining the substance of the transactions. Specifically, the court looked at "a number of factors, including the right of the [lender] to recover from the [borrower] any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the [lender]'s right to the assets assigned if the [borrower] were to pay the debt from independent funds, whether the [borrower] has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt." *Id.* (citing *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 543–46 (3d Cir.1979)). The court ultimately concluded that

> [t]he root of all of these factors is the transfer of risk. Where the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

*Id.* at 1069.

---

[39]    Moreover, the court in *AgriCap* found that the borrower "did not enter into a traditional factoring arrangement in the sense that it transferred the risk of the noncollection of the accounts receivable to [the lender]. Rather, under the transaction, virtually all of the risk of noncollection remained with [the borrower]." *AgriCap*, 597 F.3d at 601–02. Here, not only does the language in the documents fail to establish that the risk of non-collection on the debts was transferred away from the Affiliates but, at oral argument, the Banks were not willing to rule out that they "also had a right under the credit facilities to pursue the [A]ffiliates for recovery." *See* Hr. Tr. 34:14–23, Dec. 9, 2021.

Applying these same principles, the documents here make clear that the Banks hold a security interest in the Affiliates' accounts receivable. Much like *Endico Potatoes*, the Affiliates "remain[ ] liable for the debt and bear[ ] the risk of non-payment by [FDI], while the [Banks] only bear[ ] the risk that [FDI]'s non-payment will leave the [Affiliates] unable to satisfy the loan." *See id.* As in *Endico Potatoes*, the direction on the invoices for FDI to make payments directly to the Banks had no effect on the Affiliates credit balances with the Banks. Rather, "[the Affiliates'] loan balance[s] w[ere] reduced only upon receipt of payment." *See id.*; *see also supra* note 25 (Banks declarants acknowledging that they would only credit the Affiliates' accounts after receiving payments). Additionally, the Banks could demand payment directly from the Affiliates "at any time for the entire outstanding loan balance." *Endico Potatoes*, 67 F.3d at 1069; *see* Singh Decl., Ex. A at 22, 29 of 42, Ex. B at Article 25; Panda Decl., Ex. A at 22, 23–24 of 50, Ex. B; Araujo Decl., Ex. A at 3 of 6; Kumra Decl., Ex. B at 33, 34, 52, 57 of 266. "Finally, in the event that [the Affiliates] paid all outstanding obligations to [the Banks], [the Banks] would no longer hold an interest in [the Affiliates'] outstanding accounts receivable." *See Endico Potatoes*, 67 F.3d at 1069; *see also* Singh Decl., Ex. B at Article 10; Panda Decl., Ex. A at 22–23 of 50; Araujo Decl., Ex. B at 9 of 15; Kumra Decl., Ex. B at 57, 58 of 266. Thus, "[e]ach of these provisions indicates that the primary risk of a customer's non-payment remained at all times with [the Affiliates] and that [any agreements between FDI, the Affiliates, and the Banks] did not reduce [the Affiliates'] obligations to [the Banks]" unless and until payments were made on the loans. *See Endico Potatoes*, 67 F.3d at 1069. Thus, the Banks' risk here is derivative.

In sum, the Court finds that the arrangements between the parties here did not insulate the Affiliates from the risk of non-collection on the debts owed by FDI. Accordingly, the Court

finds that, as in *AgriCap* and *Endico Potatoes*, the agreements here were loan transactions in which the Banks held no more than security interests in the Affiliates' accounts receivable as collateral for the repayment of the Banks' loans to the Affiliates. *See AgriCap*, 597 F.3d at 601, 603; *Endico Potatoes*, 67 F.3d at 1069. In other words, the Banks are only lenders to and collection agents for the Affiliates. *See AgriCap*, 597 F.3d at 603. Moreover, and as further discussed below, the Court finds that because the Affiliates retained the ultimate responsibility to repay these loans under the agreements, the agreements cannot be classified as independent, contractual obligations owed by FDI to the Banks.

### B.  The Banks' Arguments About the Timing of these Transactions

The Banks attempt to sidestep the plain language in the credit facility agreements by arguing that the claims at issue here are direct obligations owed by FDI to the Banks because the Banks acquired the claims pre-petition. *See* Banks' Memo at 11–15, 16, 27 of 28; Banks' Reply at 6, 7, 11, 12, 17, 20 of 21; Hr. Tr. 15:13, 33:23–25, 57:18–58:2, Dec. 9, 2021. But the Court disagrees. The cases cited by Banks do not support their contention that claims that would otherwise be disallowed under Section 502(d) are somehow cured, or converted to obligations, based solely on the timing of the transfers or acquisitions of these claims. In fact, these cases do not even address this timing issue and, in any event, are distinguishable.

The Banks first cite *In re MacMenamin's Grill Ltd.*, 450 B.R. 414 (Bankr. S.D.N.Y. 2011) to support their argument that "pre-petition rights acquired in the ordinary course of business for value are not considered transfers of claims but rather represent the acquiring of causes of action against the Debtor, who has undertaken an obligation." Banks' Reply at 11 of 21 (citing *In re MacMenamin's Grill*, 450 B.R. at 428–29). The court in *In re MacMenamin's Grill* examined, among other things, whether certain lenders to a debtor were protected by the

safe harbor provision of Section 546(e) of the Bankruptcy Code against the Chapter 11 trustee's avoidance action against them alleging constructively fraudulent transfers under Sections 544(a) and 548(a)(1)(B).  *In re MacMenamin's Grill*, 450 B.R. at 416, 418, 428.  As is relevant here, the court in *In re MacMenamin's Grill* decided that the lenders were not protected by the safe harbor provision because—and similar to Section 502(d)—while the safe harbor provision precludes the trustee's avoidance of transfers, it does not extend to the trustee's avoidance of incurred obligations; and the debtor there had incurred a loan obligation to the lenders.  *Id.* at 428–431.  But in *In re MacMenamin's Grill*, there was no dispute over whether the debtor had incurred an obligation.  Rather, the court looked at what the effect of an incurred obligation was on the application of the safe harbor provision.  *Id.*  Additionally, the fact that the obligation was incurred pre-petition was not a salient factor in the court's decision.

The Banks also cite *In re M. Fabrikant & Sons, Inc.*, 447 B.R. 170 (Bankr. S.D.N.Y. 2011), *aff'd*, 480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013) where the alleged transfer was a two-part transaction.  *In re M. Fabrikant & Sons*, 447 B.R. at 189.  In the first part of the transaction, the lending banks advanced proceeds under lines of credit to the debtors.  *Id.*  In the second part, the debtors fraudulently transferred the proceeds to another entity.  *Id.*  While the complaint there focused on the second part, the *Fabrikant* court found that it could not ignore the first part of this transaction, in which a loan created valid obligations owed to the lending banks because the lending banks gave value.  *Id.*  But once again, the issue in *Fabrikant* is not the issue here.  Indeed, the situation here is reversed.  The first part of the transactions in this case is the avoidable claims of the Affiliates, while the second part is the alleged subsequent transfers of those tainted claims.  Moreover, the Banks here did not loan money to FDI, but rather to the Affiliates of FDI.  As in *Fabrikant*, there is no question here that

contractual obligations were created as between the Affiliates and the Banks.  But *Fabrikant* does not assist this Court in determining whether obligations were created vis-à-vis the Banks and FDI.  Additionally, whether the obligations were incurred pre- or post-petition was also not a factor considered by the court in *Fabrikant*.

For similar reasons, the *Asia Global Crossing* case also does not support the Banks' argument.  *See Asia Global Crossing*, 333 B.R. 199.  While *Asia Global Crossing* deals with whether claims are transfers or obligations under Section 502(d), it does not address whether an obligation is created under the specific facts of this case—*i.e.*, notations on invoices directing payment to a third-party.  *See id.*  In that case, a subsidiary of the debtor and a third-party entered into an agreement under which the subsidiary agreed to deliver telecommunications capacity to the third-party.  *Id.* at 201.  Under a separate guaranty, the debtor guaranteed the payment and performance of its subsidiary's obligations under that agreement.  *Id.*  Subsequently, the third-party and the subsidiary entered into a settlement agreement that released them both from any and all claims relating to the agreement—and the debtor was expressly excluded from this release.  *Id.*  Because the subsidiary never ordered or received any telecommunications capacity under that agreement, the third-party filed a proof of claim against the debtor based on the guaranty.  *Id.*  There, the trustee argued that the guaranty was a fraudulent conveyance under Section 502(d) and that the trustee was entitled to the subsidiary's defenses.  *Id.* at 201–02.  The court then addressed whether the guaranty was a transfer or an obligation and noted that Section 502(d)

> disallows the claim of the transferee of an avoidable transfer, but does not speak to the claim of an obligee under an avoidable obligation for the reasons already stated; the avoided obligation is rendered unenforceable, and the underlying claim is subject to disallowance without regard to § 502(d).  Moreover, such a provision would be entirely unnecessary.  In short, § 502(d) applies to avoidable transfers but does not apply to avoidable obligations.

*Id.* at 202–03.  The court ruled that the guaranty gave the third-party a chose in action against the

debtor—an obligation owed by the debtor—conditioned on the default of the subsidiary, but it

did not grant the third-party any interest in or right to the debtor's property—a transfer.  *Id.* at

204.  These facts do not support the Banks' argument that a claim acquired pre-petition is an

obligation that falls outside of Section 502(d).  Thus, *Asia Global Crossing* does not speak to

whether avoidable claims held by the Affiliates that are subsequently transferred to, or acquired

by, the Banks pre-petition can result in obligations owed by a party uninvolved in those

transactions—here, FDI—to the Banks.

### C.  The Banks' Arguments that a Tripartite Agreement Existed

The Banks also contend that the documents here amount to tripartite agreements that

were created pre-petition, originated between all the parties rather than just the Banks and

Affiliates and, thus, created contractual obligations owed directly by FDI to the Banks.  *See*

Banks Reply at 8–9, 19–20 of 21; Hr. Tr. 35:9–10, Dec. 9, 2021.  But once again, the Court

disagrees.  As discussed at length above, the plain language of these agreements between the

Affiliates and the Banks set up credit facilities in which the Affiliates pledged their account

receivables to the Banks as security for the loans the Affiliates received under these facilities.

The Affiliates also issued invoices to FDI, directing FDI to make payments directly to the Banks.

Although FDI concedes that it accepted the invoices from the Affiliates and agreed to pay under

the invoices, *see* Hr. Tr. 39:12–13, 42:6–7, Dec. 9, 2021, there is no evidence in the record that

FDI knowingly accepted the risk of nonpayment on loans that the Affiliates owed to the Banks or

that there was any meeting of the minds between FDI and the Banks.  Indeed, the Banks only

became aware of the Affiliates' sales to FDI after the Affiliates forwarded the invoices and proof

of shipment of the goods to FDI.  *See, e.g.*, Panda Decl., Exs. D-1 (invoice dated November 8,

2017), D-2 (export customs declaration dated November 9, 2017), D-3 (House Airway Bill

listing flight date as November 10, 2017), E-2 (letter to BOI-L, dated November 11, 2017,

informing the Bank of the sale and submitting the above documentation in order to draw funds

under the credit facility); *see also supra* note 16 (outlining the relevant dates of these documents

between the remaining Affiliates, Banks, and FDI).  Thus, based on this timing, the Trustee

rightly contends that the Banks were not parties to these sale transactions and could not have

been extending value to FDI by providing extended payment terms on deals of which the Banks

were unaware.  *See* Trustee Reply at 12 of 18.  This is particularly true given that the Affiliates

were not obligated to even seek financing from the Banks after making a sale to FDI.  *Id.*[40]

The Banks also appear to argue that the alleged tripartite agreements were entered

contemporaneously because the Affiliates and FDI were run by the same principal who could

assent at the same time to both the Affiliates agreement with the Banks and FDI's alleged

agreement to pay the Banks in exchange for additional time to pay on the invoices.  *See* Hr. Tr.

22:23–25:9, Dec. 9, 2021.  But the Affiliates, the Debtors, and their common principal, Nirav

Modi, are three distinct legal entities.  *See, e.g.*, *Novak v. Scarborough All. Corp.*, 481 F. Supp.

2d 289, 292 (S.D.N.Y. 2007) ("'Corporations, of course, are legal entities distinct from their

managers and shareholders and have an independent legal existence . . . .'") (quoting *Port*

*Chester Elec. Constr. Corp. v. Atlas,* 40 N.Y.2d 652, 656 (1976)).  Modi's actions on behalf of

the Affiliates do not bind the Debtors.

---

[40]     The Banks contend that they were similarly not obligated to extend financing to the Affiliates, but they did
so based on past performance by FDI and the alleged promise of future payments by FDI.  Banks Reply at 16 of 21.
But past performance on invoices between the Affiliates and FDI does not establish a meeting of the minds as
between FDI and the Banks and does not retroactively make the Banks parties to any arrangements made between
FDI and the Affiliates.  In any event, it cannot override the clear language of the agreements themselves, for reasons
discussed below.

In support of their view that there was a meeting of the minds among all these parties, the Banks note that there was virtually no lapse between the time when the Affiliates drew funds from the Banks and when the goods were shipped out from the Affiliates to FDI.  *See* Hr. Tr. 25:21–26:7; 36:8–37:18, Dec. 9, 2021.  In other words, the Banks look to the timing of the invoices, the export customs declarations, and the house airway bills, which the Banks contend demonstrate that the cargo was shipped a day or two after the invoices were issued and delivered to the Banks.  *Id.*; *see also id.* at 27:11–28:13.  But while the time lapse generally was a day or two, the evidence submitted by the Banks demonstrates that the Banks were notified only *after* the Affiliates issued invoices and shipped the goods to FDI.  *See supra* note 16.  Indeed, this makes sense considering that a requirement for drawing funds under the agreements was the submission of proof of the sale and shipment of the goods.  *See supra* note 18.  Moreover, the Banks' own declarations and memorandum state that the Affiliates would inform the Banks of the sales and request financing *after* the invoices were issued and fulfilled.  *See* Trustee's Response to BOI-B Statement of Facts ¶ 1; Trustee's Response to BOI-A, BOI-L, and UBI Statement of Facts ¶¶ 29–31; Trustee's Reply at 7 of 18 & n.10.  Additionally, the Court notes that the time gaps between the original financing agreements and the subsequent invoice and shipping dates are also significant.  For example, the credit facility agreement between FZE and BOI-L is dated April 2016, while the invoice in dispute here was issued to FDI in November 2017; the credit facility agreement between BVBA and BOI-A is dated January 2017, while the invoices in dispute were issued in late 2017; the credit facility agreement between BVBA and UBI is dated October 2014, while the invoices in dispute were issued in late 2017; and the credit facility agreement between FDIPL and BOI-B is dated February 2015, while the invoices in dispute were issued in late 2017.  *See supra* notes 11, 12, 13, 14, 16.  The sequence of events and

the lapses in time are squarely at odds with the Banks' argument that the Affiliates, FDI, and the Banks entered contemporaneous tripartite contractual agreements.

The Banks also argue that a tripartite agreement exists because all of the parties extended and received consideration. Specifically, the Banks assert that they extended funds to the Affiliates to finance the Affiliates' working capital needs, the Affiliates shipped goods to FDI, and FDI received extended periods of time to pay on the invoices, allegedly in exchange for FDI's acceptance of the invoices directing them to pay the Banks. *See* Banks' Reply at 8–9, 12–13 of 21. But there is no indication on the invoices—issued by the Affiliates to FDI—that the 120 to 152 days that the Affiliates gave FDI to pay was actually an offer extended by the Banks. Nor is there any indication in the record that FDI understood this extended period of time to be consideration in exchange for anything—let alone for any benefit it was extended by the Banks.

Additionally, the Banks contend that they realized—and relied on—a profit from these transactions because the invoice amounts between the Affiliates and FDI were greater than the amounts that the Banks loaned to the Affiliates. *Id.* at 10, 13, 18–19 of 21. But the Banks' own statements and evidence contradict this contention. *See* Banks' Memo at 8 of 28 ("BOI-L then credited *the balance owed under the credit facility* before remitting any amount left over to FZE's account with BOI-L") (emphasis added); Panda Decl. ¶ 10 ("In the ordinary course, FZE had no control over the funds paid by FDI unless and until BOI-L released any net funds to FZE, *after paying the credit facility* extended by the BOI-L against the bill.") (emphasis added); Banks' Memo at 9 of 28 ("BOI-A would remit any funds to BVBA only if the transfer from FDI covered *more than the sum BVBA had drawn*.") (emphasis added); Singh Decl. ¶ 9 (same); Banks' Memo at 13 of 28 ("All payments made by FDI were for the account of the Banks, and not for the Affiliates, and the Affiliates had no control or access to any funds paid by FDI until

the Banks were paid in full."); Banks' Memo at 14 of 28 ("The Affiliates had no access to or control over any of the funds *unless and until the particular Bank was paid in full for the amount of funds that the Affiliate had drawn.*") (emphasis added). The record does not support the Banks' view that they expected any additional profit due to their receipt of payments from FDI as opposed to the Affiliates.[41]

The Banks further contend that the Southern District of New York recently addressed a nearly identical transaction and concluded that an enforceable obligation was created. Banks' Reply at 13 of 21 (citing *State Bank of India v. Shane of New York, Inc.*, Case No. 12-08916, ECF No. 44 (S.D.N.Y. Nov. 7, 2014)). But while the facts of that case are somewhat similar to this case, the questions presented and the legal analysis are not. In that case, the court found that an assignment was created by the invoices there, which directed the purchaser of diamonds to make payments directly to the bank in that case rather than the seller. *See generally State Bank of India*, Case No. 12-08916, ECF No. 44. In that case, the seller entered into a credit agreement with the State Bank of India. *Id.* This seller sold diamonds to the purchasers and issued two invoices to the purchasers based on these sales. *Id.* As in this case, the invoices there included language directing payment to the bank. *Id.* Also similar to this case, the seller and the purchasers were controlled by the same principal. *Id.* Unlike this case, however, the bank in that case argued that the amounts due on the invoices had been *assigned* to the bank and sought to recover from the purchasers under that theory. *Id.* The purchasers there argued that the invoices had been satisfied by set off payments related to subsequent sales made by the purchasers to the

---

[41]    The documents underlying the credit facility between BVBA and UBI specifically contradict the notion that the Banks were expecting an additional profit due to receiving payments from FDI rather than the Affiliates. *See* Araujo Decl. ¶¶ 6, 8 (BVBA could draw up to 100% of the total sale price to FDI under its credit facility with UBI); Araujo Decl., Ex. C (for each transaction, BVBA indeed drew the full amount of the respective commercial invoice). Consequently, if BVBA drew 100% of the sale price, UBI could not realize a profit due to repayment by FDI because the sale price and amount drawn would be the same unless, of course, FDI agreed to pay UBI more than it owed BVBA for the diamond sales. But there is no support for this in the record.

seller. *Id.* The court ultimately found that these invoices created an "equitable assignment"—

and would have created an otherwise valid "common-law assignment" but for the bank's

violation of terms under the assignment—namely its acceptance of the set-off payments noted

above. *Id.* But the court in *State Bank of India* was not presented with the question of whether

the claim there was an obligation, a pledge of accounts receivable, or a transfer of a claim under

any other theory. Rather, the court was deciding whether or not the transaction was an

assignment. Moreover, the court was not addressing the applicability of Section 502(d) in those

circumstances. Thus, the court's determination in *State Bank of India* does not support the

Bank's position here. Indeed, it is undisputed here that an assignment of the Affiliates' claims to

the Banks would be avoidable under Section 502(d). So if this Court were to follow the *State*

*Bank of India* decision and determine that the invoices issued by the Affiliates here are

assignments of claims, the Banks would lose.[42]

　　　　Lastly, the Banks urge the Court to consider the past conduct and course of dealings

between the parties. *See* Banks' Reply at 14, 16, 17–19, 19–20 of 21. More specifically, the

Banks argue that because the parties have completed transactions like the transactions at issue

here in the past, the Court can conclude that there is a tripartite agreement between the parties.

*Id.* But "[a] familiar and eminently sensible proposition of law is that, when parties set down

their agreement in a clear, complete document, their writing should as a rule be enforced

according to its terms." *W.W.W. Assocs. v. Giancontieri*, 77 N.Y. 2d 157, 163 (1990); *see also*

*Crescent Oil & Shipping Servs., Ltd. v. Phibro Energy, Inc.*, 929 F.2d 49, 52 (2d Cir. 1991)

---

[42]　　　　When asked at oral argument about the invoices in *State Bank of India* being labeled assignments by the court, the Banks asserted that the judge there "called it an assignment . . . but the analysis that the court made was that there was a right of payment" owed by the debtor. Hr. Tr. 29:15–19, Dec. 9, 2021. But as noted at oral argument, the Court is not willing to ignore the actual holding of that case finding the transaction to be an assignment and recharacterize the court's conclusion as something else.

(citing Connecticut law for the same proposition); *In re Chateaugay Corp.*, 116 B.R. 887, 902–03 (Bankr. S.D.N.Y. 1990) (citing Pennsylvania law for the same proposition).[43]  Under New York, Connecticut, and Pennsylvania law, "written agreements are construed in accordance with the parties' intent and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'"  *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) (quoting *Greenfield v. Philles Records*, 98 N.Y. 2d 562, 569 (2002)); *see also Phibro Energy*, 929 F.2d at 52; *In re Chateaugay Corp.*, 116 B.R. at 903.  "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."  *W.W.W. Assocs.*, 77 N.Y. 2d at 163; *see also Phibro Energy*, 929 F.2d at 52; *In re Chateaugay Corp.*, 116 B.R. at 903.

---

[43]     The parties do not address which state's or region's laws should apply to the contracts here.  The agreements at issue are governed by English, Indian, and Belgian law respectively, *see* Panda Decl., Ex. A at 7 of 50; Kumra Decl., Ex. B at 125 of 266; Araujo Decl., Ex. B at 10 of 15; Singh Decl., Ex. B at 11 of 12, and the parties themselves are based in London, Dubai, India, and Belgium.  The Banks cite to cases that address contracts governed by Connecticut, Pennsylvania, and New York laws, *see* Banks' Memo at 13–14 of 28, and the Trustee cites cases interpreting New York contracts only, *see* Trustee's Memo at 14–15 of 21; Trustee Reply at 15–17 of 18.

Bankruptcy courts generally apply the choice of law principles of the forum state.  *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir. 2001) ("[B]ankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."); *see also Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP)*, 673 F.3d 180, 186-87 (2d Cir. 2012).  Thus, the Court looks to the choice of law rules of New York, the forum state in this case.  Under New York law, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws."  *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing *Allstate Ins. Co. v. Stolarz*, 81 N.Y.2d 219, 223 (1993)).  An actual conflict will be found to exist where "the applicable law from each jurisdiction [that might apply] provides different substantive rules" that are "relevant to the issue at hand . . . and must have a significant possible effect on the outcome of the trial."  *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (internal citations and quotations omitted).  If no actual conflict exists, then a choice of law analysis is unnecessary.  *See IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict. . . . In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."); *Curley*, 153 F.3d at 12; *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 769 N.Y.S.2d 487, 489 (App. Div., 1st Dep't 2003) ("If no conflict exists, then the court should apply the law of the forum state in which the action is being heard.").  The parties have not addressed which jurisdiction's laws apply in these circumstances, but they also have not argued that there is any material conflict between the laws of Connecticut, Pennsylvania, and New York as they concern the parol evidence rule.  Indeed, the Court concludes that there is no material conflict.  As a choice of law analysis is unnecessary, the Court will look to New York law for this Decision, with occasional citation to the law of Connecticut and Pennsylvania.

The plain meaning of terms in a written agreement is given serious weight. "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield*, 98 N.Y. 2d at 569. "It is too well settled for citation that, if a written agreement contains no obvious or latent ambiguities, neither the parties nor their privies may testify to what the parties meant but failed to state." *Oxford Commercial Corp. v. Landau*, 12 N.Y.2d 362, 365 (1963).

Thus, it is well established that "[p]arole [sic] evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract." *Schron*, 20 N.Y.3d at 436; *see also Chateaugay Corp.*, 116 B.R. at 903. The parol evidence rule "imparts stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses . . . infirmity of memory . . . [and] the fear that the jury will improperly evaluate the extrinsic evidence." *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162 (citing Fisch, New York Evidence § 42, at 22 [2d ed.]). "Whether or not a contract provision is ambiguous is a question of law to be resolved by a court." *Van Wagner Advert. Corp. v. S & M Enterprises*, 67 N.Y.2d 186, 191 (1986). "[T]he threshold decision on whether a writing is ambiguous is the exclusive province of the court." *Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 554 (1982).

The Banks first contend that the underlying credit agreements "do not specify the mechanics as to how the 'pledge' of the accounts receivables and invoices . . . are undertaken." Banks' Memo at 14 of 28. But the Court finds nothing ambiguous about the language in the credit facilities. For the reasons discussed above, the credit facility agreements clearly pledge the Affiliates' accounts receivable as security for money loaned to them by the Banks, and the agreements clearly set forth the requirements of the Affiliates prior to drawing money under these facilities. For example, the Affiliates are required to issue invoices to their customers—

here FDI—directing payment to the Banks and are further required to submit those invoices and

proof of shipment of the goods sold to the Banks before receiving the loans. *See* Trustee's

Response to BOI-B Statement of Facts ¶ 9; Trustee's Response to BOI-A, BOI-L, and UBI

Statement of Facts ¶¶ 33–34; Panda Decl. ¶ 13; *id.* at Exs. E-1, E-2; Kumra Decl., Ex. A at 10–

12, 23, 30 of 51; Singh Decl., Ex. A at 11–12 of 42.

Second, the Banks argue that the language on the invoices themselves is ambiguous and

that the Trustee misinterprets them to mean that "the payment direction was *to* the Bank, but not

*for* the Bank's account. Rather, the direction was specifically for credit to the account *at* the

Bank of the Affiliate." Banks' Memo at 14 of 28 (quoting Trustee's Memo at 19 of 21). But the

relevant documents speak for themselves as outlined above. *See, e.g.*, *supra* note 21. Not only

are the invoices not agreements involving the Banks at all for the reasons discussed above, but

the language on the invoices is not ambiguous. The Affiliates direct that FDI pay what they owe

the Affiliates directly to the Banks with instructions for how any amount over what was loaned

to the Affiliates by the Banks will be directed back to the Affiliates' accounts. *See supra* note

21. In any event, the Banks have not submitted any evidence—parol or otherwise—that

contradicts this reading of the language on the invoices.[44] Indeed, the Banks' own declarations

here support this reading. *See supra* notes 21, 25.

---

[44]    The Banks aver that this practice of crediting the accounts of the Affiliates was an "internal mechanism the Banks utilized to retire the indebtedness" of FDI, and "the method by which the Banks tracked the repayment of the loan." Banks' Reply at 10, 15 of 21; *see also* Declaration of Chander Mohan Kumra Filed in Support of Reply Memorandum of Law [BOI-B] in Opposition to Trustee's Motion for Summary Judgment and in Further Support of its Cross Motion for Summary Judgment ¶ 7 [ECF No. 1674-1] ("[T]he Bank owned and operated the account and used the Affiliate's name to track and retire the indebtedness."). But the language on the invoices and the Banks' own papers and declarations discussed above only lead to one logical conclusion: that any amount paid to the Banks by FDI over the amount that the Banks loaned to the Affiliates would be remitted to the Affiliates. *See, e.g.*, Banks' Memo at 8 of 28 ("BOI-L then credited *the balance owed under the credit facility* before remitting any amount left over to FZE's account with BOI-L") (emphasis added); Panda Decl. ¶ 10 ("In the ordinary course, FZE had no control over the funds paid by FDI unless and until BOI-L released any net funds to FZE, *after paying the credit facility* extended by the BOI-L against the bill.") (emphasis added); Banks' Memo at 9 of 28 ("BOI-A would remit any funds to BVBA only if the transfer from FDI covered *more than the sum BVBA had drawn*.") (emphasis added); Singh Decl. ¶ 9 (same); Banks' Memo at 13 of 28 ("All payments made by FDI were for the account of the Banks,

The Banks are correct that "evidence of the course of dealing and performance and usage of trade may be employed to explain or supplement provisions of the contract," but this is not an exception to the rule that "extrinsic evidence may not be used to vary or contradict the express terms of a writing embodying the parties' final agreement" as the Banks seem to suggest. *See Phibro Energy, Inc.*, 929 F.2d at 52 (citing *Fairfield Lease Corp. v. Eastern Sportswear Co.,* 6 Conn. Cir. 347, 273 A.2d 300 (1970)); *see also* Banks' Memo at 13 of 28.  Here, the extrinsic evidence that the Banks wish to introduce is intended to override the express terms of the credit facilities and invoices, which is not permitted. *See Phibro Energy, Inc.*, 929 F.2d at 52.  The Banks' reliance on *Phibro Energy* is misplaced as the court there only considered extrinsic evidence because it determined that the meaning of a word in the contract was not clear. *See id.*; *see also In re Chateaugay Corp.*, 116 B.R. at 903–04 (finding that evidence of common trade usage and course of dealing may be introduced to define ambiguous terms).  Here, for the reasons discussed above, the language in the agreements is not ambiguous.

### III.    <u>Applicability of Section 502(d)</u>

Given that the relevant agreements between the Affiliates and Banks establish pledges of accounts receivables, the Court must next address whether such pledges are transfers under Section 502(d).  As noted above, "Section 101(54) of the Bankruptcy Code defines a 'transfer' broadly as every mode, direct or indirect, absolute *or conditional*, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." *Asia Global Crossing*, 333 B.R. at 203 (emphasis added).  Given this definition of transfer, the question becomes

---

and not for the Affiliates, and the Affiliates had no control or access to any funds paid by FDI until the Banks were paid in full."); Banks' Memo at 14 of 28 ("The Affiliates had no access to or control over any of the funds *unless and until the particular Bank was paid in full for the amount of funds that the Affiliate had drawn.*") (emphasis added).

whether a security interest in accounts receivable is "a *conditional* right to 'property . . . or an interest in property'" on its own, *see id.* at 204 (quoting *Barnhill v. Johnson*, 503 U.S. 393, 400–01 (1992)) (emphasis added), or whether a foreclosure is required to complete the transfer.  As the District Court observed, "if the Banks' claims are a result of a transfer from the Affiliates, the claims must be disallowed under Section 502(d) in the same way they would be disallowed if the Affiliates were asserting them."  *Firestar II*, 627 B.R. at 808.

The Court finds that the pledges of accounts receivable here are transfers under Section 502(d) regardless of whether the pledgee has foreclosed on the property.  Specifically, a pledge of accounts receivable is a conditional transfer of an interest in the pledgor's property, which fits the broad definition of transfer under Section 101(54) of the Bankruptcy Code. *See Asia Global Crossing*, 333 B.R. at 203–04.  The facts of *Asia Global Crossing* are instructive.  There, the court found that the debtor's guaranty of repayment of its subsidiaries' contractual obligations to a third-party was a chose in action conditioned on the default of the subsidiary. *Id.* at 204.  The court reached this determination because the guaranty did not grant any interest in or right to the debtor's property. *Id.*  Although similar to this case, the promise to repay obligations owed under a contract is not the same as securing a debt using property as collateral.  In contrast, the pledges of accounts receivable here did grant the Banks a conditional interest in the Affiliates' property—and under Section 101(54) that is all that is required to establish a transfer. *See id.* at 203–04.

But even if the Banks must foreclose on the accounts receivable before a transfer is completed, the Banks' claims here would still be disallowed under Section 502(b)(1).  Under that scenario, the claims would remain with the Affiliates and the Banks would have no claims here

at all.  *See* Trustee's Memo at 14, 20 of 21 (Trustee arguing that regardless of whether the claims were transferred, they would be subject to disallowance) (citing *Firestar II*, 627 B.R. at 808).

## <u>CONCLUSION</u>

For the reasons stated above, the Trustee's motion for summary judgment is granted, and the Banks' motions for summary judgment are denied.  The Trustee should settle an order on five days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon opposing counsel.


Dated: New York, New York
       September 1, 2022


                                        */s/ Sean H. Lane*
                                        UNITED STATES BANKRUPTCY JUDGE